**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **In re** | : | **Chapter 11** |
| **TERRAFORM LABS PTE. LTD.** | : | **Case No. 24–10070 (BLS)** |
| **Debtor.**[1] | : | |

**DECLARATION OF CHRIS AMANI IN SUPPORT OF THE**
**DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY RELIEF**

I, Chris Amani, pursuant to section 1746 of title 28 of the United States Code, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information, and belief:

1. I am the Head of Company Operations (effectively the Chief Executive Officer)[2] of Terraform Labs Pte. Ltd. ("**TFL**" or the "**Debtor**"). I have served in this capacity since June 8, 2023. Before that, I was the Debtor's Chief Operating Officer and Chief Financial Officer. Prior to joining TFL in June 2022, I was Senior Vice President of Product, M&A, & Partnerships at TimeClockPlus, LLC ("**TCP Software**"), a global technology company; Chief Executive Officer of Humanity (prior to its acquisition by TCP Software), an employee schedule solutions business; a Director of Financial Planning and Analysis at MongoDB Inc., a database provider; and a Director of Financial Planning and Analysis at Zynga Inc., a developer running

[1] The Debtor's principal office is located at 1 Wallich Street, #37-01, Guoco Tower, Singapore 078881.

[2] The title of Head of Company Operations is akin to Chief Executive Officer. As further described in the *Motion of Debtor for Entry of Interim and Final Orders (I) Authorizing Debtor to (A) Pay Prepetition Employee Obligations and (B) Maintain Employee Benefit Programs, and (II) Granting Related Relief* (the "**Employee Wages Motion**"), most of the Debtor's workforce (including executives) is employed either through a third-party online payroll and human resources platform called Deel, Inc., or by the Debtor's wholly-owned subsidiary, Proximity Panorama, LDA, rather than being employed directly by the Debtor.

social video game services, among other positions. I hold a Bachelor of Science degree in Business Administration from the University of Arkansas and a Master of Business Administration degree from San Jose State University.

2. I am generally knowledgeable and familiar with the Debtor's day-to-day operations, business, financial affairs, and books and records, as well as the circumstances leading to the commencement of this chapter 11 case. I am authorized to submit this declaration (the "**Declaration**") on behalf of the Debtor (i) to assist the Court and other parties in interest in understanding the circumstances that led to the commencement of this chapter 11 case on January 21, 2024 (the "**Petition Date**") and (ii) in support of the Debtor's voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). I also refer to the *Declaration of Michael Leto in Support of the Debtor's First Day Motions*, filed concurrently herewith, which supports the motions filed herewith seeking orders granting various forms of relief intended to stabilize the Debtor's business operations, facilitate the efficient administration of this chapter 11 case, and expedite a swift and smooth reorganization.

3. Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents (including the Debtor's books and records), my personal experience, knowledge, and information concerning the Debtor's operations and financial condition, information provided to me by the Debtor's employees, or my discussions with the Debtor's officers and advisors, including professionals at Weil, Gotshal & Manges LLP ("**Weil**"), Alvarez & Marsal North America LLC ("**A&M**"), WongPartnership LLP ("**Wong**"), and Richards, Layton & Finger, P.A. ("**RLF**," collectively with Weil, A&M, and Wong, the "**Advisors**"). If called upon to testify, I would testify competently to the facts set forth in this Declaration.

4. This Declaration has been organized into three (3) sections. The **first** provides an overview of the Debtor and its chapter 11 case. The **second** provides a short primer on blockchain and cryptocurrency and describes the Debtor's business, organizational and capital structure, history, and current operations. The **third** describes the events leading to the filing of this chapter 11 case.

## I. OVERVIEW

5. As discussed in further detail below, the Debtor is a software development company. Its primary business purpose is to develop and support (i) software used to create and run the current Terra blockchain network ("**Terra**" or the "**Terra Blockchain**"), which was started in May 2022, and (ii) an entire suite of tools, protocols, and applications that operate on the Terra Blockchain, making transactions on the network easier, faster, and more user-friendly. As described below, the Terra Blockchain is a unique decentralized digital ledger of peer-to-peer transactions involving digital assets designed specifically to that network.

6. Importantly, the Debtor does not currently issue or sell digital tokens for value (i.e., to generate revenue) and it is not a trading platform for digital currencies. The Debtor does not have–and never had–"customers" in the way many digital asset companies do, like Coinbase and FTX (exchanges for digital assets) or Celsius Network (a cryptocurrency lending and borrowing platform). Nor did it make loans of cryptocurrency assets like Genesis. Users of the Debtor's products do not have accounts with the Debtor, and the Debtor never held, and does not hold, any customer funds. In fact, the Debtor does not currently operate to gain profits; all revenue earned is expected to be reinvested in the business and the Terra blockchain ecosystem.

7. The Debtor was established in 2018, when it began developing an earlier version of the Terra blockchain network (the "**Terra Classic Blockchain**"). As described in more

detail below, on April 24, 2019, TFL minted one billion LUNC tokens ("**Luna Classic**"), the Terra Classic Blockchain's native token. In addition to being the staking and governance token of the Terra Classic Blockchain, Luna Classic tokens were programmatically tradeable with the TerraUSD "stablecoin" (known by its ticker "**UST**") and other Terra network stablecoins. Stablecoins are a type of cryptocurrency designed to maintain a stable price over time by "pegging" their value to the value of a referenced asset, which in the case of UST was one U.S. dollar. UST's "peg" to the dollar was maintained by the mint-burn protocol that incentivized holders of UST and Luna Classic to arbitrage between the two currencies based on their par value.[3]

8. After the collapse of the market for UST and Luna Classic in late May 2022 (described below in more detail), after consultation with validators, builders, and others in the Terra community,[4] the Debtor relaunched the Terra Blockchain, including an entirely new token "LUNA" ("**Luna**"). The Debtor did not sell Luna in the open market. Rather, it "airdropped" (i.e., transferred as a gift) Luna tokens into the wallets of anyone holding Luna Classic at the time of Luna Classic's collapse. Luna is used for securing and governing the Terra Blockchain. It also has an inherent value on secondary cryptocurrency trading markets. The Debtor no longer mints or trades stablecoins such as UST; thus, Luna is not tethered to a "sister" cryptocurrency. Luna currently has a market capitalization of approximately $410 million USD (or approximately $700 million on a fully diluted basis, including non-circulating supply, as of January 29, 2024).

9. Luna's value on the secondary cryptocurrency markets should be correlated to its utility on the Terra Blockchain and beyond. "Validators" on the Terra Blockchain record

---

[3] Specifically, when UST's market price rose above a dollar, participants could burn a dollar's worth of Luna Classic and receive one UST, which they could sell at the greater than $1 market price of UST. This encouraged the creation of more UST, thereby increasing the circulating supply of UST and lowering its price towards a dollar. Conversely, if the market price of UST dropped below $1, a participant could burn one UST and receive one dollar's worth of LUNA, thereby lowering the circulating supply of UST and raising its price towards a dollar.

[4] These concepts are explained below.

and validate blockchain transactions between users, and users of Luna can "stake" their Luna to the validator, in each case in exchange for receiving a small transaction fee from the user initiating the transaction in the form of Luna.[5] The more users that transact on the Terra Blockchain, the more fees (in the form of cryptocurrency) that are generated and thus shared with Luna stakers. The Debtor also participates in staking in its capacity as a user, and thereby the Debtor contributes to the growth of the Terra Blockchain. The Terra Blockchain can attract more users by offering a diverse, practical, secure, and innovative set of tools, applications, and functionalities. The Debtor's primary business purpose is to continue to maintain and improve the Terra Blockchain, thereby attracting additional users to participate on, and developers to build useful applications on, the Terra Blockchain. To that end, the Debtor has introduced and is in the process of creating several exciting new software applications, described below in more detail.

10. On February 16, 2023, the Securities and Exchange Commission ("**SEC**") filed a complaint in the District Court for the Southern District of New York (the "**District Court**") naming the Debtor and its founder, Kwon Do Hyeong, as defendants, and alleging six (6) claims for violations of the Securities Act of 1933 (the "**Securities Act**") and the Exchange Act of 1934 (the "**Exchange Act**" and together with the Securities Act, the "**Acts**"). The SEC claims that prior to May 2022 the Debtor unlawfully offered and sold unregistered securities and securities-based swaps, as well as engaged in securities fraud. The action, which seeks a permanent injunction, disgorgement, and civil money penalties, is currently pending before the Honorable Jed Rakoff (*SEC v. Terraform Labs Pte. Ltd.*, *et al.*, Case No. 1:23-cv-013460-JSR (S.D.N.Y.)) (the "**SEC Enforcement Action**").

