## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------- x
                            :

In re                           :         **Chapter 11**
                           :

**TERRAFORM LABS PTE. LTD.**    :         **Case No. 24–10070 (BLS)**
                           :

           Debtor.[1]          :
                           :
-------------------------------------------------------- x

## MOTION OF DEBTOR FOR
## ENTRY OF INTERIM AND FINAL ORDERS
## (I) AUTHORIZING DEBTOR TO USE TREASURY MANAGEMENT
## SYSTEM, (II) AUTHORIZING CONTINUATION OF INTRACOMPANY
## AND INTERCOMPANY TRANSACTIONS, (III) EXTENDING TIME TO COMPLY
## WITH REQUIREMENTS OF 11 U.S.C. § 345(b), AND (IV) GRANTING RELATED RELIEF

Terraform Labs Pte. Ltd., as debtor and debtor in possession in the above-captioned chapter 11 case (the "**Debtor**"), respectfully moves and represents as follows in support of this motion (the "**Motion**"):

### Background

1.     On January 21, 2024 (the "**Petition Date**"), the Debtor commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). The Debtor is authorized to continue to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or statutory committee of creditors has been appointed in this chapter 11 case.

2.     Additional information regarding the circumstances leading to the commencement of this chapter 11 case and the Debtor's business and capital structure is set forth in the *Declaration of Chris Amani in Support of Debtor's Chapter 11 Petition and First-Day Relief*

---

[1] The Debtor's principal office is located at 1 Wallich Street, #37-01, Guoco Tower, Singapore 078881.

(the "**First Day Declaration**"),[2] filed contemporaneously herewith and incorporated herein by reference.

**Jurisdiction**

3.      The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

4.      Pursuant to Rule 9013-(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), the Debtor consents to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**Relief Requested**

5.      By this Motion, pursuant to sections 105(a), 345, 363, and 364 of the Bankruptcy Code, rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Local Rule 2015-2, the Debtor requests: (i) authority to (a) use the Debtor's digital asset and fiat currency management system, as described herein, including, without limitation, using its existing Wallets and Accounts (as defined below) and opening new wallets and accounts, (b) process transfers from the Bitcoin Wallets and Ops Multisig Wallets (as defined below), (c) process and receive transfers of digital assets or cash from third parties, and (d) process any Intracompany Transactions and Intercompany Transactions (as defined below);

---

[2]      Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the First Day Declaration.

2

(ii) authority to pay all obligations related thereto; (iii) an extension of time to comply with the requirements of section 345(b) of the Bankruptcy Code; and (iv) related relief.  In further support of this Motion, the Debtor has filed contemporaneously herewith the *Declaration of Michael Leto in Support of the Debtor's First Day Motions* (the "**Leto Declaration**" and together with the First Day Declaration, the "**Supporting Declarations**").

6.     A proposed form of order granting the relief requested herein on an interim basis is annexed hereto as __**Exhibit A**__ (the "**Proposed Interim Order**") and, pending a final hearing, if necessary, on the relief requested herein, on a final basis as __**Exhibit B**__ (the "**Proposed Final Order**" and, together with the Proposed Interim Order, the "**Proposed Orders**").

A.     **Treasury Management System**

7.     In the ordinary course of its business, the Debtor maintains a system to store, manage, and move its digital assets in a secure manner and to convert its digital assets to fiat currency to pay its obligations (the "**Treasury Management System**").  The Treasury Management System enables the Debtor to maintain control over the administration of various "wallets," or software applications that store the public and private keys needed to access digital assets. These wallets can store digital assets for different purposes, including for operational expenditures, staking, and liquidity provisioning among others, and as described in greater detail below.

8.     The Debtor's internal finance department maintains oversight over the Treasury Management System and implements controls for accepting and transferring digital assets and for reconciling the Debtor's books and records monthly to ensure that all movement of digital assets are accounted for properly.

9.     Allowing the Debtor to continue using its Treasury Management System is crucial to maintaining and maximizing the value of the Debtor's estate.  Without the relief sought

3

in this Motion, the Debtor would be unable to pay: (i) the approximately 60-person workforce employed by the Debtor (and its primary operating subsidiary) that is working diligently to develop and refine innovative software applications that operate within the Terra ecosystem, (ii) its vendors that help support the Debtor's infrastructure and operations, and (iii) its ongoing legal fees in connection with defending lawsuits that could substantially and negatively impact its business.

## B.    Wallets and Accounts

10.    The Treasury Management System is reflected in the diagram attached hereto as **Exhibit C**.

11.    Currently, the Debtor maintains:

- One (1) Bitcoin multi-signature wallet (the "**Bitcoin Wallet**");

- Three (3) operating multi-signature wallets (the "**Ops Multisig Wallets**");

- Four (4) Legacy wallets (the "**Legacy Wallets**");

- One (1) staking wallet (the "**Staking Wallet**");

- One (1) liquidity multi-signature wallet (the "**Liquidity Multisig Wallet**")

- One (1) grant multi-signature wallet (the "**Grant Multisig Wallet**");

- Nine (9) operating wallets (the "**Liquidity Operating and Other Miscellaneous Wallets**"); and

- One (1) online custody account at Hex Trust Ltd. (the "**Hex Trust Account**") (collectively, the "**Wallets and Accounts**").

12.    The Wallets and Accounts hold various digital assets, including but not limited to Bitcoin, Ethereum, and Luna, and stablecoins USDC and USDT.  Notably, none of the Wallets and Accounts hold fiat currency, such as U.S. dollars.

13.     A table summarizing the Debtor's Wallets and Accounts is attached hereto as **Exhibit D**.

>   i.    *Bitcoin Wallet*

14.     The Bitcoin Wallet is a "multi-signature wallet," which means it requires two or more private keys held by multiple authenticators to authorize and execute a transaction. The parties to a multi-signature wallet rely on access rules for the wallet that prescribe the minimum number of users required to gain access to the wallet and authorize the transfer of funds. If the required number of users do not consent to a transfer out of the wallet, the transfer will not occur.[3] Due to concerns about hacking thefts and the personal safety of the relevant authenticators, the Debtor closely guards the number and identity of the individuals who are authorized to hold the private keys to the multi-signature wallet.

15.     Historically, the Bitcoin Wallet has been used to pay vendors or professionals that accept bitcoin as payment, including to fund an advance payment to Dentons US LLP's ("**Dentons**"), as described below.  The Debtor has also transferred digital assets from the Bitcoin Wallet into the Ops Multisig Wallets.

>   ii.   *Ops MultiSig Wallets*

16.     For the Ops Multisig Wallets, which contains USDC, each individual user has a separate "key address" to stage and initiate transactions.  To start a transfer, one of the users first stages the transaction, which sends the invoice to the other users detailing what and whom the invoice is for.  The users then vote on or "initiate" the transaction to determine whether they agree with it.  The same user who stages a transaction can also initiate it.  All three of the Ops Multisig

---

[3]    The private key system for a multi-signature wallet is analogous to how certain nuclear missiles are accessed and fired, where the missile requires two or more individuals holding the firing keys.  To initiate access to the missile and fire it, all key holders must consent.  If one key holder is missing or does not consent, the missile does not fire.

Wallets are set up to require a certain number of relevant users to vote in favor of the transaction to initiate a transaction and transfer the digital assets. Hypothetically, if there are seven users in a multi-signature wallet, the wallet could require four users to approve the transaction for the transaction to be initiated. If only three users vote to initiate the transaction, the transaction would be declined. The Ops Multisig Wallets are utilized to transfer digital assets to process payroll and operating disbursements, and, historically, to fund limited partnership investments.[4]

iii.    *Legacy Wallets*

17.    The Legacy Wallets hold a mixture of tokens such as USDC and *de minimis* amounts of other digital assets. These wallets are not actively used.

iv.    *Staking Wallet*

18.    The Staking Wallet allows the Debtor to earn additional Luna tokens on the existing Luna tokens in the wallet. Staking refers to the process of committing cryptocurrency assets to a protocol in exchange for staking rewards (*e.g.*, additional cryptocurrency) at a set rate determined by each protocol. Usually, the owner of the staked cryptocurrency will need to wait for a fixed period between initiating a request for withdrawal of the staked cryptocurrency and the ability to withdraw the staked cryptocurrency for return to its respective wallet. This waiting period is typically called the "unbonding" period.

