<pre>
 1                    UNITED STATES BANKRUPTCY COURT
                       DISTRICT OF DELAWARE
 2

 3   IN RE:                    .  Chapter 11
                               .  Case No. 24-10070 (BLS)
 4   TERRAFORM LABS PTE. LTD., .
                               .
 5                             .
                               .  Courtroom No. 1
 6                             .  824 Market Street
             Debtor.          .  Wilmington, Delaware 19801
 7                             .
                               .  Wednesday, January 31, 2024
 8   . . . . . . . . . . . . . .  2:00 p.m.

 9                        TRANSCRIPT OF HEARING
                BEFORE THE HONORABLE BRENDAN L. SHANNON
10                  UNITED STATES BANKRUPTCY JUDGE

11   APPEARANCES:

12   For the Debtor:          Ronit Berkovich, Esquire
                              Jessica Liou, Esquire
13                            F. Gavin Andrews, Esquire
                              WEIL, GOTSHAL & MANGES, LLP
14                            767 Fifth Avenue
                              New York, New York 10153
15
                              -and-
16
                              Mark G. Califano, Esquire
17                            DENTONS
                              1900 K Street, NW
18                            Washington, DC 20006

19   (APPEARANCES CONTINUED)

20   Audio Operator:          Ian Willoughby, ECRO

21   Transcription Company:   Reliable
                              The Nemours Building
22                            1007 N. Orange Street, Suite 110
                              Wilmington, Delaware 19801
23                            Telephone: (302)654-8080
                              Email:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.
</pre>

1  APPEARANCES (CONTINUED):

2

    For the U.S. Trustee:      Linda Richenderfer, Esquire
3                              UNITED STATES DEPARTMENT OF JUSTICE
                               OFFICE OF THE UNITED STATES TRUSTEE
4                              J. Caleb Boggs Federal Building
                               844 King Street
5                              Suite 2207, Lockbox 35
                               Wilmington, Delaware 19801
6
    For the U.S.
7   Securities and
    Exchange Commission:       Therese A. Scheuer, Esquire
8                              Roger Landsman, Esquire
                               UNITED STATES SECURITIES AND
9                                EXCHANGE COMMISSION
                               100 F Street, NE
10                             Washington, DC 20549

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              INDEX

2    MOTIONS:                                                      PAGE

3    Agenda
     Item 4:    Application of Debtor for Entry of an Order         43
4               (I) Approving the Retention and Appointment of
                Epiq Corporate Restructuring, LLC as the
5               Claims and Noticing Agent to the Debtor,
                Effective as of the Petition Date, and (II)
6               Granting Related Relief [Docket No. 17 – filed
                January 29, 2024]
7
                Court's Ruling:                                     44
8
     Agenda
9    Item 5:    Motion of Debtor for Entry of Order (I)             44
                Authorizing the Debtor to File Under Seal (A)
10              Portions of the Creditor Matrix and (B) the
                Personal Information in Other and Future
11              Filings, and (II) Granting Related Relief
                [Docket No. 11 – filed January 11, 2024]
12
                Court's Ruling:                                     46
13
     Agenda
14   Item 6:    Motion of Debtor for Entry of Interim and          47
                Final Orders (I) Authorizing Debtor to (A) Pay
15              Prepetition Workforce Obligations and (B)
                Maintain Employee Benefit Programs, and (II)
16              Granting Related Relief [Docket No. 20 – filed
                January 30, 2024]
17
                Court's Ruling:                                     49
18
     Agenda
19   Item 7:    Motion of Debtor for Entry of Interim and          50
                Final Orders (I) Authorizing Debtor to Use
20              Treasury Management System, (II) Authorizing
                Continuation of Intracompany and Intercompany
21              Transactions, (III) Extending Time to Comply
                with Requirements of 11 U.S.C. § 345(b), and
22              (IV) Granting Related Relief [Docket No. 21 –
                filed January 30, 2024]
23
                Court's Ruling:                                     74
24

25

1                           EXHIBITS

2   <u>DECLARATIONS</u>:                                    <u>PAGE</u>

3   1)  Declaration of Chris Amani                      10

4   2)  Declaration of Michael Leto                     11

5

6   Transcriptionists' Certificate                      78

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (Proceedings commenced at 2:12 p.m.)

2              THE CLERK:  All rise.

3              THE COURT:  Please be seated.

4              Ms. Berkovich, good afternoon.  Good to see you.

5              MS. BERKOVICH:  Nice to see you too, Your Honor.

6   Good afternoon.  For the record, Ronit Berkovich from Weil

7   Gotshal & Manges on behalf of the debtor, Terraform Labs Pte.

8   Ltd.

9              I'm joined by my colleagues Jessica Liou, Gavin --

10             THE COURT:  Welcome.

11             MS. BERKOVICH:  -- Gavin Andrews, Jared Friedmann,

12  and Christine Calabrese, as well as Zach Shapiro from the

13  Richards Layton firm.

14             THE COURT:  Good to see you.

15             MS. BERKOVICH:  Also in the courtroom today is

16  Mark Califano from Dentons, which is the debtor's proposed

17  special litigation counsel.

18             THE COURT:  Mr. Califano, it is good to see you

19  again.  Welcome.

20             MR. CALIFANO:  Nice to see you, Your Honor.

21             MS. BERKOVICH:  We wanted to thank the Court for

22  making time for us this afternoon.  We also wanted to thank

23  Ms. Richenderfer and Ms. Leamy from the Office of the United

24  States Trustee.  We've worked with the Office of the U.S.

25  Trustee in respect to questions and comments that they've had

1  about the debtor's business and the first day motions and I'm

2  pleased to report that we believe we've raised all of the

3  U.S. Trustee's concerns raised for purposes of today's

4  hearing --

5          THE COURT:  Okay.

6          MS. BERKOVICH:  -- and we will, of course,

7  continue to work with the U.S. Trustee during the course of

8  this case.

9          THE COURT:  Very good.

10          MS. BERKOVICH:  We also received comments from the

11  SEC, with respect to the first day motions and we believe

12  we've resolved all of their concerns, again, today, for

13  purposes of these hearings.

14          THE COURT:  For today.

15      (Laughter)

16          MS. BERKOVICH:  For today.

17          THE COURT:  We live one day at a time.

18          MS. BERKOVICH:  So we hope and expect to have a

19  consensual hearing today.

20          We will submit revised orders with the Court

21  reflecting those terms and Ms. Liou will address some of them

22  as part of her presentation.

23          THE COURT:  Sure.  I think that there was an

24  inquiry with respect to scheduling, as well.

25          Did the Court give you a second day hearing?

1           MS. BERKOVICH:  I believe we have March 4th --

2           THE COURT:  Very good.

3           MS. BERKOVICH:  -- at 1:30 or 2:30 -- 2:30 p.m.

4           THE COURT:  Very good.

5           MS. BERKOVICH:  Thank you for accommodating us.

6           THE COURT:  Happy to oblige.

7           MS. BERKOVICH:  So we have four motions before the

8  Court today on first day motions.  My colleague Gavin Andrews

9  will present the Epiq claims and noticing agent retention

10 application at Docket 17, as well as the creditor matrix

11 motion at Docket 11, and Ms. Liou will present the wages

12 motion at Docket 20 and the Treasury Management motion at

13 Docket 21.

14          Before I begin, I'd like to make a few more

15 introductions to the Court.  Your Honor, we have with us in

16 court today, the debtor's CEO Chris Amani.  Mr. Amani is our

17 first day declarant.

18          THE COURT:  He's our declarant today?

19          MS. BERKOVICH:  Yes --

20          THE COURT:  Welcome, sir.

21          MS. BERKOVICH:  -- and he is available if Your

22 Honor has any questions for him or any parties do.

23          THE COURT:  I have read the declaration several

24 times.  I have reluctant to ask any particular questions.

25     (Laughter)

1          MS. BERKOVICH:  You will become an expert in time.

2          THE COURT:  But I am prepared to be educated.

3          MS. BERKOVICH:  That is -- we will try to educate

4     you.

5          And we also have in the courtroom, Michael Leto,

6     who's a managing director at Alvarez & Marsal --

7          THE COURT:  And he is a separate declarant for us,

8     as well, today.

9          Mr. Leto, good to see you.

10          MS. BERKOVICH:  If there are no objections, I'd

11     like to move into evidence, first, the declaration of Mr.

12     Amani, which is filed at Docket 18.

13          THE COURT:  Very good.

14          I would ask, are there any objections to the

15     admission of Mr. Amani's declaration for purposes of the

16     relief sought at this hearing?  And given some of counsel's

17     comments and the issues that are, I think, previewed in

18     hesitate declaration, I would reiterate my standard approach,

19     which is to emphasize that when relief -- when a first day

20     declaration is admitted, it's essentially on limited or no

21     notice to parties and it is the Court's position that it is

22     exclusively for the relief that's being sought today and to

23     the extent that in the future, relief is being sought, it's

24     not deemed or seemed to be conclusive findings of fact, et

25     cetera, by the Court.

1                    I think that's obvious to all parties, but since

2    the issue has been raised to me at least once or twice, and I

3    think this would be an appropriate important to note that,

4    again, Mr. Amani's testimony and this extensive description

5    of the nature of the business and the enterprise are being

6    offered today as part of the factual predicate for the relief

7    sought.

8                    Are there any objections?

9                    MS. RICHENDERFER:  Your Honor --

10                   THE COURT:  Ms. Richenderfer, good afternoon.

11   Good to see you.

12                   MS. RICHENDERFER:  Good afternoon, Your Honor.

13   Linda Richenderfer on behalf of the United States Trustee.

14                   No objection.  I appreciate the comments from Your

15   Honor, I just want to make clear that we are reserving the

16   right, perhaps, to cross-examine or raise issues with respect

17   to the same relief when it's sought at the second day

18   hearing, for final orders.  I just wanted to emphasize that.

19                   THE COURT:  And I think your reserving

20   anticipates, precisely, my admonition, which is that the

21   second day hearing is a completely new hearing and the record

22   is developed for that purpose.

23                   Ms. Scheuer, good to see you.

24                   MS. SCHEUER:  Good afternoon, Your Honor.  For the

25   record, Therese Scheuer for the SEC.

1           The SEC would also just like to make the same

2   reservation for cross-examine Mr. Amani at the second day --

3           THE COURT:  That reservation is noted.

4           MS. SCHEUER:  Thank you.

5           THE COURT:  All right.  In the absence of any

6   observe acquisition, Mr. Amani's declaration is admitted.

7       (Amani Declaration received in evidence)

8           THE COURT:  Is there any party that intends or

9   expects today to cross-examine Mr. Amani regarding the

10  contents of his declaration?

11      (No verbal response)

12          THE COURT:  Very well.  Again, for purposes of

13  today, Mr. Amani's declaration is admitted, without

14  contradiction.

15          Ms. Berkovich, you may proceed.

16          MS. BERKOVICH:  Thank you, Your Honor.

17          And if there are no objections, we would like to

18  move into evidence the declaration of Mr. Leto, filed at

19  Docket 22.

20          THE COURT:  And, again, I would ask, are there any

21  objections to the admission of Mr. Leto's declaration,

22  subject to the same considerations the Court noted a moment

23  ago?

24      (No verbal response)

25          THE COURT:  Very well, Mr. Leto --

1        Same?

2        MS. SCHEUER:  Your Honor, I would just make the

3   same reservation.

