## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------------- x
                                            :
In re                                       :     Chapter 11
                                            :
TERRAFORM LABS PTE. LTD.,                   :     Case No. 24–10070 (BLS)
                                            :
            Debtor.¹                        :     Obj. Deadline: Feb. 27, 2024 at 4:00 p.m. (ET)
                                            :     Hearing Date: Mar. 5, 2024 at 2:30 p.m. (ET)²
                                            :
                                            :
-------------------------------------------------------- x
```

## MOTION OF DEBTOR FOR ENTRY OF
## ORDERS PURSUANT TO SECTIONS 363, 503(B), AND 105(A) OF
## THE BANKRUPTCY CODE AUTHORIZING DEBTOR TO PAY CERTAIN
## AMOUNTS IN FURTHERANCE OF LITIGATION AND GRANTING RELATED RELIEF

Terraform Labs Pte. Ltd., as debtor and debtor in possession in the above-captioned chapter 11 case (the "**Debtor**"), respectfully moves and represents as follows in support of this motion (the "**Motion**"):

### Preliminary Statement

1.      As described in more detail in the First Day Declaration (as defined below), the Debtor is a named defendant in an SEC Enforcement Action (as defined below) currently pending in the District Court for the Southern District of New York (the "**District Court**").  In

---

1    The Debtor's principal office is located at 1 Wallich Street, #37-01, Guoco Tower, Singapore 078881.

2    The Debtor filed contemporaneously herewith the *Motion of Debtor to Shorten Notice and Objection Periods Solely With Respect to the Wintermute Order Sought in Motion of Debtor for Entry of Orders Pursuant to Sections 363, 503(b), and 105(a) of the Bankruptcy Code Authorizing Debtor to Pay Certain Amounts in Furtherance of Litigation and Granting Related Relief* (the "**Motion to Shorten**"), with respect to the Proposed Wintermute Order (as defined below) only.  Pursuant to the Motion to Shorten, the Debtor has requested a proposed objection deadline of February 23, 2024 and a proposed hearing date of February 28, 2024 with respect to entry of the Proposed Wintermute Order.  The hearing on the remainder of the relief sought in the Motion is currently scheduled to be heard on regular notice at the March 5, 2024 omnibus hearing.

addition, the Debtor is the subject of a Department of Justice ("**DOJ**") investigation in the Southern District of New York (the "**DOJ Investigation**").

2.     As further described in the First Day Declaration, because of the size of the potential money judgment in the SEC Enforcement Action, the Debtor filed for chapter 11 protection to continue its business operations while it (i) defends itself in a jury trial on the remaining charges in the SEC Enforcement Action (the "**SEC Jury Trial**"), currently scheduled for March 25, 2024, and (ii) after entry of a final judgment, pursues an appeal of the District Court's summary judgment ruling and any additional judgment.  If the Debtor's defense in and appeal of the SEC Enforcement Action are successful, it would mitigate the extent of the single largest claim against the Debtor, thereby benefiting the Debtor, its creditors, and the Terra Blockchain community more broadly.

3.     Certain current and former Employees (as defined herein) have retained legal counsel to represent them in connection with attending interviews and depositions and responding to subpoenas issued by the Debtor, the SEC (as defined herein), and the DOJ in the SEC Enforcement Action and/or the DOJ Investigation.  Another Employee has retained counsel to defend them in criminal proceedings in a foreign country.  Such legal counsel have incurred fees representing the Employees and expect to incur additional fees representing the Employees going forward.  Additional Employees may require legal counsel for similar reasons.  The Debtor is obligated to indemnify these Employees for such legal expenses.

4.     In addition, the Debtor has retained numerous vendors that provide services that are essential to assist with the Debtor's defense of the SEC Enforcement Action (including the upcoming SEC Jury Trial) and DOJ Investigation and have incurred costs associated with the services those vendors provide.  Finally, to assist in its defense of the SEC Enforcement Action,

2

the Debtor has pursued litigation seeking discovery in numerous foreign jurisdictions and has incurred costs associated therewith that it wishes to pay to avoid harm to the Debtor's estate and, in some cases, continue to pursue essential discovery.

5.      Accordingly, to ensure that the Debtor has an adequate defense in the SEC Enforcement Action and protects its interests in connection with the DOJ Investigation, the Debtor seeks the requested relief to make litigation-related payments falling into three categories: (1) the payment of prepetition and postpetition Employee legal fees pursuant to the Debtor's indemnification obligations, subject to certain approval procedures described herein; (2) the payment of prepetition claims of Critical Vendors (defined herein) necessary to the Debtor's defense in the SEC Enforcement Action; and (3) the payment of foreign litigation related claims and costs incurred in connection with third party discovery the Debtor sought in foreign jurisdictions.

## Background

6.      On January 21, 2024 (the "**Petition Date**"), the Debtor commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtor is authorized to continue to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee of creditors has been appointed in this chapter 11 case.

7.      Additional information regarding the circumstances leading to the commencement of this chapter 11 case and the Debtor's business and operations  is set forth in the *Declaration of Chris Amani in Support of Debtor's Chapter 11 Petition and First Day Relief*

3

[Docket No. 18] (the "**First Day Declaration**"),[3] filed on the Petition Date and incorporated herein by reference.

## Jurisdiction

8.    The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

9.    Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), the Debtor consents to the entry of an order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

10.    By this Motion, pursuant to sections 105(a), 363, and 503(b)(1)(A) of the Bankruptcy Code, and Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), the Debtor requests authority to pay the following amounts in furtherance of the SEC Enforcement Action and DOJ Investigation: (i) fees and expenses of Employee Counsel (as defined herein) including (a) prepetition fees and expenses in an amount not to exceed $355,386.31 (after application of prepetition retainers), (b) estimated fees and expenses for the three (3) months following the Petition Date, in an amount not to exceed $2,908,388, and (c) the Future Indemnification Cap (as defined herein), in an amount not to exceed on a three-month rolling basis,

---

[3]    Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the First Day Declaration.

$75,000 per month on average or $225,000 in the aggregate, in each case subject to the Employee Counsel Payment Procedures (as defined herein); (ii) the Critical Vendor Claims (as defined herein), not to exceed $1,300,000; and (iii) the Foreign Litigation Claims (as defined herein), in an amount not to exceed $1,509,000, including $1,325,000 for the Wintermute Costs on an expedited basis.

11.     Two proposed form of orders granting the relief requested herein are annexed hereto as **Exhibit A** (the "**Proposed Order**") and **Exhibit B** (the "**Proposed Wintermute Order**").  As explained below and in the Motion to Shorten, filed contemporaneously herewith, the Debtor is seeking entry of the Proposed Order granting all the relief in the Motion other than payments concerning Wintermute (as defined herein) on regular notice at the hearing currently scheduled for March 5, 2024.  Given the exigencies involved in respect of Wintermute, however, the Debtor has separated out that relief into the Proposed Wintermute Order and requested a hearing on shortened notice.

12.     For the reasons set forth herein, the Debtor submits that the relief requested herein is in the best interest of the Debtor, its estates, creditors, and other parties in interest and, therefore, should be granted.  In further support of this Motion, the Debtor submits the *Declaration of Mark Califano in Support of the Motion of Debtor for Entry of Orders Pursuant to Bankruptcy Code Section 363 Authorizing Debtor to Pay (I) Fees and Expenses of Counsel to Debtor Employees (II) Certain Critical Vendors Claims (III) Certain Foreign Litigation Related Claims and Obligations, and (IV) Granting Related Relief* (the "**Califano Declaration**"), attached hereto as **Exhibit C**.

5

13.    The following table summarizes the amounts of fees and expenses per category the Debtor is requesting authority to pay pursuant to the Motion:

| Category | Party Receiving Payment | Prepetition Amount After Retainer Application) | Estimated Three-Month Postpetition Amount |
|---|---|---|---|
| Employee Indemnification | Kobre and Kim LLP | $124,224.73[4] | $1,200,000.00 |
| Employee Indemnification | Goodwin Procter LLP | $38,229.30[5] | $155,000.00 |
| Employee Indemnification | McGuire Woods LLP | $11,788.00[6] | $170,500.00 |
| Employee Indemnification | Reed Smith LLP | $181,124.28[7] | $650,000.00 |
| Employee Indemnification | Law Office Rodic | N/A | $732,888.00 |
| Future Indemnification Cap | N/A | N/A | $225,000.00 |
| Critical Vendors | Critical Vendors | $1,300,000.00 | N/A |
| Foreign Litigation Costs | Okcoin Technology Company Ltd. | $100,000.00 | N/A |
| Foreign Litigation Costs | Bitfinex | $27,000.00 | N/A |
| Foreign Litigation Costs | Primary Digital | $57,000.00 | N/A |
| Foreign Litigation Costs | Wintermute Trading Ltd. | $185,000.00 | $1,140,000 |
| Total | | $2,024,366.31 | $4,273,388.00 |
| **Total Amount Requested:** | | **$6,297,754.31** | |

## Legal Actions Involving the Debtor

### A.    SEC Enforcement Action

14.    On February 16, 2023, the Securities and Exchange Commission (the "**SEC**") filed a complaint in the District Court naming the Debtor and its founder, former

---

[4]    This amount is net of Kobre & Kim LLP's retainer in the amount of $352,557.84.

[5]    This amount is net of Goodwin Procter LLP's retainer in the amount of $50,000.

[6]    This amount is net of McGuire Woods LLP's retainer in the amount of $50,000.

6

director, and former Chief Executive Officer, Mr. Kwon, as defendants and alleging six (6) claims

for violations of the Securities Act of 1933 and the Exchange Act of 1934.[8]  The SEC claims that

prior to May 2022, the Debtor unlawfully offered and sold unregistered securities and securities-

based swaps, as well as engaged in securities fraud.   The action, which seeks a permanent

injunction, disgorgement, and civil money penalties, is currently pending before the Honorable

Jed S. Rakoff (*SEC v. Terraform Labs Pte. Ltd.*, *et al.*, Case No. 23 Civ. 1346 (JSR) (S.D.N.Y.))

(the "**SEC Enforcement Action**").[9]   On April 21, 2023, the Debtor and Mr. Kwon moved to

dismiss the SEC's complaint in its entirety.[10]   On July 31, 2023, the District Court denied the

motion to dismiss.[11]  The case proceeded on an expedited timeline.[12]

15.    On December 28, 2023, the District Court partially granted the SEC's

motion for summary judgment.[13]   The District Court granted summary judgment against the

Debtor and Mr. Kwon on the SEC's claims relating to certain securities-based swaps claims.  The

District Court denied the parties' cross motions for summary judgment with respect to the

securities fraud claims, finding that "genuine disputes of material fact linger," particularly with

regard to the element of scienter required under both securities fraud claims.[14]  A jury trial on the

---

[7]    Please note that Reed Smith LLP does not have a prepetition retainer in connection with its representation of the Employees.

