**<u>Exhibit C</u>**

**Mark G. Califano Declaration**

RLF1 30579520v.1

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

```
-------------------------------------------------------- x
                                                         :
In re                                                    :       Chapter 11
                                                         :
TERRAFORM LABS PTE. LTD.,                                 :       Case No. 24–10070 (BLS)
                                                         :
            Debtor.¹                                      :
                                                         :
-------------------------------------------------------- x
```

**DECLARATION OF MARK G. CALIFANO IN
SUPPORT OF THE MOTION OF DEBTOR FOR ENTRY OF
ORDERS PURSUANT TO SECTIONS 363, 503(B), AND 105(A) OF
THE BANKRUPTCY CODE AUTHORIZING DEBTOR TO PAY CERTAIN
AMOUNTS IN FURTHERANCE OF LITIGATION AND GRANTING RELATED RELIEF**

I, Mark G. Califano, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury:

1. I am a partner in the law firm of Dentons US LLP ("**Dentons US**"), located at 1900 K Street, NW Washington, D.C., 20006, and have been duly admitted to practice law in the State of New York and in the District of Columbia, as well as in the United States District Courts for the Southern District of New York, the United States Court of Appeals for the Second Circuit, and the Supreme Court of the United States.

2. I act for Terraform Labs Pte. Ltd. ("**TFL**" or the "**Debtor**"), as part of its legal team in the ongoing SEC Enforcement Action (as defined below) and DOJ Investigation (as defined below). I submit this declaration (the "**Declaration**") in support of the *Motion of Debtor for Entry of Orders Pursuant to Sections 363, 503(B), and 105(A) of the Bankruptcy Code Authorizing Debtor to Pay Certain Amounts in Furtherance of Litigation and Granting Related Relief* (the "**Motion**"),[2] filed on February 13, 2024.

---

[1]  The Debtor's principal office is located at 1 Wallich Street, #37-01, Guoco Tower, Singapore 078881.

[2]  Capitalized terms used but not defined in this Declaration shall have the meanings ascribed to them in the Motion.

3.      Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, my personal experience, knowledge, and information concerning the Debtor's financial condition, information provided to me by the Debtor's employees, or my discussions with the Debtor's officers and advisors.  If called upon to testify, I would testify competently to the facts set forth in this Declaration. I am not being compensated specifically for this testimony other than through payments received by Dentons as a professional proposed to be retained by the Debtor as the Debtor's special litigation counsel in this chapter 11 case ("**Chapter 11 Case**").

## Legal Actions Involving the Debtor

### A.      SEC Enforcement Action

4.      On February 16, 2023, the Securities and Exchange Commission (the "**SEC**") filed a complaint in the in the District Court for the Southern District of New York (the "**District Court**") naming the Debtor and its founder, former director, and former Chief Executive Officer, Mr. Kwon, as defendants and alleging six (6) claims for violations of the Securities Act of 1933 and the Exchange Act of 1934.[3]  The SEC claims that prior to May 2022, the Debtor unlawfully offered and sold unregistered securities and securities-based swaps, as well as engaged in securities fraud.  The action, which seeks a permanent injunction, disgorgement, and civil money penalties, is currently pending before the Honorable Jed S. Rakoff (*SEC v. Terraform Labs Pte. Ltd.*, *et al.*, Case No. 23 Civ. 1346 (JSR) (S.D.N.Y.)) (the "**SEC Enforcement Action**").[4]  On April 21, 2023, the Debtor and Mr. Kwon moved to dismiss the SEC's complaint

---

[3]      On April 3, 2023, the SEC filed an Amended Complaint, which is identical to the Complaint in all material respects. Amended Complaint, *SEC v. Terraform Labs Pte. Ltd.*, *et al.*, Civil Action No. 23 Civ. 1346 (JSR) (S.D.N.Y. Apr. 3, 2023) (Docket No. 25) (the "**Amended Complaint**"), at ¶¶ 173-190.

[4]      Amended Complaint, Prayer for Relief at pp. 53-54.

in its entirety.[5]  On July 31, 2023, the District Court denied the motion to dismiss.[6]  The case proceeded on an expedited timeline.[7]

5.     On December 28, 2023, the District Court partially granted the SEC's motion for summary judgment.[8]  The District Court granted summary judgment against the Debtor and Mr. Kwon on the SEC's claims relating to certain securities-based swaps claims.  The District Court denied the parties' cross motions for summary judgment with respect to the securities fraud claims, finding that "genuine disputes of material fact linger," particularly with regard to the element of scienter required under both securities fraud claims.[9]  A jury trial on the remaining securities fraud claims is scheduled to begin March 25, 2024.[10]  The Debtor is currently preparing for the SEC Jury Trial.

## B.     The DOJ Investigation

6.     Prior to the Petition Date, the Department of Justice (the "**DOJ**") had been in the course of conducting a grand jury investigation in the Southern District of New York into the Debtor's business and certain current and former employees, including Mr. Kwon (the "**DOJ Investigation**").  The DOJ indicted Mr. Kwon on criminal charges and has stated that it is continuing its investigation of individuals and entities involved in the Terra Blockchain, including

---

[5]   Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended Complaint, *SEC v. Terraform Labs Pte. Ltd.*, *et al.*, Civil Action No. 23 Civ. 1346 (JSR) (S.D.N.Y. Apr. 21, 2023) (Docket No. 29), at 7 et seq.

