## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TERRAFORM LABS PTE. LTD., | ) | Case No. 24-10070 (BLS) |
| | ) | |
| | ) | Proposed Obj. Deadline: 3/4/24, 12:00 p.m. (ET) |
| Debtor. | ) | Proposed Hr'g Date: 3/5/24, 2:30 p.m. (ET) |
| | ) | Related to Docket No. 88 |
| _____ | ) | |

## MOTION OF THE U.S. SECURITIES AND EXCHANGE COMMISSION FOR REDACTION OF CERTAIN PERSONAL DATA IDENTIFIERS PURSUANT TO FED. R. BANKR. P. 9037 AND DEL. BANKR. L.R. 9037-1

The United States Securities and Exchange Commission (the "**SEC**"), a creditor in these proceedings and the federal agency responsible for regulating the nation's securities markets and enforcing compliance with the federal securities laws, hereby moves (the "**Motion**") pursuant to Rule 9037 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 9037-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**") for entry of an order, substantially in the form attached hereto as Exhibit A, directing the Clerk of the Court (the "**Clerk**") to substitute the proposed redacted form of the Declaration (as defined herein) attached hereto as Exhibit B for the version of the Declaration currently filed on the docket in this case.  In support of this Motion, the SEC respectfully represents as follows:

## BACKGROUND

1.       On January 21, 2024 ("**Petition Date**"), the Debtor commenced a voluntary case under chapter 11 of title 11 of the United States Code ("**Bankruptcy Code**").

2.       On February 13, 2024, the Debtor filed the *Motion of Debtor for Entry of Orders Pursuant to Section 363, 503(b), and 105(a) of the Bankruptcy Code Authorizing Debtor to Pay*

*Certain Amounts in Furtherance of Litigation and Granting Related Relief* [Docket No. 61] (the

"**Litigation Claims Motion**").

3.       On February 27, 2024, the SEC filed an objection to the Litigation Claims Motion

[Docket No. 87] (the "**SEC Objection**"), and the Declaration of Roger Landsman

("**Declaration**") in support thereof [Docket No. 88].

## RELIEF REQUESTED

4.       By this Motion, the SEC requests entry of an order substantially in the form

attached hereto as **Exhibit A**, directing the Clerk to substitute the proposed redacted form of the

Declaration attached here as **Exhibit B** for the version of the Declaration currently filed on the

docket in this case.

## BASIS FOR RELIEF REQUESTED

5.       Local Rule 9037-1(b) provides that "[t]he filer of the document containing

personal data identifiers shall . . . file a motion to redact that identifies the proposed document

for redaction by docket number. . . . The filer shall submit, with the motion to redact, an exhibit

containing the document to be substituted for the original filing." Del. Bankr. L.R. 9037-1(b).

6.       Relatedly, Local Rule 9037-1(c) provides that "[u]pon filing of the motion to

redact, the Clerk's Office will restrict the original image containing the personal data identifiers

from public view (except as to the filer, the case trustee, the United States Trustee and the claims

agent) on the docket." Del. Bankr. L.R. 9037-1(c).

7.       Exhibit 2 to the Declaration is a ruling from the Basic Court in Podgorica in the

Montenegrin language, and Exhibit 3 is a certified translation of that ruling from Montenegrin

into English.  Exhibits 2 and 3 inadvertently included the birth dates of certain individuals, which

dates are personal data identifiers within the meaning of Bankruptcy Rule 9037.  In addition,

while not the type of information that appears to be within Bankruptcy Rule 9037, Exhibits 2 and

3 also include certain passport numbers, which may be sensitive personal information.

        8.      Although the SEC staff believes the information described in the preceding paragraph is covered by an exemption from redaction requirements under Bankruptcy Rule 9037(b)(4), out of an abundance of caution, the SEC has redacted this information in the English translation, and has redacted the text of the Montenegrin decision.  The SEC requests that the Court direct the Clerk to substitute the proposed redacted form of the Declaration attached hereto as **<u>Exhibit B</u>** for the Declaration currently filed on the docket in this case.

*[Remainder of Page Intentionally Left Blank]*

**<u>NOTICE</u>**

9.      Notice of the Motion has been provided to parties that have requested notice

pursuant to Local Rule 2002-1(b).  In light of the nature of the relief requested herein, the SEC

submits that no other or further notice is required.

Dated: March 1, 2024                    UNITED STATES SECURITIES AND
                                        EXCHANGE COMMISSION


                                        */s/ William M. Uptegrove*
                                        William M. Uptegrove
                                        NY Bar No. 4846622; NJ Bar No. 031602003
                                        950 East Paces Ferry Road, Suite 900
                                        Atlanta, Georgia 30326-1382
                                        Tel: (404) 842-5765
                                        Email: uptegrovew@sec.gov

                                        -and-

                                        Therese A. Scheuer
                                        DE Bar No. 5699
                                        100 F. Street, NE
                                        Washington, DC 20549
                                        Phone: (202) 551-6029
                                        Fax: (202) 772-9317
                                        Email:  scheuert@sec.gov


Of Counsel: Alistaire Bambach
            Michael Kelly

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the foregoing Motion was served this 1st day of

March, 2024 upon all parties receiving notices through the Administrative Procedures of the

CM/ECF System for the Bankruptcy Court for the District of Delaware, and in addition will be

served this day by email to the following:

heath@rlf.com
shapiro@rlf.com
milana@rlf.com
ronit.berkovich@weil.com
jessica.liou@weil.com
f.gavin.andrews@weil.com
Linda.Richenderfer@usdoj.gov
Jane.M.Leamy@usdoj.gov
dpatton@kaplanhecker.com
mferraro@kaplanhecker.com


   */s/ William M. Uptegrove*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TERRAFORM LABS PTE. LTD., | ) | Case No. 24-10070 (BLS) |
| | ) | |
| | ) | Proposed Obj. Deadline: 3/4/24, 12:00 p.m. (ET) |
| Debtor. | ) | Proposed Hr'g Date: 3/5/24, 2:30 p.m. (ET) |
| | ) | Related to Docket No. 88 |
| _____ | ) | |

### NOTICE OF MOTIONS AND HEARING

PLEASE TAKE NOTICE that, on March 1, 2024, United States Securities and Exchange Commission (the "**SEC**"), a creditor in this proceeding and the federal agency responsible for regulating the nation's securities markets and enforcing compliance with the federal securities laws, filed the Motion of the U.S. Securities and Exchange Commission for Redaction of Certain Personal Data Identifiers Pursuant to Fed. R. Bankr. P. 9037 and Del. Bankr. L.R. 9037-1 (the "**Motion**") with the United States Bankruptcy Court for the District of Delaware (the "**Court**").

PLEASE TAKE FURTHER NOTICE that contemporaneously with the filing of the Motion, the SEC also filed a motion to shorten the notice and objection period with respect to the Motion (the "**Motion to Shorten**").

PLEASE TAKE FURTHER NOTICE that if the Court grants the relief requested in the Motion to Shorten: (i) a hearing to consider the Motion will be held on March 5, 2024 at 2:30 p.m. (ET) before The Honorable Brendan L. Shannon at the Court, 824 North Market Street, 6th Floor, Courtroom 1, Wilmington, Delaware 19801, and (ii) any responses or objections to the Motion must be filed by March 4, 2024 at 12:00 p.m. (ET).

PLEASE TAKE FURTHER NOTICE that if the Court denies, in whole or in part, the relief requested in the Motion to Shorten, parties-in-interest will receive separate notice of the Court-approved objection deadline and hearing date for the Motion.

Dated: March 1, 2024                    UNITED STATES SECURITIES AND
                                        EXCHANGE COMMISSION


                                        */s/ William M. Uptegrove*
                                        William M. Uptegrove
                                        NY Bar No. 4846622; NJ Bar No. 031602003
                                        950 East Paces Ferry Road, Suite 900
                                        Atlanta, Georgia 30326-1382
                                        Tel: (404) 842-5765
                                        Email: uptegrovew@sec.gov

                                        -and-

                                        Therese A. Scheuer
                                        DE Bar No. 5699
                                        100 F. Street, NE
                                        Washington, DC 20549
                                        Phone: (202) 551-6029
                                        Fax: (202) 772-9317
                                        Email:  scheuert@sec.gov


Of Counsel: Alistaire Bambach
            Michael Kelly

**EXHIBIT A**
**<u>Proposed Order</u>**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TERRAFORM LABS PTE. LTD., | ) | Case No. 24-10070 (BLS) |
| | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |
| _____ ) | | Related to Docket No. 88, __ |

**ORDER GRANTING MOTION OF THE U.S. SECURITIES AND**
**EXCHANGE COMMISSION FOR REDACTION OF CERTAIN**
**PERSONAL DATA IDENTIFIERS PURSUANT TO**
**FED. R. BANKR. P. 9037 AND DEL. BANKR. L.R. 9037-1**

Upon the motion (the "**Motion**") of the United States Securities and Exchange

Commission (the "**SEC**"), for entry of an order pursuant to Rule 9037 of the Federal Rules of

Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 9037-1 of the Local Rules of

Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of

Delaware (the "**Local Rules**"), directing the Clerk of the Court (the "**Clerk**") to substitute the

proposed redacted form of the Declaration (as defined herein) attached to the Motion as Exhibit

B for the version of the Declaration currently filed on the docket in this case; and this Court

having jurisdiction to decide the Motion and the relief requested therein pursuant to 28 U.S.C. §§

157(a)-(b) and 1334(b) and the *Amended Standing Order of Reference* from the United States

District Court for the District of Delaware, dated February 29, 2012; and upon consideration of

the Motion; and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and

venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and finding that

adequate notice of the Motion having been given; and it appearing that no other or further notice

need be given; and after due deliberation and sufficient cause appearing therefor, it is hereby

ORDERED THAT:

1.     The Motion is granted to the extent set forth herein.

2.     Pursuant to Bankruptcy Rule 9037 and Local Rule 9037-1(b), the Clerk is hereby directed to substitute the proposed redacted form of the Declaration attached to the Motion as **Exhibit B** for the version of the Declaration currently filed on the docket in this case.

3.     The terms and conditions of this Order shall be effective immediately and enforceable upon its entry.

4.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Order.

**EXHIBIT B**

**<u>Proposed Redacted Form of Declaration</u>**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TERRAFORM LABS PTE. LTD., | ) | Case No. 24-10070 (BLS) |
| | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |
| _____ | ) | |

## <u>DECLARATION OF ROGER LANDSMAN</u>

I, Roger Landsman, pursuant to 28 U.S.C. § 1746, do hereby declare as follows:

1.     I am a Senior Counsel in the Enforcement Division of the United States Securities and Exchange Commission (the "**SEC**") at the SEC's headquarters in Washington, DC.  I am over eighteen years of age and am competent to make this declaration.

2.     I am one of the attorneys involved in the SEC's enforcement action in the Southern District of New York against Terraform Labs Pte Ltd. ("**Terraform**" or the "**Debtor**"), *SEC v. Terraform Labs Pte. Ltd.*, Civ. A. No. 23-1346 (S.D.N.Y.).  I also was one of the attorneys who conducted the SEC investigation that preceded the enforcement action against Terraform, *In the Matter of Mirror Protocol* (Internal File No. HO-14164) (the "SEC Investigation.").

3.     I submit this declaration in support of the SEC's objection to the *Motion of the Debtor for Entry of Orders Pursuant to Sections 363, 503(b), and 105(a) of the Bankruptcy Code*

*Authorizing Debtor to Pay Certain Amounts in Furtherance of Litigation and Granting Related Relief* [Docket No. 61].

4.      Attached hereto as Exhibit 1 is a true and correct copy of an Employer of Record Master Services Agreement between Deel Inc. and Terraform Labs Pte. Ltd dated March 30, 2022 produced to the Commission by Deel as part of the SEC Investigation.

5.      Attached hereto as Exhibit 2 is a true and correct copy of ruling from the Basic Court in Podgorica dated June 19, 2023 concerning Do Hyeong Kwon.

6.      Attached hereto as Exhibit 3 is a certified translation of the ruling from the Basic Court in Podgorica dated June 19, 2023 concerning Do Hyeong Kwon, and the certificate of the translation.

