**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| | ) |
| TERRAFORM LABS PTE. LTD. | ) Case No. 24-10070 (BLS) |
| | ) |
| Debtor.[1] | ) **Related to Docket Nos. 60 & 61** |
| | ) |

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS'**
**(I) PRELIMINARY OBJECTION TO THE DENTONS US RETENTION**
**APPLICATION AND THE LITIGATION PAYMENT MOTION**
**AND (II) REQUEST FOR LIMITED ADJOURNMENT OF HEARING**

The Official Committee of Unsecured Creditors (the "**Committee**") appointed in the case of the above-captioned debtor and debtor-in-possession (the "**Debtor**") files this preliminary objection to (i) the *Application of Debtor for Entry of an Order Authorizing the Retention and Employment of Dentons US LLP as Special Counsel to the Debtor and Debtor in Possession Effective as of the Petition Date* [Docket No. 60] (the "**Application**") and (ii) the *Motion of Debtor for Entry of Orders Pursuant to Sections 363, 503(b), and 105(a) of the Bankruptcy Code Authorizing Debtor to Pay Certain Amounts in Furtherance of Litigation and Granting Related Relief* [Docket No. 61] (the "**Litigation Payment Motion**" and together with the Application, the "**Litigation Motions**") and request for an adjournment of the final hearing on the Litigation Motions, and respectfully states as follows:[2]

---

[1] The Debtor's principal office is located at 1 Wallich Street, #37-01, Guoco Tower, Singapore 078881.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Application or the Litigation Payment Motion, as applicable.

## Preliminary Statement

1.     The U.S. Trustee appointed the Committee on Thursday, February 29, 2024.  The Committee retained the undersigned counsel the same day.  As the Committee and its counsel worked quickly to get up to speed, it was immediately apparent that the Application and the Litigation Payment Motion—to be heard just three business days after the Committee's appointment—was a critical inflection point in the case with potentially huge ramifications for unsecured creditors' recoveries.  As the Committee has worked quickly to gather information, it developed a list of questions that must be answered for the Committee to assess the Application and its potential impact on unsecured creditors:

   (a) What is the enterprise value of the Debtor's ongoing business and does that enterprise value support the "bet the company" approach the Debtor has taken with respect to the myriad of litigation against it?

   (b) What is the impact, including on unsecured creditors' recoveries, of an adverse ruling in the SEC Enforcement Action (as defined below)?

   (c) What is the SEC's goal in the SEC Enforcement Action, and does it intend to create a victims' restitution fund?

   (d) Why did the Debtor transfer more than $165 million to Dentons US prior to the Petition Date to be held as an advance payment retainer that is purportedly Dentons US's property upon receipt?

   (e) Was the Debtor solvent when it transferred such funds and what value, if any, did it receive?

   (f) Who directed the transfer of such funds to Dentons US and what was their intent in doing so?[3]

   (g) How exactly did Dentons US spend over $86 million defending litigation in one year?

   (h) Would Dentons US and the other "Vendors" stop performing if the Court granted a short adjournment of the Litigation Motions, especially in light of the $86 million that

---

[3]     The Committee has serious concerns that the intent of the Advance Payment Retainer (as defined below) was to remove assets from the reach of the Debtor's creditors.

has already been paid to them and the impending start of the jury trial on the SEC Enforcement Action on March 25, 2024?

(i) Why did Dentons US withdraw as counsel for Kwon, the Debtor's majority shareholder, in the SEC Enforcement Action and what is the status of its current representation and relationship with Kwon in the various other matters where it is counsel for the Debtor?

Those questions remain unanswered, and certain of those questions require the Committee to receive advice from a yet-to-be-retained financial advisor.

2.      To put it bluntly, based on the papers and disclosure made to date, the Committee has serious concerns about the Debtor's determination to retain Dentons US, the Debtor's prepetition transfers to Dentons US, and the use of estate funds to pay insiders' prepetition indemnification claims.  Because of these unanswered questions, on Saturday, March 2, 2024, and several times thereafter, the Committee requested that the Debtor agree to a brief adjournment of the hearing with respect to the Litigation Motions to allow the Committee to gather more information and answers to its questions.  The Debtor repeatedly refused.  Until the foregoing (and other) questions are answered, the Committee cannot support the Application and therefore files this preliminary objection and request for adjournment.

3.      What is known and undisputed is that the crash of the Debtor's cryptocurrency (TerraUSD and Luna Classic) triggered a financial crisis that led to the destruction of billions of dollars of value and several other cryptocurrency companies as well as immense financial hardship to an untold number of people.  Its founder, Do Kwon, then hid in exile until he was arrested by the Montenegro authorities for using a fake passport.

4.      The Debtor at one point seems to have had substantial assets.  Instead of distributing those assets to its victims, the Debtor provided its victims with Luna 2 tokens ("**Luna 2**"), a bet on the Debtor's ability to repair its blockchain and build a startup software company, and rolled the dice and spent millions defending itself and Kwon against the inevitable onslaught of litigation.

