## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------------- x
                                                         :
In re                                                    :        Chapter 11
                                                         :
TERRAFORM LABS PTE. LTD.,                                :        Case No. 24–10070 (BLS)
                                                         :
        Debtor.[1]                                       :
                                                         :        Re: Docket No. 61
                                                         :
-------------------------------------------------------- x
```

### DEBTOR'S OMNIBUS REPLY TO OBJECTIONS
### TO MOTION OF DEBTOR FOR ENTRY OF ORDERS
### PURSUANT TO SECTIONS 363, 503(B), AND 105(A) OF
### THE BANKRUPTCY CODE AUTHORIZING DEBTOR TO PAY CERTAIN
### AMOUNTS IN FURTHERANCE OF LITIGATION AND GRANTING RELATED RELIEF

Terraform Labs Pte. Ltd., as debtor and debtor in possession in the above-captioned chapter

11 case (the "**Debtor**"), respectfully submits this reply (the "**Reply**") to the Objections (as defined

below) to the *Motion of Debtor for Entry of Orders Pursuant to Sections 363, 503(B), and 105(A)*

*of the Bankruptcy Code Authorizing Debtor to Pay Certain Amounts in Furtherance of Litigation*

*and Granting Related Relief* [Docket No. 61] (the "**Motion**"):[2]

### Preliminary Statement

1.      By the Motion, the Debtor seeks Court authority to pay fees and expenses

that are necessary to the Debtor's defense to litigation that threatens its ability to continue to

operate as a going concern—specifically, the action commenced by the U.S. Securities and

Exchange Commission (the "**SEC**") in the Southern District of New York (the "**SEC**

**Enforcement Action**").  The multi-week jury trial in the SEC Enforcement Action is scheduled

---

[1]    The Debtor's principal office is located at 1 Wallich Street, #37-01, Guoco Tower, Singapore 078881.

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

1

to begin in three weeks, on March 25, 2024 (the "**SEC Jury Trial**"). Certain payments are also necessary to facilitate compliance with the ongoing grand jury investigation in the Southern District of New York (the "**DOJ Investigation**").

2. The relief sought in the Motion will allow the Debtor to develop legal strategies, elicit testimony, and gather important facts from the Employees who are knowledgeable witnesses and have access to key information necessary to the Debtor's defense of the SEC Enforcement Action. The relief will also enable the Debtor's continued access to the essential services of third-party litigation vendors (the "**Critical Vendors**"), such as expert witnesses that serve a critical role in the Debtor's defense in the SEC Enforcement Action, including at the upcoming SEC Jury Trial. The evidence demonstrates that if the Debtor is unable to pay the prepetition and postpetition legal fees incurred by Employee Counsel (the "**Employee Counsel Fees and Expenses**") and make the payments to the Critical Vendors, the Debtor's defense to the SEC Enforcement Action and in the DOJ Investigation will be significantly hindered. The Debtor's and the Employees' respective strategic positions and compliance in the DOJ Investigation will also be prejudiced by failure to pay the Employee Counsel Fees and Expenses related thereto.

3. In support of the Motion, the Debtor submits the Califano Declaration and the *Supplemental Declaration of Mark Califano in Support of the Motion of Debtor for Entry of Orders Pursuant to Bankruptcy Code Section 363 Authorizing Debtor to Pay (I) Fees and Expenses of Counsel to Debtor Employees (II) Certain Critical Vendors Claims (III) Certain Foreign Litigation Related Claims and Obligations, and (IV) Granting Related Relief* (the "**Supplemental Califano Declaration**"), filed contemporaneously herewith**.** The Califano Declaration and Supplemental Califano Declaration support the requested relief.

4.      Two parties filed objections: (1) the SEC, the Debtor's litigation adversary in the upcoming SEC Jury Trial,[3] and (2) the Office of the United States Trustee (the "**U.S. Trustee**", together with the SEC, the "**Objectors**"), a division of the Department of Justice, which is conducting the DOJ Investigation.[4]  As a substantive matter, the Objections are without merit and should be overruled.  Furthermore, by seeking to prevent the Debtor from making the requested payments, these government agencies are denying the Debtor the basic due process of being able to defend itself fully from serious government charges.

5.      That the SEC, the very party pursuing the Debtor in the SEC Enforcement Action, filed such a vehement objection to the Debtor's spending its own funds to ensure an adequate defense in the SEC Enforcement Action is a troubling example of government overreach. The SEC's objection, framed as a creditor concern, is a pretext for its true motive:  to disadvantage and distract an adversary on the eve of trial.  Had the Debtor not filed for chapter 11 protection, the SEC would have had no say or behind-the-curtain visibility into the Debtor's conduct of its own defense, including its decision to pay the Employee Counsel Fees and Expenses in furtherance thereof.  Now, taking advantage of the chapter 11 process and on the eve of the SEC Jury Trial, the SEC is shamelessly leveraging the Debtor's chapter 11 case (which was prompted in large part by the SEC Enforcement Action) to torpedo the Debtor's litigation defense.  The SEC's damaging actions against the Debtor and questionable recent behavior in other similar enforcement actions

---

[3]    *Objection of the U.S. Securities and Exchange Commission to Debtor's Motion for Entry of Orders Pursuant to Sections 363, 503(B), and 105(A) of the Bankruptcy Code Authorizing Debtor to Pay Certain Amounts in Furtherance of Litigation and Granting Related Relief* [Docket No. 87] (the "**SEC Objection**");

[4]    *United States Trustee's Objection to the Motion of Debtor for Entry of Orders Pursuant to Sections 363, 503(b), and 105(a) of the Bankruptcy Code Authorizing Debtor to Pay Certain Amounts in Furtherance of Litigation and Granting Related Relief* [Docket No. 104] (the "**UST Objection**" and, together with the SEC Objection, the "**Objections**").

The Debtor understands that the recently-appointed creditors' committee (the "**Creditors' Committee**") may also object.

are detailed the Debtor's reply to the SEC's objection to the Debtor's application to retain Dentons, filed simultaneously herewith.[5]    The SEC Objection is merely a continuation of that same unprincipled strategy.  This Court should reject this brazen attempt by a litigation adversary to use the chapter 11 process to gain a litigation advantage in a non-bankruptcy proceeding and should protect the Debtor's right to defend itself in government litigation and investigations.

6.    The SEC Objection is replete with misapplications of law and factual misstatements.  For example, the SEC Objection states that the Debtor "seeks to commit tens of millions of dollars to defense costs potentially without providing creditors with transparency into how, when and why much of the money is spent.  That, by any measure, is extraordinary."  *See* SEC Objection ¶ 23.  This is a blatant misrepresentation of the facts.  The Motion does not seek "tens of millions" of dollars of relief; the *maximum* amount sought pursuant to the Motion is $6,297,754.31 (after application of the relevant retainers), inclusive of both prepetition and postpetition amounts.[6]  This information is stated clearly in a chart in the Motion, with the total amount of requested relief identified in bold font. *See* Motion ¶ 13.  It cannot be missed.

7.    Similarly, the SEC asserts that the Motion includes "no overall spending cap" for the litigation expenses.  *See* SEC Objection ¶ 11.  This is also false.  *See*, *e.g.,* Motion ¶¶ 10, 76 (requesting authority to pay, among other things, (i) estimated fees and expenses of Employee Counsel "for the three (3) months following the Petition Date, ***in an amount not to exceed $2,908,388***," and (ii) "the Future Indemnification Cap, ***in an amount not to exceed on a three-month rolling basis, $75,000 per month on average or $224,000 in the aggregate***")

---

[5]    *Response to Objection of the U.S. Securities and Exchange Commission to Application of Debtor for Entry of an order Authorizing the Retention and Employment of Dentons US LLP as Special Counsel to the Debtor and Debtor in Possession Effective as of the Petition Date* ("**Debtor's Reply to the Dentons Retention**").

[6]    After deduction of the Wintermute Costs (as defined in the Motion), which the Court already approved, the total remaining maximum amount the Motion seeks to pay is less than $5 million.

(emphasis added).  It is unclear whether the SEC did not read the Motion closely or has purposely misconstrued the facts laid out in the Motion.

        8.      The SEC also argues that "the proposed litigation expenses here do not benefit the estate—to the contrary, they would affirmatively harm it," *see* SEC Objection ¶ 18, as if the Court should look to the Debtor's litigation adversary to determine whether the Debtor's payment of certain expenses will improve the Debtor's prospects of success against that adversary.  The SEC's self-serving speculation of what will and will not aid in the Debtor's defense cannot outweigh the evidence before the Court, which is Mr. Califano's strong testimony as to the benefits of making the payments to ensure that the Debtor can properly defend itself in the SEC Enforcement Action and comply with the DOJ Investigation.  The bottom line is that if the Debtor cannot make these payments, its defense to the SEC Enforcement Action will be hindered and its adversary—the SEC—will be unjustly advantaged.  This outcome cannot be allowed.

