**Exhibit B**

**Form Deel Employment Agreement**

RLF1 30648338V.1

**Employment Agreement**

THIS AGREEMENT made BETWEEN:

**Deel US LLC** (the "**Employer**"), a corporation registered under the law of the United State of America and with registered office at 1013 Centre Road, Suite 403-B, Wilmington, New Castle County, Delaware 19805.

And

███████ (the "**Employee**") with residence at ████████████████████████ ████████████

WHEREAS:
1. The Employer and the Employee are desirous of entering into an employment relationship for their mutual benefit;
2. The Employer and the Employee wish to clarify certain obligations and rights in respect of said employment relationship;
IN CONSIDERATION of the above, and in further consideration of the mutual promises and covenants set forth, this Employment Agreement (the "**Agreement**") witnesses that the parties agree as follows:

**EMPLOYMENT AGREEMENT MINIMUM TERMS AND CONDITIONS (the "Table")**

**1- Start date:** April 15th, 2022

**2- Contract term:**

- indefinite

**3- Probation Period:**

- The Employment agreement is not subjected to a probationary period

**4- Job Role:** ███████████████

**5- Job Description:** General PurposeThe role of the ██████████████ is to increase brand awareness through the marketing of content online and by sharing valuable content to attract and convert prospects into customers, and customers into repeat buyers. They are responsible for creating impactful content, publishing content on the appropriate platforms, and measuring the results of marketing activity. In this role, the ██████████████ needs to be highly familiar with

social media marketing, to have also a high level of creativity.Duties and Responsibilities- Develop and orchestrate digital content strategy across all online platforms, including social media.- Share content through various platforms, ensuring strong web presence.- Collaborate with design and writing teams to produce high quality content.- Manage a content marketing budget.- Design and implement creative marketing strategies to disseminate content.- Undertake content marketing initiatives to achieve business targets.- Develop editorial calendar, delegate tasks and ensure deadlines are met.- Receive customer feedback and generate ideas to increase customer engagement.

**6- Manager:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

**7- Place of work:** Remote.

**8- Employment type:**

- Full-time

**9- Organization of the working time:**

- Full-time employment : not less than forty (40) hours per week

**10- Holidays / Leaves:** 15 days of Paid Time Off per year ("PTO"). The Employee may use the PTO for vacation, personal time, or sick leave. The PTO days accrue at the rate of 1.25 days per month during the Employee's term of employment at the Company.

**11- Paid Holidays:** The Company observes the following paid holidays: New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, Christmas Day, Martin Luther King Jr. Day, Veterans Day and President's Day. If any holiday occurs on a Saturday or Sunday, the preceding Friday will be a paid Company holiday.

**12- Notice period:** 14 days prior notice.

**13- Salary:** ▮▮▮▮▮▮▮▮▮▮

**14- Bonus:**

- Bonus at the discretion of the Company

**15- Additional Benefits:**

- Not applicable

**16- Payment terms/ Currency:** Twice monthly to the Employee's bank account in accordance with the normal routines of the Company.

**17- Expenses reimbursement:** Pre-authorized expenses and upon receipts.

**DETAILED TERMS AND CONDITIONS OF THE EMPLOYMENT**

**1- START DATE AND NATURE OF RELATIONSHIP**
Subject to the Employee's acceptance of this offer and compliance with its provisions, the Employee's employment with the Company will begin on the date set out in **Point 1** of the Table.
The Employee's employment will, at all times, remain "at will" employment. As such, either the Employee or the Company may terminate the Employee's employment at any time for any reason or for no reason. No provision of this Agreement, and no actions by either the Employee or the Company, shall be construed to create a promise of employment for any specific period of time.
The Employee may voluntarily terminate the employment by giving a prior notice set out in **Point 12** of the Table.

**2- CONTRACT TERM**
The contract term is set out in **Point 2** of the Table.

**3- PROBATION PERIOD**
The probation period is set out in **Point 3** of the Table.

**4- JOB ROLE**
The Employee shall report to and work under the supervision of the manager mentioned in **Point 6** of the Table.

