UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          . Chapter 11
                                . Case No. 24-10070 (BLS)
TERRAFORM LABS PTE. LTD.,       .
                                .
                                .
                                . Courtroom No. 1
                                . 824 Market Street
            Debtor.             . Wilmington, Delaware 19801
                                .
                                . Tuesday, March 5, 2024
. . . . . . . . . . . . . . .   2:45 p.m.

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE BRENDAN L. SHANNON
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtor:            Ronit Berkovich, Esquire
                           WEIL, GOTSHAL & MANGES, LLP
                           767 Fifth Avenue
                           New York, New York 10153

                           -and-

                           Tania M. Moyron, Esquire
                           DENTONS
                           601 South Figueroa Street
                           Suite 2500
                           Los Angeles, California 90017


(APPEARANCES CONTINUED)

Audio Operator:            Dana L. Moore, ECRO

Transcription Company:     Reliable
                           The Nemours Building
                           1007 N. Orange Street, Suite 110
                           Wilmington, Delaware 19801
                           Telephone: (302)654-8080
                           Email:  gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1  APPEARANCES (CONTINUED):

2  For the U.S. Trustee:        Linda Richenderfer, Esquire
                                UNITED STATES DEPARTMENT OF JUSTICE
3                               OFFICE OF THE UNITED STATES TRUSTEE
                                J. Caleb Boggs Federal Building
4                               844 King Street
                                Suite 2207, Lockbox 35
5                               Wilmington, Delaware 19801

6  For the Official
   Committee of
7  Unsecured Creditors:         David R. Hurst, Esquire
                                MCDERMOTT WILL & EMERY, LLP
8                               The Brandywine Building
                                1000 North West Street
9                               Suite 1400
                                Wilmington, Delaware 19801
10
                                -and-
11
                                Colin T. West, Esquire
12                              WHITE & CASE, LLP
                                1221 Avenue of the Americas
13                              New York, New York 10020

14                              Aaron Colodny, Esquire
                                555 South Flower Street
15                              Suite 2700
                                Los Angeles, California 90071

16

17

18

19

20

21

22

23

24

25

1                                    INDEX

2    MOTIONS:                                                    PAGE

3    Agenda
     Item 8:     Motion of Debtor for Entry of Interim and          7
4                Final Orders (I) Authorizing Debtor to (A) Pay
                 Prepetition Workforce Obligations and (B)
5                Maintain Employee Benefit Programs, and
                 (II) Granting Related Relief
6                [Docket No. 20 - filed January 30, 2024]

7                Court's Ruling:                                    7

8    Agenda
     Item 10:    Application of Debtor for Entry of an Order        8
9                Authorizing the Retention and Employment of
                 Dentons US LLP as Special Counsel to the
10               Debtor and Debtor in Possession Effective as
                 of the Petition Date
11               [Docket No. 60 - filed February 13, 2024]

12               Court's Ruling:

13   Agenda
     Item 11:    Motion of Debtor for Entry of Orders Pursuant
14               to Sections 363, 503(b), and 105(a) of the
                 Bankruptcy Code Authorizing Debtor to Pay
15               Certain Amounts in Furtherance of Litigation
                 and Granting Related Relief
16               [Docket No. 61 - filed February 13, 2024]

17               Court's Ruling:

18

19

20

21

22

23

24

25

1                              INDEX

2    MOTIONS:                                                    PAGE

3    Agenda
     Item 12:   Motion of the U.S. Securities and Exchange
4               Commission for Redaction of Certain Personal
                Data Identifiers Pursuant to Fed. R. Bankr. P.
5               9037 and Del. Bankr. L.R. 9037- 1
                [Docket No. 109 - filed March 1, 2024)
6
                Court's Ruling:
7
     Agenda
8    Item 13:   Debtor's Motion for Entry of an Order            7
                Authorizing Debtor to File Under Seal
9               Confidential Information in Connection with
                the Application to Retain and Employ Dentons
10              US LLP as Special Counsel
                [Docket No. 141 - filed March 4, 2024]
11
                Court's Ruling:
12

13
     Transcriptionists' Certificate                             41
14

15

16

17

18

19

20

21

22

23

24

25

1          (Proceedings commenced at 2:45 p.m.)

2                    THE CLERK:  All rise.

3                    THE COURT:  Please be seated.

4                    Ms. Berkovich, good afternoon.  Welcome.  Good to

5     see you.

6                    Mr. West, good to see you.  It's been awhile.

7                    MR. WEST:  Nice to see you.

8                    MS. BERKOVICH:  Good afternoon, Your Honor.

9                    THE COURT:  Good afternoon.

10                   MS. BERKOVICH:  Ronit Berkovich from Weil, Gotshal

11    & Manges, for the debtor Terraform Labs Pte. Ltd.  I'm joined

12    here today by my colleagues Jared Friedmann, Christine

13    Calabrese, and Gavin Andrews, as well as Zach Shapiro from

14    the Richards Layton firm.

15                   We also have in the courtroom today, from Dentons

16    US, the debtors proposed special litigation counsel, Samuel

17    Maizel, Tania Moyron, and Mark Califano.

18                   THE COURT:  Very good.  Welcome, all.

19                   MS. BERKOVICH:  As Your Honor would have noted,

20    Mr. Califano is the declarant in respect of the debtor's,

21    both the debtor's motions.

22                   So thank you for making time for us this

23    afternoon.  Your Honor, we filed a revised agenda on the

24    docket at 146.

25                   THE COURT:  I have it.

1          MS. BERKOVICH:  Before we begin with the contested

2   matters on the docket, I thought it would make sense to deal

3   with the other matters on today's agenda.

4          THE COURT:  Sure.

5          MS. BERKOVICH:  First, in respect of the Treasury

6   management motion, Docket 21, the debtor has agreed with the

7   SEC to adjourn consideration of the final relief until the

8   omnibus hearing of April 18th that's on the agenda.  So we're

9   not seeking any relief today with respect to the Treasury

10  management motion and we intend to continue to operate,

11  pursuant to the interim order at Docket 40.