---

5 The concept of "validating" and "staking" is described in more detail below.

11. On December 28, 2023, the District Court granted partial summary judgment to the SEC, finding that the Debtor and Mr. Kwon offered and sold unregistered securities by issuing TFL's native tokens to investors. The District Court also granted partial summary judgment to the Debtor and Mr. Kwon on the SEC's securities-based swap counts. Finally, the District Court denied the parties' cross-motions for summary judgment with respect to the securities fraud claims. Although the District Court has not yet addressed remedies or entered any money judgment, the Debtor faces significant liability as a result of the summary judgment decision and the pending securities fraud claims to be resolved at trial, which is scheduled to begin on March 25, 2024.

12. As discussed in more detail below, the Debtor disagrees with the District Court's summary judgment decision and believes it should be reversed because the cryptocurrency tokens at issue are not securities under the Acts, and the SEC Enforcement Action therefore lies outside the SEC's jurisdiction. After the District Court enters its final judgment following trial, the Debtor intends to file an appeal in the U.S. Court Appeals for the Second Circuit.

13. Leading up to and following the summary judgment decision, the Debtor began considering its options to maximize value for all stakeholders. The Debtor retained Weil as appellate and restructuring counsel beginning in November 2023, retained Wong as special foreign counsel in January 2024, and retained A&M (through Weil) as financial advisors in January 2024. In addition, the Debtor identified John Dubel as an independent director with a strong history of involvement in companies accused of wide scale misconduct. On January 19, 2024, the Debtor's board of directors (the "**Board**") unanimously appointed John Dubel as an independent director. The Debtor's Advisors and Mr. Dubel are focused on ensuring proper governance, controls, and oversight at the Company.

14. Because of the size of the potential money judgment in the SEC Enforcement Action, the Debtor would likely not be able to satisfy such judgment nor would it be able to post the supersedeas bond necessary for an appeal. Thus, without the protection of chapter 11, the Debtor would likely have to liquidate after the trial and entry of final judgment, forfeiting its right to an appeal and causing disastrous consequences for the Debtor's business, its approximately 60 employees, its creditors, and the hundreds of thousands of holders of Luna that depend on the Debtor to maintain the Terra Blockchain—the same token holders the SEC purports to protect. With the assistance of its Advisors, the Debtor considered whether chapter 11 relief could provide it with the necessary breathing room to pursue the appeal, to continue its software development business, and to help sustain and grow the over $400 million in Luna value for all stakeholders. After extensive discussion with the Advisors over the course of multiple meetings, on January 21, 2024, the Board concluded that a self-funded chapter 11 filing represented the optimal path forward for the Debtor and would best position it for long-term success. Shortly thereafter, on January 21, 2024, the Debtor filed a voluntary petition for chapter 11 relief in this Court.

15. Significantly, the Debtor's chapter 11 filing triggered the automatic stay under the Bankruptcy Code, which will stay the enforcement of the SEC's money judgment while the Debtor seeks to obtain vacatur of the District Court decision on appeal. To be clear, the Debtor is not seeking to use the automatic stay to prevent the SEC from continuing to litigate the SEC Enforcement Action against the Debtor. The Debtor intends to proceed with the trial scheduled for March 25, 2024. But the automatic stay will prevent the SEC from taking actions in connection with enforcing any money judgment.[6] Other than any money judgment, the Debtor does not

[6] To that end, immediately after filing its chapter 11 petition on January 21, 2024, the Debtor filed a Notice of Suggestion of Bankruptcy in the SEC Enforcement Action, informing the District Court and the SEC of the

believe the SEC Enforcement Action, including the injunctive relief the SEC seeks in connection therewith, is likely to have a significant impact on the Debtor's current business. The Debtor's current business does not involve TFL's creation of new cryptocurrency tokens.

16. A chapter 11 case is, therefore, critical to the Debtor's ability to operate as a going concern, preserve value for its creditors and stakeholders (including the Terra community), provide an orderly process for resolving competing claims against it, and pursue an appeal of the SEC Enforcement Action. A successful appeal would eliminate the single largest claim against the Debtor, thereby benefiting the Debtor, its creditors, and the community more broadly. If the SEC prevails in the appeal, the Debtor can utilize the chapter 11 tools to allocate value among creditors, including the SEC. By utilizing the chapter 11 process and the tools made available by the Bankruptcy Code, the Debtor hopes to emerge as a reorganized and stronger enterprise for the benefit of all of its stakeholders.

## II. THE DEBTOR'S BUSINESS

### A. Cryptocurrency 101

17. To better understand the Debtor's history, business operations, and events leading up to this chapter 11 case, it is helpful to provide a brief primer on blockchains and cryptocurrency.

#### a. Blockchains

18. Blockchains are decentralized digital public ledgers run by communities of individuals and independent organizations that record and enable secure peer-to-peer transactions without third-party intermediaries. Blockchains enable the existence of digital assets by allowing

Debtor's chapter 11 filing and noting that the continuation of the SEC Enforcement Action is subject to an exception from the automatic stay, but observing that any activity in connection with the enforcement of any money judgment is automatically stayed. Notice of Suggestion of Bankruptcy, SEC Enforcement Action (ECF No. 169).

participants to engage in and confirm transactions without the need for contracts, banks, or other central certifying authorities, and they enable "trustless" transactions that are based entirely on the operation of open-source, auditable code and algorithms. When a participant requests a transaction on the blockchain, members of the community on the peer-to-peer computer network use algorithms to validate the transaction and the user's status, and then combine that transaction with other transactions to create a new block of data. The new block is added to the existing blockchain in a manner that is public, reviewable, permanent, and unalterable; this completes the transaction. As each new block refers back to and "connects" with the immediately prior block associated with it, the addition of each new block adds to the blockchain, similar to a new link being added to a chain.

19. Blockchains rely on cryptographic techniques and validation and replication of the ledger among its many members to ensure that individual transactions on any given copy of the ledger cannot be altered or counterfeited. And because the ledger is public and distributed, meaning that there are many copies of the entire blockchain, it is readily apparent if a single copy of the blockchain has been tampered with or is otherwise corrupted. Thus, blockchain technology is strongly resistant to tampering or counterfeiting.

20. Generally speaking, blockchains operate using a consensus mechanism to validate the transactions and blocks added to the blockchain. Consensus mechanisms can differ from blockchain to blockchain. On public blockchains, consensus mechanisms generally take one of two forms: Proof of Work or Proof of Stake. Proof of Work blockchains use virtual "miners" to secure and verify transactions by processing complex mathematical problems. In contrast, Proof of Stake blockchains use a network of "validators" who contribute—or "stake"—their own cryptocurrency in exchange for a chance to validate new transactions, update the blockchain, and

earn a reward. Validators forfeit their staked coins if the transactions are not verified promptly or accurately, and they are rewarded with transaction fees and block rewards in the form of additional cryptocurrency for their validation services. The Terra Blockchain runs on a Proof of Stake model.

21. Various parties can participate on a blockchain network, including, among others, users, validators, stakers, and developers. Generally speaking, a user is a participant on the blockchain that interacts with the network in various ways, including transferring tokens back and forth, interacting with protocols, and staking. Users pay a transaction fee in the form of cryptocurrency when they execute a transaction on the blockchain—a portion of which is distributed to stakers and a portion of which is taken by validators. Validators are individuals or businesses that run software to validate transactions, often requiring specialized hardware to do the computational work of validating transactions. Validators set and charge a commission, paid out of the staking award in the form of a cryptocurrency, in exchange for performing the validation. Stakers are a subset of token-holding users that stake their cryptocurrency with validators to secure the network. In return, stakers receive a portion of the cryptocurrency transaction fees users pay in connection with the transaction. Separately, developers build useful software tools and applications on the blockchain. In simple terms, without developers creating practical applications for users to interact with, blockchains would have little purpose.