19.    The Debtor has been participating in staking projects through the Terra Blockchain by committing a certain amount of Luna tokens held in the Staking Wallet to these projects. In return for staking the Luna, the Debtor earns like-kind tokens, and it earns greater rewards the longer the staked crypto stays on the blockchain.

---

[4]    For the avoidance of doubt, the Debtor is not seeking authority at this time to use digital assets to fund limited partnership investments. The Debtor reserves the ability to seek authority from the Court at a later time to fund investments.

6

v.    *Liquidity Multisig Wallet*

20.    The Liquidity Multisig Wallet holds digital assets the Debtor intends to deploy for liquidity provisioning and liquidity pool positions the Debtor maintains on decentralized exchanges ("**DEX's**").  The DEX's that are governed by smart contracts that determine the price of two "paired" tokens and adjust the prices in real time depending on supply and demand.  For assets deployed in these pools, the Debtor receives compensation in the form of cryptocurrency from the relevant exchanges for providing liquidity.

vi.    *Grant Multisig Wallet*

21.    In late May 2022, TFL created a new Terra Blockchain, from which Luna was "airdropped" (*i.e.*, transferred as a gift) at chain genesis to holders of Luna Classic and UST on the original Terra blockchain.[5]  In October 2023, the Terra community approved a grant of 150 million Luna to be provided to TFL to support the work outlined in the First Day Declaration, with 100 million Luna transferred to the treasury, 25 million Luna earmarked for strategic partnerships and community project incentives, and 25 million Luna for liquidity, as further described in the First Day Declaration.  The first 125 million Luna vests over five (5) years and the remaining 25 million has no vesting period.  The Debtor stakes the Luna held in the Grant Multisig Wallet and may, in connection with its staking activities, delegate, undelegate or redelegate Luna tokens from one validator to another validator.

22.    There is a one-year cliff, allowing the Debtor to claim twenty percent (25 million Luna tokens) of the 125 million community grant in January 2025.

---

[5]    https://classic-agora.terra.money/t/terra-ecosystem-revival-plan-2-passed-gov/18498

vii.    *Liquidity Operating and Other Miscellaneous Wallets*

23.    The Liquidity Operating Wallet's primary function is to facilitate the fast and efficient conversion of one digital asset into another.  The fees that are incurred as a result of such conversion transactions are also paid out of the Liquidity Operating Wallet.  The Debtor maintains a number of other miscellaneous wallets which serve a similar function to the Liquidity Operating Wallet.

viii.    *Hex Trust Account*

24.    Finally, the Debtor deposited Bitcoin, Ethereum, USDT, and Luna Classic in the Hex Trust Account held by Hex Trust.  Hex Trust provides customers a digital asset online custody platform that allows institutions to integrate digital assets into their business operations in a secure, scalable, and compliant way.  The Hex Trust Account is currently frozen and inaccessible to the Debtor.

**C.    Intracompany Transfers**

25.    In certain circumstances, the Debtor moves digital assets between certain operational Wallets and Accounts, such as the Bitcoin Wallet and Ops Multisig Wallets, to fund ordinary course operations and pay vendors, employees, and legal fees (the "**Intracompany Transactions**").  The Debtor seeks authority to conduct these Intracompany Transactions in the ordinary course.  Finally, in certain situations, the Debtor may need to open new wallets or accounts.  For example, an authorized signatory to an Ops Multisig Wallet might terminate his or her employment with the Debtor.  To prevent such a former employee from accessing the Ops Multisig Wallet, the Debtor would create a new wallet with different signatories (as it has done in

the past).  Therefore, the Debtor seeks approval to open new wallets and accounts in the ordinary course of business.

## D.    The Debtor's Disbursements

26.    As previously described, the Debtor deploys its digital assets through staking and liquidity pools; this activity generates staking rewards (such as transaction fee shares) and liquidity provision rewards.  The Debtor regularly makes disbursements out of existing assets (*i.e.*, its "treasury") it holds or controls to support ongoing business operations.  The Debtor makes a number of disbursements using the Treasury Management System to cover costs including: (i) paying employees through Deel; (ii) reimbursing employees directly for expenses using digital assets, typically USDC; (iii) paying third party vendors for hosting and other support services; (iv) satisfying corporate overhead expenses; and (vii) paying rent.

27.    For vendors and service providers that accept digital assets for payment, the Debtor may transfer digital assets directly from the Bitcoin Wallet.

28.    For vendors and service providers that do not accept digital assets for payment, the Debtor has established a system whereby it transfers the necessary digital assets to pay specific vendor invoices to a designated third-party service provider, Moon Rabbit Labs, Inc. ("**Moon Rabbit**").[6]  Moon Rabbit was the only digital asset service provider that was willing to work with the Debtor and could handle the Debtor's volume of transfers.  Moon Rabbit processes the digital assets by the way of two over-the-counter exchanges (the "**OTCs**").  The OTCs exchange digital assets into local government-issued currency (*e.g.*, fiat currency), such as U.S. dollars or Singapore dollars, and remits payment of such amounts to the relevant vendor.  The OTCs, in effect, act as a digital asset converter for the Debtor, exchanging one form of currency

---

[6]    Moon Rabbit was founded and owned by an officer of the Debtor.

(digital) for another (fiat).  Moon Rabbit acts as the intermediary to source the OTCs pursuant to the terms of a *Service Agreement* dated November 4, 2022 (the "**Service Agreement**").  The OTCs charge a 3% service fee for each transfer and conversion they complete on behalf of the Moon Rabbit, which is in turn passed onto the Debtor.  Moon Rabbit does not accept any percentage of the service fee.  Instead, the Debtor pays Moon Rabbit a monthly flat rate for Moon Rabbit to provide accounting services to the Debtor.

29.    Moon Rabbit also facilitates payments to the Debtor's third-party payroll provider and employment agency, Deel, Inc. ("**Deel**"), a human capital management firm.  As further described in the *Motion Of Debtor For Entry Of Interim and Final Orders (I) Authorizing Debtor to (A) Pay Prepetition Workforce Obligations and (B) Maintain Employee Benefit Programs, and (II) Granting Related Relief*, Deel administers payroll, benefits and human resource services for nearly all of the Debtor's workforce throughout the world.

30.    The Debtor transfers digital assets from either the Bitcoin Wallet or Ops Multisig Wallets, usually in Bitcoin or USDC to Moon Rabbit.  Moon Rabbit then sends the digital assets to the OTCs, which convert the digital assets into fiat currency and transfer it to Deel to pay Deel's invoices.  Deel then transfers the fiat currency to the Debtor's employees and contractors to pay wages and benefits.

E.    **Dentons Advance Payment**

31.    Prepetition, the Debtor directly transferred digital assets to Dentons to fund an advance payment to Dentons (the "**Dentons Advance Payment**"), which is advising and representing the Debtor in ongoing litigation and investigations around the globe, including the SEC Enforcement Action (as defined below).  Upon receipt of the Dentons Advance Payment, Dentons converted it from digital assets to fiat currency to hold in a fee advance.  Under the terms of the engagement letter governing the advance payment, the Debtor has the right to request the

10

return of excess funds from Dentons at the conclusion of the engagement. The Debtor and Dentons have agreed postpetition that the Debtor may request the return of excess funds from Dentons before the conclusion of the engagement, regardless of the status of the engagement, provided that Dentons is able to effectuate a transfer of, and the Debtor is able to receive, such funds. Absent a willing party to convert the funds sitting in the Dentons Advance Payment to digital assets, Dentons may be unable to effectuate a return of the excess funds in the form of digital assets to the Debtor; absent the Debtor being able to establish an account with a financial institution that will accept fiat currency, the Debtor may be unable to receive transferred fiat currency from Dentons. In the event a request for such refund can be implemented, the Debtor may use such excess funds to satisfy its ongoing business operations in lieu of using the digital assets in the Wallets and Accounts. The Debtor hereby requests authorization, but not direction, to seek the return of excess funds from Dentons, whether in fiat currency or digital assets, before the conclusion of the engagement so long as the transfer and receipt of such excess funds can be implemented. The Debtor further seeks authorization, but not direction, to use any returned funds in the ordinary course of its business to pay its expenses.