4        THE COURT:  Of course.

5        And that reservation is noted both, for the SEC,

6   the United States Trustee, and, frankly, any other party in

7   interest that wishes to be heard at the second day hearing or

8   thereafter.

9        In the absence of objection, the Mr. Leto's

10  declaration is admitted.

11     (Leto Declaration received in evidence)

12        THE COURT:  Is there any party that intends or

13  expects to cross-examine Mr. Leto regarding the contents of

14  his declaration?

15     (No verbal response)

16        THE COURT:  Very well, Mr. Leto's declaration is

17  admitted, likewise, without contradiction.

18        You may proceed.

19        MS. BERKOVICH:  Thank you.

20        Your Honor, it was a team effort to get us here

21  today.  There are a number of people in the courtroom and

22  joining us via dial-in, who have put hard work into getting

23  this case together.  So those are all the introductions and

24  with that, I would like to present some slides with some

25  background.

1           THE COURT:  Before we do that, I would just like

2  to check in with the Office of the United States Trustee.

3           And Ms. Richenderfer, good afternoon.  I, as

4  always, appreciate your office's engagement with the debtor

5  in advance and I'm certainly pleased to hear that, at least,

6  thus far, matters seem to be resolved for purposes of today.

7           Has your office sent out a notice for a formation

8  meeting?

9           MS. RICHENDERFER:  Yes, Your Honor, we have.

10          You may have noticed if you look at the petition,

11 it was a rather limited list of creditors and we also had a

12 lot of bouncebacks with the email addresses, so we have since

13 been provided by debtor with new additional email addresses

14 and I believe debtor intends to file an amended list of

15 creditors, adding at least two more.

16          We have been able to already send out

17 questionnaires to the additional creditors and use the

18 revised email addresses we received.  We have asked for

19 responses by Thursday for the first group and Friday for the

20 second group.  You know, I'm going to wait and see if we

21 receive anything.  That would give us plenty of time before

22 the second day hearing, but we are looking to form a

23 committee, of course --

24          THE COURT:  Very good.

25          MS. RICHENDERFER:  -- we just don't know what type

1  of response we may receive.

2          THE COURT:  Well, and, again, the timing, as

3  outlined by Ms. Berkovich, certainly affords a sufficient

4  opportunity to get through that process and we'll reconvene

5  on the 4th, if not in advance of that, so if there are

6  parties interested, then you'll do your thing.

7          MS. RICHENDERFER:  That's correct, Your Honor.

8          And there were various, I think, potentially

9  gatekeeping issues, but those are -- we don't need to

10  address those today, but Your Honor may have guessed at one

11  or two of them:  What are we doing with a Singapore

12  corporation in Delaware?  And, in addition, where is the --

13  I'm going to forget the exact language, and I should remember

14  it because I was on the LTL team -- but the immediate

15  financial --

16          THE COURT:  Distress?

17          MS. RICHENDERFER:  -- distress of the debtor at

18  this point in time.  I know that Judge Walrath, at one point

19  in time, wrote about a company facing a verdict.  I think

20  it's been, since then, that the Third Circuit has ruled in

21  LTL, going through circumstances where there was the two-step

22  process, but there was also the issues concerning the

23  liability itself.

24          And so, you know, we'll wait to see what evolves

25  here and there's a history here with this company and that's

1  why we have the SEC counsel here with us today.  And, I mean,

2  these are points that I have raised in my conversations with

3  Mr. Shapiro.  Again, I don't think that they necessarily need

4  to be dealt with today.  I only raised them because -- and I

5  forgot to check the name of the case -- Your Honor had a case

6  before Your Honor where we had an issue about corporate

7  authority to file the bankruptcy case in the first

8  instance --

9              THE COURT:  Yeah.

10             MS. RICHENDERFER:  -- where Your Honor eventually

11 ruled they did not have authority, so the Court didn't have

12 jurisdiction over the case.

13             THE COURT:  That was the PhysIQ case --

14             MS. RICHENDERFER:  Thank you.

15             THE COURT:  -- and I specifically found that I had

16 jurisdiction.  They just lacked any corporate authority to

17 file the petition.

18      (Laughter)

19             MS. RICHENDERFER:  Excuse me, Your Honor.  I got

20 it backwards.  You're right, they lacked corporate authority.

21 That's right.  And I guess I just took it a step further,

22 though, because they didn't have corporate authority, they

23 were out of the court.

24             But the concern there had been, if Your Honor

25 remembers, the interim first day order regarding the DIP and

1  the way we view it, I don't think that there's any interim

2  relief that's --

3          THE COURT:  Well, there's the Treasury Management

4  motion, but there's not a borrowing and there's not the

5  granting of liens and the other mechanics.

6          But if we go much further down this path,

7  Ms. Berkovich is likely to file a brief and, otherwise,

8  filibuster.

9          MS. RICHENDERFER:  Well, and --

10      (Laughter)

11         THE COURT:  You may consider the shot over the bow

12 made.

13         MS. RICHENDERFER:  Well, and, Your Honor, I just

14 wanted to give everyone a heads-up officially.  And it is for

15 the very reason that we don't see the relief as being granted

16 today as, in any way, affecting the position of creditors

17 *vis-a-vis*, each other as what happened in PhysIQ once we had

18 the -- the secured lender ended up with a lien on the assets.

19         THE COURT:  So noted.

20         MS. RICHENDERFER:  And, in fact, I think it was

21 almost a year ago.  I remember it was February in which we

22 had that last year.

23         But, just, we didn't want that to go unnoticed,

24 Your Honor, and I'm sure that came to your attention in

25 reading the first day declaration.  Thank you.

1          THE COURT:  All right.  We're spending a lot of

2  time talking about stuff we're not doing today.

3          MS. BERKOVICH:  Yes.  Yes.

4          I thank Ms. Richenderfer for raising those issues

5  and I actually think during the course of my presentation,

6  I'll have some answers and it'll be pretty clear why we're

7  here and why we should be here.

8          So we have a presentation.  We did email it to

9  chambers.  Jesse Kitnick has it on his computer and we can

10  put it up on the screen and they also have a hard copy.

11          THE COURT:  I'll take a hard copy if you've got

12  it.

13          MS. BERKOVICH:  Okay.

14          THE COURT:  Thanks.

15          And can we give Mr. Kitnick privileges and we can

16  move forward.

17          I have observed before that the practice has

18  evolved to the point where bankruptcy lawyers can't order

19  appetizers without a PowerPoint.

20      (Laughter)

21          MS. BERKOVICH:  Yes.  We were holdouts for a

22  while, but I think people now --

23          THE COURT:  I blame Kirkland.

24          MS. BERKOVICH:  -- expect a presentation, so give

25  the people what they want, right.  That's what we're here

1  for.

2         THE COURT:  I think I'm "the people," and nobody

3  asked.

4      (Laughter)

5         MS. BERKOVICH:  Okay.  Well, noted.  Noted.

6         Hopefully, you'll find this illuminating -- fewer

7  words than the 40-point declarations, for sure.  We'll start

8  with the roadmap overview.  We'd like to tell the Court who

9  we are, why we're here, and where we're going.

10         So, starting, who is TFL?  Terraform Labs, or TFL,

11  is a company specializing in the development of open source

12  software and blockchain technology.

13         I'm just waiting a moment for the PowerPoint to

14  catch up.

15         THE COURT:  That's okay.

16         MS. BERKOVICH:  Its primary business is developing

17  and supporting the software used to create and run the

18  current Terra blockchain network, which we generally refer to

19  as the "Terra blockchain," --

20         THE COURT:  Uh-huh.

21         MS. BERKOVICH:  -- and numerous tools, protocols,

22  and applications that operate on the Terra blockchain, making

23  transactions on the network easier, faster, and more user

24  friendly.

25         In early May 2022, TFL's initial blockchain, which

 1  we call "Terra classic," failed on the collapse of its native

 2  tokens, Luna Classic and UST.  After TFL consulted with

 3  members of the Terra community, and with their support, TFL

 4  relaunched the new Terra blockchain in May of 2022,

 5  introduced an entirely new token, which we'll call "Luna,"

 6  and AirDropped those into the wallets of the holders of Luna

 7  Classic at the time of the Luna Classic collapse.

 8           THE COURT:  Uh-huh.

 9           MS. BERKOVICH:  The Terra community, which you'll

10  hear a lot about today, includes hundreds of thousands of

11  individual users, as measured by wallets, who participate on

12  the Terra blockchain in various capacities.  The Terra

13  community is committed to the Terra blockchain and TFL is

14  deeply committed to the community.

15           So, TFL's, like, primary business purpose is to

16  continue to maintain and improve the Terra blockchain,

17  thereby attracting additional users to participate on it and

18  developers to build useful applications on it.  To that end,

19  TFL has introduced and is in the process of creating several

20  new, exciting software applications that we'll talk about

21  today.

22           Let's talk about what TFL is not, because there've

23  been a lot of crypto cases out there and you'll find that

24  this company is different from --

25           THE COURT:  From the one downstairs?

1           MS. BERKOVICH:  Yes, exactly.

2           And maybe fewer juicy bankruptcy issues, and maybe

3    sorry to disappoint, but I think that actually makes it

4    easier.

5           So TFL does not currently issue or sell digital

6    tokens for value.  The SEC's action does involve TFL's sale

7    of tokens years ago, but not its current activities.  And TFL

8    is not and has never been a trading platform for digital

9    currencies like FTX, for example.  TFL does not have, and

10   never had customers in a way that digital asset companies do,

11   for example, Celsius Networks, and TFL does not make loans of

12   cryptocurrency like Genesis did.

13          TFL product users do not have accounts with TFL

14   and TFL has never held, and does not hold any customer funds;

15   instead, more simple, TFL is a software-development company.

16   It doesn't operate to gain profits in a traditional sense;

17   rather, it expects to reinvest all of the revenue that it

18   earns into the business and back into the Terra blockchain

19   ecosystem for the benefit of the Terra community.

20          THE COURT:  But it is a corporate enterprise.

21          I read that in the declaration and I'm -- it's

22   almost like a -- the description is almost a public-interest

23   corporation or a public trust.

24          MS. BERKOVICH:  It does seem like a not-for-profit

25   or whatever, but that's the way the business purpose is.

1   It's a community built on it and the purpose is to expand the

2   blockchain.

3              THE COURT:  Can I ask in the more general terms,

4   it seems more of an ethic than a restriction on the business.

5   This is how it's being modeled in order to achieve this

6   result and build this community, rather than sell as many

7   widgets or get as many people to sign up for Amazon Prime as

8   you could.

9              Is that a fair characterization?

10             MS. BERKOVICH:  No, that's right.

11             And you can see the company benefits from

12  reinvesting --

13             THE COURT:  Sure.

14             MS. BERKOVICH:  -- those profits back in and

15  building up the Terra blockchain, so it does inure to the

16  benefit of the company.  There is a sense of maximizing value

17  by improving the Terra blockchain.

18             THE COURT:  Okay.

19             MS. BERKOVICH:  You're right, it's an ethic.  They

20  don't think about, let's, you know, gain dollars and cents

21  and put it in our pockets.  It's to put it back into the

22  ecosystem and back into the blockchain.