[8]    On April 3, 2023, the SEC filed an Amended Complaint, which is identical to the Complaint in all material respects. Amended Complaint, *SEC v. Terraform Labs Pte. Ltd.*, *et al.*, Civil Action No. 23 Civ. 1346 (JSR) (S.D.N.Y. Apr. 3, 2023) (Docket No. 25) (the "**Amended Complaint**"), at ¶¶ 173-190.

[9]    Amended Complaint, Prayer for Relief at pp. 53-54.

[10]   Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended Complaint, *SEC v. Terraform Labs Pte. Ltd.*, *et al.*, Civil Action No. 23 Civ. 1346 (JSR) (S.D.N.Y. Apr. 21, 2023) (Docket No. 29), at 7 et seq.

[11]   Opinion and Order, *SEC v. Terraform Labs Pte. Ltd.*, *et al.*, Civil Action No. 23 Civ. 1346 (JSR) (S.D.N.Y. July 31, 2023) (Docket No. 51)

[12]   Opinion and Order, *SEC v. Terraform Labs Pte. Ltd.*, *et al.*, Civil Action No. 23 Civ. 1346 (JSR) (S.D.N.Y. December 28, 2023) (Docket No. 149) (the "**MSJ Order**"), at p. 71.

[13]   MSJ Order at p. 2-3.

[14]   MSJ Order at p. 50.

7

remaining securities fraud claims is scheduled to begin March 25, 2024.[15]  The Debtor is currently preparing for the SEC Jury Trial.

**B.     The DOJ Investigation**

16.     Prior to the Petition Date, the DOJ had been in the course of conducting a grand jury investigation in the Southern District of New York into the Debtor's business and certain current and former employees, including Mr. Kwon.  The DOJ indicted Mr. Kwon on criminal charges and has stated that it is continuing its investigation of individuals and entities involved in the Terra Blockchain, including the Debtor and some of its former employees.  *See United States v. Kwon,* 23 Cr. 151 (JPC) (S.D.N.Y.).  The DOJ has not indicated, however, whether it intends to file additional charges against any parties. The Debtor has been cooperating with the DOJ and intends to continue to do so.

17.     Dentons US LLP ("**Dentons**") is the Debtor's trial counsel in the SEC Enforcement Action and in the DOJ Investigation and is proposed as the Debtor's special litigation counsel in this chapter 11 case.

**Employee Indemnification Claims**

**A.     The Debtor's Employees**

18.     As of the Petition Date, and as further described in the *Motion of Debtor for Entry of Interim and Final Orders (I) Authorizing Debtor to (A) Pay Prepetition Workforce Obligations and (B) Maintain Employee Benefit Programs, and (II) Granting Related Relief* (the "**Wages Motion**") [Docket No. 20], the Debtor employs 45 full-time employees and utilizes the services of approximately 15 independent contractors (collectively, the "**Current**

---

[15]    The trial was originally scheduled to begin on January 29, 2024; however, on January 16, 2024, the District Court issued an order postponing the start to March 25, 2024, but stated that "[n]o further requests from any party for any further adjournment will be entertained." MSJ Order at p. 71; Order, *SEC v. Terraform Labs Pte. Ltd.*, *et al.*, Civil Action No. 1:23-cv-013460-JSR (S.D.N.Y. January 16, 2024) (Docket No. 166), at p2.

8

**Workforce**"). The Current Workforce primarily consists of software developers, coders, senior management, and a constellation of staff required to support operations. The Current Workforce and former employees and contractors (together with the Current Workforce, the "**Employees**") are located all over the world. The Debtor is and was the employer of record for Employees located in Singapore, where the Debtor is incorporated, while Deel, Inc. ("**Deel**," and such Employees, the "**EOR Employees**"), a human capital management firm, is the employer of record for those Employees located outside of Singapore.

**B.      The Debtor's Constitution**

19.     Pursuant to the Article 141 of the Debtor's Constitution (the "**Constitution**") (the Debtor's governing document, similar to a charter or articles of incorporation), the Debtor is obligated to indemnify Employees for costs incurred arising from the carrying out of their duties. The Constitution provides:

> Subject to the provisions of and so far as may be permitted by the Act, every Director, manager, Secretary and other officer or servant of the Company shall be indemnified by the Company against, and it shall be the duty of the Directors out of the funds of the Company to pay, all costs, losses and expenses which any such officer or servant may incur or become liable to incur by reason of any contract entered into or act or deed done by him as such officer or servant or in any way in the discharge of his duties, including reasonable hotel, travelling and other expenses.

20.     Pursuant to the laws of Singapore, the Debtor may not be obligated to indemnify an Employee and is permitted to seek recovery of the legal costs paid to an Employee under its indemnification obligations under various circumstances, such as if: (i) an Employee's conduct resulted in a criminal conviction as determined by a final order of a court of competent jurisdiction , (ii) an Employee commits a form of wrongful conduct against the Debtor, such as

9

fraud or misappropriating funds, or (iii) the acts the subject of indemnification were outside the scope of an Employee's duties (collectively, the "**Indemnity Limitations**").[16]

## C.    Employment Agreements

21.    To the extent the Employees are, or were, EOR Employees, Deel is obligated to indemnify such EOR Employees for costs incurred arising from the carrying out of their duties.  Specifically, each EOR Employee's employment agreement with Deel (each, a "**Deel Employment Agreement**") contains an indemnification provision substantially similar to the following provision in the Deel Employment Agreement between Deel and the Head of Company Operations, Chris Amani:

> [Deel] and its respective successors and assigns, shall indemnify, protect, and hold Employee harmless from, for, and against any and all claims . . . asserted against the employee arising out of, in whole or in part, the actions or commissions by the Employee . . . . [Deel] shall advance all expenses, including reasonable attorney's fees and costs of court approved settlements, actually or necessarily incurred by Employee in connection with the defense of any action, suit, or proceeding . . . , which has been brought against Employee by reason of his service as an officer or agent of [Deel] . . . .  The obligations

---

[16]    Sections 172(2) of the Singapore Companies Act 1967 renders void any provision by which a company directly or indirectly provides an indemnity (to any extent) for an officer of the company (as regards "officers" of the company, defined to include any "person employed in an executive capacity" by the company) against any liability attaching to him or her in connection with any negligence, default, breach of duty or breach of trust in relation to the company. Section 172B of the Companies Act 1967 provides that an indemnity against liability incurred by the officer to a person other than the company may be valid, except where the indemnity is against, *inter alia*, any liability incurred by the officer in defending criminal proceedings in which he or she is convicted. See also *Chee Kheong Mah Chaly and others v Liquidators of Baring Futures (Singapore) Pte Ltd* [2003] 2 SLR(R) 571, where the Singapore Court of Appeal held that a firm of auditors could not be indemnified in respect of legal expenses in defending a claim brought by the company for alleged negligence, as such costs were not incurred in the execution of their duties. See also the English case *Coulson v News Group Newspapers Ltd* [2012] EWCA Civ 1547 (which though not binding in Singapore is highly persuasive), where the court held a newspaper editor was entitled to be indemnified for expenses in defending criminal charges for engaging in telephone hacking, but not for presenting fraudulent claims for expenses to the company. The court there held that the alleged hacking was "*a misguided attempt to fulfil his duty to obtain accurate and authentic information upon all matters and questions dealt with by [newspaper]*" and could fall within the scope of the indemnity. On the other hand, the costs of defending a criminal allegation in respect of a fraudulent claim for expenses presented to the company fell outside the scope of indemnity, as that conduct was "*for a purpose not related to the employment, is not an attempt to do the job at all*" (at [47]).

of [Deel] pursuant to this Section will survive the expiration or earlier termination of the Employees employment.

22.    Further, the Employer of Record Master Services Agreement between Deel and the Debtor (the "**Deel MSA**") provides that the Debtor will indemnify Deel for costs and expenses arising from the indemnification provisions in the Deel Employment Agreements between the EOR Employees and Deel.  Accordingly, the Debtor is obligated to indemnify EOR Employees for costs incurred arising from the carrying out of their duties, pursuant to the Deel Employment Agreements and the Deel MSA.

D.    **Employee Testimony/Subpoenas**

23.    In connection with the SEC Enforcement Action, the Debtor has subpoenaed six (6) Employees (three (3) former Employees and three (3) current Employees (including the Debtor's Chief Executive Officer Chris Amani)) for testimony at the SEC Jury Trial. In addition, some Employees have agreed to participate in interviews with Dentons as cooperating witnesses in connection with pre-trial diligence for the SEC Jury Trial. It is critical that the Employees are represented by competent counsel, which will further ensure that the Debtor has an adequate defense in connection with the SEC Enforcement Action.

24.    In connection with the DOJ Investigation, at least eight (8) Employees (four (4) former Employees and four (4) current Employees) have received grand jury subpoenas for documents and, in some cases, testimony, in connection with the DOJ Investigation.  It is likewise critical that the Employees are adequately represented in the DOJ Investigation, not only to protect the Employees' interests and to cooperate with governmental units, but also to protect the Debtor from the potential of judicial prejudice or unfair and inaccurate prosecution of claims against the Debtor.

E.    **Counsel Representing Employees**

25.    Sixteen (16) Employees have retained separate counsel for their individual representation in connection with the SEC Enforcement Action and/or the DOJ Investigation. These counsel have gained significant knowledge, expertise, and familiarity with the Debtor, its operations, and the legal issues it faces.   In addition to the above, Mr. Kwon as retained Montenegrin counsel, Law Office Rodic ("**Rodic**"), in connection with his detention in Montenegro, as discussed in more detail below.

1.    *Kobre and Kim LLP*

26.    Twelve (12) Employees have retained Kobre & Kim LLP ("**Kobre**") as counsel, including five (5) members of the Current Workforce and seven (7) former Employees and contractors.[17]  Prior to the Petition Date, the Debtor and Kobre entered into a Pool Counsel & Employee Assistance Retention Agreement, dated June 1, 2022 (the "**Kobre Pool Retention Agreement**"), pursuant which the Debtor offered the Employees the opportunity to retain Kobre should the need for individual counsel arise.  The Kobre Pool Retention Agreement provides that that Employees who retain Kobre will also execute separate engagement letters with Kobre (the "**Kobre Employee Engagement Letters**") "approved by the [Debtor], wherein the [Debtor] agrees to indemnify and advance legal fees on behalf of the individual [Employee]."   As contemplated by the Kobre Pool Retention Agreement, the Employees who retained Kobre each executed a Kobre Employment Engagement Letter.

27.    Although the precise terms of the Kobre Employee Engagement Letters vary slightly from Employee to Employee depending on the necessary scope of the engagement, the scope of services in such letters generally cover Kobre acting as counsel to the Employee in

---

[17]    One Employee has retained Kobre as counsel with regard to the SEC Enforcement Action and separate counsel with regard to the DOJ Investigation.

responding to requests for information from the SEC, the DOJ, and other governmental units in connection with their respective investigations of the Debtor.  To date, Kobre has generally performed the following services for Employees that have executed Kobre Employee Engagement Letters: (i) assisted with preparation for, and represented as counsel during, interviews, depositions, and testimony; (ii) produced documents in response to subpoenas; and (iii) provided general advice.  This includes assisting the Employees with respect to both the Debtor's subpoenas of certain of such Employees for testimony at the SEC Jury Trial and grand jury subpoenas from the DOJ for documents and, in some cases, testimony in connection with the DOJ Investigation.