[6]   Opinion and Order, *SEC v. Terraform Labs Pte. Ltd.*, *et al.*, Civil Action No. 23 Civ. 1346 (JSR) (S.D.N.Y. July 31, 2023) (Docket No. 51)

[7]   Opinion and Order, *SEC v. Terraform Labs Pte. Ltd.*, *et al.*, Civil Action No. 23 Civ. 1346 (JSR) (S.D.N.Y. December 28, 2023) (Docket No. 149) (the "**MSJ Order**"), at p. 71.

[8]   MSJ Order at p. 2-3.

[9]   MSJ Order at p. 50.

[10]  The trial was originally scheduled to begin on January 29, 2024; however, on January 16, 2024, the District Court issued an order postponing the start to March 25, 2024, but stated that "[n]o further requests from any party for any further adjournment will be entertained." MSJ Order at p. 71; Order, *SEC v. Terraform Labs Pte. Ltd.*, *et al.*, Civil Action No. 1:23-cv-013460-JSR (S.D.N.Y. January 16, 2024) (Docket No. 166), at p2.

the Debtor and some of its former employees. *See United States v. Kwon,* 23 Cr. 151 (JPC) (S.D.N.Y.). The DOJ has not indicated, however, whether it intends to file additional charges against any parties. The Debtor has been cooperating with the DOJ and intends to continue to do so.

7.    I have also participated in numerous meetings with the Debtor's Board of Directors (the "**Board**") to address (i) the SEC Enforcement Action, (ii) the DOJ Investigation, and (iii) the Chapter 11 Case.

## Employee Indemnification Claims

### A.    The Debtor's Employees

8.    As of the Petition Date, and as further described in the *Motion of Debtor for Entry of Interim and Final Orders (I) Authorizing Debtor to (A) Pay Prepetition Workforce Obligations and (B) Maintain Employee Benefit Programs, and (II) Granting Related Relief* (the "**Wages Motion**") [Docket No. 20], the Debtor employs 45 full-time employees and utilizes the services of approximately 15 independent contractors (collectively, the "**Current Workforce**"). The Current Workforce primarily consists of software developers, coders, senior management, and a constellation of staff required to support operations. The Current Workforce and former employees and contractors together with the Current Workforce, the "**Employees**") are located all over the world. The Debtor is and was the employer of record for Employees located in Singapore, where the Debtor is incorporated, while Deel, Inc. ("**Deel**," and such Employees, the "**EOR Employees**"), a human capital management firm, is the employer of record for those Employees located outside of Singapore.

### B.    The Debtor's Constitution

9.    Pursuant to the Article 141 of the Debtor's Constitution (the "**Constitution**") (the Debtor's governing document, similar to a charter or articles of

incorporation), the Debtor is obligated to indemnify Employees for costs incurred arising from the carrying out of their duties. The Constitution provides:

> Subject to the provisions of and so far as may be permitted by the Act, every Director, manager, Secretary and other officer or servant of the Company shall be indemnified by the Company against, and it shall be the duty of the Directors out of the funds of the Company to pay, all costs, losses and expenses which any such officer or servant may incur or become liable to incur by reason of any contract entered into or act or deed done by him as such officer or servant or in any way in the discharge of his duties, including reasonable hotel, travelling and other expenses.

## C.    Employment Agreements

10.     It is my understanding upon discussions with the Debtor, to the extent the Employees are, or were, EOR Employees, Deel is obligated to indemnify such EOR Employees for costs incurred arising from the carrying out of their duties.  Specifically, each EOR Employee's employment agreement with Deel (each, a "**Deel Employment Agreement**") contains an indemnification provision substantially similar to the following provision in the Deel Employment Agreement between Deel and the Head of Company Operations, Chris Amani:

> [Deel] and its respective successors and assigns, shall indemnify, protect, and hold Employee harmless from, for, and against any and all claims . . . asserted against the employee arising out of, in whole or in part, the actions or commissions by the Employee . . . . [Deel] shall advance all expenses, including reasonable attorney's fees and costs of court approved settlements, actually or necessarily incurred by Employee in connection with the defense of any action, suit, or proceeding . . . , which has been brought against Employee by reason of his service as an officer or agent of [Deel] . . . .  The obligations of [Deel] pursuant to this Section will survive the expiration or earlier termination of the Employees employment.

11.     Further, the Employer of Record Master Services Agreement between Deel and the Debtor (the "**Deel MSA**") provides that the Debtor will indemnify Deel for costs and expenses arising from the indemnification provisions in the Deel Employment Agreements between the EOR Employees and Deel.  Accordingly, the Debtor is obligated to indemnify EOR

Employees for costs incurred arising from the carrying out of their duties, pursuant to the Deel Employment Agreements and the Deel MSA.

**D.      Employee Testimony/Subpoenas**

12.      In connection with the SEC Enforcement Action, the Debtor has subpoenaed six (6) Employees (three (3) former Employees and three (3) current Employees (including the Debtor's Chief Executive Officer Chris Amani)) for testimony at the SEC Jury Trial. In addition, some Employees have agreed to participate in interviews with Dentons as cooperating witnesses in connection with pre-trial diligence for the SEC Jury Trial. It is critical that the Employees are represented by competent counsel, which will further ensure that the Debtor has an adequate defense in connection with the SEC Enforcement Action.

13.      In connection with the DOJ Investigation, at least eight (8) Employees (four (4) former Employees and four (4) current Employees) have received grand jury subpoenas for documents and, in some cases, testimony, in connection with the DOJ Investigation.  It is likewise critical that the Employees are adequately represented in the DOJ Investigation, not only to protect the Employees' interests and to cooperate with governmental units, but also to protect the Debtor from the potential of judicial prejudice or unfair and inaccurate prosecution of claims against the Debtor.