Dated: February 27, 2024

By: /s/ Roger Landsman____
    Roger Landsman
    100 F Street, NE
    Washington, DC 20549
    Phone: (202) 551-7501
    Email: landsmanr@sec.gov

# EXHIBIT 1

# EMPLOYER OF RECORD
## MASTER SERVICES AGREEMENT

| **Deel Group:** | Deel, Inc., a Delaware corporation with its principal offices at 425 1st San Francisco, CA 94107 United States, and any of its Affiliates as defined below (each a "Deel Group Member" and collectively, "Deel Group") | |
|---|---|---|
| **Customer:** | Terraform Labs Pte. Ltd. corporation with its principal offices located at 80 Raffles Place #32-01, UOB Plaza, Singapore 048624. | |
| **Effective Date** | 03 / 30 / 2022 | **Initial Term:** |
| **Signatures** | **Deel Group** <br> By: *Alex Bouaziz* | **Customer** <br> By: *(signature)* |

This Employer of Record Master Services Agreement, together with its exhibits (the "**Agreement**"), is entered into as of the Effective Date by and between Deel Group and Customer. For purposes of this Agreement, Deel Group and Customer will be referred to individually as a "**Party**" and together as the "**Parties**."

**WHEREAS,** for the purpose of this Agreement, an "Affiliate" is any entity which is (i) a subsidiary of any Deel Group Member; (ii) a subsidiary of the same entity or controlled by the same entity or individual; or (iii) any other entity or company operating in partnership with Deel under a separate written agreement. Deel and Affiliates together are referred as Deel Group.

**WHEREAS,** Deel Group is engaged in the business of provides Customers with specialized service providers (i) identified and presented by the applicable Customer, and (ii) engaged by Deel Group for the provision thereto of certain human resource and other related services hereunder ("**Consultants**" and "**Deel Services**", respectively); and

**WHEREAS,** Deel Group provides as part of the Deel Services a software-as-a-service solution that allows Customers to seamlessly manage relationships with local and international independent contractors, including, the receipt of services from Consultants (the "**Deel Platform**"); and

**WHEREAS,** Customer desires to obtain from Deel Group, and Deel Group desires to provide to Customer, the Deel Services and a license to access and use the Deel Platform, subject to the terms and conditions of this Agreement.

**NOW, THEREFORE,** in consideration of the mutual covenants and promises set forth below, and other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties hereby agree as follows:

1. **Services.**

**1.1.** Customer and each Deel Group Member may, during the Term (as defined below), from time to time enter into one or more scope of work for the provision hereunder of the Deel Services, substantially in the form attached hereto as **Exhibit A** (each a "**Scope of Work**").

**1.2.** Customer hereby retains Deel Group to provide the Deel Services in accordance with any applicable Scope of Work.

**1.3.** The Parties acknowledge and agree that during the term of the Agreement the Deel Services may be modified and/or expanded from time to time upon a Scope of Work executed by authorized representatives of the Parties expressly referencing this Agreement. In the event of any inconsistency between the terms of any Scope of Work and the terms hereof, the terms of the applicable Scope of Work shall prevail to the extent of such inconsistency.

2. **Deel Platform**. Subject to the terms hereof, including, without limitation, payment of all applicable fees, during the Term, Deel Group hereby grants to Customer a non-exclusive, non-sublicensable, non-transferable license to access and use the Deel Platform solely for Customer's internal business purposes in connection with its receipt of the Deel Services hereunder, in accordance with the provisions of the Deel Platform Terms of Service, as may be in effect from time to time (the "**Terms of Service**"). In the event of any conflict between the terms hereof and the Terms of Service, the terms of this Agreement shall prevail.

3. **Fee; Payment.**

    3.1. <u>Platform Fee</u>. In consideration for the provision of the Deel Services and the license granted to access and use the Deel Platform, Customer will pay on a monthly basis the Platform Fee specified in the applicable Scope of Work.

    3.2. <u>Setup Fee</u>. Within five (5) days from the SOW Effective Date (as defined in the Scope of Work), Customer shall pay to Deel Group a one-time, non-refundable Setup Fee as specified in the applicable Scope of Work.

    3.3. <u>Consulting Fee.</u> Customer shall pay to Deel Group a fee in the amount equal to the full amount Deel Group paid Consultant for Consultant's employment and services, including but not limited to, any additional remuneration for statutory leave, legal costs, severance or any other such payments incurred due the provision of the Deel Services, as may be further set forth in the Scope of Work (the "**Consulting Fee**").

    3.4. <u>Fee Deposit</u>. Within five (5) days from the SOW Effective Date, Customer shall pay Deel Group a deposit in the amount set forth in the applicable Scope of Work (the "**Fee Deposit**"). Deel Group shall return this Fee Deposit to Customer within sixty (60) days of having received full and final payment of all invoices relating to the applicable Scope of Work after its termination. Deel Group shall not be obliged to supply the Deel Services until it has received the Fee Deposit from Customer.

    3.5. <u>Additional Fees</u>. In the event of a change to local laws or regulations that may generate additional expenses, external costs and charges incurred by Deel Group in the performance of its obligations under this Agreement, such expenses, costs and charges shall be reimbursed by Customer (the "**Additional Fees**"), unless the Parties expressly agreed otherwise beforehand in writing and provided that any such increase must be limited to the amount of the additional cost imposed upon Deel Group and that the Platform Fee will not be increased without

Doc ID: 8f28b6902ce7255d833fae5e97dc769ae4c6bbd8

mutual written agreement of the Parties. Relevant supporting documentation will be made available to Customer by Deel Group upon written request.

3.6.    Reporting. Deel Group shall provide Customer with reports showing details of the cost of the Deel Services, including all applicable fees during the relevant period, in the manner set forth in the applicable Scope of Work.

3.7.    Payment Terms. Customer shall pay the full amount invoiced to it by Deel Group in US currency in the manner set forth in the applicable Scope of Work or in the Deel Payments Page located at https://www.letsdeel.com/payments. All payments shall be made through the Deel Platform unless otherwise provided by Deel Group. In case of dispute of any invoice amount, Customer will pay all undisputed amounts in compliance with the payment terms agreed herein, and the Parties shall make their best efforts to resolve the dispute.

3.8.    Late Payments. If Customer fails to make any payment due to Deel Group under this Agreement by the due date for payment, then, without limiting Deel Group's other remedies under this Agreement, Customer shall pay interest on the overdue amount at the rate of 0.15% per day. Such interest shall accrue on a daily basis from the due date until actual payment of the overdue amount, whether before or after judgment. Customer shall pay the interest together with the overdue amount.

3.9.    Fee Changes. In the event of a change to local laws or regulations that increases the cost to Deel Groups of its provision of the Deel Services, the Parties shall adapt the fees accordingly, provided that any such increase must be limited to the amount of the additional cost imposed upon Deel Group and that Deel Group's Platform Fee will not be increased without mutual written agreement of the Parties.

**3.10.**    Taxes. All fees are exclusive of all state, local and other taxes, or other taxes or charges (other than income taxes payable by Deel Group) as may be directly applicable to the receipt or use of the Deel Services. Customer will pay all such charges or taxes within thirty (30) days of the applicable invoice date.

4.   **Confidentiality.**

4.1.    Confidential Information. The Parties acknowledge that by reason of their relationship hereunder, each Party may disclose or provide access to the other certain Confidential Information. "**Confidential Information**" shall mean (a) information concerning a Party's products, business and operations including, but not limited to, information relating to business plans, financial records, customers, suppliers, vendors, products, product samples, costs, sources, strategies, inventions, procedures, sales aids or literature, technical advice or knowledge, contractual agreements, pricing, product specifications, trade secrets, procedures, distribution methods, inventories, marketing strategies and interests, algorithms, data, designs, drawings, work sheets, blueprints, concepts, samples, inventions, manufacturing processes, computer programs and systems and know-how or other intellectual property, of a Party and its affiliates that may be at any time furnished, communicated or delivered to a Party, whether in oral, tangible, electronic or other form; (b) the terms of any agreement, including this Agreement, and the discussions, negotiations and proposals related to any agreement; (c) information acquired during any tours of or while present at a Party's facilities; and (d) all other non-public information provided by a Party hereunder. All Confidential Information shall remain the exclusive property of the disclosing Party.

Doc ID: 8f28b6902ce7255d833fae5e97dc769ae4c6bbd8

4.2.    Use of Confidential Information; Standard of Care. The receiving Party shall maintain the disclosing Party's Confidential Information in strict confidence and disclose the Confidential Information only to its employees, subcontractors and representatives who (a) have a need to know such Confidential Information in order to fulfill the business affairs and transactions between the Parties contemplated by this Agreement; (b) have been informed of the confidential nature of the Confidential information furnished by the disclosing Party and the receiving Party's obligations with respect thereto; and (c) are under confidentiality obligations no less restrictive than this Agreement. Receiving Party shall use the same degree of care as it uses with respect to its own similar information, but no less than a reasonable degree of care, to protect the Confidential Information from any unauthorized use, disclosure, dissemination, or publication. Each Party shall only use the Confidential Information in furtherance of its performance of its obligations under this Agreement, and agrees not to use the other Party's Confidential Information for any other purpose or for the benefit of any third party.

4.3.    Exceptions; Required Disclosures. Confidential Information does not include information that: (a) was lawfully in the receiving Party's possession before receipt from the disclosing Party, as established by competent evidence; (b) at or after the time of disclosure, becomes generally available to the public other than through any act or omission of the receiving Party; (c) is received by the receiving Party from a third party free to make such disclosure without, to the best of the receiving Party's knowledge, breach of any legal or contractual obligation of confidentiality to the other Party; (d) is independently developed by the receiving Party without use of or reliance on the Confidential Information, as demonstrated by competent evidence; or (e) is disclosed by receiving Party with the disclosing Party's prior written approval. If the receiving Party is required by law, regulation, or legal proceeding to disclose Confidential Information, it shall, unless prohibited by applicable law, provide prompt written notice to the disclosing Party to allow the disclosing Party an opportunity to seek a protective order or other relief it deems appropriate, and the receiving Party shall reasonably assist the disclosing Party in such efforts. If disclosure is nonetheless required, the receiving Party shall limit its disclosure to only that portion of the Confidential Information which it is advised by its legal counsel, which may include internal legal counsel, must be disclosed.

4.4.    Unauthorized Use or Disclosure of Confidential Information; Equitable Relief. In the event the receiving Party discovers that any Confidential Information has been used, disseminated or accessed in violation of this Agreement, it will immediately notify the disclosing Party; take all commercially reasonable actions available to minimize the impact of the use, dissemination or publication; and take any and all necessary steps to prevent any further breach of this Agreement. The receiving Party agrees and acknowledges that any breach or threatened breach regarding the treatment of the Confidential Information may result in irreparable harm to the disclosing Party for which there may be no adequate remedy at law. In such event the disclosing Party shall be entitled to seek an injunction, without the necessity of posting a bond, to prevent any further breach of this Agreement, in addition to all other remedies available in law or at equity.

4.5.    Return of Confidential Information; Survival. The receiving Party shall promptly return or, at the disclosing Party's option, certify destruction of all copies of Confidential Information at any time upon request or within thirty (30) days following the expiration or earlier termination of this Agreement. Notwithstanding any expiration or termination of this Agreement, the receiving Party's obligations to protect the Confidential Information pursuant to this Section will survive for two (2) years after the expiration or earlier termination of this Agreement.

Doc ID: 8f28b6902ce7255d833fae5e97dc769ae4c6bbd8

5. **Intellectual Property.** The Parties hereto acknowledge and agree that, to the extent permitted by applicable law, Deel Group shall assign and transfer all Intellectual Property Rights (as defined below) such that Customer shall be the sole and exclusive owner of all right, title and interest in and to any and all materials and other deliverables provided or created by the Consultant in the provision of the Deel Services to Customer hereunder ("**Customer Developments**"). Deel Group shall ensure that Consultant, as part of its engagement by Deel Group and its provision of the Deel Services for Customer, shall execute, in accordance with the local laws and regulations where it performs the Deel Services, an invention assignment agreement in favor of Deel Group in connection with the Customer Developments. Subject to the terms and conditions hereof, Deel Group shall assign all right, title and interest in any Customer Developments, including all Intellectual Property Rights therein, to Customer. Except as otherwise specifically stated herein with respect to the assignment of Customer Developments, Deel Group does not assign and expressly retains all Intellectual Property Rights in all other Deel Group materials, including the Deel Platform.