That gamble has not paid off so far, and the Debtor has paid **over $165 million** to their law firm Dentons US to pay itself and numerous other attorneys, including tens of millions for Kwon's legal defense.  Much of the amounts paid on behalf of Kwon were paid to Dentons US who until recently represented Kwon in the SEC Enforcement Action and following the Petition Date continued to represent Kwon in a representative action in Singapore.[4]

5.      On December 28, 2023, the District Court for the Southern District of New York (the "**District Court**") held that the Debtor and Kwon had illegally offered and sold unregistered securities.[5]  The Debtor and the Securities and Exchange Commission (the "**SEC**") are scheduled to go to trial on March 25, 2024, to determine whether the Debtor and Kwon also committed securities fraud.[6]

6.      As disclosed in the Debtor's first day papers, the Debtor filed for chapter 11 protection to avoid the execution of a judgment by the SEC and the requirement to post a bond to appeal the District Court's final order, which has yet to be entered.[7]  The Debtor's apparent intent is to sit in chapter 11 for the likely more than 2 years that it will take to appeal the District Court's decision, potentially to the Supreme Court.  If the Debtor is successful, Luna 2 may have value or may have no value at all, but one thing is for certain, all of the Debtor's funds in Dentons US's possession will be used to fund the SEC Enforcement Action and other lawsuits against the Debtor and its prepetition officers or directors.  In fact, in the 90 days prior to the Petition Date, the Debtor

---

[4]    App. at 10.

[5]    Opinion and Order, *SEC v. Terraform Labs Pte. Ltd., et al.*, Civil Action No. 1:23-cv-013460-JSR (S.D.N.Y. Dec. 28, 2023) (Docket No. 149), at 71.

[6]    Order, *SEC v. Terraform Labs Pte. Ltd., et al.*, Civil Action No. 1:23-cv-013460-JSR (S.D.N.Y. Jan. 16, 2024) (Docket No. 166), at 2.

[7]    *Declaration of Chris Amani in Support of the Debtor's Chapter 11 Petition and First Day Relief* [Docket No. 18] (the "**First Day Declaration**") ¶ 14.

4

sent an additional **over $121 million** to Dentons US to fund its gamble through an advance payment retainer, which by its terms became Dentons US's property when received.[8]

7.       The Debtor has filed the Application and the Litigation Payment Motion which it claims are required to move forward with the trial in the SEC Enforcement Action.  By the Litigation Motions, the Debtor seeks to pay **millions** in satisfaction of prepetition claims, including prepetition amounts owed to Dentons US and amounts owed to former executives and directors under prepetition indemnity agreements (including amounts to Kwon).  For the reasons set forth herein, the hearing with respect to the Litigation Motions should be adjourned.  If the Court is not inclined to adjourn the Litigation Motions, for the reasons set forth herein, each should be denied.

## Background

8.       On January 21, 2024 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "**Court**").  On February 29, 2024, the United States Trustee (the "**U.S. Trustee**") appointed the Committee.  *See* Docket No. 101.

### I.       Dentons US Application

9.       On February 13, 2024, the Debtor filed the Application, seeking authority to retain Dentons US as special counsel on the terms and conditions of an Engagement Letter dated November 27, 2023 (the "**Engagement Letter**").  *See* App. ¶ 3.  Dentons US is a member of the US Region of Dentons Group (a Swiss Verein) ("**Dentons**").  *Id.* at ¶ 1.  Dentons US and other members of Dentons, including within the United States (the "**Member Firms**"), are collectively

---

[8]     It is unclear to the Committee whether the entire amount is budgeted for attorneys or the Debtor's other operations. It is also unclear whether there even is a litigation budget.  *See* App., Ex. B (the "**Califano Declaration**") ¶ 33 ("The Debtor and Dentons expect that it may be necessary to develop a prospective budget plan to comply with the U.S. Trustee's requests for information and additional disclosures, recognizing that in the course of this large chapter 11 case, there may be unforeseeable fees and expenses that will need to be addressed by the Debtor and Dentons.").

5

referred to by the Application as "**Dentons Member Firms**." *Id.* at ¶ 5.  The Application is supported by the Califano Declaration, attached to the Application as Exhibit B.

10.    Dentons US was initially retained in 2021 to represent the Debtor, Mr. Kwon, and Chang Joon Han.[9]  *See Notice of Filing Redacted Versions of Dentons US LLP's Engagement Letters* [Docket No. 116], Ex. B.  Its engagement was later expanded to include the role of "global coordinating counsel and [] processing payments by [the Debtor] for retainers requested, and legal fees and costs expended, by Dentons US, other firms, and former employees."  *Id.* at Ex. A ("**2023 Dentons Engagement Letter**").  The Debtor disclosed that Dentons US has ceased representing Kwon in the SEC Enforcement Action.[10]  As of the filing of the Application, Dentons US still represented Kwon in the Beltran Action (as defined below), though stated that it was in the process of withdrawing as counsel for Kwon in that matter.  App. ¶ 29.