        9.      The U.S. Trustee filed a milder objection.  The UST Objection oddly states that it "doesn't contest the Debtor's determination that the payment of certain litigation-related costs and fees may be necessary to assist them in defending the SEC Enforcement Action and other matters," yet nevertheless objects to the Debtor making the payments.  UST Objection ¶ 1.  The UST Objection primarily attacks the evidentiary record set forth in the Motion and the Califano Declaration.  Specifically, the U.S. Trustee takes issue with the justification for prepetition payments to Employee Counsel and Critical Vendors and seeks to impose additional procedures with regard to the payment of postpetition Employee Counsel Fees and Expenses.  The Supplemental Califano Declaration addresses many of these points.  Among other things, the Supplemental Califano Declaration provides additional factual detail supporting the justifications for making the payments and describes the Debtor's governance process in obtaining unanimous

board approval of the Motion, including three separate formal and informal Board meetings, discussion, and the involvement and approval of independent director John S. Dubel.  To the extent this additional information does not satisfy the U.S. Trustee, the Court should overrule the UST Objection.  Just like the SEC, the U.S. Trustee should not be permitted to frustrate the Debtor's defense of existential litigation.

10.     At the end of the day, while the Objectors try to poke holes in the Debtor's evidentiary basis for the requested relief, neither the SEC nor the U.S. Trustee can overcome the Debtor's robust evidence that these payments are supported by its business judgment.  For the reasons set forth herein and in the Motion, the Debtor respectfully requests that the Court overrule the Objections and approve the relief requested in the Motion.

### **Response**

11.     The SEC Objection is primarily focused on whether the Debtor is legally obligated to pay the Employee Counsel Fees and Expenses.  The SEC misses the point.  Although, as discussed below, the Debtor *is* obligated to make such payments (under both its Constitution and various contractual arrangements), the Debtor's primary justification for making all the requested payments is that *they are necessary to support the Debtor's defense of the SEC Enforcement Action* and its ability to comply with the DOJ Investigation.  The Debtor's business judgment in that regard is supported by evidence from its primary trial counsel, who is the person best positioned to make the determination of whether such payments are necessary to the Debtor's defense of the SEC Enforcement Action.  The Objectors provide no evidence in support of their position; instead, they just arrogantly substitute their conflicted judgment about what is helpful to the Debtor's defense of the litigation.

12.     If the Court finds that the Debtor has met its burden that it has properly exercised its business judgment in seeking to pay such amounts for such reason, the Court need

not even consider the Debtor's secondary justifications for the relief—that it is legally obligated to pay the Employee Counsel Fees and Expenses, that the payment of postpetition Employee Counsel Fees and Expenses is entitled to administrative priority, and that the payment of postpetition Employee Counsel Fees and Expenses is an ordinary course transaction. Nevertheless, as discussed below, the Debtor believes these secondary justifications further support paying these expenses.

13.    The Objectors do not appear to be objecting to the payment of the Foreign Litigation Claims (as defined in the Motion), the largest portion of which (the Wintermute Costs) has already been approved by this Court.  They spend little time on the Critical Vendors, other than to ask for more information, which the Debtor provides below and in the Supplemental Califano Declaration.  The primary objection is to the payment of the Employee Counsel Fees and Expenses.  Accordingly, this Reply likewise focuses on that category of relief.

## I.    Payment of the Prepetition and Postpetition Employee Counsel Fees and Expenses is a Proper Exercise of the Debtor's Business Judgment.

14.    Deep into the SEC Objection, the SEC finally addresses the Debtor's primary argument in support of the Motion—that the Debtor is justified in paying the Employee Counsel Fees and Expenses under sections 363(b) and 105(a) because such payments will benefit the Debtor's estate.  *See* SEC Objection ¶¶ 22-31.  The SEC's arguments and the UST Objection in this regard do little to refute the Debtor's core position that paying such amounts will improve the Debtor's defense in the SEC Enforcement Action and thereby benefit the estate.

### A.    The Evidence Supports the Debtor's Business Judgment to Pay Employee Counsel Fees and Expenses

15.    The Objectors argue that the Debtor has provided insufficient evidence to support its claim that the relief sought in the Motion is a proper exercise of its business judgment. *See* SEC Objection ¶ 25; UST Objection ¶¶ 17, 22.  The SEC's primary argument on this issue is

RLF1 30647653V.1

to attack the fact that the Debtor's evidentiary basis for its business judgment is provided by Mr. Califano, one of the Debtor's lead trial counsel handling both the SEC Enforcement Action and the DOJ Investigation.  *See* SEC Objection ¶ 25.  The U.S. Trustee makes the same argument.  *See* UST Objection ¶ 22.  The Objectors are off base.

16.    As one of the lead litigation counsel in the SEC Enforcement Action, Mr. Califano has detailed knowledge of the Debtor's defense and cooperation strategy and the expenses the Debtor needs to pay to facilitate its defense and improve its prospects for success.  He is therefore in a position to explain why the particular expenses the Debtor seeks authorization to pay are necessary to the Debtor's defense in the SEC Enforcement Action and would benefit to the estate.  Mr. Califano likewise has first-hand knowledge about the DOJ Investigation and why making the associated requested payments will benefit the estate.  Any other witness the Debtor could offer would simply testify that these expenses are necessary based on Mr. Califano's advice and would be *less helpful* to the Court than Mr. Califano.  Further, because Mr. Califano was present at the Board meetings where the Debtor's Board made the decision to approve these payments in its business judgment, Mr. Califano can likewise offer testimony to further support that these payments are a sound exercise of the Debtor's business judgment.

17.    The SEC also argues that the Debtor does not state "when, how, and by whom any specific judgment was made, let alone the rationale used in exercising that judgment . . . [n]or . . . whether any of the parties benefitting from this motion recused themselves from the decision-making."  *See* SEC Objection ¶ 25.  As set out in the Supplemental Califano Declaration, before the Debtor filed the Motion, the Debtor's Board, in consultation with Mr. Califano and with the Debtor's other advisors, reviewed the information relating to the proposed litigation expenses, including the Employee Counsel Fees and Expenses and Payment Procedures (as defined in the

8

Motion), during the course of three separate formal and informal Board meetings on February 6, February 9, and February 12. *See* Supplemental Califano Declaration ¶ 26. The Debtor's Board unanimously approved the payments and Payment Procedures after the third meeting. *See* Supplemental Califano Declaration ¶ 26.

18.    The Board consists of three members: Chris Amani (Chief Executive Officer), Ashwin Mathialagan (Senior Legal Counsel), and John S. Dubel (independent director). Mr. Dubel was appointed to the Board as an independent director in January 2024 due to his strong history of involvement in companies accused of wide scale misconduct.[7] Mr. Mathialagan joined the Company as both an employee and a director in March 2023, well after the relevant time period related to the SEC Enforcement Action. Mr. Amani is the only Board member who is one of the sixteen (16) Employees represented by Employee Counsel (in his case, Kobre (as defined in the Motion)). Under the terms of the Kobre Pool Retention Agreement (as defined below), the Company, not Mr. Amani, is obligated to pay Kobre. Other than Mr. Amani, none of the other Employees at issue are current insiders. As detailed in the Califano Declaration and the Supplemental Califano Declaration, the Debtor benefits from paying all of the Employee Counsel Fees and Expenses.

19.    The UST argues that the Debtor has not demonstrated that payment of the prepetition Employee Counsel Fees and Expenses is essential to the continued operation of the Debtor's business, because the Debtor has not alleged that Employee Counsel will cease providing services if their outstanding prepetition amounts are not paid. UST Objection ¶ 22. The Supplemental Califano Declaration provides supporting detail in that regard, stating that each

---

[7]    As described in the First Day Declaration (as defined in the Motion), Mr. Dubel has served on the board of, or been part of the management of, numerous companies in high-profile, contentious restructuring situations, including Purdue Pharma Inc., WorldCom, Inc., SunEdison, Inc., Highland Capital Management, LP, and WMC Mortgage, LLC, among others. *See* First Day Declaration ¶ 86. He has led numerous high-profile investigations.

Employee Counsel has contacted Mr. Califano repeatedly in the past few weeks seeking the status of their payment and the Court's decision on the Motion. *See* Supplemental Califano Declaration ¶ 6. One counsel to the Employees has advised Mr. Califano that it would significantly scale back the representation, or cease assisting or responding to the Debtor's request for information without payment. Supplemental Califano Declaration ¶ 6.

20.    Moreover, if the Debtor does not provide payments on account of the Employee Counsel Fees and Expenses, the majority of Employees do not have the ability or willingness to pay existing Employee Counsel or replacement counsel. *See* Supplemental Califano Declaration ¶ 9. If the Debtor cannot pay Employee Counsel, most Employees would likely be unrepresented (and thus unprepared) for the upcoming trial and DOJ Investigation and may even not respond to communications, attend interviews or depositions, or appear to offer trial testimony. Such a scenario would be incredibly detrimental to the Debtor's position in the SEC Enforcement Action and the DOJ Investigation. Even if the Employees attempted to engage new counsel, that would take weeks, and new counsel would likely only be willing to be engaged if they receive a retainer, which most Employees would not be able or willing to pay. There is simply not enough time for new counsel to get acquainted with the facts of the case and provide the same level of representation that the Employees receive from existing Employee Counsel, and from which the Debtor benefits. *Id.* The Debtor should be entitled to pay Employee Counsel and mitigate the very real risks set forth in detail by Mr. Califano.