The Employee's work responsibilities and duties shall be as described in **Point 5** of the Table, or as may from time to time be prescribed by the Employee's supervisor and/or the Company. As part of such a position, the Employee shall be assigned to provide services to particular customers of the Company, as shall be designated by the Company (each a "**Customer**"). The Company may modify the Employee's duties from time to time in accordance with the Company's requirements, including as requested from the Company by the applicable Customer. The Employee is required to abide by all of the policies and procedures as set forth by the Company ("**Company Policies**"), including any such applicable policies and procedures provided by the Customer ("**Customer Policies**"). In the event of any inconsistency between any Customer Policies and Company Policies, the terms of the Company Policies shall prevail. Moreover, during the Employee's employment with the Company, the Employee will be expected to conduct the Employee's business activities at all times in accordance with the highest legal, ethical and professional standards.

**5- ORGANISATION OF THE WORKING TIME AND SCOPE OF EMPLOYMENT**
The type of employment is specified in **Point 9** of the Table.

The Employee employed full-time shall devote his/her best professional efforts, skills and energies and his/her full business time and attention to the performance of his/her duties and responsibilities under this Agreement.

The Employee employed on a part-time basis shall devote 100% of his/her business time to his/her duties under this Agreement.

The organization of the working time of the Employee is set out in **Point 9** of the Table.

The Employee hereby confirms, as a condition to accepting and entering into this Agreement, that he/she is under no contractual or other legal obligations that would prohibit or restrict him/her from fully entering into this Agreement, performing his/her obligations hereunder, including, without limitation, providing services to the Customer as part of his/her work for the Company, and complying with all terms of this Agreement, and that the Employee has no current or potential conflict of interest relating to his/her employment with the Company and performance of his/her duties hereunder.

**6- SALARY**

The Employee's salary is laid out in **Point 13** of the Table. As set out in **Point 16** of the Table, the Employee's salary shall be payable in accordance with the Company's regular payroll practices in effect from time to time, currently twice a month. The Company shall make any withholdings which may be required by law or which the Employee may authorize from time to time. The Company reserves the right to review the salary and to adjust it from time to time in its sole discretion. This review is typically done annually but may be done more or less frequently.

As set out in **Point 17** of the Table, the Employee shall be entitled to reimbursement from the Company in respect to such expenses submitted and approved in advance by the Company in such manner as notified to the Employee by the Company from time to time.

**7- BENEFITS**

During the Employee's employment, the Employee will be eligible to participate in the employee benefit plans as set out in **Point 14** of the Table. These benefits shall be made generally available by the Company from time to time to its similarly-situated employees, subject to plan terms and generally applicable Company policies, including, without limitation. These benefits may be modified or changed from time to time in the sole discretion of the Company, and the provisions of such benefits to the Employee in no way changes or impacts the Employee's status as an at-will employee.

**8- HOLIDAYS**

The Employee shall be entitled to the number of days of Paid Time Off per year set forth in **Point 10** of the Table. The Company observes the paid holidays set forth in **Point 10** of the Table. The Company's policy is that except as otherwise required by applicable law, employees are not paid out for accrued, unused Paid Time Off and Paid Time Off does not roll over from year to year.

**9- EFFECT OF TERMINATION**

If the Employee ceases to be an employee of the Company, for any reason, the Employee shall act as follows:
(i) deliver and/or return to the Company all property of the Company in the Employee's possession or
control including, without limitation, cellular telephones, other telecommunications material, keys, modems, computers, identification badges or other equipment, company documents, CDs, letters, notes, reports, business cards and other papers and electronic files in the Employee's possession and relating to the Employee's tenure with the Company;

(ii) deliver and/or return to the Company all property of the Customer in the Employee's possession
or control including, without limitation, cellular telephones, other telecommunications material, keys, modems, computers, identification badges or other equipment, company documents, CDs, letters, notes, reports, business cards and other papers and electronic files in the Employee's possession in connection with the Employee's engagement with the Company hereunder;
(iii) delete any information relating to the Company and/or Customer from the Employee's personal computer, phone and other devices; and
(iv) provide reasonable assistance to the Company to ensure an orderly transition, including the handing over to the persons designated by the Company, any documents and all other matters that the Employee dealt with.