12         We've been working with the Creditors Committee

13  with their comments on the order and we'll continue to do so.

14  We're confident that we can get to a resolution and we might

15  submit that on -- under certification of counsel, if

16  necessary.

17         THE COURT:  Very good.

18         Ms. Richenderfer, good afternoon.

19         MS. RICHENDERFER:  Good afternoon, Your Honor.

20  Linda Richenderfer for the Office of the United States

21  Trustee.

22         I apologize to counsel for interrupting.  I just

23  wanted the Court to know that the debtor has opened up a bank

24  account with a UDA bank, which is why we weren't troubled by

25  just continuing it, because under the interim order, they had

1  so many days to meet the requirements.  They've already met

2  that requirement; they've opened up the bank account.  And so

3  adjourning it until another day for the final hearing was

4  okay the U.S. Trustee's Office.

5          THE COURT:  Very good.  Thank you,

6  Ms. Richenderfer.

7          MS. BERKOVICH:  Thank you, Ms. Richenderfer, for

8  sharing that good news.  We now have a bank account for the

9  first time in years.  We're very happy.

10          With respect to the wages motion, we received

11  informal comments from the Committee and U.S. Trustee, and we

12  just filed the final under certification of counsel just

13  prior to the hearing.  I don't have the docket, but the wage

14  motion is Docket 20 and the interim wages order is Docket 35.

15          THE COURT:  Very good.  I haven't seen that yet,

16  but I'll review that and I expect that we'll get that order

17  entered today.

18          MS. BERKOVICH:  Thank you, Your Honor.

19          There are a few more administrative motions filed

20  that are reflected towards the end of the agenda.  We propose

21  to deal with them at the end of the hearing --

22          THE COURT:  Okay.

23          MS. BERKOVICH:  -- since we have a packed agenda.

24  I'll just say that with respect to the motion to seal, we did

25  resolve the issues with the U.S. Trustee's Office.

1          THE COURT:  Great.

2          MS. BERKOVICH:  Okay.  So there's two key

3   contested matters going forward today, the Dentons retention

4   application at Docket 60 and the debtor's motion to pay

5   certain amounts in furtherance of litigation at Docket 61.

6   We received objections from the SEC and UST in respect of the

7   Dentons retention at Dockets 86 and 103, and with respect to

8   the litigation payment motion can at Dockets 87 and 104, last

9   night, the Committee filed a preliminary objection to both,

10  the motion and application and requested an adjournment of

11  the hearing at Docket 140.

12          The debtors filed replies to the objections at

13  Dockets 143 and 142, but the UCC's objection was filed at the

14  same time that we filed the reply, so we'll address that

15  orally at the hearing.

16          THE COURT:  Okay.

17          MS. BERKOVICH:  I suggest that we proceed as

18  follows.  I'd like to provide the Court a brief update of the

19  business since the last time we were before the Court.  We

20  can then address the Committee's motion to adjourn.  I'll

21  then have Mr. Maizel handle the Dentons retention

22  application, and then I will present the litigation payments

23  motion.

24          THE COURT:  Very good.

25          MS. BERKOVICH:  Okay.

1          THE COURT:  That makes sense.

2          MS. BERKOVICH:  Okay.  So, first, Your Honor,

3    we're pleased to report that the company's business has been

4    doing well since the filing.  There have been no major

5    hiccups, and in addition to preserving the value of the

6    business operations, the debtor has been focused on

7    preparation for the SEC trial, which now begins in less than

8    three weeks.  As Your Honor can imagine for a litigation of

9    that complexity and magnitude and importance, it's all hands

10   on deck for both, the trial team and the people at the

11   company with a role in the trial.

12          One big development since we were last before the

13   Court is the appointment of a Creditors Committee last week.

14   And I have some things to say about that, but I did agree

15   that I would let my colleague from the McDermott firm address

16   the Court about the Committee first.

17          THE COURT:  Very good.

18          Mr. Hurst, good afternoon.  Good to see you.

19          MR. HURST:  Good afternoon, Your Honor.

20          David Hurst from McDermott Will & Emery, on behalf

21   of the Official Committee of Unsecured Creditors.

22          Your Honor, the Committee was appointed on

23   Thursday, so the 29th of February, and that same day,

24   selected its counsel, White & Case and McDermott.  With me in

25   the courtroom today from White & Case, Mr. Colin West and

1   also Aaron Colodny -- excuse me for the mispronunciation;

2   both have been admitted *pro hac vice* in the case.

3           Unless Your Honor has any questions for me, I just

4   wanted to turn it over to my colleagues from White & Case to

5   make a brief introduction for the Committee.

6           THE COURT:  Of course.

7           MR. HURST:  Thank you, Your Honor.

8           THE COURT:  Mr. Colodny, welcome, sir.

9           MR. COLODNY:  Good afternoon, Your Honor.  Aaron

10  Colodny from White & Case, on behalf of the Official

11  Committee of Unsecured Creditors.  It's good to be back in

12  Delaware.

13          I'm joined by my partner Colin West and co-counsel

14  David Hurst of the McDermott firm.  Two of our lead

15  attorneys, Chris Shore and Greg Pesce, couldn't be here today

16  due to family commitments and the fact that we were just

17  retained on Thursday.

18          The UCC immediately swung into action.  It

19  consists of two individuals and the litigation administrator

20  for Celsius, who is a crypto company who filed for

21  Chapter 11, following the (indiscernible).

22          THE COURT:  That's in front of Judge Glenn, right?

23          MR. COLODNY:  Correct.

24          THE COURT:  Okay.

25          MR. COLODNY:  And we confirmed a plan -- the end

1   of January, it went effective.

2           We have not yet been able to retain a financial

3   advisor, but hope to do that this week.

4           Since we were appointed, we've been drinking from

5   a firehose.  No doubt, these cases are complicated and the

6   relief that has been requested is complicated.  We have

7   worked our best to digest the pleadings and the transactions

8   that are implicated by the motions that are before Your Honor

9   today.