22. No single entity owns or operates a public blockchain; instead, the infrastructure is collectively maintained by a decentralized public user base, which stores the many copies of the blockchain and validates new transactions. The blockchain thus does not rely on governmental authorities, financial institutions, or any other central certifying authority to create, transmit, or determine the value of digital assets or the transactions conducted. Nor does it rely on trust or contracts. Rather, the combination of a decentralized and public ledger, open source

software, strong cryptographic security, and a defined mechanism for validating transactions ensures by operation of computer code—without traditional contracts or intermediaries—that the blockchain and all the information recorded on it are valid. Many blockchains, like the Terra Blockchain, have governance mechanisms that allow participants to propose changes in the blockchain and its operation, which are then voted on by the community and implemented only if approved.

23. In short, a blockchain network is the blockchain ledger, along with everyone contributing to and using that ledger; and a blockchain protocol is the rules that govern the operation of the blockchain. In addition to supporting the transactions described above, many blockchains allow for the creation and operation of additional protocols on the network that can perform different functions, including lending and borrowing cryptocurrency, creating new tokens, exchanging one cryptocurrency for another, and transferring a cryptocurrency from one blockchain to another. These protocols can be created by anyone, and they generally operate on a peer-to-peer basis, without any centralized intermediary. Most of the software code used to operate a blockchain is open source, which allows anyone to examine the code to understand how it works, evaluate its functionality and security, and propose changes to the code to improve its operation. In the case of Terra, most of the code written by the Debtor for the operation of the Terra Blockchain is open source, and the Terra Blockchain itself was created as an instance of the Cosmos blockchain architecture (which is itself an open source project).[7]

[7] Cosmos is a decentralized network of independent, scalable, and interoperable blockchains upon which the Terra Blockchain was built. Cosmos allows blockchain developers, such as the Debtor, to break the barriers between otherwise siloed blockchains by allowing them to transact with each other (i.e., cross-chain transactions).

**b. Cryptocurrency**

24. Cryptocurrency tokens are a medium of exchange, and the blockchain technology controls the creation of new tokens and verifies transactions. Every single transaction, and the ownership of every single token in circulation, is automatically recorded on the blockchain—that is, recorded on many copies of a public database—which effectively contains a record of all account balances. Each account on the blockchain is identified solely by its unique public key, and is secured with its associated private key, which is kept secret, like a password. The combination of private and public cryptographic keys constitutes a secure digital identity in the form of a digital signature, providing strong control of ownership.

25. A cryptocurrency wallet is a device or program that stores cryptocurrency keys and allows holders to access their cryptocurrency tokens and send them to other wallets. Wallets contain a public key (the wallet address), and a private key is needed to sign, or execute, cryptocurrency transactions. Anyone who knows the private key can control the tokens associated with that address. Because transactions on the blockchain are public, tokens can be traced from wallet to wallet using open-source tools that can search for wallets and transactions.

26. The value of any given cryptocurrency token as a medium of exchange is determined by supply and demand for it, with prices being determined by mutual agreement, by barter, or by merchants that accept the digital asset. People also can buy or sell digital assets for fiat currencies, such as the U.S. dollar, on centralized exchanges, like Binance or Coinbase, and decentralized markets like Astroport,[8] or through private sales.

27. Although the value of most tokens can be volatile, some tokens are "stablecoins," a type of cryptocurrency designed to maintain a stable price over time by "pegging"

8 https://astroport.fi/

their value to the value of a referenced asset, such as the U.S. dollar. For example, a U.S. dollar-based stablecoin is a token that resides on a blockchain and is designed to trade for one dollar. "Asset-backed" stablecoins are backed by assets that can include fiat currency, bonds, or commercial paper. "Algorithmic" stablecoins, by contrast, are designed to maintain their price peg via algorithms that control the supply of the token, and thus impact the willingness of market participants to exchange the token for a given amount of fiat currency. Although algorithmic stablecoins can be traded for fiat currency on centralized and decentralized markets, the algorithms designed to maintain their peg rely on programmatic mechanisms, like the Terra mint-burn mechanism (described below), to facilitate conversions between the stablecoin and the associated balance token(s). Algorithmic stablecoins, by their nature, do not carry a promise that anyone will, in fact, trade the stablecoin for the amount of fiat currency to which it is pegged.

**B. Company Overview**

**1. Company History**

28. The Debtor is an open-source software development company that specializes in blockchain technology. The Debtor traces its roots back to 2018, when the Debtor's co-founder, Mr. Kwon, along with others, began developing the Terra network. The Debtor was incorporated as a limited exempt private company in the Republic of Singapore on April 23, 2018. Mr. Kwon and others outlined a novel approach to the price volatility of cryptocurrencies in a white paper announcing the creation of the Terra Classic Blockchain and the Luna Classic token, the first crypto asset developed by the Debtor.

29. In April 2019, Mr. Kwon and others published another white paper, entitled "Terra Money: Stability and Adoption," which announced the adoption of Terra's suite of stablecoins:

> Recognizing strong regionalities in money, Terra aims to be a family of cryptocurrencies that are each pegged to the world's major currencies. Close to genesis, the protocol will issue Terra currencies pegged to USD, EUR, CNY, JPY, GBP, KRW, and the IMF SDR. Over time, more currencies will be added to the list by user voting. TerraSDR will be the flagship currency of this family, given that it exhibits the lowest volatility against any one fiat currency (Kereiakes, 2018). TerraSDR is the currency in which transaction fees, miner rewards and stimulus grants will be denominated.

30. As with other stablecoins, UST's value was pegged to the U.S. dollar through the algorithm tying its value to Luna Classic. The algorithm maintained UST's price through a mechanism in which UST and Luna Classic would be "minted" (created) or "burned" (destroyed) in parallel. In other words, the mint-burn mechanism was coded into the Terra Classic Blockchain itself by using Luna Classic as the variable counterweight to Terra stablecoins: A person could always use the Terra Classic Blockchain itself to exchange $1 worth of Luna Classic for $1 worth of UST, and vice versa, creating an arbitrage opportunity if the price of UST dropped below (or rose above) the value of the peg. Such an exchange would automatically cause the Terra blockchain either to mint (or burn) UST to increase (or decrease) the supply, and return the market value of UST to its pegged price. This programmatic process did not involve activity by the Debtor. Rather, users used the mint-burn mechanism by interacting with the Terra Classic Blockchain, not by interacting with the Debtor. To obtain U.S. dollars (or any other fiat currency), however, a holder still would need to sell its Luna Classic (or UST) on a centralized or decentralized market. The Debtor did not operate any such markets.

31. As noted above, on April 24, 2019, the Debtor launched the Terra Classic Blockchain and created one billion Luna Classic tokens (what is often referred to as the "genesis block"). Luna Classic tokens, in addition to being algorithmically tradeable with UST via the mint-burn mechanism, were the staking and governance token of the Terra Classic Blockchain.

Luna Classic was therefore created as the counterpart to the Terra stablecoins, to validate transactions on the Terra Classic Blockchain and to enable voting for governance proposals. The mint-burn mechanism by which UST and other stablecoins could be created became operational in September 2020.

32. Following the launch of the Terra Classic Blockchain, users began to populate the network, develop and use applications on it, and acquire Luna Classic and UST. Over time, the Debtor also created other protocols and cryptocurrencies.[9]

33. UST experienced at least two significant "de-pegging" events during its existence.[10] First, in May of 2021, the market price of UST declined below $1, but within a few days recovered and the peg was restored. Following the May 2021 de-peg, Terra community concerns about UST stability led to proposals to create a reserve of cryptocurrency tokens that could be used to protect UST from significant price disruptions. As a result, on January 19, 2022, the formation of Luna Foundation Guard, Ltd. ("**LFG**") (described below) was announced, and TFL contributed millions of Luna Classic tokens to LFG. Over the course of the following months, LFG sold such tokens to amass over $3 billion in reserves held in BTC, stablecoins, and a small number of other digital assets.

---

[9] In December 2020, the Debtor launched the "Mirror Protocol," which allowed users to create digital assets designed to track or "mirror" the price of real world assets. The Mirror Protocol also enabled users to obtain "MIR tokens," which were "governance tokens" that, among other features, gave their holders voting power over the development and structure of the Mirror protocol, including the right to propose changes. For example, users were able to propose for community approval new mirrored assets beyond those that were available when the Mirror protocol launched. These mirror assets, or "mAssets," could be traded in peer-to-peer transactions and on trading platforms.