F.      **Intercompany Transactions**

32.     As further described in the First Day Declaration, the Debtor is the sole owner of subsidiary Proximity Panorama, LDA ("**Proximity**"), a Portuguese company. Proximity maintains its own bank accounts and directly employs almost all its employees.[7]

33.     After the Debtor acquired Proximity, Proximity's employees were added to Deel to help ease the administrative burden of processing payroll. Now, Deel handles the payroll for the Debtor's employees and for the employees of the Debtor's sole operating subsidiary

---

[7]     Proximity's CEO is contractually employed by Deel, similar to many of the Debtor's other employees.

Proximity.  The Debtor transfers digital assets from the Ops Multisig Wallets to Moon Rabbit.

Moon Rabbit sends the digital assets to the OTCs, which convert the digital assets to fiat.  Finally,

the OTCs transfer the funds to Deel to pay Proximity's employees.

34.    Additionally, the Debtor anticipates funding Proximity's operating

expenses, including Proximity's lease, office maintenance, hosting and technology costs, and

insurance, among other expenses.  Proximity's operating expenses average approximately $20,000

to $30,000 each month.  To pay Proximity's operating expenses, the Debtor transfers digitals assets

into Proximity's wallet.  The Debtor maintains records of the Proximity intercompany transactions

(collectively, the "**Proximity Intercompany Transactions**").

35.    As described in further detail in the First Day Declaration, the software

applications that Proximity and the Debtor are developing together are groundbreaking and an

integral component of the Debtor's go-forward business.  If the Debtor does not continue to fund

Proximity's operating expenses and employee wages, Proximity will cease to operate, and the

Debtor's business would suffer irreparable harm.

36.    Further, as described in the First Day Declaration, the Debtor has been

diligently reviewing its books and records with the assistance of the Advisors to confirm the

ownership of certain of the Debtor's digital asset wallets as between TFL and TLL and the

intercompany claims between the entities, and is considering its options in respect to TLL,

including whether to reinstate it in accordance with BVI law.  As noted, the Debtor was the 100%

shareholder of TLL, and the Debtor is not aware of any creditors of TLL.  This issue is also being

considered by the special committee of the Board as part of the Investigation.[8]  To the extent the

Debtor continues to use digital assets from the Wallets and Accounts, it will continue to record,

---

[8]    As defined in the First Day Declaration.

consistent with past practice, intercompany transactions and balances between the Debtor and TLL (the "**TLL Intercompany Transactions**" and, together with the Proximity Intercompany Transactions, the "**Intercompany Transactions**") on its books and records.

**G.    Bank Accounts to Which the Debtor has no Access**

37.    Currently, the Debtor does not maintain a bank account at an authorized depository under the Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees (the "**UST Operating Guidelines**") published by the Office of the United States Trustee for Region 3 (the "**U.S. Trustee**").

38.    Up until March 2023, the Debtor had access to bank accounts (the "**Bank Accounts**") with various banks (the "**Banks**") across different continents.  A table summarizing the Bank Accounts is attached hereto as **Exhibit E**.  The Bank Accounts were used for operating purposes and fiat currency was transmitted through the Bank Accounts.  After the market for UST and Luna Classic collapsed in May 2022, the U.S. Securities and Exchange Commission ("**SEC**") began an investigation into TFL and, in February 2023, the SEC filed a complaint in the District Court for the Southern District of New York (the "**District Court**") against the Debtor and Kwon (the "**SEC Enforcement Action**").  Shortly thereafter in July 2023, the Banks began freezing the Bank Accounts and ceased conducting business with the Debtor.  The Bank Accounts remain frozen, notwithstanding the Debtor's attempts to contact the Banks and multiple requests for the release of funds sitting in the Bank Accounts.

39.    Prior to the Petition Date, the Debtor made multiple attempts to open new bank accounts, including with banks that are in compliance with section 345 of the Bankruptcy Code, all to no avail.  The Debtor continues to explore whether opening a bank account with an authorized U.S. depository or other acceptable institution is a viable option; however, based on the

Debtor's past experiences there can be no guarantee as to outcome.[9]  Thus, as it is highly difficult

for the Debtor to open and maintain a bank account, the Debtor requests an extension of time to

comply with section 345 of the Bankruptcy Code.

**H.    Singapore Court Deposit**

40.    Additionally, as described in more detail in the First Day Declaration, in

connection with litigation filed by certain claimants in Singapore against the Debtor and other

parties, the Debtor deposited with the Singapore High Court (the "**High Court**") on

September 15, 2022, approximately $57 million USD.  The deposit was made to terminate an

emergency injunction over all of TFL's operations issued by the High Court after an emergency

application by plaintiffs.  For the foreseeable future, the funds will remain with the High Court,

until the lawsuit is complete (at which point in time the High Court may order the funds be used

in whole or in part to satisfy any judgment, or be returned to the Debtor if the plaintiffs are

unsuccessful in obtaining a judgment) or a successful application to release the funds is made by

the Debtor, whichever occurs earlier.  In the meantime, the Debtor has no access to or control over

the approximately $57 million USD.

**I.    Debtor's Existing Business Forms**

41.    In the ordinary course of its business, the Debtor uses a variety of

correspondence forms, invoices, purchase orders, and other business forms (collectively, and as

they may be modified from time to time, the "**Business Forms**").  To avoid a significant disruption

to its business operations that would result from a disruption of the Treasury Management System

and to avoid unnecessary expense, the Debtor requests authorization to continue using all of the

Business Forms in use immediately before the Petition Date (and as may be amended or modified

---

[9]    The Debtor believes that an authorized depository may be more willing to open a bank account with the safeguards that a chapter 11 case provides, such as court supervision of the Debtor's assets and accounts.

in the ordinary course from time to time), including with respect to the Debtor's ability to update authorized signatories and services, as needed—without reference to the Debtor's status as a chapter 11 debtor in possession—rather than requiring the Debtor to incur the expense and delay of ordering new Business Forms.

**J.    Debtor's Credit Card Program**

42.    In the ordinary course of business, the Debtor's employees use a Moon Rabbit credit card, the balance of which is paid by the Debtor (the "**Corporate Credit Card**").[10] In general, certain of the Debtor's employees use the Corporate Credit Card for various necessary business expenses, such as purchasing hardware and software products from vendors that only accept credit card payments online.

43.    The Debtor estimates that it incurs on average a balance of $15,000 per month on account of the Corporate Credit Card.  The Debtor pays the Corporate Credit Card in full each payment cycle.  As of the Petition Date, the Debtor estimates that there is approximately one (1) issued and active Corporate Credit Card.

## Relief Requested Should Be Granted

**A.    Continuation of Treasury Management System is in the Best Interests of Debtor and All Other Parties in Interest**

44.    Continuation of the Treasury Management System in the ordinary course is an appropriate exercise of the Debtor's judgment.  Section 363(c)(1) of the Bankruptcy Code authorizes the debtor in possession to "use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1).  The purpose of section 363(c)(1) is to provide a debtor in possession with the flexibility to engage in the ordinary transactions required to operate its business without unneeded oversight by its creditors or the court. *In re Roth Am., Inc.*, 975

---

[10]    Employees are not liable for any charges made on a Corporate Credit Card.

F.2d 949, 952 (3d Cir. 1992) ("Section 363 is designed to strike [a] balance, allowing a business to continue its daily operations without excessive court or creditor oversight and protecting secured creditors and others from dissipation of the estate's assets.") (citations omitted); *In re Vision Metals, Inc.*, 325 B.R. 138, 145 (Bankr. D. Del. 2005) (same).  Included within the purview of section 363(c) is a debtor's ability to continue "routine transactions" necessitated by a debtor's cash management system.  *See, e.g., In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 796 (Bankr. D. Del. 2007) (noting that courts have shown a reluctance to interfere in a debtor's making of routine, day-to-day business decisions) (citations omitted); *In re Vision Metals*, 325 B.R. at 142 ("[W]hen a chapter 11 debtor in possession continues to operate its business, as permitted by section 1108, no court authorization is necessary for the debtor to enter transactions that fall within the ordinary course of its business.").