23             THE COURT:  Okay.  I understand.

24             MS. BERKOVICH:  Okay.  So why is TFL here?

25             So, TFL is a defendant in an action that the SEC

1  commenced and is currently pending in the District Court for

2  the Southern District of New York.  In late December, so less

3  than -- or I guess now, just a month ago, the District Court

4  granted summary judgment to the SEC on certain claims,

5  importantly finding that TFL and its founder and former CEO

6  Bill Kwon, offered and sold unregistered securities by

7  issuing TFL's native tokens to investors.  So there's already

8  been a finding that TFL engaged in wrongdoing.

9          The trial is scheduled for March 25th on the

10  remaining claims, which are the securities fraud claims and

11  the District Court is expected to enter a final judgment

12  shortly thereafter.

13          THE COURT:  After the trial?

14          MS. BERKOVICH:  After the trial.

15          THE COURT:  So I just wanted to make sure I

16  understood procedurally.  So summary judgment has been

17  granted by Judge Rakoff.

18          MS. BERKOVICH:  Yes, Your Honor.

19          THE COURT:  Matters that remain in dispute are

20  headed to trial next month or March, and at that point, there

21  is the prospect of a judgment being, a money judgment being

22  entered with the consequences that are described in the

23  declaration.  Do I have that timing right?

24          MS. BERKOVICH:  Yes, Your Honor.

25          THE COURT:  So there was -- it wasn't a hundred

1  percent clear.  I thought that that was it, but again, part

2  of the concern, or part of my uncertainty was whether or not

3  there was an expectation of an immediate issuance of a money

4  judgment by the Southern District in advance of the trial,

5  but the summary judgment just answered the question as to

6  certain issues of liability.

7           MS. BERKOVICH:  Liability, yes, Your Honor.

8           THE COURT:  Okay.  I understand.

9           MS. BERKOVICH:  So given the existing ruling,

10  however, it's possible, maybe likely that the liability

11  exposure outstrikes the value of the assets.  So this isn't

12  LTL and this isn't the other case in which Ms. Richenderfer

13  mentioned.  We have the judgment against us.  That will be

14  converted into a money judgment.  That will put us into

15  financial distress for now.  For now.  It's not over yet.

16           So, where is TFL going?  So after the judgment is

17  entered, we will appeal the District Court decision to the

18  Second Circuit Court of Appeals.  TFL believes it has very

19  strong arguments that the District Court's summary judgment

20  decision should be reversed and I'll discuss that a little

21  bit -- obviously not an issue that we're asking this Court to

22  decide -- but we need to be able to pursue the appeal for the

23  benefit of the company.

24           THE COURT:  And again, I think that the

25  declaration was clear on this, but I want to confirm, the

1   debtor is not seeking to use the stay to stop the litigation

2   in the Southern District.  It intends to move forward with

3   the trial in March; is that correct?

4         MS. BERKOVICH:  Yes, Your Honor.

5         THE COURT:  Okay.  You may proceed.

6         MS. BERKOVICH:  So TFL sought Chapter 11

7   protection to protect its assets from value-destructive

8   creditor enforcement actions which would come, ensure the

9   ability to appeal to the Second Circuit, maximize value for

10  all stakeholders, including creditors, our 60 employees, and

11  the hundreds of thousands of people that have a stake in the

12  success of this blockchain, enable operations in the ordinary

13  course of business, including continuing and expanding our

14  web-free offerings, and if necessary, treat similarly

15  situated creditors similarly through our restructuring plan.

16  In short, TFL is using Chapter 11 to pursue the appeal while

17  continuing its business.

18        Absent the protections of Chapter 11, the SEC

19  could eventually enforce its money judgments before

20  resolution of the appeal, which would be value-destructive to

21  all stakeholders, including, in our view, the very same token

22  holders that the SEC is purporting to protect in its action.

23  We believe our path is more value-maximizing and protective

24  of them.

25        So, today, TFL's focused on the future of the

1  business and the Terra community, including developing and

2  releasing exciting, cutting-edge technology and applications

3  to maximize the value of the blockchain.

4          The key players here on the management team --

5  I'll go a little bit out of order, but Chris Amani, who Your

6  Honor met.  We have Cayden Bernstein, who's the vice

7  president of people, and I'm going to -- Peter Shea, who's

8  the general counsel.  Those three members of senior

9  management are based in the United States.  And then we have

10 Mike Brown, the chief technology officer; Mark Chan, the head

11 of Ecosystem; Edward Lim; and Javier Su.  The board of

12 directors consists of Mr. Amani.  We have Mr. (Indiscernible)

13 again.  For Singapore company, you need to have a resident

14 director in Singapore and --

15         THE COURT:  I understand.

16         MS. BERKOVICH:  -- he is part of our -- he is an

17 employee, but also a director.  And the third director is

18 also a U.S. person, John Dubel, and we put something about

19 his background into the deck.

20         THE COURT:  I saw that.

21         MS. BERKOVICH:  We did form a special committee

22 prepetition and we'll talk about the investigation, but

23 Mr. Dubel is on the special committee.

24         And you see here, the advisors that TFL assembled

25 to get it through its process and to make sure that there are

1   appropriate controls and adherence to the law and bankruptcy

2   law during the course of this Chapter 11 case.

3               THE COURT:  Very good.

4               MS. BERKOVICH:  With that, I will go to the

5   company background.  At this point, people have different

6   levels of understanding about cryptocurrency and blockchains.

7   I'm happy to go through the 101 or we can skip over it if you

8   would like.

9               THE COURT:  Why don't we skip over it for purposes

10  of today.

11              MS. BERKOVICH:  Okay.  So we get to the company

12  timeline.  I think this is helpful.

13              So Terraform was formed in 2018.  It launched the

14  Terra Classic blockchain in 2019 and issued one billion Luna

15  Classic.  In 2020, it introduced the UST stablecoin, which

16  became operational on the Terra Classic blockchain.  It's

17  those two, you know, sales of those tokens that are the

18  issue --

19              THE COURT:  The subject of the litigation.

20              MS. BERKOVICH:  -- yeah, subject of the

21  litigation.

22              THE COURT:  I got it.

23              MS. BERKOVICH:  So, you know, 2020, there's the

24  crypto (indiscernible) collapse.  Particularly, the UST

25  experienced a significant de-peg and the prices of both of

1   those tokens collapsed.  TFL went to the community and had a

2   proposal to launch a new blockchain that was approved and it

3   air dropped new Luna, different from at the Luna Classic, to

4   the holders of Luna Classic and UST.

5           Then, in early 2023, several things happened.  The

6   SEC commenced its litigation.  Mr. Kwon resigned as both, CEO

7   and director, and Mr. Amani was appointed as CEO and

8   director.  So the management changes last spring.

9           THE COURT:  And Mr. Kwon, I saw in Footnote 20,

10  Mr. Kwon is currently in Montenegro in custody, correct?

11          MS. BERKOVICH:  Yes, correct, in jail.

12          THE COURT:  So you may proceed.

13          MS. BERKOVICH:  And then something exciting

14  happened in 2023.  The company approached the community with

15  a proposal (indiscernible) how to improve the blockchain.

16  The community voted in favor and granted to grant the company

17  150 million Luna out of the community pool.

18          As the summary judgment decision was approaching,

19  TFL hired Weil at the end of December.  We got the summary

20  judgment decision and then in January, TFL hired Alvarez &

21  Marsal as financial advisor.  Wong Partners is assisting the

22  company with Singapore governance advice.  We brought John

23  Dubel on board as an independent director in mid-January and

24  then the Board approved and the company filed the Chapter 11

25  petition on January 21st.  And you see here, the trial is

1  expected to commence in two months.

2        So, again, TFL's goal is to foster a self-

3  sustaining digital network with a vibrant and flourishing

4  community of users.  TFL does this through developing tools

5  and applications on the blockchain that drive economic

6  opportunity to it.  We have a workforce of 60 employees and

7  contractors in more than 15 countries, including many in the

8  United States, and these are mostly software developers.

9        THE COURT:  Uh-huh.

10        MS. BERKOVICH:  Okay.  So we talked a lot about

11  the Terra community.  Who is the Terra community?

12        So we've got over half a million stakeholders as

13  measured by wallets, with 37,000 monthly active users,

14  measured by unique wallets.  The users own the Luna tokens

15  and they utilize the various applications that the debtor and

16  others have developed and some of them (indiscernible).  So,

17  there's a decentralized governance process on the blockchain.

18  Community members can submit proposals, democratically vote

19  on proposals, and implement various proposals, if approved by

20  the requisite vote.

21        So, again, for example, as I mentioned in October

22  of last year, TFL proposed, and the community approved the

23  proposal to provide TFL with 150 million Luna tokens from the

24  community pool to support a project that TFL outlined and we

25  put in the declaration, to grow the blockchain and fund other

1  developers that contribute to its operation.  So out of those

2  150, there's 100 million that went to TFL's treasury and 25

3  million were earmarked for strategic partnerships and

4  community project initiatives.  Those 125 vest over 5 years

5  and then there's 25 million non-vesting.  They're immediately

6  for liquidity funds to be meshed with TFL's treasury and

7  deployed opportunitively.  So anyone, actually, can create

8  new applications and protocols for the Terra blockchain, not

9  just TFL and all that makes it more useful.  And this funding

10 will help others come to the blockchain.

11         I could spend about 10 minutes talking about the

12 various applications.  I'm happy to get into it.  It's in

13 detail in the declaration.

14         THE COURT:  Yeah, I think the declaration covers a

15 lot of it and I don't think I'm going to get any smarter this

16 afternoon.

17     (Laughter)

18         THE COURT:  Let's talk about the organizational

19 structure --

20         MS. BERKOVICH:  Sure.

21         THE COURT:  -- unless we need to cover some of the

22 software.  Again, it's helpful to me in walking through this.

23 This is not a typical brick-and-mortar kind of company.

24         MS. BERKOVICH:  Yes.  Yes.

25         THE COURT:  So I think I would like to understand

1  the organizational structure and then we can talk about where

2  we go from here with the assets and liabilities.

3          MS. BERKOVICH:  Sure.  So we've got the

4  organizational structure.  We have just one debtor here, the

5  Singapore entity.  Yes, it's a Singapore entity, but its

6  management is in the U.S.  Its primary creditor is the U.S.

7  Its advisors are in the U.S.  And I think that's enough

8  (indiscernible) it's clear why we're here.

9          There are four subsidiaries.  Two are dissolved.

10 One is in the process of being dissolved.  The main operating

11 subsidiary is Proximity Panorama (phonetic).  This is an

12 entity that the company acquired in November or December of

13 last year that has exciting software and IT that works really

14 well with the company's application.  So there's already been

15 a lot of synergies there and the company thinks that it'll

16 bring value.  So that's the corporate structure.

17         THE COURT:  And is the Korea entity, Terraform

18 Labs Korea, that's an operating entity, is that correct, or

19 is that dissolved?

20         MS. BERKOVICH:  No, that's in the process of being

21 dissolved.  It just hasn't been formally.  It's like stuck in

22 the court or something.

23         THE COURT:  Okay.

24         MS. BERKOVICH:  It's not an entity that the

25 company uses.

1           So the company's assets are the various digital

2   assets held in treasury.  These through the wallets that TFL

3   controls.

4           You know, after the SEC commenced this litigation,

5   all of the company's banks froze the bank accounts and some

6   of the exchanges froze the digital asset accounts, so those

7   are locked.  The company -- it's very unusual, the company

8   has no cash.  We don't see a cash management motion; we see a

9   Treasury Management motion.

10          THE COURT:  I read the Treasury Management motion

11  a couple times.