28.     In connection with preparation of these Employees for testimony at the SEC Jury Trial, Kobre reviewed relevant materials, prepared with the Employees for potential cross-examination at trial, and accompanied the Employees to preparatory meetings with Dentons. Kobre plans to accompany certain of the Employees at the SEC Jury Trial.  In connection with the DOJ Investigation, Kobre has begun responding to the grand jury subpoenas, and document production is ongoing.  It is expected that the DOJ will conduct additional interviews of certain Employees who have received grand jury subpoenas.

29.     Kobre does not represent the Debtor.  The Kobre Pool Retention Agreement makes clear that Kobre represents the respective Employee's personal interests and not those of the Debtor.  The attorney-client relationship between the Employees and Kobre is governed by the individual Kobre Employee Engagement Letters.  By executing the Kobre Pool Retention Agreement, the Debtor has simply engaged Kobre to (i) speak with Employees on an attorney-client privileged basis regarding the circumstances under which the Employees' potential future

13

engagement of Kobre may be warranted, and (ii) offer the Employees the opportunity to formally retain Kobre.

30.      Pursuant to the Kobre Pool Retention Agreement, the Debtor agreed to pay Kobre on an hourly basis for Kobre's services at Kobre's standard hourly rates for services Kobre provides to the Employees, including time spent communicating with Employees, the Debtor, or the Debtor's counsel prior to the execution of a Kobre Employee Engagement Letter.  Each Kobre Employee Engagement Letter includes a provision stating, "[f]ees and expenses of [the] engagement are being covered by Terraform Labs, with whom [Kobre] has a separate agreement to be reimburse."  Each Kobre Employee Engagement Letter also includes a provision stating that the Employee acknowledges and accepts that Kobre may withdraw its representation of the Employee if the Debtor stops advancing fees and expenses to Kobre.

31.      On or around June 8, 2022, the Debtor deposited $150,000 into Kobre's escrow attorney account as a fee advance for Kobre's services to Employees (the "**Kobre Retainer**").  On May 31, 2023, the Debtor replenished the Kobre Retainer with an additional $750,000 due to an increase in the amount of work Kobre performed on behalf of the Employees. Pursuant to the Kobre Pool Retention Agreement, Kobre Retainer funds are to be drawn to fund Kobre's ongoing time and administrative charges upon issuance of the related invoice without further authorization.[18]  As of the Petition Date, there is a balance of approximately $352,557.84 remaining on the Kobre Retainer.

---

[18]     Separate from the relief sought in this Motion, the Debtor delivered to Kobre $4 million in a series of installments over the span of June 2023 to August 2023 to satisfy its legal defense obligations to Head of Company Operations Chris Amani pursuant to the Debtor's Constitution.  The funds are held by Kobre in a segregated escrow account. There was an agreement prior to the Petition Date between Kobre, Mr. Amani, and Director and Employee Ashwin Mathialagan whereby Mr. Amani agreed to allocate $1 million of the $4 million defense fund escrow to be used to cover the Debtor's legal defense obligations to Mr. Mathialagan pursuant to the Debtor's Constitution.

14

32.     Kobre has a prepetition balance of $467,423.77.  After application of the Kobre Retainer thereto, a balance of $124,224.73 remains.  Kobre estimates that its total costs for the three (3) months following the Petition Date will be approximately $1,200,000.

### 2.  *Other Employee Counsel*

33.     Five (5) Employees have retained certain other law firms as separate counsel, including Goodwin Procter LLP ("**Goodwin**"), McGuire Woods LLP ("**McGuire**"), and Reed Smith LLP ("**Reed Smith**" and collectively with Goodwin and McGuire, the "**Other Employee Counsel**;" the Other Counsel collectively with Kobre and Rodic, the "**Employee Counsel**") in connection with the DOJ Investigation, pursuant to individual engagement letters.

34.     Goodwin represents one (1) Employee.  The engagement letter between Goodwin and the Employee (to which the Debtor is not a party) states that Goodwin will request that the Debtor indemnify the Employee and advance Goodwin's legal fees and costs; however, the Employee is obligated to pay such fees and costs if the Debtor fails to pay Goodwin.  Pursuant to Goodwin's engagement letter, the Debtor deposited a $50,000 retainer fee into Goodwin's attorney escrow account (the "**Goodwin Retainer**").  Goodwin has a prepetition balance of $88,229.30.  After application of the Goodwin Retainer balance of $50,000, a balance of $38,229.30 remains.

35.     McGuire represents one (1) Employee.  The engagement letter between McGuire and the Employee (to which the Debtor is not a party) contemplates that the Debtor will pay McGuire fees, costs, and expenses for McGuire's representation of the Employee; however, the Employee is obligated to pay such fees, costs, and expenses if the Debtor fails to pay McGuire. Pursuant to McGuire's engagement letter, the Debtor deposited a $50,000 retainer fee into McGuire's attorney escrow account (the "**McGuire Retainer**").  McGuire has a prepetition

15

balance of $61,788.  After application of the McGuire Retainer of $50,000, a balance of $11,788 remains.

36.      Reed Smith represents three (3) Employees.  Pursuant to the engagement letter between Reed Smith and the Employees (to which the Debtor is not a party), the Employees are ultimately responsible for paying for fees and expenses incurred in connection with Reed Smith's services.  The Debtor is obligated to indemnify these Employees, pursuant to the Constitution, and in the 90 days prior to the Petition Date, the Debtor paid $82,010.67 to Reed Smith for legal services provided to the Employees.  The total unpaid prepetition amount incurred by Reed Smith in connection with its representation of Employees is $181,124.28.

37.      Although the scope of services of the engagement letters with each of the Other Employee Counsel varies slightly, each engagement letter generally states that the scope of services includes representation of the Employees in connection with the DOJ Investigation.

38.      The total unpaid prepetition amounts incurred by the Other Employee Counsel in connection with their representation of Employees is $331,141.58.  Collectively, the Other Employee Counsel have retainer balances of $100,000, as of the Petition Date.  After application of the Goodwin Retainer and McGuire Retainer, the balance of unpaid prepetition amounts incurred by Other Employee counsel is $231,141.58.  The Other Employee Counsel estimate that their total costs for the three (3) months following the Petition Date will be approximately $975,500.

        **3.  *Law Office Rodic***

39.      Mr. Kwon, the Debtor's former director and Chief Executive Officer and current majority shareholder, has substantial knowledge about important events in the Debtor's history and the Debtor's operations.  As a result, Mr. Kwon has provided key information for the Debtor's defense in the SEC Enforcement Action and will continue to be an invaluable resource

16

in connection with the Debtor's appeal thereof.  In addition, because Mr. Kwon is the Debtor's majority shareholder, certain corporate governance practices require Mr. Kwon to execute or direct proxies to execute documents on his behalf.

40.    Mr. Kwon is currently detained in Montenegro, awaiting extradition to either the United States or South Korea.  Mr. Kwon retained Rodic to serve as his Montenegrin counsel in connection with their detention and other matters related to the Debtor's corporate governance.  Rodic is a capable, experienced, and reputable firm in Montenegro.

41.    Montenegrin authorities highly restrict foreign counsel from visiting Mr. Kwon.  Therefore, the primary means of communication between Dentons and Mr. Kwon is through Rodic as an intermediary.  Rodic has assisted with communications between the Debtor's counsel and Mr. Kwon, as well as facilitated the execution of corporate documentation on behalf of the Debtor.

42.    Mr. Kwon, as a former officer of the Company, is an Employee entitled to indemnification pursuant to the Constitution for necessary fees and expenses for matters related to the Debtor's business, including legal fees for proceedings involving actions taken in their capacity as Employees.

43.    Rodic charges a fixed fee of $244,296 per month.  Prepetition, the Debtor fully paid Rodic for fees and expenses incurred in connection with its representation of Mr. Kwon. The Debtor believes that Rodic will need to continue to serve as Mr. Kwon's Montenegrin counsel until such time as Mr. Kwon is extradited.[19]  It is important for Rodic to continue to represent Mr.

---

[19]    Rodic also represents the Debtor's former Chief Financial Officer, Han Chang Joon, who was also detained in Montenegro.  Mr. Han has substantial knowledge about key events in the Debtor's history and the Debtors operations as related to the SEC Enforcement Action, and has assisted with the Debtor's defense thereof.  Mr. Han is likewise entitled to indemnification for the fees and expenses of Rodic, pursuant to the Constitution. However, the Debtor understands that Rodic's representation of Mr. Han has terminated upon Mr. Han being

Kwon, for the reasons outlined above, including to facilitate Mr. Kwon's ability to provide the Debtor with critical information in connection with the SEC Enforcement Action. Accordingly, the Debtor's Board of Directors (the "**Board**") approved, as an exercise of sound business judgment, the payment of postpetition fees and expenses of Rodic for the three (3) months following the Petition Date, totaling $732,888. The Debtor requests that the Court authorize the Debtor to make such payments.

## G. Proposed Procedures for Paying Employee Counsel and Future Indemnification Claims

44.     Prior to the filing of this Motion, the Board approved the payment of the prepetition fees and expenses of Employee Counsel in the amount of $355,366.31 (after application of the retainers), subject to Court approval.

45.     The Debtor seeks approval of the following procedures (the "**Employee Counsel Payment Procedures**") to pay postpetition fees and expenses to Employee Counsel:

a. The Debtor will inform all Employee Counsel of the Indemnification Limitations; and any payments made to Employee Counsel will be subject thereto and the Debtor may seek repayment of amounts in accordance therewith.

b. Each Employee Counsel must provide an invoice (each, an "**Invoice**") setting forth in reasonable detail the nature of the postpetition services rendered by Employee Counsel, including any expenses.

c. Invoices must be provided to the Debtor within thirty (30) days following the end of the previous month, with copies sent to Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn: Ronit Berkovich (ronit.berkovich@weil.com); Jessica Liou (jessica.liou@weil.com); and F. Gavin Andrews (f.gavin.andrews@weil.com).

d. Each Invoice will be reviewed and approved by the Board, in consultation with the Special Committee of the Board (the "**Special Committee**"), in its

---

extradited to South Korea this week. Accordingly, the Debtor does not expect that Rodic will perform work for Mr. Han postpetition going forward.

discretion.  The Debtor shall have 14 days after receiving the Invoice to inform the respective Employee Counsel as to whether the Invoice was approved by the Board or if the Board requires further information from Employee Counsel before determining whether to approve the Invoice (the "**Response Deadline**").

e. If the Debtor has informed Employee Counsel by the Response Deadline that its invoice has been approved, the Debtor shall be authorized to make payment to the Employee Counsel in the amount stipulated on the Invoice.