**E.      Counsel Representing Employees**

14.      It is my understanding that sixteen (16) Employees have retained separate counsel for their individual representation in connection with the SEC Enforcement Action and/or the DOJ Investigation. These counsel have gained significant knowledge, expertise, and familiarity with the Debtor, its operations, and the legal issues it faces.  In addition to the above, Mr. Kwon as retained Montenegrin counsel, Law Office Rodic ("**Rodic**"), in connection with his detention in Montenegro, as discussed in more detail below.

1. *Kobre and Kim LLP*

15.　　Further, I understand twelve (12) Employees have retained Kobre & Kim LLP ("**Kobre**") as counsel, including five (5) members of the Current Workforce and seven (7) former Employees and contractors.[11]  Prior to the Petition Date, the Debtor and Kobre entered into a Pool Counsel & Employee Assistance Retention Agreement, dated June 1, 2022 (the "**Kobre Pool Retention Agreement**"), pursuant which the Debtor offered the Employees the opportunity to retain Kobre should the need for individual counsel arise.  The Kobre Pool Retention Agreement provides that that Employees who retain Kobre will also execute separate engagement letters with Kobre (the "**Kobre Employee Engagement Letters**") "approved by the [Debtor], wherein the [Debtor] agrees to indemnify and advance legal fees on behalf of the individual [Employee]."  As contemplated by the Kobre Pool Retention Agreement, the Employees who retained Kobre each executed a Kobre Employment Engagement Letter.

16.　　Although the precise terms of the Kobre Employee Engagement Letters vary slightly from Employee to Employee depending on the necessary scope of the engagement, the scope of services in such letters generally cover Kobre acting as counsel to the Employee in responding to requests for information from the SEC, the DOJ, and other governmental units in connection with their respective investigations of the Debtor.  To date, Kobre has generally performed the following services for Employees that have executed Kobre Employee Engagement Letters:  (i) assisted with preparation for, and represented as counsel during, interviews, depositions, and testimony; (ii) produced documents in response to subpoenas; and (iii) provided general advice.  This includes assisting the Employees with respect to both the Debtor's subpoenas

---

[11]　One Employee has retained Kobre as counsel with regard to the SEC Enforcement Action and separate counsel with regard to the DOJ Investigation.

of certain of such Employees for testimony at the SEC Jury Trial and grand jury subpoenas from the DOJ for documents and, in some cases, testimony in connection with the DOJ Investigation.

17.    In connection with preparation of these Employees for testimony at the SEC Jury Trial, Kobre reviewed relevant materials, prepared with the Employees for potential cross-examination at trial, and accompanied the Employees to preparatory meetings with Dentons. Kobre plans to accompany certain of the Employees at the SEC Jury Trial.  In connection with the DOJ Investigation, Kobre has begun responding to the grand jury subpoenas, and document production is ongoing.  It is expected that the DOJ will conduct additional interviews of certain Employees who have received grand jury subpoenas.

18.    Kobre does not represent the Debtor.  The Kobre Pool Retention Agreement makes clear that Kobre represents the respective Employee's personal interests and not those of the Debtor.  The attorney-client relationship between the Employees and Kobre is governed by the individual Kobre Employee Engagement Letters.  By executing the Kobre Pool Retention Agreement, the Debtor has simply engaged Kobre to (i) speak with Employees on an attorney-client privileged basis regarding the circumstances under which the Employees' potential future engagement of Kobre may be warranted, and (ii) offer the Employees the opportunity to formally retain Kobre.

19.    Pursuant to the Kobre Pool Retention Agreement, the Debtor agreed to pay Kobre on an hourly basis for Kobre's services at Kobre's standard hourly rates for services Kobre provides to the Employees, including time spent communicating with Employees, the Debtor, or the Debtor's counsel prior to the execution of a Kobre Employee Engagement Letter.  Each Kobre Employee Engagement Letter includes a provision stating, "[f]ees and expenses of [the] engagement are being covered by Terraform Labs, with whom [Kobre] has a separate agreement

to be reimburse." Each Kobre Employee Engagement Letter also includes a provision stating that the Employee acknowledges and accepts that Kobre may withdraw its representation of the Employee if the Debtor stops advancing fees and expenses to Kobre.

20.    It is my understanding that around June 8, 2022, the Debtor deposited $150,000 into Kobre's escrow attorney account as a fee advance for Kobre's services to Employees (the "**Kobre Retainer**"), and that on May 31, 2023, the Debtor replenished the Kobre Retainer with an additional $750,000 due to an increase in the amount of work Kobre performed on behalf of the Employees.  Pursuant to the Kobre Pool Retention Agreement, Kobre Retainer funds are to be drawn to fund Kobre's ongoing time and administrative charges upon issuance of the related invoice without further authorization.[12]

21.    It is my understanding that as of the Petition Date, (i) there is a balance of approximately $352,557.84 remaining on the Kobre Retainer, (ii) Kobre has a prepetition balance of $467,423.77, (iii) after application of the Kobre Retainer thereto, a balance of $124,224.73 remains, and (iv) Kobre estimates that its total costs for the three (3) months following the Petition Date will be approximately $1,200,000.