"**Intellectual Property Rights**" means all copyright rights, patent rights, trademark rights, trade secret rights, mask work rights, moral rights, rights of publicity, authors' rights, contract and licensing rights, goodwill and all other intellectual property rights as may exist now and/or hereafter come into existence and all applications therefor and registrations, renewals, continuations, continuations in part and extensions thereof, regardless of whether such rights arise under the law of the United States or any other state, country or jurisdiction.

6. **Responsibilities and Obligations of Deel Group.**

      6.1.    Deel Group will engage the Consultant as employee(s) in accordance with the Scope of Work and assign the Consultant to perform the services requested by the Customer in the Scope of Work.

      6.2.    Deel Group will: (i) handle Consultant's background check, to the extent permitted by the applicable law; (ii) pay Consultant's wages and provide other benefits as Deel Group deems appropriate; (ii) pay, withhold and transmit payroll taxes to the Consultant in an amount no less than required by applicable law.

      6.3.    Deel Group will be responsible for handling the employment of the Consultant, including, without limitation, (i) the payment of all salaries and wages thereto, in full accordance with all applicable laws, rules and regulations; (ii) handling unemployment claims involving Consultant; (iii) ensure Consultants are legally authorized to work within the jurisdiction in which the Deel Services will be provided; (iv) if applicable, providing health coverage to Consultant under the Affordable Care Act's (ACA) employer mandate and its implementing regulations, and will provide the necessary coverage to Customer. Deel Group represents and warrants that it will comply with all applicable laws, including the ACA, in doing so.

      6.4.    Deel Group will maintain at its own expense all insurance coverage required by law as well as employer liability insurance, in connection with the provision of the Deel Services hereunder. Upon Customer's request, Deel Group shall deliver certificates of insurance to Customer.

      6.5.    Deel Group will require Consultant to comply with Customer's policies and guidelines as documented (provided such policies and guidelines are compliant with applicable law and the internal policies of Deel Group).

6.6.    The Consultant assigned to Customer under this Agreement shall remain an employee of Deel Group for the duration of time Consultant provides services to Customer pursuant to any Scope of Work. For the avoidance of doubt, the Consultant shall not be entitled to participate in any of Customer's employee benefit plans.

**7.    Responsibilities and Obligations of Customer.**

7.1.    Customer acknowledges that irrespective of Customer's recruitment and introduction of Consultant, Deel Group shall serve as Consultant's employer and all employment-related matters will be managed and handled by Deel Group. Notwithstanding the foregoing, Customer shall be solely responsible for (i) the day-to-day supervision of the Consultant, (ii) maintaining a safe work environment at all times, (iii) maintaining all requisite business licenses (including professional licenses), and (iv) compliance with all applicable laws, rules and regulations in connection with its receipt of the Deel Services hereunder from the applicable Consultant.

7.2.    Customer shall comply with (i) the Deel Group human resources and other such related policies as may be provided to Customer from time to time and (ii) any reasonable or necessary human resource directive of Deel Group, when necessary for compliance with applicable laws, as determined in Deel Group's sole discretion.

7.3.    Customer shall inform Deel Group sufficiently in advance and in writing of any changes regarding any Scope of Work or more generally, any changes impacting Consultant's service (including without limitation any employment-related legal claim, injury, or incident relating to the Consultant or the workplace), such that Deel Group may reasonably inform and notify Consultant, any applicable authority or any other relevant third party in advance, respecting any notice periods required by law, agreement or best practice or any matters which may confer to the Customer a right to terminate this Agreement, or as otherwise required to comply with applicable law.

7.4.    Customer acknowledges that when providing services under and pursuant to a Scope of Work, the Consultant's engagement will be governed by the laws and regulations of the Jurisdiction of Employment stated in the Scope of Work, without prejudice to Consultant's rights and Deel Group's obligations under the laws and regulations of the jurisdiction where the services of Consultant are actually rendered.

7.5.    Customer agrees to pay promptly all fees and costs invoiced by Deel Group. Customer shall not make any payments relating to the Agreement directly to the Consultant.

7.6.    Customer shall be liable for any additional costs and losses arising from Customer's failure to comply with the obligations described above in this clause.

**8.    Indemnification.**

8.1.    Customer Indemnification. Customer will indemnify, defend and hold harmless Deel Group, its affiliates, officers, directors, employees, agents and other representatives (collectively, "**Deel Indemnitee**") from and against any judgments, losses, damages, liabilities, costs or expenses (including, but not limited to, attorneys' fees and legal expenses) Deel Indemnitee may suffer or incur in connection with any actual or threatened claim, demand, action or other proceeding by any third party arising from or relating to (a) any breach of this Agreement by Customer or any of its obligations or representations and warranties hereunder;

Doc ID: 8f28b6902ce7255d833fae5e97dc769ae4c6bbd8

(b) any act or omission by Customer, its employees, affiliates, agents and/or independent contractors in connection with Customer's receipt of the Deel Services, including, without limitation, the engagement of the Consultant by Deel Group in connection therewith; (c) Customer's use, attempted use or misuse of the Deel Services and/or Deel Platform; or (d) expenses and costs incurred by Deel Group arising from the indemnification provision inserted at Customer's request in the employment agreements with Consultants engaged for Customer.

8.2.   Indemnification for Prior Engagement. Customer shall indemnify and hold harmless Deel Indemnitee against any legally enforceable claim made by the Consultant relating to or arising from any engagement undertaken directly or indirectly by Consultant with or for Customer prior to the beginning of Consultant's engagement with Deel Group. Should any such prior engagement exist, Customer shall reimburse Deel Group in accordance with the payment terms of this Agreement any and all Deel Group's Platform Fees and any other applicable fees hereunder. Such costs and fees may include, without limitation, additional remuneration, accrued statutory leave, seniority benefits, termination indemnity, rights and obligations gained as a result of deemed employment, and loss of earnings or status, whether perceived or actual, of Consultant as well as any employer's costs, contributions, taxes or similar relating to arising from the foregoing. For the avoidance of doubt, engagement shall mean engagement in any form including but not limited to as an employee, or an independent sub-contractor whether directly or via one or more third parties.

8.3.   Permanent Local Establishment. Customer acknowledges and agrees that any permanent local establishment risk or liability affecting Customer in the country or state where the Deel Services are being provided by the Consultant under this Agreement shall be exclusively the Customer's responsibility. Customer shall indemnify and hold Deel Indemnitee harmless against any such risk or liability.

8.4.   Deel Group Indemnification. Deel Group will indemnify, defend and hold harmless Customer from and against any judgments, losses, damages, liabilities, costs or expenses (including, but not limited to, attorneys' fees and legal expenses) Customer may suffer or incur in connection with any actual or threatened claim, demand, action or other proceeding by any third party arising from or relating to (a) any breach of this Agreement by Deel Group or any of its obligations or representations and warranties hereunder; (b) any misrepresentation, negligence or willful misconduct by Deel Group in connection with the performance of the Deel Services hereunder; and (c) any claim that the Deel Platform infringes any intellectual property or other rights of a third party, provided however, that Deel Group shall have no responsibility or liability for any claim to the extent resulting from or arising out of (i) the use of the Deel Platform not in compliance with this Agreement, the Terms of Service or applicable law; (ii) the combination of the Deel Platform with any services not provided by and/or pre-approved in writing by Deel Group; (iii) the modification of the Deel Platform  by any party other than Deel Group; or (iii) the use of any version of the Deel Platform that is not the most up-to-date version.

8.5.   Procedure. Either party claiming indemnification under this Section 8 ("**Indemnitee**") shall: (i) provide the other party ("**Indemnifying Party**") with written notice of a claim promptly upon becoming aware thereof, (ii) allow Indemnifying Party to control the defense and settlement of the claim, provided that no settlement may be entered into without the consent of Indemnitee if such settlement would impose any liability or responsibility on the Indemnitee; and (iii) reasonably cooperate with Indemnifying Party, at Indemnifying Party's expense, in the defense and settlement of the claim. Notwithstanding the foregoing, the

Indemnitee may be represented in any such suit by counsel of its own choosing, at its own expense.

9. **Non-Competition**. Deel Group agrees not to enter into another contract with another customer, whose products or services compete with or are substantially similar to those offered by Customer, to provide it with the services of the same Consultant providing Customer with any Deel Services hereunder ("**Customer-Assigned Consultant**") for a period of six (6) month after the expiration or termination of the applicable Scope of Work in respect of such Customer-Assigned Consultant unless authorized by the Customer or upon request by another customer in good faith and without solicitation by Deel Group.

10. **Representations and Warranties**. Each party represents and warrants that:

 10.1. <u>Power and Authority; Execution and Delivery</u>. It has the power and authority, and the legal right, to execute and deliver this Agreement and to perform its obligations hereunder.

 10.2. <u>No Approvals</u>. No consent or authorization of, filing with, notice to or other act by, or in respect of, any governmental authority or any other person is required in order for it to execute, deliver, or perform any of its obligations under this Agreement.

 10.3. <u>No Violations</u>. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby do not and will not violate any applicable law or constitute a default under any agreement or contract by which such party may be bound.

 10.4. <u>Enforceability</u>. This Agreement represents a valid, legal and binding obligation of the party, enforceable against it in accordance with the terms of this Agreement, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles.

11. **Limitation of Liability; Limitation of Warranty**

 11.1. EXCEPT FOR CUSTOMER'S INDEMNIFICATION OBLIGATIONS SET FORTH IN SECTION 8 AND EITHER PARTY'S CONFIDENTIALITY OBLIGATIONS SET FORTH IN SECTION 4, AND A PARTY'S GROSS NEGLIGENCE AND WILLFUL MISCONDUCT, NEITHER PARTY WILL BE LIABLE TO THE OTHER FOR ANY CONSEQUENTIAL, SPECIAL, PUNITIVE, OR INDIRECT DAMAGES OF ANY SORT, INCLUDING, WITHOUT LIMITATION, (A) ANY DAMAGES FOR LOST PROFITS, OR (B) ANY DAMAGES RESULTING FROM LOSS OF USE OR LOSS OF DATA. NEITHER PARTY'S TOTAL LIABILITY TO THE OTHER PARTY UNDER THIS AGREEMENT SHALL EXCEED THE TOTAL OF FEES PAID ACCORDING TO THIS AGREEMENT.

 11.2. DEEL GROUP DOES NOT WARRANT OR GUARANTEE, AND IS NOT RESPONSIBLE FOR ANY WORK PERFORMED OR SERVICES PROVIDED BY CONSULTANT. DEEL GROUP DOES NOT WARRANT THE DEEL PLATFORM AND DOES NOT GUARANTEE THAT IT WILL BE UNINTERRUPTED OR THAT ITS OPERATION WILL BE ERROR-FREE. IT IS UNDERSTOOD AND AGREED THAT WHILE DEEL GROUP SHALL TAKE REASONABLE CARE AND USE COMMERCIALLY REASONABLE EFFORTS IN ARRANGING AND PROVISIONING OF THE DEEL PLATFORM AND DEEL SERVICES, DEEL GROUP SHALL NOT BE LIABLE FOR THE

Doc ID: 8f28b6902ce7255d833fae5e97dc769ae4c6bbd8

TIMELY PROVISIONING OF ORDERS FOR CUSTOMER OR FOR ANY ACT OF COMMISSION OR OMISSION IN CONNECTION WITH THIS AGREEMENT OVER WHICH DEEL GROUP HAS NO CONTROL.