11.    By the Application, the Debtor seeks authority to retain Dentons US as special counsel pursuant to section 327(e) of the Bankruptcy Code, to "represent the Debtor in litigation and investigations in multiple fora," including, *__but not limited to__*: (i) an enforcement action, entitled *SEC v. Terraform Labs Pte Ltd, et al.*, Case No. 1:23-cv-01346-JSR (S.D.N.Y), naming the Debtor and its co-founder Kwon Do Hyeong (the "**SEC Enforcement Action**"); (ii) ongoing grand jury, criminal and regulatory investigations, and prosecutions of former Debtor employees and others in the U.S. and other jurisdictions; and (iii) the matter entitled *Julian Moreno Beltran, et al., v. Terraform Labs Pte Ltd, et al.*, Case No. HC/OC 247/2022, currently pending in the High Court of the Republic of Singapore (the "**Beltran Action**").  App. ¶ 5.

---

[9]    Mr. Han is the former financial officer of the Debtor.  He was also arrested in Montenegro for attempting to travel with forged documents and recently was extradited to South Korea.

[10]    The Committee has requested all written waivers and releases between Mr. Kwon and Dentons US.  As of the filing of this preliminary objection, those documents have not been provided.

12.     Trial in the SEC Enforcement Action will start on March 25, 2024, with the District Court stating that "[n]o further requests from any party for any further adjournment will be entertained." *SEC v. Terraform Labs Pte Ltd, et al.*, Case No. 1:23-cv-01346-JSR (S.D.N.Y Dec. 28, 2023) (Docket No. 149), at 71.

13.     The Application identifies five broad matters where the Debtor will seek advice from Dentons US:

> (a)  represent and advise the Debtor in the Litigations (which is not limited in any manner);
>
> (b)  manage and support the Debtor's Litigations;
>
> (c)  provide necessary background knowledge of and information regarding the Debtor's structure and operations to the Debtor's bankruptcy counsel, as necessary;
>
> (d)  provide advice regarding matters related to product counseling, privacy and cybersecurity counseling, and employment law; and
>
> (e)  perform such other legal services in connection with this chapter 11 case as may be reasonably required and consistent with Dentons US's role as special counsel.

App. ¶ 11.

14.     Pursuant to the terms of the Engagement Letter, Dentons US states that it will: (a) involve other lawyers and professionals from its Member Firms to assist, as necessary, in providing legal advice and representation to the Debtor and its present and former employees; and (b) retain other law firms and third-party vendors (collectively, the "**Vendors**," and together with Member Firms, the "**Contractors**") on behalf of the Debtor.  *See* Docket No. 116-1.

15.     In his declaration, Mr. Califano of Dentons US states that it will "apply the Advance Payment Retainer . . . to pay all outstanding prepetition invoices related to the Litigations . . . ." Califano Decl. ¶ 17.  Again, "Litigations" is defined broadly in the Application and the Califano Declaration to include all litigation against the Debtor.  App. ¶ 6; Califano Decl. ¶ 3.  The Proposed Order (as defined below) would specifically authorize Dentons US to pay the postpetition invoices

7

of (a) 10 Dentons affiliate Member Firms, (b) 5 other law firms, and (c) 7 Vendors.  Proposed
Order ¶ 7.  It is not clear whether the Debtor will seek to retain each of those law firms in this
chapter 11 case.

### a.  The Advance Payment Retainer

16.    Prior to the Petition Date, the Debtor transferred cryptocurrency to Dentons US,
which, in accordance with the terms of the Engagement Letter, purportedly became Dentons US's
property upon receipt and was converted to fiat currency (USD) and held in a Dentons US savings
account as an advance payment retainer (collectively, the "**Advance Payment Retainer**").  2023
Dentons Engagement Letter at 1.  Dentons US made payments from the Advance Payment
Retainer for legal fees and costs expended by Dentons US and the Contractors on behalf of the
Debtor.  App. ¶ 22.

17.    On the Petition Date, the opening balance in the Advance Payment Retainer totaled
$62,954,002.44, and Dentons US held $7,742,492.37 separately in its operating account to pay
outstanding costs to the Contractors.  App. ¶ 23.

18.    During the year prior to the Petition Date, Dentons US has received a staggering
$165,996,818.87 (total cash including retainers) from the Debtor and billed $86,143,605.29 in
connection with prepetition fees and costs for representation of the Debtor (the "**Prepetition
Invoices**").  App. ¶ 25.

19.    During the year prior to the Petition Date, Dentons US made the following
payments, on account of the Prepetition Invoices: (i) $37,817,271.62 to Dentons US;
(ii) $989,320.03 to Member Firms; and (iii) $47,337,013.64 to Vendors (including the law firms
representing certain of the Debtor's former and current employees) on behalf of the Debtor.  *Id.*

20.    Within the ninety (90) days prior to the Petition Date, the Debtor disclosed that Dentons US had received $121,973,086.03 (total cash including retainers) and billed $43,153,676.68 in connection the Prepetition Invoices.  *Id.*

21.    Within the ninety (90) days prior to the Petition Date, on account of the Prepetition Invoices, Dentons US made the following payments: (i) $11,204,224.00 to Dentons US; (ii) $306,030.99 to Member Firms; and (iii) $31,643,421.69 to Vendors on behalf of the Debtor. *Id.*  On the Petition Date, Dentons US had unpaid invoices of $2,235,517.65.  *Id.*