21.    In any event, the Debtor does not need to prove with absolute certainty that the Employee Counsel will cease representing their clients absent payment of prepetition amounts and the certainty of payment going forward. The mere *risk* that Employee Counsel would cease providing services to the Employees on the eve of the SEC Jury Trial with the concomitant

devastating effect on access to information and the ability to advise and defend the Debtor justifies payment of the prepetition fees and expenses.  Under applicable law, it is a reasonable exercise of the Debtor's business judgment to use its funds pursuant to section 363(b) of the Bankruptcy Code to mitigate risks going into the SEC Jury Trial, including paying the Employee Counsel Fees and Expenses.  *In re Martin*, 91 F.3d 389, 395 (3d. Cir. 1996) (noting that courts defer to the trustee/debtor's judgment concerning use of property under § 363(b) when there is a legitimate business justification); *In re Foothills Tex., Inc.*, 408 B.R. 573, 584-85 (Bankr. D. Del. 2009) (noting that the governing standard for requests to authorize transactions outside the ordinary under section 363(b) is whether the proposed action would be a reasonable exercise of the Debtor's business judgment).

22.    Further, paying the prepetition Employee Counsel Fees and Expenses is also justified by section 105(a) of the Bankruptcy Code.  Such payments are necessary and essential for the continued operation of the Debtor's business, as they give the Debtor the opportunity mitigate its exposure in connection with the SEC's claim, which is likely to be the largest claim against the estate and threatens the Debtor's very existence, as well as allows the Debtor to better protect its interests in the DOJ Investigation.  Failure to make such payments would therefore jeopardize the Debtor's business. In this context, the doctrine of necessity is an independent basis for approving the payments.  *See In re Lehigh & New Eng. Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that, to justify payment under the "doctrine of necessity," a real and immediate threat must exist that failure to pay will place the continued operation of the Debtor in serious jeopardy); *In re Just for Feet*, 242 B.R. 821, 824-25 (D. Del. 1999) (noting that, under the "doctrine of necessity," a debtor must show that payment of the prepetition claims is critical to the debtor's reorganization). The SEC does not directly dispute this in the SEC Objection.  And

the U.S. Trustee admits, as discussed herein, that the "litigation related costs and fees may be necessary in defending the SEC Enforcement and other matters."  *See* UST Objection ¶ 1.

23.    Using estate assets to pay Employee Counsel Fees and Expenses is essential to the Debtor's ability to minimize the SEC's claim against the estate (likely the biggest claim against the Debtor's estate), which is beneficial to the estate and consistent with the Debtor's duty as a debtor in possession.  *See In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 687, 705 (Bankr. S.D.N.Y. 1992) (trustees have routine duties "to minimize the prepetition claims against the estate");[8] 11 U.S.C. § 704(a)(5) (debtors are required under the Bankruptcy Code to "examine proofs of claims and object to the allowance of any claim that is improper . . . if a purpose would be served").[9]

24.    Beyond the clear benefit of aiding the Debtor's defense of the SEC Enforcement Action, the payment of the Employee Counsel Fees and Expenses is also justified by the need to maintain employee morale and employee retention.  If the Debtor were not able to honor its indemnification obligations to Employees and pay the Employees' litigation expenses relating to their service to the Debtor, the Current Workforce (as defined in the Motion) may experience discomfort and uncertainty in continuing its employment with the Debtor, which will negatively impact the Debtor's business.

25.    The SEC's odd argument that the payment of counsel fees is not justified under section 363(b) of the Bankruptcy Code because it is more similar to a section 327 retention

---

[8]    *See also In re Congoleum Corp.,* 426 F.3d 675, 690 (3d Cir. 2005) (The debtor's "interests called for a reduction in the number of claims approved that would likely be included in a settlement package presented to the insurers. To the extent that the claims were not valid, it was [the debtor's counsel's] responsibility in representing [the debtor] to see that they were rejected.").

[9]    Section 1106 of the Bankruptcy Code incorporates the duties of chapter 7 trustees under section 704(a)(5) (and other sections) into the duties of chapter 11 trustees.  11 U.S.C. § 1106(a)(1).  Section 1107 then incorporates the duties of a chapter 11 trustee into the duties of the debtor in possession.  11 U.S.C. § 1107(a).

RLF1 30647653V.1

is incorrect as a matter of law. *See* SEC Objection ¶ 26. The SEC confuses the Debtor's requested relief here (payment of Employee Counsel Fees and Expenses) with situations where a debtor hires professionals to represent the estate. As the SEC correctly notes, the latter is typically accomplished through section 327, but may be done through section 363(b) in certain circumstances (the Jay Alix Protocol). That is irrelevant. As noted in the Motion, the Employee Counsel are not Debtor professionals. *See* Motion ¶¶ 29, 34-36. Rather, the Employees have retained Employee Counsel to represent them pursuant to their respective engagement letters—to which the Debtor is not a party—and the Debtor has agreed to pay Employee Counsel on behalf of the Employees. As noted below, it is typical in a situation like this to seek approval under section 363(b) to pay such Employee Counsel.

**B.    Precedent Supports Paying the Employee Fees**

26.    Despite the SEC's suggestion to the contrary, *See* SEC Objection ¶ 28, it is not uncommon for courts to grant the type of relief requested here, including the payment of current and former employees' litigation expenses pursuant to indemnification obligations.[10]

---

[10]    *See, e.g., In re Purdue Pharma L.P.,* No. 19-23649 (RDD) (Bankr. S.D.N.Y. Oct. 16, 2019) [Docket No. 309] ("The Debtors are authorized, but not directed, in their sole discretion, to advance and pay the legal costs of Indemnitees on the terms set forth in the Motion."); *In re Hawker Beechcraft, Inc.*, No. 12-11873 (SMB) (Bankr. S.D.N.Y. May 31, 2012) [Docket No. 187] (authorizing the debtors to continue in the ordinary course of business on a postpetition basis and to pay and honor prepetition amounts related to, among other things, "Indemnification Obligations," which are defined in the motion [Docket No. 9] and include the advancement of directors' and officers' litigation expenses); *see also In re RNI Wind Down Corp.*, No. 06-10110 (CSS) (Bankr. D. Del. July 17, 2006) [Docket No. 531] (authorizing the debtor to advance and reimburse legal costs and expenses incurred by certain current and former employees to defend or otherwise respond to an equity holders' committee investigation into the debtor's officers and directors); *In re W.R. Grace & Co.*, No. 01-01139 (JKF) (Bankr. D. Del. Dec. 13, 2004) [Docket No. 7143] (authorizing the debtors to advance payment for legal services provided to the debtor' current or former officers, directors, or employees in connection with a Department of Justice grand jury investigation); *In re Enron Corp.*, 335 B.R. at 27-32 (affirming bankruptcy court's authorization of payment of fees of special counsel to debtors' employees under section 363 of the Bankruptcy Code); *In re Celsius LLC*, No. 22-10964 (MG) (Bankr. S.D.N.Y. Sept. 21, 2023) [Docket No. 3515] (approving the reimbursement of current and former employees' legal fees, under section 363(b) in connection with their cooperation as witnesses in investigations concerning the debtor); *In re Lehman Brothers Holdings Inc.*, No. 08-13555 (JMP) (Bankr. S.D.N.Y. Dec. 3, 2008) [Docket No. 2052] (authorizing the debtors to advance up to $3 million for payment of legal costs of certain former employees incurred in connection with arbitration proceedings and government investigations related to their involvement with the debtors); *In re Delphi Corp.*,

27.    Faced with this substantial precedent, the SEC picks out one of the many cases the Debtor cites, *Enron*, and argues it should be distinguished from the Debtor's case because the circumstances were at the time "unprecedented" and the debtors there sought to retain a single firm for over 100 individuals. *See* SEC Objection ¶ 27. The SEC ignores that in the nearly twenty years since *Enron*, other courts have approved the payment of litigation expenses for even larger groups of employees. *See, e.g., In re Purdue Pharma L.P.,* No. 19-23649 (RDD) (Bankr. S.D.N.Y. Oct. 16, 2019) [Docket No. 309] (authorizing the advancement of litigation expenses for over 270 employees). If anything, that the Debtor seeks payment of litigation expenses for significantly fewer Employees (16), as compared to *Enron* or *Purdue* (each 100+), should make the relief requested easier, not harder, to approve.