**10- WAIVER AND RELEASE**

Without limiting or derogating from the foregoing, if the Employee's employment is terminated by the Company without Cause (as defined herein), then the Company may offer the Employee severance benefits equal to two (2) weeks' base salary. All severance benefits are conditioned on the Employee's signing a full release of any and all claims against the Company and any Customer in a release form acceptable to the Company (within the period specified in it by the Company) and the Employee's not revoking such release pursuant to any revocation rights afforded by applicable law.

For purposes of this Section 10, the term "**Cause**" shall mean (a) any material breach by the Employee of this Agreement or any other agreement to which the Employee and the Company are both parties, (b) any act (other than retirement) or omission to act by the Employee which may have a material and adverse effect on the Company's business or on the Employee's ability to perform services for the Company, including, without limitation, the commission of any crime (other than minor traffic violations), or (c) any material misconduct or material neglect of the Employee's duties in connection with the business or affairs of the Company. The Employee's employment shall be deemed to have been terminated for Cause if the Company determines within thirty (30) days of the termination of employment (whether such termination was voluntary or involuntary) that termination for Cause was warranted.

**11- INDEMNIFICATION OF EMPLOYEE**

To the maximum extent permitted by law, the Company and its respective successors and assigns, shall indemnify, protect, defend and hold Employee harmless from, for, and against any and all claims, liabilities, liens, fines, demands, lawsuits, actions, losses, damages, injuries, judgments, settlements, costs or expenses whether asserted in law or in equity and including any claims made by regulatory agencies asserted against the Employee arising out of, in whole or in part, the actions or commissions of the Employee, other than those which have arisen from the Employee's gross negligence, willful misconduct, or breach of this Agreement (hereinafter, collectively, "**Claims**"). Employer shall advance all expenses, including reasonable attorney's fees and costs of court approved settlements, actually or necessarily incurred by Employee in connection with the defense of any action, suit, or proceeding and in connection with any appeal, which has been brought against Employee by reason of his service as an officer or agent of the Company and shall continue to provide such costs and expenses of defense to the Employee until the matter is fully resolved by either final judgment, settlement, or other release executed by the Employee. The Company indemnifies the Employee from, for and against all Claims, including, without limitation, all legal fees, costs and expert fees and costs that the Employee may directly or indirectly sustain, suffer or

incur as a result thereof. The Company shall and does hereby assume on behalf of the Employee, upon its demand, the amount of any costs allowed by law, and costs identified herein, any settlement reached or any judgment that may be entered against the Employee, as a result of such Claims. The obligations of the Company pursuant to this Section will survive the expiration or earlier termination of the Employees employment.

**12- EMPLOYEE NDA**

Attached hereto as **Exhibit A** is a copy of the Company's Non-Disclosure, Non-Competition and Assignment of Intellectual Property Agreement (the "**Employee Undertaking**"). This offer is conditioned on the Employee's signing the Employee Undertaking and the Employee's continuing willingness thereafter to abide by its terms. The Employee is required to sign the Employee Undertaking when he/she countersigns this Agreement. For the sake of clarity, the terms and obligations as set forth in the Employee Undertaking are incorporated herein by reference and such terms and obligations shall survive termination of the Employee's employment, regardless of whether such termination is with, or without, cause.

**13- PROOF OF RIGHT TO WORK**

The Immigration Reform and Control Act requires employers to verify the employment eligibility and identity of new employees. Prior to commencing employment with the Company, the Employee shall provide the Company with Form I-9 accurately completed to evidence his/her eligibility for employment. The Employee shall bring the appropriate documents listed in the Form I-9 on the start date of his/her employment. The Company will not be able to employ the Employee if he/she failed to comply with that requirement. The Company reserves the right to perform standard background checks on all employees consistent with applicable laws.