10          We met with the debtor's counsel the day we were

11  retained to get up to the speed as fast as possible.  Dentons

12  also made time for us on Saturday morning to discuss the

13  litigation and the motion to retain them.

14          We also worked with the debtors cooperatively to

15  address comments to the wages motion and, I hope, the

16  Treasury management motion shortly.

17          And as you have seen, Your Honor, we requested a

18  short adjournment of the Dentons retention application and

19  the motion to pay litigation expenses so that we can do some

20  basic diligence to better understand the debtor's reasons for

21  moving forward with that litigation.  I'm happy to take that

22  up whenever you would please or let Ms. Berkovich talk about

23  it.

24          THE COURT:  I think Ms. Berkovich was providing a

25  status report.  If she was concluded with her status report,

1   then I think in the agenda that you had laid out, it would be

2   the Committee request.  If you still have other items, then

3   I'd be happy to hear and then we'd circle back.  Seeing the

4   Committee request for an adjournment, that's sort of a gating

5   question this afternoon.

6          MS. BERKOVICH:  Yes, Your Honor.

7          Before we get to the request for an adjournment, I

8   did want to give the debtor's views about the Committee

9   itself, because I think this is very important.  You know,

10  the fact that the Committee was appointed six weeks into the

11  case and just a few days before the second day hearing has

12  caused some issues, which we'll get to.  But the timing is

13  not even our biggest issue with the UCC, you know, which I'll

14  describe shortly.

15         So as Mr. Colodny said, the debtor has done what

16  it can to try to get the UCC up to speed.  We set up two

17  calls with White & Case as soon as they reached out to us.

18  We provided documents they requested, to the extent

19  available, relying on their assurances of confidentiality,

20  and we've worked with them on their comments to the first day

21  orders.

22         But, Your Honor, our problem is the debtor

23  believes that the Unsecured Creditors Committee in this case

24  is illegitimate, both with regard to its membership and its

25  conduct to date.  This is not something that we say lightly

1   or something that I've ever said to a Court before, but the

2   situation here is unprecedented.

3          The debtor is considering what actions may be

4   available for it in this regard, but I thought it was

5   important to let the Court and all parties know our views up

6   front.  To start with, the debtor filed a top-creditor list,

7   revised, at Docket 56.  That listed 29 legitimate, general

8   unsecured creditors.

9          It's our understanding that the U.S. Trustee sent

10  questionnaires to all those creditors and that none of them

11  wanted to serve on the Creditors Committee, maybe with the

12  possible exception of one who's a critical vendor.  The best

13  explanation is that these legitimate general unsecured

14  creditors reviewed the debtor's first day papers and agreed

15  with the debtor's vision and strategy.  They understand that

16  their path to a full recovery is for the debtor to do what it

17  has been doing:  focusing on its business and putting up its

18  strongest case to defeat the SEC's wrong claims.  These real

19  creditors decided -- declined to serve on a UCC, thinking one

20  would not be additive.

21          Of the three members of the UCC, not one was on

22  our creditor list and not one of them had a pending, filed

23  claim against the debtor, as of the petition date.  Two of

24  them were total strangers to the debtor and our understanding

25  is that all of them -- all of their claims, if they have any,

1 had the same underlying basis as the SEC's claims:

2 basically, securities fraud claims relating to Luna Classic

3 and UST.  And the third number is an individual and he did,

4 at one point, join a class-action lawsuit asserting

5 securities law claims, but that lawsuit was dismissed and

6 I'll get to that.

7          There's two clear conclusions from this set of

8 facts:  first, if these UCC members have any claims at all,

9 their claims would be subordinated to general unsecured

10 claims under Section 510(b) of the Bankruptcy Code, as

11 they're based on the purchase and sale of securities; second,

12 and much more importantly, these UCC members' only prayer of

13 having any allowed claim at all, even a subordinated claim,

14 is if the debtor loses in its defense against the SEC

15 enforcement action.

16          As I mentioned last time, the debtor's primary

17 basis for appeal is that their tokens are not securities.  We

18 feel very good about our position on that issue for the

19 reasons that I explained to the Court last time.  Our chances

20 of winning have only gone up since then, given other

21 litigation on the same issues have been in other federal

22 courts.

23          If we prevail on that issue on appeal, then all

24 three UCC members could not possibly have a claim.  Because

25 their natural incentive is to do everything they can to

1  sabotage the debtor's defense to the litigation, and you can

2  see that in action now.

3          This UCC is constitutionally incapable of

4  representing the interests of real creditors with real,

5  general unsecured claims like those in our top-30 creditor

6  list.  It's effectively a committee of disputed, unliquidated

7  claims that can only possibly be valid if the debtor loses on

8  its existential SEC litigation if the SEC gets to keep its

9  claim against the company, no matter how large it might be.

10          So the incentive is to throw away the company's

11  chances of reorganization and side with the SEC.  This is, of

12  course, antithetical to Chapter 11 goals.

13          The UCC doesn't care that an SEC win will destroy

14  the company and its chances of reorg.  They don't care if an

15  SEC win would be devastating to all stakeholders, including

16  general unsecured creditors.  For these UCC members, getting

17  even a .001 percent recovery on a subordinated claim against

18  an estate that's dwarfed by an SEC claim is better than a

19  scenario where the debtor prevails on the SEC litigation,

20  reorganizes, and preserves value for everyone, but defeats

21  the (indiscernible) securities fraud claimants.

22          So these positions that this UCC is incentivized

23  to take are not what will max value of the company and

24  recovery to GUCs.  The UCC's members' interests are

25  diametrically opposed to the interests of general unsecured

1   cases.  We're aware of no other case where a UCC consisted

2   solely of subordinated creditors.  We're also aware of no

3   case where the UCC consisted solely of members with disputed,

4   unliquidated claims that had not even been filed as of the

5   petition date, but could have been.

6           Even in the mass tort context, you have committees

7   with unliquidated claims, but most of the people, or at least

8   some of them, filed lawsuits against the debtor prepetition.