In March 2021, the Debtor announced the launch of the "Anchor Protocol," a decentralized protocol that accepted deposits of UST and allowed users to borrow UST by pledging other digital assets as collateral. The Anchor Protocol paid UST as digital "interest" to depositors.

[10] A "de-pegging" event occurs when a stablecoin, whose value is pegged to another currency, decreases or increases in value relative to the currency to which it is pegged.

34. Second, on or about May 6, 2022, sudden and heavy selling of UST by a small number of market participants caused UST to de-peg from the U.S. dollar and its price to decline steeply. Over the course of several days, TFL, using some of the LFG reserves and several hundred million dollars' worth of its own assets, tried to resist this sell pressure and support the price of UST in order to try to re-peg it. But the massive tidal wave of selling caused the price of UST to collapse to nearly zero, and the price of Luna Classic collapsed in parallel.

35. After the collapse of the prices for UST and Luna Classic, the Debtor retained its remaining assets in its treasury. In late May 2022, TFL created the new Terra Blockchain, from which Luna was "airdropped" at chain genesis to Luna Classic and UST token holders on the Terra Classic Blockchain, in accordance with a governance proposal by Do Kwon on behalf of TFL that was approved by the community.[11] In accordance with the approved governance proposal, a portion of the newly issued Luna was placed in a "community pool" account on the Terra Blockchain, which is a common bucket of tokens that can be deployed based on community proposals that have been approved by the requisite number of community token-holder votes (the "**Community Pool**"). TFL did not intend to receive, and did not retain, any Luna tokens in the airdrop, and there was no sale of any of the Luna tokens.[12] The Debtor has used its remaining treasury, including non-Luna assets and the community-granted Luna, to support the new Terra Blockchain. As of today, the value of outstanding Luna tokens that drive the new Terra Blockchain is over $400 million.

---

[11] https://bit.ly/4b9cRJb.

[12] As described below, pursuant to a community-approved proposal, members of the Terra community recently independently elected to provide 150 million Luna to the Debtor's treasury. http://bit.ly/3OIJpQH.

36. Following the start of the new Terra Blockchain, TFL approached the community with a proposal to grow the new Terra Blockchain and fund other developers that contribute to its operation:

a. TFL would negotiate and pay for community tools/projects using its non-Luna treasury and conduct due diligence on a proposed project's potential value-add to the network and ability to execute, relieving a significant burden on the community.

b. TFL would provide Foundation (a best-in-class, high-performance infrastructure, indexer[13] and relayer application,[14] described in more detail below) to all credible builders on the new Terra Blockchain, significantly reducing protocol developer operating expenses and enabling developers to provide a differentiated experience.

c. In implementing grants from TFL's treasury to users, TFL would provide additional Luna as incentives to teams that develop applications and protocols that attract users to the Terra Blockchain. Additional users result in more transactions and engagement within the Terra Blockchain and additional fees.[15] These incentives will vest based on time and total Luna market cap, avoiding short- to medium-term price fluctuation, encouraging long-term commitments from teams, and giving teams upside exposure.

d. TFL would provide collateral (in the form of non-Luna cryptocurrencies from TFL's treasury like BTC, ETH, stablecoins, and others), matching Luna from the Terra Community Pool to provide liquidity on Terra to attract developers and users to the Terra Blockchain.

e. TFL would implement a Fee Share Module[16] to match 50% of fees generated by Terra applications with stablecoins such as USDC and USDT until January 2025, enabling teams contributing to the Terra Blockchain to earn 75% of the fees they generate on-chain. The Fee Share Module would attract developers to the Terra Blockchain by offering higher fee earning potential.

---

[13] An indexer helps query and analyze data stored on a blockchain by retrieving information on the blockchain, including wallet and transaction information. It may also offer additional features such as indexing smart contract events, filtering data based on specific criteria, and enabling complex queries.

[14] Blockchain relayers are third-party services that facilitate the communication and transaction of data between different blockchain networks. They do this by acting as intermediaries between the networks, translating data between different protocols, and ensuring that transactions are processed correctly

[15] As discussed above, "fees" refer to the small portion of each transaction paid in kind to blockchain validators for confirming the transaction. Fees are generated each time a transaction on the blockchain is confirmed by a validator.

[16] The Fee Share Module is a blockchain upgrade that redirects fees from stakers to teams developing applications on the Terra Blockchain.

f. TFL would continue to support the chain, offering financial and non-financial support to community teams, organizing community events, driving awareness of the community and its projects, and building out new products like Enterprise, Warp, Alliance, Station, Tashkent, Verity, and Quill--all in service of the network's stakeholders. These are described below in more detail.

37. In response to this proposal and in recognition of TFL's support of the new Terra Blockchain, in October 2023, the Terra community approved a grant of 150 million Luna to be provided to TFL to support the work outlined above, with 100 million Luna transferred to TFL's treasury, 25 million Luna earmarked for strategic partnerships and community project incentives, and 25 million Luna for a liquidity fund to be matched with the Debtor's non-Luna treasury and deployed opportunistically. The 125 million Luna in the first two buckets vest over five (5) years, with the 25 million Luna in the liquidity fund not being subject to vesting. TFL has continued to build new applications and support the new Terra community, as described below in more detail.

38. As noted, the Debtor holds a significant sum of Luna in the Debtor's treasury pursuant to the community grant. Such Luna is not being held as an investment—its purpose is to be deployed in furtherance of improving the Terra network. If Luna is successful and its value continues to increase, the Debtor will eventually be able to fund its operations for years to come with the Luna grant. Thus, it is imperative that the Debtor be permitted to continue to operate and launch its important applications in development, maximizing value for all of the Debtor's stakeholders.

**2. Operations**

39. True to its name—Terraform—the Debtor's goal is to foster a self-sustaining digital network with a vibrant and flourishing community of users. Utilizing its globally distributed workforce of experienced software developers, the Debtor produces and maintains next-generation blockchain technology beyond just the basic recording of decentralized peer-to-

peer transactions. The Debtor's technology facilitates complex decentralized transactions between independent blockchains (cross-chain transactions), executes smart-contracts (programmable transactions that automatically execute once certain criteria are met), and empowers decentralized autonomous organizations (digital management structure with no central authority, governed by smart contracts). For example, the Debtor offers a unique digital wallet application that allows users to execute transactions with cryptocurrency tokens on the Terra Blockchain. The Debtor does not currently earn revenue on its software products, but it may do so in the future as adoption of some of these tools grows.

**a. Terra Blockchain**

40. The Terra Blockchain is a decentralized public blockchain governed by community members. It includes (i) a decentralized digital public "ledger" that recorded and enables secure peer-to-peer transactions, (ii) a community of users contributing to and using that ledger, and (iii) a blockchain protocol (i.e., the rules that govern the operation of the blockchain network). It also includes numerous decentralized applications and tools created by TFL and other independent developers. The Terra Blockchain has a governance mechanism that allows community stakeholders to propose changes to the network and its operation, which are then voted on—via token transaction—by the community of users and implemented only if they are approved by the requisite vote of the community.

**b. Terra Community**

41. One of the Debtor's primary goals is to foster a robust and vibrant community on the Terra network by developing tools and applications on the Terra Blockchain that, among other things, drive economic activity to the Terra Blockchain. To accomplish this goal, the Debtor has continuously improved and maintained the Terra Blockchain, while building innovative functionality for the Terra community to utilize.

42. The Terra community currently consists of over half a million stakeholders (measured by wallets) and 37,000 monthly active users (measured by unique wallets), who participate in the Terra network in various capacities.[17] Members of the Terra community participate in a number of activities, including, among others, recording and verifying transactions (validators), staking their tokens to support the validators (stakers), developing tools and applications for use on the Terra Blockchain (developers), utilizing the various applications the Debtor has developed, and participating in the decentralized governance of the Terra Blockchain. Community members can submit, democratically vote on, and implement various proposals, including, for example, making changes to the Terra Blockchain, deploying funds from the Terra Community Pool, and entering into agreements with regard to the intellectual property held in the Terra Community Trust (described below in more detail).