45.    Even if the continuation of the Treasury Management System and other relief requested herein were outside the ordinary course of business, the Court may grant such relief pursuant to section 363(b) of the Bankruptcy Code, which provides, in relevant part, that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  To approve the use of assets outside the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code, courts require only that the debtor "show that a sound business purpose justifies such actions."  *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *see also, e.g.*, *In re Phoenix Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987) (finding that a sale of equipment was permissible under section 363(b) of the Bankruptcy Code because "there [wa]s a good business reason for completing the sale").  Moreover, if "the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will

16

generally not entertain objections to the debtor's conduct." *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) ("Overcoming the presumptions of the business judgment rule on the merits is a near-Herculean task.").

46.    In addition, the Court has the authority, pursuant to its equitable powers under section 105(a) of the Bankruptcy Code, to authorize the relief requested herein because such relief is necessary for the Debtor to carry out its fiduciary duties under section 1107(a) of the Bankruptcy Code.  Section 105(a) of the Bankruptcy Code empowers bankruptcy courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a); *see also In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (applying section 105(a) to justify an order authorizing the payment of certain prepetition wages, salaries, medical benefits, and business-expense claims to the debtor's employees).  Section 1107(a) of the Bankruptcy Code "contains an implied duty of the debtor-in-possession" to act as a fiduciary to "protect and preserve the estate, including an operating business' going-concern value," on behalf of a debtor's creditors and other parties in interest.  *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002)); *see also In re Cybergenics Corp.,* 226 F.3d 237, 243 (3d Cir. 2000) (citing *In re Marvel Ent. Group, Inc.*, 140 F.3d 463, 474 (3d Cir. 1998) ("A paramount duty of a trustee or debtor in possession in a bankruptcy case is to act on behalf of the bankruptcy estate, that is, for the benefit of the creditors.")); *Unofficial Comm. of Equity Holders v. McManigle (In re Penick Pharm., Inc.)*, 227 B.R. 229, 232–33 (Bankr. S.D.N.Y. 1998) ("[U]pon filing its petition, the Debtor became debtor in possession and, through its management . . . was burdened with the duties and responsibilities of a bankruptcy trustee.").  Courts consistently have permitted

17

payment of prepetition obligations where necessary to preserve or enhance the value of a debtor's estate for the benefit of all creditors. *See, e.g.*, *In re Lehigh & New Eng. Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that "if payment of a claim which arose prior to reorganization is essential to the continued operation of the [business] during reorganization, payment may be authorized even if it is made out of [the] corpus").

47.     Maintaining the Treasury Management System is in the best interests of the Debtor's estate and all parties in interest, including the Terra community and, therefore, should be approved.  If the Debtor is required to alter the way in which it stores and disburses digital assets throughout the Treasury Management System, it will severely disrupt the Debtor's operations and ability to maintain and maximize the value of its estate.

48.     Further, the Treasury Management System provides significant benefits to the Debtor, including the ability to control corporate costs by facilitating the transfer of digital assets to employees, vendors, and other third parties.  Accordingly, the Debtor requests that it be permitted to maintain and continue to use its existing Treasury Management System.

49.     Courts in this district routinely authorize debtors to maintain their integrated cash management systems. See, e.g., *In re CMC II, LLC*, No. 21-10461 (JTD) (Mar. 3, 2021 and Apr. 1, 2021) (granting interim and final relief) D.I. 28, 137; *In re Knotel, Inc.*, No. 21-10146 (MFW) (Feb. 3, 2021 and Feb. 25, 2021) (same), D.I. 63, 281; *In re Pennsylvania Real Estate Investment Trust*, No. 20-12737 (KBO) (Nov. 3, 2020 and Nov. 23, 2020) (same), D.I. 79, 188; *In re Mallinckrodt PLC*, No. 20-12522 (JTD) (Oct. 14, 2020 and Nov. 19, 2020) (same), D.I. 212, 552; *In re YouFit Health Clubs, LLC*, No. 20-12841 (MFW) (Nov. 10, 2020 and Dec. 3, 2020) (same), D.I. 47, 193; *In re AAC Holdings, Inc.*, No. 20-11648 (CTG) (June 23, 2020 and July 15, 2020) (same), D.I. 58, 148.  Similar relief is also appropriate here.

**B.      Continued Performance of Intercompany and Intracompany Transactions Is Warranted**

50.      As stated above, under section 363(c)(1) of the Bankruptcy Code, a debtor in possession "may use property of the estate in the ordinary course of business without notice or a hearing."  11 U.S.C. § 363(c)(1).  The Debtor believes that it does not require the Court's approval to continue entering into and performing under its Intercompany Transactions.  The Debtor enters into and perform under Intercompany Transactions "in the ordinary course of business" within the meaning of section 363(c)(1) of the Bankruptcy Code.  Intercompany Transactions are made by the Debtor on behalf its non-Debtor subsidiary, Proximity, in the ordinary course as part of the Treasury Management System.  The Debtor tracks all fund transfers in its accounting system and can ascertain, trace, and account for all Intercompany Transactions previously described.  The Debtor, moreover, will continue to maintain records of such Intercompany Transactions.  If the Intercompany Transactions were to be discontinued, the Treasury Management System, including paying Proximity's employees and operating expenses, could be disrupted to the Debtor's and the estate's detriment.

51.      Intercompany Transactions are not just a matter of routine in the Debtor's business, they are the sort of transactions that are common among many business enterprises that operate through multiple entities.  It is precisely because of their routine nature that the Intercompany Transactions are integral to the Debtor's ability to operate its business and successfully preserve value for stakeholders during the chapter 11 case.  If the Debtor ceases its Intercompany Transactions, its business will suffer along with the non-Debtor entity, Proximity.  Accordingly, out of an abundance of caution, the Debtor requests express authority to continue to engage in such transactions in the ordinary course postpetition.

19

52.     At the same time, the Debtor enters into and performs under Intracompany Transactions "in the ordinary course of business" within the meaning of section 363(c)(1) of the Bankruptcy Code.    The Debtor requests express authority to continue to engage in such transactions in the ordinary course postpetition.

**C.     Maintenance of Debtor's Existing Business Forms is Warranted**

53.     The Operating Guidelines for Chapter 11 Cases (the "**UST Operating Guidelines**") of the U.S. Trustee generally require that a chapter 11 debtor, among other things, (a) establish one debtor in possession account for all estate monies required for the payment of taxes, (b) close all existing bank accounts and open new debtor in possession accounts, (c) maintain a separate debtor in possession account for collateral, and (d) obtain checks that bear the designation "Debtor in Possession." Moreover, Local Rule 2015-2(a) generally requires that, upon exhausting its existing check stock, a chapter 11 debtor order new checks labeled "Debtor in Possession" with the corresponding bankruptcy number.

54.     The Debtor requests, in accordance with Local Rule 2015-2, that the Court waive the requirements of the UST Operating Guidelines with respect to the Debtor's business forms.    Strict enforcement of the UST Operating Guidelines with respect to the Treasury Management System would severely disrupt the Debtor's ordinary course financial operations by reducing efficiencies, increasing administrative burdens, and creating unnecessary expenses.

55.     Courts in this district and in other districts have granted debtors similar relief in other complex chapter 11 cases.    *See, e.g., In re Ector County Energy Center LLC*, No. 22-10320 (JTD) (May 31, 2022), D.I. 184; *In re Lighthouse Resources Inc.*, No. 20-13056 (JTD) (Jan. 1, 2021), D.I. 143; *In re Mallinckrodt PLC*, No. 20-12522 (JTD) (Nov. 19, 2020), D.I. 552. Similar relief is also appropriate here.