12          MS. BERKOVICH:  Yes.

13       (Laughter)

14          MS. BERKOVICH:  You know, one thing we're hoping

15  is that through the Chapter 11 case, then we'll be able to go

16  to banks and convince them that we are a company that they

17  should be banking with us or we should be banking with them.

18          You know, there's larger law firm retainers than

19  normal, partly because of a cash situation.  It helps fund

20  professional fees.  There's 57 million in fiat currency and

21  fiat is what, you know, people refer to like "U.S.

22  dollars" --

23          THE COURT:  Dollars.

24          MS. BERKOVICH:  Yeah, exactly.  Not crypto.

25          THE COURT:  Is that functionally a prejudgment

1  attachment or something in the Singapore Court?

2          MR. CALIFANO:  Your Honor.

3          THE COURT:  If you could come on up to the podium.

4          MR. CALIFANO:  That amount was deposited in the

5  Court's registry as part of its request to lift a Mareva

6  injunction that had been filed ex parte.

7          THE COURT:  Okay.  And it is under the

8  jurisdiction of that Court pending further proceedings there.

9          MR. CALIFANO:  That is correct.

10          THE COURT:  Okay.  Good to see you again, sir.

11          MS. BERKOVICH:  You know, the company is

12  considering what to do with respect to that action in terms

13  of getting recognition in Singapore, or seeking to stay, or

14  move forward, or seeking to have some of that money released

15  because the company believes that the amounts in custody

16  exceeds the exposure for reasons that we put in the

17  declaration.

18          THE COURT:  One question I did have is, is there

19  any companion proceeding or insolvency proceeding initiated

20  in Singapore by the debtor or is that intended, or expected,

21  or where does that stand?

22          MS. BERKOVICH:  The company is considering whether

23  it needs -- we don't know yet.

24          THE COURT:  Okay.

25          MS. BERKOVICH:  There's none existing at the

1  moment.

2          THE COURT:  Very good.

3          MS. BERKOVICH:  The company has invested over the

4  years over $50 million in 12 limited partnerships and LLC's,

5  effectively, venture investments on various technology

6  fields.  More than half of those are Delaware Limited

7  Partnerships or Delaware LLC's.  The company has some IP.  A

8  lot of its IP is open source, but it does have valuable IP

9  through the Proximity acquisition.  Those are the assets.

10         The liabilities we don't have funded debt --

11         THE COURT:  So, on the LLC's and the LP's those

12  are simply investments --

13         MS. BERKOVICH:  Investments, yes.

14         THE COURT:  -- that the company has made in

15  unrelated corporations, right?

16         MS. BERKOVICH:  Unrelated corporations, yes.

17         THE COURT:  That is part of doing their thing and

18  to the extent that there is value to their investment then

19  the debtor benefits from that and to the extent there's not

20  so be it, but these are, effectively, just investments?

21         MS. BERKOVICH:  Correct.

22         THE COURT:  Okay. I understand.

23         MS. BERKOVICH:  On the liability side no funded

24  debt. We have contingent litigation liability in the SEC

25  enforcement action.  That is our biggest potential debt,

1  potential liability in the Singapore action.  Under the

2  venture investments there are additional capital

3  contributions that the company is obligated to make.

4  Obviously, the company will decide whether it makes sense to

5  do so in their judgment to come before the Court before

6  paying any amounts.  Then there is intercompany claims which

7  the company is in the process of reconciling.

8              THE COURT:  Okay.

9              MS. BERKOVICH:  So, again, I will be brief here

10  because we covered it in the beginning, but we are here

11  because of the SEC filing.  The key issue is whether these

12  tokens are securities.  If they are not securities then the

13  SEC doesn't have jurisdiction over them.  Again, it's an

14  interesting issue, Your Honor.  No one is asking this Court

15  to decide that.

16              The company's view is that these are not

17  securities.  These securities laws were adopted in 1930's

18  before computers were even invented and that the SEC,

19  therefore, doesn't have jurisdiction over cryptocurrencies or

20  any other type of currency.  Congress had actually considered

21  recently proposals to regulate cryptocurrencies either by the

22  SEC or by the CFDC, but Congress has not enacted those bills.

23  Until recently the SEC did not assert jurisdiction over

24  cryptocurrencies and also refused industry requests to issue

25  regulations clarifying the scope of its authority.  But

1  recently the SEC has brought a series of enforcement actions

2  against different companies including TFL and others.

3           Franky, Federal Courts have disagreed about the

4  scope of the SEC's authority over crypto tokens.  We cite

5  here a Ripple Labs opinion.  So, what happens when there is

6  disagreement over matters of great concern is the company is

7  going to appeal the judgment.

8           I guess we have the SEC's position here, they do

9  believe that these are securities under the Howey case we

10 learned about in law school. I hadn't thought about it since

11 then, but it's interesting and involved orange groves, but

12 not cryptocurrency and we do not believe that the offering

13 sale of tokens constitute investment contracts as required by

14 Howey.

15          You know, we are going to pursue an appeal in the

16 Second Circuit and this is an important matter for the

17 company.  If the Second Circuit agrees with TFL, it will be

18 able to continue its business as a going concern. If not, we

19 are going to seek appeal all the way up to the Supreme Court.

20 Because of the size of the potential money judgment the

21 debtor is not likely to satisfy such judgment, nor would it

22 be able to post a supersedeas bond required to appeal.  That

23 would enable the SEC to enforce its judgment which would be

24 disastrous for the company and its stakeholders, including

25 the holders of the Luna tokens.

1        As I mentioned earlier, we are not seeking to use

2  the automatic stay to prevent the SEC from continuing to

3  litigate the enforcement action to judgment.  We understand

4  that that is subject to an exception to the stay.  We are not

5  seeking to expand that, but we are relying on the exception

6  to the exception that would prevent the SEC from enforcing

7  its action.

8        So, the protection of the automatic stay is

9  beneficial for the company, it would allow us to continue to

10  conduct our business, avoid immediate risk of cessation of

11  its operations through enforcement, pursue its right to

12  appeal and protect estate assets.

13        I am nearly done. The company has recently taken

14  steps to improve its governance. I know that some of this,

15  most of this -- and there is a special committee that has

16  already been active in conducting investigations into various

17  items that are laid out here including claims and causes of

18  actions against current and former directors and

19  shareholders.

20        Last slide on the path forward.  By utilizing the

21  Chapter 11 process and the tools of the bankruptcy code, TFL

22  hopes to emerge as a reorganized and stronger enterprise for

23  the benefit of all stakeholders.

24        Does Your Honor have any questions?

25        THE COURT:  I don't.  Before we turn to the

1  motions though I would hear from anyone that wishes to be

2  heard.  I appreciate getting context from the Office of the

3  United States Trustee a few moments ago, but I certainly --

4  the SEC came up here, your name was mentioned a few times or

5  your organization, Ms. Scheuer.  Good to see you.  Welcome

6  back.

7          MS. SCHAUER:  Thank you, Your Honor.  Good to see

8  you as well.  For the record Therese Scheuer for the U.S.

9  Securities and Exchange Commission.

10          Your Honor, with me on the line is William

11  Uptegrove from the Securities and Exchange Commission, Roger

12  Landsman and Chris Carney are handling the District Court

13  litigation are also on the line by Zoom.  And additional SEC

14  staffers are also joining this hearing by Zoom.

15          THE COURT:  Very good.  Welcome all.

16          MS. SCHEUER:  Thank you, Your Honor.

17          Your Honor, if I may, I would like to first give a

18  brief status report on the SEC's action against Terraform.  I

19  think it might be helpful to provide a little bit of context

20  as this appears to be the reason they filed for bankruptcy.

21  Then, Your Honor, I would like to highlight for the Court

22  some concerns that we have regarding the bankruptcy case.

23          Your Honor, as Ms. Berkovich has noted, the SEC

24  sued the debtor and its former CEO in the Southern District

25  of New York alleging the debtor offered and sold unregistered

1  securities and engaged in a fraudulent scheme that led to the

2  loss of $40 billion in market value.  On December 28th, 2023

3  the District Court ruled in favor of the SEC finding that the

4  debtor offered and sold certain crypto assets including UST

5  and Luna Classic as unregistered securities.  A jury trial on

6  the fraud charges is scheduled to start March 25th.

7          Rober Landsman and Chris Carney are attorneys in

8  the Division of Enforcement handling the District Court

9  litigation.  They have not filed a government certification,

10  Your Honor, under the local rules, but are on the line with

11  me and can provide further detail regarding the District

12  Court action if Your Honor will permit.

13          THE COURT:  I would certainly permit and, again, I

14  think counsel has heard me give this speech before.  This is

15  a first day hearing, I certainly am not going to stand on

16  ceremony as to either affiliation with local counsel or the

17  filing of the certifications. If there are parties that wish

18  to be heard either remotely or in the courtroom, as always, I

19  will hear from anyone that wishes to be heard.

20          Again, I have been given a lot of context from the

21  declaration, from Ms. Berkovich's comprehensive presentation

22  and colloquy with the United States Trustee.  And to be -- I

23  want each side to be clear, I welcome the context. This is

24  both a complex business and product, for lack of a better

25  term, but in some ways the structure of what is in front of

1  me is actually not terribly complicated.  I would welcome any

2  party that wishes to address the Court.

3          Understand, and I think everyone does, that I am

4  focused exclusively today on the relief that is being sought.

5  So, parties rights are fully reserved and to the extent that

6  I am being advised by counsel, at the podium or otherwise, it

7  is for purposes of context. It doesn't hurt, but there is

8  often a sense of discomfort when the other side is explaining

9  everything about where it is that we -- how it is that we got

10 here and where it is we are going to go.  I understand that

11 dynamic pretty comfortably.

12         But, no, to the extent that you or your colleagues

13 wish to touch on some of these issues, understand, of course,

14 I am not trying this litigation and the debtor has

15 represented that it intends to move forward and there has

16 been substantial description and discussion of that

17 litigation.  So, to the extent that I would benefit from

18 being educated a bit on it, I am all ears.

19         MS. SCHEUER:  Thank you, Your Honor.  I think we

20 do have a bit more to do, but maybe helpful to the Court in

21 addressing some of the relief that the debtors seek today.

22 We do have some concerns about the relief being sought today,

23 specifically the treasury management motion.

24         THE COURT:  Okay.

25         MS. SCHEUER:  Thank you, Your Honor.  I will turn

1  it over to my colleagues.

2          THE COURT:  Very good.

3          MR. LANDSMAN:  Thank you, Your Honor.  I will try

4  and be brief and not go over too much of what was already

5  discussed, but try and highlight some things that we think

6  are of particular importance as well as provide some

7  additional concerns that we have about aspects of the SEC

8  case that may impact the (indiscernible) case.

9          It was previously discussed on December 28th, 2023

10 Judge Rakoff from the Southern District of New York agreed

11 with the SEC and held that as a matter of law Terraform

12 engaged in unregistered offers and sales of, what the debtors

13 have described as, Luna Classic or their original Luna

14 tokens, as well as another token, MIR, which are securities.