46.    The Debtor seeks approval of the following procedures to pay and/or reimburse Employees for Future Indemnification Requests (as defined below):

a. The Debtor shall timely inform the Board if the Debtor wishes to include an Employee, that has not already engaged Employee Counsel to participate in interviews, or otherwise, in each case in connection with the SEC Enforcement Action and/or DOJ Investigation.

b. The Debtor shall inform the Board within seven (7) days if an Employee that has not already engaged Employee Counsel is the subject of a subpoena or otherwise issued by the SEC or DOJ in connection with the SEC Enforcement Action or DOJ Investigation.

c. In the case of either (a) or (b), the Debtor shall thereafter provide the Board with (i) an engagement letter between the Employee and proposed counsel to the Employee, which describes in reasonable detail the scope of counsel's representation of the Employee, and (ii) a non-binding fee estimate for counsel's representation of the Employee (collectively, the "**Future Indemnification Requests**").

d. Each Future Indemnification Request shall be reviewed and approved by the Board in consultation with the Special Committee.

e. If the Board approves a Future Indemnification Request, the Debtor shall be authorized to make payment in the ordinary course to the Employee's counsel, *provided*, *that:*

i. Such payments shall be at all times subject to the Employee Counsel Payment Procedures; and

ii. Any Future Indemnification Requests shall not exceed on a rolling three (3) month period, $75,000 per month on average or $225,000 in the aggregate (the "**Future Indemnification Cap**").

19

**Critical Vendor Claims**

47.    The Debtor, via Dentons, has retained numerous vendors (the "**Critical Vendors**") that provide services essential to the Debtor's defense of the SEC Enforcement Action (including the upcoming SEC Jury Trial) and DOJ Investigation.  Such services include: provision of external and/or internal expert witnesses (such as crypto experts and trading experts), expert testimony, expert reports, analyses, opinion, and/or conclusions, translation services, videographers, court reporters, discovery related services, consulting services, investigation services regarding third parties and witnesses, and any other services that Dentons or the Debtor may request the Critical Vendors provide in preparation for SEC Jury Trial.

48.    To mitigate the risk of the Debtor not having adequate support in preparation for and during the SEC Jury Trial by failing to pay prepetition amounts owed to Critical Vendors (the "**Critical Vendor Claims**"), the Debtor and its advisors engaged in a comprehensive process to identify those vendors that are "critical" to the SEC Jury Trial preparation.  In this process, the Debtor, with the assistance of Dentons and the Debtor's restructuring professionals, assessed a variety of qualitative and quantitative factors, including:

- whether a vendor was located in a jurisdiction that would likely honor the applicability of the Bankruptcy Code;

- the goods or services provided by a vendor;

- whether services are provided pursuant to a contract;

- the degree to which replacement costs (including pricing, transition expenses, professional fees, and lost sales or future revenue) would exceed the amount of a vendor's prepetition claim;

- which vendors would be prohibitively expensive or practically difficult to replace;

- whether an agreement exists by which the Debtor could compel a vendor to continue performing on prepetition terms;

20

- whether a vendor is currently refusing to supply the Debtor with services or is refusing to do so without cash up front; and

- whether the Debtor's inability to pay all or part of a vendor's prepetition claim could trigger financial distress for the applicable vendor, leading to future difficulty of that vendor's ability to perform.

49.     After a thorough analysis involving an assessment applying the above factors, the Debtor designated certain vendors as necessary to continue preparing for the SEC Jury Trial and, thus, preserve value for the benefit of the Debtor's estate and creditors.  As of the Petition Date, the Debtor estimates that approximately $1,300,000 is outstanding on account of obligations to the Critical Vendors.  The relief requested in this Motion seeks to pay prepetition amounts owed to the Critical Vendors in an amount not to exceed such amount.

50.     The Debtor's selection process balanced the need to ensure that this chapter 11 case does not disrupt SEC Jury Trial preparation with the need to limit the expenditure of estate resources.   The Critical Vendors have all previously provided essential services to the Debtor and Dentons in connection with the SEC Jury Trial.  Paying targeted prepetition claims of the Critical Vendors benefits the Debtor's estates by enabling the Debtor to continue to prepare for the SEC Jury Trial without interruption and make sure it can obtain essential information on an ongoing basis.  Further, the Debtor reserves all rights to enter into postpetition trade agreements with the Critical Vendors if it deems it prudent and necessary.

51.     It is the Debtor's view that the Critical Vendors will not perform unless they receive payment of their outstanding prepetition claims.  The Debtor and Dentons rely heavily on the Critical Vendors to provide critical information and expert reports to prepare for its SEC Jury Trial.  For example, one of the Critical Vendors provides the Debtor and its advisors with information obtained through numerous foreign jurisdictions, such as Montenegro and Serbia.

21

Even a short interruption in the provision of any of these services could have potentially disastrous effects on the Debtor's preparation for the SEC Jury Trial, given that it is scheduled to begin in late March, and, in turn, the success of this chapter 11 case.  Most of these Critical Vendors are virtually irreplaceable due to the specialized nature of the services provided to the Debtor and cost a fraction of what other firms may cost for the same amount of work and services.  Even where alternative vendors exist, the time and costs associated with switching from a Critical Vendor to a new provider would likely be significant and detrimental to the Debtor's estate, particularly given the timing of the upcoming SEC Jury Trial.

## **Foreign Litigation Related Claims**

52.    In connection with its defense of the SEC Enforcement Action, the Debtor sought third-party discovery in foreign jurisdictions under a federal law that empowers U.S. Federal Courts to make requests of foreign courts to allow discovery within their jurisdictions at the parties' request.  Specifically, 28 U.S.C. § 1781 authorizes federal courts to issue letters rogatory or letters of request that enable a U.S. litigant to obtain non-party discovery from a foreign entity. 28 U.S.C. § 1781(b)(2) (allowing for "the transmittal of a letter rogatory or request directly from a tribunal in the United States to the foreign or international tribunal, officer, or agency to whom it is addressed and its return in the same manner").[20]  The parties receiving the discovery request in the foreign jurisdiction may contest such requests in their local courts.  The Debtor has

---

[20]    Where applicable, such letters of request are enforced "through bilateral treaties with the United States." *Lantheus Med. Imaging, Inc. v. Zurich Am. Ins. Co.*, 841 F. Supp. 2d 769, 777 (S.D.N.Y. 2012). One such treaty is the Hague Convention of 18 March 1970 on Taking of Evidence Abroad in Civil or Commercial Matters, opened for signature, Mar. 18, 1970, 23 U.S.T. 2555 (the "**Hague Evidence Convention**"), under which U.S. courts may "request the competent authority of another Contracting State, by means of a Letter of Request, to obtain evidence, or to perform some other judicial act." Hague Evidence Convention Chapter I, Article 1. The United States, the United Kingdom, and Hong Kong (through the Republic of China) are all parties to the Hague Evidence Convention.

22

incurred certain prepetition and postpetition costs associated with litigating such discovery requests in foreign jurisdictions, which are outlined in further detail below.

53. As it prepares for the upcoming SEC Jury Trial, it is critical for the Debtor to obtain certain information in foreign jurisdictions which may be pivotal in assisting the Debtor with presenting evidence in its defense of the SEC Enforcement Action. In addition, nonpayment of certain amounts incurred in connection therewith subjects the Debtor to penalties and other consequences in foreign jurisdictions. In light of the potential for serious consequences if the Debtor do not make payments to the Foreign Litigation Creditors, the Debtor has determined, in the exercise of its business judgment, that payment of the Foreign Litigation Creditors' claims is essential to the Debtor and, accordingly, the relief requested herein should be granted. By this Motion, the Debtor seeks authority to pay the claims of Foreign Litigation Creditors up to a maximum aggregate amount of approximately $1,509,000 related to the four (4) Foreign Litigation Creditors below.

**A.      Okcoin Hong Kong Litigation**

54. On August 15, 2023, Judge Rakoff issued a letter of request to Okcoin Technology Company Ltd. ("**Okcoin**") in Hong Kong to gather more information in that jurisdiction (the "**Okcoin Letter of Request**"). The Okcoin Letter of Request sought information and documents about significant UST trading volume and a large volume of Luna Classic[21] transactions on the Okcoin exchange, which may have caused or contributed to the May 2022 Depeg (the "**Depeg**"). The Debtor, through Dentons, subsequently retained the Howse Williams

---

[21] As discussed further in the First Day Declaration, Luna Classic is the Terra Blockchain network's native token. Luna Classic tokens were programmatically tradeable with the TerraUSD "stablecoin" (known by its ticker "**UST**") and other Terra network stablecoins.

law firm ("**Howse Williams**") to bring an application in the High Court of the Hong Kong Special Administrative Region (the "**Hong Kong Court**") to enforce the Okcoin Letter of Request.

55.     Howse Williams brought an *ex parte* summons to enforce the Okcoin Letter of Request.   The Hong Kong Court granted the request and ordered disclosure on November 21, 2023; however, counsel for Okcoin subsequently filed an application to set aside the disclosure order.  The Hong Kong Court sided with Okcoin and granted the application to set aside the Debtor's disclosure order on January 19, 2024.  It also ordered the Debtor to pay costs of HK$1,068,700 (approximately USD $137,000 as of the date hereof) to Okcoin (the "**HK Costs Order**").[22]

56.     Although the Debtor can appeal the HK Costs Order and the information sought from Okcoin remains relevant to its defense in the SEC Enforcement Action, the Debtor believes is unlikely it will receive the information sought from Okcoin in sufficient time for use at the SEC Jury Trial even if the appeal of the HK Costs Order is successful.  Thus, Howse Williams approached Okcoin's counsel to propose a reduction in costs in exchange for not appealing the Costs Order.  After negotiation, Okcoin's counsel agreed to a 25% reduction of costs (for a total of HK$750,000) (approximately USD $96,000 as of the date hereof), pending approval from this Court.  Failure to pay the Costs Order would cause the Debtor to be in contempt of the Hong Kong Court, which would incur criminal and/or civil penalties, amounting in additional costs.

57.     The Costs Order has the same effect as any other final judgment order granted by the Hong Kong Court.  In this case, Okcoin, as the "judgment creditor," can enforce it

---

[22]   In certain foreign jurisdictions, particularly those having a foundation in the English common law system, it is common for the losing party of the litigation to pay the legal costs, including attorney's fees, of the winning party on a scale that is fixed by the court.

in the usual manner.  Specifically, Okcoin will have recourse against the Debtor for such unpaid amounts by filing the following three applications to the Hong Kong Court:

> i.    A compulsory winding up order against the Debtor, where first, Okcoin serves a statutory demand on the Debtor, requiring the Debtor pay back the debt (*i.e.*, the Costs Order) in twenty-one (21) days.  If the Debtor fails to pay within the three weeks, Okcoin could then commence winding-up proceedings against the Debtor in Hong Kong;

> ii.   a garnishee order against known third parties that owe monies to the Debtor in Hong Kong (such that banks and/or other crypto trading platform will be ordered to repay the costs order on behalf of the Debtor using their funds); and

> iii.  a charging order(s) against real properties, securities, and/or digital assets held by the Debtor in Hong Kong providing charge over such property or securities to guarantee payment of the costs order, which can become the basis of a subsequent application for an order for sale of such properties for payment of the costs order with the sale proceeds.