**2.    *Other Employee Counsel***

22.    It is my understanding that five (5) Employees have retained certain other law firms as separate counsel, including Goodwin Procter LLP ("**Goodwin**"), McGuire Woods LLP ("**McGuire**"), and Reed Smith LLP ("**Reed Smith**" and collectively with Goodwin and McGuire, the "**Other Employee Counsel**;" the Other Counsel collectively with Kobre and Rodic,

---

[12]    Separate from the relief sought in the Motion, the Debtor delivered to Kobre $4 million in a series of installments over the span of June 2023 to August 2023 to satisfy its legal defense obligations to Head of Company Operations Chris Amani pursuant to the Debtor's Constitution.  The funds are held by Kobre in a segregated escrow account.  There was an agreement prior to the Petition Date between Kobre, Mr. Amani, and Director and Employee Ashwin Mathialagan whereby Mr. Amani agreed to allocate $1 million of the $4 million defense fund escrow to be used to cover the Debtor's legal defense obligations to Mr. Mathialagan pursuant to the Debtor's Constitution

the "**Employee Counsel**") in connection with the DOJ Investigation, pursuant to individual engagement letters.

23.     Goodwin represents one (1) Employee.  The engagement letter between Goodwin and the Employee (to which the Debtor is not a party) states that Goodwin will request that the Debtor indemnify the Employee and advance Goodwin's legal fees and costs; however, the Employee is obligated to pay such fees and costs if the Debtor fails to pay Goodwin.  Pursuant to Goodwin's engagement letter, the Debtor deposited a $50,000 retainer fee into Goodwin's attorney escrow account (the "**Goodwin Retainer**").  It is my understanding that Goodwin has a prepetition balance of $88,229.30, and after application of the Goodwin Retainer balance of $50,000, a balance of $38,229.30 remains.

24.     McGuire represents one (1) Employee.  The engagement letter between McGuire and the Employee (to which the Debtor is not a party) contemplates that the Debtor will pay McGuire fees, costs, and expenses for McGuire's representation of the Employee; however, the Employee is obligated to pay such fees, costs, and expenses if the Debtor fails to pay McGuire. Pursuant to McGuire's engagement letter, the Debtor deposited a $50,000 retainer fee into McGuire's attorney escrow account (the "**McGuire Retainer**").  It is my understanding that McGuire has a prepetition balance of $61,788, and after application of the McGuire Retainer of $50,000, a balance of $11,788 remains.

25.     Reed Smith represents three (3) Employees.  Pursuant to the engagement letter between Reed Smith and the Employees (to which the Debtor is not a party), the Employees are ultimately responsible for paying for fees and expenses incurred in connection with Reed Smith's services.  The Debtor is obligated to indemnify these Employees, pursuant to the Constitution.  I understand in the 90 days prior to the Petition Date, the Debtor paid $82,010.67 to

Reed Smith for legal services provided to the Employees, and the total unpaid prepetition amount incurred by Reed Smith in connection with its representation of Employees is $181,124.28.

26.    Although the scope of services of the engagement letters with each of the Other Employee Counsel varies slightly, each engagement letter generally states that the scope of services includes representation of the Employees in connection with the DOJ Investigation.

27.    Further, it is my understanding that (i) the total unpaid prepetition amounts incurred by the Other Employee Counsel in connection with their representation of Employees is $331,141.58, (ii) the Other Employee Counsel have retainer balances of $100,000, as of the Petition Date, (iii) after application of the Goodwin Retainer and McGuire Retainer, the balance of unpaid prepetition amounts incurred by Other Employee counsel is $231,141.58, and (iv) the Other Employee Counsel estimate that their total costs for the three (3) months following the Petition Date will be approximately $975,500.

### 3.    *Law Office Rodic*

28.    Mr. Kwon, the Debtor's former director and Chief Executive Officer and current majority shareholder, has substantial knowledge about key events in the Debtor's history and the Debtor's operations.  As a result, Mr. Kwon has provided important information for the Debtor's defense in the SEC Enforcement Action and will continue to be a valuable resource in connection with the Debtor's appeal thereof.  In addition, because Mr. Kwon is the Debtor's majority shareholder, certain corporate governance practices require Mr. Kwon to execute or direct proxies to execute documents on his behalf.

29.    Mr. Kwon is currently detained in Montenegro, awaiting extradition to either the United States or South Korea.  Mr. Kwon retained Rodic to serve as his Montenegrin counsel in connection with his detention and other matters related to the Debtor's corporate governance.  Rodic is a capable, experienced, and reputable firm in Montenegro.

30.     Montenegrin authorities highly restrict foreign counsel from visiting Mr. Kwon.  Therefore, the primary means of communication between Dentons and Mr. Kwon is through Rodic as an intermediary.  Rodic has assisted with communications between the Debtor's counsel and Mr. Kwon, as well as facilitated the execution of corporate documentation on behalf of the Debtor.

31.     Mr. Kwon, as a former officer of the Company, is an Employee entitled to indemnification pursuant to the Constitution for necessary fees and expenses for matters related to the Debtor's business, including legal fees for proceedings involving actions taken in their capacity as Employees.

32.     Rodic charges a fixed fee of $244,296 per month.  Prepetition, the Debtor fully paid Rodic for fees and expenses incurred in connection with its representation of Mr. Kwon. The Debtor believes that Rodic will need to continue to serve as Mr. Kwon's Montenegrin counsel until such time as Mr. Kwon is extradited.[13]  It is important for Rodic to continue to represent Mr. Kwon, for the reasons outlined above, including to facilitate Mr. Kwon's ability to provide the Debtor with critical information in connection with the SEC Enforcement Action.  Accordingly, the Debtor's Board approved, as an exercise of sound business judgment, the payment of postpetition fees and expenses of Rodic for the three months following the Petition Date, totaling $732,888.  The Debtor requests that the Court authorize the Debtor to make such payments.