**11.3.** EXCEPT AS SET OUT IN THIS AGREEMENT, DEEL GROUP DOES NOT MAKE ANY OTHER WARRANTIES OR REPRESENTATIONS RELATING TO THE DEEL PLATFORM OR DEEL SERVICES, INCLUDING, WITHOUT LIMITATION, THE NATURE, QUALITY AND BACKGROUND OF THE CONSULTANT, OR ANY LEGAL IMPEDIMENT RELATING TO THE ENGAGEMENT OF THE CONSULTANT BY DEEL GROUP IN CONNECTION WITH THE DEEL SERVICES. ALL OTHER WARRANTIES, EXPRESS OR IMPLIED ARE EXPRESSLY DISCLAIMED AND EXCLUDED, INCLUDING WARRANTIES OF MERCHANTABILITY AND OF FITNESS FOR A PARTICULAR PURPOSE.

12. **Dispute Resolution.**

12.1. If a dispute arises out of or relates to this contract, or the breach thereof, and if the dispute cannot be settled through negotiation, the parties agree first to try in good faith to settle the dispute by mediation administered by the American Arbitration Association under its Commercial Mediation Procedures before resorting to arbitration, litigation, or some other dispute resolution procedure.

12.2. If the Parties have not been successful in resolving through mediation as set forth in 12.1, then the Parties shall attempt to resolve the dispute through binding arbitration by a sole arbitrator selected by the Parties in accordance with the then current Commercial Arbitration Rules of the American Arbitration Association ("AAA") in effect at the time, in San Francisco, California. Any award shall be final and binding and judgment thereon may be entered in any court of competent jurisdiction.

12.3. Each Party shall bear its own expenses and an equal share of the expenses of the mediator or arbitrator and the fees of the AAA. The Parties, their representatives, other participants and the mediator or arbitrator shall hold the existence, content and result of the dispute resolution process in confidence. Subject to other provisions of this Agreement, if a dispute is not resolved by arbitration, the Parties shall have the right to resort to any remedies permitted by law. All defenses based on passage of time shall be tolled pending the termination of arbitration. Nothing in this paragraph will be construed to preclude either Party from seeking injunctive relief in order to protect its rights pending an outcome in arbitration. A request by a party to a court for such injunctive relief shall not be deemed a waiver of the obligation to mediate.

13. **Term; Termination.**

13.1. <u>Term</u>. This Agreement shall take effect on the Effective Date and shall remain in effect for the Initial Term set forth above unless terminated as permitted herein. Thereafter, this Agreement shall automatically renew for successive one (1) year terms (each a "**Renewal Term**") unless and until terminated as permitted herein. The Initial Term and any Renewal Term(s) shall collectively be the "Term." The term of each Scope of Work shall commence as of the SOW Effective Date and remain in effect for the period specified therein, unless and until terminated as permitted herein. Upon termination or expiration of this Agreement, Customer will cease all use of the Deel Platform.

Doc ID: 8f28b6902ce7255d833fae5e97dc769ae4c6bbd8

13.2.  <u>Termination</u>.

13.2.1.  Either Party may terminate this Agreement by giving not less than thirty (30) days prior written notice to the other Party or as provided for below. In the event of termination, this Agreement will continue to govern the Parties' rights and obligations with respect to services performed prior to termination and any rights and obligations which survive the termination of the Agreement.

13.2.2.  In the event of termination of this Agreement pursuant to 13.2.1 above, the services being provided by Consultant under and pursuant to any Scope of Work will continue to be performed and payment in respect of them to be due in accordance with the termination provisions contained in such Scope of Work or until the expiration of the term of such Scope of Work.

13.2.3.  Notwithstanding Section 13.2.2, Customer may request of Deel Group to terminate the services being provided by Consultant under and pursuant to any Scope of Work provided that Customer has and will comply with the obligations imposed on it under Section 7. Deel Group will take all reasonable steps necessary to allow the termination to be effective at the earliest possible date without being in breach of any relevant laws, regulations or agreements and in respect with the relevant applicable law to limit exposure to potential lawsuit and related risk. On such effective termination date, Customer shall have no liability to make any further payment to Deel Group other than in respect of amounts accrued, due or relating to any period prior to such effective termination date and any statutory requirements or regulations including, but not limited to, pay-in-lieu of notice or vacation, termination indemnity and their related direct or indirect costs and fees.

13.2.4.  Deel Group is entitled to terminate this Agreement or any Scope of Work with immediate effect upon the happening of any of the following occurrences:

13.2.4.1.  if, having failed to pay one or more invoices by the due date and having been served notice by Deel Group to do so within eight (8) business days, Customer has failed to pay all the amounts due, together with interest, within eight (8) business days of receiving such notice; or

13.2.4.2.  if Customer is in breach of a material term of this Agreement, including in particular any of the obligations contained in Section 7, and having been served notice by Deel Group to remedy any such breach, the Customer fails to do so within eight (8) days of receiving such notice.

13.2.5.  In the event of such termination of this Agreement pursuant to Section 13.2.4 above and without waiver of its rights to claim damages or an indemnity for any losses suffered by it, Deel Group may immediately terminate the services being provided by Consultant under and pursuant to any Scope of Work or elect to have the Deel Services provided under and pursuant to it to continue to be performed until the date provided for in such Scope of Work.

13.2.6.  Customer may terminate this Agreement if Deel Group is in breach of a material term of this Agreement, including in particular any of the obligations contained in Section 6 and having been served notice by Customer to remedy any such breach, Deel Group fails to do so within thirty (30) days of receiving such notice. In such case, Customer may

Doc ID: 8f28b6902ce7255d833fae5e97dc769ae4c6bbd8

terminate the services being provided by Consultant under and pursuant to any Scope of Work, provided that it has complied and will comply with the obligations contained in Section 7 above or elect to have the services provided under and pursuant to it to continue to be performed until the date provided for in such Scope of Work.

13.2.7. A Party has the right to immediately terminate this Agreement in the event that the other Party (a) defaults in the performance of any of its material duties or obligations under this Agreement and the default is not cured within fourteen (14) days after written notice is given to the defaulting Party specifying the default; or (b) becomes insolvent, makes a general assignment for the benefit of creditors, is subject to or permits the appointment of a receiver for its business or assets or avails itself of or becomes subject to any proceeding under the Federal Bankruptcy Code or any other federal, state or foreign statute relating to insolvency or protection of creditors, and the proceeding is not discharged within ninety (90) days after filing.

13.2.8. Customer acknowledges that Deel Group reserves the right to terminate this Agreement or any Scope of Work in circumstances whereby the Deel Services and/or Deel Platform may be used other than as intended as reasonably determined by Deel Group, or whereby Customer's usage adversely affect or interfere with the operation of the product or service, or the use of the product or service by others.

13.2.9. Notwithstanding the foregoing, either party may terminate any Scope of Work in accordance with the applicable terms and conditions set forth therein.

13.3.   Survival. The termination or expiration of this Agreement will not discharge or relieve either Party of any obligations that are intended to survive the termination of this Agreement, including but not limited to Sections 4, 5, 8 and 9 through 14.

## 14. General.

14.1.   Relationship. The Parties are and will remain independent contractors. Nothing herein will be deemed to establish a partnership, joint venture or agency relationship between the Parties. Neither Party will have the right to obligate or bind the other Party in any manner to any third party. Without limiting the foregoing, neither party shall make any representations or warranties to third parties on behalf of the other Party hereto. The Parties agree to deal with each other fairly and in good faith and to perform all acts reasonably required to carry out the intent of this Agreement.

14.2.   Assignment. Customer will not assign its rights and duties under this Agreement to another (including an affiliate) without the prior written consent of Deel Group. Any purported assignment in violation of this Section 14.2 will be void and of no effect. No assignment will relieve Customer of its previously accrued obligations under this Agreement. This Agreement will be binding upon and inure to Customer's permitted successors and assigns.

14.3.   Notices. Any notice required or desired to be given to a Party will be given in writing and addressed to such Party at its principal places of business, or to such other address as the Party may hereafter designate in writing, and will be sufficiently given by actual delivery thereof to the Party, or by electronic mail or registered mail, postage prepaid, return receipt requested, addressed to the Party as aforesaid, and the date of delivery, mailing or electronic mail will be the date of the giving of such notice. This clause does not apply to the service of any

Doc ID: 8f28b6902ce7255d833fae5e97dc769ae4c6bbd8

proceedings or any documents in any legal action or, where applicable, any arbitration or other method of dispute resolution.

14.4. <u>Compliance with Laws</u>. Each Party will comply with the applicable state, federal and local laws, executive orders and regulations in the performance of its obligations under this Agreement, including but not limited to export control laws and regulations. Each Party certifies that it has full capacity to enter into and perform its obligations under this Agreement. Each Party certifies that there are no actions, suits or proceedings or regulatory investigations pending or affecting that might affect its ability to meet and carry out its obligations under this Agreement. Both Parties acknowledge that they comply with all health and safety, security (including information security policies), privacy, and other policies, procedures and requirements for all settings where Deel Group shall provide Deel Services under this Agreement.

14.5. <u>Construction</u>. The headings and captions appearing in this Agreement have been inserted for the purposes of convenience and ready reference only and do not purport to and will not be deemed to define, limit or extend the scope or intent of the provisions to which they appertain. Where the context so admits, words and expressions appearing in the singular in this Agreement may be interpreted in the plural, and vice versa. Words having well known technical or trade meanings shall be so construed.

14.6. <u>Entire Agreement; Modification</u>. This Agreement, including its attached Exhibits, constitutes the entire agreement between the Parties and supersedes all prior agreements and understandings between them, whether written or oral, between them relating to the subject matter of this Agreement. No modification, amendment of or other change in this Agreement will be binding on either Party unless it is in writing and signed by authorized representatives of both Parties.

14.7. <u>Waiver</u>. No waiver of any provision of this Agreement will be effective unless made in writing and signed by the waiving Party, nor will any such waiver, if made, constitute a waiver of any subsequent breach of the same or of any other provision of this Agreement. The failure of either Party at any time to enforce any right or remedy available to it under this Agreement or otherwise with respect to any breach or failure by the other Party shall not be construed to be a waiver of such right or remedy with respect to any other breach or failure by the other Party.

14.8. <u>Force Majeure</u>. Neither party shall have no liability, including as set forth in this Section, for non-performance or interruption of the Deel Services (including delays on the part of Deel Group in making deliveries hereunder), due to a Force Majeure even that occurs beyond Deel Group's control. 'Force Majeure Event' means any act beyond a party's reasonable control, including without limitation any of the following: (i) flood, fire, earthquake, or explosion; (ii) epidemic, pandemic, or other health emergency, (iii) war, invasion, hostilities (whether war is declared or not), terrorist threats or acts, riot, or other civil unrest; (iv) government order or law; (v) actions, embargoes, or blockades in effect on or after the date of this Agreement; and (vi) action by any governmental authority. Unless the performance by Deel Group of its obligations under this Agreement is delayed by the occurrence of an Event of Force Majeure for a period of more than one (1) year (and such delay is excused under the foregoing provisions), no Event of Force Majeure shall excuse permanent nonperformance, but shall excuse only delays in performance and only to the extent that such delays are directly attributable to such cause. Should any Event of Force Majeure delay performance for a period of more than one (1) year, either Party may terminate and rescind this Agreement upon notice to the other Party.

Doc ID: 8f28b6902ce7255d833fae5e97dc769dae4c6bbd8

14.9.  <u>Governing Law</u>. This Agreement will be construed in accordance with and governed by the substantive laws of the State of California. The Parties hereby agree that the United Nations Convention on Contracts for the International Sale of Goods will not apply to this Agreement.

14.10.  <u>Relationship Between Parties</u>. Relationship between Customer and Deel Group shall be that of an independent contractor, and nothing in this Agreement is intended to nor shall be constructed as creating a partnership, joint venture, agency, or employment relationship.

14.11.  <u>Publicity</u>. Except as set forth herein, without the other Party's prior written consent in each instance, neither Party will (a) make any other public statements or issue any press releases regarding this Agreement or the relationship between the Parties; (b) disclose or publish the terms and conditions of this Agreement; or (c) use the other Party's name, logo or trademarks.