**b.  Lack of a Litigation Budget**

22.    Since the Debtor has lost access to bank accounts, the Debtor has purportedly used the Advance Payment Retainer, which Dentons US controls, to pay its legal fees and expenses.[11] First Day Decl. ¶ 63.  Based on the Debtor's pleadings, it is not possible to determine the amount the Debtor anticipates will be required for each step of the various litigations it faces around the world.  Notwithstanding the amount of fees Dentons US has collected and seeks to collect, the Debtor and Dentons US have failed to provide any budget and staffing plan as part of the Application.  App. ¶ 34.  It is unclear whether such a budget has ever been presented to the Debtor.

**II.    The Litigation Payment Motion**

23.    Under the Litigation Payment Motion, the Debtor seeks Court authorization to pay three primary buckets of prepetition claims (1) approximately $3.3 million[12] for the legal bills of the Debtor's current and former employees which the Debtor purportedly is obligated to pay under prepetition indemnity agreements (and unknown amounts thereafter subject to a cap), (2) an amount not to exceed $1.3 million to critical litigation vendors, and (3) approximately $1.5 million

---

[11]    Based on the Debtor's Wages Motion [Docket No. 20], the Debtor has used cryptocurrency held by it to pay its employee obligations and, presumably, other operating expenses.

[12]    These amounts do not appear to include $450,000 in prepetition retainers which were charged by the firms representing current or former employees.  Litigation Payment Mot. ¶ 13.

9

in costs owed to opponents in foreign jurisdictions where the Debtor lost discovery disputes or settled with the counterparty.  Litigation Payment Mot. ¶ 10.  The Debtor does not disclose which employees' counsel are to be paid pursuant to their prepetition indemnity claims, but the list includes Kwon's Montenegro counsel, the Law Office Rodic, who the Debtor proposes to pay $732,888.  Litigation Payment Mot. ¶¶ 16; 14.  The total amount requested to be paid under the Litigation Payment Motion is approximately $6.2 million plus amounts to be paid on account of the Debtor's purported indemnity obligations in the future.  *Id.* ¶ 16.

24.    The Litigation Payment Motion also vaguely stated that "because Mr. Kwon is the Debtor's majority shareholder, certain corporate governance practices require Mr. Kwon to execute or direct proxies to execute documents on his behalf" as a basis for paying nearly a million more of his legal fees.  Litigation Payment Mot. ¶ 39.

25.    The Debtor also seeks approval of proposed procedures to pay future claims for legal expenses from current and former employees that does not provide for any notice to the Committee, the U.S. Trustee, or the Court.  *Id.* ¶ 45.

## Preliminary Objection

26.    The Application and the Litigation Payment Motion should be adjourned.  At this point, the Debtor has provided no evidence to demonstrate that proceeding with the myriad of Litigations, including the SEC Enforcement Action, is in the best interest of the estate.  It is not possible to make that determination without a comprehensive litigation budget to determine the cost of proceeding and a valuation of the Debtor's business to determine if that cost outweighs the potential benefit.  There are also significant questions with respect to the proposed unlimited scope of Dentons US's retention, the blank check it is requesting to pay other counsel engaged by the Debtor, its former and potentially current representation of Kwon and Han, and the more than

$165 million Advance Payment Retainer that was transferred to Dentons US prior to the Petition

Date.  The Committee, which was appointed less than five calendar days prior to the filing of this

preliminary objection, has not had the opportunity to investigate any of those questions, or even

retain a financial advisor.  At this time, the Debtor has not carried its burden to show that either

Dentons US's retention or the payment of prepetition claims requested under the Litigation

Payment Motion should be granted.  It would be shocking if, after having received more than $165

million from the Debtor, Dentons US would seek to withdraw from the SEC Enforcement Action

weeks prior to the start of the SEC jury trial merely because the Committee needs more time to

answer pertinent questions.

27.    To the extent the Court is not inclined to adjourn the Litigation Motions, each

should be denied for the following reasons.  *First*, Dentons US should be retained under section

327(a) and not section 327(e), as it is coordinating all litigation for the Debtor, including the SEC

Enforcement Action that is the stated purpose for the Debtor seeking chapter 11 protection and

whose resolution will dictate whether the Debtor is able to reorganize.  Dentons US cannot meet

the "disinterested person" and "adverse interest" requirements of section 327(a).  Even if the less

stringent standard applicable to special counsel under section 327(e) were applied, Dentons US

has an interest adverse to the estate which precludes its retention.  *Second*, for the same reasons

that it has not met its burden to retain Dentons US, the Debtor has not proven that spending more

than $6 million on prepetition claims, including counsel fees for its ex-CEO in exile, warrants

vaulting those claims ahead of every other unsecured creditor.