28.    Further, the SEC suggests that the relief requested in the Motion is not justified because, unlike *Enron*, it is not "primarily to help facilitate resolutions of investigations" and instead dedicated to defend the Debtor in the SEC Enforcement Action. *See* SEC Objection ¶ 27. The SEC's argument that payments are only justified when a company cooperates with the SEC as opposed to defending itself in litigation against the SEC makes no sense and must be rejected. This distinction has no bearing on whether paying the Employee Counsel Fees and Expenses will benefit the estate. The SEC would prefer to hamper the Debtor's ability to defend itself in the SEC Enforcement Action and improve the SEC's chance of success in obtaining a large claim against the Debtor. The Court should reject this attempt to sabotage the Debtor's defense and appeal prospects.

---

No. 05-44481 (RDD) (Bankr. S.D.N.Y. Oct. 13, 2005) [Docket No. 198] (authorizing the debtor to advance litigation expenses, up to an aggregate cap of $5 million to former officers and directors).

29.    The SEC also fails in its attempt to refute the Debtor's citation to the *RNI Wind Down* order authorizing the advancement of litigation expenses to current and former directors and officers.  The SEC cites to a completely separate opinion from the *RNI Wind Down* chapter 11 proceedings, wherein the court held that a former officer's proof of claim for administrative priority for indemnification and advancement of litigation expenses should *not* be disallowed pursuant to section 502(e)(1)(B).  *See* SEC Objection ¶ 28; *In re RNI Wind Down Corp.*, 369 B.R. 174, 178 (Bankr. D. Del. 2007).  The ruling in the SEC's citation does nothing to challenge the proposition that in the *RNI Wind Down* chapter 11 cases, the Court granted relief similar to the relief the Debtor seeks in the Motion.  *In re RNI Wind Down Corp.*, No. 06-10110 (CSS) (Bankr. D. Del. July 17, 2006) [Docket No. 531].  The Debtor has been scratching its head trying to understand the point the SEC is attempting to make, particularly because, as discussed in more detail below, section 502(e)(1)(B) is inapplicable to the relief sought in the Motion.

30.    The UST argues that none of the cases the Debtor cites in the Motion authorized the payment of prepetition amounts due to Employee Counsel.  UST Objection ¶ 23.  This assertion is incorrect.  A number of the cases appear to approve payments to employee counsel for prepetition amounts. *See In re Purdue Pharma L.P.,* No. 19-23649 (RDD) (Bankr. S.D.N.Y. Oct. 16, 2019) [Docket No. 309] ("The Debtors are authorized, but not required, to pay, in their sole discretion, all amounts required under or related to the Pre-Petition Employee Obligations," where the definition of "Pre-Petition Employee Obligations" in the motion [Docket No. 6] includes advancement of employee legal expenses); *In re Hawker Beechcraft, Inc.*, No. 12-11873 (SMB) (Bankr. S.D.N.Y. May 31, 2012) [Docket No. 187] ("The Debtors are further authorized, but not directed . . . in the Debtors' discretion, to pay and honor ***prepetition*** amounts related [to] Indemnification Obligations.") (emphasis added); *In re Delphi Corp.*, No. 05-44481 (RDD)

(Bankr. S.D.N.Y. Oct. 13, 2005) [Docket No. 198] ("With respect to former officers and directors, the authority granted hereunder on account of ***Prepetition Human Capital Obligations*** is limited to advancement of litigation expenses," where the definition of "Prepetition Human Capital Obligations" in the motion [Docket No. 12] includes employee indemnification claims).

31.     However, even if the U.S. Trustee was correct that none of the cited cases approved the payment of such prepetition fees, that itself would not be a reason to deny the Debtor's request to pay them in this case given the strong evidence that Employee Counsel would stop performing services if they were not paid their outstanding prepetition amounts.  *See* Supplemental Califano Declaration ¶ 6.

32.     The justification to make the payments here is even stronger than in the ample precedent the Debtor has cited in support.  For example, in many of the cited cases, the employees were accused of wrongdoing.  In contrast, the Employees in this case (with the exception of Do Kwon, discussed below) generally have not been accused of wrongdoing and are merely witnesses participating in the SEC Enforcement Action and the DOJ Investigation.  *See* Supplemental Califano Declaration ¶ 5.  The relief requested is designed to help the Debtor's defense of its own litigation.  For the same reason, in the other cases, the litigation fees advanced pursuant to indemnification obligations were susceptible to claw-back if the recipient were to be convicted of wrongdoing or found to have acted in bad faith.  Because the context is different here, it is unlikely that the litigation fees in this case would be subject to claw back.  In any event, to the extent that the Indemnity Limitations (as defined below and in the Motion) are triggered with respect to any Employee Counsel fees, the Debtor reserves the right to seek reimbursement for such fees.

C.    **The Debtor's Process for Approving Fees is Reasonable**

33.    The SEC argues that the expenses should be subject to independent review for reasonableness, such as by a review of independent directors. *See* SEC Objection at p. 14. The Debtor's proposed Payment Procedures do just that. As set forth in the Motion, the Payment Procedures require the Board, in consultation with the Special Committee (as defined in the Motion), to approve Invoices before payment is made and subject to the Debtor's right to deny payment based upon, among other reasons, a triggering of the Indemnity Limitations. *See* Motion ¶ 45. As noted, the Special Committee consists of John S. Dubel, who is an independent director of the Board. Further, the Payment Procedures also provide that Future Indemnification Requests (as defined in the Motion) are subject to Board review and approval, up to the Future Indemnification Cap (as defined in the Motion) of $225,000 in the aggregate. *See* Motion ¶ 46.

34.    Both the SEC and the U.S. Trustee reference the procedural safeguards in *In re Celsius LLC*, No. 22-10964 (MG) (Bankr. S.D.N.Y. Sept. 21, 2023) [Docket No. 2147], wherein both the Debtor and the creditors' committee determined which employees to reimburse, and the U.S. Trustee requests that the Debtor modify the proposed Payment Procedures to include similar safeguards. *See* SEC Objection ¶ 28; UST Objection ¶ 25. Specifically, the U.S. Trustee requests that it and the Creditors' Committee receive notice and the opportunity to object to proposed future payments. *See* UST Objection ¶ 25. In addition, the U.S. Trustee requests that the proposed order provide that any Employee who is determined to have engaged in wrongdoing or found guilty of misconduct is not eligible for reimbursement and will be required to disgorge any amounts previously paid by the Debtor on behalf of such Employee. *Id.*

35.    The Debtor considered the request that the U.S. Trustee or the Creditors' Committee be provided the opportunity to object to proposed future payments, but does not believe it is appropriate in this case. As noted in the Supplemental Califano Declaration, the Employee

Counsel need immediate assurances that the payment of fees will not be held up further as a result of the chapter 11 case. Having their fees be subject to further approval will not give the Employee Counsel sufficient assurances of payment, and therefore does not mitigate the risk that they will stop performing. Similarly, the Debtor may need additional Employees to offer information and/or testimony in connection with the imminent SEC Jury Trial. Any delay in engaging counsel for additional Employees would be harmful to the Debtor. The Debtor also notes that the requests for future payment are limited in amount; further amounts would require Court approval.

36. In any event, the *Celsius* case is an outlier in giving a creditors' committee such rights. Some of the cases the Debtor cited have no identified payment procedures, while others have payment procedures in place, but do not provide the committees the right to object to the approval of the litigation expenses at issue. *See, e.g., In re Purdue Pharma L.P.,* No. 19-23649 (RDD) (Bankr. S.D.N.Y. Oct. 16, 2019) [Docket No. 309]; *In re Lehman Brothers Holdings Inc.*, No. 08-13555 (JMP) (Bankr. S.D.N.Y. Dec. 3, 2008) [Docket No. 2052].

37. Nevertheless, the Debtor is willing to agree to certain modification to the proposed order in relation to the SEC's and U.S. Trustee's concerns regarding procedural safeguards:

i. The Debtor will notify the U.S. Trustee and the Creditors' Committee upon receiving a Future Indemnification Request;

ii. The Debtor will provide the U.S. Trustee and the Creditors' Committee with a monthly report disclosing the total payments made to each of the Employee Counsel hereunder; and

iii. Employees who have triggered the Indemnity Limitations will be required to disgorge any amounts previously paid by the Debtor on behalf of such Employees.

RLF1 30647653V.1

D.     **Paying Mr. Kwon's Fees Is Justified**

38.     The Objectors argue that the Debtor has not demonstrated that payment of legal fees and expenses incurred by Mr. Kwon's Montenegrin counsel, Law Office Rodic ("**Rodic**"), is a reasonable exercise of the Debtor's business judgment.  *See* SEC Objection ¶ 29-31; UST Objection ¶ 21.  The Objectors point to Mr. Kwon's criminal conviction in Montenegro for possession of a false document as a reason not to pay Rodic's fees going forward.  *See* SEC Objection ¶ 30; UST Objection ¶ 21.  However, at this point, Rodic's services are not related to such criminal conviction, and such services were completed well before the Petition Date.  Rather, Rodic's services are the only means by which the Debtor and Mr. Kwon's counsel in the SEC Enforcement Action are able to communicate with him and obtain his cooperation while he is in prison in Montenegro.  The prior conviction does not negate the fact that the Debtor needs Mr. Kwon's cooperation for its own defense of the SEC Enforcement Action.  As explained in the Motion and in the Supplemental Califano Declaration ¶¶ 11-12, due to Mr. Kwon's significant involvement in the Debtor's business during the period of time relevant to the SEC Enforcement Action, he is uniquely privy to key information that will assist the Debtor's defense.  And given that the Debtor and Mr. Kwon are facing the same charges in the SEC Enforcement Action, it is critical to the Debtor's defense that Mr. Kwon be given continued access to his own counsel,[11] which is only possible through Rodic's services.