**14- MISCELLANEOUS**

This Agreement, and Exhibits attached hereto, contain the entire understanding between the Employee and the Company with regard to the subject matter contained herein, and supersedes all prior agreements, understandings, intents, promises or statements, whether oral or written, between the Employee and the Company or any related party regarding the offered terms of employment.

The terms of the Employee's employment shall be governed by the laws of Wisconsin. Any controversy or claim arising out of, or relating to, this Agreement or breach hereof shall be brought before courts having jurisdiction thereof.

The Employee acknowledges that the services he/she will render hereunder are unique and personal. Accordingly, the Employee may not assign any of his/her rights or delegate any of his/her duties or obligations under this Agreement. The rights and obligations of the Company under this Agreement shall inure to the benefit of and be binding upon its successors and assigns.

Should any provision of this Agreement or any portion thereof, be found invalid and unenforceable, the remaining provisions shall continue in full force and effect. Failure of either the Employee or the Company to enforce at any time any provision of this Agreement shall not be construed to be a waiver of such provision, nor in any way affect the validity of this Agreement or any part hereof or the right of either the Employee or the Company to enforce each and every such

provision. No waiver of any breach of this Agreement shall be held to constitute a waiver of any other or subsequent breach. This Agreement may be executed in one or more counterparts, each of which shall be considered an original instrument, but all of which shall be considered one and the same agreement, and shall be binding when one or more counterparts have been signed by each of the parties and delivered to each of the parties.

In accepting this offer, the Employee gives the Company assurance that the Employee has not relied on any agreements or representations, express or implied, with respect to the Employee's employment that are not set forth expressly in this Agreement.

IN WITNESS WHEREOF the parties executed this agreement April 14th, 2022, in Wisconsin United States.

SIGNED, SEALED AND DELIVER



EXHIBIT A

**DEEL US LLC EMPLOYEE UNDERTAKING**

In consideration of my employment by the Company pursuant to the offer letter to which this Employee Undertaking is attached (the "Agreement") and as a material condition of such engagement and continuation of my engagement by the Company, I, the undersigned, hereby agree, effective as of the date on which I executed the Agreement (the "Effective Date"), as follows (the "Undertaking"):

All terms not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement.

**Note**: 'I' is a reference to 'the Employee'

**1. Confidentiality.**
I (the Employee) will not at any time, whether during or after the termination of my engagement by the Company, reveal to any person or entity any of the trade secrets or confidential, proprietary or other non-public information concerning the organization, business, finances or assets of the Company, or any third party which the Company is under an obligation to keep confidential,

including but not limited to information related to Company or any Customer inventions, research, testing, manufacturing, production, marketing, supplies, suppliers, consultants, strategic partners, products, designs, methods, know-how, techniques, systems, processes, software programs and/or code, works of authorship, customer and collaborator lists, projects, plans, proposals, any Developments (as defined below), and the notes, memoranda, reports, lists, records, drawings, sketches, specifications, data, documentation or other materials of any nature containing such trade secrets or confidential information (the "**Confidential Information**"), except as may be required in the ordinary course of performing my duties as an employee of the Company. I shall keep secret all matters entrusted to me by the Company, and shall not use, attempt to use or permit to be used any Confidential Information in any manner which may injure or cause loss or may foreseeably injure or cause loss, whether directly or indirectly, to the Company, or which is for any purpose other than for the benefit of the Company.

Further, I agree and acknowledge that all Confidential Information, in any form or manifestation, shall be and remain the sole and exclusive property of the Company and/or the Customer, as applicable, and that immediately upon the termination of my engagement by the Company, or at such other time as the Company may request, I shall deliver all of the foregoing, and all copies and derivations thereof, to the Customer or Company at its main office, as applicable. I further agree to return all other Company owned or Customer owned material, including without limitation files, computer equipment, passwords, telephone equipment and cards, credit cards and/or keys to the Company or Customer, as applicable upon the earlier of the Company's request therefore or the termination of my engagement by the Company.