9           The fact that this UCC's interests are adverse to

10  maximizing value is not just theoretical.  They have shown it

11  to all of us already.  The actual position they take in their

12  papers is that the debtor should stop defending itself in the

13  SEC litigation.  They want us to default, lose the company,

14  lose our ability to reorganize, and give all our assets away

15  to the UCC with its asserted claim of more than $40 billion.

16          How do I know it's $40 billion?  It says so right

17  there in paragraph 1 of the SEC's amended complaint and those

18  are just their asserted damages, not even including

19  penalties.

20          Defaulting and letting the SEC have a claim cannot

21  possibly be in the interests of real unsecured creditors or

22  any legitimate stakeholder here.  The same thing with

23  preventing the debtor from being able to reorganize.

24          TFL, its community, its employees, and its real

25  creditors deserve better.  The UCC's position that the debtor

1   is doing something nefarious by vigorously defending itself

2   in litigation brought by the government, litigation that the

3   debtor strongly believes has no merit, is no less than

4   absurd.

5         The first time I've ever seen a UCC or any

6   creditor argue that a debtor defending itself against a

7   large, let alone $40 billion claim, is cause for concern.

8   It's the Twilight Zone, but now that I've connected the dots,

9   the Court can see why this Creditors Committee filed that

10  pleading.

11        Beyond the conflict issue, we have other

12  indications about how outlandish the UCC's positions are.

13  Consider the following:  Celsius has been around for a long

14  time.  The White & Case firm has been representing the

15  Celsius creditors and litigation trust for a long time.  They

16  now claim to have a creditor with a large claim against TFL.

17  That came as news to us.  They never asserted it before, but

18  okay, taking them at their word.

19        TFL has been in Chapter 11 since January 21st.  If

20  Celsius had a legitimate, large claim, a legitimate interest

21  in this case, and Celsius and White & Case believed that the

22  debtor had been pursuing the wrong strategy, the one

23  announced at the very beginning of this case, then why didn't

24  they make an appearance before March?  They could have

25  appeared in January.  Why didn't they file an objection to

1  the litigation payments motion by the February 27th objection

2  deadline?  Same question about the Dentons retention

3  application.

4          I know why.  It's because they're smart lawyers.

5  They know how far-fetched their arguments are and they don't

6  want to waste their own litigation trust funds pursuing these

7  silly arguments, but they have no problem wasting TFL estate

8  assets on these positions.  So only after they convinced the

9  U.S. Trustee to appoint the illegitimate Creditors Committee

10  so the debtor must pay for their costs, did White & Case

11  decide to show up and make these outrageous arguments.

12          From their perspective, even a ridiculous argument

13  is worth a shot if someone else is paying for it.  They have

14  nothing to lose.  And I'll note that no real creditor has

15  filed objections to any of these motions.

16          From the debtor's perspective, it's a travesty

17  that the estate would pay not only for its own defense of the

18  SEC litigation, which everyone admits is expensive, but for

19  the costs of a party that is seeking to sabotage the debtor's

20  defense of that litigation.  The last thing this case needs

21  and this estate needs is an estate-paid representative that's

22  going to side with the SEC on everything and work against the

23  estate's interests.

24          The SEC is well-funded enough.  They have

25  excellent lawyers, Mr. Uptegrove and Mister -- and they don't

1  need a big law firm like White & Case and McDermott doing

2  their bidding.

3        This is not, as I said last time, a complicated or

4  large case.  There's one debtor, no funded debt, no secure

5  debt, and minimal trade debt.  It is inappropriate in our

6  simple case, which, as I mentioned the other day, doesn't

7  have sexy crypto issues you see in cases like FTX, Voyager,

8  and Celsius, and pales in comparison to those cases in terms

9  of size and complexity.

10        We have a UCC that proposes to have the combined

11  law firm firepower of the Celsius UCC, in the form of White &

12  Case, and the Voyager UCC, in form of McDermott Will & Emery.

13  Not only are both of those law firms proposed to represent

14  the UCC, their notices of appearance list no less than 10

15  lawyers spanning the country from Delaware to New York to

16  Miami to Chicago to Los Angeles.

17        So, you know, given our views about the

18  illegitimacy of this UCC, these proposed law firms should be

19  on notice that they may not get retained and they may not

20  receive payment for their spending gobs of money working

21  against the estate's interests.

22        I'd like to spend a few minutes on each of these

23  UCC members.  First, Celsius, and --

24        THE COURT:  Hang on.

25        MS. RICHENDERFER:  Your Honor --

1          THE COURT:  Hang on.

2          I think if we're going to head down this path,

3   we're not in a format that the Court is able to do that.

4   Obviously -- I assume it's obvious -- counsel's report to the

5   Court is news to me in terms of the issues and the concerns

6   and positions expressed and they're hardly typical.  And you,

7   Ms. Berkovich, noted at the outset that it's neither typical,

8   nor do you make them lightly.  I accept that.

9          I think I get your point, and before we expand

10  upon that point, I think I'd like to hear at least from the

11  Office of the United States Trustee --

12          I understand your point.

13          MS. BERKOVICH:  Yes, Your Honor.

14          THE COURT:  -- and we'll go from there.

15          MS. RICHENDERFER:  Your Honor, Linda Richenderfer

16  from the Office of the United States Trustee.

17          I just returned from vacation so, I'm going to try

18  to keep my vacation mode in mind as I make my remarks, but I

19  am just flabbergasted.  To quote counsel, there are smart

20  lawyers in this room, and seated at the debtor's table are

21  many of them.

22          Your Honor, we have had so many discussions with

23  the debtor about today's hearing and everything that was

24  going to be covered and their concern that Your Honor

25  wouldn't have enough time to get through the agenda and then

1   I hear this issue brought up, never previewed with us before.

2   Did they like the fact that we appointed a committee?  No.

3   But to start to go through these detailed threats, I guess,

4   against the people who came forward and said, We lost money,

5   because when the depegging occurred, there was a huge, huge

6   loss of value by many, many people.