43. The individual users that make up the community have a significant amount of democratic control over how tokens are spent and in what direction the Terra Blockchain should further develop. As noted above, following the May 2022 de-peg, in October 2023, the community approved TFL's proposal and granted it 150 million Luna.[18] Notably, three months prior to the successful community-approved proposal, the community had rejected consideration of a similar proposal from the Debtor, which the Debtor withdrew before a community vote was held. This demonstrates that the Terra community exercises independent judgement. The Debtor had to earn the confidence of the community to petition successfully for the Luna grant.[19]

---

[17] https://bit.ly/3HEBvDI

[18] http://bit.ly/3OIJpQH.

[19] I understand another example, as is discussed in more detail below, relates to the Terra Community Trust (the "**TCT**"), which holds valuable intellectual property related to the Terra brand, including the intellectual property rights for Terra, Luna, and UST. TCT executes community-approved proposals related to the intellectual property based on the community's decentralized governance practices. In that way, the Terra community is democratically in control of the Terra brand intellectual property. For example, in February 2022, pursuant to a community-approved proposal, the TCT entered into a sponsorship agreement with the Washington Nationals

44. Anyone can create new applications and protocols for the Terra Blockchain, thus making it more useful. The Debtor is a key member of the community, and has a slate of innovative, secure, and practical applications (both in development and already launched) that drive increased use of the Terra Blockchain pursuant to various diverse mechanisms. In addition, the Debtor engages in marketing to increase adoption of the Terra Blockchain and improve the Debtor's reputation. Once new users join the community, the Debtor offers a number of tools that help retain them and enrich the community experience. As discussed in more detail below, the Debtor has a promising slate of applications in various stages of development, with certain applications ready to be launched in the next several months. These applications aim to garner additional interest in the Terra Blockchain, realizing more users and generating more Luna transactions. The Debtor believes that, over the long-term, the value of Luna will be tied to the Debtor's success in growing the Terra ecosystem.

**c. Development of Applications**

45. The Debtor does not currently issue any cryptocurrency assets, nor does the Debtor sell any cryptocurrency assets (other than selling assets in its treasury to pay its operating expenses). Rather, the Debtor's current operations are focused on developing, maintaining, and marketing the Terra Blockchain. Specifically, the Debtor has developed, and continues to develop, a robust slate of applications that are designed to be used on the Terra Blockchain and "cross-chain" (i.e. on other blockchains). The Debtor is not currently monetizing such applications (i.e., it does not currently earn revenue through transactions), but it may do so in the future.

---

Baseball Club and Washington Nationals Stadium wherein the parties agreed to advertise the Terra brand during Nationals games. Similar uses of the Terra intellectual property can expose potential users to the Terra Blockchain and incentivize them to participate in the community.

46. The Debtor prides itself on having the capability to provide users with cutting-edge applications that are secure and easy to use and offer functionality that is unparalleled among the Debtor's competitors in the crypto sector. These applications not only bolster and rehabilitate the Debtor's reputation, leading to additional users, but the applications also increase the usefulness of, and help direct activity to, the Terra Blockchain. The Debtor intends to develop applications that "abstract away" the blockchains, essentially allowing seamless cross-chain access and breaking the barriers between siloed blockchains. In doing so, however, the Debtor's applications will, in many instances, route cross-chain transactions through the Terra Blockchain to capture user activity and transaction fees. Accordingly, if the Debtor's upcoming slate of applications can become best-in-class, first-in-market applications that create a seamless "cross-chain" experience for blockchain users, the Terra Blockchain will be a premier blockchain hub with a significant share of the market.

47. The Debtor's current slate of applications are in various stages of development, including, among others:

- **Station**. The Debtor's flagship application, Station, is a "cross-chain" wallet (i.e., compatible with third-party blockchains) that allows users to access, in addition to the Terra Blockchain, other chains and decentralized applications built within the third-party Cosmos blockchain network. Station has unique capabilities that no other competitor wallets in the ecosystem offer, including, among others, (1) seam-less multi-hop cross-chain transactions, (2) allowing users to view all of their cross-chain holdings on a consolidated basis, (3) fee abstraction (allowing users to pay fees in currencies other than the ones accepted by the chain on which they are transacting), and (4) allowing users to view cross-chain transaction histories and transaction status updates.

  Station is easier and safer to use, with approximately 15,000 daily active users. One important feature the Debtor plans to introduce on Station in the near future is smart wallet capabilities that will allow users to configure their Station wallet with various settings, including multiple private keys, private key recovery, two-factor authentication, and other security measures. The Debtor intends for Station to be the "portal" for consumers using all of the Terra applications and plans to develop and expand the capabilities of Station further to be compatible with additional blockchains. Currently, Station is compatible with the full Cosmos ecosystem, but the Debtor intends for it to be compatible with additional blockchain ecosystems in the near future. As the Debtor rolls out additional capabilities

for Station, as planned, the Terra Blockchain will see more users and more transaction fees. Station adoption opens up perhaps the broadest opportunity for potential avenues that would drive user activity on the Terra Blockchain.

- **Foundation**. Foundation is an infrastructure offering that pairs the Debtor's infrastructure and user experience framework with the newly-acquired Pulsar's data indexing capabilities (described below) to create a product that currently has no equivalent in the crypto market. Foundation Infrastructure will allow developers to avoid maintaining their own costly infrastructure necessary for reading and writing transactions from the blockchain. Foundation Data will provide a generalized API layer that will allow teams to easily query useful blockchain data via REST API rather than building and maintaining complex custom indexing solutions. Currently, the Debtor offers Foundation to users who build on the Terra Blockchain for free, thus strengthening the Debtor's reputation via word-of-mouth. Ordinarily, the startup costs for a user to index information and get a product up and running can be significant. Foundation offers a less expensive and higher-quality alternative. Thus, when the Debtor eventually begins selling Foundation—or even just the underlying data index from Pulsar—to generate revenue on a B2B basis, it expects to gain an edge against its competitors, which will not have access to the proprietary and unmatched Pulsar software. As is the goal for many of the Debtor's applications, the Debtor intends for Foundation, Station, and other Terra applications to work seamlessly together, creating an overall synergy on the Terra Blockchain and increasing user retention.

- **Enterprise Protocol.** Enterprise Protocol is suite of applications developed in the Terra network to aid users to conduct business in "Web 3.0"—the emergent evolution of the internet built upon blockchain technologies and decentralization. Enterprise could be most readily compared to Oracle, an enterprise resource planner, but for Web 3.0. Enterprise Protocol includes a number of tools that help users build applications and run their businesses with blockchain technology, driving economic activity onto the Terra Blockchain. For example, Enterprise DAO allows users to create, organize, and manage decentralized autonomous organizations ("**DAOs**") on the Terra Blockchain.

  Enterprise Protocol is highly innovative, in that it is the best cross-chain application of its kind on the market and "abstracts away" the blockchain, creating a seamless experience for users to jump between different blockchains. Where ordinarily, users building tools across multiple applications would need to maintain different code for different blockchains, Enterprise Protocol allows users to maintain one primary code that will work across numerous different chains. Because this primary code sits on the Terra Blockchain, it is another avenue that drives up user transactions on the Terra Blockchain. For example, users can use Enterprise Protocol to vote on a proposal on a different blockchain, with that blockchain's native token; however the vote registers a transaction through the Terra Blockchain. The Debtor's ultimate goal is to expand the capabilities of Enterprise Protocol and other related applications, such as Enterprise Treasury and Enterprise Payments, to allow users to create DAOs or protocols that can, among other things, run payrolls, implement payment streams, and implement vesting contracts for cryptocurrencies, all on a cross-chain basis. The Debtor also intends to launch Enterprise Labor Market, a tool within Enterprise Protocol, which will allow a DAO, treasury, or individual to create job listings and will allow those entities to accept and complete work tasks. Enterprise Labor

Market will also include a decentralized "reputation" component (i.e. a rating system), which users completing work tasks for another party to transport their "reputation" to other platforms outside the Terra Blockchain.

- **Warp**. Warp is an automation tool designed for Web 3.0 protocols, which will allow economic activity automated by "bots" from centralized services to be brought on to the Terra Blockchain and then decentralized.