**D.      An Extension of Time to Comply with the Requirements of Section 345(b) of the Bankruptcy Code Is Warranted**

56.     To the extent the Treasury Management System does not strictly comply with section 345 of the Bankruptcy Code, the Debtor further seeks an extension of the deposit and investment requirements set forth therein.

57.     Section 345(a) of the Bankruptcy Code governs a debtor's cash deposits during a chapter 11 case and authorizes deposit or investment of money of estates, such as cash, as "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment."  11 U.S.C. § 345(a).   For deposits that are not "insured or guaranteed by the United States or by a department, agency or instrumentality of the United States or backed by the full faith and credit of the United States," the Bankruptcy Code provides that the estate must require from the entity with which the money is deposited or invested a bond in favor of the United States secured by the undertaking of a corporate security, "unless the court for cause orders otherwise."  *Id.* § 345(b).   Additionally, under the U.S. Trustee Guidelines, debtors in possession must, among other things, close prepetition bank accounts and open new "debtor in possession" operating, payroll, and tax accounts at one or more approved depositories.

58.     Courts may waive or extend compliance with section 345 of the Bankruptcy Code and the U.S. Trustee Guidelines for "cause."   In evaluating whether "cause" exists, courts have considered a number of factors such as:

(1)      the sophistication of the debtor's business;

(2)      the size of the debtor's business operations;

(3)      the amount of the investments involved;

(4)      the bank ratings (Moody's and Standard & Poor) of the financial institutions where the debtor in possession funds are held;

(5)      the complexity of the case;

21

(6)     the safeguards in place within the debtor's own business for ensuring the safety of the funds;

(7)     the debtor's ability to reorganize in the face of a failure of one or more of the financial institutions;

(8)     the benefit to the debtor;

(9)     the harm, if any, to the debtor;

(10)    the harm, if any, to the estate; and

(11)    the reasonableness of the debtor's request for relief from section 345(b) requirements in light of the overall circumstances of the case.

*See In re Serv. Merch. Co., Inc.*, 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999).

59.     As stated above, the Debtor does not currently have bank accounts and has historically been unable to open or keep open bank accounts.  Although the Debtor will continue to attempt to find a financial institution or other acceptable third party custodian willing to transact with it, it may not be successful in doing so.  Accordingly, the Debtor believes "cause" exists to extend the requirement to comply with section 345(b) of the Bankruptcy Code and the U.S. Trustee Guidelines.

60.     Additionally, the Debtor holds digital assets in its Wallets and Accounts and through counterparty custodians in the ordinary course of business. Requiring the Debtor to collateralize its digital asset holdings, including cryptocurrency, would be prohibitively expensive (if possible at all).  Further, requiring the Debtor to liquidate its digital assets and transfer the resulting cash to an authorized depository would be extremely value destructive to the detriment of the Debtor, its stakeholders, and estate and, absent a willing depositary to receive those funds, impossible to implement.

22

61.     The Debtor has few ordinary course creditors.  Third-party vendors and counterparties have consistently worked with the Debtor and its current Treasury Management System without raising any concerns.

62.     To allay the concerns addressed by section 345(b) of the Bankruptcy Code, the Debtor will engage with the U.S. Trustee in good faith discussion to determine whether potential modifications to the Debtor's Treasury Management System are possible or prudent.

63.     Courts in this district and elsewhere have allowed debtors to maintain their existing depository accounts in complex chapter 11 cases, despite a failure to strictly comply with section 345 of the Bankruptcy Code.  *See, e.g., In re FTX Trading Ltd.*, No. 22-11068 (JTD) (Nov. 23, 2022) (order suspending debtors' obligation to comply with section 345 and authorizing maintenance of existing bank accounts), D.I. 145; *In re Clover Techs. Grp., LLC*, No. 19-12680 (KBO) (Jan. 21, 2020) (same), D.I. 125; *In re Anna Holdings, Inc*., No. 19-12551 (CSS) (Dec. 3, 2019) (same), D.I. 102; *In re Destination Maternity Corporation*, No. 19-12256 (BLS) (Nov. 12, 2019) (same), D.I. 228*; In re Forever 21, Inc*., No. 19-12122 (KG) (Oct. 28, 2019) (same), D.I. 334; *In re Blackhawk Mining*, LLC, No. 19-11595 (LSS) (Aug. 9, 2019) (same), D.I. 158; *In re Avaya Inc*., Case No. 17-10089 (SMB) (Mar. 31, 2017) (same), D.I. 341.

E.     **Maintaining Existing Treasury Management System Will Not Harm Parties in Interest**

64.     The Debtor's continued use of its Treasury Management System will facilitate the Debtor's transition into chapter 11 by, among other things, avoiding administrative inefficiencies, expenses, and distraction associated with disrupting this system and minimizing delays in the payment of postpetition obligations.  The Debtor respectfully submits that parties in interest will not be harmed by the Debtor's maintenance of its existing Treasury Management System, including maintenance of the Wallets and Accounts, and continuance of the Intercompany

23

Transactions, because the Debtor has developed and implemented appropriate mechanisms to ensure that unauthorized payments will not be made on account of obligations incurred before the Petition Date.  Specifically, with the assistance of its advisors, the Debtor has implemented internal control procedures that prohibit payments on account of prepetition debts without the prior approval of the Debtor's finance department.  In light of such protective measures, the Debtor submits that maintaining the Treasury Management System is in the best interests of its estate and creditors.

**F.     Authorizing Debtor to Continue Using Digital Asset Transfers Is Warranted.**

65.     The Debtor requests that the Court grant further relief from the U.S. Trustee Guidelines to the extent such guidelines require the Debtor to make all disbursements by check. The UST Operating Guidelines require that all receipts and all disbursements of estate funds must be made by check with a notation representing the reason for the disbursement.  The Debtor conducts all of its transactions on a daily basis through digital asset transfers and other similar methods.  If the Debtor's ability to conduct transactions by digital asset transfer or other similar methods is impaired, the Debtor's day-to-day activities may be unnecessarily disrupted, and the estate will incur additional costs.  Therefore, the Debtor submits that authorizing the continuation of digital asset transfers and other similar methods is warranted.

**G.     Court Should Authorize Debtor to Maintain Corporate Credit Card and to Pay Obligations Related Thereto**

66.     As stated above, under section 363(c)(1) of the Bankruptcy Code, a debtor in possession may use property of the estate in the ordinary course of business without a hearing. Furthermore, section 364(a) of the Bankruptcy Code permits a debtor in possession to "obtain unsecured credit and incur unsecured debt in the ordinary course of business" without a court order.  11 U.S.C. § 364(a).  Purchases made using the Corporate Credit Card fall within the

24

ordinary course of business under section 363(c)(1) of the Bankruptcy Code. The use of credit cards and similar payment methods is widespread at companies across the United States as a means of facilitating day-to-day business activities. As a result, the Debtor believes that it do not require the Court's approval to continue using the Corporate Credit Card on a postpetition basis.

67.     Nonetheless, out of an abundance of caution, the Debtor requests authority to continue using the Corporate Credit Card in the ordinary course of business, and to pay all obligations related thereto. In the event the Court finds that such transactions do not fall within the ordinary course of business, the Debtor requests authority pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code.

68.     Continued use of the Corporate Credit Card is integral to the success and stability of the Debtor's business.  Certain vendors of online services may only be paid via credit card.  Permitting the Debtor to continue using the Corporate Credit Card will ensure that the Debtor's employees are able to fulfill their daily professional obligations and, in turn, prevent significant disruption to the Debtor's business operations.

### Bankruptcy Rule 6003(b) Has Been Satisfied

69.     Bankruptcy Rule 6003(b) provides that, to the extent relief is necessary to avoid immediate and irreparable harm, a bankruptcy court may issue an order granting "a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" prior to 21 days after the Petition Date.  Fed. R. Bankr. P. 6003(b).  As explained above and in the Leto Declaration, the Debtor would suffer immediate and irreparable harm if the relief sought herein is not promptly

granted.  Accordingly, the Debtor submits that the relief requested herein is necessary to avoid immediate and irreparable harm, and, therefore, Bankruptcy Rule 6003 is satisfied.