15         In that action, what is pending for trial at the

16 end of the March the SEC also alleged that defendants

17 violated the anti-fraud provisions of the Securities and

18 Exchange Act.  The SEC alleged two different frauds.

19         The first fraud is that defendants allegedly

20 fraudulently told people that their blockchain was used to

21 settle real world transactions, it was not.  The second fraud

22 is that defendants allegedly told people that another one of

23 their tokens, called UST, was supposed to equal one dollar

24 and was pegged to the US dollar by an automated algorithm

25 when it was not. Judge Rakoff has described the SEC's

1 evidence as compelling and damning.

2           Without going into and repeating too much about

3 the case, I think I also wanted to mention that the SEC has

4 concerns about Terraforms business and particularly the use

5 of Luna 2.0.  As noted, Judge Rakoff found Terraform liable

6 for violating the Securities Act for unregistered offers and

7 sales of their original Luna token or the Luna Classic.  When

8 Luna Classic collapsed in 2022 Terraform and Do Kwon created

9 new Luna tokens, known as Luna 2.0 which it currently holds a

10 significant sum according to the debtor's filings.

11           Just like Luna Classic, Luna 2.0 appears to derive

12 value from the use of the blockchain.  Moreover, in

13 accordance with the debtor's filings, the success of Luna 2.0

14 will be tied to the debtor's success.

15           While the debtors say in its papers that it is not

16 currently issuing or selling crypto assets for value, the

17 business they seek to reorganize as may not be in compliance

18 with the securities laws as it appears to us that they are

19 seeking to replicate the business for which the District

20 Court found violative of the Federal Securities laws by

21 trying to fund its operations for years with Luna.

22           If you have any questions, I am happy to answer

23 them or, otherwise, I will turn it back over to Ms. Scheuer.

24           THE COURT:  No, I don't have any questions.  Thank

25 you for your comments.

1          Ms. Scheuer.

2          MS. SCHEUER:  Thank you, Your Honor.

3          Your Honor, the debtor has said that it filed for

4    bankruptcy because of the SEC action, but I would just like

5    to provide a little bit more background on the filing.  Prior

6    to the bankruptcy case the SEC repeatedly asked Terraform for

7    information regarding $70 million which was transferred to

8    Dentons in the past month.  The staff was told that Terraform

9    would provide this information by January 22nd, but rather

10   then provide the information about the $70 million in

11   prepetition transfers Terraform filed for bankruptcy on

12   January 21st.

13          Your Honor, among your concerns with the

14   bankruptcy case is whether the petition was properly filed.

15   Obviously, we are still very early on, but based on the

16   declarations, as has been discussed by the Office of the

17   United States Trustee, the debtor appeared to perceive

18   possible financial problems down the road in the future;

19   however, it doesn't appear to be in current financial

20   distress.

21          To the extent the debtor has solvency issues now

22   it may be because of the assets it transferred prepetition.

23   The SEC's claim is unliquidated because we obtained a

24   judgment as to liability only, not as to amount, but

25   according to the debtor's own filings we appear to be their

1  most significant creditor.  The top creditor with a

2  liquidated claim is listed at approximately $3,000.

3         Because there are so few creditors here and those

4  with liquidated claims are small there may not be sufficient

5  interest in a committee to investigate the $70 million in

6  prepetition transfers or pursue other avoidance actions.  And

7  for the reasons discussed by my colleague, Mr. Landsman, it

8  appears to us that the debtor may be unable to reorganize its

9  business.

10        In addition, Your Honor, as also discussed by the

11  Office of the United States Trustee, venue may not be proper

12  in this District. It's worth noting, Your Honor, that the

13  debtor contested personal jurisdiction in the District Court

14  action and my understanding is it took that issue all the way

15  up to the Supreme Court.  The debtor's principal place of

16  business and placement corporation is in Singapore.  They

17  don't appear to have -- they don't have an affiliate that

18  filed for bankruptcy here.  So, venue in Delaware may not be

19  proper.  This is one of the issues that we are looking into,

20  Your Honor.

21        I have some comments with respect to the treasury

22  management motion, Your Honor.

23        THE COURT:  We will deal with that when we get to

24  the motions.  Any other comments, Ms. Scheuer?

25        MS. SCHEUER:  Not at this time.  Thank you, Your

 1  Honor.

 2              THE COURT:  Thank you.

 3              Does anyone else wish to be heard before we turn

 4  to the motions?

 5         (No verbal response)

 6              THE COURT:  Very good.  Again, I think there has

 7  been a lot of colloquy with the Court that is helpful to

 8  provide context and I take it in that light. I think we can

 9  then turn to the applications themselves.

10              Ms. Berkovich, I think you had given me a dance

11  card, but I don't have it written down. So, I am happy to

12  hear from anyone that wishes to present the motions.

13              MS. BERKOVICH:  We will have Mr. Andrews present

14  the first two motions.

15              THE COURT:  Very good.

16              MR. ANDREWS:  Good afternoon, Your Honor.  Gavin

17  Andrews of Weil Gotshal & Manges on behalf of the debtor.

18              THE COURT:  Welcome.

19              MR. ANDREWS:  Your Honor, I will keep this brief,

20  but Item No. 4 on the agenda is the application to retain

21  Epiq as the claims and noticing agent.  That is at Docket No.

22  17.  Your Honor, we did receive some minor administrative

23  comments from the U.S.T., which I believe that order has been

24  uploaded prior to the hearing.

25              THE COURT:  I did receive a revised form of order

1  and I did not have issues with that order.

2         MR. ANDREWS:  Thank you, Your Honor.  Barring any

3  other questions, we would like that to be entered.

4         THE COURT:  I would ask if anyone wishes to be

5  heard with respect to the application to retain Epiq as

6  claims and noticing agent.

7         (No verbal response)

8         THE COURT:  Very well.  I am going to grant the

9  motion.  As Mr. Andrews noted, this application was filed for

10  purposes of having Epiq provide the back-office claims and

11  noticing services for the debtor.  The Court is certainly

12  familiar with Epiq and I am satisfied that they possess the

13  requisite resources and experience to perform the services

14  that are necessary and required here.

15         In addition, I believe that this case also

16  implicates our local rules which require in large cases that

17  a debtor move promptly to engage the services of a claims and

18  noticing agent. That has occurred here.  I have had an

19  opportunity to review the application as well as the

20  accompanying documents. I am satisfied it's compliant with

21  our local rules and consistent with relief that I have

22  granted in prior cases.  The motion is granted.  The order

23  will issue.

24         MR. ANDREWS:  Thank you, Your Honor.

25         Moving to Item No. 5, that is the debtor's motion

1  requesting authorization to file portions of the creditor

2  matrix and future filings with personal information under

3  seal.  That is at Docket No. 11, Your Honor. The personal

4  information is home addresses of the employees.  We believe

5  disclosure would pose to those individuals risk, potentially

6  due to threats of violence.  Some of the debtor's personnel

7  (indiscernible) in the past.  And also, in relation to both

8  trading identify theft.

9          Again, the United States Trustee had some minor

10  comments to the order and I believe that has been uploaded to

11  your Chambers.  And, again, if there are no other questions,

12  Your Honor, we would ask that that order be entered.

13          THE COURT:  Very good. I would ask if anyone

14  wishes to be heard with respect to the debtor's motion

15  relating to its creditor matrix.

16      (No verbal response)

17          THE COURT:  Okay.  I have no issue with this

18  motion. Mr. Andrews, I have a question and if you need to

19  confer with your client or colleagues, you are welcome to do

20  so.  The motion, as currently posited, is relief that is

21  standard in this jurisdiction and I think in many, and it

22  goes to the issues that you just raised primarily about

23  concerns about identity theft and personal information being

24  loaded.

25          Historically, this wasn't a big concern because

1   they were giant stacks of paper and nobody would bother to go

2   to the clerk's office and dig that stuff out. Right now,

3   given availability of this electronically and even the

4   services, frankly, provided by the claims and noticing agent

5   it becomes exceedingly easy to do that.  I and my colleagues

6   have, I think, consistently approved this relief.

7           I have had a couple different crypto cases and it

8   may be that this company is simply different, but in prior

9   cases there has been significant attention paid to customers,

10  but I don't think you have customers.  So, again, the last

11  case that I had, which was Bittrex, I believe, had a

12  significant issue because they had millions of customers that

13  participated on the exchange.  This debtor doesn't have that

14  type of a business and doesn't hold that kind of information.

15  So, those folks would not appear.

16          We wouldn't have a community like that on your

17  creditor matrix, do I have that right?

18          MR. ANDREWS:  I believe that is correct, Your

19  Honor.  Yes.

20          THE COURT:  Very good.  Then the motion is

21  certainly narrow in scope and I would ask if anyone wishes to

22  be heard.

23      (No verbal response)

24          THE COURT:  Hearing no response, I am going to

25  grant the motion.  For the reasons that I stated a moment ago

1  in my colloquy with Mr. Andrews I find that the relief

2  requested is appropriate and warranted and consistent with

3  that which I and my colleagues have granted on many prior

4  occasions.  The motion is granted and the order will issue.

5         MR. ANDREWS:  Thank you very much, Your Honor.  I

6  will turn it over to my colleague, Ms. Jessica Liou.

7         THE COURT:  Very good.  Ms. Liou, welcome.

8         MS. LIOU:  Good afternoon, Your Honor.  For the

9  record Jessica Liou of Weil Gotshal & Manges, proposed

10 counsel for the debtor.

11        Your Honor, the next item on the agenda is Item

12 No. 6, it's the debtor's employee wages motion filed at

13 Docket No. 20.  As my colleague noted, we have been in

14 conversations with the United States Trustee and are fully

15 resolved on comments received to that proposed order. It has

16 been submitted to your Chambers.

17        Very briefly, the scope of requested relief for

18 this motion is authority to pay all outstanding prepetition

19 accrued workforce obligations associated with the 60

20 employees and contractors that are working for the debtor

21 currently or its operating subsidiary, Proximity.  These

22 amounts include obligations relating to employee portion of

23 payroll taxes, employee benefits, and also outstanding

24 prepetition accrued amounts relating to leave benefits, the

25 medical plan, and we also seek authority, just out of an

1  abundance of caution, to continue to honor and pay amounts in

2  the ordinary course going forward and also continue business

3  practices, programs, and policies relating to the work force

4  going forward as well.

5          The aggregate amount of the relief sought to be

6  paid relating to the prepetition period is approximately

7  $846,650, a relatively minimal amount.  I can also confirm

8  that the debtor is not seeking to pay any single individual

9  over the statutory priority cap of $15,150.

10         THE COURT:  And the same proposition applies to

11 the contractors that you have identified at Paragraph 25?

12         MS. LIOU:  Correct.  That is correct, Your Honor.

13 And as noted in the motion, there are many reasons to make

14 these payments.  As you have heard and seen this company

15 exists primarily online, but for all of the physical

16 employees around the world who do their jobs, show up every

17 day, and provide a high level of specialized knowledge and

18 skills in order to help the debtor do what it does, which is

19 turn out interesting, exciting software products in order to

20 aid in the adoption of the Terra blockchain and aid in

21 increasing user traffic to the blockchain.

22         So, for those reasons and to avoid immediate and

23 irreparable harm to the business we ask the Court grant the

24 wages motion on an interim basis.

25         THE COURT:  Very good. I would ask if anyone

1   wishes to be heard with respect to the wages and benefits

2   motion.

3           Ms. Scheuer.

4           MS. SCHEUER:  Good afternoon, Your Honor.  Therese

5   Scheuer for the U.S. Securities and Exchange Commission for

6   the record.