58.    Even though the Debtor is a Singapore company, the Hong Kong Court has previously ruled that it is has jurisdiction to wind up a foreign company pursuant to powers under statute authority provided that certain threshold requirements are satisfied.[23]  The possible garnishee or charging orders may be relevant if the Debtor has assets in Hong Kong.

59.    Although the scope of the automatic stay set forth in section 362 of the Bankruptcy Code is universal, the Debtor may not be able to enforce the stay in foreign jurisdictions if the creditor against which enforcement is sought has minimal or no presence in the United States.  Upon information and belief, Okcoin likely has little or no connection to the United States.  Further, the Hong Kong Court will likely not automatically recognize the Debtor's chapter 11 case and the protections chapter 11 provides.  As such, Okcoin may be able to pursue remedies and seek to collect amounts owed to it notwithstanding the automatic stay.  To prevent such action,

---

[23]    Such requirements are the company's connection with Hong Kong, the reasonable possibility the winding-up order will benefit the applicant, and whether the Hong Kong Court has jurisdiction over distribution of the company's assets.

the Debtor could commence a proceeding in the Hong Kong Court seeking recognition of the chapter 11 case. However, doing so would take time and may be more expensive than paying the HK Costs Order. Therefore, the Debtor has determined, in the exercise of its business judgment, that payment of the HK Costs Order is essential to prevent further litigation costs.

**B.     British Virgin Islands Litigation**

60.     Judge Rakoff issued letters of request to two entities in the British Virgin Islands to gather more information in that jurisdiction to (a) iFinex Inc. d/b/a Bitfinex ("**Bitfinex**") on August 15, 2023 (the "**Bitfinex Letter of Request**"), and to Primary Digital Master Fund Ltd. ("**Primary Digital**" together with Bitfinex, the "**BVI Foreign Litigation Claimants**") on October 12, 2023 (the "**Primary Digital Letters of Request**" together with the Bitfinex Letter of Request, the "**BVI Letter of Requests**"). The letter of request to Bitfinex sought documents and information about crypto wallets and the trading accounts involved in trading UST that were hosted by the Bitfinex cryptocurrency exchange and have been identified as potentially causing and/or contributing to the Depeg. The letter of request to Primary Digital sought documents and information about Primary Digital's involvement in the Depeg, including its respective connections to a cryptocurrency wallet/trading account identified as causing and contributing to the May 2022 Depeg. The Debtor, through Dentons, retained the Collas Crill law firm ("**Collas**") to bring an application in the Eastern Caribbean Supreme Court in the High Court of Justice, Virgin Islands (the "**BVI Court**") to enforce the BVI Letter of Requests.

61.     After bringing an application to enforce the Bitfinex Letter of Request, Collas agreed to a consent order with counsel for Bitfinex to produce the requested material, which the BVI Court approved (the "**Bitfinex Order**"). In accordance with British Virgin Islands law, the Bitfinex Order provided that the Debtor would pay for Bitfinex's reasonable costs if Bitfinex

26

complied with the terms of the Bitfinex Order, with the costs being assessed if not agreed by the Debtor and Bitfinex. Bitfinex produced all agreed-upon materials and identified to the Debtor its costs as $37,840.45 (the "**Bitfinex Costs Order**"). The Debtor further negotiated with Bitfinex and agreed to pay $26,488.36 to settle Bitfinex's costs of complying with the terms of the Bitfinex Order.

62.    Subsequently, Collas brought an application to enforce the Primary Digital Letter of Request against Primary Digital to produce the requested material, which BVI Court approved (the "**Primary Digital Order**" together with the Bitfinex Order, the "**BVI Orders**"). Similarly to the Bitfinex Order, the Primary Digital Order provided that the Debtor would pay for Primary Digital's reasonable costs if Primary Digital complied with the terms of Primary Digital Order. Primary Digital complied with the Primary Digital Order and produced the requisite documents, incurring reasonable costs of $57,000.00, including furthers costs from negotiating the execution of a declaration confirming the authenticity of the produced documents (the "**Primary Digital Costs Order**" together with the Bitfinex Costs Order, the "**BVI Costs Orders**").

63.    As noted above, although the scope of the automatic stay set forth in section 362 of the Bankruptcy Code is universal, the Debtor may not be able to enforce the stay in foreign jurisdictions if the creditor against which enforcement is sought has minimal or no presence in the United States. The BVI Foreign Claimants have little or no connection to the United States. Further, the BVI Court will likely not automatically recognize the Debtor's chapter 11 case and the protections chapter 11 provides.

64.    If payment of the BVI Costs Orders is not made, the Debtor would be in breach of its debt obligations pursuant to the relevant BVI Orders, which may subject the Debtor to legal action by the creditors to enforce the debts. To prevent such action, the Debtor could

27

commence a foreign recognition proceeding in the BVI Court. However, doing so would take time and may be more expensive than paying the BVI Orders. Therefore, the Debtor has determined, in the exercise of its business judgment, that payment of the BVI Costs Orders is essential to prevent further litigation costs.

### C.    Wintermute United Kingdom Litigation

65.    U.S. District Judge Jed Rakoff issued a letter of request (the "**Wintermute Letter of Request**") for records and testimony of Wintermute Trading Ltd. ("**Wintermute**" and, together with Okcoin and the BVI Foreign Litigation Claimants, the "**Foreign Litigation Creditors**" and their respective claims, the "**Foreign Litigation Claims**"), a global algorithmic crypto-trading firm that is based in the United Kingdom. Dentons retained Rahman Ravelli Solicitors ("**Rahman Ravelli**") and through Rahman Ravelli, engaged Henry Byam-Cook KC and Socrates Papadopoulos of Twenty Essex as the Debtor's barristers ("**Twenty Essex**" together with Rahman Ravelli, the "**English Counsel**"), on behalf of the Debtor to litigate the Wintermute Letter of Request in the High Court of Justice, King's Bench Division (the "**English High Court**").

66.    The Debtor believes the information it is seeking from Wintermute is valuable to its defense of the SEC Litigation Action in the SEC Jury Trial in at least three important ways.

67.    First, Wintermute's Code (as defined below) is relevant to the causation and loss amount alleged by the SEC. Specifically, the Debtor believes that during an event known as the Depeg, in which the value of the Debtor's stablecoin, UST, fell below one dollar, Wintermute shorted Luna Classic and UST, which contributed to the catastrophic loss of value and supports the Debtor's argument that the Depeg was caused by independent actions of third parties and not the Debtor. To determine and prove Wintermute's role in the Depeg, the Debtor is attempting to

compel Wintermute to produce its trading code used during the Depeg ("**Wintermute's Code**"). As Judge Rakoff indicated in the form approving the Wintermute Letter of Request,

> the evidence sought will be used in the proceedings and at trial by the Defendants to enable the U.S. Court to determine whether or not…the Defendant's fraudulent activity led to $40 billion in market losses. To do so, Defendants will argue that the Court and jury need to understand the full extent of Wintermute's shorting activities and strategy and that this activity caused the collapse of the UST and LUNA prices.

68.     Second, to the extent Wintermute's Code is relevant to the causation issue, it will also potentially shed further light on the alleged false statements the SEC claims the Debtor and Do Kwon made in connection with the first brief depeg in May 2021.  Similarly, statements made in depositions the Debtor took in London on January 15, 2024, (the "**Wintermute Depositions**") appear to confirm that Wintermute deployed a specific and sophisticated strategy to depress the price of UST.  To fully present this defense to the jury, however, the Debtor requires Wintermute's Code, which is expected to provide confirmatory physical evidence of Wintermute's alleged short selling strategy.

69.     Lastly, statements from the Wintermute Depositions revealed information relevant to Wintermute's market activities.  Wintermute's Code will likely provide physical evidence that will enable the Debtor to determine the effect of Wintermute's market activities on the price of Luna Classic.

70.     The litigation with Wintermute, represented by Mishcon de Reya LLP ("**Mishcon**") and Morrison Cohen LLP ("**Morrison Cohen**"), has been contentious from the beginning.  Wintermute has consistently resisted the production of relevant information related to the execution of trades during the Depeg, despite the Wintermute Letter of Request.  Rahman Ravelli requested that the English High Court compel Wintermute to produce the requested information under threat of criminal penalty, known as a penal notice, on an expedited basis

(the "**Motion for Penal Notice**"), which the court granted.[24]  On appeal, however, the High Court of Justice, King's Bench Division, Mr. Justice Lavender, reversed the grant of the Penal Notice and ordered costs of the appeal in favor Wintermute.  It is the usual practice in English courts to order that the losing party to a contested application reimburse the legal costs of the successful party (in an amount assessed by the court).  Accordingly, on January 29, 2024, as a consequence of the Debtor's losing the appeal, the English High Court awarded Wintermute £143,000 (approximately $180,000 as of the date hereof) in costs (the "**Wintermute Costs Award**") related to the Motion for Penal Notice.  However, Mr. Justice Lavender did allow the Debtor to pursue the discovery it sought through civil discovery, which it is doing.

71.    After the Debtor commenced the chapter 11 case, Wintermute served a security for costs application on the Debtor, claiming that security in the amount of £892,407.50 (approximately $1,130,000 as of the date hereof) is needed because the Company is impecunious due to its status as a chapter 11 debtor (the "**Wintermute Security for Costs**" and together with the Wintermute Costs Award, the "**Wintermute Costs**").  A defendant in a U.K. lawsuit may apply for a security for costs, which forces the plaintiffs to pay to the court a fixed sum the court determines is appropriate to secure the defendant's costs of and incidental to the proceeding should the defendant prevail. Security for costs orders serve as protection for defendants with a legitimate concern that a plaintiff may not be able to pay the defendant's costs of the proceeding if so ordered by the court.  If the court approves the application for security of costs, the proceedings are effectively stayed until the plaintiffs provides the security.

---

[24]    Seeking a penal notice on an expedited basis means if a party fails to produce evidence as required, such party can be jailed for not doing so.

72.     A hearing is currently scheduled for February 16, 2024 by the English High Court to determine the Wintermute Security for Costs application and what amount the Debtor must pay.  Wintermute has demanded that the Debtor pay the Wintermute Security for Costs within five days of such hearing.  Although the Debtor views this amount as excessive and will argue to the English High Court that any required security payment amount should be lower, the Debtor will likely be compelled by the English High Court to pay the Wintermute Security for Costs in some amount to continue the litigation against Wintermute.

73.     If the Court approves the Wintermute Security for Costs application, the Debtor would pay the Wintermute's Security for Costs directly to the English High Court, not to Wintermute.  Further, if the Debtor ultimately prevails in the Wintermute Letter of Request litigation against Wintermute, which English Counsel has advised is more likely than not, the money the Debtor deposited with the English High Court will be returned to it and the Debtor would also be entitled to receive costs from Wintermute.  If the Debtor loses in litigation to Wintermute, any security deposited in excess of the actual costs of litigation would be returned to the Debtor.