---

[13]  Rodic also represents the Debtor's former Chief Financial Officer, Han Chang Joon, who was also detained in Montenegro.  Mr. Han has substantial knowledge about key events in the Debtor's history and the Debtors operations as related to the SEC Enforcement Action, and has assisted with the Debtor's defense thereof.  Mr. Han is likewise entitled to indemnification for the fees and expenses of Rodic, pursuant to the Constitution. However, the Debtor understands that Rodic's representation of Mr. Han has terminated upon Mr. Han being extradited to South Korea this week.  Accordingly, the Debtor does not expect that Rodic will perform work for Han postpetition.

**Critical Vendor Claims**

33.     The Debtor, via Dentons, has retained numerous vendors (the "**Critical Vendors**") that provide services essential to the Debtor's defense of the SEC Enforcement Action (including the upcoming SEC Jury Trial) and DOJ Investigation.  Such services include: provision of external and/or internal expert witnesses (such as crypto experts and trading experts), expert testimony, expert reports, analyses, opinion, and/or conclusions, translation services, videographers, court reporters, discovery related services, consulting services, investigation services regarding third parties and witnesses, and any other services that Dentons or the Debtor may request the Critical Vendors provide in preparation for SEC Jury Trial.

34.     To mitigate the risk of the Debtor not having adequate support in preparation for and during the SEC Jury Trial by failing to pay prepetition amounts owed to Critical Vendors (the "**Critical Vendor Claims**"), the Debtor and its advisors engaged in a comprehensive process to identify those vendors that are "critical" to the SEC Jury Trial preparation.   In this process, the Debtor, with the assistance of Dentons and the Debtor's restructuring professionals, assessed a variety of qualitative and quantitative factors, including:

- whether a vendor was located in a jurisdiction that would likely honor the applicability of the Bankruptcy Code;

- the goods or services provided by a vendor;

- whether services are provided pursuant to a contract;

- the degree to which replacement costs (including pricing, transition expenses, professional fees, and lost sales or future revenue) would exceed the amount of a vendor's prepetition claim;

- which vendors would be prohibitively expensive or practically difficult to replace;

- whether an agreement exists by which the Debtor could compel a vendor to continue performing on prepetition terms;

- whether a vendor is currently refusing to supply the Debtor with services or is refusing to do so without cash up front; and

- whether the Debtor's inability to pay all or part of a vendor's prepetition claim could trigger financial distress for the applicable vendor, leading to future difficulty of that vendor's ability to perform.

35.     It is my belief, after a thorough analysis involving an assessment applying the above factors, the Debtor designated certain vendors as necessary to continue preparing for the SEC Jury Trial and, thus, preserve value for the benefit of the Debtor's estate and creditors.  As of the Petition Date, the Debtor estimates that approximately $1,300,000 is outstanding on account of obligations to the Critical Vendors.  The relief requested in the Motion seeks to pay prepetition amounts owed to the Critical Vendors in an amount not to exceed such amount.

36.     The Debtor's selection process balanced the need to ensure that this Chapter 11 Case does not disrupt SEC Jury Trial preparation with the need to limit the expenditure of estate resources.    The Critical Vendors have all previously provided essential services to the Debtor and Dentons in connection with the SEC Jury Trial.  Paying targeted prepetition claims of the Critical Vendors benefits the Debtor's estates by enabling the Debtor to continue to prepare for the SEC Jury Trial without interruption and make sure it can obtain essential information on an ongoing basis.  Further, the Debtor reserves all rights to enter into postpetition trade agreements with the Critical Vendors if it deems it prudent and necessary.

37.     It is my view that the Critical Vendors will not perform unless they get receive payment of their outstanding prepetition claims.  The Debtor and Dentons rely heavily on the Critical Vendors to provide critical information and expert reports to prepare for its SEC Jury Trial.  For example, one of the Critical Vendors provides the Debtor and its advisors with information obtained through numerous foreign jurisdictions, such as Montenegro and Serbia.

Even a short interruption in the provision of any of these services could have potentially disastrous effects on the Debtor's preparation for the SEC Jury Trial, given that it is scheduled to begin in late March, and, in turn, the success of this Chapter 11 Case.  Most of these Critical Vendors are virtually irreplaceable due to the specialized nature of the services provided to the Debtor and cost a fraction of what other firms may cost for the same amount of work and services.  Even where alternative vendors exist, the time and costs associated with switching from a Critical Vendor to a new provider would likely be significant and detrimental to the Debtor's estate, particularly given the timing of the upcoming SEC Jury Trial.

### **Foreign Litigation Related Claims**

38.     In connection with its defense of the SEC Enforcement Action, the Debtor sought third-party discovery in foreign jurisdictions under a federal law that empowers U.S. Federal Courts to make requests of foreign courts to allow discovery within their jurisdictions at the parties' request.  Specifically, 28 U.S.C. § 1781 authorizes federal courts to issue letters rogatory or letters of request that enable a U.S. litigant to obtain non-party discovery from a foreign entity. 28 U.S.C. § 1781(b)(2) (allowing for "the transmittal of a letter rogatory or request directly from a tribunal in the United States to the foreign or international tribunal, officer, or agency to whom it is addressed and its return in the same manner").[14]  The parties receiving the discovery request in the foreign jurisdiction may contest such requests in their local courts.  The Debtor has

---

[14]    Where applicable, such letters of request are enforced "through bilateral treaties with the United States." *Lantheus Med. Imaging, Inc. v. Zurich Am. Ins. Co.*, 841 F. Supp. 2d 769, 777 (S.D.N.Y. 2012). One such treaty is the Hague Convention of 18 March 1970 on Taking of Evidence Abroad in Civil or Commercial Matters, opened for signature, Mar. 18, 1970, 23 U.S.T. 2555 (the "**Hague Evidence Convention**"), under which U.S. courts may "request the competent authority of another Contracting State, by means of a Letter of Request, to obtain evidence, or to perform some other judicial act." Hague Evidence Convention Chapter I, Article 1. The United States, the United Kingdom, and Hong Kong (through the Republic of China) are all parties to the Hague Evidence Convention.

incurred certain prepetition and postpetition costs associated with litigating such discovery requests in foreign jurisdictions, which are outlined in further detail below.