14.12.  <u>Severability</u>. If any provision of this Agreement is held invalid or unenforceable under any applicable law, such invalidity or unenforceability will not affect any other provision of this Agreement that can be given effect without the invalid or unenforceable provision, and this Agreement will be construed as if said invalid or unenforceable provision had not been contained herein.

14.13.  <u>Remedies Cumulative</u>. The rights and remedies of the Parties under this Agreement will be cumulative and in addition to all other rights and remedies available at law and in equity.

14.14.  <u>Counterparts; Electronic Signatures</u>. This Agreement may be executed in multiple counterparts, each of which will be deemed to be an original, and all such counterparts will constitute but one instrument. An electronic signature or a scan of an original signature or digitally signed version transmitted to the other Party is effective as if the original was sent to the other Party.

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the Effective Date.

**DEEL INC.**

By: Aleo Bouaziz
Name: Alexandre Bouaziz
Title: CEO
Date: 03 / 30 / 2022

**CUSTOMER**

By: Kwon
Name: Do Kwon
Title: Ceo
Date: 03 / 30 / 2022

Doc ID: 8f28b6902ce7255d833fae5e97dc769ae4c6bbd8

 **HELLOSIGN**

Audit Trail

| | |
|---|---|
| **TITLE** | Terra + Deel MSA |
| **FILE NAME** | Deel- Terraform L...24Mar22 .docx.pdf |
| **DOCUMENT ID** | 8f28b6902ce7255d833fae5e97dc769ae4c6bbd8 |
| **AUDIT TRAIL DATE FORMAT** | MM / DD / YYYY |
| **STATUS** | • Signed |

Document History

| | | |
|---|---|---|
| SENT | **03 / 30 / 2022** 02:03:04 UTC | Sent for signature to Do Kwon (do@terra.money) and Alexandre Bouaziz (eor-onboarding@letsdeel.com) from eor-onboarding@letsdeel.com IP: 207.237.112.251 |
| VIEWED | **03 / 30 / 2022** 08:30:27 UTC | Viewed by Do Kwon (do@terra.money) IP: 223.62.202.118 |
| SIGNED | **03 / 30 / 2022** 08:32:17 UTC | Signed by Do Kwon (do@terra.money) IP: 223.62.202.118 |
| VIEWED | **03 / 30 / 2022** 09:15:58 UTC | Viewed by Alexandre Bouaziz (eor-onboarding@letsdeel.com) IP: 178.148.29.14 |
| SIGNED | **03 / 30 / 2022** 09:17:16 UTC | Signed by Alexandre Bouaziz (eor-onboarding@letsdeel.com) IP: 178.148.29.14 |
| COMPLETED | **03 / 30 / 2022** 09:17:16 UTC | The document has been completed. |

Powered by **HELLOSIGN**

# EXHIBIT 2

**REDACTED**

# EXHIBIT 3

K. br. 242/23

[stamp: THE DECISION IS FINAL
BASIC COURT IN PODGORICA
On November 6, 2023
Authorized officer of the court
[signature]]

[stamp: THE DECISION IS
EXECUTIVE
BASIC COURT IN PODGORICA
On November 22, 2023
Authorized officer of the court
[signature]]

[stamp: Montenegro
Basic Court
8
Podgorica]



ON BEHALF OF MONTENEGRO

[stamp: Montenegro
Basic Court
8
Podgorica]

The Basic Court in Podgorica, judge Ivana Bećić, with the participation of the independent clerk Anđela Mitrović, as recorder, in the criminal case against the accused Chang Joon Han and Kwon Do Hyeong, for the criminal offense of document forgery from Art. 412 para. 2 in conection with point 1 of the Criminal Code of Montenegro, after the public main hearing held on June 16, 2023, in the presence of the prosecution representative Haris Šabotić, the state prosecutor at the Basic State Prosecutor's Office in Podgorica, the accused, defense attorneys, and an English language interpreter, on June 19, 2023, reached and publicly announced a

VERDICT

that the accused:

1. CHANG JOON HAN, born to father Sae Myung and mother Suk Hee, maiden name Choi, born on ███ 1986 in Seoul, South Korea, residing in Singapore, at the address 29 Keppel Bayview, employed as a business development manager, unfamiliar with the Montenegrin language, with Korean as his native language, married, father of two minor children, graduated from the University of Pennsylvania's School of Economics, of moderate financial status, in custody based on the decision of the investigating judge of the Basic Court in Podgorica Kri. br. 195/23 dated March 24, 2023, which is effective from March 23, 2023, from 4:50 p.m., as the day and time of deprivation of liberty,

2. KWON DO HYEONG, born to father Jaehwan and mother Myeong Ja, maiden name Park, born on ███████ 1991 in Seoul - South Korea, living in Singapore, at the address 8 Ardmore Park 19-01, employed as a software engineer, unfamiliar with the Montenegrin language, with Korean as his native language, married, father of one minor child, with a completed high school in computer science, of moderate financial status, in custody based on the decision of the investigating judge of the Basic Court in Podgorica Kri. No. 195/23 of March 24, 2023, which is effective from March 23, 2023 from 4:50 p.m., as the day and hour of deprivation of liberty,

Are guilty

Because they:

On March 23, 2023, at 08:59 a.m., at border crossing II Podgorica Airport, aware of the act they wanted to commit and knowing that their act was prohibited, used false public documents with the intention of using them as real ones, namely the accused Chang Joan Han, Costa Rican passport number ███████ , and the accused Kwon Do Hyeong Costa Rican passport number ███████ , as they were given to an authorized officer of the Police Administration - Border Police Station II Podgorica Airport, during passport control of passengers on flight number ALE45X of the airline company "Alliance Jet" operated by Fly Star at the VIP passage on the Podgorica route - Dubai handed over the marked documents, and acquired them for use, namely the accused Chang Joon Han's passport ███████ and the identity card number ███████ which read in the name "Wang Thomas", allegedly issued by the competent state authority of Belgium, and the accused Kwon Do Hyeong passport ███████ and identity card number ███████ in the name "Nguyen Frederic", also allegedly issued by the competent state authority of Belgium

- Thereby, they committed the criminal offense of document forgery under Art. 412 para. 2, in conjunction with para. 1 of the Criminal Code of Montenegro.

The court based on Art. 4 para. 2, Art. 32, Art. 36, Art. 42 para. 1 and Art. 51 para. 1 of the Criminal Code of Montenegro, and Art. 226, Art. 229 and Art. 374 of the Criminal Procedure Code,

CONVICTS

the accused to a prison sentence of 4 (four) months, and the time spent in custody from March 23, 2023, from 4:50 p.m., to June 15, 2023, from 2:35 p.m., is credited towards their sentence.

Based on Art. 66, 67, and 75 of the Criminal Code of Montenegro, the following is imposed on the accused:

SAFETY MEASURE
CONFISCATION OF ITEMS

False public documents are confiscated from the accused, namely from the accused Chang Joon Han, the Costa Rican passport number ███████, the passport ███████ and the identity card number ███████ in the name of "Wang Thomas", allegedly issued by the competent state authority of Belgium, and from the accused Kwon Do Hyeong, the Costa Rican passport number ███████ as well as passport ███████ and identity card number ███████ in the name "Nguyen Frederic", also allegedly issued by the competent state authority of Belgium, as items used in the commission of the crime.

The accused are obligated to pay the sum of 100.00 euros each, as a lump-sum court fee for the criminal proceedings, to the budget of Montenegro, within 15 days of the finality of the judgment, under the threat of enforcement.

Reasoning

By the indictment proposal of the Basic Public Prosecutor's Office in Podgorica, Kt. br. 408/23 dated April 20, 2023, the accused were charged with the criminal offense of document forgery under Art. 412 para. 2, in conjunction with para. 1 of the Criminal Code of Montenegro. The prosecution representative, in the closing statement, adhered to the submitted indictment proposal, stating that the accusation is based on the fact that the passport identification numbers used by the accused on this occasion belong to other individuals, namely, they were issued to Costa Rican citizens. On the other hand, these documents were not issued by the competent authorities of Costa Rica, and the accused are not registered in the civil records of the Republic of Costa Rica. Regarding the part of the factual description related to passports and identity cards allegedly issued by the competent authorities of Belgium, evidence presented during the main hearing and the findings of the graphological expert examination in the proceedings have established that they are not reliable and authentic, wherein the intent of the accused to use them primarily stems from the fact that these documents were found in the hand luggage of the accused. Regarding the defense's claims that the accused had no reason to doubt the authenticity of the documents because they obtained them through a certain agency whose name they do not know, it is considered unfounded, since it is completely illogical that when documents are issued in other names, any average citizen, including the accused, would not pay attention to it. In light of the above, the prosecutor proposed to the court to find the accused guilty and convict them according to the law.

The accused Chang Joon Han, in the defense given during the investigation, stated that it is a valid passport of Costa Rica, and that he has not used, nor planned to use, this passport in Montenegro, and he also mentioned that he believes his South Korean passport may have expired, and he would like the validity of the

Costa Rican passport to be verified. During the main hearing on May 11, 2023, he stated that when it comes to the passport issued by the competent authority of Costa Rica, it was issued based on legal procedures. However, on the main hearing on June 16, 2023, providing additional statements on the evidence already presented at the previous hearing, he mentioned differently, stating that the documents in question were obtained through a specific agency in Singapore, and he only filled out forms, while the accused Kwon Do Hyeong handed them in. His defense was different because he was not informed about the Interpol documents since his previous defense attorney did not provide them for inspection, and he became aware of the details only after engaging another defense attorney who explained in detail the nature of the document. He emphasized that there was no reason to doubt the issuance procedure of documents by the agency since economic citizenship programs are not unknown here. Bearing in mind that the accused Kwon Do Hyeong is his friend, he believed that he himself believed in the legality of the procedure carried out by the agency, and for these reasons there was no room for them to doubt the authenticity of these documents. He does not know the name of the agency through which they regulated the documents in question, as he handed over all the documentation through the accused Kwon. In his closing statement, he aligned with the closing statement of his defense attorney.

The accused Kwon Do Hyeong stated in his defense during the investigation that it is a valid passport of Costa Rica and that he never had the intention to use his Belgian passport, and his Korean passport was invalidated. At the main hearing, dated May 11, 2023, he stated that the accused Chang Joon Han and himself did not forge passports issued by the competent authorities of Costa Rica, and he emphasized that the only valid proof to verify these travel documents is to obtain information from the competent authorities of Costa Rica. On the main hearing, dated June 16, 2023, providing additional statements on the evidence already presented at the previous hearing, he stated differently, indicating that he did not have access to documents related to the authenticity of the mentioned travel documents, which were provided by Interpol-Europol-Sirene. He mentioned that his previous defense attorney informed him that there was only some communication between police authorities, and if he had seen these documents, his defense would have been different. He respects the findings and opinions stated in the Interpol documents, stating that he obtained these travel documents through a specialized agency in Singapore dealing with the procedure of obtaining citizenship and travel documents. This is not an unfamiliar practice in many countries worldwide, and he had no reason to doubt the issued documents. Moreover, the concept of economic citizenship is known in Montenegro as well. Such agencies exist in Granada, Portugal, and Dubai, where their work is related to shortening the time of the procedure for obtaining citizenship and travel documents. The procedure takes approximately 2-3 months, during which he mentioned that, for example, investing in Montenegro in construction projects worth around 250.000,00 euros is a requirement for acquiring economic citizenship. For the aforementioned reasons, he applied to that one agency and did it personally, stating that the accused Chang Joon Han also received the documents found in his possession through the same procedure, and through him, and that for the aforementioned reasons he had no reason to suspect their authenticity. Additionally, it would be illogical for someone globally known to travel with a passport in their name on a private plane and arrive in Podgorica, which would be equivalent to suicide. He pointed out that the accused Chang Joon Han had no connection to the procedure through which the relevant documents were obtained. If the court still finds him guilty of the alleged crime, he should be the only one to bear the punishment. He explained that in the mentioned passports, which read as if they were issued by the competent authorities of Belgium, not only the wrong name and surname were stated, but also the date of birth, and that when they took over the relevant travel documents and identity cards, they did not pay attention to the information contained in them, since that they did not suspect that such a mistake could occur. They noticed it only a few days later, which is why they did not use those passports. If they had wanted to commit fraud, they would not have used passports in their own names. When they asked the agency that issued them why this happened, they were told it was a mistake. That's why they requested a correction for the Belgian passports, but it was not provided. At the time they approached this agency for Belgian passports,

they had already submitted a proposal for a Grenada passport, which was rejected, as well as a proposal for a Costa Rican passport, which was approved, for which reasen, they built a trusting relationship with this agency. In his closing statement, he aligned with the closing statement of his defense attorney.