**I.     Dentons US Must Be Retained Under Section 327(a) of the Bankruptcy Code and Cannot Meet the Standard for Retention.**

28.    The Debtor filed for chapter 11 in the wake of the December 2023 adverse partial

summary judgment ruling in the SEC Enforcement Action.  The Debtor asserts that, absent the

DM_US 204163937-1.T27104.0010

chapter 11 filing, the Debtor would likely need to "liquidate after the trial and entry of final judgment, forfeiting its right to an appeal and causing disastrous consequences for the Debtor's business, its approximately 60 employees, its creditors, and the hundreds of thousands of holders of Luna." First Day Decl. ¶ 14. The Debtor is seeking to self-fund the case, has no funded debt, and is not seeking approval of any form of postpetition financing. *See id.* at ¶ 88 ("With its existing liquidity, the Debtor should have sufficient funds to self-fund this chapter 11 cases, and, in parallel, the "do-or-die" appeal of the judgment in the SEC Enforcement Action."). In other words, the chapter 11 case rises and falls on the SEC Enforcement Action.

29.     Section 327(e) is to be construed narrowly to avoid eviscerating the general rule that an attorney for the debtor must be a disinterested person and shall not possess an interest that is adverse to the debtor's estate. *In re First Am. Health Care of Ga., Inc.*, No. 96-20188, 1996 WL 33404562 at *3-6 (Bankr. S.D. Ga. Apr. 18, 1996). The bankruptcy court, when considering an application under section 327(e), must guard against the retention of a creditor whose role as "special counsel" has the potential of placing the professional in a role which is impermissibly broad and general. Most instances where special counsel is retained under section 327(e) "involve litigation not central to the debtor's business or the success of the case." *Id.*

30.     The retention of Dentons US as counsel in the SEC Enforcement Action is a core restructuring issue. That requires that Dentons US be retained under section 327(a). *See In re Congoleum Corp.,* 426 F.3d 675, 689 (3d Cir. 2005) (stating that the "specified special purpose" for which counsel may be retained under section 327(e) "must be *unrelated* to the reorganization") (emphasis added); *In re Argus Grp.* 1700, 199 B.R. 525, 531 (Bankr. E.D. Pa. 1996) (noting that the more rigorous standards of section 327(a) apply when special counsel is being retained for litigation that plays a "preeminent" role in the bankruptcy proceedings);

DM_US 204163937-1.T27104.0010

*In re First Am. Health Care of Ga.*, 1996 WL 33404562 at *3-6 (finding that proposed counsel's role in litigation, the "outcome of which w[ould] dictate the manner in which Debtor's bankruptcy counsel c[ould] conduct the case and determine in large measure the success of th[e] Chapter 11 case," could not be approved under section 327(e)). Moreover, the Debtor does not seek to engage Dentons US for a specified purpose, but rather to "[r]epresent and advise the Debtor in the Litigations," which is unlimited in scope. App. ¶ 11. The Advance Payment Retainer and Dentons US will also apparently be the primary source of payment for all of the Debtor's future legal expenses, and the Debtor also seeks permission for Dentons US to make unlimited payments to multiple other law firms that may or may not be retained by the Debtor in this chapter 11 case. App., Ex. B (the "**Proposed Order**") ¶ 7. Dentons US's broad (and seemingly unlimited) scope requires that Dentons US be retained under section 327(a). *See In re Roper & Twardowsky, LLC*, 566 B.R. 734, 751-52 (Bankr. D.N.J. 2017) (holding that the retention of special counsel fell under the ambit of section 327(a) instead because special counsel's representation in "every major remaining legal action" affecting the distribution of funds to the estate was too expansive").

31.    Dentons US cannot satisfy the requirements of section 327(a) of the Bankruptcy Code as Dentons US has an approximately $2.2 million prepetition claim and potential preference and other avoidance actions, including potentially actual fraudulent transfers, for amounts transferred to it prior to the Petition Date. Because of those claims, Dentons US is not a disinterested person and has a disqualifying interest adverse to the estate.

32.    Section 327(a) of the Bankruptcy Code provides that a debtor, with the court's approval, "may employ one or more attorneys . . . that do not hold or represent an interest adverse to the estate, and that are disinterested persons," to represent or assist the debtor. 11 U.S.C. § 327(a). Courts have defined an "interest adverse to the estate" as: (1) possessing or asserting

13

any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant; or (2) possessing a predisposition under circumstances that render such a bias against the estate. *See I.G. Petrol., L.L.C. v. Fenasci (In re West Delta Oil Co.)*, 432 F.3d 347, 356 (5th Cir. 2005) (citations omitted); *In re eToys, Inc.*, 331 B.R. 176, 189 (Bankr. D. Del. 2005). The term "disinterested person" is defined in part as a person who "does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason." 11 U.S.C. § 101(14)(C). This provision is "broad enough to include anyone who 'in the slightest degree might have some interest or relationship that might faintly color the independence and impartial attitude required [of estate professionals] by the Code and the Bankruptcy Rules.'" *In re BH & P, Inc.*, 949 F.2d 1300, 1309 (3d Cir. 1991) (internal citations omitted).