39.     Further, there are limited options for counsel in Montenegro with the experience and expertise that the Debtor requires.  *See* Supplemental Califano Declaration ¶ 13.

---

[11]     Mr. Kwon is represented by Kaplan Hecker & Fink LLP in connection with the SEC Enforcement Action.  To be clear, Dentons does not represent Mr. Kwon.

RLF1 30647653V.1

As such, it is not a simple matter of retaining separate and less expensive Montenegrin counsel, whose scope of engagement would be limited to business-related, non-criminal matters.

40.     Moreover, Rodic is paid a relatively modest monthly *fixed fee* of $244,296 for all of its services in connection with his representation of Mr. Kwon, including both the cooperation and the past criminal work.  The Debtor must pay the full monthly fee to Rodic to obtain its postpetition services.

41.     The U.S. Trustee also argues that Rodic's services may not be necessary as Mr. Kwon was recently approved for extradition to the United States.  *See* UST Objection ¶ 21. But such proceedings are not completed and an appeal is pending.  *See* Supplemental Califano Declaration ¶ 13.  For the avoidance of doubt, the Debtor will not need to pay Rodic's fees and expenses going forward once Mr. Kwon is extradited to the United States from Montenegro. *See* Supplemental Califano Declaration ¶ 14.  Until the extradition process is completed, however, it is necessary to pay Rodic's fees to facilitate access to Mr. Kwon for corporate governance or litigation defense purposes during this integral, but short-term, period.

42.     Further, although the Debtor owes Mr. Kwon an indemnification obligation for costs and expenses incurred from the carryout of his duties as a former employee, the Debtor acknowledges it may not be obligated to indemnify Mr. Kwon for such expenses if Mr. Kwon's conduct is found to have triggered any of the Indemnity Limitations, by a final non-appealable judgment.[12]   No final, non-appealable judgment by a court of competent jurisdiction has been

---

[12]    As stated in the Motion, Singapore law provides that the Debtor may not be obligated to indemnify an Employee and is permitted to seek recovery of the legal costs paid to an Employee under its indemnification obligations under various circumstances, such as if: (i) an Employee's conduct results in a criminal conviction as determined by a final order of a court of competent jurisdiction, (ii) an Employee commits a form of wrongful conduct against the Debtor, such as fraud or misappropriating funds, or (iii) the acts the subject of indemnification were outside the scope of an Employee's duties (collectively, the "**Indemnity Limitations**").

RLF1 30647653V.1

entered against Mr. Kwon in the SEC Enforcement Actions or the criminal cases in the United States or Korea such that the Indemnity Limitations are triggered as to those defenses. Therefore, the Debtor is entitled to honor its indemnification obligations to Mr. Kwon, subject to the Debtor's right to reimbursement. For the reasons stated above, and with the Debtor's express reservation of rights, it is a sound exercise of business judgment to advance Rodic's fees.

## II.    Advancing the Litigation Expenses is Required Under the Debtor's Constitution and Other Contractual Obligations.

43.    Given the importance of the outcome of the SEC Enforcement Action to the Debtor's ability to operate as a going concern, the benefit to the Debtor of preserving its defense by paying the Employee Counsel Fees and Counsel is sufficient to justify the requested relief, regardless of any contractual obligation to do so. That the Debtor has a legal obligation to do so provides further support.

44.    The SEC focuses its objection on this secondary justification for the requested relief. The SEC argues that the documents that the Debtor relies upon for the proposition that it owes an obligation to indemnify Employees for costs and expenses incurred from the carrying out of their duties do not obligate the Debtor to pay the Employee Counsel Fees and Expenses. *See* SEC Objection ¶ 12. In addition to being a red herring argument, this assertion is patently false.

45.    The Debtor's obligation to indemnify Employees for costs and expenses incurred in the carrying out of their duties arises from the Constitution, the Deel Employment Agreements, Deel MSA, the Company Employment Agreements, and the Kobre Pool Retention Agreement. The Debtor has submitted each of these agreements in support of the Motion. *See* Supplemental Califano Declaration. *See* Supplemental Califano Declaration ¶¶ 16-19.

46.     First and most importantly, the Constitution provides a legal obligation for the Debtor to pay all Employee Counsel Fees and Expenses.  Section 141 of the Constitution states that the Debtor must pay "all costs, losses and expenses which any such officer or servant may incur or become liable by reason of any . . . act or deed done by him as such officer or servant or in any way in the discharge of his duties" ("**Section 141**").  *See* Supplemental Califano Declaration, Ex. A, § 141.  This plain language covers legal fees incurred by the Employee relating to the Employee's employment.  Under Singapore law, which governs the Debtor's obligations under the Constitution, this language requires the Debtor to pay litigation expenses incurred by the beneficiaries, which includes the Employees, relating to their employment, including serving as witnesses in the SEC Jury Trial and DOJ Investigation.  *Id.*

47.     The SEC makes a distinction between indemnification and advancement of legal expenses that is relevant for Delaware corporations.  *See* SEC Objection ¶¶ 12-13.   But Delaware corporate law has no bearing on the Debtor's obligations under its Constitution, which broadly requires the Debtor to pay *all* costs, losses, and expense that its employees "may . . . become liable to incur" and does not make a distinction between payment of legal fees and payment of indemnity for ultimate liability.  The SEC is conflating the broad language of the Constitution with the much more limiting language of the Delaware corporate statute, which has specific provisions relating to indemnification and advancement of legal fees a Delaware corporation is required to pay in the event of certain actions against the employee.[13]   These

---

[13]    DGCL § 145(a) ("A corporation shall have power to indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the corporation) by reason of the fact that the person is or was a director, officer, employee or agent of the corporation, or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by the person in connection with such action, suit or proceeding if the person acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the corporation, and, with respect to any criminal action or proceeding, had no reasonable cause

Delaware principles and the Delaware cases cited by the SEC[14] simply have no relevance to the Debtor's obligations under its Constitution and Singapore law.

48.     Singapore law provides the relevant framework for interpreting the Constitution and is actually quite simple.   The Singapore Court of Appeal affirmed that the principles of contractual interpretation apply in construing an indemnity clause.   *CIFG Special Assets Capital I Ltd (formerly known as Diamond Kendall Ltd) v Ong Puay Koon and others and another appeal* [2018] 1 SLR 170.   Moreover, these principles remain relevant in the context of interpreting an indemnity provision in the Constitution.   Because the "constitution is a statutory contract between the members and the company as well as amongst the members inter se, the courts' approach follows contractual principles of interpretation" (*see* Tan Lay Hong, *The Annotated Singapore Companies Act* (2nd Ed, S&M, 2024) at [35.07] and Hans Tjio, *Corporate Law* (Academy Publishing, 2015) at [05.025]).[15]

49.     The key principles that Singapore courts apply to interpreting contracts are as follows:

---

to believe the person's conduct was unlawful…."); § 145(b) ("A corporation shall have power to indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the corporation to procure a judgment in its favor by reason of the fact that the person is or was a director, officer, employee or agent of the corporation…").  Delaware law looks at indemnification and advancement as two separate rights.  DGCL § 145(e) ("Expenses (including attorneys' fees) incurred by an officer or director of the corporation in defending any civil, criminal, administrative or investigative action, suit or proceeding may be paid by the corporation in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such director or officer to repay such amount if it shall ultimately be determined that such person is not entitled to be indemnified by the corporation as authorized in this section.  Such expenses (including attorneys' fees) incurred by former directors and officers or other employees and agents of the corporation or by persons serving at the request of the corporation as directors, officers, employees or agents of another corporation, partnership, joint venture, trust or other enterprise may be so paid upon such terms and conditions, if any, as the corporation deems appropriate.")

[14]   *See* SEC Objection ¶ 14; *In re RNI Wind Down Corp.*, 369 B.R. 174, 185 (Bankr. D. Del. 2007); *Majkowski v. Am. Imaging Mgmt. Svcs., LLC*, 913 A.2d 572, 586 (Del. Ch. 2006).

[15]   This conclusion is further bolstered by the fact that unlike in Delaware, there is no requirement in any Singapore statute for a company to indemnify its directors and/or employees for any losses that they may incur in the discharge of their duties. Singapore's Companies Act 1967 only prescribes certain situations where a provision of an indemnity to an officer of the company will be found to be void, as described above.