Notwithstanding the foregoing confidentiality obligations, I hereby understand and acknowledge that pursuant to the Defending Trade Secrets Act of 2016, I shall not be criminally or civilly liable under any federal or state laws for the disclosure of a trade secret that is made (i) in confidence to a federal, state or local government official, either directly or indirectly, or to any attorney, and solely for the purpose of reporting or investigating a suspected violation of law; or (ii) in a complaint or other document filed in a lawsuit or other proceeding only if such filing is made under seal. I hereby further understand and acknowledge that in the event I file a lawsuit for retaliation by the Company for reporting a suspected violation of the law, I may disclose the trade secret to my attorney and use the trade secret information in the court proceeding only if (i) any documents I file containing such trade secrets are filed under seal and (ii) I do not disclose the trade secret except pursuant to a court order. For the sake of clarity, the exceptions set forth in this paragraph shall only apply to trade secrets of the Company and shall not affect, or apply to, any other Confidential Information of the Company and shall not derogate from my confidentiality obligations set forth herein.

**2. Work Product.**
Inventions. If, at any time or times during my engagement by the Company, I shall (either alone or with others) make, conceive, create, discover, invent or reduce to practice any invention, modification, discovery, design, development, improvement, process, software program, work of authorship, documentation, formula, data, technique, know-how, trade secret or intellectual property right whatsoever or any interest therein (whether or not patentable or registrable under copyright, trademark or similar statutes) that (a) relates to the business of the

Company or any Customer, collaborator of or supplier to the Company, or any of the products or services being developed, manufactured or sold by the Company or its Customers or which may be used in relation therewith, (b) results from tasks assigned to me by the Company or any of its Customers or (c) results from the Confidential Information or use of facilities, premises or personal property (whether tangible or intangible) owned, leased or contracted for by the Company and/or Customer ("**Developments**"), such Developments and the benefits thereof are and shall immediately become the sole and absolute property of the Company and its assigns, as works made for hire or otherwise, and I shall promptly disclose to the Company (or any persons designated by it) each such Development. I hereby acknowledge and agree that, as between me and the Company, the Company shall own, and I hereby assign and, upon future creation, automatically assign to the Company, all right, title and interest, including, without limitation all Intellectual Property Rights, in and to any existing and future Developments (whether created prior to, on or after the Effective Date). For purposes of this Undertaking, "Intellectual Property Rights" are all:

> (a) patents and associated reissues, divisions, renewals, extensions, provisionals, continuations and continuations-in-part;
> (b) all inventions, whether patentable or not and whether or not reduced to practice;
> (c) registered and unregistered trademarks, service marks, certification marks, trade dress, logos, trade names, brand names, corporate names, business and product names, internet domain names, internet uniform resource locators, and internet protocol addresses and all goodwill associated with these rights;
> (d) Trade Secrets, industrial rights, industrial designs;
> (e) registered and unregistered works of authorship, copyrights, moral rights and publicity rights;
> (f) all rights to computer software, computer software source code, proprietary databases and mask works and all documentation and developer tools associated with these;
> (g) proprietary rights that are similar in nature to those enumerated in (a) through (f) anywhere in the world;
> (h) all enhancements and improvements to and all derivations of any of the rights enumerated in (a) through (g);
> and (i) all applications, registrations and documentation associated with the rights described in (a) through (g).

I will, during my engagement by the Company and at any time thereafter, at the request of the Company, promptly sign, execute, make and do all such deeds, documents, acts and things as the Company and its duly authorized agents may reasonably require, in connection with the Developments, to (i) apply for, obtain, register and vest in the name of the Company alone (unless the Company otherwise directs) all patents, copyrights, trademarks and other analogous protections in any country throughout the world, and when so obtained or vested to renew and restore the same; and (ii) to defend any judicial, opposition or other proceedings in respect of such applications, and any judicial, opposition or other proceedings or petitions or applications for revocation of such patents, copyrights, trademarks or other analogous protections.