7           And it's not just a securities claim.  I don't

8   understand how on the one hand debtors say, These weren't

9   securities, but people who lost money because they bought

10  them are subordinated because they bought securities.  I

11  can't figure out how that goes together.

12          It took us weeks to get from debtors, a complete

13  list of who they said were their unsecured creditors.  I

14  think it was finally after list number three that we gave up

15  and we said, Okay, now we've got to send out more letters.

16  So, in other words, the reason for the delay was, they kept

17  adding to the list and we kept sending out letters.

18          And we've interviewed people and we interviewed

19  more than the people who are on the committee.  And these are

20  people that we determined presented a *prima facie* case of a

21  claim.  I mean, we don't sit there and decide who really has

22  a claim; that is the job of the process.

23          But they presented to us information, and now to

24  hear this condemnation and we're going to turn this into a

25  speaking motion on the fly with absolutely no briefing

1   whatsoever, just because somebody is standing up and is

2   willing to say to the debtor that, what about the people who

3   lost all of this money?  No different than the other

4   cryptocurrency cases.  I'm trying to stay away from the

5   particulars, but, Your Honor, again, if they want to bring it

6   up, that's fine, we have another hearing scheduled in April

7   and I'm sure the Committee will be more than welcome.

8          And everybody takes on a case with a risk that

9   they might not get paid, including Dentons and including Weil

10  and Richards.  And I don't understand why -- I understand why

11  they wanted to bring it up, but I don't understand beating

12  the dead horse of what their position is.

13         Their position is clear:  they don't think these

14  people really have a claim.  Well, then, brief it.  We'll

15  respond to the extent we need to, and the Committee members

16  will respond to the extent that they must.

17         But, Your Honor, the process was clean.  We

18  interviewed people.  We did what we needed to do.  It's not

19  unusual to have people with unliquidated, contingent claims

20  on a committee.  And as Ms. Berkovich knows, I have been on

21  more tort cases than probably many people, other than

22  perhaps, a couple of the plaintiff's firms, and, Your Honor,

23  the tort claimants' committee is often made up of people who

24  don't have a complaint that has yet been filed.  That doesn't

25  mean they don't have a claim; they just haven't filed their

1  complaint yet, because filing of the bankruptcy tolls the

2  statute of limitations.

3          I don't know if Your Honor has any specific

4  questions for me at this point, but we reached out.  The

5  people that were used became, all of a sudden, critical

6  vendors, people that were on the list of creditors.  The

7  debtor has the right to do it.  It happens an awful lot.

8  People who might respond to the request for questionnaires

9  get paid and no longer are available to sit on the committee.

10         But we stand by the three people that we chose to

11 be on the committee, to the extent that they gave us the

12 information proven and correct, we can deal with it then.

13         But I just -- again, I am flabbergasted with all

14 of the communications we've had and with the goodwill, I

15 thought we were working out issues, to come in here and to

16 have this ambush -- I'm sure that Committee will speak to

17 this -- but to have this addressed when never, ever, ever was

18 it bought up before Ms. Berkovich stood here and made her

19 speech to Your Honor.

20         And I think that, you know, litigation by ambush,

21 I didn't think was going to be the course of the day in this

22 bankruptcy case, but, unfortunately, it's beginning to be a

23 trend and this is just one example.

24         THE COURT:  Mr. Colodny?

25         MR. COLODNY:  Good afternoon, Your Honor.  Aaron

1  Colodny from White & Case.

2          I would echo Mrs. Richenderfer's comments;

3  however, I will do it in maybe a milder manner.  To say we

4  have been sandbagged is an understatement.  We spoke with

5  debtor's counsel on Friday and other then oblique references

6  to do your committee members hold Luna and, you know, why has

7  it taken Celsius a long time to file a claim, we heard none

8  of this.  Celsius has been dealing with its own bankruptcy,

9  triggering hundreds of thousands of account holders, and now

10 we are effective, and are asserting our rights but we are not

11 representing Celsius.

12         Our members, three members, were appointed by the

13 United States Trustee to be fiduciaries for unsecured

14 creditors and today we stand here, as a fiduciary for

15 unsecured creditors, questioning the debtor's business

16 judgement to take a bet the company litigation when they

17 don't know what the company is worth.  I think that is a

18 perfectly rational position to take and to do on three

19 business days' notice.

20         I don't know, Your Honor, I am quite shocked, to

21 be honest with you, that the hearing would kick off in this

22 manner.

23         THE COURT:  Let's turn to your request for an

24 adjournment.

25         MR. COLODNY:  Sure.  So, Your Honor, as I said, we

1   have requested a brief adjournment from the debtors which

2   they have refused.  We understand that they are going to

3   trial on March 25th.  Our adjournment is in no way meant to

4   stop the preparations for trial.  We have discussed the

5   adjournment with the United States Trustee who has consented.

6   We discussed it with the SEC who stated that they are

7   prepared to move forward today.

8           We requested basic information from the debtors, a

9   13-week cash flow, an estimated budget for the litigation in

10  anticipated weekly fees, information about the value of the

11  debtor's business, information about how they protect their

12  cryptocurrency; and at this point we don't have many answers

13  to that.

14          As I said, and I will say this many times, the

15  company is pursuing a bet the company litigation, they don't

16  know what the wager is and they don't know what the return is

17  after the bet.  Instead, they seem willing to take $70

18  million, put it in a retainer account for their counsel and

19  proceed down a no holds bar litigation path.  That is not to

20  say that we can't get comfortable with the prospects for the

21  company, the prospects for the litigation, but on three days'

22  notice it's impossible for any fiduciary with the resources

23  that we have and the information that we have had access to,

24  to stand before Your Honor and make an informed decision

25  about whether to spend $70 million on a litigation and $6.2

1  million which is 17 percent of their liquid assets on

2  pursuing that litigation to pay prepetition claims and

3  especially prepetition claims of employees and insiders.

4        We have a number of questions, Your Honor, that

5  haven't been answered and we haven't had time to answer them.