**d. Venture Investments**

48. In an effort to diversify its portfolio and generate favorable returns through venture capital investments, the Debtor has invested in several technology-related ventures in early-stage and growth-stage companies. Specifically, the Debtor is a limited partner or LLC member in twelve (12) such ventures, seven (7) of which are Delaware limited partnerships or Delaware LLCs (together, the "**Venture Investments**"). These Venture Investments invest in companies involved in various sectors, including consumer technology, gaming, financial technology, enterprise software, blockchain, digital/virtual assets/currencies, and healthcare information technology.

49. In the last few years, the Debtor invested an aggregate of approximately $54 million total in the Venture Investments. Pursuant to the applicable agreements, the Debtor is further committed to contribute a total of approximately $35 million to certain of the Venture Investments (subject to Bankruptcy Court approval). The Debtor will be entitled to distributions on account of the profitability and success of the Venture Investments' portfolio companies, which have the potential to be highly valuable given the early-stage nature of the investments.

**3. Corporate Structure**

50. The Debtor is a Singapore exempt private limited company. Mr. Kwon owns approximately 92% of the Debtor's equity and minority shareholder Daniel Hyunsung Shin

owns the remaining 8%.[20] The Debtor never sold equity interests in the Debtor to anyone. The following chart depicts the Debtor's corporate structure:




51. **Terraform Labs Korea.** The Debtor understands that Terraform Labs Korea is a South Korean entity and wholly-owned subsidiary of the Debtor. Terraform Labs Korea underwent dissolution through a shareholder resolution on April 30, 2022, with Do Kwon designated as the liquidator; however, the liquidation process and closure have not been completed.

52. **Terraform Labs Limited.** Terraform Labs Limited ("**TLL**") is a British Virgin Islands company limited by shares and a wholly-owned subsidiary of the Debtor. It was incorporated on June 25, 2018 and was dissolved on July 18, 2023. TLL was established in connection with the distribution of Luna Classic. The Debtor has been diligently reviewing its books and records with the assistance of the Advisors to confirm the ownership of certain of the

---

[20] In March 2023, Kwon was arrested in Montenegro and charged with forging official documents. Mr. Kwon stepped down as Chief Executive Officer of TFL on March 31, 2023 and resigned his position as director of TFL shortly thereafter, appointing a new locally resident director, Ashwin Mathialagan, on May 27, 2023. On June 19, 2023, a court in Montenegro sentenced Kwon to four months in prison for using forged passports. Mr. Kwon is still held in custody in Montenegro. There is currently a dispute between the United States and Korea with regard to his potential extradition. The Debtor's only communication with Kwon is through his legal counsel.

Debtor's cryptocurrency wallets as between TFL and TLL and the intercompany claims between the entities, and is considering its options in respect to TLL, including whether to reinstate it in accordance with BVI law. As noted, the Debtor was the 100% shareholder of TLL, and the Debtor is not aware of any creditors of TLL. This issue is also being considered by the special committee of the Board as part of its internal investigation (as described below).

53. **Moon Landing Ventures I Ltd.** Moon Landing Ventures I Ltd. is a British Virgin Islands entity and wholly-owned subsidiary of the Debtor. It was dissolved in May 2023.

54. **Proximity Panorama, LDA Transaction.** In November 2023, the Debtor acquired the stock of Proximity Panorama, LDA ("**Proximity**"), a Portuguese private limited liability company, pursuant to a sale and purchase of share agreement. Proximity owned valuable intellectual property—cross-chain portfolio management and analytics software called Pulsar Finance ("**Pulsar**"), which it transferred to the Debtor pursuant to the transaction. Proximity is now a wholly-owned subsidiary of the Debtor, providing the Debtor with access to Pulsar for purposes of application development.

55. The Debtor believes the acquisition of Proximity presents a fortuitous and exciting opportunity to integrate the cutting-edge, one-of-a-kind Pulsar software into applications on the Terra Blockchain. The Debtor has paired its Foundation application with Pulsar analytics software to create a user interface product that is unavailable on any of the Debtor's competitors' blockchain platforms. The Debtor believes the integration of Pulsar into the Terra Blockchain will give the Debtor a significant competitive advantage that will attract and retain users, thereby fueling increased transaction fees on the Terra Blockchain.

56. **Luna Foundation Guard.** LFG is a non-profit Singapore entity established in December 2021. In January 2022, TFL and LFG entered into a master services

agreement, whereby TFL provided management and administrative services to LFG in exchange for a fee of $10,000. As noted above, TFL funded LFG with a grant of millions of Luna Classic, which was used to amass a reserve of over $3 billion in BTC, stablecoins, and other digital assets. When the May 2022 de-peg occurred, LFG transferred almost $3 billion to Jump trading (a crypto trading firm) and to TFL to defend the peg. Since the May 2022 de-peg, the LFG wallets have not been active.

57. Although Mr. Kwon established LFG, and serves as a director, LFG does not sit within the Debtor's corporate structure. Moreover, LFG has no more control over the Debtor or the Terra Blockchain than an ordinary user would. I am in the process of being appointed to the LFG board of directors.

58. **Terra Community Trust ("TCT").** I understand that the TCT was formed as a Guernsey trust on January 18, 2022 and appointed Remi Tetot (RealVision co-founder) and Ryan Moore (Draft Kings board member) as trustees, and Gabriel Shapiro (Delphi Labs general counsel) as enforcer. According to the Purpose Trust Instrument that governs the TCT, the trustees are authorized to, pursuant to community-approved proposals, but subject to the trustees' absolute discretion, use the TCT's funds in furtherance of the TCT's stated purpose—to carry out community-approved proposals and to enter into agreements relating to certain intellectual property held by the TCT. The Debtor has no control over the TCT.

59. TFL assigned the branding and the marks for Luna Classic, UST, and Terra (as existed at the time of the transfer) (the "**Terra IP**") to TCT. On February 3, 2022 the Terra community voted to transfer $40 million worth of UST from the Community Pool to the TCT, with such transfer taking place a few days thereafter. Pursuant to the community-approved proposal and the TCT's Purpose of Instrument, the TCT transferred $38.15 million worth of UST

(worth approximately $38.15 million USD at the time) to the Washington Nationals baseball team to pay for a sponsorship deal to promote Terra in its stadium and $1.83 million worth of UST was held by the TCT to cover the TCT's operating expenses.

60. The TCT has not been active since the May 2022 de-peg.

### 4. Corporate Governance and Management

61. The Debtor's Board consists of three (3) directors: Chris Amani, Ashwin Mathialagan, and John S. Dubel. The Debtor's highly experienced management team consists of the following individuals:

| Name | Position and Location |
|---|---|
| Chris Amani | Head of Company Operations a.k.a. Chief Executive Officer (United States) |
| Cayden Bernstein | Vice President, People (United States) |
| Mike Brown | Chief Technology Officer (Japan) |
| Mark Chan | Head of Ecosystem (Singapore) |
| Peter Hsieh | General Counsel (United States) |
| Edmund Lim | Finance Manager (Singapore) |
| Javier Su | Core Engineer (Singapore) |

### 5. Prepetition Assets and Liabilities

#### a. Assets

62. As noted above, the Debtor is continuing to review its books and records with its Advisors and may identify adjustments to its assets and liabilities, including with respect to intercompany claims (e.g., the books and records currently reflect significant intercompany payables from the Debtor to TLL).

63. The Debtor's treasury currently reflects approximately $28 million of BTC, $7 million of various other cryptocurrencies, and approximately 155 million in Luna (currently

estimated to have a value of approximately $87 million), 125 million of which vest linearly over five years, as of January 2024. In addition, the Debtor has interests in fee advances it paid to law firms, the unapplied amounts of which exceed $70 million as of the Petition Date. The majority of this amount is with the Debtor's litigation counsel, Dentons US LLP ("**Dentons**"). Since the Debtor's loss of access to bank accounts to hold fiat currency, the Debtor has used the amount at Dentons to pay legal fees and expenses.

64. The Debtor's other significant assets include: (i) the Venture Investments (discussed above), (ii) approximately $57 million of fiat currency held in a Singapore escrow account, pending the outcome of the Singapore Action (described below); and (iii) amounts that are held in various locked accounts as discussed in the *Motion of Debtor for Entry of Interim and Final Order (I) Authorizing Debtor to Use Treasury Management System, (II) Authorizing Continuation of Intracompany and Intercompany Transactions, (III) Extending Time to Comply with Requirements of 11 U.S.C. § 345(b), and (IV) Granting Related Relief* (the "**Treasury Management Motion**").