### Request for Bankruptcy Rule 6004(a) and (h) Waivers

70.     To implement the foregoing successfully, the Debtor seeks waivers of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).  As explained above and in the Leto Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtor.  Accordingly, ample cause exists to justify the waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

### Reservation of Rights

71.     Nothing contained herein is intended to be or shall be construed as (a) an admission as to the validity of any claim against the Debtor or any liens satisfied pursuant to this Motion, (b) an agreement or obligation to pay any claims, (c) a waiver of any claims or causes of action that may exist against any creditor or interest holder, (d) a waiver of the Debtor's or any appropriate party in interest's rights to dispute any claim, (e) an approval, assumption, or rejection of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code, (f) a determination as to whether digital assets, cryptocurrency, or tokens constitute money or securities, section 345 of the Bankruptcy Code, to the extent applicable, is hereby waived with respect to crypto tokens or transactions.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtor's rights to dispute such claim subsequently.

**Notice**

72.     Notice of this Motion will be provided to (a) the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington Delaware 19801 (Attn: Linda Richenderfer, Esq. (Linda.Richenderfer@usdoj.gov)); (b) the holders of the largest unsecured claims against the Debtor; (c) the Internal Revenue Service; (d) the United States Attorney's Office for the District of Delaware; (e) SEC; (f) Moon Rabbit; (g) Deel; (h) the Banks; and (i) any other party entitled to notice pursuant to Local Rule 9013-1(m) (collectively, the "**Notice Parties**").  Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m).  The Debtor respectfully submits that no further notice is required.

**No Previous Request**

73.     No previous request for the relief sought herein has been made by the Debtor to this or any other court.

*[Remainder of page intentionally left blank]*

WHEREFORE the Debtor respectfully requests entry of the Proposed Interim Order and Proposed Final Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated:  January 30, 2024
         Wilmington, Delaware

Respectfully submitted,

/s/ Matthew P. Milana
RICHARDS, LAYTON & FINGER, P.A.
Paul N. Heath (No. 3704)
Zachary I. Shapiro (No. 5103)
Matthew P. Milana (No. 6681)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Email:     heath@rlf.com
           shapiro@rlf.com
           milana@rlf.com

-and-

WEIL, GOTSHAL & MANGES LLP
Ronit Berkovich (admitted *pro hac vice*)
Jessica Liou (admitted *pro hac vice*)
F. Gavin Andrews (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Email:     ronit.berkovich@weil.com
           jessica.liou@weil.com
           f.gavin.andrews@weil.com

*Proposed Attorneys for Debtor*
*and Debtor in Possession*

RLF1 30497290V.1

**Exhibit A**

**Proposed Interim Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

```
------------------------------------------------------------ x
                                         :
In re                                    :    Chapter 11
                                         :
TERRAFORM LABS PTE. LTD.                 :    Case No. 24–10070 (BLS)
                                         :
        Debtor.¹                         :    Re: Docket No. __
                                         :
------------------------------------------------------------ x
```

**INTERIM ORDER (I) AUTHORIZING**
**DEBTOR TO USE TREASURY MANAGEMENT**
**SYSTEM, (II) AUTHORIZING CONTINUATION OF INTERCOMPANY**
**AND INTRACOMPANY TRANSACTIONS, (III) EXTENDING TIME TO COMPLY**
**WITH REQUIREMENTS OF 11 U.S.C. § 345(b), AND (IV) GRANTING RELATED RELIEF**

Upon the motion, dated January 30, 2024 (the "**Motion**")[2] of Terraform Labs Pte.

Ltd., as debtor and debtor in possession in the above-captioned chapter 11 case (the "Debtor"), for

entry of interim and final orders pursuant to sections 105(a), 345, 363(b)(1), 363(c)(1), and 364(a)

of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004: (i) authority to (a) use the Debtor's

digital asset and fiat currency management system, as described herein, including, without

limitation, using its existing Wallets and Accounts and opening new wallets and accounts,

(b) process transfers from the Bitcoin Wallets and Ops Multisig Wallets, (c) process and receive

transfers of digital assets or cash from third parties, and (d) process any Intracompany Transactions

and Intercompany Transactions; (ii) authority to pay all obligations related thereto; (iii) an

extension of time to comply with the requirements of section 345(b) of the Bankruptcy Code; and

(iv) related relief, all as more fully set forth in the Motion; and upon consideration of the

Supporting Declarations; and the Court having jurisdiction to consider the Motion and the relief

---

[1]    The Debtor's principal office is located at 1 Wallich Street, #37-01, Guoco Tower, Singapore 078881.
[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the
       Motion

requested therein pursuant to 28 U.S.C. §§ 157(a)–(b) and §1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and it appearing that venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided; and such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and this Court having reviewed the Motion; and this Court having held a hearing to consider the relief requested in the Motion; and all objections, if any, to the Motion have been withdrawn, resolved, or overruled; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtor and its estate as contemplated by Bankruptcy Rule 6003 and is in the best interests of the Debtor and its respective estate and creditors; and upon all of the proceedings had before this Court and after due deliberation and sufficient cause appearing therefor,

### IT IS HEREBY ORDERED THAT:

1. The Motion is granted on an interim basis to the extent set forth herein.

2. The Debtor is authorized, but not directed, pursuant to sections 105(a), 345, 363(b)(1), 363(c)(1), and 364(a) of the Bankruptcy Code, to continue to maintain and manage its digital assets and fiat currency pursuant to the Treasury Management System; to receive, transfer, disburse, and convert digital assets and fiat currency, as applicable, in accordance with the Treasury Management System; to continue to engage in the TLL Intercompany Transactions and the Intracompany Transactions; to open new wallets and accounts, including bank accounts, in the

2

ordinary course.  Except as otherwise set forth herein, the Debtor may, without further order of this Court, implement changes to the Treasury Management System and procedures in the ordinary course of business.

3.      The Debtor is further authorized, but not directed, to: (i) designate, maintain, and continue to use any or all of its existing Wallets and Accounts, including those listed on **Exhibit D** to the Motion, and (ii)  deposit digital assets in, and withdraw digital assets from, such accounts by all usual means.

4.      The Debtor is authorized, but not directed, to continue (i) participating in staking projects through the Terra Blockchain or other non-Debtor blockchains and to stake or unstake digital assets or delegate, redelegate or undelegate validators in connection therewith, as it may deem desirable in its sole discretion, and (ii) deploying or maintaining liquidity positions in liquidity pools, in each case in the ordinary course of its business.

5.      The Debtor is authorized, but not directed, to seek the return of excess funds from Dentons, whether in fiat currency or digital assets, before the conclusion of the engagement so long as the transfer and receipt of such excess funds can be implemented.  The Debtor is further authorized, but not directed, to use any returned funds in the ordinary course of its business to pay its expenses.

6.      The Debtor is authorized, but not directed, to open any new bank accounts as it may deem necessary and appropriate in its sole discretion; provided, however, that the Debtor shall provide notice within 15 days of opening such new account to the U.S. Trustee and counsel to any statutory committee appointed in these chapter 11 cases; provided, further, that the Debtors shall open any new bank account at a bank that has executed a Uniform Depository Agreement with the Office of the United States Trustee for the District of Delaware.

3

7.    The Debtor is authorized pursuant to sections 363(c) and 364(a) of the Bankruptcy Code to continue to use Moon Rabbit and Deel to satisfy vendor and employee-related obligations.

8.    Nothing contained herein shall prevent the Debtor, in its sole discretion, from applying to the High Court to release all or a portion of the deposit held by the High Court.

9.    The Debtor is authorized, but not directed, to continue using, and, if used, to perform its obligations under the Corporate Credit Card and to pay any amounts owing with respect thereto, including any amounts relating to the prepetition period.

10.    The Debtor shall maintain accurate records of all transfers within the Treasury Management System so that all postpetition transfers and transactions shall be adequately and promptly documented in, and readily ascertainable from, its books and records, to the same extent maintained by the Debtor before the Petition Date.