7           Just very briefly, Your Honor, my understanding is

8   that an SEC carve-out has been added to the order.  Thank

9   you.  Given the timing here, the SEC hasn't had the

10  opportunity to fully review the motion and just reserves the

11  right to object to final entry of the order.

12          THE COURT:  And I would note that that right is

13  reserved without even making it specifically on the record,

14  but so noted.  As for purposes of today you are satisfied

15  with the language in the order.

16          MS. SCHEUER:  Yes, as long as the carve-out is

17  being included.  Thank you.

18          THE COURT:  Very good.  Does anyone else wish to

19  be heard with respect to wages and benefits?

20      (No verbal response)

21          THE COURT:  Okay.  I am going to grant the motion

22  and consistent with Ms. Liou's observations I would make a

23  comment I have made many, many times which is that at the

24  outset of a case there is no constituency for whom I have

25  greater concern then the employees that look to the company

1  for payment of wages and benefits.

2          I have had an opportunity to review the

3  application, it is comprehensive and thorough. It identifies

4  a compensation and benefit regime that I would generally

5  expect in a company of this size and that I would also

6  observe that, again, consistent with Ms. Liou's comments the

7  nature of this company's business is in the heads of the

8  people that do the work for the company.  That is not a novel

9  proposition in this day in age, but to me a company that

10 comes into a Chapter 11 seeking to reorganize or achieve some

11 particular goal step one is insuring that your employees are

12 paid.  So, this relief accomplishes that.

13         As Ms. Liou noted, the relief does implicate

14 Bankruptcy Rule 6003 in that it contemplates a payment of

15 certain prepetition obligations in the first few weeks of the

16 case.  For the reasons stated in the declaration as well as

17 the Court's long experience I am satisfied that the debtor's

18 reorganization would suffer the risk of immediate and

19 irreparable harm in the absence of the relief requested.  The

20 motion is granted.  The order will issue.

21         MS. LIOU:  Thank you, Your Honor.

22         The next item on the agenda is Item No. 7, that is

23 the debtor's treasury management motion which was filed at

24 Docket No. 21.  And I am happy to walk through this motion in

25 as much or as little detail as needed, but --

1           THE COURT:  My colleagues asked if I would ask you

2      if you brought the wallets with you.

3           (Laughter)

4           MS. LIOU:  So, generally speaking, I would

5      classify the relief in this motion in three broad categories

6      just to make it easy to digest. I do think that in many

7      respects, as odd as the motion seems because of the nature of

8      this business, its actually fairly vanilla in the sense that

9      we are simply seeking to continue to use the management --

10     the treasury management system that we are using prepetition.

11          Now had the debtor had the ability to access bank

12     accounts then a component of this motion would have included

13     cash management as well, but given that the debtor had its

14     access cut off prepetition it had to find other ways to

15     support itself and as you saw from the first day declaration

16     the large majority of its assets are digital assets and those

17     digital assets are stored in existing wallets and accounts

18     that exist online on the blockchain.

19          So as the first component of the relief its simply

20     continuing our ability to store, transfer, stake, convert,

21     and disburse those digital assets as we, otherwise, would in

22     the ordinary course.  And to continue using those existing

23     wallets and accounts.  And as you can imagine, there will

24     come a time where occasion demands that we will need to open

25     new wallets and accounts and we would like to ensure that we

1 | have authority to do that as well.

2 | THE COURT:  Ms. Liou, I just want to ask, I think

3 | that the motion speaks directly to this, but anticipating,

4 | I'm sure, a discussion you probably had with Ms.

5 | Richenderfer, notwithstanding the difference in currency

6 | which then leads to the difference in the mechanics by which

7 | it's held and where it's held your point is this is a cash

8 | management system.

9 | MS. LIOU:  Pretty much, Your Honor.

10 | THE COURT:  So, one of the main considerations in

11 | a cash management system in a more typical case is ensuring

12 | that there are records that are -- that show where money goes

13 | and that that can be tracked and traced, etc.  I think that

14 | the papers and the declarations speak to exactly that, but if

15 | you would confirm that the debtor does have the ability to

16 | track transfers and explain to the Court, to the world, etc.,

17 | if asked, how money was used post-petition under this regime

18 | that would be helpful.

19 | MS. LIOU:  Yes, Your Honor. I would say that there

20 | is actually two components to that tracking.  There is an

21 | internal component, which is the debtor's books and records,

22 | and the debtor keeps books and records unlike some of the

23 | crypto companies that have filed.

24 | THE COURT:  I am sad to say it is helpful for you

25 | to make that point.

1          MS. LIOU:  They do have internal individuals

2   responsible for maintaining those books and records. This is

3   an area of concern that was identified by the U.S. Trustee's

4   Office and we have negotiated acceptable language for

5   inclusion in the proposed treasury management order that

6   addresses this very issue that we would provide those records

7   upon request to the United States Trustees Office.

8          So, I can assure you that there should be no

9   concern on that front, but in addition to that I will point

10  out that this is a company that transacts in the digital

11  world. So, every transaction is publicly available on the

12  blockchain and it will be there forever.

13          THE COURT:  Okay.  I interrupted you, you may

14  proceed.

15          MS. LIOU:  Sure.  I was also going to mention that

16  with respect to the Treasury management component of this,

17  there is a cash management component in the sense that we are

18  endeavoring to try to open new bank accounts now that we are

19  in Chapter 11, and to the extent that we are able to find a

20  willing financial institution to partner with, then we are

21  requesting authority to continue to use those bank accounts

22  and open new bank accounts.  And to the extent that we are

23  able to gain access to the frozen bank accounts that existed

24  prepetition, then we would obviously want to be able to make

25  transfers out of those accounts.

1          THE COURT:  And, if I'm correct, I think that the

2   revised language that has been proposed in the most recent

3   order addresses the mechanics of that.  Do I have that right?

4          MS. LIOU:  Yes.  Actually, Your Honor, do you

5   have -- I just want to make sure you do have the redline with

6   proposed language --

7          THE COURT:  You know --

8          MS. LIOU:  -- from the U.S. Trustee's Office.

9          THE COURT:  -- I may have left it on my desk.  Do

10  we have a copy?

11         MS. LIOU:  Yes, I do have a copy of the redline.

12         THE COURT:  That would be great.

13         MS. LIOU:  Would you like me to approach?

14         THE COURT:  Sure.

15      (Pause)

16         THE COURT:  Thanks.  So this is what we received

17  by chambers I think a couple hours before the hearing.  I

18  think I left my copy on my desk.

19         MS. LIOU:  So I will note a couple of things.

20  That redline is a little incomplete, that is the redline that

21  the United States Trustee's Office provided to us maybe less

22  than an hour before the hearing.  And so, luckily, we were

23  able to consensually resolve language.  And there are going

24  to be some edits to that language --

25         THE COURT:  Okay.

1     MS. LIOU:  -- which we will submit in a revised

2 order to the Court through certification of counsel after the

3 hearing.

4     THE COURT:  But that's all fine and, again, I

5 appreciate the engagement between you folks and the United

6 States Trustee on this, I think the point that I was raising

7 was language that's been added to paragraph 4 that I had seen

8 that talked about providing the U.S. Trustee with notice if

9 we do -- if you're able to get accounts or open accounts.

10 And that's what I would typically expect, I just wanted to

11 make sure --

12     MS. LIOU:  Correct.

13     THE COURT:  -- that it was in there.

14     MS. LIOU:  Yes, yes.  There will be no changes to

15 that language.

16     THE COURT:  Okay.

17     MS. LIOU:  The second component of the relief

18 sought in the Treasury management motion is the ability to

19 continue processing intercompany transactions.  This is

20 primarily relating to supporting the operating expenses of

21 Proximity.  The wages motion covered the supporting of the

22 employee obligations arising from Proximity, but there will

23 be additional operating expenses -- fairly de minimis

24 expenses, about 20 to $30,000 a month, and so we are seeking

25 authority to continue to support that integral part of the

1  debtor's business.

2          THE COURT:  Okay.

3          MS. LIOU:  In addition, I will say that there are

4  some other components of relief that are intended to

5  facilitate the debtor's continued access to funds or access

6  to additional funds, and these components include the ability

7  to continue to use Moon Rabbit as effectively a digital asset

8  converter, so that we can convert digital assets to --

9          THE COURT:  To fiat currency --

10         MS. LIOU:  -- fiat --

11         THE COURT:  -- as necessary.

12         MS. LIOU:  Exactly, exactly.  There's also the

13 additional component of the language we built in addressing

14 the Dentons fee advance, and to the extent that the debtors

15 and Dentons are able to facilitate the transfer of excess

16 funds from the fee advance back to the debtor, then the

17 debtor would like the authority to be able to make those

18 transfers and utilize those funds going forward for operating

19 expenses.

20          Lastly, I would say that there is language that

21 also addresses the deposit placed with the Singapore high

22 court and reserving our ability to of course file an

23 application before the Singapore high court to see release of

24 all or a portion of the funds as may be necessary, so that we

25 can bring that asset back into the estate as well.

1          THE COURT:  Okay.

2          MS. LIOU:  Okay.  And I would say that there's

3  some additional relief relating to paying any obligations

4  that arise in connection with all of the things that I laid

5  out to Your Honor, and then also seeking an extension of time

6  to comply with Section 345(b) for obvious reasons here.

7          THE COURT:  Okay.

8          MS. LIOU:  If Your Honor has no questions, I think

9  at this time we would say, for the reasons set forth in the

10  motion and based upon the evidence provided in the Leto

11  declaration, we would request entry of the Treasury

12  management order on an interim basis.

13          I will note because I forgot the first time with

14  the wages motion that we did agree to consensual language

15  with the SEC as well for this order, which we have included

16  in the proposed order that we will submit to Your Honor.

17          THE COURT:  Is that language in the draft that I

18  have or is that still in flux?

19          MS. LIOU:  It should be in the draft that you

20  have, Your Honor, but I think one of the paragraphs is in

21  there, maybe not the other.  So we just have to make sure we

22  have both paragraphs negotiated with the SEC in the order for

23  you.

24          THE COURT:  Okay.  I have no questions at this

25  time.

1        I'd like to hear first from the United States

2  Trustee, and then I'll hear from Ms. Scheuer.

3        Ms. Richenderfer?

4        MS. RICHENDERFER:  Good afternoon again, Your

5  Honor.  I have to say, this is the first time -- and in my

6  discussions with debtor's counsel they admitted that they

7  were not aware of any other cases where every -- all of the

8  accounts were cryptocurrency accounts.  I mean, in FTX

9  there's a live mixture of accounts.  And unfortunately,

10 because Ms. Sarkessian --

11       THE COURT:  But it seems --

12       MS. RICHENDERFER:  -- decided to retire, I'm in

13 FTX, so I know about that one now.  So --

14       THE COURT:  That has not my problem written all

15 over it.

16       MS. RICHENDERFER:  Yes.

17     (Laughter)

18       MS. RICHENDERFER:  Yeah, unfortunately.

19       THE COURT:  I don't disagree.  I think, though, as

20 I read the context provided by the declaration and Ms. Liou's

21 presentation, in the absence of the difficulties with the

22 traditional banking entities, this company would have arrived

23 presumably with all of these various wallets, but also with

24 bank accounts and checking, et cetera, that it would have

25 used to facilitate some of its operations.  So it's more a

1  function of circumstance than design necessarily that we're

2  looking at this kind of unusual situation that I likewise

3  have not seen.  Again, in -- in the other crypto case that I

4  had, at the first day I was asked to approve a DIP facility

5  in bitcoin and, apparently, it was an unremarkable thing.