74.     The Debtor's English Counsel has further advised that failure to pay the Wintermute Costs will likely cause the English High Court to dismiss the Debtor's the case against Wintermute, resulting in the Debtor's being unable to further pursue the Wintermute Letter of Request.  This would negatively impact the Debtor's litigation position in the SEC Enforcement Action.  Moreover, failure to pay the Wintermute Costs Award may cause the English High Court to impute higher penalties on the Debtor.

75.     Therefore, the Debtor has determined, in the exercise of its business judgment, that payment of the Wintermute Costs on an expedited basis is essential to retain its

31

ability to pursue Wintermute's Code.  For the reasons set forth in the Motion to Shorten Notice, it

is imperative that the Debtor be able to pay the Wintermute Costs in short order so that it can get

the requested information before the SEC Jury Trial. Accordingly, the relief requested herein

should be granted to pay the Wintermute Costs on an expedited basis as specified in the Proposed

Wintermute Order attached hereto as **Exhibit B**.

**Relief Requested Should Be Granted**

76.     As noted above, the Debtor seeks to authority to pay the following amounts

in furtherance of the SEC Enforcement Action and DOJ Investigation: (i) fees and expenses of

Employee Counsel including (a) prepetition fees and expenses in an amount not to exceed

$355,386.31 (after application of prepetition retainers), (b) estimated fees and expenses for the

three (3) months following the Petition Date, in an amount not to exceed $2,908,388, and (c) the

Future Indemnification Cap, in an amount not to exceed on a three-month rolling basis, $75,000

per month on average or $225,000 in the aggregate, in each case subject to the Employee Counsel

Payment Procedures; (ii) the Critical Vendor Claims, not to exceed $1,300,000; and (iii) the

Foreign Litigation Claims, in an amount not to exceed $1,509,000, including $1,325,000 for the

Wintermute Costs on an expedited basis.

A.     **Applicable Law**

i.     ***Section 363(b)(1)***

77.     Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a

debtor in possession "after notice and a hearing, may use, sell or lease, other than in the ordinary

course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Under applicable case law in

this and other circuits, if a debtor's proposed use of its assets pursuant to section 363(b) of the

Bankruptcy Code represents a reasonable exercise of business judgment on the part of the debtor,

such use should be approved. *See*, *e.g.*, *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir.

32

1996); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070-71 (2d Cir. 1983) (requiring a "good business reason" to approve a sale pursuant to section 363(b)); *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999).

78.    The business judgment rule is highly deferential to debtors and may be satisfied "'as long as the proposed action *appears* to enhance the debtor's estate.'" *Crystalin, LLC v. Selma Props. Inc. (In re Crystalin, LLC)*, 293 B.R. 455, 463–64 (B.A.P. 8th Cir. 2003) (quoting *Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 566 n.16 (8th Cir. 1997)); *see also In re Farmland Indus. Inc.*, 294 B.R. 903, 913 (Bankr. W.D. Mo. 2003) ("Under the business judgment standard, the question is whether the [proposed action] is in the Debtors' best economic interests, based on the best business judgment in those circumstances.").

### ii.    *Doctrine of Necessity/Section 105(a)*

79.    Further, pursuant to section 105(a) of the Bankruptcy Code, the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  The Court may also authorize the payment of prepetition claims in appropriate circumstances under section 105(a) of the Bankruptcy Code and the doctrine of necessity when such payment is essential to the continued operation of a debtor's business.  *See*, *e.g.*, *In re Just for Feet, Inc.*, 242 B.R. 821, 824–25 (D. Del. 1999) (holding that section 105(a) of Bankruptcy Code provides a statutory basis for payment of prepetition claims under the doctrine of necessity and noting that "[t]he Supreme Court, the Third Circuit and the District of Delaware all recognize the court's power to authorize payment of pre-petition claims when such payment is necessary for the debtor's survival during chapter 11"); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (confirming that the doctrine of necessity is standard for

33

enabling a court to authorize payment of prepetition claims prior to confirmation of a reorganization plan).

80.     The Court has the authority, pursuant to its equitable powers under section 105(a) of the Bankruptcy Code, to authorize the relief requested herein, because such relief is necessary for the Debtor to carry out its fiduciary duties under section 1107(a) of the Bankruptcy Code, which "contains an implied duty of the debtor-in-possession" to act as a fiduciary to protect and preserve the estate, including an operating business' going-concern value," on behalf of a debtor's creditors and other parties in interest. *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002)); *see also Unofficial Comm. of Equity Holders v. McManigle (In re Penick Pharm., Inc.)*, 227 B.R. 229, 232–33 (Bankr. S.D.N.Y. 1998) ("[U]pon filing its petition, the Debtor became debtor in possession and, through its management . . . was burdened with the duties and responsibilities of a bankruptcy trustee.").

81.     In a long line of well-established cases, courts consistently have permitted payment of prepetition obligations where necessary to preserve or enhance the value of a debtor's estate for the benefit of all creditors. *See, e.g.*, *Miltenberger v. Logansport, C&S W.R. Co.*, 106 U.S. 286, 312 (1882) (payment of pre-receivership claim prior to reorganization permitted to prevent "stoppage of the continuance of [crucial] business relations"); *In re Lehigh & New Eng. Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that "if payment of a claim which arose prior to reorganization is essential to the continued operation of the . . . [business] during reorganization, payment may be authorized even if it is made out of [the] corpus"); *Dudley v. Mealey*, 147 F.2d 268, 271 (2d Cir. 1945) (extending doctrine for payment of prepetition claims beyond railroad reorganization cases), *cert. denied* 325 U.S. 873 (1945); *Mich. Bureau of Workers' Disability*

34

*Comp. v. Chateaugay Corp. (In re Chateaugay Corp.)*, 80 B.R. 279, 285–86 (S.D.N.Y. 1987) (approving lower court order authorizing payment of prepetition wages, salaries, expenses, and benefits).

82.     This "doctrine of necessity" functions in a chapter 11 reorganization as a mechanism by which the Court can exercise its equitable power to allow payment of critical prepetition claims not explicitly authorized by the Bankruptcy Code when such payment is essential to the continued operation of a debtor's business.  *See, e.g.*, *In re Just for Feet*, 242 B.R. 821, 824-25 (D. Del. 1999) (holding that section 105(a) of Bankruptcy Code provides statutory basis for payment of prepetition claims under the doctrine of necessity particularly when such payment is necessary for the debtor's survival during chapter 11); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (confirming that the doctrine of necessity is standard for enabling a court to authorize payment of prepetition claims prior to confirmation of a reorganization plan).

### iii.    Section 363(c)

83.     Furthermore, section 363(c) of the Bankruptcy Code authorizes a debtor in possession to "use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1). *In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 796 (Bankr. D. Del. May 24, 2007) ("Section 363(c)(1) of the Bankruptcy Code provides that, unless the Court orders otherwise, a debtor in possession may enter into transactions, including the use, sale or lease of estate property in the ordinary course of business, without notice and a hearing.").

84.     Notably, "[t]he framework of section 363 is designed to allow a trustee (or debtor in possession) the flexibility to engage in ordinary transactions without unnecessary creditor and bankruptcy court oversight, while protecting creditors and giving them an opportunity to be

35

heard when transactions are not ordinary." *In re Roth American, Inc.* 975 F.2d 949, 952 (3d Cir. 1992); *In re Nellson Nutraceutical, Inc.*, 369 B.R. at 796-97 (noting that the discretion for a debtor in possession to act with regard to ordinary business matters without court approval is "at the heart" of the powers of a debtor in possession and courts should be reluctant to interfere in the making of routine, day-to-day business decisions).

85.     Although neither the Bankruptcy Code nor its legislative history provides a framework for analyzing whether particular transactions are in the ordinary course of a debtor's business, most courts, including courts in the Third Circuit, have adopted a two-step inquiry. *In re Nellson Nutraceutical, Inc.*, 369 B.R. at 796 (citing *In re Roth American, Inc.* 975 F.2d at 952). In applying this two-step inquiry, courts look at a transaction from horizontal and vertical dimensions. *Id.*; *In re Blitz U.S.A. Inc.*, 475 B.R. 209, 214 (Bankr. D. Del. July 9, 2012). Under the "horizontal test," courts consider whether, from an industry-wide perspective, the transaction is of the sort commonly undertaken by companies in that industry. *Id.* (citing *In re Roth American, Inc.* 975 F.2d at 953). Under the "vertical test," also known as the "creditor's expectation test," courts analyze the transaction from the vantage of a hypothetical creditor and consider whether the transaction subjects a creditor to economic risk of a nature different from those the creditor expected when it decided to extend credit. *Id.* (citing *In re Roth American, Inc.* 975 F.2d at 953) ("[T]he touchstone of ordinariness is the interested parties' reasonable expectations of what transactions the debtor-in-possession is likely to enter in the course of business.").

### iv.     *Section 503(b)(1)(A)*

86.     In addition, section 503(b)(1)(A) of the Bankruptcy Code provides that "[a]fter notice and a hearing, there shall be allowed administrative expenses . . . including the actual, necessary costs and expenses of preserving the estate . . . ." And section 503(b)(4) of the

36

Bankruptcy Code provides that, "[a]fter notice and a hearing, there shall be allowed administrative expenses . . . including reasonable compensation for professional services rendered by an attorney . . . ."

87.     Moreover, the timing of such reimbursement lies squarely within the Court's discretion.  *In re Glob. Home Prods., LLC*, No. 06-10340 (KG), 2006 WL 3791955, at \*3 (Bankr. D. Del. Dec. 21, 2006) (agreeing with parties that "the timing of the payment of [a section 503] administrative expense claim is left to the discretion of the Court").

**B.     Payment of Employee Counsel Fees and Expenses is Warranted Under Sections 105(a), 363(b), 363(c), and 503(b)(1)(A) of the Bankruptcy Code**

i.     Payment of Employee Counsel Fees Under Sections 105(a) and 363(b) is Warranted

88.     Paying the fees and expenses of Employee Counsel is a sound exercise of the Debtor's business judgment and in the best interest of the Debtor's estate, as determined by the Board.   Specifically, the Debtor submits that payment of Employee Counsel fees is justified under section 363(b)(1) as a prudent exercise of the Debtor's business judgment and under section 105(a) as essential to the continued operation and survival of the Debtor's business.

89.     First, payment of such counsel is beneficial to the Debtor's litigation position.  The Debtor expects the Employees to provide evidence and testimony that will aid the Debtor's position with regard to both the SEC Enforcement Action and the DOJ Investigation.  To mount a strong defense and potentially prevail in the SEC Jury Trial, the Debtor relies on the accurate testimony of certain Employee witnesses.   Indemnifying Employees allows Employees to be valuable witnesses on the Debtor's behalf in the SEC Enforcement Action, which is essential to the Debtor's survival, as described above.   Similarly, indemnifying Employees allows Employees to respond adequately to subpoenas in connection with the DOJ Investigation and

37

otherwise cooperate with the investigation on a voluntary basis. Without their own counsel separate from the Debtor's counsel, Employees may be hesitant to engage with the Debtor or DOJ on a voluntary basis. Paying the Employee Counsel thus promotes transparency and cooperation with the government authorities and helps expedite their respective actions.