39.    As it prepares for the upcoming SEC Jury Trial, it is critical for the Debtor to obtain certain information in foreign jurisdictions which may be pivotal in assisting the Debtor with presenting evidence in its defense of the SEC Enforcement Action.  In addition, nonpayment of certain amounts incurred in connection therewith subjects the Debtor to penalties and other consequences in foreign jurisdictions.  In light of the potential for serious consequences if the Debtor do not make payments to the Foreign Litigation Creditors, the Debtor has determined, in the exercise of its business judgment, that payment of the Foreign Litigation Creditors' claims is essential to the Debtor and, accordingly, the relief requested herein should be granted.  By the Motion, the Debtor seeks authority to pay the claims of Foreign Litigation Creditors up to a maximum aggregate amount of approximately $1,509,000 related to the four (4) Foreign Litigation Creditors below.

**A.    Okcoin Hong Kong Litigation**

40.    On August 15, 2023, Judge Rakoff issued a letter of request to Okcoin Technology Company Ltd. ("**Okcoin**") in Hong Kong to gather more information in that jurisdiction (the "**Okcoin Letter of Request**").  The Okcoin Letter of Request sought information and documents about significant UST trading volume and a large volume of Luna Classic[15] transactions on the Okcoin exchange, which may have caused or contributed to the May 2022 Depeg (the "**Depeg**").  The Debtor, through Dentons, subsequently retained the Howse Williams

---

[15]    As discussed further in the First Day Declaration, Luna Classic is the Terra Blockchain network's native token. Luna Classic tokens were programmatically tradeable with the TerraUSD "stablecoin" (known by its ticker "**UST**") and other Terra network stablecoins.

law firm ("**Howse Williams**") to bring an application in the High Court of the Hong Kong Special Administrative Region (the "**Hong Kong Court**") to enforce the Okcoin Letter of Request.

41.    Howse Williams brought an *ex parte* summons to enforce the Okcoin Letter of Request.    The Hong Kong Court granted the request and ordered disclosure on November 21, 2023; however, counsel for Okcoin subsequently filed an application to set aside the disclosure order.  The Hong Kong Court sided with Okcoin and granted the application to set aside the Debtor's disclosure order on January 19, 2024.  It also ordered the Debtor to pay costs of HK$1,068,700 (approximately USD $137,000 as of the date hereof) to Okcoin (the "**HK Costs Order**").[16]

42.    Although the Debtor can appeal the HK Costs Order and the information sought from Okcoin remains relevant to its defense in the SEC Enforcement Action, the Debtor believes is unlikely it will receive the information sought from Okcoin in sufficient time for use at the SEC Jury Trial even if the appeal of the HK Costs Order is successful.  Thus, Howse Williams approached Okcoin's counsel to propose a reduction in costs in exchange for not appealing the Costs Order.  After negotiation, Okcoin's counsel agreed to a 25% reduction of costs (for a total of HK$750,000) (approximately USD $96,000 as of the date hereof), pending approval from this Court.  Failure to pay the Costs Order would cause the Debtor to be in contempt of the Hong Kong Court, which would incur criminal and/or civil penalties, amounting in additional costs.

43.    I understand the Costs Order has the same effect as any other final judgment order granted by the Hong Kong Court.  In this case, Okcoin, as the "judgment creditor," can enforce it in the usual manner.  Further, it is my understanding that Okcoin will have recourse

---

[16]    In certain foreign jurisdictions, particularly those having a foundation in the English common law system, it is common for the losing party of the litigation to pay the legal costs, including attorney's fees, of the winning party on a scale that is fixed by the court.

against the Debtor for such unpaid amounts by filing the following three applications to the Hong Kong Court:

    i.    A compulsory winding up order against the Debtor, where first, Okcoin serves a statutory demand on the Debtor, requiring the Debtor pay back the debt (*i.e.*, the Costs Order) in twenty-one (21) days. If the Debtor fails to pay within the three weeks, Okcoin could then commence winding-up proceedings against the Debtor in Hong Kong;

    ii.    a garnishee order against known third parties that owe monies to the Debtor in Hong Kong (such that banks and/or other crypto trading platform will be ordered to repay the costs order on behalf of the Debtor using their funds); and

    iii.    a charging order(s) against real properties, securities, and/or digital assets held by the Debtor in Hong Kong providing charge over such property or securities to guarantee payment of the costs order, which can become the basis of a subsequent application for an order for sale of such properties for payment of the costs order with the sale proceeds.

44.    Even though the Debtor is a Singapore company, the Hong Kong Court has previously ruled that it is has jurisdiction to wind up a foreign company pursuant to powers under statute authority provided that certain threshold requirements are satisfied.[17] The possible garnishee or charging orders may be relevant if the Debtor has assets in Hong Kong.