The defense attorney for the accused, lawyer Goran Rodić, stated in the closing statement that his clients, during two instances with the prosecutor – first during the initial interrogation and then in a supplementary interrogation conducted at their request – presented their defense by asserting that their Costa Rican passports are legitimate, insisting on obtaining information from the competent authorities of Costa Rica regarding the validity of the documents confiscated from them upon their arrest at Podgorica Airport. The persistent efforts of his clients, who have a qualified defense attorney in this proceeding, indicate a serious and firm conviction on their part that they are dealing with valid travel documents containing their names, and that, in attempting to leave Montenegro with these travel documents, they do not perceive anything illegal. The accused are foreigners in a foreign country, this is not their native language, and they are in conditions of detention in Spuž that are incomprehensible to them, isolated from the rest of the world, with limited communication and other resources, therefore, they certainly did not aim to delay the criminal proceedings by proposing a verification of the regularity of their documents. He also mentioned that he, together with lawyer Marija Radulović, inspected and copied the complete case files, after which they, during their visit to the accused, presented Interpol's reports. Both accused told them that they were not familiar with those reports, nor had they read them, regarding which they explained to the court that their previous defense attorney had informed them about the Interpol data, stating that there was a CD with extensive documentation of police communication in the case of collaboration with Interpol. Therefore, he clarified to the accused that they could mention this before the court without any obstacles, which they did, unlike the previous defense, they responded to the court's and parties' questions in this proceeding. As the accused emphasized, it is a well-known fact that there are various ways to acquire citizenship and travel documents. It is known that in Montenegro, there is the possibility of obtaining a passport based on economic citizenship related investment amounts. It is also widely recognized that many foreign citizens have acquired Montenegrin citizenship and a passport through this program without going through the counters of the Ministry of Internal Affairs of Montenegro, because qualified and relevant agencies chosen by the state perform this procedure in its interests. It is also known that people believed to be wealthy are always targeted by various hunters and become the subject of fraud, and he believes that this is the case with his clients in the situation involving the Singaporean agency that conducted the mentioned procedures. It is evident that his clients were not aware or conscious that they were using false documents at the official border crossing when attempting to exit Montenegro, which is confirmed by the fact that they did not encounter any issues during their travels, including entering Montenegro or traveling through other countries they visited. In this case, the court should consider that these individuals have no criminal record, no involvement in criminal activities, are highly educated, successful in their professions, family-oriented, and fathers of minor children, which taken into account supports their defense regarding the lack of awareness on their part that they were using a false and public document in this specific case. Due to the absence of this element of the criminal offense, he proposed that the court rejects the charges against them.

The court, in the evidentiary procedure, read the letter from the Police Administration, Division for International Operational Police Cooperation Interpol-Europol-Sirene 51/7 No. 51/7-34-143 dated March 23, 2023, the letter from the Police Administration, Division for International Operational Police Cooperation Interpol-Europol-Sirene 51/7 No. 51/7-34-144 dated March 23, 2023, the official note from the Police Administration, Border Police Sector, Regional Center of the Border Police "Centar" Border Police Station II Podgorica Airport No. 352/23 dated March 23, 2023, confirmation of temporarily confiscated items from the Police Administration, Border Police Sector II No. 352/1/23 dated March 23, 2023, confirmation of temporarily confiscated items from the Police Administration, Border Police Sector II No. 352/2/23 dated March 23, 2023, confirmation of temporary confiscation

of items of the Police Administration, Department of Security Podgorica, Criminal Police Station for the Suppression of Economic Crime, no. 73/10 dated March 23, 2023 issued in the name of Chang Joon Han, confirmation of temporarily confiscated items from the Police Administration, Security Department Podgorica Police Station for the Suppression of Economic Crime No. 73/10 dated March 23, 2023 issued in the name of Kwon Do Hyeong, letter from the Police Administration, Security Department Podgorica Police Station for Search and Requests No. 73/7-215/29-8961/1 dated March 27, 2023, letter from the Police Administration, Sector for the Fight Against Crime, Division for International Operational Police Cooperation Interpol-Europol-Sirene telegram No. 51/7-63-145 dated March 23, 2023, letter from the Police Administration, Security Department Podgorica Police Station for the Suppression of Economic Crime No. 73/10-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/2 dated March 27, 2023, letter from the Police Administration, Sector for the Fight Against Crime 5117 No. 215/23-21959/1 dated April 4, 2023 with a CD of correspondence between NCB Interpol Podgorica and NCB Interpol of Costa Rica and Belgium, a letter from the Department for Document Security of the National Central Bureau, extracted from the CD delivered by the Police Department of Montenegro, Anti-Crime Sector, with a translation from English to Montenegrin from the court interpreter Selman Adžović, who read 3 pages of NCB Interpol Podgorica and NCB Interpol San Jose - Costa Rica correspondence taken from the CD delivered by the Police Department of Montenegro, Anti-Crime Sector, with translation from Spanish to Montenegrin language by court interpreter Ana Čanović, report on the graphological expertise of the Forensic Center Danilovgrad no. 1186/23-1 dated June 9, 2023, and inspected the passport of the Republic of Costa Rica number ▮▮▮▮▮ the passport of Costa Rica number ▮▮▮▮▮, the passport ▮▮▮▮▮ and the identity card number ▮▮▮▮▮, allegedly issued by the competent state authority of Belgium, issued in the name of "Wang Thomas", and the passport ▮▮▮▮▮ and identity card number ▮▮▮▮▮ in the name "Nguyen Frederic", also allegedly issued by the competent state authority of Belgium.

From the letter of the Police Administration, Division for International Operational Police Cooperation Interpol-Europol-Sirene 51/7 No. 51/7-34-143 dated March 23, 2023, made on the occasion of the deprivation of liberty of the accused Han Chang Joon, it follows that an international warrant was issued against him by NCB Interpol Seoul, based on the arrest warrant of the South Seoul District Court, no. 202214592 dated September 13, 2022, for the purpose of conducting criminal proceedings, on suspicion of committing the criminal offense of severe penalties for a specific criminal offense against property (fraud), prohibition of unfair trading under Art. 3 of the Law on Severe Punishment of Certain Criminal Offenses in the Field of Economic Crime and Art. 178 of the Law on Financial Investment Services and Capital Market. A review of the passport issued in the name of the accused Han Chang Joon, carried out through NCB Interpol San Jose, shows that it does not appear in their data on national residence, and that the identification number ▮▮▮▮▮ belongs to another person, as well as that the document is not registered in their country.

From the letter of the Police Administration, Division for International Operational Police Cooperation Interpol-Europol-Sirene 51/7 No. 51/7-34-144 dated March 23, 2023, made on the occasion of the deprivation of liberty of the accused Kwon Do Hyeong, follows that an international warrant was issued against him by NCB Interpol Seoul, based on the arrest warrant of the Southern District Court in Seoul, no. 202214591 dated September 13, 2022, for the purpose of conducting criminal proceedings due to suspicion of committing a criminal offense of severe penalties for a specific property offense (fraud), prohibition of unfair trade under Art. 3 of the Law on severe penalties for certain criminal offenses in the field of economy and Art. 178 of the Law on financial investment services and capital market. A review of the passport issued in the name of the accused Kwon Do Hyeong, carried out through NCB Interpol San Jose, shows that it does not appear in their data on national residence, and that the identification number ▮▮▮▮▮ belongs to another person, as well as that the document is not registered in their country.

From the official note of the Police Directorate of the Border Police Sector of the Regional Center of the Border Police "Centar" Border Police Station II Podgorica Airport number 352/23 dated

March 23, 2023, it follows that on March 23, 2023, at 08:59, at the border crossing "Aerodrom Podgorica" on flight number ALE45X of the airline company "Alliance operator Fly Star" (general aviation) at the VIP passage on the line Podgorica - Dubai, the accused Kwon Do Hyeong, holder of the Costa Rican travel document number ██████, valid until March 9, 2028, and the accused Han Chang Joon, holder of Costa Rica travel document number ██████, approached the border check of passengers. Upon entering their data into the electronic records of crossing the state border, the measure "FIND" with the measure "arrest" issued by NCB Interpol Seoul, South Korea, appeared for them. After that, NCB Interpol Podgorica carried out an additional check of the warrant in question, and it was determined that in relation to the accused Kwon Do Hyeong, a warrant was issued on September 20, 2022, and in relation to the accused Han Chang Joon, a warrant issued on September 26, 2022, and that the same is claimed for the criminal offense of criminal association. A conversation was conducted with the mentioned individuals during which they stated that they entered Montenegro from Serbia two weeks ago at one of the border crossings and stayed in Petrovac, renting a villa. An examination of the hand luggage of the accused Kwon Do Hyeong found Korean travel documents number ██████ in the name of Kwon Do Hyeong, as well as Belgian travel documents number ██████ and Belgian identity card number ██████ in the name of Nguyen Frederic, while in the hand luggage there are the faces of Han Chang Joon was found to have Korean travel documents number ██████ in the name of Han Chang Joon, as well as Belgian travel documents number ██████ and Belgian identity card number ██████ in the name of Wang Thomas.

From the letter of the Police Administration Department for Security Podgorica Station of the Criminal Police for Search and Requests No. 73/7-215/29-8961/1 dated March 27, 2023, it follows that the officials of the criminal police station for investigative activities and the interrogation center OB Podgorica were informed by the NCB Interpol Seoul that the checks of the delivered fingerprint material seized by the accused had been carried out, and it was determined that the persons in question were Kwon Do Heyong, born on ██████ 1991 and Han Chang Joon, born on ██████ 1986, as well as that the travel documents in question, issued by the competent authorities of the Republic of South Korea, are authentic, but have been declared invalid. NCB Interpol San Jose was informed that the accused Kwon Do Heyong and Han Chang Joan were not registered in the civil records of Costa Rica, and that travel documents number ██████ and ██████ were not issued by the competent authorities of Costa Rica. Additionally, NCB Interpol Brussels notified that the identity cards with numbers ██████ and ██████ as well as travel documents with numbers ██████ and ██████, were not issued by the competent authorities of the Kingdom of Belgium, and the accused are not registered in the civil and police records of the Kingdom of Belgium.

From the confirmation of temporarily confiscated items by the Police Administration Border Police Sector No. 352/2/23 dated March 23, 2023, it follows that the accused Han Chang Joon's Costa Rican travel document number ██████, Korean travel document number ██████ in the name of Han Chang Joon, Belgian travel document number ██████ in the name of Wang Thomas, Belgian identity card number ██████ in the name of Wang Thomas, as well as a Patek Philippe wristwatch with serial number A3840AP, were confiscated.

From the confirmation of temporarily confiscated items by the Police Administration Border Police Sector No. 352/1/23 dated March 23, 2023, it follows that the Costa Rican passport number ██████ in the name of Kwon Do Hyeong, Korean passport number ██████ in the name of Kwon Do Hyeong, Belgian passport number ██████ in the name of Nguyen Frederic and Belgian identity card number ██████ in the name of Nguyen Frederic were temporarily confiscated from the accused Kwon Do Hyeong.

From the confirmation on temporarily confiscated items of the Police Administration, Security Department, Podgorica, Criminal Police Station, number 73/10 dated March 23, 2023, it follows that a laptop brand LG - Gram, gray color, serial number 002NZSJ006734, a laptop brand LG - Gram, black color, model 14T90P, serial number 109QCXM558978, a mobile phone brand

Iphone, white color with a silver frame, with three cameras, and a mobile phone of the brand "iPhone XS", black color, have been temporarily confiscated from the accused Chang Joan Han.