33. Dentons US is purportedly owed more than $2.2 million on account of prepetition unpaid invoices. App. ¶ 25. Counsel who has a prepetition claim against the estate is not a "disinterested person." *U.S. Tr. v. Price Waterhouse*, 19 F.3d 138, 141 (3d Cir. 1994) (finding "no ambiguity" in the statutory text of section 327(a) and reversing a lower court order approving retention of an accounting firm that was also a prepetition creditor). The Third Circuit has previously held that counsel which has received preferential transfers is also not a "disinterested person." *See In re Pillowtex, Inc.*, 304 F.3d 246, 255 (3d Cir. 2002) ("We hold that when there has been a facially plausible claim of a substantial preference, the district court and/or the bankruptcy court cannot avoid the clear mandate of the statute by the mere expedient of approving retention conditional on a later determination of the preference issue"); *see also U.S. Tr. v. First Jersey Secs., Inc. (In re First Jersey Secs., Inc.)*, 180 F.3d 504 (3d Cir. 1999) (disqualifying counsel

14

due to receipt of a preferential transfer, which created an actual conflict of interest, and stating "[a] Court may consider an interest adverse to the estate when counsel has 'a competing economic interest tending to diminish estate values or to create a potential or actual dispute in which the estate is a rival claimant'") (citations omitted); *In re Mich. Gen. Corp.*, 78 B.R. 479, 484 (Bankr. N.D. Tex. 1987) (disqualifying counsel despite offer to waive potential preference recovery and refusing to accept the proposition that "counsel for the Debtor may be expected to actively pursue investigations into matters which might directly result in their own liability to the estate"). Dentons US received $121,973,086.03 in transfers from the Debtor during the 90-day period prior to the Petition Date and was paid $43,153,676.68 (plus an additional $11,204,224) from the funds received. App. ¶ 25. For Dentons US to be retained under section 327(a), the Debtor must establish that there is not a "facially plausible claim of a substantial preference," which it has failed to (and likely cannot) do. Indeed, the Advance Payment Retainer, which appears designed to insulate the payment from the Debtor's creditors may be an actual fraudulent transfer made with the intent to hinder, delay, and defraud the Debtor's creditors.

## II.    Dentons US Cannot Satisfy the Standard for Retention Under Section 327(e) of the Bankruptcy Code as Dentons US May Hold an Interest Adverse to the Estate with Respect to the SEC Enforcement Action.

34.    Even if the Court determines that section 327(e) of the Bankruptcy Code is the appropriate standard to apply to Dentons US's retention—and it is not—Dentons US cannot satisfy that standard. Under section 327(e) of the Bankruptcy Code, a professional cannot be employed by the estate if it holds "any interest adverse to the debtor or to the estate with respect to the matter on which such attorney is to be employed." 11 U.S.C. § 327(e). This standard is less stringent than that applied under section 327(a) as it only looks to the matter which such attorney is employed.

15

35. Here, the scope of Dentons US's representation is practically unlimited to include all litigation of the Debtor. As of the filing, it represented both Kwon and the Debtor in the Beltran Action, which creates a disqualifying potential (and likely actual) conflict. App. ¶ 29; *see, e.g.*, *In re Mican Homes, Inc.*, 179 B.R. 886, 888 (Bankr. E.D. Mo. 1995) ("Under the Bankruptcy Code, the interests of the Debtors are intertwined with the interests of the estate which includes the interests of creditors. Simultaneous representation of a Chapter 11 Debtor and the Debtor's principals gives rise to at least a potential conflict of interest."); *see also Co. Nat'l Bank of Denver v. Ginco, Inc. (In re Ginco, Inc.)*, 105 B.R. 620, 621 (D. Colo. 1988) (dual representation of principal shareholder, officer, and guarantor and debtor is sufficient conflict to be adverse interest under § 327(a) and (e) where individual is potential target for claims of mismanagement); *In re F & C Int'l, Inc.,* 159 B.R. 220, 222-23 (Bankr. S.D. Ohio 1993) (holding that counsel, which sought approval under § 327(e) to represent debtor in litigation involving fraud claims against its outside accounting professionals, had an interest adverse to the estate since it also represented debtor's outside directors in matters arising from such fraud).

36. That conflict likely extends to the SEC Enforcement Action, which has significant factual overlap with the Beltran Action. First Day Decl. ¶ 68. Moreover, to date, the Debtor has provided no evidence that when Dentons US withdrew from representing Kwon in the SEC Enforcement Action he waived the potential conflict that had been created through Dentons US's joint representation of him and the Debtor. The conflict there is easy to see, as the Debtor may have a desire to settle the SEC Enforcement Action and/or cooperate with the SEC, while Kwon may still seek to fight, potentially to avoid the impact of any findings that the District Court may make and the application of those findings with respect to Kwon's liability in the SEC Enforcement Action or the Beltran Action. It is also possible that the conflict could prevent the Debtor from

16

taking certain positions in the SEC Enforcement Action that would be adverse to Kwon's interest in the Beltran Action. Moreover, it remains unclear at the moment the extent to which Kwon is involved in Dentons US's representation of the Debtor, including whether he reviews and approves pleadings or otherwise participates in the formulation of the Debtor's litigation strategy whether directly or through Rodic (his Montenegro counsel). This potential conflict requires the Court to deny the Application. *See In re NNN 400 Cap. Ctr. 16, LLC*, 619 B.R. 802, 815 (Bankr. D. Del. 2020) (holding that "section 327(e) provides no basis for obtaining a waiver of its requirements to avoid adverse interests").