23

(a) As a starting point, the court looks to the text that the parties have used: *Lucky Realty Co Pte Ltd v HSBC Trustee (Singapore) Ltd* [2016] 1 SLR 1069 at [2];

(b) Where the text is plain and unambiguous, the court will usually give effect to the plain meaning of the clause, provided it does not engender an absurd result: *HSBC Institutional Trust Services (Singapore) Ltd (as trustee of AIMS AMP Capital Industrial REIT) v DNKH Logistics Pte Ltd* [2022] SGHC 248 at [26]; *Y.E.S. F&B Group Pte Ltd v Soup Restaurant Singapore Pte Ltd* [2015] 5 SLR 1187 at [31]; and

(c) The court has to ascertain the meaning which the expressions in a document would convey to a reasonable person having regard to the background knowledge which would reasonably have been available to the parties at the time of contract: *Sembcorp Marine Ltd v PPL Holdings Pte Ltd and another and another appeal* [2013] 4 SLR 193.

50.    A plain reading of Section 141 supports the interpretation that the Debtor's indemnification obligations apply to the payment of legal expenses.  As previously mentioned, Section 141 is broadly worded: it requires the Debtor to pay all costs, losses and expenses which its employee (whether current or former employee) "*may incur or become liable to incur.*"  The use of the words "*may incur or become liable to incur*" is plain and unambiguous and contemplates a broad obligation for the Debtor to pay all costs and expenses incurred by an officer or employee.  Thus, a Singapore court will give effect to the plain meaning of Section 141 and find that it provides for payment of legal expenses that have already been incurred, as well as the indemnification of future expenses that may be incurred.

51.    This construction is buttressed by a comparison of Section 141 against the template wording for such regulations.  The indemnity regulation of the Model Constitution (regulation 119) (see Singapore's Companies (Model Constitutions) Regulations 2015) provides that:

> Every officer of the company is to be indemnified out of the assets of the company against any liability (other than any liability referred to in section 172B(1)(*a*) or (*b*) of the Act) incurred by the officer to a person other than the company attaching to the officer in

connection with any negligence, default, breach of duty or breach of
trust.

52.    The deliberate use of the phrase "it shall be the duty of the Directors out of
the funds of the Company to pay all costs…which any such officer or servant **may incur** or become
liable to incur" in Regulation 141 of TFL's Constitution (which must be seen in contrast to the use
of the phrase "any liability… **incurred by** the officer" in the Model Constitution), supports the
position that Section 141 was specifically drafted to be broad enough to capture the advancement
of legal expenses, even where liability has not yet been incurred.

53.    The SEC further argues that indemnity beneficiaries under the Constitution,
including "servants," may not apply to the Employees in this case, whom the SEC characterizes
as "independent contractors" instead of "employees" by virtue of the Deel relationship.  *See* SEC
Objection ¶ 15.  The SEC is wrong.  Singapore law provides that an independent contractor is
entitled to indemnification as a "servant" where the work done and relationship with the employer
has characteristics of an employer-employee relationship.  Under Singapore law, a person can be
considered an employee of a company even if the person's contract with the company labels the
person as an independent contractor.  *Ravi Chandran, Employment Law in Singapore* (LexisNexis,
6th Ed, 2019) ("***Employment Law in Singapore***"), at 1.34 (*Ravi Chandran, Employment Law in
Singapore (LexisNexis, 6th Ed, 2019* at [1.56]; *Ferguson v John Dawson & Partners (Contractors)
Ltd* at pp. 1221F–1222B, 1224D–F, 1229F–1230B).  Whether a person is an independent
contractor or employee depends on a range of factors. In *Employment Law in Singapore* (at [1.34]),
the learned author writes:

> In common law at various points in time, different tests such as the 'control' test and
> the 'integration' test held sway, but the current position is that all the relevant factors
> have to be considered. Some relevant factors are listed below, though the list is not
> exhaustive. Neither can an exhaustive list ever be drawn. Further, it is not possible
> to pre-assign relative weights to each of these factors. It is also possible that the

very same factors carry different weight in different circumstances. Hence, much depends on the actual facts and essentially the court has to embark on a balancing act.

54.    As discussed in the Wages Motion (as defined in the Motion), the Debtor uses Deel as a third-party human resources and payroll vendor and Employee of Record for certain of the Employees, purely out of convenience, given the global span of the Debtor's business and the very nature of the cryptocurrency sector.  Nonetheless, the Employees are, or were, each highly important members of the Debtor's workforce.  Further, it is the Debtor, rather than Deel, that primarily has control over the delegation of tasks to be performed and the manner of performance by the Employee.  In addition, the Employees are fully integrated into the Debtor's business and rarely, if ever, interact with Deel in the ordinary day-to-day.  The Debtor—not Deel—selected the Employees for employment, and while salary payments are actually transferred by Deel, the source of the salary payments originate from the Debtor, who transfers funds using Deel as an intermediary.

55.    The fact that the Employees are witnesses in the SEC Enforcement Action and DOJ Investigation due to their detailed knowledge of the Debtor's business is evidence enough to demonstrate that they played an integral role in the Debtor's business.[16]  A suggestion that the Constitution did not mean to cover these people's costs and expenses makes no sense, and the Court just reject the SEC's grasp at straws in an attempt to deny the Debtor the best defense possible.  It is clear, rather, that under Singapore law, the Employees employed through Deel

---

[16]    The greater the control exercised by the purported employer over the task to be performed and the manner of performance, the more likely an employment relationship exists (*Halsbury's Laws of Singapore* vol 5 (Butterworths Asia) (accessed March 1, 2024) at [100.001]; *Lim Chin Yok Co Ltd v Malayan Insurance Co Inc* [1974-1976] SLR(R) 265 at [13]-14]; *Asia Beni Steel Industries Pte Ltd v Chua Chuan Leong Contractors Pte Ltd* [1996] 3 SLR(R) 253 at [9]-[10]; *Employment Law in Singapore* at [1.35]). However, control is not a strict requirement of an employment relationship, especially in the context of professional employees (*Employment Law in Singapore* at [1.36]).

should be considered "servants" within the meaning of the Constitution.  Accordingly, they are entitled to indemnification pursuant to Section 141.

56.    While the primary source of the Debtor's indemnification obligations is the Constitution, the Deel Employment Agreements and Deel MSA provide a secondary basis for the Debtor's indemnification obligations.   Under the Deel Employment Agreement, Deel "shall indemnify . . . Employee harmless from, for, and against any and all claims, liabilities . . . costs or expenses whether asserted in law or in equity . . . arising out of . . . the actions or commissions of the Employee . . . ."

57.    Clause 8.1 of the Deel MSA provides:

The [Debtor] will indemnify . . . defend and hold harmless Deel Group, its affiliates, officers, directors, **employees**, agents and other representatives (collectively, "Deel Indemnitee")  Deel . . . from and against any judgments, losses, damages, liabilities, costs or expenses . . . Deel [] may suffer or incur in connection with any actual or threatened claim . . . by any third party arising from or relating to . . . (b) any act or omission by [the Debtor], its employees, affiliates, agents and/or independent contractors in connection with [the Debtor's] receipt of the Deel Services, including, without limitation, the engagement of the Consultant by Deel . . . or (d) expenses and costs incurred by Deel [] arising from the indemnification provision inserted at [the Debtor's] request in the employment agreements with Consultants engaged for [the Debtor.]

*See* Supplemental Califano Declaration, Ex. C (emphasis added).

58.    Accordingly, the Debtor is obligated to indemnify the Deel Indemnitees, including Deel employees (who are the Employees) for any act of a Debtor employee or contractor in connection with the Debtor's receipt of "Deel Services" pursuant to clause 8.1(b) of the MSA.

59.     Further, if the indemnification provision in a Deel Employment Agreement were to be invoked and expenses and costs were incurred by Deel under that provision, the

Company would be obligated to indemnify Deel Indemnitees for those costs and expenses pursuant to clause 8.1(d) of the MSA.  *See* Supplemental Califano Declaration, Ex. B.

60.     Third, certain Employees that have retained Employee Counsel have employment agreements with the Debtor (the "**Company Employment Agreements**"), which provide for the same indemnification provision as the Deel Employment Agreements.  *See* Supplemental Califano Declaration, Ex. D

61.     Fourth, the Debtor is obligated to pay the Employee Counsel Fees and Expenses of certain Employees pursuant to engagement agreements between Employee Counsel and Employees.   Kobre represents the majority of Employees in connection with the SEC Enforcement Action and the DOJ Investigation.  As described in the Motion and Declaration, prior to the Petition Date, the Debtor and Kobre entered into a Pool Counsel & Employee Assistance Retention Agreement, dated June 1, 2022 (the "**Kobre Pool Retention Agreement**"), pursuant to which the Debtor offered the Employees the opportunity to retain Kobre should the need for individual counsel arise.  The Kobre Pool Retention Agreement provides that that Employees who retain Kobre will also execute separate engagement letters with Kobre (the "**Kobre Employee Engagement Letters**").   The Kobre Pool Retention Agreement provides that the Debtor is obligated to pay Kobre directly for expenses incurred in connection with services Kobre has performs for the Employees.  Additionally, each Kobre Employee Engagement Letter states that the Debtor has agreed to pay Kobre for services rendered on behalf of the Employee. *See* Supplemental Califano Declaration, Ex. E.