I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney-in-fact, to act for and in my behalf and stead, in the event the Company is unable,

after reasonable effort, to secure my signature on any application for patents, copyright or trademark registration or other documents regarding any legal protection relating to any Developments, whether because of my physical or mental incapacity or for any other reason whatsoever, to execute and file any such application or applications or other documents, and to do all other lawfully permitted acts to further the prosecution and issuance of patents, copyright or trademark registrations or any other legal protections thereon with the same legal force and effect as if executed by me.

**3. Non-solicitation.**

During the period of my engagement by the Company, I will devote my full business time (unless I was hired on a part-time basis) and best efforts to the business of the Company. Further, during the period of my engagement by the Company and for two (2) years thereafter (the "Restricted Period"), I agree that I will not, directly or indirectly, alone or as a partner, officer, director, employee, consultant or stockholder of any entity:

> (a) hire, solicit, interfere with or endeavor to entice away any person who was an employee or contractor of the Company at the time of termination of my engagement by the Company;
> 
> (b) render services to or otherwise be engaged or employed by, or solicit, interfere with or endeavor to divert away from the Company any person or entity who is or was a supplier of the Company during the Restricted Period, or any prospective supplier of the Company whose identity or potential as a supplier was learned by me during my engagement by the Company.
> 
> (c) solicit any Customer of the Company for the purpose of selling or providing any products or services in a manner which is competitive with the Company's business or is similar to the services provided to the Customer by Company, including by services performed by me.

These restrictions shall apply to those Customers (i) to whom I provided a service on behalf of the Company; (ii) who received services from the Company under my supervision and coordination; (iii) about whom I obtained or accessed Confidential Information as part of my role with the Company; or (iv) who receive products or services authorized by the Company, the sale or provision of which results or resulted in compensation, commissions, or earnings for me within two (2) years prior to the date of my termination.

**4. Non-competition.**

During the period of my engagement by the Company, I will devote my full business time (during my required hours) and best efforts to the business of the Company. I acknowledge that my access to Confidential Information, if disclosed, would assist in competition against the Company, and I further acknowledge that my personal dealings with customers, collaborators and clients will generate substantial goodwill for the Company. Therefore, I agree that the restrictions on my activities during and after my engagement set forth in this Section 4 and in Section 3 are necessary to protect the good will, Confidential Information and other legitimate business interests of the Company. Accordingly, during my engagement by the Company and for a period of one (1) year thereafter, regardless of the reason for my separation, except in the event that the Company terminates my employment without cause, I agree that I will not, directly or indirectly, alone or as a partner, officer, director, employee, consultant, investor, agent, representative

or stockholder of any entity, engage in any business activity which is in competition with the services or products being rendered, delivered, marketed, commercialized, produced or sold or under development or active consideration by the Company during my engagement by the Company, including, without limitation, any entities engaged in any activity in any way relating to the field of business of the Company.

**5. Non-Disparagement.**

During the period of my engagement by the Company and indefinitely thereafter, I will not make any statements, whether verbally or in writing (including in electronic communications) that are professionally or personally disparaging of, or adverse to the interest of, the Company or its affiliates, stockholders, officers, directors, managers, employees, advisors, consultants or agents. This includes, but is not limited to, any statements that disparage the products, services, finances, financial condition, capability or any other aspect of the business of the Company and its affiliates. I further agree not to engage in any conduct which is intended to harm, professionally or personally, the reputation of the Company or its affiliates, officers, directors, managers, consultants or employees. For purposes of this Agreement, the term "affiliate" of the Company means and includes, without limitation, any and all persons and entities directly or indirectly controlling, controlled by or under common control with the Company, including subsidiaries, and such affiliate's directors, officers, employees, agents, successors and assigns.

**6. Miscellaneous.**

(a) I agree that any breach of this Undertaking by me will cause irreparable damage to the Company, and that in the event of such breach the Company shall have, in addition to any and all remedies at law, the right to an injunction, specific performance or other equitable relief to prevent the violation of my obligations hereunder, without having to post bond, together with an award of its attorney's fees incurred in securing such relief.

(b) I understand that this Undertaking does not create an obligation on the part of the Company or any other person or entity to continue my engagement by the Company.