6  So, what we were going to propose was that we adjourn the

7  hearing for a brief period of time, we will not object to

8  Dentons payment of fees between the date of the hearing and

9  whenever we are able to hear the final fee application on a

10 quantum meruit basis subject to the Court's review.  There is

11 no reason that if they were prepared to go forward today and

12 the committee were delayed in acting that they should suffer

13 or not be paid for their work moving forward; however, we do

14 have serious questions about their ability and the debtor's

15 ability and decision to pursue this litigation.

16       So, this is not a we are trying to kill the

17 company.  We are trying to understand why the litigation is

18 worth pursuing and we don't know right now.  So, Your Honor,

19 unless you have any other questions, I believe our request is

20 for a 10-day adjournment and as a condition to that

21 adjournment we would agree not to object to Dentons fees

22 incurred from today's date to the final hearing on a quantum

23 meruit basis subject to Your Honor's review.

24       THE COURT:  Ms. Berkovich.

25       MS. BERKOVICH:  Yes, Your Honor.  I'm sorry that

1  the U.S. Trustee took our views, the debtor's views on the

2  committee as an attack on the U.S. Trustees process. For the

3  record, we have no problem with the process. We have no

4  reason to believe the U.S. Trustee didn't do everything that

5  the office can and should do to form a good committee.  And

6  we mentioned to the U.S. Trustee, when we spoke to them on

7  February 15th, that the reasons we did not believe these

8  particular members, who have turned out in the committee,

9  would be good representatives of the general unsecured body.

10 So, we did mention this weeks ago.

11       We just disagree with the decision to appoint

12 these particular members on the committee.  And it's not just

13 that they don't have claims, that is not exactly the point,

14 it's sort of the point, but the point is if they have claims,

15 the only way they have claims is if the SEC wins in the

16 litigation.  So, their interests are against all other

17 unsecured creditors, the general unsecured creditors would

18 want us to prevail on the litigation against the $40 billion

19 claim. That is the point, they are conflicted.

20       On the adjournment I think it is important, when

21 Your Honor considers the UCC's request for adjournment, to

22 take into account what we said about their incentive to

23 sabotage the litigation because that is what an adjournment

24 would do.  And I want to look at the very first paragraph of

25 their preliminary statement where they say that there is all

1  these unanswered questions and I want to go through each of

2  these because I think answering them will help explain why

3  the adjournment doesn't make sense.

4         A few of these they asked and already answered

5  before they filed this.  A few others they didn't bother to

6  ask us, although we told them we were available for

7  questions.  A few more are puzzling, but we will answer them

8  anyway just to be complete.

9         So, first they say what is the enterprise value of

10  the debtors, Mr. Colodny said this of the debtors ongoing

11  business, and does that enterprise value support the bet the

12  company approach the debtor has taken with respect to the

13  myriad of litigation against it.

14         THE COURT:  I'm sorry, what paragraph are you on?

15         MS. BERKOVICH:  This is on Paragraph 1, page 2 the

16  preliminary statement.  This is question A.

17         THE COURT:  Okay.  Right.

18         MS. BERKOVICH:  We don't know the enterprise

19  value. It is unusual except in a prepackaged Chapter 11 case

20  to have an enterprise value known at the very beginning of

21  the case.  We have to imagine that experienced bankruptcy

22  counsel like White & Case and McDermott Will & Emery know

23  this.

24         Second, one doesn't need to know the enterprise

25  value to know that spending funds to dispend against the $40

1  billion claim is a good use of resources.  The cost of

2  litigation will take their $70 million number, although it's

3  not exactly right, is certainly less than $40 billion.

4          Third, it is certain that if the SEC prevails

5  fully there will be no enterprise value because the SEC will

6  take it all.  The SEC is seeking disgorgement of ill-gotten

7  gains and nothing less than the destruction of the company.

8  An adverse decision will make the enterprise value zero,

9  destroy the business.

10          Fourth, if the debtor defaults in the litigation

11  or loses that is a final judgment.  Other parties can use the

12  final judgment to pursue claims. Others, such as Celsius, and

13  Mr. Golder, and similar securities plaintiff types.  So, the

14  SEC gets everything and the claims pool gets larger, much

15  larger.  Not hard to conclude that defending against the

16  litigation is worth it.

17          Fifth, the way the UCC phrased this question and

18  Mr. Colodny said also, it's as if the debtor is using all its

19  assets to pursue company litigation.  The debtor is the

20  defendant in all this litigation, not the plaintiff.  It

21  didn't want this.  Its doing what every single other

22  defendant in America does when its accused of something that

23  it believes to be wrong.

24          Sixth, I will say something about the enterprise

25  value; it is potentially very high, but only if the company

1  survives to support this blockchain. The market is currently

2  showing that it believes in the company's business.

3        Just a few examples.  At launch the network value

4  was $200 million. It's now worth $800 million.  Significantly

5  more than the treasury spend to support the blockchain.

6  Somebody who had Luna II at the outset would now have value

7  that is worth four times as much.

8        Even since the filing the price of Luna II has

9  gone up quite a bit.  When we filed it was 57 cents.  Last

10 week it was 73 cents.  The current pricing is trading well

11 over $1 dollar. It's a 150 percent increase since filing.

12       Similarly, at filing, Luna II market

13 capitalization was approximately $410 million or $700 million

14 on a fully diluted basis.  As of today, that number is as

15 high as $940 million or $1.5 billion. More than a 100 percent

16 increase since the petition date.

17       The dollar value of Luna II held in the debtor's

18 treasury has likewise increased in price.  The company's

19 valuable applications, which we spoke about last week, work

20 only on the Terra blockchain and would only have value if the

21 Terra blockchain is thriving.

22       Seventh, the UCC wants a two week adjournment so

23 it can determine enterprise value with no banker.  That is

24 never going to happen in two weeks.  Whatever purpose the

25 adjournment serves it certainly cannot be to figure out the

1   enterprise value.  And I will discuss this a little bit

2   later.