65. As described above, the Debtor does not own the Terra IP transferred to TCT. Rather, the Debtor granted the Terra IP, including trademarks, to the TCT, which holds such intellectual property and has authority to enter into agreements relating to the Terra IP with third parties for the benefit of the Terra community. The Debtor owns any intellectual property created or acquired after the TCT transfer. Although the Terra IP is not an estate asset, the Terra brand has the potential to have significant value if the Debtor is able to execute on its business plans.

66. The Debtor owns the intellectual property rights to Pulsar. Foundation and the underlying Pulsar software are not open source. Accordingly, Pulsar and Foundation are

valuable intellectual property estate assets. However, most of the Debtor's other software is open source, which is fairly standard in the blockchain sector.

**b. Liabilities**

67. The Debtor currently has no secured or unsecured funded debt. The Debtor's liabilities consist primarily of significant unsecured contingent litigation liabilities, including the SEC Enforcement Action, and related indemnification obligations under its constitution (similar to a charter). The Debtor's constitution provides that the Debtor owes indemnification obligations to current and former directors, officers, and employees, including for legal fees and fees for the defense of former members of management.

68. In addition to the SEC Enforcement Action (described below in more detail), the Debtor is also a defendant in other litigation including an action in Singapore in which 377 individuals claiming to be purchasers of UST filed a representative action against TFL, LFG, Do Kwon, and former TFL employee, Nikolaos Platias, who was an author of whitepapers on the Terra Classic Blockchain and Anchor Protocol (the "**Singapore Action**"). The claimants alleged they were misled into purchasing UST and staking it on Anchor Protocol based on certain alleged representations on the TFL website, suffering claimed damages of approximately $57 million. TFL's challenge on jurisdictional grounds (similar to a motion to compel arbitration) was rejected for procedural reasons peculiar to Singapore rules of court; however, the court held that it was likely that the terms of service associated with the Debtor's web site and more specifically the Anchor Protocol would apply to the claims made; among other things, those terms of service contain broad releases and risk acknowledgements. The Debtor has $57 million of fiat currency held in a Singapore escrow account, pending the outcome of the Singapore Action. The Debtor believes this amount in excess of its judgment exposure, among other reasons because the claimants' Mareva injunction was not properly presented to the Singapore court, the claimants

failed to comply with certain Singapore rules regarding representative actions (which are in any event barred by the applicable terms of service), and because a majority of claimants have significant defects in their claims (for example, one of the named claimants made all of his UST purchases after the de-peg started and thus could not have relied on the alleged misstatements, and another claimant continued purchasing Terra Tokens even after this lawsuit was filed). The Debtor is considering the impact of this chapter 11 case on the Singapore Action, including whether to seek recognition of this chapter 11 case in Singapore.

69. The Debtor also owes approximately $35 million in outstanding capital contributions obligations on account of certain of its Venture Investments.

## III. SIGNIFICANT EVENTS LEADING TO CHAPTER 11 FILING

70. Although the Debtor's operating performance has been steady and Luna has value, the Debtor would not likely be able to satisfy a judgment in the SEC Enforcement Action of the amount the SEC is likely to seek. These events leading to the chapter 11 filing are discussed in further detail below.

### A. The Collapse of Luna Classic and UST

71. As described above, the Debtor's troubles began with the collapse of Luna Classic and UST. In light of the actions the Debtor took to shift its focus to software development, the Debtor was able to recover its business and focus on improving the Terra Blockchain for the benefit of the Terra community. However, the Debtor soon faced legal action that led it to commence this chapter 11 case.

**B. The SEC Enforcement Action**

72. On February 16, 2023, the SEC filed a complaint in the District Court against the Debtor and Mr. Kwon.[21] In the SEC Enforcement Action, the SEC alleged six claims, including violations of the Securities Act and the Exchange Act based on the alleged unregistered offer and sale of securities and securities-based swaps, and violations of the Securities Act and Exchange Act based on alleged securities fraud.[22] In connection with its claims, the SEC seeks a permanent injunction, disgorgement, and civil money penalties.[23]

73. The Debtor believes that the SEC Enforcement Action should be dismissed because the SEC does not have jurisdiction over the Debtors. Specifically, I understand that the SEC has jurisdiction to regulate "securities," but that the statutory definition of "security" does not mention cryptocurrencies (or currencies more broadly). *See* 15 U.S.C. 77b(a)(1), 78c(a)(10). Congress has considered various proposals to give the SEC or the Commodities Futures Trading Commission jurisdiction over cryptocurrencies, but Congress has not enacted any such proposal. *See*, *e.g.*, Lummis-Gillibrand Responsible Financial Innovation Act (RFIA), S. 4356, 117th Cong. (2022). The SEC's position is that it is unnecessary for Congress to give it jurisdiction over cryptocurrencies expressly because the original Acts—adopted in the 1930s, before the invention of computers—already give it such jurisdiction. The Acts define "security" to include an "investment contract," 15 U.S.C. 77b(a)(1), 78c(a)(10), and the SEC takes the position that the

---

21 On April 3, 2023, the SEC filed an Amended Complaint, which is identical to the Complaint in all material respects. Amended Complaint, *SEC v. Terraform Labs Pte. Ltd.*, *et al.*, Civil Action No. 1:23-cv-013460-JSR (S.D.N.Y. Apr. 3, 2023) (Docket No. 25) (the "**Amended Complaint**").

22 Amended Complaint at ¶¶ 173-190.

23 Amended Complaint, Prayer for Relief at pp. 53-54. The SEC requested the imposition of a conduct-based injunction prohibiting the Debtor from "(i) participating, directly or indirectly, in the purchase, offer, or sale of any crypto asset security, or (ii) engaging in activities for purposes of inducing or attempting to induce the purchase, offer, or sale of any crypto asset security by others." *Id.* at p. 54. However, the Debtor does not believe this conduct-based injunction will have a significant impact on the Debtor's existing operations related to software development.

cryptocurrency tokens at issue are "investment contracts," even though they are not themselves contracts and do not include any promise of future performance. The SEC has described its unilateral $1 trillion increase in the scope of its jurisdiction resulting from including cryptocurrency as a "rounding error." *SEC v. Coinbase, Inc., et al.*, 23-Civ-1346 (JSR), Jan. 17, 2024 Hearing Tr. 71:1–7.

74. The Debtor disagrees with the SEC's position. On April 21, 2023, the Debtor and Mr. Kwon moved to dismiss the SEC's complaint in its entirety, principally arguing that the SEC lacks jurisdiction because the offerings of UST, Luna Classic, WLUNA[24], and MIR were not "securities."[25] On July 31, 2023, the District Court denied the motion to dismiss.[26] The case proceeded on an expedited timeline.[27]

75. On December 28, 2023, the District Court partially granted the SEC's motion for summary judgment.[28] Specifically, the District Court found that the Debtor and Mr. Kwon "offered and sold unregistered securities, in violation of Sections 5(a) and 5(c) of the Securities Act" when they "offered and sold LUNA and MIR in unregistered transactions" and when the Debtor offered UST together with the Anchor protocol.[29] In reaching that finding, the District Court relied on *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), and held that there was "no

---

[24] WLUNA tokens, or "Wrapped Luna," was a Terra Classic Blockchain-native token whose value was pegged to the value of Ethereum on the Ethereum blockchain. Generally speaking, "wrapped" tokens make it possible to use cryptocurrencies from one blockchain on a different blockchain.

[25] Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended Complaint, *SEC v. Terraform Labs Pte. Ltd.*, *et al.*, Civil Action No. 1:23-cv-013460-JSR (S.D.N.Y. Apr. 21, 2023) (Docket No. 29), at 7 et seq.

[26] Opinion and Order, *SEC v. Terraform Labs Pte. Ltd.*, *et al.*, Civil Action No. 1:23-cv-013460-JSR (S.D.N.Y. July 31, 2023) (Docket No. 51)

[27] Opinion and Order, *SEC v. Terraform Labs Pte. Ltd.*, *et al.*, Civil Action No. 1:23-cv-013460-JSR (S.D.N.Y. December 28, 2023) (Docket No. 149) (the "**MSJ Order**"), at p. 71.