11.    To the extent any of the Debtor's Accounts and Wallets are not in compliance with section 345(b) of the Bankruptcy Code, or any of the U.S. Trustee's requirements or guidelines, the Debtors shall have thirty (30) days from the date of the entry of this Interim Order, without prejudice to seek an additional extension to come into compliance with section 345(b) of the Bankruptcy Code and any of the U.S. Trustee's requirements or guidelines, or to make such other arrangements as agreed to by the U.S. Trustee; *provided*, that nothing herein shall prevent the Debtor or the U. S. Trustee from seeking further relief from the Court to the extent that an agreement cannot be reached.

12.    The Debtor is authorized to use its existing Business Forms; *provided*, that with respect to any Business Forms that exist or are generated electronically, the Debtor shall use

4

reasonable efforts to ensure that such electronic Business Forms are labeled "Debtor In Possession" as soon as reasonably practicable following entry of this Interim Order.

13.      Except as otherwise provided herein, nothing contained in the Motion or this Interim Order or any payment made pursuant to the authority granted by this Interim Order is intended to be or shall be deemed as (i) an admission as to the validity of any claim against the Debtor, (ii) a waiver of the Debtor's or any party in interest's rights to dispute the amount of, basis for, or validity of any claim, (iii) a waiver of the Debtor's or any party in interest's rights under the Bankruptcy Code or any other applicable nonbankruptcy law, (iv) an agreement or obligation to pay any claims, (v) a waiver of any claims or causes of action which may exist against any creditor or interest holder, (vi) an admission as to the validity of any liens satisfied pursuant to this Motion, (vii) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy under section 365 of the Bankruptcy Code, (viii) a determination as to whether digital assets, cryptocurrency, or tokens constitute money or securities.

14.      Notwithstanding entry of this Interim Order, nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by, any party.

15.      The requirements of Bankruptcy Rule 6003(b) have been satisfied.

16.      Under the circumstances of this chapter 11 case, notice of the Motion is adequate under Bankruptcy Rule 6004(a) and Local Rule 9013-1(m).

17.      Notwithstanding the provisions of Bankruptcy Rule 6004(h), this Interim Order shall be immediately effective and enforceable upon its entry.

18.      A hearing to consider entry of an order granting the relief requested in the Motion on a final basis shall be held on _____, 2024, at _____ (Eastern Time) and any

objections or responses to the Motion shall be in writing, filed with the Court, and served by no

later than **4:00 p.m. (Eastern Time) on _____, 2024** on the following:

    a.   (i) proposed attorneys for the Debtor: Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Ronit Berkovich, Esq. (ronit.berkovich@weil.com), Jessica Liou, Esq. (Jessica.Liou@weil.com), and F. Gavin Andrews Esq. (f.gavin.andrews@weil.com)); and (ii) proposed co-counsel for the Debtor: Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 (Attn: Paul N. Heath, Esq. (heath@rlf.com), Zachary I. Shapiro, Esq. (shapiro@rlf.com), and Matthew P. Milana, Esq. (milana@rlf.com); and

    b.   the Office of the United States Trustee for the District of Delaware:  844 King Street, Suite 2207, Lockbox 35, Wilmington Delaware 19801 (Attn: Linda Richenderfer, Esq. (Linda.Richenderfer@usdoj.gov)).

25.    The Debtor is authorized to take all action necessary or appropriate to effectuate the relief granted in this Interim Order.

26.    The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Interim Order.

6

**<u>Exhibit B</u>**

**Proposed Final Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

```
------------------------------------------------------------ x
                                                             :
In re                                                        :        Chapter 11
                                                             :
TERRAFORM LABS PTE. LTD.                                     :        Case No. 24–10070 (BLS)
                                                             :
        Debtor.[1]                                           :        Re: Docket No. __
                                                             :
------------------------------------------------------------ x
```

**FINAL ORDER (I) AUTHORIZING
DEBTOR TO USE TREASURY MANAGEMENT
SYSTEM, (II) AUTHORIZING CONTINUATION OF INTERCOMPANY
AND INTRACOMPANY TRANSACTIONS, (III) WAIVING COMPLIANCE
WITH REQUIREMENTS OF 11 U.S.C. § 345(b), AND (IV) GRANTING RELATED RELIEF**

Upon the motion, dated January 30, 2024 (the "**Motion**")[2] of Terraform Labs Pte.

Ltd., as debtor and debtor in possession in the above-captioned chapter 11 case (the "Debtor"), for

entry of interim and final orders pursuant to sections 105(a), 345, 363(b)(1), 363(c)(1), and 364(a)

of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004: (i) authority to (a) use the Debtor's

digital asset and fiat currency management system, as described herein, including, without

limitation, using its existing Wallets and Accounts and opening new wallets and accounts,

(b) process transfers from the Bitcoin Wallets and Ops Multisig Wallets, (c) process and receive

transfers of digital assets or cash from third parties, and (d) process any Intracompany Transactions

and Intercompany Transactions; (ii) authority to pay all obligations related thereto; (iii) waiving

compliance with the requirements of section 345(b) of the Bankruptcy Code; and (iv) related relief,

all as more fully set forth in the Motion; and upon consideration of the Supporting Declarations;

and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant

---

[1]     The Debtor's principal office is located at 1 Wallich Street, #37-01, Guoco Tower, Singapore 078881.
[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the
        Motion

to 28 U.S.C. §§ 157(a)–(b) and §1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and it appearing that venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided; and such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and this Court having reviewed the Motion; and this Court having held a hearing to consider the relief requested in the Motion; and all objections, if any, to the Motion have been withdrawn, resolved, or overruled; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is in the best interests of the Debtor and its respective estate and creditors; and upon all of the proceedings had before this Court and after due deliberation and sufficient cause appearing therefor,

## IT IS HEREBY ORDERED THAT

1.      The Motion is granted on a final basis to the extent set forth herein.

2.      The Debtor is authorized, but not directed, pursuant to sections 105(a), 345, 363(b)(1), 363(c)(1), and 364(a) of the Bankruptcy Code, to continue to maintain and manage its digital assets and fiat currency pursuant to the Treasury Management System; to receive, transfer, disburse, and convert digital assets and fiat currency, as applicable, in accordance with the Treasury Management System; to continue to engage in the Intercompany Transactions and the Intracompany Transactions; to open new wallets and accounts, including bank accounts, in the ordinary course.  Except as otherwise set forth herein, the Debtor may, without further order of this Court, implement changes to the Treasury Management System and procedures in the ordinary course of business.

RLF1 30497290V.1

3.      The Debtor is further authorized, but not directed, to: (i) designate, maintain, and continue to use any or all of its existing Wallets and Accounts, including those listed on **Exhibit D** to the Motion, and (ii) to the extent of available digital assets, deposit digital assets in, and withdraw digital assets from, such accounts by all usual means.

4.      The Debtor is authorized, but not directed, to continue (i) participating in staking projects through the Terra Blockchain or other non-Debtor blockchains and to stake or unstake digital assets or delegate, redelegate or undelegate validators in connection therewith, as it may deem desirable in its sole discretion, and (ii) deploying or maintaining liquidity positions in liquidity pools, in each case in the ordinary course of its business.

5.      The Debtor is authorized, but not directed, to seek the return of excess funds from Dentons, whether in fiat currency or digital assets, before the conclusion of the engagement so long as the transfer and receipt of such excess funds can be implemented.  The Debtor is further authorized, but not directed, to use any returned funds in the ordinary course of its business to pay its expenses.

6.      The Debtor is authorized, but not directed, to open any new bank accounts as it may deem necessary and appropriate in its sole discretion; provided, however, that the Debtor shall provide notice within 15 days of opening such new account to the U.S. Trustee and counsel to any statutory committee appointed in these chapter 11 cases.

7.      The Debtor is authorized pursuant to sections 363(c) and 364(a) of the Bankruptcy Code to continue to perform under and honor Intercompany Transactions in the ordinary course of business, so long as such Intercompany Transactions are materially consistent with the Debtor's operation of its business in the ordinary course during the prepetition period.

8.      Nothing contained herein shall prevent the Debtor, in its sole discretion, from applying to the High Court to release all or a portion of the deposit held by the High Court.