6              MS. RICHENDERFER:  Uh-huh.

7              THE COURT:  But -- so I -- and I understand, I

8  guess -- I mentioned at the outset I had read this motion a

9  couple of times to understand precisely what was going on,

10  but, again, I think it was helpful to break it down into the

11  handful of categories that Mr. Liou provided.

12             MS. RICHENDERFER:  Yes, Your Honor.  And we had an

13  extremely helpful call this morning and I know that most of

14  the participants here from the debtors, representing the

15  debtors were, unfortunately, in the train station getting

16  ready, and Ms. Leamy was in her car.  I decided to go into

17  work late, but we had a call around 8 o'clock that really

18  helped --

19             THE COURT:  Okay.

20             MS. RICHENDERFER:  -- walk us through this because

21  one of our primary concerns, Your Honor, is transparency.

22  With the bank accounts, we get the bank statements, we can --

23  we understand and we know them.  And that's one of the

24  reasons why we added language in here about the

25  recordkeeping, and also making information available to us so

1  that we can see the transfers and the transactions.

2  THE COURT:  And on that, at least from my point of

3  view, you're pushing an open door.  That was my first

4  question to Ms. Liou and she certainly answered it

5  satisfactorily.

6  MS. RICHENDERFER:  Yes, Your Honor, and that was

7  as a result of our discussions this morning and then we came

8  up with the language that we could then put into here.

9  There's still a couple of open items of

10  information that we need to receive from the debtors and it's

11  still part of, you know, open doors you say, Your Honor,

12  because we're trying to get a handle around who was in the

13  corporate structure, controls which of the wallets, and what

14  assets as described in the first day declaration are in which

15  of these wallets.  I mean, there is an exhibit that's

16  attached hereto that lays them out, and there's -- you know,

17  they're called different things, they're very different.

18  There's also the legacy wallets, which I learned this morning

19  can never be closed because they exist forever.  I don't know

20  what's in those wallets, though, and if they're not using

21  them, then they should be -- we respectfully suggest, should

22  be transferred out, much like we would ask for a no-longer-

23  used bank account to be closed out.

24  THE COURT:  My guess is that that's a discussion

25  you should continue to have because --

1          MS. RICHENDERFER:  Yes.

2          THE COURT:  -- I think your and my intuition is

3    going to suggest to the debtor that they should proceed with

4    something that's probably an impossibility, but I think this

5    is not a today issue.

6          MS. RICHENDERFER:  Right.

7          THE COURT:  Okay --

8          MS. RICHENDERFER:  Right.

9          THE COURT:  -- I get it.

10          MS. RICHENDERFER:  It's not a today issue, Your

11   Honor, I just wanted to say -- mention that there are things

12   that are still in flux that we're trying to get more of a

13   comfort level with, if you will, Your Honor.  And one of the

14   reasons is it's been represented to us that Mr. Kwon and

15   Mr. Shin (phonetic), the shareholders who still own this

16   debtor, that they no longer have access to any of these

17   wallets, but -- and I do appreciate that, but that's one of

18   the reasons why we want to know who does have access.  And I

19   know there's multi-level approvals that need to be given in

20   order to do the transfers and we want -- we would like that

21   information, again, to make sure that there is no way that

22   the 92 percent shareholder or anyone he may have given his

23   information to can access, and I know the debtor doesn't want

24   that happening either.

25          And the other thing is, Your Honor, and we're

1   still exploring this a bit is that Moon River -- Moon Rabbit,

2   excuse me, is not what I would call a true third party.  It

3   is owned by one of the officers of the debtor and it's been

4   represented to us what the flat fee is that they receive

5   every month.  And we'll gain some comfort with that, again,

6   Your Honor, when we see the transfers as they occur back and

7   forth to -- you know, to Moon Rabbit.

8           The Dentons fee advance, again, that is something

9   we've requested information about.  I understand it's covered

10  by a letter agreement, which we've requested.  So we can see

11  because one of our first questions was, well, how do we know

12  that Dentons is really going to go pay that bill if you ask

13  them to go pay that bill?

14          And so, you know, the retainers can be a tricky

15  thing.  Law firms could take different positions vis-a-vis a

16  retainer that they've received and whether or not it's still

17  debtor's money or their money.

18          And I think that one of the last ones that -- and

19  I do -- I do apologize to debtors, this just recently came to

20  our attention as we were getting ready to come over here.  If

21  you look on Exhibit D with the wallets that are listed,

22  number 21 says Hex trust account, and debtors had advised us

23  that this was frozen.  And we're not exactly sure what's in

24  there, I think they told us it was bitcoin, but we have read

25  about there being an entity out there called Hex, and the

1  founder of the company, who seems to go by two names, is in a

2  lot of trouble with different authorities and everything got

3  froze.

4          THE COURT:  There's a lot of that going around.

5          MS. RICHENDERFER:  There is a lot of that going

6  around in this industry.  So I don't know whether it's frozen

7  because of the SEC action against Terraform or if it's frozen

8  because of what's going on with Hex, and I just want to make

9  sure that there are safeguarding of debtor's assets.

10          And, again, we just had a new trial attorney join

11 our office who is sitting at counsel table with us --

12          THE COURT:  Ms. Bu, it's good to see you again.

13 Welcome --

14          MS. RICHENDERFER:  Yes, someone that you may --

15          THE COURT:  -- welcome back.

16          MS. RICHENDERFER:  -- I know that she is known to

17 this Court and Ms. Bu has been joined with us, and she loves

18 to go explore things on the internet for us.  And so she is

19 the one that found the information for us about Hex just as

20 we were getting ready to come over.

21          THE COURT:  Well, I'll hear -- a couple things.

22          MS. RICHENDERFER:  Yes.

23          THE COURT:  As to the information requests, in

24 dealing with this, I will -- I will at least observe it now.

25 The debtor has commenced a Chapter 11 case, the debtor needs

1  to deal with the United States Trustee, other stakeholders, a

2  committee, if appointed, the Court, and it's my expectation

3  that there will be a productive exchange of information.

4  Part of that exchange today's hearing has demonstrated is

5  an -- there's an educational component to each of those.

6          Again, Ms. Berkovich, you've done a thousand

7  cases.  If we were talking about bank accounts at JPMorgan or

8  at TD Bank or something else, we wouldn't be necessarily

9  noodling over this.  The concern about where the money is,

10 whether it's money, and to whom it belongs and who has access

11 to it are all completely legitimate questions, most of which

12 I would hope and expect are solvable by productive

13 engagement, and experience teaches that the parties will go

14 through that.  I'm not telling you anything that you don't

15 know.

16          If there's a breakdown in communications or

17 there's information that is needed or the wheels start to

18 come off, I would expect -- I'm not a big fan of letters and

19 motion practice on mechanical things, get me on the phone.

20 We have a hearing scheduled for about a month out, but,

21 again, the Trustee has identified concerns just about

22 functionally getting your arms around exactly what it is that

23 you are overseeing in your statutory capacity.  That makes

24 perfect sense to me.  And, again, the record indicates from

25 counsel that there's been an open dialogue that remains

1  ongoing, and I'm supportive of that and I will foster that.

2  If there are problems, you can expect that I would make

3  myself available.

4          MS. RICHENDERFER:  Thank you, Your Honor.  And I

5  just wanted to again thank the debtors because they have been

6  trying very hard to educate those of us who are new to all of

7  this.

8          THE COURT:  I would note -- any other comments?

9          MS. RICHENDERFER:  No, Your Honor.  Go ahead.

10         THE COURT:  Okay.  I would note for the benefit of

11  Ms. Liou and Ms. Berkovich that I think Mr. Amani, who you

12  didn't see, but I did, may have information responsive on the

13  Hex issue.  Whether that's a today issue or not, you're

14  welcome to confer, but I'll leave that to you folks.

15         Ms. Liou, did you wish to be heard?

16         MS. LIOU:  Yes, I did, Your Honor.  First, thank

17  you for the offer to help the parties bridge any differences,

18  if there are differences that end up existing between us.

19         I did want to respond to just three points for

20  purposes of clarity.  The first is we are trying to be as

21  transparent as possible, which hopefully you could tell from

22  the papers that we filed, but we are also, as you're probably

23  experienced with this, balancing safety and security

24  concerns, especially given the online and digital nature of

25  the business and the transactions that are being conducted.

1          And so I just want to reiterate that we will need

2   assurances from the United States Trustee's Office that, if

3   we do provide highly sensitive information that may impact

4   the security of the company, including its accounts, that

5   that information will be kept highly confidential.

6          The second point that I wanted to make is that

7   with respect to the Dentons fee advance, I didn't want there

8   to be any ambiguity.  The scope of the relief requested in

9   the Treasury management motion was that excess funds would be

10  returned to the debtor, so that the debtor can pay its

11  expenses.  And so I just want to be very clear about that,

12  not that there was an expectation that Dentons would be

13  paying operating expense bills directly.

14         The third point I wanted to just raise is that

15  with respect to the Hex trust account, currently, I

16  believe  -- I am getting a note on this, so I will pause.

17       (Pause)

18         MS. LIOU:  I can confirm that our access to this

19  account is frozen and we welcome any help or aid that the

20  United States Trustee's Office would like to provide us in

21  helping us gain access to not only this account, but other

22  frozen accounts that we have.

23         THE COURT:  Okay.  Ms. Scheuer?

24         MS. SCHEUER:  Thank you, Your Honor.  Again, for

25  the record, Therese Scheuer for the SEC.

1          Your Honor, we appreciate the debtor incorporating

2     the carveout language.  Given the timing here, I did alert

3     debtor's counsel that we may have -- we would likely have

4     some additional comments.  And for the reasons discussed by

5     Mr. Landsman, Your Honor, you know, it appears that some of

6     the relief set forth in the Treasury management motion may

7     not be in compliance with the securities laws.

8          I think, you know, the SEC requested any relief

9     provided to the debtor on an interim basis be as limited as

10    possible.  Specifically, we'd ask that the Court not

11    authorize any transactions involving LUNA 2.0.

12         THE COURT:  I think I'd like to know if the debtor

13    is intending -- let's do this, actually, I think we should

14    take a five-minute break.  A couple things.

15         The parties have engaged productively the SEC and

16    the United States Trustee on this motion.  There is language

17    here, I've had an opportunity to review it; I have no issues

18    with it.  But, again, this is a first day hearing and if the

19    SEC or the Government has additional comments or

20    observations, it would be better to have that discussion

21    without me in the middle of it.  So I would be happy to give

22    you a few moments to have that discussion.

23         A couple other things that, again, I think are --

24    should be apparent, but bear repeating.  The sensitivity

25    concerns Ms. Liou just touched on about the nature of the

1  debtor's business and the, frankly, highly confidential and

2  sensitive information that may be relevant to the responses

3  from the -- for information from the United States Trustee,

4  to me, that seems apparent, but this is not unplowed ground.

5  The United States Trustee commonly gets sensitive

6  information.  And part of the reason that I suggested, if

7  there are issues with respect to the exchange of information

8  that the dialogue starts to falter, I don't want letters from

9  the parties, I want you to get me on the phone.  And, to be

10  honest, if circumstances warrant, a chambers conference that

11  some of these discussions are not on the record may be

12  appropriate because there are consequences.