90.     Without the payment of such Employee Counsel, the Employees may not be adequately represented. For example, the Kobre Employee Engagement Letters state that Kobre may withdraw from representing the Employees if the Debtor stops paying Kobre's fees and expenses. Similarly, the engagement letters with respect to the Other Employee Counsel each state that the Employees are ultimately responsible for paying the Other Employee Counsel in the event that the Debtor does not pay the Other Employee Counsel's fees and expenses. The Debtor believes at least some of the Employee Counsel would cease representing the Employees if the Debtor does not pay them outstanding amounts and ensure payment of future amounts, and that at least some of the Employees would hesitate to engage with the Debtor or government authorities. The Debtor would be negatively impacted if the Employee Counsel ceased representing the Employees, as during the course of their representation, these counsel have gained significant knowledge, expertise, and familiarity with the Debtor, its operations, and the legal issues it faces. Having to retain new counsel would be inefficient and less effective. Moreover, if the Debtor did not pay the Employee Counsel expenses, it is uncertain if all Employees could continue to pay for counsel of their choice on their own.

91.     Given the Employees' extensive experience and institutional knowledge of the Debtor, participation of Employees as witnesses in the SEC Enforcement Action and the DOJ Investigation ensures the Debtor and its actions are fairly and accurately characterized in the SEC Enforcement Action and DOJ Investigation. *See In re Enron Corp.*, 335 B.R. 22, 30 (S.D.N.Y.

2005) (finding that the Debtor properly exercised its business judgment in retaining separate counsel for its employees because the retention (1) would facilitate employees' cooperation with the SEC's investigation into the debtor and therefore allow the governmental investigations to be completed as quickly as possible, (2) would better allow employees to focus their time and energy on their work, and (3) would contribute to the Debtor retaining employees).

92.    Second, the Debtor is required to honor its indemnification obligations owed to the Employees under the Constitution and, in certain cases, the Deel Employment Agreements.  While some Employees are former employees and others are members of the Current Workforce, it would nonetheless be significantly detrimental to Employee morale if the Debtor did not honor its indemnification obligations with respect to both former employees and the Current Workforce.  Payment of the indemnification obligations ensures current Employees can focus more of their time and energy on the Debtor's business and not worry about satisfying legal fees due to their current or future involvement in the SEC Enforcement Action and/or DOJ Investigation.  *See In re Enron Corp.*, 335 B.R. at 32 ("[T]he Bankruptcy Court here deferred to the Debtors' judgment that hiring attorneys to represent its employees would help them retain employees and boost morale. That finding was not clearly erroneous.").

93.    With regard to the payment of Rodic's postpetition fees and expenses in connection with his representation of Mr. Kwon, the payment of such fees as they come due are a prudent exercise of the Debtor's business judgment.  Due to his detailed and exclusive knowledge of key events related to the SEC Enforcement Action and the Debtor's business, Mr. Kwon has, among other things, provided important information for the Debtor's defense in the SEC Enforcement Action and will be a valuable resource to the Debtor in connection with the SEC Jury Trial and the Debtor's appeal of the SEC Enforcement Action.  Additionally, because Mr. Kwon

39

is the Debtor's majority shareholder, his authorization or that of his proxy is required for certain corporate governance practices.

94.     As described above, Montenegrin authorities are highly restrictive regarding direct communication between Mr. Kwon and the Debtor's counsel and largely require communications to pass through Montenegrin counsel.  Accordingly, Rodic is an essential intermediary between the Debtor and Mr. Kwon.  If Rodic ceases to represent Mr. Kwon, the Debtor may lose access to Mr. Kwon's valuable knowledge in connection with the SEC Enforcement action and be hampered in its ability to undertake certain corporate governance practices.  It is essential for the Debtor's continued success that it retain the ability to freely communicate with Mr. Kwon while he is detained in Montenegro, which necessarily requires payment of the Rodic Fees to secure Rodic's continued representation of Mr. Kwon.  In addition, the Debtor owes Mr. Kwon an obligation to indemnify him for the Rodic Fees.

ii.     <u>Payment of Employee Counsel Fees Under Section 363(c) is Warranted</u>

95.     The Debtor's advancement of the Employee's postpetition legal fees and expenses, which is akin to reimbursement for such expenses, also satisfies both the horizontal and vertical tests, and is accordingly an "ordinary course" transaction under section 363(c) of the Bankruptcy Code.  As noted above, the Debtor's Constitution and certain Deel Employment Agreements provide that the Debtor owes Employees an indemnification obligation to expenses incurred in the carrying out of the Employees' duties.  Prior to the Petition Date, the Debtor routinely reimbursed Employees for various expenses, deemed to be necessary in the advancement of the Debtor's business, in the ordinary course of business, including, among others, transportation, lodging, work-related equipment and Employee legal fees.  And since the investigations and lawsuits relating to the Depeg began last year, the Debtor has routinely paid the

40

fees of Employee Counsel.  Indeed, the practice of paying for, or reimbursing Employees for the cost of, separate counsel to represent Employees in connection with matters related to their employment was already contemplated before the filing of this chapter 11 case, as set forth in the Constitution and the Deel Employment Agreements.  Moreover, such an arrangement is typical in matters involving regulatory and criminal investigations.

96.     Finally, reimbursing the Employee Counsel fees and expenses that relate to the Employees' cooperation with the DOJ Investigation falls within the reasonable expectations of parties in interest, particularly creditors, given the extensive and public litigation the Debtor has faced in the last two years, including the SEC Enforcement Litigation.  Thus, the Debtor submits that reimbursing the Employee Counsel fees and expenses is "ordinary course" under section 363(c) of the Bankruptcy Code.

          iii.    <u>Payment of Employee Counsel Fees Under Section 503(b) is Warranted</u>

97.     In addition, pursuant to section 503(b) of the Bankruptcy Code, any claims related to postpetition services provided by Employee Counsel and related postpetition expenses may be entitled to administrative expense priority status under section 503(b), as such Employees are being asked to cooperate with the Debtor in the postpetition period.  Thus, such amounts, to the extent they are entitled to administrative expense priority status, would need to be paid in full under any chapter 11 plan.

          iv.    <u>Precedent Supports Payment of Employee Counsel Fees</u>

98.     Courts in this and other district have approved the payment of fees and reimbursement of expenses incurred by counsel to a debtor's employees.  *See, e.g., In re RNI Wind Down Corp.*, No. 06-10110 (CSS) (Bankr. D. Del. July 17, 2006) [Docket No. 531] (authorizing the debtor to advance and reimburse legal costs and expenses incurred by certain current and

41

former employees to defend or otherwise respond to an equity holders' committee investigation into the debtor's officers and directors); *In re W.R. Grace & Co.*, No. 01-01139 (JKF) (Bankr. D. Del. Dec. 13, 2004) [Docket No. 7143] (authorizing the debtors to advance payment for legal services provided to the debtor' current or former officers, directors, or employees in connection with a Department of Justice grand jury investigation); *In re Enron Corp.*, 335 B.R. at 27-32 (affirming bankruptcy court's authorization of payment of fees of special counsel to debtors' employees under section 363 of the Bankruptcy Code); *In re Celsius LLC*, No. 22-10964 (MG) (Bankr. S.D.N.Y. Sept. 21, 2023) [Docket No. 3515] (approving the reimbursement of current and former employees' legal fees, under section 363(b) in connection with their cooperation as witnesses in investigations concerning the debtor); *In re Purdue Pharma L.P.,* No. 19-23649 (RDD) (Bankr. S.D.N.Y. Oct. 16, 2019) [Docket No. 309] (authorizing the debtors to advance and pay the legal costs of certain current and former officers, directors and other employees who were named defendants, potential defendants, and/or witnesses in actions against the debtors); *In re Hawker Beechcraft, Inc.*, No. 12-11873 (SMB) (Bankr. S.D.N.Y. May 31, 2012) [Docket No. 187] (authorizing the debtors to advance in the ordinary course legal expenses to current and former directors and officers to defend against any litigation related to the directors' and officers' prepetition or postpetition conduct); *In re Lehman Brothers Holdings Inc.*, No. 08-13555 (JMP) (Bankr. S.D.N.Y. Dec. 3, 2008) [Docket No. 2052] (authorizing the debtors to advance up to $3 million for payment of legal costs of certain former employees incurred in connection with arbitration proceedings and government investigations related to their involvement with the debtors); *In re Delphi Corp.*, No. 05-44481 (RDD) (Bankr. S.D.N.Y. Oct. 13, 2005) [Docket No.

42

198] (authorizing the debtor to advance litigation expenses, up to an aggregate cap of $5 million to former officers and directors).[25]

99.     For the reasons outlined above, the Debtor believes that paying the ongoing fees and expenses of Employee Counsel is appropriate and in the best interest of the Debtor, its estates, creditors and other parties in interest and, therefore, should be granted.

### C.     Payment of Critical Vendor Claims is Warranted Under Sections 105(a) and 363(b) of the Bankruptcy Code

100.     The relief requested by this Motion represents a sound exercise of the Debtor's business judgment, is necessary for the Debtor's SEC Jury Trial preparation, and is justified under sections 105(a) and 363(b) of the Bankruptcy Code.

101.     The Critical Vendors have all provided essential services to the Debtor and Dentons in connection with the SEC Jury Trial.  Paying targeted prepetition claims of the Critical Vendors benefits the Debtor's estate by enabling the Debtor to continue to prepare for the SEC Jury Trial without interruption.  The Debtor and Dentons rely heavily on the Critical Vendors to provide critical information and expert reports in connection with SEC Jury Trial.  For example, one of the Critical Vendors provides the Debtor and its advisors with the information obtained through numerous foreign jurisdictions, such as Montenegro and Serbia.  Most of these Critical Vendors are virtually irreplaceable due to the specialized nature of the products and services provided to the Debtor.   Even where alternative vendors exist, the time and costs associated with switching from a Critical Vendors to a new provider would likely be significant and detrimental to the Debtor's estate, particularly given the timing of the upcoming SEC Jury Trial.  Even a short

---

[25]     The Debtor notes that in several of these cases, the debtors were authorized to reimburse legal expenses for certain employees that were defendants in litigation or were the targets of regulatory and/or criminal investigations. The relief requested in this Motion seeks to advance legal fees to Employees who are currently merely witnesses in the SEC Enforcement Action and the DOJ Investigation and have not been identified as subjects or targets by the DOJ.

43

interruption in the provision of any of these products or services could have potentially disastrous effects on the Debtor's preparation for the SEC Jury Trial, given that it is scheduled to begin in late March, and could impede the Debtor's litigation efforts and, in turn, jeopardize the success of this chapter 11 case.