45.    Although the scope of the automatic stay set forth in section 362 of the Bankruptcy Code is universal, the Debtor may not be able to enforce the stay in foreign jurisdictions if the creditor against which enforcement is sought has minimal or no presence in the United States. Okcoin likely has little or no connection to the United States. Further, I understand the Hong Kong Court will likely not automatically recognize the Debtor's Chapter 11 Case and the protections chapter 11 provides. As such, Okcoin may be able to pursue remedies and seek to collect amounts owed to it notwithstanding the automatic stay. To prevent such action, the Debtor

---

[17]    I understand such requirements are the company's connection with Hong Kong, the reasonable possibility the winding-up order will benefit the applicant, and whether the Hong Kong Court has jurisdiction over distribution of the company's assets.

could commence a proceeding in the Hong Kong Court seeking recognition of the Chapter 11 Case. However, it is my belief upon discussions with Weil, doing so would take time and may be more expensive than paying the HK Costs Order. Therefore, the Debtor has determined, in the exercise of its business judgment, that payment of the HK Costs Order is essential to prevent further litigation costs.

## B.    British Virgin Islands Litigation

46.    Judge Rakoff issued letters of request to two entities in the British Virgin Islands to gather more information in that jurisdiction to (a) iFinex Inc. d/b/a Bitfinex ("**Bitfinex**") on August 15, 2023 (the "**Bitfinex Letter of Request**"), and to Primary Digital Master Fund Ltd. ("**Primary Digital**" together with Bitfinex, the "**BVI Foreign Litigation Claimants**") on October 12, 2023 (the "**Primary Digital Letters of Request**" together with the Bitfinex Letter of Request, the "**BVI Letter of Requests**"). The letter of request to Bitfinex sought documents and information about crypto wallets and the trading accounts involved in trading UST that were hosted by the Bitfinex cryptocurrency exchange and have been identified as potentially causing and/or contributing to the Depeg. The letter of request to Primary Digital sought documents and information about Primary Digital's involvement in the Depeg, including its respective connections to a cryptocurrency wallet/trading account identified as causing and contributing to the May 2022 Depeg. The Debtor, through Dentons, retained the Collas Crill law firm ("**Collas**") to bring an application in the Eastern Caribbean Supreme Court in the High Court of Justice, Virgin Islands (the "**BVI Court**") to enforce the BVI Letter of Requests.

47.    After bringing an application to enforce the Bitfinex Letter of Request, Collas agreed to a consent order with counsel for Bitfinex to produce the requested material, which the BVI Court approved (the "**Bitfinex Order**"). I understand, in accordance with British Virgin

Islands law, the Bitfinex Order provided that the Debtor would pay for Bitfinex's reasonable costs if Bitfinex complied with the terms of the Bitfinex Order, with the costs being assessed if not agreed by the Debtor and Bitfinex.  Bitfinex produced all agreed-upon materials and identified to the Debtor its costs as $37,840.45 (the "**Bitfinex Costs Order**").  The Debtor further negotiated with Bitfinex and agreed to pay $26,488.36 to settle Bitfinex's costs of complying with the terms of the Bitfinex Order.

48.    Subsequently, Collas brought an application to enforce the Primary Digital Letter of Request against Primary Digital to produce the requested material, which BVI Court approved (the "**Primary Digital Order**" together with the Bitfinex Order, the "**BVI Orders**"). Similarly to the Bitfinex Order, the Primary Digital Order provided that the Debtor would pay for Primary Digital's reasonable costs if Primary Digital complied with the terms of Primary Digital Order.  Primary Digital complied with the Primary Digital Order and produced the requisite documents, incurring reasonable costs of $57,000.00, including furthers costs from negotiating the execution of a declaration confirming the authenticity of the produced documents (the "**Primary Digital Costs Order**" together with the Bitfinex Costs Order, the "**BVI Costs Orders**").

49.    As noted above, although the scope of the automatic stay set forth in section 362 of the Bankruptcy Code is universal, the Debtor may not be able to enforce the stay in foreign jurisdictions if the creditor against which enforcement is sought has minimal or no presence in the United States.  I understand the BVI Foreign Claimants have little or no connection to the United States.  Further, the BVI Court will likely not automatically recognize the Debtor's Chapter 11 Case and the protections chapter 11 provides.

50.     It is my understanding that if payment of the BVI Costs Orders is not made, the Debtor would be in breach of its debt obligations pursuant to the relevant BVI Orders, which may subject the Debtor to legal action by the creditors to enforce the debts.

51.     To prevent such action, the Debtor could commence a foreign recognition proceeding in the BVI Court.  However, I understand doing so would take time and may be more expensive than paying the BVI Orders.  Therefore, the Debtor has determined, in the exercise of its business judgment, that payment of the BVI Costs Orders is essential to prevent further litigation costs.

**C.     Wintermute United Kingdom Litigation**

52.     U.S. District Judge Jed Rakoff issued a letter of request (the "**Wintermute Letter of Request**") for records and testimony of Wintermute Trading Ltd. ("**Wintermute**" and, together with Okcoin and the BVI Foreign Litigation Claimants, the "**Foreign Litigation Creditors**" and their respective claims, the "**Foreign Litigation Claims**"), a global algorithmic crypto-trading firm that is based in the United Kingdom.  Dentons retained Rahman Ravelli Solicitors ("**Rahman Ravelli**") and through Rahman Ravelli, engaged Henry Byam-Cook KC and Socrates Papadopoulos of Twenty Essex as the Debtor's barristers ("**Twenty Essex**" together with Rahman Ravelli, the "**English Counsel**"), on behalf of the Debtor to litigate the Wintermute Letter of Request in the High Court of Justice, King's Bench Division (the "**English High Court**").

53.     It is my belief the information the Debtor is seeking from Wintermute is valuable to its defense of the SEC Litigation Action in the SEC Jury Trial in at least three important ways.