From the confirmation of temporarily confiscated items by the Police Administration, Department of Security Podgorica, Criminal Police Department for the Suppression of Economic Crime, nr. 73/10 dated March 23, 2023, it follows that a Macbook PRO laptop, dark blue color, serial number C02FR1AKQ05R, an"Iphone" mobile phone, white color with gold edges and a white plasticized mask, with three cameras, an "Iphone" mobile phone, blue with two cameras and a mobile phone of the brand "Iphone", black with one camera, were confiscated from the accused Kwon Do Hyeong.

According to the letter from the Police Administration, Sector for the Fight Against Crime, Division for International Operational Police Cooperation Interpol, telegram number 51/7-63-145 dated March 23, 2023, it is revealed that, after checks via NCB Interpol Brussels, the aforementioned authority informed that the identity cards with numbers ███████ and ███████, and travel documents with numbers ███████ and ███████, were not issued by the competent authorities of the Kingdom of Belgium. Also, the names of the accused and their travel documents issued by the Republic of South Korea are not registered in the civil and police records of the Kingdom of Belgium.

From the letter of the Police Administration, Department of Security Podgorica, Criminal Police Station for the Suppression of Economic Crime, no. 73/10-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/2 dated March 27, 2023, it follows that a Telegram of the Department for International Operational Police Cooperation Interpol-Europol-Sirene No. 57/7-63-153 dated March 24, 2023, is delivered, in connection with the checks related to determining the identity of the accused, with the content as in the act of the Police Administration, Security Department, Podgorica, Criminal Police Station for investigative activity and request letter number 73/7-215/29-8961/1 dated March 27, 2023.

From the letter of the Police Administration, Sector for the Fight Against Crime, number 51/7, document 215/23-21959/1 dated April 4, 2023, with the CD of correspondence from NCB Interpol Podgorica to NCB Interpol Costa Rica and Belgium, it is evident that after reviewing the internal records of the Division for International Operational Police Cooperation Interpol-Europol-Sirene, communication between the mentioned competent authorities has been identified. Namely, from the aforementioned act it essentially follows that on March 23, 2023, officials of the Department for International Operational Police Cooperation Interpol-Europol-Sirene, in the capacity of NCB Interpol Podgorica, and after previous internal communication, sent an urgent communication to NCB Interpol San Jose, number 51/7-44-3961/2023/9, which the requested verification of the authenticity of the travel document of the Republic of Costa Rica number ███████ issued to the person Kwon Do Heyong, as well as the urgent communication number 51/7-34-3962/2023/1 which requested the verification of the authenticity of the travel document of the Republic of Costa Rica number ███████, issued to the person Han Chang Joon. Regarding these requests, on March 23, 2023, the Division for International Operational Police Cooperation Interpol-Europol-Sirene received responses from NCB Interpol San Jose (with marked communication channels), informing them that the provided travel documents of the Republic of Costa Rica were not issued by the competent authorities of that state and that the named individuals are not registered in the civil records of the Republic of Costa Rica. Also, from NCB Interpol Brussels (with marked communication channels), they were informed that there are no travel documents of the Kingdom of Belgium with the numbers ███████ and ███████, nor personal documents of the Kingdom of Belgium with the numbers ███████ and ███████. Additionally, the named individuals are not registered in their police and civil records. Also, on March 23, 2023, a request for the submission of copies of travel documents of the Republic of Costa Rica was sent by NCB Interpol San Jose, and this request was fulfilled on the same day. On March 24, 2023, information was provided stating that through verifications, it was determined that the data on the submitted copies do not correspond to the actual travel documents. It was also noted that the serial numbers on the documents, marked with "S", belong to other individuals, namely two foreign nationals naturalized in the Republic of Costa Rica. However, these individuals were issued travel documents different from those whose copies were submitted.

From the letter of the Document Security Division of the National Central Bureau, extracted from the CD provided by the Police Administration of Montenegro, Sector for the Fight Against Crime, with translation from English to Montenegrin by the court interpreter Selman Adžović, it is evident that a brief technical visual analysis is submitted regarding the Belgian passports and identity cards of the accused Han Chang Joon and Kwon Do Heyong. In the accompanying letter, it was pointed out that this authority, since it is not in possession of the suspicious documents in question, is not in a position to do a certified/official analysis, for which reason the report can be considered informative, but that they can confirm that they have found some clear irregularities in relation to four attached documents. Specifically, concerning the provided photographs of two suspicious Belgian passports under the names "Thomas Wang" and "Frederic Nguyen", a search of the passport numbers in the Interpol databases yielded a negative result. Based on the provided photographs of both marked passports and their comparison with an authentic Belgian passport, the main visually detected issue relates to the front part of the document used for variable data. In addition to the fact that the main photography of the holder does not seem to be integrated in the same manner as in the authentic document, the initial irregularities discovered concern the ISO code "BEL" in the "country of issue" section, as well as the passport number composed of two letters followed by six digits. It is indicated that the font used is different from that on the authentic document, at least when it comes to the letter "E". In the "name" section, a different font is used compared to the authentic one, especially noticeable with the letters "M" and "A". In the "nationality" section, once again, the letter "E" differs from that on the original document. In the "date of birth" section, the digits "1" and "9" clearly differ from those used on the authentic document, and in the "place of birth" section, the use of the font for the letters "R", "E", and "S" on the suspicious document is not the same as on the authentic one, which is clearly evident when comparing the letters "R", "E", and "S", and it is important to note that on recent authentic Belgian documents (passports and identity cards), the letter "R" is indeed distinctive on the original pages of biographical data/front pages. Additionally, in the "expiration date" and "issue date" sections, different digits have a different font from the authentic one, especially noticeable for the digits "3", "1", "9", and "4". Regarding the provided photographs of two suspicious Belgian identity cards issued under the names "Thomas Wang" and "Frederic Ngyen", a search of the identity card number in the Interpol databases yielded a negative result. Based on the provided photographs and their comparison with an example of an authentic Belgian identity card, the initial irregularities on both identity cards relate to the fixed data available in four Belgian official languages at the top of the front side of the identity card. Namely, the used font differs from that on the authentic document, especially noticeable when closely examining the letters "B", "E", "T", "Q", "U", "R", "S", and "M". Moreover, there is a spelling mistake in the French version "carte d'identite" as there is an additional accent on top of the last letter "E". Also, the discovered irregularity concerns the ISO code "BEL" in the "country of issue" section, specifically regarding the font of the letter "E". In the section related to the "date of birth", the digits "1", "0", and "9" clearly differ from those used on the authentic document. In the section related to the "national registration number", there are differences in the font, and an irregularity regarding the font used for the letter "R". The same type of irregularity applies to the "valid until" part, where different digits have a different font than that on the authentic document.

From the correspondence between NCB Interpol Podgorica and NCB Interpol San Jose - Costa Rica, extracted from the CD provided by the Police Administration of Montenegro, Sector for the Fight Against Crime, with translation from Spanish to Montenegrin by the court interpreter Ana Čanović, it is evident that a verification of the biographical data of both submitted documents has been conducted. It is clear that the data from the identification document corresponds to the data of two individuals who have acquired citizenship of the Republic of Costa Rica, and both individuals possess travel documents different from those submitted. Additionally, the serial number does not contain the letter "S", and the serial numbers themselves correspond to other individuals. Thus, booklet ███████ was assigned to the person Enoc Adolfo Calderon Quiros, identification document no. ███████, issued on December 13, 2017, in an active state, while booklet ███████ was assigned to the person Geiner Sandoval

Barboza, identification document number ███████, issued on December 16, 2021, is also in an active status. Also, it is stated that the accused Han Chang Joon and Kwon Do Hyeong do not currently have legal migratory activities in this country, nor are they registered as citizens.

From the report on graphological examination of the Forensic Center Danilovgrad, no. 1186/23-1 dated June 9, 2023, it is evident that travel documents (Belgium) with serial number ███████ under the name Wang Thomas, and an identity card (Belgium) with number ███████, under the name Wang Tomas, were submitted for examination to determine the authenticity of the documents. Also, a travel document (Belgium) with serial number ███████, under the name Nguyen Frederic, and an identity card (Belgium) with number ███████, under the name Nguyen Frederic, were submitted. After applying the comparative method of document examination, the opinion was given that the mentioned documents are not authentic.

By inspecting the passport of the Republic of Costa Rica no. ███████, it appears that it is in the name of Chang Joon Han, born on ███████ 1986 and that the passport in question was issued in San Jose on March 11, 2022, with a term of validity until March 10, 2028.

By inspecting the passport of the Republic of Costa Rica no. ███████ it appears that it is in the name of Kwon Do Hyeong, born on ███████, 1986 and that the passport in question was issued in San Jose on March 10, 2022, with a term of validity until March 9, 2028.

Upon inspection of passport no. ███████ it appears that it is in the name of Thomas Wang, born on ███████, 1986, and that the passport in question was issued in Brussels on October 4, 2022, with a term of validity until October 3, 2029.

Upon reviewing the identity card with number ███████, it is evident that it is issued in the name of Thomas Wang, born on ███████, 1986, and that the identity card was issued in Brussels on August 17, 2021, with a term of validity until August 16, 2031.

Upon inspection of passport no. ███████, it appears that it is in the name of Nguyen Frederic, born on ███████ 1987, and that the passport in question was issued in Brussels on August 14, 2022, with a term of validity until August 13, 2029.

Reviewing the identity card with the number ███████, it is evident that it is issued in the name of Nguyen Frederic, and that the identity card was issued in Brussels on September 23, 2021, with a term of validity until September 22, 2031.

After conscientious evaluation of each piece of evidence individually and all pieces of evidence together, the court undoubtedly established that the accused on March 23, 2023, at 08:59 a.m., at border crossing II Podgorica Airport, used false public documents with the intention of using them as real ones, namely the accused Chang Joon Han, Costa Rican passport number ███████, and the accused Kwon Do Hyeong, Costa Rican passport number ███████, in such a manner that they handed to an authorized officer of the Police Administration - Border Police Station II Podgorica Airport, during passport control of passengers on flight number ALE45X of the airline company "Alliance Jet" of the operator Fly Star at the VIP passage on the Podgorica - Dubai line, marked documents over, with the intent to use them. The documents at issue are the passport ███████ of the accused Chang Joon Han and identity card number ███████ in the name "Wang Thomas", allegedly issued by the competent state authority of Belgium, and the passport ███████ of the accused Kwon Do Hyeong and identity card number ███████ in the name "Nguyen Frederic", also allegedly issued by the competent state authority of Belgium.