37. Finally, there are significant questions regarding the Debtor's transfer of more than $165 million to Dentons US, including who directed the transfers and whether they did so with the actual intent to hinder, delay, and defraud their creditors. It is necessary to determine whether Dentons US may have received an actual fraudulent transfer in connection with fees incurred with respect to the SEC Enforcement Action and whether that would create a conflict with the estate with respect to that specific action.

### III.    The Proposed Terms of Dentons US's Retention Are Not Reasonable Under Section 328(a) of the Bankruptcy Code.

38. Dentons US currently holds more than $70 million as an Advance Payment Retainer. The terms of that retainer, *i.e.* that it not be held in a client trust account and purportedly became Dentons US's property upon receipt, indicate that it may have been provided to put the subject funds out of the reach of the Debtor's creditors. Such a payment could not possibly be reasonable under section 328 of the Bankruptcy Code. *See, e.g., In re Dividend Dev. Corp.*, 145 B.R. 651, 654 (Bankr. C.D. Cal. 1992) (noting that "[section] 328 specifically mandates that the bankruptcy judge review the reasonableness of any fee arrangement" including a retainer); *In re C&P Auto Transport, Inc.*, 94 B.R. 682, 685-86 (Bankr. E.D. Cal. 1988) (requiring a retainer

17

to "be maintained in trust with no disbursements except upon court order" because "[t]he court must be persuaded that the terms and conditions are in the interest of the estate").

39.     Moreover, the Proposed Order gives Dentons US a blank check to pay the expenses of five other law firms without those firms being retained in these chapter 11 cases and subject to the disclosures, protections, and fee review associated with Debtor professionals in chapter 11. Proposed Order ¶ 10.  This attempt to circumvent the retention and disclosure requirements of the Bankruptcy Code is not reasonable and inappropriate.

40.     If the Application is to be approved, Dentons US should be required to refund the retainer and the Debtor should be required to retain all professionals that will be receiving payment during the chapter 11 case.

## IV.    The Litigation Payments Motion Should Not Be Approved

41.     The Debtor's motion to pay $6.2 million in prepetition expenses tied to the Debtor's myriad litigations should also be denied.  Among other things, the Debtor seeks to pay over $3.3 million to counsel for current and former employees, including Kwon, that are purportedly owed by the Debtor under prepetition indemnity agreements with the Debtor.   Indemnification obligations arising out of prepetition agreements are unsecured claims even if the contingency that creates the payment obligation arises after the Petition Date.  *In re Pinnacle Brands, Inc.*, 259 B.R. 46, 50 (Bankr. D. Del. 2001) (classifying an indemnification contract that was executed prepetition as a prepetition claim); *In re Hemingway Transp.*, 954 F.2d 1, 8-9 (1st Cir. 1992) (concluding "most courts now recognize" that a prepetition indemnification agreement results in a prepetition claim, even where the contingency triggering the agreement's application occurred postpetition); *In re Rainbows United, Inc.*, 547 B.R. 430, 437-39 (Bankr. D. Kan. 2016) (concluding an indemnification clause *contained in the company's charter* created a prepetition claim).

18

42.     The Debtor has provided no compelling reason to pay those prepetition claims.  In fact, as recited by the Debtor, most of the engagement letters provide the employees are obligated to pay their own counsel if the Debtor is unable.  Litigation Payment Mot. ¶ 90.  Similarly, the Deel Employment Agreement provides that Deel (and not the Debtor) is required to indemnify the EOR employees for their costs.  *Id.* at ¶ 21.  Deel would then have an unsecured claim against the Debtor on account of its similar indemnification obligation.

43.     The Debtor has subpoenaed its witnesses for the SEC jury trial, and likely controls certain of the witnesses.  *Id.* at ¶ 23.  Paying their counsel's fees and vaulting the unsecured claims of the Debtor's current and former employees ahead of all other creditors is not warranted.

44.     The Debtor also seeks authority to pay its current and former employees' counsel's fees on a go forward basis solely within the discretion of its board and Special Committee, with no notice (or opportunity to object) to the Committee, the U.S. Trustee, or the Court.  *See id.* at ¶¶ 45-46.  The Debtor's citation to the *Enron* decision as support is inapposite, as there, the Enron debtors retained common counsel for its employees and such counsel was subject to the retention disclosures and fee review required under the Bankruptcy Code.  335 B.R. 22, 30-32 (S.D.N.Y. 2005).  Likewise, although procedures were approved with respect to payments to cooperating witnesses recently in the Celsius case, the Committee had a consent right over any such payment, notice was provided to all parties in interest, and each party in interest had the ability to object to the payment of such fees.  *In re Celsius LLC*, No. 22-10964 (MG) (Bankr. S.D.N.Y. Sept. 21, 2023) [Docket No. 3515].  Finally, although the Debtor has expended millions on behalf of its current and former employees, including Kwon and Chang, there can be no doubt that those payments (or devoting substantially all of its remaining cash to litigation) were not contemplated by creditors or made in the ordinary course of either the Debtor's business or the industry.