## III.    Postpetition Litigation Expenses Are Entitled to Administrative Priority.

62.     The SEC argues that the Employee Counsel Fees and Expenses incurred postpetition are not entitled to administrative priority because the claims are based on prepetition activities. *See* SEC Objection ¶ 16.  More specifically, the SEC asserts that the Debtor has not

established the two elements of an administrative expense claim: (i) there was a postpetition

transaction between the Debtor and the claimant and (ii) the expenses did not yield a benefit to the

estate.  *See* SEC Objection ¶ 17.

63.     The SEC once again misunderstands the Debtor's core reason for paying

the postpetition Employee Counsel Fees and Expenses: that the Debtor requires the postpetition

cooperation of the Employees because doing so provides a real benefit to the Debtor's estate

postpetition.  This is different than the standard indemnity situation where an employee seeks

advancement of payments to counsel to help the employee defend him/herself from litigation based

on the employee's alleged prepetition wrongdoing.

64.     For that reason, the cases the SEC cites for the proposition that

indemnification claims are typically prepetition claims cites are distinguishable from the facts here.

*See* SEC Objection ¶ 17.[17]  For example, the court in *Christian Life* noted that the officer was not

entitled to administrative priority because the claim for reimbursement arose from his prepetition

services *and* the legal fees incurred were for defending the officer from his own alleged

---

[17]     These cases stand for the unremarkable proposition that payment of claims of employees based on prepetition indemnity obligations are not entitled to administrative priority when there is no benefit to the debtor alleged and the payments are not based on the debtor's actively requesting anything from the employee postpetition.  *In re Mid-American Waste Sys.* involved former directors' and officers' claims for administrative priority for indemnification claims related to their actions brought against them for their prepetition alleged wrongdoing. 228 B.R. 816, 820-21 (Bankr. D. Del. 1999).  The court held that the former directors and officers were not entitled to administrative priority because the basis for the litigation against the indemnitees arose out of their prepetition activities.  *Id.*  Similarly, *In re Summit Metals, Inc.* involved a claim for administrative priority by a former director for reimbursement of expenses incurred in defending himself against claims initiated prepetition and arising out of the former director's prepetition conduct.  379 B.R. 40, 56 (Bankr. D. Del. 2007).  The remaining cases the SEC cites, in addition to being non-binding on this Court, are equally distinguishable.  *In re Christian Life Center*, involved a former officer seeking administrative priority, under section 503(b)(3)(D) for his postpetition expenses incurred in defending himself against actions in which he was accused of wrongdoing in connection with his *prepetition* services. 821 F.2d 1370, 1374 (9th Cir. 1987); *see also In re Philadelphia Mortgage Trust*, 117 B.R. 820, 831 (Bankr. E.D. Pa. 1990) (where the indemnitee's claims were denied administrative priority because they arose from claims primarily raised against him personally, not in his capacity as an officer of the debtor, and rose from his prepetition services); *In re Consolidated Oil & Gas, Inc.*, 110 B.R. 535, 537 (Bankr. D. Col. 1990) (where former officers' and directors' claims for administrative priority for their indemnification claims were denied because the indemnity arose strictly from their prepetition services)

wrongdoing and *not* for defending the debtor itself.  821 F.2d 1370, 1374 (9th Cir. 1987).  The SEC also cites to *Andrikopoulos v. Silicon Valley Innovation co., LLC* for the proposition that advancement obligations are contractual in nature and are "no different from other creditors' claims." *See* SEC Objection at 17.  Of course, the Debtor does not dispute that its obligations are contractual.  However, that fact is irrelevant to whether the creditor-employee is entitled to administrative priority on account of its claim when the debtor is requesting the Employee take action postpetition and that action benefits the estate.

65.    In contrast to facts of the SEC's cases, the payment of postpetition Employee Counsel Fees and Expenses in this case easily meet the requirements to qualify as administrative priority under section 503(b) of the Bankruptcy Code.  For a claim to be entitled to administrative priority under section 503(b)(1)(A), the claim must arise from a postpetition transaction with the debtor and must be beneficial to the debtor in the operation of its business.  *In re ID Liquidation One, LLC*, 503 B.R. 392, 399 (Bankr. D. Del. 2013) (citing *In re O'Brien Env't Energy, Inc.*, 181 F.3d 527, 532-33 (3d Cir. 1999)).  First, the postpetition litigation expenses relate to postpetition activities—namely, the Employees are participating in interviews and producing documents postpetition in connection with the SEC Enforcement Action and the DOJ Investigation, many at the direct request of the Debtor.  *See* Califano Declaration ¶ 12.  Second, the expenses paid to Employee Counsel clearly yield a direct benefit to the Debtor's estate and are necessary to preserve estate value because they allow the Debtor to put on its best defense in the SEC Enforcement Action, including the upcoming SEC Jury Trial, and provide the DOJ with accurate information in connection with the DOJ Investigation, in each case assisting the Debtor postpetition.

66.     Overall, in its attempt to hamper the witness testimony in the SEC Jury Trial, the SEC again misses the point.   That an indemnification claim may be a form of compensation or is based on a prepetition contractual relationship is irrelevant to the administrative priority inquiry and is not dispositive.   The key inquiry is whether the particular indemnification claim arose from a postpetition transaction with the Debtor and is necessary to preserve the value of the estate.   The SEC's cases each involve scenarios where the indemnitees have allegedly committed some form of wrongdoing and there is no showing that that defense of their claims provided a benefit to, and were necessary to preserve the value of, the debtor's estate.   Moreover, the claims were based on the indemnitees' prepetition conduct.   In contrast, here, it is the Debtor that is benefitting from the Employees' providing testimony and cooperation postpetition and counsel incurring postpetition fees as a result.

67.     On the benefit-to-the-estate point, the SEC's statement in paragraph 18 that "the proposed litigation expenses here do not benefit the estate—to the contrary, they would affirmatively harm it" is completely unsupported.   *See* SEC Objection ¶ 18.   This bald, self-serving assertion ignores the Debtor's evidence that the Employee testimony benefits the Debtor in the litigations.   It simply points to the fact that the Debtor is spending money as evidence of harm. But all administrative expense payments involve using estate assets; that itself is not harm.   The SEC's suggestion that the Debtor's spending funds to defend itself adequately against what is likely the biggest claim against the Debtor's estate would be harmful to the Debtor's estate is ludicrous and should be rejected.   If the SEC was truly concerned about wasteful estate expenditures harming the Debtor's estate, it would not have filed two meritless objections designed to gain an unfair litigation advantage by making it more difficult for the Debtor to use its existing trial counsel and impeding the Debtor's ability to pay certain critical expenses important to its

31

defense in the SEC Enforcement Action, in each case causing the Debtor to have to spend resources on replying to the objections.

68.     Administrative claim status for postpetition Employee Counsel Fees and Expenses is also supported by the Debtor's postpetition contractual obligation to the Employee Counsel as set forth in the Kobre Pool Retention Agreement, as described above.  The Kobre Employee Engagement Letters and engagement letters between the Employees and the Other Employee Counsel require the Employee Counsel to provide services in exchange for payment of fees and expenses.  The Debtor has agreed to pay the fees and expenses on behalf of the Employees. Thus, to the extent that postpetition performance is provided by the Employee Counsel under the engagement letters, then such expenses should be entitled to administrative priority.  It is black letter law that a contract counterparty that performs under a contract postpetition is entitled to administrative expense priority.  *See, e.g., In re ID Liquidation One, LLC*, 503 B.R. 392, 399 (Bankr. D. Del. 2013) ("Courts in this district have consistent held that administrative expense priority is available to contract parties when the debtor enjoys the benefits of the contract [postpetition] pending assumption or rejection").

69.     The SEC also argues that alleged "contingent" reimbursement claims for Employees should be disallowed under section 502(e)(1)(B) because the Debtor may conceivably be co-liable on those claims. [18]  *See* SEC Objection ¶ 19.  Again, the SEC appears to have misunderstood the facts and the law.  There is nothing contingent about the payment of Employee Counsel.  Rather, the Debtor's obligation to pay these litigation expenses incurred by the Employee

---

[18]    The Debtor notes that the SEC Objection references section 501(e)(1)(B), but the Debtor understands the SEC to mean section 502(e)(1)(B).