(c) I represent that the Developments identified in the pages, if any, attached hereto comprise all of the unpatented and unregistered copyrightable Developments which I have made, conceived or created prior to my engagement by the Company, which Developments are excluded from this Undertaking. I understand that it is only necessary to list the title and purpose of such Developments but not any details thereof; and, if no pages are attached, I represent that there are no such Developments to be excluded from this Undertaking. I further represent that my performance of all of the terms of this Undertaking and as an employee of the Company does not and will not breach any other agreement, including without limitation an agreement to keep in confidence proprietary information of others acquired by me prior to my engagement by the Company, nor will my performance of the terms of this Undertaking violate any agreement not to compete. I have not entered into, and I agree I will not enter into, any agreement, either written or oral, in conflict herewith.

(d) Any waiver by the Company of a breach of any provision of this Undertaking shall not operate or be construed as a waiver of any other provision of this Undertaking, and shall not operate or be construed as a waiver of any subsequent breach of such provision or any other provision hereof.

(e) It is agreed that the periods of post-engagement restriction set forth in Sections 3 and 4 of this Undertaking shall be tolled, and shall not run, during any period of time in which I am in violation of the terms hereof, in order that the Company shall have all of the agreed-upon temporal protections recited herein.

(f) I hereby agree that each provision herein shall be treated as a separate and independent clause, and the unenforceability of any one clause shall in no way impair the enforceability of any of the other clauses herein. I further agree that no breach of any provision of this Undertaking by the Company, or any other claimed breach of contract or violation of law, shall operate to excuse my obligation to fulfill the requirements of Sections 3 and 4 hereof. In signing this agreement, I give the Company assurance that I have carefully read and considered all the terms and conditions of this agreement, including the restraints imposed on me under Sections 3 and 4. I agree that these restraints are necessary for the reasonable and proper protection of the Company and that each and every one of the restraints is reasonable in respect to subject matter, length of time and geographic area. Moreover, if one or more of the provisions contained in this Undertaking shall for any reason be held to be excessively broad as to scope, time period, geographic scope, activity, subject or otherwise so as to be unenforceable at law, such provisions shall be construed by the appropriate judicial body by limiting or reducing it or them, so as to be enforceable to the maximum extent compatible with the applicable law as it shall then appear. I acknowledge and agree that I do not rely, and have not relied, on any representation or statement made by the Company with regard to the subject matter, basis or effect of this Undertaking, other than those contained in this agreement.

(g) My obligations under this Undertaking shall survive the termination of my engagement by the Company, regardless of the reason for such termination, and shall be binding upon my heirs, executors, administrators and legal representatives. It is further agreed that no changes to the nature or scope of my relationship with the Company shall operate to extinguish my obligations hereunder or require that this Undertaking be re-executed.

(h) The term "Company" means Deel US LLC, and, for purposes of this Undertaking, shall also mean and include its parent, subsidiaries, subdivisions or affiliates. The Company shall have the right to assign this Undertaking to its successors and assigns, and all covenants and agreements hereunder shall inure to the benefit of and be enforceable by said successors or assigns. I acknowledge that I do not have any right to assign any portion of this agreement.

(i) This Undertaking shall be governed by and construed in accordance with the laws of Wisconsin, without regard to its conflict of law provisions. Any disputes relating to or arising out of this Undertaking shall be resolved in the state and/or federal courts of Wisconsin, to whose exclusive jurisdiction I hereby assent.

(j) This Undertaking, together with any attachments hereto, constitutes the entire agreement between the Company and me with respect to the subject matter hereof, and supersedes all prior discussions, promises, negotiations and agreements (whether written or oral). This Undertaking may be amended or modified only by a written agreement executed by the Company and me.

If the employment agreement is not signed by the start date, the start date of your employment will be delayed to the date of employee agreement signature, or later if so agreed between the parties.

| DEEL | EMPLOYEE |
|---|---|
| Signature: ███████ | Signature: ███████ |
| Date: April 14th, 2022 | Date: April 14th, 2022 |