3          Taking the company's resources away from trial

4   preparation on the eve of trial to focus on enterprise value

5   now would be disastrous to the trial preparation, but, of

6   course, that is the point to make it more likely that the

7   debtor will lose the trial.

8          Okay, let's go to the next question.  What is the

9   impact, including on unsecured creditors recovery, of an

10  adverse ruling in the SEC enforcement action.

11         THE COURT:  I am going to interrupt you.

12         MS. BERKOVICH:  Yes.

13         THE COURT:  I think we are getting substantially

14  ahead of ourselves on two different paths. This is,

15  effectively, a second day hearing.  I have a committee that

16  was recently appointed and I have serious challenges raised

17  by the debtor, which I take seriously, but I have -- but I

18  don't believe that it is a matter that I can deal with or

19  dispose of today in a way that advances this process.

20         I say that because what the debtor is asking is

21  that I conclude that the committee, for lack of a better

22  word, is improperly and illegitimately created and,

23  therefore, I should disregard the input or position of the

24  dually appointed statutory fiduciary for all unsecured

25  creditors under Bankruptcy Code Section 1102.  I have,

1  obviously, the response of the Office of the United States

2  who is the appointing agent, the appointing authority for a

3  committee.

4         I don't have any record in front of me.  I have,

5  on rare occasion, dealt with motions to disband of change

6  membership of a committee.  There is typically a record

7  associated with that.  I am not faulting counsel because the

8  committee was only appointed and I get your concerns, but I

9  don't believe that I am in any position today to make a

10 decision that I will discount or disregard concerns

11 articulated by a committee because they are potentially

12 illegitimate.

13         Similarly, we talk about the questions that a

14 committee has raised.  Some of those may be good questions,

15 some of those may be bad questions, they are questions put

16 into a 20-page pleading created by a committee that was

17 appointed three days ago.  We are going to carry this motion

18 to next week and I will give you my reasons.  And I don't

19 want either side to attribute more significance to the

20 Court's decision to adjourn this matter then it deserves.

21         It does not seem to me that this matter is fully

22 and completely developed.  Actually, I was considering

23 adjourning the matter prior to receiving the committee's

24 objection.  I don't fault the debtor for not consenting to

25 the adjournment. The intensity of effort leading up to trial

1  is something that is not a secret to this Court and the

2  debtors need and desire to engage counsel to get the order of

3  retention and to move forward is obvious.

4          Both the Securities Exchange Commission and the

5  United States Trustee have both raised, at a minimum,

6  questions with respect to the engagement, prior payments,

7  eligibility, honking big retainer, and then the other issues

8  with respect to the payment of the litigation claims.  I

9  would note that both the SEC and the United States Trustee

10  included in their objection to the litigation payment motion

11  at least some concepts that would be responsive to their

12  concerns.  I make no comment on that dialog, but that dialog

13  needs to occur.

14          I don't believe that I am in a position with a

15  committee objection and a request for an adjournment that is,

16  from my point of view, routine.  A committee -- by way of

17  course analogy, this isn't a bid procedures hearing, but it's

18  often that a committee's first official act is to request an

19  adjournment of a bid procedures hearing which the Court

20  almost always grants in order to allow those parties an

21  opportunity to get their arms around it.

22          Debtors often express concern and frustration that

23  the committee is putting at risk the reorganization, whatever

24  their motives and motivations may be.  And, obviously, you

25  know, I take seriously the concerns that are expressed and it

1  was hardly typical to get that kind of a report.  But I don't

2  think it would be either appropriate or procedurally proper

3  for me to require the committee to stand up as its first

4  official act and defend its existence, again, on no record

5  before me and with no submissions in briefing.

6          So, I don't think that I can deal with that

7  question and I have a request for an adjournment.  That is

8  the question that is in front of me and I am going to grant

9  that. I will carry this motion to either Monday or Tuesday of

10  next week.

11          MS. BERKOVICH:  Your Honor, may I address the

12  Court?

13          THE COURT:  Yes.

14          MS. BERKOVICH:  We would ask that the Court

15  reconsider that.

16          THE COURT:  No.

17          MS. BERKOVICH:  We would like to put on evidence

18  about the --

19          THE COURT:  No.

20          MS. BERKOVICH:  -- harm.

21          THE COURT:  No.

22          MS. BERKOVICH:  Could I have one minute please?

23  We are three weeks away from trial.  The trial team and the

24  company have already been really distracted by the bankruptcy

25  issues, and by issues relating to the retention, issues

1  relating to the questions about the litigation motion.

2          The Dentons team and the company needs to be

3  working 24/7 on trial prep and this will be -- the evidence

4  we would like to show you, even on one week adjournment, will

5  very much negatively impact the company's trial prep and our

6  position in the SEC litigation.

7          THE COURT:  I appreciate your candor and I will be

8  candid with you: I am not certain, on today's record,

9  irrespective of the evidence that you would adduce, that I

10  would be in a position to grant the motion. I am not certain

11  that I would deny it, but with the issues that have been

12  raised by the SEC, by the United States Trustee and by a

13  committee that has also said not only do we have issues, but

14  we don't have answers to a lot of foundational questions.

15          I don't know that I would be in a position after

16  hearing your evidence today to grant that motion and resolve

17  those concerns. I am -- the committee has asked for 10 days

18  and I agree, I think that is too long.  We are in a -- it is

19  a difficult situation. I don't make this adjournment lightly,

20  but I am not prepared to do this. I think the committee has

21  asked for an adjournment. I have asked, in my making my

22  comments in granting the adjournment, that the parties not

23  attribute more significance to my comments today.

24          This case is, again, kind of an unusual case.

25  Issues were raised by the Office of the United States Trustee

1  at the first day which I noted and you noted were not today

2  issues.  Arguably, they're not really today issues today

3  either, but this is an unusual case and a committee has shown

4  up asking for some more time in order to get its arms around

5  it.

6        At this point I am not prepared to ascribe ill

7  designs on the committee's request.  As a matter of fact, I

8  regard the committee's -- I regarded it as pretty routine.