[28] MSJ Order at p. 2-3.

[29] MSJ Order at p. 43-44.

genuine dispute that UST, LUNA, WLUNA, and MIR are securities because they are investment contracts."[30] The District Court granted summary judgment to the Debtor and Mr. Kwon on the SEC's claims relating to the Mirror Protocol, finding that mAssets are not securities-based swaps.

76. The District Court denied the parties' cross motions for summary judgment with respect to the securities fraud claims, finding that "genuine disputes of material fact linger," particularly with regard to the element of scienter required under both securities fraud claims.[31] I understand that as with the alleged registration violations, the District Court's finding that the assets at issue are "securities" is a threshold requirement for liability on securities fraud. I understand that, to the extent an appellate court holds that this case does not involve "securities," then the entire case would be dismissed, including the securities fraud claims.

77. A jury trial on the remaining securities fraud claims was scheduled to begin on January 29, 2024.[32] On January 16, 2024, the District Court issued an order postponing the start to March 25, 2024, but stated that "[n]o further requests from any party for any further adjournment will be entertained."[33]

78. The District Court has not yet addressed remedies or entered a money judgment of any kind. The Debtor could face civil penalties and disgorgement, as well as injunctive relief, for the regulatory offenses and potentially also for the securities fraud counts.[34]

---

[30] MSJ Order at p. 36 et seq.

[31] MSJ Order at p. 50. The SDNY District Court also partially granted the Debtor and Mr. Kwon's motion for summary judgment, finding that the Debtor and Kwon "did not offer or effect transactions in security-based swaps" by creating and maintaining the Mirror Protocol through which others could mint mAssets. MSJ Order at p. 47.

[32] MSJ Order at p. 71.

[33] Order, *SEC v. Terraform Labs Pte. Ltd.*, *et al.*, Civil Action No. 1:23-cv-013460-JSR (S.D.N.Y. January 16, 2024) (Docket No. 166), at p2.

[34] Amended Complaint at p. 53-54.

The exact size of a money judgment remains unknown, but it could very well outstrip the Debtor's assets.

79. The SEC also seeks the imposition of a conduct injunction that would prevent the Debtor from (i) participating, directly or indirectly, in the purchase, offer, or sale of any crypto asset security, or (ii) engaging in activities for purposes of inducing or attempting to induce the purchase, offer or sale of any crypto asset security by others. The Debtor does not believe that such an injunction, if imposed, would significantly impact the Debtor's existing operations related to software development.[35] As previously described, the Debtor's primary business activity is maintaining the Terra Blockchain and developing tools and applications for use on the Terra Blockchain, as well as treasury management activities described in the Treasury Management Motion.

80. Pursuing a chapter 11 restructuring at this time is critical to ensuring the Debtor can operate as a going concern while pursuing an appeal of the SEC Enforcement Action, thereby preserving value for its creditors and stakeholders and providing an orderly process for resolving competing claims against it. A successful appeal would eliminate the single largest claim against the Debtor, benefiting the Debtor, its other creditors, and the Terra community more broadly, including holders of Luna.

81. To appeal an adverse judgment while continuing operations, the Debtor needs a stay of enforcement, as the Debtor likely lacks sufficient assets to satisfy the impending judgment in connection with the securities registration liability and any subsequent judgment in connection with the remaining securities fraud claims. And, the Debtor would not be able to afford the supersedeas bond of 110% of the total judgment necessary to stay the judgment pending an

[35] Amended Complaint at p. 54.

appeal. In this case, the automatic stay provides the necessary flexibility to pursue the appeal while precluding the SEC's enforcement of the judgment.

82. If the appeal is unsuccessful, then the chapter 11 case will permit the orderly distribution of assets to all of the Debtor's creditors, including the SEC.

**C. New Governance and Engagement of Advisors**

83. On March 31, 2023, Mr. Kwon stepped down as Chief Executive Officer of TFL.

84. Following the appointment of a new Singapore resident director, Ashwin Mathialagan, on May 27, 2023, Mr. Kwon also resigned his position as Director of TFL. I was appointed as a Director and Head of Company Operations, announced to the world as "interim CEO."[36] Under my leadership, TFL has launched new products and tools on the Terra Blockchain, such as Alliance, Warp, and Enterprise, in addition to acquiring Proximity and its advanced cross-chain data analytics platform.

85. In November 2023, the Debtor engaged Weil in connection with a potential appeal and subsequently to explore strategic options to manage its mounting litigation liabilities. The Debtor thereafter undertook a search to retain an independent director, a financial advisor, a law firm to provide advice on Singapore governance issues, and other advisors. In mid-January 2024, the Debtor engaged A&M to serve as its financial advisor. In mid-January, the Debtor engaged Wong to serve as special foreign counsel.

86. On January 9, 2024, Messrs. Amani and Mathialagan, then the sole Board members, interviewed John Dubel as a potential candidate to join the Board as an independent director. Mr. Dubel has served on the board of, or been part of the management of, numerous

---

[36] https://prn.to/3UkS0fM.

companies in high-profile, contentious restructuring situations. These include: Special Committee Chairman of Purdue Pharma Inc.,[37] Chief Financial Officer of WorldCom, Inc. (after the discovery of massive fraud), Chief Executive Officer and Chief Restructuring Officer of SunEdison, Inc., and an independent board member for Highland Capital Management, LP and WMC Mortgage, LLC, among numerous others. Based on Mr. Dubel's extensive experience as an independent director of distressed companies, including those accused of wrongdoing, and leading related investigations, Messrs. Amani and Mathialagan unanimously appointed Mr. Dubel as an independent director of the Board on January 19, 2024.

87. Further, on January 21, 2024, the Board approved the formation of a special committee consisting of John Dubel (the "**Special Committee**"). The Special Committee is authorized to, among other things, (A) conduct and oversee an investigation of (i) the Debtor's and its subsidiaries' assets and liabilities, including issues relating to subsidiary TLL and (ii) claims and/or causes of action in favor of the Debtor against current and former members of the Board, current and former members of the applicable governing bodies of the Debtor's subsidiaries, and any equityholders of the Debtor; (B) consult with the Advisors to the Debtor to evaluate the legal basis of any such claims and/or causes of action; and (C) act on behalf of, and bind the Debtor and its subsidiaries with respect to any disposition of any such claims and/or causes of action, to prosecute, compromise, settle, exculpate, release, or otherwise dispose of any such claims and/or causes of action, subject to any required approval of the Bankruptcy Court.

[37] The examiner in Purdue Pharma's chapter 11 case, whose scope was to determine whether the Dubel-led Special Committee acted independently and not under the direction or influence of interested parties with respect to the settlement reflected in the debtors' chapter 11 plan, concluded that there was no evidence that the Special Committee acted other than independently in its consideration and recommendation of the settlement and chapter 11 plan. *See* Report of Stephen D. Lerner, Examiner, *In re Purdue Pharma, L.P.*, Case No. 19-23649 (RDD) (Bankr. S.D.N.Y. July 19, 2021) (Docket No. 3285).

**D. Self-Funded Chapter 11**

88. Given risks arising from the SEC Action, and after consultation with the Advisors, the Board approved resolutions authorizing the Debtor to file chapter 11. As of the Petition Date, the Debtor has a combination of cash (albeit frozen or deposited in a court account), cryptocurrency assets, and interests in amounts held by its law firms. With its existing liquidity, the Debtor should have sufficient funds to self-fund this chapter 11 case, and, in parallel, the "do-or-die" appeal of the judgment in the SEC Enforcement Action.

89. As described, the Debtor is in the process of developing and launching over a dozen applications on the Terra Blockchain, many of which will have cross-chain capabilities and some of which could potentially generate revenue for the Debtor. The Bankruptcy Code's chapter 11 tools will allow the Debtor to continue this transformative undertaking to broaden and enrich the Terra Blockchain. Therefore, it is my belief that the proposed self-funded chapter 11 is in the best interests of the Debtor and its stakeholders.

I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: January 30, 2024
New York, New York

Respectfully submitted,

By: */s/ Chris Amani*
Chris Amani
Head of Company Operations

on behalf of Terraform Labs Pte. Ltd.