9.      The Debtor is authorized pursuant to sections 363(c) and 364(a) of the Bankruptcy Code to continue to use Moon Rabbit and Deel to satisfy vendor and employee-related obligations.

10.     The Debtor is authorized, but not directed, to continue using, and, if used, to perform its obligations under the Corporate Credit Card and to pay any amounts owing with respect thereto, including any amounts relating to the prepetition period.

11.     The Debtor shall maintain accurate records of all transfers within the Treasury Management System so that all postpetition transfers and transactions shall be adequately and promptly documented in, and readily ascertainable from, its books and records, to the same extent maintained by the Debtor before the Petition Date.

12.     To the extent any of the Debtor's Wallets and Accounts are not in compliance with section 345(b) of the Bankruptcy Code or any of the U.S. Trustee's requirements or guidelines, the requirement for the Debtor to come into compliance with section 345(b) of the Bankruptcy Code and any of the U.S. Trustee's requirements or guidelines shall be waived.

13.     The Debtor is authorized to use its existing Business Forms; *provided*, that with respect to any Business Forms that exist or are generated electronically, the Debtor shall use reasonable efforts to ensure that such electronic Business Forms are labeled "Debtor In Possession."

14.     Except as otherwise provided herein, nothing contained in the Motion or this Final Order or any payment made pursuant to the authority granted by this Final Order is intended to be or shall be deemed as (i) an admission as to the validity of any claim against the

4

Debtor, (ii) a waiver of the Debtor's or any party in interest's rights to dispute the amount of, basis for, or validity of any claim, (iii) a waiver of the Debtor's or any party in interest's rights under the Bankruptcy Code or any other applicable nonbankruptcy law, (iv) an agreement or obligation to pay any claims, (v) a waiver of any claims or causes of action which may exist against any creditor or interest holder, (vi) an admission as to the validity of any liens satisfied pursuant to this Motion, (vii) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy under section 365 of the Bankruptcy Code, (viii) a determination as to whether digital assets, cryptocurrency, or tokens constitute money or securities.

15.     Notwithstanding entry of this Final Order, nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by, any party.

16.     Notice of the Motion is adequate under Bankruptcy Rule 6004(a).

17.     Notwithstanding the provisions of Bankruptcy Rule 6004(h), this Final Order shall be immediately effective and enforceable upon its entry.

18.     The Debtor is authorized to take all actions necessary or appropriate to carry out the relief granted in this Final Order.

19.     The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Final Order.

RLF1 30497290V.1

**<u>Exhibit C</u>**

**Diagram of Treasury Management System**

**Treasury Schematic - Terraform Labs Pte Ltd.[1]**



(1) The schematic depicted herein represents the flow of funds related to both digital assets and cash.
(2) Legacy Wallets (4), Staking Wallet (1), Liquidity Operating and Other Miscellaneous Wallets (9), Grant Multisig Wallet (1), Liquidity Multisig Wallet (1).
(3) Employees reimbursed in primarily USDC, a digital stablecoin; in addition, one contractor is paid directly by the Debtor.
(4) While this wallet has historically been less active, the Debtor has leveraged it occasionally for vendor and professional fee disbursements.
(5) On occasion, the Debtor has transferred digital assets between Bitcoin and Ops Multisig Wallets.
(6) Designated third party service provider used by the Debtor to transfer necessary digital assets to pay specific vendor invoices; sends digital assets to certain third party OTC exchanges.
(7) The OTCs exchange digital assets into local government-issued currency (e.g., fiat currency), such as U.S. dollars or Singapore dollars, and remits payment of such amounts to the relevant vendor.
(8) Third party payroll provider and employment agency, a human capital management firm, used by the Debtor.

## **Exhibit D**

**Wallets and Accounts**

**Terraform Labs Pte Ltd.**
Wallets and Account Types

| No | Type of Wallets and Accounts | Wallet Type |
|---|---|---|
| 1. | Bitcoin Wallet | Wallet used to pay vendors and/or professionals; contains BTC |
| 2. | Liquidity Operating and Other Miscellaneous Wallet | Wallet used to facilitate the fast and efficient conversion of one digital asset into another; primarily contains ARB and USDC |
| 3. | Liquidity Operating and Other Miscellaneous Wallet | Wallet used to facilitate the fast and efficient conversion of one digital asset into another; contains OSMO |
| 4. | Liquidity Operating and Other Miscellaneous Wallet | Wallet used to facilitate the fast and efficient conversion of one digital asset into another; no digital asset balance |
| 5. | Liquidity Operating and Other Miscellaneous Wallet | Wallet used to facilitate the fast and efficient conversion of one digital asset into another; contains RUNE |
| 6. | Liquidity Operating and Other Miscellaneous Wallet | Wallet used to facilitate the fast and efficient conversion of one digital asset into another; contains SOL |
| 7. | Liquidity Operating and Other Miscellaneous Wallet | Wallet used to facilitate the fast and efficient conversion of one digital asset into another; primarily contains ETH and various other digital assets |
| 8. | Liquidity Operating and Other Miscellaneous Wallet | Wallet used to facilitate the fast and efficient conversion of one digital asset into another; contains BTC |
| 9. | Liquidity Operating and Other Miscellaneous Wallet | Wallet used to facilitate the fast and efficient conversion of one digital asset into another; contains BTC |
| 10. | Liquidity Operating and Other Miscellaneous Wallet | Wallet used to facilitate the fast and efficient conversion of one digital asset into another; contains DYDX |
| 11. | Ops Multisig Wallet | Wallet used to transfer digital assets to process payroll and operating disbursements; contains USDC |
| 12. | Ops Multisig Wallet | Wallet used to transfer digital assets to process payroll and operating disbursements; contains USDC |
| 13. | Ops Multisig Wallet | Wallet used to transfer digital assets to process payroll and operating disbursements; contains USDC |
| 14. | Legacy Wallet | Relatively inactive legacy wallet for various digital assets; primarily contains OP and AVAX |
| 15. | Legacy Wallet | Relatively inactive legacy wallet for various digital assets; primarily contains AVAX and USDC |
| 16. | Legacy Wallet | Relatively inactive legacy wallet for various digital assets; contains CVX |
| 17. | Legacy Wallet | Relatively inactive legacy wallet for various digital assets; contains ETH |
| 18. | Staking Wallet | Staking account for Luna digital assets; contains Luna |
| 19. | Liquidity Multisig Wallet | Liquidity pool position on the blockchain; primarily contains LUNA and various other digital assets |
| 20. | Grant Multisig Wallet | Vesting account for Luna digital assets granted by the Terra community; contains Luna |
| 21. | Hex Trust Account | Digital asset custody platform; deposits frozen and inaccessible; primarily contains ETH and BTC |

**<u>Exhibit E</u>**

**Bank Accounts**

**Terraform Labs Pte Ltd.**
Bank Account Listing

| No | Legal Entity | Bank Name | Bank Country | Currency | Account Ending | Purpose |
|----|--------------|-----------|--------------|----------|----------------|---------|
| 1. | Terraform Labs Pte Ltd | ASPIRE | Singapore | SGD | x7874 | Operating |
| 2. | Terraform Labs Pte Ltd | ASPIRE | Singapore | USD | x9959 | Operating |
| 3. | Terraform Labs Pte Ltd | CIMB | Singapore | USD | x5203 | Operating |
| 4. | Terraform Labs Pte Ltd | DBS | Singapore | SGD | x496-3 | Operating |
| 5. | Terraform Labs Pte Ltd | DBS | Singapore | USD | x496-3 | Operating |
| 6. | Terraform Labs Pte Ltd | SYGNUM | Switzerland | CHF | x368 2 | Operating |
| 7. | Terraform Labs Pte Ltd | SYGNUM | Switzerland | EUR | x370 4 | Operating |
| 8. | Terraform Labs Pte Ltd | SYGNUM | Switzerland | SGD | x371 2 | Operating |
| 9. | Terraform Labs Pte Ltd | SYGNUM | Switzerland | USD | x367 4 | Operating |
| 10. | Terraform Labs Pte Ltd | Volopay | Singapore | SGD | N/A | Operating |