13        The United States Trustee is trying to do a job,

14  but in many ways the job and the framework of that job

15  doesn't necessarily fit neatly with the nature of this

16  company that's in front of me.  Again, this is not the only

17  case of this nature that's before the courts or even in my

18  court.  So I hear you on the issues and the Court will be

19  sensitive to those issues, and we'll balance those

20  considerations.

21        I'm likewise aware that the SEC appears today

22  as  -- again, as Ms. Scheuer noted from her point of view or

23  her view is that they're the largest contingent creditor in

24  the case.  I get it, but that also -- the fundamental nature

25  of a Chapter 11 case is often that stakeholder is a

1  stakeholder and a creditor, but is also a litigation

2  adversary in pending litigation.

3          So those are considerations I'm aware of.  I make

4  no comment on how the discussion plays out from here, just to

5  observe that, if it does start to go off the rails, I would

6  expect to hear from the parties on these issues.  The parties

7  want information, the debtor is obliged to provide certain

8  information, but the debtor is entitled to ensure that its

9  interests and those of other stakeholders are not harmed by

10  the exchange of that information.  And one of the luxuries I

11  have in this job is able and experienced professionals that

12  have done this particular dance before, and I would expect

13  counsel to be able to handle most of that.  And, again, I'll

14  be available to assist that process if it starts to go

15  sideways.

16          Why don't we take five minutes, you can have your

17  discussion about any open issues on the form of order, and

18  then we can reconvene.

19          Stand in recess.

20      (Recess taken at 3:34 p.m.)

21      (Proceedings resumed at 3:50 p.m.)

22          THE COURT:  Please be seated.  Ms. Liou, how are

23  we doing?

24          MS. LIOU:  Your Honor, for the record, Jessica

25  Liou on behalf of the debtor.  We are in discussions with the

1  SEC and I think we have a resolution that could work.  So we

2  do need some time, however --

3              THE COURT:  Of course.

4              MS. LIOU:  -- to type up the language, and then

5  get it in front of the SEC and have them run it up the

6  proverbial chain to make sure it's okay with them.  However,

7  we do want to try to get the interim Treasury management

8  order entered.  So I have a proposal for you and, if that

9  doesn't work, then we have an alternative as a backup.

10             So our proposal is that we take a very short

11  second break because I understand we may be your last matter

12  for today --

13             THE COURT:  God bless.

14       (Laughter)

15             MS. LIOU:  Yes.  And, unfortunately, we are going

16  to potentially keep you here a little longer, but I would

17  like to try to resolve the issue --

18             THE COURT:  I have no problem with that.

19             MS. LIOU:  -- and we can come back at like, you

20  know, maybe 4:30, 4:45.

21             THE COURT:  Sure.

22             MS. LIOU:  Okay.

23             THE COURT:  Let's do 4:30.

24             MS. LIOU:  Okay -- well, I think Ms. Scheuer

25  needs --

1          THE COURT:  Let me ask you a question --

2          MS. LIOU:  Yes.

3          THE COURT:  -- in terms of timing -- yeah, because

4  you've got to go up a chain.  Again, in a typical case, we'd

5  be talking about not a cash management, we would be talking

6  about a DIP order and whether or not that order needs to be

7  entered today in order to fund payroll or something else.  Is

8  there -- is that what we're talking about?  Is there an

9  issue -- is there an urgency that requires an order entered

10  today because, as a practical matter, the markets are closing

11  and the wires are occurring.

12          MS. LIOU:  Right, and we obviously don't have the

13  wiring issue here.

14          THE COURT:  Yes.

15          MS. LIOU:  We are in the process of fairly

16  advanced talks with a potential banking partner.  Obviously,

17  we'd love the ability to move forward with that, if we can,

18  and then we may have some vendor obligations coming due, but

19  I'm looking over at Mr. Leto to see if there are any --

20          THE COURT:  Yeah, I --

21          MS. LIOU:  -- okay.

22          THE COURT:  -- I think I -- look, I'm open.  I

23  would be happy to have the parties revise and send an order.

24          MS. LIOU:  Yes.

25          THE COURT:  If there's not a difference between

1  today and tomorrow morning that I'm indifferent --

2          MS. LIOU:  Right.

3          THE COURT:  -- but I think -- let me hear from Ms.

4  Scheuer.

5          MS. LIOU:  Yeah, so I --

6          THE COURT:  Oh, okay.

7          MS. LIOU:  -- just wanted to say that our back-up

8  plan is that we can try to work through the language and

9  submit it hopefully, if we are able to come to a consensual

10 resolution, tomorrow, or we take you up on your invitation to

11 call you --

12         THE COURT:  Sure.

13         MS. LIOU:  -- to try to resolve the issue so that

14 we can get the order entered.

15         THE COURT:  Ms. Scheuer?

16         MS. SCHEUER:  Thank you, Your Honor.  So the

17 debtors have proposed tuned language, you know, I will have

18 to run it up the chain.  I don't know at this stage whether

19 it will be acceptable or not, but certainly happy to -- you

20 know, to try and see what we can do in half an hour or, you

21 know, come back --

22         THE COURT:  Yeah.  Well, let me ask, there are a

23 bunch of ways to skin this cat.  I am here until 5:00, I

24 would be happy to allow you that opportunity.  I guess the

25 one question I'm asking in terms of process is the basic

1  question:  Is there an urgency to having an order with my

2  signature on it this evening?

3        If an order is -- if something is sent in under

4  certification tonight or tomorrow morning, you can -- I've

5  already reviewed what you have given me, there is zero chance

6  I will have any issue in terms of agreed reservation or

7  protective language that the Securities Exchange Commission

8  has agreed to with the debtor.  So that order is going to get

9  entered, it's just a question, frankly, of -- I know parties

10  may be traveling, et cetera.  If you want an order tonight

11  and you're going to hand me a marked-up order, that's pretty

12  old school, I haven't done that in a while --

13        (Laughter)

14        THE COURT:  -- but that would be fine, or if the

15  parties want to confer -- and, again, I'm sensitive to Ms.

16  Scheuer's comment that, you know, some of her colleagues are

17  on the phone and likely are going to want to see that

18  language just to make sure that there's nothing that they're

19  concerned about.

20        So I'm really at your pleasure.  Do you want to

21  reconvene in 40 minutes or do you want to presume that the

22  wordsmithing can get done, we'll take it under certification,

23  and if not, then we'll get on the phone and we'll talk about

24  whatever the open issue is.

25        MS. LIOU:  No, Your Honor, if this is going to

1  hold over until tomorrow, that is perfectly fine with us.  I

2  think we can --

3          THE COURT:  Okay, why don't we do this.  Unless

4  there's an objection, I will do the following.

5          Before me is what has been called the Treasury

6  motion, I am prepared to grant that motion.  I'm satisfied

7  that the relief requested is appropriate and warranted.  As

8  Ms. Liou noted, it did fall into five buckets, and that

9  structure was actually helpful for me to understand.  And

10  from the colloquy with Ms. Richenderfer, it's clear that

11  we're kind of looking at this the same way, which is a cash

12  management motion and a bank account motion, which is

13  typically not controversial.  We don't have a bank account

14  here, although I think you're telling me you're hoping you

15  do.  And that may be part of the language that the parties

16  are going to noodle through, but sort of the three-body

17  problem, we've got too many moving parts.

18          The relief requested is certainly appropriate.

19  The debtor needs to be able to operate and to fund whatever

20  operations it does, and the mechanics of that process are

21  laid out in the motion and are appropriate.

22          To the extent that there are issues, they relate

23  primarily to requests for disclosure and education from the

24  part of the United States Trustee.  And then from the SEC, I

25  imagine most of it is just essentially a reservation to

1  ensure that their rights aren't prejudiced by entry of an

2  order in this proceeding that might have an impact that's not

3  necessarily intended or expected or acceptable to the SEC.

4  That's a drafting exercise.

5          But the motion itself is granted, subject to the

6  parties finalizing the language.  And as I said, if I

7  understand the scope of the dialogue that you're having, the

8  chances that I would stand in the way of that or have issues

9  with revisions that you are currently noodling through are

10 about zero.  If there is -- and, again, I appreciate the

11 urgency of this.  So, again, if there is a problem that is

12 insuperable, then get me on the phone and we'll be able to

13 noodle through because, again, we are talking about an

14 interim order that is appropriate and necessary but needs to

15 have sufficient safeguards in it to reflect the interim

16 nature of it and the rights of the parties that are affected.

17         MS. LIOU:  Yes, we appreciate that, Your Honor.  I

18 do want to clarify for the record in that I think the SEC's

19 concerns run a little broader than just a reservation of

20 rights, this new concern that was raised at this hearing.  So

21 we are trying to resolve it, but it deals primarily with

22 respect to the use of the LUNA 2 digital asset.  So --

23         THE COURT:  Okay.  Well --

24         MS. LIOU:  -- I think we can -- again, I think

25 we'll hopefully get there, but I didn't want you to think

1  that it was akin to wordsmithing of the original reservation

2  of rights that they proposed.

3         THE COURT:  Okay.  Well, no, and I appreciate your

4  clarification.  It was actually -- that was kind of my

5  reaction when Ms. Scheuer identified the concern, it seemed

6  to me that that should be a discussion that the parties

7  should have offline --

8         MS. LIOU:  Absolutely.

9         THE COURT:  -- and not necessarily in front of me.

10 And I'm happy to allow that discussion to continue, but it

11 would seem to me that resources are best served by rather

12 than having you do it in the hall, unless you want to, I

13 would look for that under certification or, if need be, to

14 deal with the parties if there's an issue.

15        But in terms of the record for purposes of today,

16 the motion is well founded and would be granted subject to

17 preparation of a satisfactory form of order, all rights being

18 reserved until that order is either agreed to or ruled upon

19 by the Court after a hearing.  Okay?

20        MS. LIOU:  Thank you very much, Your Honor.

21 That's wonderful.

22        THE COURT:  Very good, Ms. Liou.  So that covers

23 us for the Treasury motion.

24        Ms. Berkovich, do we have anything else this

25 afternoon?

1         MS. BERKOVICH:  Nothing else.  Thank you, you and
2   the Court for your time this afternoon.
3         THE COURT:  All right.  With that, we will stand
4   in recess.  I'll look for the certification.  I think the
5   other orders may have already been entered; if not, that will
6   happen this afternoon.  I appreciate everyone's time and the
7   education, and I will look forward to seeing you in just a
8   few weeks' time.
9         With that, we stand in recess.  Thank you,
10  Counsel.
11        COUNSEL:  Thank you, Your Honor.
12     (Proceedings concluded at 3:59 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

1                        CERTIFICATION

2            We certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of our

5    knowledge and ability.

6

7    /s/ William J. Garling                February 1, 2024

8    William J. Garling, CET-543

9    Certified Court Transcriptionist

10   For Reliable

11

12   /s/ Tracey J. Williams                 February 1, 2024

13   Tracey J. Williams, CET-914

14   Certified Court Transcriptionist

15   For Reliable

16

17   /s/ Mary Zajaczkowski                  February 1, 2024

18   Mary Zajaczkowski, CET-531

19   Certified Court Transcriptionist

20   For Reliable

21

22

23

24

25