102.    Allowing the Debtor to pay Critical Vendor Claims, is especially appropriate where, as here, doing so is consistent with the "two recognized policies" of chapter 11 of the Bankruptcy Code—preserving value and maximizing the value of property available to satisfy creditors. *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'Ship*, 526 U.S. 434, 453 (1999).  Failing to prepare adequately for the SEC Jury Trial would potentially cause severe negative consequences for the Debtor, its estate, and its stakeholders (including the Terra community).  Success in the SEC Enforcement Action is important to the value of the Debtor and its ability to pay creditor claims.

103.    Accordingly, authorizing the Debtor to pay prepetition amounts related to Critical Vendor Claims is in the best interests of the Debtor and its estate, will preserve value for its creditors and stakeholders (including the Terra community), and will potentially allow the Debtor to pursue an appeal of the SEC Enforcement Action.  Indeed, the Debtor submits that all of the Debtor's stakeholders (including the Terra community) will benefit if the Court grants the requested relief.  Thus, the Debtor has a strong business purpose for paying the Critical Vendor Claims here, and the relief requested herein is necessary and appropriate.

104.    Courts in this district and others regularly grant relief to pay Critical Vendors consistent with that which the Debtor is seeking in this Motion. *See, e.g.*, *Western Global Airlines, Inc.*, No. 23-11112 (KBO) (Bankr. D. Del. Sept. 6, 2023) [Docket No. 200] (authorizing the debtors to pay certain prepetition critical vendor claims); *Phoenix Services Topco, LLC*,

44

No. 22-10906 (MFW) (Bankr. D. Del. Oct. 25, 2022) [Docket No. 187] (same); *FTX Trading Ltd.*,

No. 22-11068 (JTD) (Bankr. D. Del. Jan. 9, 2023) [Docket No. 429] (same).

> ### D.      Payment of Foreign Litigation Claims is Warranted Under Sections 105(a), 363(b), 363(c), and 503(b)(1)(A) of the Bankruptcy Code

>> #### v.      Payment of Foreign Litigation Claims Under Sections 105(a) and 363(b) is Warranted

105.     Payment of the prepetition and postpetition claims of the Foreign Litigation

Creditors is a sound exercise of the Debtor's business judgment, because doing so will avoid value-

destructive penalties and additional costs and in some cases will enable the Debtor to obtain

information helpful to its defense in the SEC Jury Trial.  Specifically, the Debtor submits that

payment of the Foreign Litigation Claims is justified under section 363(b)(1) as a prudent exercise

of the Debtor's business judgment and under section 105(a) as important to the continued operation

of the Debtor's business.

106.     It is important to pay the Okcoin Costs Order, because doing so will prevent

OKCoin from taking destructive actions against the Debtor in Hong Kong and elsewhere and will

avoid incurring additional costs and penalties.  As discussed above, the Okcoin Costs Order has

the effect of a final judgment order granted by the Hong Kong Court, and as a "judgment creditor,"

Okcoin can enforce the order against the Debtor.  As noted, it is likely that Okcoin is not subject

to enforcement by the Debtor of the automatic stay and pursuing a foreign recognition proceeding

in Hong Kong is likely to be more costly and burdensome than simply paying the amount of the

OKCoin Costs Order (less than $100,000, reflecting a 25% reduction of costs).   Therefore, the

Debtor has determined, in the exercise of its business judgment, that payment of the OkCoin Costs

Order is essential to prevent further litigation costs.

107.     Similarly, it is important to pay the BVI Orders, because doing so will avoid

the incurrence of additional costs and penalties and prevent the BVI Foreign Litigation Claimants

45

from taking similar harmful actions against the Debtor in BVI.  As noted, it is likely that the BVI Foreign Litigation Claimants are not subject to enforcement by the Debtor of the automatic stay, and pursuing a foreign recognition proceeding in BVI is likely to be more costly and burdensome than simply paying the amount of the BVI Orders.   Therefore, the Debtor has determined, in the exercise of its business judgment, that payment of the BVI Orders is essential to prevent further litigation costs.

108.    Payment of the Wintermute amounts is justified by similar considerations, as well as the need to continue the case against Wintermute in the English High Court to obtain documents that will be helpful to the Debtor in the upcoming SEC Jury Trial.  The Debtor's English Counsel has advised that failure to pay the Wintermute Costs will likely cause the English High Court to dismiss the Debtor's the case against Wintermute, resulting in the Debtor being unable to pursue the Wintermute Letter of Request.  The failure to get the Wintermute documents will negatively impact the Debtor's litigation position with the SEC.  In addition, failure to pay the Wintermute Costs Award may cause the English High Court to impute higher penalties on the Debtor.  For the reasons set forth in the Motion to Shorten, the relief requested herein to pay the Wintermute Costs should be granted on an expedited basis as specified in the Wintermute Order attached hereto as **Exhibit B**.

109.    Further, it is likely that Wintermute is not subject to enforcement by the Debtor of the automatic stay and seeking recognition or administration in the United Kingdom is likely to be more costly and burdensome than paying the amounts necessary to pursue the Wintermute Letter of Request.  Without recognition, Wintermute will likely continue to enforce remedies against the Debtor in respect of the Wintermute Costs, which could impute harsher penalties on the Debtor, including higher legal expenses and security for costs payment.  And,

46

even if the Debtor did obtain recognition of the Chapter 11 Case in the United Kingdom, this likely would not obviate the need for the Debtor to pay the Wintermute Security for Cost to continue its litigation against Wintermute.

110.    Moreover, as explained above, the Debtor's payment of the Wintermute Security for Costs (most of the amount the Debtor is seeking to pay Wintermute hereunder) would be paid directly to the English High Court, not to Wintermute.  In light of U.K. counsel's view that the Debtor is more likely than not to prevail in the Wintermute Letter of Request dispute, there is a probability the Debtor will recoup the Wintermute Security for Costs from the English High Court and may even receive costs from Wintermute.  Even if the Debtor is unsuccessful, it may recoup a significant portion of the Wintermute Security for Costs from the English High Court to the extent such amounts exceed Wintermute's actual costs.

111.    Courts in this district and others regularly grant relief to pay foreign creditors consistent with that which the Debtor is seeking in this Motion.  Courts have properly relied on section 105(a) to authorize payment of prepetition claims of foreign creditors in similar circumstances where, as here, the estate will obtain more value for all creditors or avoid more harm by making the prepetition and postpetition payments.  *See, e.g.*, *In re Vyera Pharms., LLC*, No. 23-10605 (JKS) (Bankr. D. Del. June 13, 2023) [Docket No. 105] (authorizing the Debtors to pay foreign vendors under doctrine of necessity); *In re MacD Helicopters, Inc.*, No. 22-10263 (KBO) (Bankr. D. Del. Apr. 20, 2022) [Docket No. 169] (same); *In re Alpha Latam Mgmt., LLC*, No. 21-11109 (JKS) (Bankr. Del. Sept. 1, 2021) [Docket No. 143] (same); *In re Alamo Drafthouse Cinemas Holdings, LLC*, Case No. 21-10474 (MFW) (Bankr. D. Del. Mar. 29, 2021) [Docket No. 155] (same); *In re Northwest Hardwoods, Inc.*, Case No. 20-13005 (CSS) (Bankr. D. Del. Dec.

47

15, 2020) [Docket No. 100] (same); *In re Global Eagle Entertainment Inc.*, Case No. 20-11835

(JTD) (Bankr. D. Del. Aug. 14, 2020) [Docket No. 201] (same).

vi.    <u>Payment of Wintermute Security for Costs Under Section 503(b) is Warranted</u>

112.    Further, the Debtor's request to pay the Wintermute Security for Costs is

justified as an administrative expense pursuant to section 503(b) of the Bankruptcy Code. The

Wintermute Security for Costs is part of an action the Debtor is continuing to pursue postpetition

to obtain information from Wintermute to assist its defense in the SEC Enforcement Action. The

failure to pursue the Wintermute Code could severely hamper the Debtor's defense in the SEC

Enforcement Action and cause irreversible damage to the Debtor's litigating position.

Accordingly, payment of such amounts is thus necessary for the administration of the estate

**<u>Waiver of Rule 6004</u>**

113.    To implement the foregoing successfully, the Debtor seeks waivers of the

notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing

the use, sale, or lease of property under Bankruptcy Rule 6004(h). As explained above, the relief

requested herein is necessary to avoid immediate and irreversible harm to the Debtor.

Accordingly, ample cause exists to justify the waiver of the notice requirements under Bankruptcy

Rule 6004(a) and the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice

requirements and such stay apply.

**<u>Reservation of Rights</u>**

114.    Nothing contained herein is intended to be or shall be construed as (a) an

admission as to the validity of any claim against the Debtor or any liens satisfied pursuant to this

Motion, (b) an agreement or obligation to pay any claims, (c) a waiver of any claims or causes of

action that may exist against any creditor or interest holder, (d) a waiver of the Debtor's or any

48

appropriate party in interest's rights to dispute any claim, (e) an approval, assumption, or rejection of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code, and (f) a determination as to whether digital assets, cryptocurrency, or tokens constitute money or securities. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtor's rights to dispute such claim subsequently.

## Notice

115. Notice of this Motion will be provided to (a) the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington Delaware 19801 (Attn: Linda Richenderfer, Esq. (Linda.Richenderfer@usdoj.gov)); (b) the holders of the largest unsecured claims against the Debtor; (c) the Internal Revenue Service; (d) the United States Attorney's Office for the District of Delaware; (e) SEC; (f) Employees who have engaged Employee Counsel; (g) Kobre & Kim LLP; (h) Goodwin Procter LLP; (i) McGuire Woods LLP; (j) Reed Smith LLP; (k) Law Office Rodic; (l) the Critical Vendors; (m) Okcoin; (n) Clifford Chance LLP as Okcoin's counsel; (o) Bitfinex; (p) Primary Digital; (q) Wintermute; (r) Mishcon as Wintermute's counsel; (s) Morris Cohen as Wintermute's counsel; and (t) any other party entitled to notice pursuant to Bankruptcy Rule 2002 (collectively, the "**Notice Parties**"). The Debtor respectfully submits that no further notice is required.

## No Previous Request

116. No previous request for the relief sought herein has been made by the Debtor to this or any other court.

*[Remainder of page intentionally left blank]*

49

WHEREFORE the Debtor respectfully requests entry of the Proposed Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated:  February 13, 2024
       Wilmington, Delaware

Respectfully submitted,

/s/ Matthew P. Milana
RICHARDS, LAYTON & FINGER, P.A.
Paul N. Heath (No. 3704)
Zachary I. Shapiro (No. 5103)
Matthew P. Milana (No. 6681)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Email:    heath@rlf.com
          shapiro@rlf.com
          milana@rlf.com

-and-

WEIL, GOTSHAL & MANGES LLP
Ronit Berkovich (admitted *pro hac vice*)
Jessica Liou (admitted *pro hac vice*)
F. Gavin Andrews (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Email:    ronit.berkovich@weil.com
          jessica.liou@weil.com
          f.gavin.andrews@weil.com

*Proposed Attorneys for Debtor*
*and Debtor in Possession*