54.     First, Wintermute's Code (as defined below) is relevant to the causation and loss amount alleged by the SEC.  Specifically, the Debtor believes that during an event known as

the Depeg, in which the value of the Debtor's stablecoin, UST, fell below one dollar, Wintermute

shorted Luna Classic and UST, which contributed to the catastrophic loss of value and supports

the Debtor's argument that the Depeg was caused by independent actions of third parties and not

the Debtor.  To determine and prove Wintermute's role in the Depeg, the Debtor is attempting to

compel Wintermute to produce its trading code used during the Depeg ("**Wintermute's Code**").

As Judge Rakoff indicated in the form approving the Wintermute Letter of Request,

> the evidence sought will be used in the proceedings and at trial by the Defendants to enable the U.S. Court to determine whether or not…the Defendant's fraudulent activity led to $40 billion in market losses. To do so, Defendants will argue that the Court and jury need to understand the full extent of Wintermute's shorting activities and strategy and that this activity caused the collapse of the UST and LUNA prices.

55.    Second, to the extent Wintermute's Code is relevant to the causation issue,

it will also potentially shed further light on the alleged false statements the SEC claims the Debtor

and Do Kwon made in connection with the first brief depeg in May 2021.  Similarly, statements

made in depositions the Debtor took in London on January 15, 2024, (the "**Wintermute**

**Depositions**") appear to confirm that Wintermute deployed a specific and sophisticated strategy

to depress the price of UST.  To fully present this defense to the jury, however, the Debtor requires

Wintermute's Code, which is expected to provide confirmatory physical evidence of Wintermute's

alleged short selling strategy.

56.    Lastly, statements from the Wintermute Depositions revealed information

relevant to Wintermute's market activities.  Wintermute's Code will likely provide physical

evidence that will enable the Debtor to determine the effect of Wintermute's market activities on

the price of Luna Classic.

57.    It is my understanding upon discussions with the Debtor's English Counsel,

the litigation with Wintermute, represented by Mishcon de Reya LLP ("**Mishcon**") and Morrison

Cohen LLP ("**Morrison Cohen**"), has been contentious from the beginning.  Wintermute has consistently resisted the production of relevant information related to the execution of trades during the Depeg, despite the Wintermute Letter of Request.  Rahman Ravelli requested that the English High Court compel Wintermute to produce the requested information under threat of criminal penalty, known as a penal notice, on an expedited basis (the "**Motion for Penal Notice**"), which the court granted.[18]  On appeal, however, the High Court of Justice, King's Bench Division, Mr. Justice Lavender, reversed the grant of the Penal Notice and ordered costs of the appeal in favor Wintermute.  I understand it is the usual practice in English courts to order that the losing party to a contested application reimburse the legal costs of the successful party (in an amount assessed by the court).  Accordingly, on January 29, 2024, as a consequence of the Debtor's losing the appeal, the English High Court awarded Wintermute £143,000 (approximately $180,000 as of the date hereof) in costs (the "**Wintermute Costs Award**") related to the Motion for Penal Notice.  However, Mr. Justice Lavender did allow the Debtor to pursue the discovery it sought through civil discovery, which it is doing.

58.    After the Debtor commenced the Chapter 11 Case, Wintermute served a security for costs application on the Debtor, claiming that security in the amount of £892,407.50 (approximately $1,130,000 as of the date hereof) is needed because the Company is impecunious due to its status as a chapter 11 debtor (the "**Wintermute Security for Costs**" and together with the Wintermute Costs Award, the "**Wintermute Costs**").  I understand, a defendant in a U.K. lawsuit may apply for a security for costs, which forces the plaintiffs to pay to the court a fixed sum the court determines is appropriate to secure the defendant's costs of and incidental to the

---

[18]    It is my understanding upon discussions with the Debtor's English Counsel, seeking a penal notice on an expedited basis means if a party fails to produce evidence as required, such party can be jailed for not doing so.

proceeding should the defendant prevail. I understand security for costs orders serve as protection for defendants with a legitimate concern that a plaintiff may not be able to pay the defendant's costs of the proceeding if so ordered by the court. If the court approves the application for security of costs, the proceedings are effectively stayed until the plaintiffs provides the security.

59.    A hearing is currently scheduled for February 16, 2024 by the English High Court to determine the Wintermute Security for Costs application and what amount the Debtor must pay. Wintermute has demanded that the Debtor pay the Wintermute Security for Costs within five days of such hearing. Although the Debtor views this amount as excessive and will argue to the English High Court that any required security payment amount should be lower, the Debtor will likely be compelled by the English High Court to pay the Wintermute Security for Costs in some amount to continue the litigation against Wintermute.

60.    I understand, if the Court approves the Wintermute Security for Costs application, the Debtor would pay the Wintermute's Security for Costs directly to the English High Court, not to Wintermute. Further, if the Debtor ultimately prevails in the Wintermute Letter of Request litigation against Wintermute, which English Counsel has advised is more likely than not, the money the Debtor deposited with the English High Court will be returned to it and the Debtor would also be entitled to receive costs from Wintermute. If the Debtor loses in litigation to Wintermute, any security deposited in excess of the actual costs of litigation would be returned to the Debtor.

61.    The Debtor's English Counsel have advised that failure to pay the Wintermute Costs will likely cause the English High Court to dismiss the Debtor's the case against Wintermute, resulting in the Debtor being unable to further pursue the Wintermute Letter of Request. This would negatively impact the Debtor's litigation position in the SEC Enforcement

Action.  Moreover, failure to pay the Wintermute Costs Award may cause the English High Court to impute higher penalties on the Debtor.

I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:    February 13, 2024
          Washington, D.C.

Respectfully submitted,

By:    */s/ Mark G. Califano*
       Mark G. Califano
       Partner, Dentons US LLP

25