The factual situation is established from the conducted material evidence, specifically from the official note of the Police Administration Border Police Station II Podgorica Airport No. 352/23 dated March 23, 2023, in which it was stated that the accused Chang Joon and Han Kwon Do Hyeong, on Marsh 23, 2023, at 08:59 a.m., while they were at the "Podgorica Airport" border crossing, on flight number ALE45X of the "Alliance Jet" airline company, operated by "Fly Star", at the VIP passage on the Podgorica - Dubai line, proceeded to the border check of passengers, and gave the authorized officials, namely the accused Chang Joon Hana, a travel document, i.e. a Costa Rican passport number ███████, and the accused Kwon Do Hyeong, a travel document, i.e. a Costa Rican passport numbered ███████, and when entering the said data into the electronic records, the measure "FIND" appeared, according to the warrant issued by the NCB

Interpol Seoul - Korea. From the marked official note and two certificates of temporarily confiscated items from the Police Administration Border Police Sector II No. 352/1/23 and 352/2/23, both dated March 23, 2023, as well as two certificates on temporarily confiscated items from the Police Administration, Security Department, Podgorica, Criminal Police Station for the Suppression of Economic Crime, No. 73/10 dated March 23, 2023, issued in the name of the accused Chang Joon Han and Kwon Do Hyeong, it was further determined that the examination of the hand luggage of the accused Han Chang Joon, among other things, found Belgian travel documents number ███████ and Belgian identity card number ███████ in the name of Wang Thomas, while in the hand luggage of Kwon Do Hyeong, among other things, Belgian travel documents number ███████ and Belgian identity card number ███████ in the name of Nguyen Frederic. In the specific case, the determination that the documents in question are false public documents is established through two letters from the Police Administration, International Operational Police Cooperation Division Interpol-Europol-Sirene, numbers 51/7 no.51/7-34-143 and no. 51/7 no. 51/7-34-144 dated March 23, 2023, a letter from the Police Administration, Criminal Police Station for Search Operations and Requests, number 73/7-215/29-8961/1 dated March 27, 2023, which also identified the accused, a letter from the Police Administration, Security Department Podgorica, Criminal Police Station for Combating Economic Crime, no. 73/10- 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/2 dated March 27, 2023, a letter from the Police Administration, Crime Fighting Sector, number 51/7 no. 215/23-21959/1 dated April 4, 2023,with a CD of the correspondence of NCB Interpol Podgorica with NCB Interpol of Costa Rica and Belgium, from the correspondence of NCB Interpol Podgorica and NCB Interpol San Jose - Costa Rica extracted from the CD provided by the Police Department of Montenegro, Anti-Crime Sector, with a translation from Spanish to Montenegrin language by the court interpreter Ana Čanović, and from the letter of the Division for Document Security of the National Central Bureau, extracted from the CD delivered by the Police Directorate of Montenegro, Sector for the fight against crime, with a translation from English to Montenegrin by the court interpreter Selman Adžović. Namely, with regard to the relevant documents that the court inspected, namely the passport of the Republic of Costa Rica number ███████ issued in the name of the accused Chang Joon Han, and the passport of the Republic of Costa Rica number ███████, issued in the name of Kwon Do Hyeong, from the marked material evidence it is undoubtedly established that these are false public documents, since the passports in question do not appear in the national residence databases of the Republic of Costa Rica, and that the travel documents numbered ███████ and ███████ were not issued by the competent authorities of this country, as well as that the identification numbers ███████ and ███████ actually belong to other persons, i.e. that the data from the identification document correspond to the data of two foreign persons who acquired the citizenship of the Republic of Costa Rica and who possess travel documents different from those submitted for the purpose of verification, while the accused do not have legal migratory activities in this country, nor are they registered as citizens. Also, when it comes to the documents found in the hand luggage of the accused Chang Joon Han, namely the passport marked ███████ and the identity card no ███████ in the name of "Wang Thomas", and the documents found in the hand luggage of the accused Kwon Do Hyeong, namely passport number ███████ and identity card number ███████ in the name of "Nguyen Frederic", on which the court also carried out an inspection, it is undisputedly established that these are false public documents, since it follows from the marked material evidence that there are no travel documents of the Kingdom of Belgium with the numbers ███████ and ███████, as well as personal documents of the Kingdom of Belgium with the numbers ███████ and ███████, nor are issued by the competent authorities of this country, while the named persons are not even registered in the police and civil records of the Kingdom of Belgium. This is particularly established from the expert report on graphological examination of the Forensic Center Danilovgrad, No. 1186/23-1 of June 9, 2023, from which it follows that the submitted two Belgian travel documents, and two Belgian identity cards, issued in the name of Wang Thomas and in the name of Nguyen Frederic, are not authentic, which is in accordance with the content of the previously marked material evidence.

In connection with the previously mentioned, the court unequivocally establishes that the mentioned documents are public documents, as they are travel documents – passports and identity cards issued by the competent state authorities in a legally prescribed procedure. These documents serve as evidence of important facts in legal transactions and as proof of identity both domestically and internationally.

Considering the subjective attitude of the accused towards the committed criminal act, the court finds that they were aware that, by submitting the passports of the Republic of Costa Rica to the authorized police officer during the passport control at the VIP passage on the Podgorica - Dubai flight, they were using false public documents as genuine. In other words, they knowingly acquired false public documents, specifically marked passports and identity cards allegedly issued by the competent state authority of Belgium, which were found in the luggage of the accused. The accused evidently intended and were aware of the illegality of such actions. In the above-mentioned manner, in addition to the objective elements, the subjective elements of the criminal offense of document forgery from Art. 412 para. 2, in conjunction with para. 1 of the Criminal Code of Montenegro are also present.

The court appreciated the statements of the accused given during the subsequent statement on the already conducted material evidence, that they obtained the relevant travel documents and identity cards through a specialized agency from Singapore, which deals with the issue of the procedure for obtaining citizenship and travel documents, and which procedure, according to them, initiated the accused Kwon Do Hyeong, while the accused Chang Joon Han only filled out the forms, and that due to earlier procedures, they had a relationship of trust with this agency whose name they do not know. However, the court regarded such statements by the accused as calculated attempts to avoid guilt. These statements not only contradicted the material evidence presented but were also inconsistent and logically implausible. The accused themselves do not dispute that a few days after receiving passports supposedly issued by the competent authorities of Belgium, they realized that their personal information was not contained in them. Even though they requested a correction of these documents and did not receive it, the accused carried these documents critical to their situation in their personal luggage, without providing the court with any logical explanation for doing so. Therefore, it is difficult to imagine and justify a life situation in which an individual knowingly carries invalid public documents in their hand luggage, crosses state borders, and undergoes passport controls, claiming that they do so without the intention of using them. It is equally difficult and socially unacceptable to conceive a situation where a relationship of trust is established with an agency that issued such documents to the accused. Despite noticing errors on subsequently issued Belgian documents, the accused, during the border crossing, presented passports of the Republic of Costa Rica, also issued by the same agency. However, the accused did not provide any specific information about the mentioned agency in Singapore, and, for the purpose of proving and verifying their claims, they themselves emphasized that they do not insist on verifying these statements.

For the same reasons, the court did not accept the statements of the defense attorney, lawyer Goran Rodić, that his clients were deceived by the Singaporean agency handling the issuance of the relevant documents. This includes his specific claims that in this case, the element of consciousness regarding the use of false public documents is lacking because his clients did not face any issues during their travels through other countries or upon entering and staying in Montenegro. In this regard, the court emphasizes that the focus of this proceeding is the event of March 23, 2023, and not the earlier actions of the accused related to their travels through other countries or entry and stay in Montenegro. This is because, regarding the specific event, the factual circumstances concerning the actions taken by the accused and the existence of the subjective element of the alleged criminal offense have been unequivocally established, as previously outlined. The question of alleged fraudulent actions by a certain agency mentioned by the accused does not, in any manner, cast doubt on their subjective relation to the criminal offense for which they have been found guilty. However, the court took into account that the defense attorney has a completely legitimate right to interpret the

Statements of the accused in a manner that favors their clients and attempts to mitigate and minimize the harmfulness of their actions. Still, the court's task and role are to objectively assess the entire event in line with unequivocally established facts in the proceedings. The court rejected the proposal of the accused and their defense attorney to conduct a re-verification of the authenticity of Costa Rican passports issued in their names by the competent authorities of Costa Rica. The court deemed that undertaking such an action would unnecessarily prolong the proceedings, especially since the verification would need to be carried out through international legal assistance, namely by contacting the relevant authorities of the Republic of Costa Rica. This decision was based on the fact that the Ministry of Internal Affairs, Police Administration, in the attachment to document number 73/10-21523-8658/2 dated March 28, 2023, provided a telegram from the Division for International Operational Police Cooperation Interpol-Europol-Sirene, no. 51/7-63-153 dated March 24, 2023, and a document from the Ministry of Internal Affairs, Police Administration 51/7 no. 215/23-21959/1 dated April 5, 2023. These documents pertain to the verifications of the relevant travel documents and are considered official and legally valid evidence on which the established facts are based.

During the sentencing process, the court, in accordance with Art. 42 para. 1 of the Criminal Code of Montenegro, valued all the circumstances that affect the sentence to be less or greater, so it valued the mitigating circumstances on the part of the accused, their earlier life, i.e. the fact that they had not been convicted before (and which circumstance, although it was not checked, bearing in mind that were born in Seoul, South Korea, which would significantly contribute to the prolongation of the proceedings is valued in their favor), and their family circumstances, i.e. the fact that the accused Chang Joon Han is married and the father of two minor children, while the accused Kwon Do Hyeong is also married and the father of one minor child, so the court, in the absence of aggravating circumstances, pursuant to Art. 36 of the Criminal Code of Montenegro, sentenced both accused to a prison term of 4 (four) months each, pursuant to Art. 51 of the Criminal Code of Montenegro, the sentence includes the time spent in detention from March 23, 2023 from 4:50 p.m., as the day and hour of deprivation of liberty, until June 15, 2023 at 2:35 p.m. According to the court's assessment, these individually tailored sentences are appropriate for the severity of the committed criminal offense and the personalities of the accused as perpetrators. The court believes that this sentence will undeniably have a sufficient impact on the accused to prevent them from committing future criminal acts. The court took into account not only special but also general prevention, finding that the imposed sentence will contribute to strengthening moral values, fostering social responsibility, and sending a clear message expressing societal condemnation of such behavior. This, will influence others not to engage in similar criminal acts. Therefore, in all respects, the purpose of punishment outlined in Art. 32 of the Criminal Code of Montenegro will be achieved, within the framework of the general purpose of prescribing and imposing criminal sanctions stated in Art. 4 para. 2 of the Criminal Code of Montenegro.

The court also took into account the other evidence presented, but found that it had no influence on a different verdict.

Pursuant to Art. 67 and Art. 75 of the Criminal Code of Montenegro, the court imposed a security measure against the accused, confiscating the items, i.e. the Costa Rican passport number ███████, passport ███████ and identity card number ████████████ in the name of "Wang Thomas", allegedly issued by the competent state authority of Belgium, were confiscated from the accused Chang Joon Han, and the accused Kwon Do Hyeong's Costa Rican passport number ███████, as well as passport ███████ and identity card number ███-████ in the name "Nguyen Frederic", also allegedly issued by the competent state authority of Belgium, taking into account the fact that the public documents in question were used as items of the criminal act of document forgery from Art. 412 para. 2, in conjunction with para. 1 of the Criminal Code of Montenegro. In this manner, the purpose of the safety measure will be achieved, which aims to eliminate conditions or circumstances that may influence the perpetrator to commit future criminal acts, in accordance with Art. 66 of the Criminal Code of Montenegro.

Bearing in mind that the accused Chang Joon Han and Kwon Do Hyeong were declared guilty, the court, pursuant to Art. 226 and Art. 229 of the Code of Criminal Procedure, orders them to pay

an amount of 100.00 euros each for the costs of the criminal proceedings. This amount pertains to the judicial flat-rate fee as part of the overall costs of the criminal proceedings, proportionally determined based on the duration of the proceedings, complexity of the case, and the financial situation of the accused.

Based on the above and in accordance with Art. 374 of the Criminal Procedure Code, the decision is as stated in the verdict.

BASIC COURT IN PODGORICA
On June 19, 2023

RECORDER
Anđela Mitrović, s.r.

JUDGE
Ivana Becić, s.r.

LEGAL NOTICE: An appeal is possible
against this verdict within 8 days from the date of
receiving a copy of the same, to the High Court
in Podgorica, and through this court.

ZTO:_____

[stamp: JUDGE - PRESIDENT OF THE COUNCIL
The accuracy of the transcript is confirmed by the
ADMINISTRATOR OF THE COURT
OFFICE
[signature]]

[stamp: Montenegro
Basic Court
8
Podgorica]



# Certification of Translation Accuracy

LATITUDE PRIME hereby certifies that the attached document(s), translated from <u>Montenegrin</u> into <u>English</u> is, to the best of our knowledge and belief, a true, accurate, and complete translation of the following document(s):

Appellate Court of Montenegro_Second instance decision_061123
Basic Court in Podgorica_First instance decision_190623

Executed this <u>9th</u> day of <u>February</u> 2024

Signed: _____

Latitude Prime LLC
80 S 8th St, Suite 900
Minneapolis, MN 55402

**ATA Member #** 260699

**ISO 9001:2015 & ISO 17100:2015 Certified**

Order Number: O-05927

Latitude Prime LLC uses all available measures to ensure the accuracy of each translation but shall not be held liable for damages due to error or negligence in translation or transcription.