19

45.    The payment of certain trial vendor claims may be a prudent exercise of the Debtor's business judgment, if it were able to demonstrate that moving forward with the litigation is supported by the facts.  As discussed above, because the Debtor does not appear to have an estimate of the cost to litigate the various actions to conclusion or the value of the business it has committed to save through its "litigation at all costs" strategy, it cannot demonstrate that the payment of these invoices is appropriate at this time.

46.    Finally, the Debtor has not demonstrated that creditors in the United Kingdom, the British Virgin Islands, or Hong Kong would not recognize the worldwide effect of the automatic stay or that seeking a recognition proceeding in those jurisdictions is not possible.  Indeed, chapter 11 filings are regularly recognized in each jurisdiction.  *In re Nortel Networks Corp.*, 426 B.R. 84, 91 (Bankr. D. Del. 2010) (enforcing the automatic stay in the United Kingdom with respect to foreign pension fund protection proceedings), *aff'd*, 2011 WL 1154225 (D. Del. Mar. 29, 2011), *aff'd*, 669 F.3d 128 (3d Cir. 2011); *In re MIG, LLC*, 543 B.R. 527 (Bankr. D. Del. 2015) (interpreting the British Virgin Islands' 1996 Partnership Act and determining whether adversary proceeding defendants could continue British Virgin Islands liquidation proceeding); *In re Fairfield Sentry Ltd.*, 440 B.R. 60 (Bankr. S.D.N.Y. 2010) (recognizing foreign liquidation proceeding in the British Virgin Islands as foreign main proceeding); *In re Manley Toys Ltd.*, 580 B.R. 632 (Bankr. D.N.J. 2018) (recognizing foreign liquidation proceeding in Hong Kong as foreign nonmain proceeding and staying related District Court Action in order to protect the foreign debtor's assets and ensure the integrity of the restructuring process under the laws of Hong Kong); *In re De Coro, Ltd.*, 2010 WL 5140440, *1-2 (Bankr. M.D.N.C. Dec. 13, 2010) (same).

## Reservation of Rights

47.    This objection is submitted without prejudice to, and with a full reservation of, the Committee's rights, claims, defenses, and remedies, including the right to amend, modify or

DM_US 204163937-1.T27104.0010

further supplement the objection, to seek additional discovery, to raise additional objections and to introduce evidence at any hearing relating to the objection, and without in any way limiting any other rights of the Committee.

48.    For the foregoing reasons, the Committee has serious concerns about the propriety of the SEC Enforcement Action and the manner in which it is being prosecuted.  The Committee will monitor these matters if the Application is approved over the Committee's objection to ensure that the fees paid to Dentons US are reasonable.  Accordingly, the Committee reserves its rights to object to Dentons US's future fees under section 328 and section 330 of the Bankruptcy Code.

## Conclusion

WHEREFORE, the Committee requests that the Court defer the hearing on the Application and the Litigation Payment Motion or, in the alternative, deny the Application and the Litigation Payment Motion and grant any other and further relief as the Court deems just and proper.

DM_US 204163937-1.T27104.0010

Dated: March 4, 2024
Wilmington, Delaware

Respectfully submitted,
*/s/ David R. Hurst*

**MCDERMOTT WILL & EMERY LLP**
David R. Hurst (I.D. No. 3743)
Dante Pavan (I.D. No. 7095)
The Brandywine Building
1000 N. West Street, Suite 1400
Wilmington, Delaware 19801
Telephone:    (302) 485-3900
Email:         dhurst@mwe.com
                dpavan@mwe.com

– and –

Darren Azman
Joseph B. Evans
One Vanderbilt Avenue
New York, New York 10017
Telephone:    (212) 547-5400
Email:         dazman@mwe.com
                jbevans@mwe.com

– and –

Gregg A. Steinman
333 SE 2nd Avenue, Suite 4500
Miami, Florida 33131
Telephone:    (305) 358-3500
Email:         gsteinman@mwe.com

*Proposed Co-Counsel to the Official
Committee of Unsecured Creditors*

**WHITE & CASE LLP**
J. Christopher Shore (*pro hac vice* pending)
Southeast Financial Center
200 South Biscayne Boulevard, Suite 4900
Miami, Florida 33131
Telephone:    (305) 371-2700
Email:         cshore@whitecase.com

– and –

Colin T. West (*pro hac vice* pending)
1221 Avenue of the Americas
New York, New York 10020
Telephone:    (212) 819-8200
Email:         cwest@whitecase.com

– and –

Gregory F. Pesce (*pro hac vice* pending)
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone:    (312) 881-5400
Email:         gregory.pesce@whitecase.com

– and –

Aaron Colodny (*pro hac vice* pending)
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Telephone:    (213) 620-7700
Email:         acolodny@whitecase.com

*Proposed Counsel to the Official Committee
of Unsecured Creditors*