Counsel mature upon services being completed.  The Motion is also not seeking to pay any legal liability on which the Debtor may be co-liable.  Section 502(e)(1)(B) does not apply.[19]

IV.     **Payment of Postpetition Employee Counsel Fees and Expenses Are Justified as Ordinary Course Payments.**

70.     The SEC argues that the payment of postpetition Employee Counsel expenses is outside the ordinary course of business because the Debtor is "not in the business of hiring defense counsel for it employees." *See* SEC Enforcement Action ¶ 22.  This is not the standard.

71.     To the contrary, it is certainly ordinary course for any company to pay to defend itself in litigation that is not subject to the chapter 11 automatic stay.  Under the SEC's logic, the Debtor (and any other debtor in chapter 11) would not even be able to pay its own defense counsel, as defending litigation is not within the Debtor's primary business of software development, a preposterous conclusion.  Further, it is ordinary course for a business to provide payment for employees' legal expenses (even without an indemnification obligation to pay such expenses), where the business determines that to do so would be a prudent exercise of its business judgment.  Indeed, where the Bankruptcy Court has granted relief to pay employees' legal and/or indemnification expenses in a number of cases based on the debtors' arguments that such expenses were an ordinary course payment. *See In re Celsius LLC*, No. 22-10964 (MG) (Bankr. S.D.N.Y.

---

[19]     Section 502(e)(1)(B) requires the disallowance of a claim where the claimant asserts a (i) contingent claim (ii) for reimbursement of a debt (iii) for which the debtor is co-liable. § 502(e)(1)(B); *In re RNI Wind Down Corp.*, 369 B.R. 174, 178 (Bankr. D. Del. 2007). Section 502(e)(1)(B) is inapplicable here for several reasons. First, the fact that the exact amount of postpetition expenses Employee Counsel may incur is unknown establishes that the claim is unliquidated, not that that the claim is contingent. *Id.* Additionally, it is not conceivable that the Employees could be co-liable with the Debtor with respect to their claims for advancement of Employee Counsels' fees, because the Employees' claims do not relate to some third party that could hold both the Employee and the Debtor liable. Further, the possibility that the Debtor could theoretically have a claim for return of some or all of an Employees' advanced legal expenses, based upon the triggering of the Indemnity Limitation, is insufficient to render the claim contingent. *Id.* ("[T]he possibility that the Plan Administrator may have a claim for return of some or all of the legal defense costs advanced to claimant if it is ultimately determined that claimant has no right to indemnification is insufficient, as a matter of law, to render the claim contingent").

Sept. 21, 2023) [Docket No. 3515] (where the Debtor argued in its motion [Docket No. 2147] that reimbursement for employee litigation expenses was "ordinary course" under section 363(c)); *In re RNI Wind Down Corp.*, No. 06-10110 (CSS) (Bankr. D. Del. July 17, 2006) [Docket No. 531] (where the debtors noted in their motion [Docket No. 408] that the advancement, reimbursement, and indemnification of directors' and officers' was a transaction within the ordinary course of business, but requested the relief in the motion out of an abundance of caution).

72.    Under both the horizontal and vertical tests that courts use to determine whether a transaction is in the ordinary course, the postpetition payment of the Employee Counsel Fees and Expenses is a transaction in the ordinary course of the Debtor's business.   From a cryptocurrency-industry-wide perspective, the payment of employee legal expenses is of the kind commonly undertaken by companies in that industry.   *In re Roth American, Inc.*, 975 F.2d 949, 953 (3d Cir. 1992) ("The inquiry deemed horizontal is whether, from an industry-wide perspective, the transaction is of the sort commonly undertaken by companies in that industry"); *see, e.g., In re Celsius LLC*, No. 22-10964 (MG) (Bankr. S.D.N.Y. Sept. 21, 2023) [Docket No. 3515] (where the Court authorized the debtors to advance employees' legal expenses, subject to certain payment procedures, in accordance with the debtors' routine prepetition practice).   Given the significant level of regulatory involvement in the cryptocurrency industry, other major cryptocurrency businesses very likely pay for their employees' legal expenses related to regulatory investigation.[20] In addition, a hypothetical creditor would consider would normally expect that the Debtor would pay for the Employees' legal expenses, given that the Debtor operations on an international stage in a volatile and regulatory-prone sector, which could necessitate the Debtor's and its Employees'

---

[20]    MacKenzie Sigalo and Ryan Browne, *United States acts as top cop – setting the crypto standards for the world*, CNBC (Dec. 31, 2023), https://www.cnbc.com/2023/12/31/state-of-crypto-regulation-in-2023-eu-laws-approved-but-us-is-top-cop.html.

cooperation with regulators. *In re Roth American, Inc.*, 975 F.2d at 953 (the vertical test "analyzes the transactions from the vantage point of a hypothetical creditor and the inquiry is whether the transaction subjects a creditor to economic risk of a nature different from those he accepted when he decided to extend credit").

## V.    Payment of Critical Vendor Claims Is Justified

73.    In addition, the Objectors suggest that the payment of prepetition Critical Vendor Claims is not supported by business judgment, noting that the Debtor has not provided sufficient detail regarding the services provided by the Critical Vendors.  *See* SEC Objection at p. 14; UST Objection ¶¶ 17, 24.  The Supplemental Califano Declaration sets forth additional detail regarding the four Critical Vendors the Debtor seeks to pay in the motion, each providing essential litigation-related services in connection with the SEC Enforcement Action, including:

    a.  <u>Alpha Consulting</u>: provides strategic security consulting and local intelligence in Montenegro. Alpha Consulting has been vital to obtaining information from relevant authorities related to Mr. Kwon's extradition from Montenegro, which is important, as the timing of Mr. Kwon's extradition determines whether he will be a witness in the SEC Enforcement Action. Alpha Consulting is owed approximately $4,000 in prepetition fees.

    b.  <u>Cornerstone Research</u>: serves as a research consultant in connection with expert testimony for the SEC Enforcement Action and the DOJ Investigation. Cornerstone Research is owed approximately $637,000 in prepetition fees.

    c.  <u>JS Held LLC</u>: provides expert witness and consulting services regarding cyptocurrency transaction tracing and analysis. JS Held LLC is owed approximately $387,000 in prepetition fees.

    d.  <u>Quinlan Partners</u>: provides investigative services, including regarding trial witness backgrounds, financial statements, past social media statements, and cryptocurrency wallet histories. Quinlan Partners is owed approximately $262,000 in prepetition fees.

*See* Supplemental Califano Declaration ¶ 22.

74.    All of Critical Vendors contacted Mr. Califano repeatedly in the past few weeks seeking the status of these payments and the Court's decision on the Motion and have

conveyed to Mr. Califano that they will strongly reconsider or cease providing services if the Debtor does not promptly pay the prepetition amounts owing to the Critical Vendors.  *See* Supplemental Califano Declaration ¶ 24.  Especially given that the subject matter of the SEC Enforcement Action and investigations is highly complex, and that many of the Critical Vendors have been working for almost a year and a half conducting complex analyses of immense quantities of data, all of the Critical Vendors have months of nontransferable institutional knowledge of the facts and issues at hand, and there are no alternatives to the services they provide.  Given that the Debtor is on the eve of the SEC Jury Trial, the Critical Vendors are irreplaceable.  *See* Supplemental Califano Declaration ¶ 25.  Even if non-conflicted alternative vendors existed that were capable of performing this work, the time and costs associated with switching from a Critical Vendor to a new provider would be significant and detrimental to the Debtor's defense of the SEC Enforcement Action and the Debtor can simply not afford a delay in services being performed by the Critical Vendors to aid its defense in the SEC Enforcement Action. Supplemental Califano Declaration ¶ 25.

75.    Thus, paying the Critical Vendor Claims is necessary to preserve the value of the Debtor's estate for the benefit of all creditors, because it aids the Debtor's defense in the SEC Enforcement Action.  *See In re Lehigh & New Eng. Ry. Co.,* 657 F.2d 570, 581 (3d Cir. 1981) (holding that "if payment of a claim which arose prior to reorganization is essential to the continued operation of the . . . [business] during reorganization, payment may be authorized even if it is made out of [the] corpus").

**Conclusion**

76.    For the reasons stated above and in the Motion, the Motion should be granted and the Court should enter an order substantially in the form of the Proposed Order with the changes discussed in paragraph 37, herein.

Dated: March 4, 2024
    Wilmington, Delaware

/s/ Matthew P. Milana
RICHARDS, LAYTON & FINGER, P.A.
Paul N. Heath (No. 3704)
Zachary I. Shapiro (No. 5103)
Matthew P. Milana (No. 6681)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Email:    heath@rlf.com
        shapiro@rlf.com
        milana@rlf.com

-and-

WEIL, GOTSHAL & MANGES LLP
Ronit J. Berkovich (admitted *pro hac vice*)
Jessica Liou (admitted *pro hac vice*)
F. Gavin Andrews (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Email:    ronit.berkovich@weil.com
        jessica.liou@weil.com
        f.gavin.andrews@weil.com

*Attorneys for Debtor*
*and Debtor in Possession*

RLF1 30647653V.1