9  Again, I don't want to ascribe more significance to that then

10  it deserves.  We have done a lot of bankruptcy cases, I found

11  out that a committee got appointed, and I was kind of

12  expecting that there would be something from the committee

13  saying we are still trying to get our arms around this.

14        I don't know and I don't think that a record can

15  be developed today that would allow me to say that I am going

16  to completely disregard those folks. In addition, you know --

17  I have said enough.  This should be carried.  This case is

18  six weeks old which I recognize in the lead up to the trial

19  is a long time, but it is not a long time in the life of a

20  case.

21        So, this is, effectively, the second hearing that

22  we are having in this case, I think.  The issues that are

23  raised by the SEC, by the United States Trustee and by the

24  committee about where we are going with this case are hardly

25  typical.  That doesn't mean that I won't find that its

1  appropriate and we need to move forward. I get the concern

2  both with respect to being ready for the litigation and also

3  being the debtor's candid statement that the litigation is

4  existential.  I get it. I understand that position.

5          I am not prepared to move forward today and I

6  believe that we should adjourn this matter.  We are already

7  on the calendar for next Tuesday.  If there is a difference

8  between Tuesday and Monday, I would hear you on Monday.

9          MS. BERKOVICH:  Tuesday it is.

10          THE COURT:  All right.  Then I would suggest that

11  we move the hearing.  We are on for 11:30 a.m. and I would

12  suggest that we move the hearing up to 10 a.m., and your

13  agenda can reflect that.

14          The parties are in discussions, some, and I take

15  that only simply from reports from Ms. Richenderfer as well

16  as counsel about drinking from a firehose, the phrase that

17  committees always use.  That's fine.  And it may be that

18  there are other significant issues that I am going to need to

19  deal with in a week's time, I get it.  And if some of those

20  relate to the providence of this committee so be it, but I

21  don't think that we can do it from the podium on a speaking

22  objection.

23          Again, I don't want to sound like a broken record

24  on this, and I have made comments in response to your request

25  for reconsideration, which I respect, but I am going to

1  decline it for the reasons I have given you. I would ask that

2  the parties, in your negotiations, engage without ascribing

3  real significance to my decision to adjourn.  I have a case

4  that's six weeks old, I have a committee that was appointed

5  just a few days ago, and I have significant complex issues to

6  a retention that is critical to the prosecution of the case

7  as described by the debtors of this reorganization and they

8  have asked for a short adjournment.  I have granted it.  That

9  is the only question that I have answered today.

10           I will look forward to hearing from the parties,

11  but I do not believe that it would be appropriate to move

12  forward with either of the motions today and I will carry

13  them to 10 a.m. on Tuesday.  Are there any questions?

14           MS. BERKOVICH:  Just a moment, Your Honor.

15           THE COURT:  Of course, take your time.

16       (Pause)

17           MS. BERKOVICH:  Your Honor, we noted that there

18  were some housekeeping motions that we would deal with at

19  the -- we will just deal with them on Tuesday.

20           THE COURT:  Yeah, if there are issues, they were

21  about leave for a reply, and sealing, and some other stuff. I

22  assume that they are routine and if they can be entered, I

23  will enter them. If there is an issue with respect to sealing

24  or something we will deal with it, but I think that our rules

25  provide that something that is filed under seal remains under

1  seal until the Court deals with it.  So, that should be fine.

2          Ms. Richenderfer.

3          MS. RICHENDERFER:  Thank you, Your Honor.  The

4  only thing I would mention is that I know that the U.S.

5  Trustee has come to an agreement with the debtor on the

6  sealing -- unsealing, I should say, of a good amount of the

7  information that is in the engagement letter.  I don't know

8  whether or not there is any issue with the other parties of

9  interest, but I would request that a COC be entered -- I'm

10  sorry, be submitted so that the engagement letter, in full,

11  except for three minor points be on the record so that it is

12  public and people in interest can see what the engagement

13  letter says.

14          THE COURT:  Has the debtor agreed to that?

15          MS. RICHENDERFER:  Your Honor, we came to an

16  agreement out in the hallway.  So, I don't know whether or

17  not perhaps they have changed their minds.

18          THE COURT:  Welcome.

19          MS. MOYRON:  Good afternoon, Your Honor.  Tania

20  Moyron of Dentons US LLP, proposed special litigation

21  counsel.

22          The statements are accurate, Your Honor.  We

23  reached an agreement in the hallway with respect to the

24  engagement letters.  We will unredact all of the language

25  except for page 3 of the November 2023 engagement letter.

1          THE COURT:  Okay.

2          MS. MOYRON:  There are three numbers, those will

3  remain redacted.  The Office of the United States Trustee has

4  agreed to that.

5          THE COURT:  And that is fine with the U.S.T.,

6  okay.  That is fine. If that gets filed under a COC or is

7  otherwise on the docket by agreement of the parties that is

8  fine with me.

9          As to the housekeeping issues, again, if there is

10  consent and consensus then I would either enter orders

11  approving that or we can deal with it on Tuesday at 10 a.m.

12          MS. BERKOVICH:  Thank you so much, Your Honor.

13          THE COURT:  Any other matters?

14     (No verbal response)

15          THE COURT:  With that we are adjourned.  Thank

16  you, counsel.  See you next week.

17     (Proceedings concluded at 3:33 p.m.)

18

19

20

21

22

23

24

25

```
 1                           CERTIFICATION

 2            We certify that the foregoing is a correct

 3  transcript from the electronic sound recording of the

 4  proceedings in the above-entitled matter to the best of our

 5  knowledge and ability.

 6

 7  /s/ William J. Garling                 March 5, 2024

 8  William J. Garling, CET-543

 9  Certified Court Transcriptionist

10  For Reliable

11

12  /s/ Mary Zajaczkowski                  March 5, 2024

13  Mary Zajaczkowski, CET-531

14  Certified Court Transcriptionist

15  For Reliable

16

17

18

19

20

21

22

23

24

25
```