**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------------- x
                                              :

| | | |
|---|---|---|
| **In re** | : | **Chapter 11** |
| | : | |
| **TERRAFORM LABS PTE. LTD.** *et al.*, | : | **Case No. 24–10070 (BLS)** |
| | : | |
| **Debtors.**[1] | : | **(Jointly Administered)** |
| | : | |

---------------------------------------------------------- x

### DISCLOSURE STATEMENT FOR AMENDED CHAPTER 11 PLAN OF
### LIQUIDATION OF TERRAFORM LABS PTE. LTD. AND TERRAFORM LABS LIMITED

| **WEIL, GOTSHAL & MANGES LLP** | **RICHARDS, LAYTON & FINGER, P.A.** |
|---|---|
| Ronit J. Berkovich (admitted *pro hac vice*) | Paul N. Heath (No. 3704) |
| Jessica Liou (admitted *pro hac vice*) | Zachary I. Shapiro (No. 5103) |
| Clifford W. Carlson (admitted *pro hac vice*) | Matthew P. Milana (No. 6681) |
| F. Gavin Andrews (admitted *pro hac vice*) | One Rodney Square |
| 767 Fifth Avenue | 920 North King Street |
| New York, New York 10153 | Wilmington, Delaware 19801 |
| Telephone:  (212) 310-8000 | Telephone: (302) 651-7700 |
| Email:     ronit.berkovich@weil.com | Email:     heath@rlf.com |
|              jessica.liou@weil.com |              shapiro@rlf.com |
|              f.gavin.andrews@weil.com |              milana@rlf.com |

*Attorneys for the Debtors*
*and Debtors in Possession*

Dated:     August 8, 2024
            Wilmington, Delaware

---

[1]    The Debtors in these chapter 11 cases are: Terraform Labs Pte. Ltd; Terraform Labs Limited.  The Debtors'
principal offices are located at 1 Wallich Street, #37-01, Guoco Tower, Singapore 078881.

A SOLICITATION OF VOTES IS BEING CONDUCTED TO OBTAIN SUFFICIENT ACCEPTANCES OF THE CHAPTER 11 PLAN OF LIQUIDATION OF TERRAFORM LABS PTE.  LTD. AND TERRAFORM LABS LIMITED (AS MAY BE AMENDED, MODIFIED, OR SUPPLEMENTED FROM TIME TO TIME, THE "PLAN").  A COPY OF THE PLAN IS ANNEXED HERETO AS EXHIBIT A.

YOU ARE ADVISED TO REVIEW AND CONSIDER THIS DISCLOSURE STATEMENT AND THE PLAN CAREFULLY, INCLUDING THE INJUNCTION, RELEASE, AND EXCULPATION PROVISIONS, AS YOUR RIGHTS MAY BE AFFECTED.

THE DATES FOR DETERMINING WHICH HOLDERS OF CLAIMS MAY VOTE ON THE PLAN ARE: (I) FOR ALL HOLDERS OF CLAIMS IN VOTING CLASSES OTHER THAN CLASS 5 (CRYPTO LOSS CLAIMS), AUGUST 9, 2024 (THE "VOTING RECORD DATE"); OR (II) FOR HOLDERS OF CLAIMS IN CLASS 5 (CRYPTO LOSS CLAIMS), AUGUST 21, 2024 (THE "PRELIMINARY CRYPTO LOSS CLAIMS BAR DATE").

THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS SEPTEMBER 12, 2024 AT 4:00 P.M. EASTERN TIME (THE "VOTING DEADLINE"), UNLESS EXTENDED BY THE DEBTORS.

IF YOU FILE AN OBJECTION TO THE PLAN IN ACCORDANCE WITH THE PROCEDURES SET FORTH HEREIN, A HEARING WILL BE HELD IN PERSON AND TELEPHONICALLY, ON SEPTEMBER 19, 2024 AT 10:00 A.M. (EASTERN TIME) AT WHICH YOU WILL BE REQUIRED TO APPEAR.

---

## RECOMMENDATION BY THE DEBTORS AND CREDITOR'S COMMITTEE

The Board of Terraform Labs Pte. Ltd. (the "Board"), on behalf of itself and TLL, has unanimously approved the transactions contemplated by the Plan and recommends that all creditors whose votes are being solicited submit ballots to accept the Plan.

The Debtors continue to work collaboratively with the Official Committee of Unsecured Creditors (the "Creditors' Committee") and Securities and Exchange Commission (the "SEC") on the terms of the Plan and this Disclosure Statement.

The Official Committee of Unsecured Creditors recommends that all creditors whose votes are being solicited submit ballots to accept the Plan.  The Official Committee of Unsecured Creditors' letter in support of the Plan (the "Letter in Support") is attached hereto as Exhibit C.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR THE PURPOSES OF SOLICITING SUFFICIENT ACCEPTANCES OF THE PLAN.  NO SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN MAY BE MADE EXCEPT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE.

HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE AND SHOULD CONSULT WITH THEIR OWN ADVISORS BEFORE VOTING ON THE PLAN. HOLDERS OF CLAIMS OR INTERESTS ARE ADVISED AND ENCOURAGED TO READ BOTH THE DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY.  IN PARTICULAR, ALL HOLDERS OF CLAIMS OR INTERESTS SHOULD CAREFULLY READ AND CONSIDER FULLY THE RISK FACTORS SET FORTH IN SECTION VIII OF THIS DISCLOSURE STATEMENT.  THE PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE PLAN, THE PLAN SUPPLEMENT, AND THIS DISCLOSURE STATEMENT.

THE DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND NOT NECESSARILY IN ACCORDANCE WITH OTHER NON-BANKRUPTCY LAW.

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING STATEMENTS INCORPORATED BY REFERENCE, PROJECTED CREDITOR RECOVERIES, PROJECTED FINANCIAL INFORMATION, AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS.  CERTAIN OF THESE FORWARD-LOOKING STATEMENTS CAN BE IDENTIFIED BY THE USE OF WORDS SUCH AS "BELIEVES," "EXPECTS," "PROJECTS," "INTENDS," "PLANS," "ESTIMATES," "ASSUMES," "MAY," "SHOULD," "WILL," "SEEKS," "ANTICIPATES," "OPPORTUNITY," "PRO FORMA," "PROJECTIONS," OR OTHER SIMILAR EXPRESSIONS.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES.  FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN.  READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN ARE BASED ON ASSUMPTIONS THAT ARE BELIEVED TO BE REASONABLE, BUT ARE SUBJECT TO A WIDE RANGE OF RISKS, INCLUDING THOSE IDENTIFIED IN SECTION VIII OF THIS DISCLOSURE STATEMENT.

THE DEBTORS ARE UNDER NO OBLIGATION TO (AND EXPRESSLY DISCLAIM ANY OBLIGATION TO) UPDATE OR ALTER ANY FORWARD-LOOKING STATEMENTS WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE BANKRUPTCY COURT (AS DEFINED BELOW).

ALL STATEMENTS CONTAINED HEREIN ARE BASED ON THE FACTS KNOWN TO THE DEBTORS AT THE TIME OF FILING.  THE INVESTIGATION INTO THE DEBTORS AND THIRD PARTIES IS ONGOING.  ACCORDINGLY, THE STATEMENTS CONTAINED HEREIN ARE SUBJECT TO CHANGE BASED ON THE DEBTORS' AND THEIR SUCCESSORS' ONGOING INVESTIGATION.  THIS DISCLOSURE STATEMENT IS NOT EVIDENCE AND CANNOT BE RELIED UPON ON IN ANY CURRENT OR FUTURE LITIGATION.

NO INDEPENDENT AUDITOR OR ACCOUNTANT HAS REVIEWED OR APPROVED THE LIQUIDATION ANALYSIS ANNEXED HERETO AS EXHIBIT B.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED.  THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARIES IN THIS DISCLOSURE STATEMENT.

**ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO, AND ARE A PART OF, THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.**

**THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE OR IN CONNECTION WITH CONFIRMATION OF THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PARTY FOR ANY OTHER PURPOSE.**

**A HEARING TO CONSIDER CONFIRMATION OF THE PLAN IS SCHEDULED TO BE HELD BEFORE THE HONORABLE BRENDAN L. SHANNON, UNITED STATES BANKRUPTCY JUDGE, AT THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE, 824 NORTH MARKET ST, 6TH FLOOR, COURTROOM 1, WILMINGTON, DELAWARE 19801, ON SEPTEMBER 19, 2024 AT 10:00 A.M. (EASTERN TIME), OR AS SOON THEREAFTER AS COUNSEL MAY BE HEARD.**

**THE BANKRUPTCY COURT HAS DIRECTED THAT ANY OBJECTIONS TO CONFIRMATION OF THE PLAN BE SERVED AND FILED ON OR BEFORE SEPTEMBER 12, 2024 AT 4:00 P.M. (EASTERN TIME).**

**PLEASE READ THIS DISCLOSURE STATEMENT, INCLUDING THE PLAN, IN ITS ENTIRETY. THE DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT SUCH SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE ACTUAL PROVISIONS OF THE PLAN. ACCORDINGLY, IF THERE ARE ANY INCONSISTENCIES BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN SHALL CONTROL.**

# TABLE OF CONTENTS

Page

I.     INTRODUCTION .................................................................................................. 1

    A.     Summary of SEC Settlement and Wind Down Process ................................... 2

    B.     The Plan ...................................................................................................... 4

    C.     Confirmation Timeline .................................................................................. 10

    D.     Summary of Plan Classification and Treatment of Claims .............................. 11

II.    OVERVIEW OF THE COMPANY'S OPERATIONS, ASSETS, AND
    LIABILITIES ...................................................................................................... 16

    A.     Terraform Labs Pte. Ltd.'s Business ............................................................ 16

    B.     Terraform Labs Limited's History and Business ............................................ 19

    C.     Debtors' Organizational Structure ................................................................ 19

    D.     Governance ................................................................................................ 21

    E.     Assets ........................................................................................................ 22

    F.     Prepetition Liabilities and Litigation ............................................................ 24

III.   CIRCUMSTANCES LEADING TO COMMENCEMENT OF THIS CHAPTER 11
    CASE .................................................................................................................. 31

IV.    OVERVIEW OF THE CHAPTER 11 CASES .................................................... 31

    A.     Commencement of The Chapter 11 Cases and First-Day Motions .................. 31

    B.     Treasury Management Motion and Orders .................................................... 31

    C.     Procedural Motions and Retention of Professionals ...................................... 32

    D.     Appointment of the Creditors' Committee .................................................... 33

    E.     Automatic Stay Letters to Foreign Banks and Custody Account .................... 33

    F.     Litigation Related Motions .......................................................................... 33

    G.     Postpetition SEC Enforcement Action .......................................................... 35

    H.     Lease Related Motions ................................................................................ 37

    I.     Singapore Recognition and Beltran Stay Motion .......................................... 38

    J.     Terraform Labs Limited .............................................................................. 39

    K.     Schedules and Statements and Bar Date ...................................................... 41

    L.     Asset Sales ................................................................................................ 43

    M.     Coordination with Creditors' Committee Regarding Causes of Action Against
        Third Parties .............................................................................................. 44

    N.     Terra Blockchain Breach ............................................................................ 44

    O.     Severance .................................................................................................. 45

V.     SUMMARY OF PLAN ...................................................................................... 46

A.     Substantive Consolidation ........................................................... 46

B.     Administrative Expense, Priority Claims, Private Wallet Crypto Holders, and Bridge Wallet Crypto Holders ........................................................... 48

C.     Classifications of Claims and Interests ....................................... 50

D.     Treatment of Claims and Interests .............................................. 52

E.     Means for Implementation ........................................................... 56

F.     Distributions ................................................................................. 69

G.     Procedures for Disputed Claims .................................................. 73

H.     Executory Contracts and Unexpired Leases ............................... 75

I.     Conditions Precedent to the Effective Date ................................ 79

J.     Effect of Confirmation .................................................................. 81

K.     Retention of Jurisdiction .............................................................. 85

L.     Miscellaneous Provisions ............................................................ 87

**VI.**     **CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF PLAN ........ 91**

A.     General ........................................................................................... 91

B.     Certain U.S. Federal Income Tax Consequences to the Debtors ..................... 92

C.     Certain U.S. Federal Income Tax Consequences to U.S. Holders of Relevant Claims ........................................................................................... 92

D.     Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Relevant Claims, and CVRs ........................................................................... 96

E.     Information Reporting and Backup Withholding .......................... 97

**VII.**     **CERTAIN SINGAPOREAN TAX CONSEQUENCES OF PLAN ...................... 98**

**VIII.**     **CERTAIN RISK FACTORS TO BE CONSIDERED ........................................ 98**

A.     Certain Bankruptcy Law Considerations ..................................... 99

B.     Additional Factors ...................................................................... 100

**IX.**     **VOTING PROCEDURES AND REQUIREMENTS ....................................... 101**

A.     Voting Deadline ........................................................................... 102

B.     Voting Procedures ....................................................................... 102

C.     Parties Entitled to Vote ............................................................... 103

**X.**     **CONFIRMATION OF PLAN ....................................................................... 105**

A.     Disclosure Statement Hearing and Confirmation Hearing ........... 105

B.     Objections to Confirmation and Final Approval of Disclosure Statement ........ 106

C.     Requirements for Confirmation of Plan ....................................... 107

**XI.**     **ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF PLAN ........... 110**

A.     Alternative Plan .......................................................................... 110

B.     Liquidation Under Chapter 7 or Applicable Non-Bankruptcy Law ................ 110

**XII.    CONCLUSION AND RECOMMENDATION** ......................................................... **112**

**EXHIBIT A** ......................................................................................................................... **1**

**EXHIBIT B** ......................................................................................................................... **1**

**EXHIBIT C** ......................................................................................................................... **1**

EXHIBIT A:    Plan

EXHIBIT B:    Liquidation Analysis

EXHIBIT C:    Creditors' Committee Letter in Support of the Plan

# I.
## INTRODUCTION

Terraform Labs Pte. Ltd. ("**TFL**"), commenced its chapter 11 case in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") on January 21, 2024 (the "**Petition Date**"). Subsequently, TFL's subsidiary Terraform Labs Limited ("**TLL**," and together with TFL, the "**Debtors**") commenced its chapter 11 case in the Bankruptcy Court on July 1, 2024.  The Debtors' chapter 11 cases (the "**Chapter 11 Cases**") are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

The Debtors submit this disclosure statement (as amended, modified, or supplemented from time to time, the "**Disclosure Statement**") pursuant to section 1125 of title 11 of the United States Code (the "**Bankruptcy Code**") in connection with the solicitation of votes with respect to the *Chapter 11 Plan of Liquidation of Terraform Labs Pte. Ltd. and Terraform Labs Limited*, dated June 30, 2024 (as amended, modified, or supplemented, the "**Plan**").[2]  The Plan is annexed hereto as **<u>Exhibit A</u>** and is incorporated herein by reference.

The purpose of this Disclosure Statement, including the exhibits annexed hereto, is to provide information of a kind, and in sufficient detail, to enable creditors that are entitled to vote on the Plan to make an informed decision on whether to vote to accept or reject the Plan.  This Disclosure Statement contains summaries of the Plan, events that have occurred or will occur in the Chapter 11 Cases, certain documents related to the Plan, and instructions for voting on the Plan.

As described in more detail below and as further set forth in the *Declaration of Chris Amani in Support of Debtor's Chapter 11 Petition and First Day Relief* (Docket No. 18) (the "**First Day Declaration**"), TFL sought chapter 11 relief to preserve value and maximize creditor recoveries in light of a judgment in the action the SEC commenced against TFL and its founder, former director, and former Chief Executive Officer, Kwon Do Hyeong ("**Mr. Kwon**") in the District Court of the Southern District of New York (the "**District Court**"), titled *SEC v. Terraform Labs Pte. Ltd.*, *et al.*, Case No. 1:23-cv-013460-JSR (S.D.N.Y.) (the "**SEC Enforcement Action**").

As discussed in detail below, following the District Court's summary judgment ruling in favor of the SEC on certain counts and a jury trial verdict against Mr. Kwon and TFL on other counts, TFL entered into settlement discussions with the SEC, which culminated in a consent agreement signed by TFL (the "**Consent**"), and the *Final Judgment Against Terraform Labs Pte. Ltd. and Do Hyeong Kwon* No. 1:23-cv-1346 (JSR) (Docket No. 273) (the "**Final Judgment**"), approved by District Court Judge Jed S. Rakoff ("**Judge Rakoff**") on June 12, 2024.

The Consent and Final Judgment (together, the "**SEC Settlement**") contemplate, among other things, a chapter 11 plan of liquidation, a wind down of the Debtors' business operations, and sales of TFL's assets. Moreover, under the SEC Settlement, Mr. Kwon is transferring assets worth hundreds of millions of dollars into the Debtors' estates for distribution to certain creditors and the SEC is agreeing to forgo any monetary recoveries on its multi-billion-dollar claim until most creditors are paid in full, enabling other creditors to receive all available proceeds of the Debtors' estates (after wind-down costs).  The Debtors believe that the wind down and asset sales pursuant to the terms of the SEC Settlement and the Plan accomplish the Debtors' goal of maximizing recovery for the Debtors' creditors in light of the jury verdict.

---

[2]    Capitalized terms used in this Disclosure Statement, but not defined herein, shall have the meanings ascribed to such terms in the Plan.  To the extent any inconsistencies exist between this Disclosure Statement and the Plan, the Plan shall govern.

The Creditor's Committee urges creditors to vote to accept the Plan for the following reasons (described in more detail in the Letter in Support, attached hereto as **Exhibit C**):

- The Creditor's Committee chooses the Plan Administrator, subject to the consent of the SEC and the Debtors;

- The Plan embodies the SEC Settlement;

- The Plan does not provide a release for Mr. Kwon or other key participants;

- The Plan is better than any other alternative; and

- Each creditors' vote is important.

> **The Plan has been proposed in close consultation with the Creditors' Committee and the SEC, and the Creditors' Committee urges all creditors to vote to accept the Plan.**

A.    **Summary of SEC Settlement and Wind Down Process**

*a)    Settlement of SEC Enforcement Action (TFL)*

The following are certain key terms of the SEC Settlement as relates to the SEC's claim:

- The SEC's allowed claim under the SEC Settlement is $4,473,828,306 (the "**SEC Claim**"), comprised of the following elements:  disgorgement totaling $3,586,875,883 together with prejudgment interest thereon to the Petition Date in the amount of $466,952,423, and a civil enforcement penalty due from TFL in the amount of $420,000,000;

- By consent of the SEC, pursuant to the SEC Settlement, the SEC Claim shall be treated as an Allowed general unsecured claim.  Any distribution made to holders of Allowed Class 4 Claims and Allowed Class 5 Claims shall be deemed to satisfy the SEC Claim in the aggregate amount of such Allowed Class 4 Claims and Allowed Class 5 Claims.  For the avoidance of doubt, (i) there shall be no distributions on the SEC Claim unless Allowed Claims in Class 4 and Class 5 are satisfied in full, and (ii) if the Allowed Claims in Class 4 and Class 5 are satisfied in full under the Plan, distributions shall be made on account of any remaining unsatisfied portion of the SEC Claim until paid in full before any distribution is made to holders of 510(c) Subordinated Claims or holders of TFL Equity Interests.  The SEC is not expected to receive any direct distributions pursuant to the Plan;

- TFL agreed to make certain governance changes to its Board of Directors, including appointing two new independent directors, as outlined in more detail below;

- TFL agreed to certain chapter 11 plan-related milestones, including:

  - filing the Plan by June 30, 2024;

  - using best efforts to obtain confirmation of the Plan by September 30, 2024; and

  - the Effective Date to occur no later than October 30, 2024; and

- TFL will not receive a discharge under the Plan.

    *b)*   **Wind Down and Asset Sales**

As described above, the SEC Settlement requires TFL to commence a wind down of its operations and liquidate its assets, including taking the following actions:

- prior to the Effective Date, liquidating its assets, including:

  - marketing and selling TFL's equity interest in Proximity Panorama LDA and the Venture Investments (as defined below);

  - Converting certain digital assets within its possession and control into U.S. dollars;

- by the Effective Date, burning all tokens in its possession native to the Terra Blockchain (as defined below), including, but not limited to Luna Classic, Luna, UST, MIR and ANC (each as defined below), or destroying all private keys in TFL's possession to wallets or blockchain addresses holding such tokens; and

- by the Effective Date, allowing third parties to withdraw, unwind, and/or unstake their positions from TFL's applications and protocols.

    *c)*   **Settlement of SEC Enforcement Action (Mr. Kwon)**

Pursuant to the terms of the SEC Settlement, Mr. Kwon is jointly and severally liable with TFL in the amount of $110,000,000 of disgorgement, plus prejudgment interest in the amount of $14,320,196. In addition, Mr. Kwon owes a civil penalty of $80,000,000. Mr. Kwon, as the director of the Luna Foundation Guard ("**LFG**"),[3] is required to transfer all crypto assets in LFG's name to TFL's estate, which will be used solely for payment of harmed investors holding Crypto Loss Claims. Mr. Kwon's disgorgement and civil penalties owed to the SEC shall be deemed satisfied, provided that all transfers by Mr. Kwon to the SEC and TFL's estate total no less than $204,320,196, excluding the value of any of TFL's digital assets transferred to TFL's estate, only if and until Mr. Kwon completes: (1) transferring into an escrow account agreed by Mr. Kwon and the SEC staff $4,700,000 within thirty (30) days of Final Judgment as set for the above; (2) transferring into an escrow account agreed by Mr. Kwon and the SEC staff $2,300,000 of assets belonging to Mr. Kwon in accounts at Sygnum Bank of Zurich, Switzerland, associated with Portfolio Number 84.002.088-00, within thirty (30) days of Final Judgment; (3) transferring to TFL's estate within thirty (30) days all crypto assets of the LFG, which shall first be applied to satisfy the disgorgement amount and prejudgment interest with any remaining assets applied to the civil penalty amount; and (4) transferring to TFL's estate within thirty (30) days Mr. Kwon's ownership interest in all Pyth tokens Mr. Kwon obtained pursuant to a May 18, 2021 token grant agreement between Mr. Kwon and Tribal Invest Corp, which shall be applied to satisfy the civil penalty amount.

    *d)*   **Wind Down Motion**

On July 9, 2024, the Debtors filed the *Motion of Debtor for Entry of Order Approving Implementation Steps in Compliance with TFL Consent and Final Judgment in SEC Enforcement Action* (Docket No. 435) (the "**Wind Down Motion**") requesting authority for TFL to take certain of the steps outlined above to

---

[3]  LFG is a non-profit Singapore entity formed in December 2021.

implement the SEC Settlement, including but not limited to: (i) converting TFL's Bitcoin ("**BTC**") to fiat currency; (ii) marketing TFL's non-digital assets, such as Proximity and the Venture Investments; (iii) destroying and/or burning tokens native to the Terra Blockchain; (iv) continuing operation of certain of TFL's applications and protocols to allow third parties to withdraw, unwind, and/or unstake their positions and redeem assets on the Terra Blockchain; and (v) directing the transfer of assets upon receipt from Mr. Kwon and/or LFG into designated segregated bank accounts or custodial accounts.

On July 17, 2024, the Bankruptcy Court entered an order approving the Wind Down Motion (Docket No. 479).

>      B.      **The Plan**

The Plan is a result of the SEC Settlement, as well as the Debtors' and their advisors' collaborative work with the SEC and the Creditors' Committee and its advisors to negotiate the terms of a chapter 11 plan of liquidation and wind down of the Debtors' estates.

>              a)      *General Description*

The Plan provides for an orderly liquidation of all of the Debtors' assets and the distribution of value to the Debtors' creditors in accordance with the priorities under the Bankruptcy Code and the SEC Settlement.

As described further herein in section V, the Plan contemplates the limited substantive consolidation of the estates of TFL and TLL solely for purposes relating to the Plan, including voting, Confirmation, claim allowance, and Distribution. Substantive consolidation is an equitable remedy available to bankruptcy courts where the assets and liabilities of two or more debtors are combined to create a single estate, solely for purposes of a chapter 11 plan. This means Allowed Claims against either TFL or TLL will receive distributions from the assets of the consolidated estate. Further, no distribution under the Plan will be made on account of Intercompany Claims (defined below) between TFL and TLL. The limited substantive consolidation of the Debtors under the Plan shall not affect (i) the legal and organizational structure of the Debtors, including for corporate, tax or any other purpose, (ii) any Causes of Action or defenses thereto, and (iii) payments from any insurance policies or the proceeds thereto.

The Debtors anticipate there will be a number of assets available for distribution to holders of Allowed Claims (after the payment of wind-down expenses) on or after the Effective Date, each as described further herein, including:

> (1) cash or cash equivalents,

> (2) assets transferred to the Debtors by Mr. Kwon and LFG pursuant to the SEC Settlement,

> (3) cash in currently frozen bank accounts to the extent recovered,

> (4) proceeds from the sale of any or all estate assets (e.g. cryptocurrency, Proximity, interests in Venture Investments), and

> (5) proceeds from Causes of Action.

The Plan Supplement is a supplemental appendix to the Plan which contains, among other things, forms or term sheets of applicable documents, schedules, and exhibits to the Plan to be filed with the Bankruptcy Court, including the following: (a) the Assumption Schedule, (b) the Schedule of Retained Causes of Action, (c) the Wind Down Budget, (d) the identity of the Wind Down Trustee, (e) a Wind Down Trust

Agreement, (f) the identity of the Plan Administrator, (g) the identity of the Advisory Board, and (h) information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code. The Plan Supplement will be filed at least fourteen (14) days before the Voting Deadline for Classes 4 and 6 and eighteen (18) days before the Voting Deadline with Class 5. Through the Effective Date, the Debtors shall have the right to amend any documents contained in, and exhibits to, any Plan Supplement document subject to the requirements of <u>Section 12.4</u> of the Plan.

>    b)    ***Wind Down Trust***

On the Effective Date, the Debtors' assets and liabilities will be transferred to and vest in the Wind Down Trust which will be a STAR Trust under the laws of the Cayman Islands (the "**Wind Down Trust**").[4] The Wind Down Trust will assume sole and exclusive responsibility and liability for all claims against the Debtors, as well as the Debtors' operating expenses, and such claims shall be liquidated, resolved, or paid by the Wind Down Trust. In addition, the Wind Down Trust will hold a supermajority equity interest in TFL, such that it may assert shareholder control and commence the winding up of TFL and TLL upon completion of the wind down. Under the Plan, creditors do not receive a beneficial interest in the Wind Down Trust. Rather, the Wind Down Trust is purely an objects trust, without beneficiaries, for the purpose of effectuating the wind down and distributions to creditors.

The Wind Down Trust will be governed by the "**Wind Down Trust Agreement**," which will delineate the terms and conditions for the creation and operation of the Wind Down Trust and governing the three governing figures: (i) the "**Wind Down Trustee**," (ii) the "**Plan Administrator**," and (iii) the "**Advisory Board**." The Wind Down Trust Agreement will be included in the Plan Supplement.

The Wind Down Trustee will be a Cayman Islands licensed professional trust company selected by the Debtors and the Creditors' Committee, subject to the consent of the SEC. The Wind Down Trustee will be appointed pursuant to the Wind Down Trust Agreement. The Wind Down Trustee is a nominal role required under Cayman law for the form of trust contemplated under the Plan. The Wind Down Trustee technically holds the power to, among other things, prosecute causes of action and make distributions; however, the Wind Down Trustee will be directed by the Plan Administrator.

The Plan Administrator will be selected by the Creditors' Committee, subject to the consent of the SEC and the Debtors. The Plan Administrator is effectively in control of the Wind Down Trust, with power to direct the Wind Down Trustee, subject to the oversight of the Advisory Board. The Plan Administrator has broad authority to, among other things, (i) direct and control the wind down, (ii) control and effectuate the claims reconciliation process, (iii) prosecute all causes of action on behalf of the Company, and (iv) direct the Wind Down Trustee to make distributions pursuant to the Plan.

The Advisory Board will be selected by the Creditors' Committee, in consultation with the Debtors and not objectionable to the SEC, in accordance with <u>Section 5.5(i)</u> of the Plan, and disclosed in the Plan Supplement. The Advisory Board will have rights and powers to enforce the Wind Down Trust and supervise its administration, as set forth in the Wind Down Trust Agreement. The Advisory Board is a

---

[4]    The Cayman Islands Special Trust Alternative Regime, or "STAR" trust regime, Trusts can be created for persons, purposes or a combination of both and provide significantly more planning flexibility than traditional trusts. STAR Trusts are well-suited to a liquidating trust scenario due to the flexibility allowed in determining the trust's objects as the objects can be aligned with the liquidation plan such that the mission of the trust is to achieve/follow the liquidation plan. STAR trusts may, but are not required to, have beneficiaries. For the avoidance of doubt, the Debtors reserve the right, with the Creditors' Committee's consent, not to be unreasonably withheld, to establish the Wind Down Trust under a different form under Cayman Islands law or in a jurisdiction other than the Cayman Islands prior to the Effective Date.

supervisory role, holding rights and powers relating to supervision of the Wind Down Trust. The Advisory Board can replace the Plan Administrator and/or the Wind Down Trustee, pursuant to the terms of the Wind Down Trust Agreement.

The identity of the Plan Administrator and the Wind Down Trustee, and additional details related to the wind down process, will be included in a Wind Down Trust Agreement filed with the Plan Supplement.

The Debtors intend that the Wind Down Trust will be organized in compliance with applicable law such that any beneficial interest in (if any), or the right to receive distributions from, the Wind Down Trust (each a "**Wind Down Trust Interest**" and together, the "**Wind Down Trust Interests**") will not be deemed to be or treated as securities under applicable law. As a result, the Debtors do not believe that registration under the Securities Act and applicable state law in connection with the issuance and distribution of Wind Down Trust Interests or an exemption from such registration requirements is required. However, to the extent that the Wind Down Trust Interests issued under the Plan are deemed securities, the issuance and distribution thereof would qualify for issuance without registration under the Securities Act or any similar federal, state, or local law pursuant to section 1145 of the Bankruptcy Code. To the extent that the issuance and distribution of the Wind Down Trust Interests under the Plan is completed pursuant to section 1145 of the Bankruptcy Code, such Wind Down Trust Interests would be exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to the offering, issuance, distribution, or sale of securities.

Notwithstanding the forgoing or anything to the contrary in the Plan, the Wind Down Trust Agreement will provide that the Wind Down Trust Interests will not be certified and may not be transferred, sold, pledged or otherwise disposed of, or offered for sale, except for transfers by will, intestacy or operation of law. The Wind Down Trust will be organized in compliance with applicable law such that the Wind Down Trust Interests will not be treated as securities and under such facts the Debtors do not believe that registration under the Securities Act and applicable state law in connection with the issuance and distribution of the Wind Down Trust Interests or an exemption from such registration requirements would be required.

### c)    *Key Classes and Treatment*

The following chart summarizes the key Classes in the Plan and the treatment and distribution to holders of Claims in each Class. A more comprehensive description of the Claim Classes is provided below.

| Class | Designation | Description | Distribution |
|---|---|---|---|
| 3 | Beltran Allowed Secured Claims | Claims asserted against TFL in the Beltran Action (as defined herein). | Holders will receive payment from either (i) a settlement with TFL and/or the Wind Down Trustee or (ii) as determined by Final Order of the courts of the Republic of Singapore, in each case up to the amount of the Beltran Escrow Deposit; *provided*, *however*, that (i) to the extent the Bankruptcy Court determines that claims asserted against TFL in the Beltran Action are not Secured Claims, such Claims shall not be Beltran Allowed Secured Claims but shall be Crypto Loss Claims and (ii) any portion of such Allowed Claim asserted against TFL in the Beltran |

| Class | Designation | Description | Distribution |
|---|---|---|---|
| | | | Action that exceeds its allocated portion of the Beltran Escrow Deposit shall be treated as an Allowed Crypto Loss Claim.<br><br>On the later of the Effective Date and the date that is thirty (30) days after the date that: (i) such Beltran Allowed Secured Claim becomes an Allowed Claim, and (ii) a Final Order of the courts of the Republic of Singapore is made permitting the release of the Beltran Escrow Deposit to the holders of the Beltran Allowed Secured Claims, or as soon thereafter as is reasonably practicable, each holder of a Beltran Allowed Secured Claim will receive payment from the Beltran Escrow Deposit as determined by the Final order of the courts of the Republic of Singapore.<br><br>Holders of Beltran Allowed Secured Claims are required to file proofs of claim pursuant to the Crypto Loss Claims Bar Date. |
| 4 | General Unsecured Claims ("**GUC**") | Claims against the Debtors (other than Intercompany Claims, Crypto Loss Claims, and Subordinated Claims) that are neither secured by collateral nor entitled to priority under the Bankruptcy Code. | Holders of Allowed General Unsecured Claims will receive their Pro Rata share of the GUC Pool up to the full allowed amount of such Claim.<br><br>Holders of Allowed General Unsecured Claims are required to file proofs of claim pursuant to the General Bar Date Order. |
| 5 | Crypto Loss Claims | Claims asserted against the Debtors arising from (a) the purchase, sale, or rescission of the purchase or sale, of a (i) Cryptocurrency, including Terra Crypto[5], (ii) any wrapped version on any blockchain of any Terra Crypto, (iii) any receipt or | Holders of Allowed Crypto Loss Claims will receive their share of the Crypto Loss Claim Pool according to the Crypto Loss Claim Procedures. Individual Crypto Loss Claims will be administered in accordance with the Crypto Loss Claim Procedures and any related procedures for determining the |

---

[5]    "***Terra Crypto***" means any Cryptocurrency issued, created, generated, minted, promoted by or otherwise associated with the Company and its Affiliates, the Terra Ecosystem, or any decentralized or centralized application or protocol on the TerraLunaClassic and TerraLuna blockchains, including Anchor (ANC), Bonded Assets (bLUNA and bETH), Mirror (MIR), Mirror Assets (mAssets), TerraLunaClassic (LUNC), Wrapped Luna (wLUNA), TerraClassicUSD (USTC), TerraLuna (LUNA), and Liquidity Pool (LP) tokens on TerraLunaClassic and TerraLuna decentralized exchanges.

| Class | Designation | Description | Distribution |
|---|---|---|---|
| | | derivative of any Terra Crypto, or (iv) any other Cryptocurrency that derives a value from Terra Crypto, and (v) any other Cryptocurrency that was transacted or made available on the TerraLunaClassic and TerraLuna blockchains, and (b) any reimbursement or contribution claims allowed under section 502 of the Bankruptcy Code on account of such claims. | Allowed Claim for each creditor that asserts a Crypto Loss Claim, which general process to such procedures are to be described in the Plan Supplement.<br><br>Holders of Crypto Loss Claims must file and serve on the Wind Down Trust Proofs of Claim consistent with the procedures to be specified in the motion seeking to establish a Crypto Loss Claims Bar Date or be forever barred, estopped, and enjoined from asserting such Claims against the Wind Down Trust or their assets or properties. |
| 6 | SEC Claim | The Claim, as determined by the Final Judgment in the SEC Enforcement Action, by the SEC against TFL pursuant to the SEC Settlement fixing TFL's civil penalty and disgorgement. | The SEC Claim shall be treated as an Allowed general unsecured claim. Any distribution made to holders of Allowed Class 4 Claims and Allowed Class 5 Claims shall be deemed to satisfy the SEC Claim in the aggregate amount of such Allowed Class 4 Claims and Allowed Class 5 Claims. For the avoidance of doubt, (i) there shall be no distributions on the SEC Claim unless Allowed Claims in Class 4 and Class 5 are satisfied in full, and (ii) if the Allowed Claims in Class 4 and Class 5 are satisfied in full under the Plan, distributions shall be made on account of any remaining unsatisfied portion of the SEC Claim until paid in full before any distribution is made to holders of 510(c) Subordinated Claims or holders of TFL Equity Interests. |
| 9 | 510(c) Subordinated Claims | The Wind Down Trustee may seek to subordinate certain claims pursuant to section 510(c) of the Bankruptcy Code ("equitable subordination"), including claims for indemnification, pursuant to a final order of the Bankruptcy Court. | 510(c) Subordinated Claims shall be deemed expunged, released, and extinguished without further action by or order of the Bankruptcy Court, and will have no further force or effect.<br><br>Holders of claims for indemnification are required to file proofs of claim pursuant to the General Bar Date Order. |

*d)*    **Plan Funds**

On the Effective Date, the Debtors will establish the following pools of funds for wind-down costs and distributions to claimants:

- Wind Down Reserve: Funded with Cash sufficient to fund (i) the wind down process until the Wind Down Completion Date,[6] taking into account funds that are not yet in the Debtors' estates, but are likely to be available after the Effective Date, as provided in the Wind Down Budget,[7] and (ii) the D&O Indemnification Obligations.[8]    The Wind Down Budget will be included in the Plan Supplement.

- Senior Claim Pool: Funded on the Effective Date with Cash estimated to be necessary to pay holders of secured and/or priority claims (*i.e.*, Administrative Expense, Priority Tax, Priority Non-Tax, and Other Secured Claims) ("**Senior Claims**") a 100% recovery, plus any amounts estimated to be necessary to pay holders of Disputed Senior Claims.

- Fee Escrow Account: Funded with Cash for the payment of professional fees and costs ("**Fee Claims**"), based on estimates provided in advance of the Effective Date.

- GUC Pool (for the payment of Allowed General Unsecured Claims): Funded (i) on the Effective Date, with Effective Date Available Cash (i.e., available cash that is not otherwise reserved for another fund/pool) and (ii) after the Effective Date, with (a) Post-Effective Date Cash (as described below), (b) Surplus Reserved Cash, and (c) Surplus Senior Claim Pool Cash, in each case in accordance with the Waterfall (these defined terms are explained later in this subsection).

- Crypto Loss Claims Pool: (for the payment of Crypto Loss Claims):  Funded initially with (i) the funds in the SEC Settlement Fund and (ii) thereafter, with any remaining Cash in the GUC Pool upon the time at which all Allowed General Unsecured Claims are indefeasibly paid in full in Cash and there are no Disputed General Unsecured Claims (the "**General Unsecured Claim Payment Completion**").

- SEC Settlement Fund: Funded with amounts transferred to the Debtors by Mr. Kwon and LFG under the SEC Settlement, which shall be converted to Cash after the Effective Date and reserved for distribution solely to harmed investors holding Crypto Loss Claims pursuant to the SEC Settlement.

Cash received after the Effective Date, such as proceeds from the sale of Estate assets, proceeds from Estate Causes of Action, and Cash in restricted bank accounts (to the extent recovered) ("**Post-Effective Date**

---

[6]    "**Wind Down Completion Date**": is defined in the Plan as the date upon which all assets of the Wind Down Trust have been sold, abandoned, dissolved, liquidated, or otherwise disposed of, and all proceeds thereof or remaining assets of the Wind Down Trust have been distributed in accordance with the Plan.

[7]    "**Wind Down Budget**": is defined in the Plan as the budget setting forth the estimate of costs and expenses necessary to effectuate the wind down through the Wind Down Completion Date, which budget may, after the Effective Date, be amended, modified, or supplemented from time to time by the Plan Administrator in its reasonable discretion.

[8]    "**D&O Indemnification Obligations**": is defined in the Plan as the obligation of the Debtors or the Wind Down Trust, as applicable, to indemnify John S. Dubel, Russell Nelms ("**Mr. Nelms**"), and Thong Kum Keen Benjamin ("**Mr. Thong**"), each in his capacity as an independent director of TFL, including in TFL's capacity as director of TLL, in accordance with the TFL constitution and TLL's articles of association.

**Cash**"), as well as surplus Cash in the Wind Down Reserve, as may be released from the Wind Down Reserve by the Wind Down Trustee, as directed by the Plan Administrator from time to time (the "**Surplus Reserved Cash**"), and surplus Cash in the Senior Claim Pool, as may be released by the Wind Down Trustee, as directed by the Plan Administrator from time to time (the "**Surplus Senior Claim Pool Cash**") shall be distributed pursuant to a "**Waterfall**": (i) first, to fund any deficits in the Wind Down Reserve, as determined in the sole discretion of the Plan Administrator, (ii) second, to fund any deficits in the Senior Claim Pool, as determined in the sole discretion of the Plan Administrator, and (iii) third, to fund the GUC Pool, until the General Unsecured Claim Payment Completion.

The Plan also contemplates that holders of allowed Beltran Allowed Secured Claims can recover up to the amount held in the escrow account in Singapore Court (the "**Beltran Escrow Deposit**"). However, to the extent the Bankruptcy Court determines that claims asserted against TFL in the Beltran Action are not Secured Claims, such Claims will not be Beltran Allowed Secured Claims but will instead be Crypto Loss Claims. In addition, if any portion of any Allowed Claim asserted against TFL in the Beltran Action exceeds its allocated portion of the Beltran Escrow Deposit (e.g. the Singapore Court determines damages pertaining to the Beltran Allowed Secured Claims exceed the Beltran Escrow), such excess claim amounts will be treated as Allowed Crypto Loss Claims, and entitled to distributions from the Crypto Loss Claims Pool (as described above). To the extent claims arising out of the Beltran Action are not Beltran Allowed Secured Claims, TFL and/or the Wind Down Trustee shall request of the High Court of the Republic of Singapore that the Beltran Escrow Deposit be returned to the Wind Down Trust. Further, to the extent Claims arising out of the Beltran Action are Beltran Allowed Secured Claims, then after such Claims are satisfied, TFL and/or the Wind Down Trustee shall request of the High Court of the Republic of Singapore that any excess amount of the Beltran Escrow Deposit shall be returned to TFL and/or the Wind Down Trust, as applicable.

*e)* **Releases and Exculpation**

In conjunction with the SEC Settlement, the Company and the SEC substantially negotiated the releases and exculpation of certain parties under the Plan. The Plan provides limited Estate releases for a select number of parties, including: independent directors, the Wind Down Trustee, the Creditors' Committee, the Advisory Board and the Plan Administrator, Weil, Gotshal & Manges LLP, Alvarez & Marsal North America, LLC, Epiq Corporate Restructuring, LLC, and Richard, Layton, and Finger, P.A.. The Plan does not provide Estate releases for Mr. Kwon, shareholders, or directors (except for independent directors) and officers. The Plan also reserves all rights under the Dentons Retention Order with respect to any release of Dentons. The releases and exculpations under the Plan are discussed in further detail in section V.E below.

C. **Confirmation Timeline**

The Debtors seek to move forward expeditiously with the solicitation of votes and a hearing on confirmation ("**Confirmation**") of the Plan in an effort to minimize the continuing accrual of administrative expenses. Accordingly, subject to the Bankruptcy Court's approval, the Debtors are seeking approval of the Disclosure Statement and the Plan on the following timeline:

| Class 4 (General Unsecured Claims) and Class 6 (SEC Claim) Voting Record Date | Friday, August 9, 2024 |
|---|---|
| Solicitation Date | Wednesday, August 14, 2024 |

| Deadline to file a Claim Objection or Request to Estimate Claim for Voting Purposes | Tuesday, August 20, 2024 |
|---|---|
| Class 5 (Crypto Loss Claims) Voting Record Date | Wednesday, August 21, 2024 |
| Supplemental Solicitation Date | Monday, August 26, 2024 |
| Deadline to File Plan Supplement (other than with respect to the identity of the Wind Down Trustee or the Plan Administrator, as applicable, and the identity of the Advisory Board) | Thursday, August 29, 2024 |
| Deadline to file Rule 3018 Motion | Tuesday, September 3, 2024 |
| Deadline to Disclose (i) the identity of the Plan Administrator or the Wind Down Trustee, as applicable, and (ii) the identity of the Advisory Board | Thursday, September 5, 2024 |
| Deadline to Object to Rule 3018 Motion | Tuesday, September 10, 2024 at 4:00 p.m. |
| Deadline to Object to Confirmation of Plan | Thursday, September 12, 2024 at 4:00 p.m. (ET) |
| Voting Deadline for Classes 4 and 6 | Thursday, September 12, 2024 at 4:00 p.m. (ET) |
| Voting Deadline for Class 5 | Monday, September 16, 2024 at 12:00 p.m. (ET) |
| Deadline to File (i) Reply to Plan Objection(s), (ii) Brief in Support of Plan Confirmation, (iii) Proposed Confirmation Order, and (iv) Declarations in Support of Plan Confirmation (including Voting Certification) | Tuesday, September 17, 2024 at 12:00 p.m. (ET) |
| Plan Confirmation Hearing | Thursday, September 19, 2024 at 10:00 a.m. (ET) |

D.    **Summary of Plan Classification and Treatment of Claims**

**THE DEBTORS AND THE CREDITORS' COMMITTEE SUPPORT CONFIRMATION OF THE PLAN AND URGE ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN TO VOTE TO ACCEPT THE PLAN. THE DEBTORS BELIEVE THAT THE PLAN PROVIDES THE HIGHEST AND BEST POSSIBLE RECOVERY FOR ALL STAKEHOLDERS.**

**WHO IS ENTITLED TO VOTE**: Under the Bankruptcy Code, only holders of claims or interests in "impaired" Classes are entitled to vote on the Plan (unless, for reasons discussed in more detail below, such

holders are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code).  Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" unless (i) the Plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the Plan, among other things, cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

**HOLDERS OF CLAIMS IN CLASS 4 (GENERAL UNSECURED CLAIMS), CLASS 5 (CRYPTO LOSS CLAIMS), AND CLASS 6 (SEC CLAIM) ARE THE ONLY CLASSES BEING SOLICITED UNDER, AND THE ONLY CLASSES ENTITLED TO VOTE ON, THE PLAN.**

The following table summarizes (i) the treatment of Claims and Interests that are classified under the Plan, (ii) which Classes are impaired by the Plan, (iii) which Classes are entitled to vote on the Plan, and (iv) the estimated recoveries for holders of Claims and Interests under the Plan.  The table is qualified in its entirety by reference to the full text of the Plan.  For a more detailed summary of the terms and provisions of the Plan, see Section V—Summary of Plan below.  A discussion of the amount of Claims in each Class is set forth in Section V.B hereof.

Note that the "Approximate Recovery Under the Plan" is only an estimate.  As the General Bar Date is set to occur on August 9, 2024, the Debtors have only begun the process of reconciling General Unsecured Claims.  The bar date for Crypto Loss Claims (discussed below) will not occur until after the Effective Date so the Debtors have not begun the process of reconciling Crypto Loss Claims.  The actual recovery under the Plan will depend, among other things, on the Allowed Claims in each Class.

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitled to Vote on the Plan | Approximate Recovery Under Plan | Estimated Amount of Allowed Claims[9] |
|---|---|---|---|---|---|---|
| 1 | Priority Non-Tax Claims | On or as soon as practicable after the Effective Date, except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to less favorable treatment, each holder thereof shall be paid in full in Cash or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. | Unimpaired | No (Presumed to accept) | 100% | $0 |
| 2 | Other Secured Claims | Except to the extent that a holder of an Allowed Other Secured Claim agrees to different treatment, on the later of the Effective Date and the date that is thirty (30) days after the date such Other Secured Claim becomes an Allowed Claim, or as soon thereafter as is reasonably | Unimpaired | No (Presumed to accept) | 100% | $70,000 |

---

[9]     The Estimated Amount of Allowed Claims reflects an estimated range of Allowed Claims.  The actual aggregate amount of Allowed Claims in each class will be determined following the applicable Bar Date and claims reconciliation.

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitled to Vote on the Plan | Approximate Recovery Under Plan | Estimated Amount of Allowed Claims[9] |
|---|---|---|---|---|---|---|
| | | practicable, each holder of an Allowed Other Secured Claim will receive, on account of such Allowed Claim, at the sole option of the Debtors or the Plan Administrator, as applicable: (i) Cash in an amount equal to the Allowed amount of such Claim; (ii) such other treatment sufficient to render such holder's Allowed Other Secured Claim Unimpaired; or (iii) return of the applicable collateral in satisfaction of the Allowed amount of such Other Secured Claim. Except as otherwise specifically provided herein, upon the payment in full in Cash of an Other Secured Claim, any Lien securing an Other Secured Claim that is paid in full, in Cash, shall be deemed released, and the holder of such Other Secured Claim shall be authorized and directed to release any collateral or other property of the Debtors held by such holder and to take such actions as may be requested by the Plan Administrator, to evidence the release of such Lien, including the execution, delivery and filing or recording of such releases as may be requested by the Plan Administrator. | | | | |
| 3 | Beltran Allowed Secured Claims | Except to the extent that a holder of a Beltran Allowed Secured Claim agrees to different treatment, on the later of the Effective Date and the date that is thirty (30) days after the date that: (i) such Beltran Allowed Secured Claim becomes an Allowed Claim, and (ii) a Final Order of the courts of the Republic of Singapore is made permitting the release of the Beltran Escrow Deposit to the holders of the Beltran Allowed | Unimpaired | No (Presumed to accept) | 100% | $0 - $56.9 million |

13

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitled to Vote on the Plan | Approximate Recovery Under Plan | Estimated Amount of Allowed Claims[9] |
|---|---|---|---|---|---|---|
| | | Secured Claims, or as soon thereafter as is reasonably practicable, each holder of a Beltran Allowed Secured Claim will receive payment from the Beltran Escrow Deposit as determined by Final Order of the courts of the Republic of Singapore. | | | | |
| 4 | General Unsecured Claims | Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment of such Claim, each holder of an Allowed General Unsecured Claim will receive its Pro Rata share of the GUC Pool up to the full amount of such Allowed General Unsecured Claim. | Impaired | Yes | 51.5-100% | $5.0 - $48.0 million |
| 5 | Crypto Loss Claims | Each holder of an Allowed Crypto Loss Claim will receive its share of the Crypto Loss Claim Pool according to the Crypto Loss Claim Procedures.    Except as provided for herein or in any order of the Bankruptcy Court, holders of Crypto Loss Claims must file and serve on the Wind Down Trust Proofs of Claim consistent with the procedures to be specified in the motion seeking to establish a Crypto Loss Claims Bar Date or be forever barred, estopped, and enjoined from asserting such Claims against the Wind Down Trust or their assets or properties. | Impaired | Yes | 0.1-100% | Unknown |
| 6 | SEC Claim | By consent of the SEC, pursuant to the SEC Settlement, the SEC Claim shall be treated as an Allowed general unsecured claim. Any distribution made to holders of Allowed Class 4 Claims and Allowed Class 5 Claims shall be deemed to satisfy the SEC Claim in the aggregate amount of such Allowed Class 4 Claims and | Impaired | Yes | 0-100% | $4,473,828,306 |

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitled to Vote on the Plan | Approximate Recovery Under Plan | Estimated Amount of Allowed Claims[9] |
|---|---|---|---|---|---|---|
| | | Allowed Class 5 Claims. For the avoidance of doubt, (i) there shall be no distributions on the SEC Claim unless Allowed Claims in Class 4 and Class 5 are satisfied in full, and (ii) if the Allowed Claims in Class 4 and Class 5 are satisfied in full under the Plan, distributions shall be made on account of any remaining unsatisfied portion of the SEC Claim until paid in full before any distribution is made to holders of 510(c) Subordinated Claims or holders of TFL Equity Interests. | | | | |
| 7 | Intercompany Claims | On or after the Effective Date, all Intercompany Claims will either be reinstated or cancelled and released at the option of the Debtor; *provided* that no such distributions shall be made on account of such Intercompany Claims on the Effective Date. | Impaired | No (Deemed to reject) | N/A | N/A |
| 8 | Intercompany Interests | On the Effective Date, Intercompany Interests shall receive no recovery or distribution and be reinstated solely to maintain the Debtors' corporate structure, as necessary. | Unimpaired /Impaired | No (Deemed to accept/ reject) | N/A | N/A |
| 9 | 510(c) Subordinated Claims | Class 9 510(c) Subordinated Claims are subordinated pursuant to the Plan and section 510(c) of the Bankruptcy Code. 510(c) Subordinated Claims shall be deemed expunged, released, and extinguished without further action by or order of the Bankruptcy Court, and shall be of no further force or effect. | Impaired | No (Deemed to reject) | 0% | $0 |
| 10 | TFL Equity Interests | On the Effective Date, the Debtors shall cause TFL to issue the TFL Additional Stock in favor of the Wind Down Trust, pursuant to Section 5.5(c) of this Plan, solely for the purposes of facilitating the | Impaired | No (Deemed to reject) | 0% | N/A |

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitled to Vote on the Plan | Approximate Recovery Under Plan | Estimated Amount of Allowed Claims[9] |
|---|---|---|---|---|---|---|
| | | orderly administration of the Wind Down and dissolution of the Debtors. Holders of TFL Equity Interest shall retain their TFL Stock, subject to dilution by the issuance of the TFL Additional Stock in favor of the Wind Down Trust, pursuant to Section 5.5(c) of this Plan. Holders of TFL Equity Interests are not expected to receive distributions under the Plan. | | | | |

# II.
## OVERVIEW OF THE COMPANY'S OPERATIONS, ASSETS, AND LIABILITIES

A.    **Terraform Labs Pte. Ltd.'s Business**

a)    *History and Formation*

TFL was incorporated as a limited exempt private company in the Republic of Singapore on April 23, 2018, when its co-founder, Mr. Kwon, along with others, began developing an early version of the Terra blockchain (the "**Terra Classic Blockchain**").

On April 24, 2019, TFL minted one billion LUNC tokens ("**Luna Classic**"), the Terra Classic Blockchain's native token. TFL created the Terra Classic Blockchain and the Luna Classic token as a proposed solution to price volatility of cryptocurrencies. In addition to being the staking and governance token of the Terra Classic Blockchain, Luna Classic tokens were programmatically tradeable with the TerraUSD "stablecoin" (known by its ticker "**UST**").

Stablecoins are a type of cryptocurrency designed to maintain a stable price over time with reference to the value of a specified asset, usually fiat currency, either by backing the stablecoin with assets or using an algorithm to maintain the stablecoin at or near the value of that fiat currency.

Through most of its history UST's value remained near the price of the U.S. dollar. For UST, there was an algorithm through which UST and Luna Classic would be "minted" (created) or "burned" (destroyed) in parallel on the Terra Classic Blockchain. In other words, the mint-burn mechanism was coded into the Terra Classic Blockchain by using Luna Classic as the variable counterweight to Terra stablecoins: A person could use the Terra Classic Blockchain to exchange $1 worth of Luna Classic for $1 worth of UST, and vice versa. [10]

---

[10]    Specifically, when UST's market price rose above a dollar, participants could burn a dollar's worth of Luna Classic and receive one UST, which they could sell at the greater than $1 market price of UST. Conversely, if the market price of UST dropped below $1, a participant could burn one UST and receive one dollar's worth of LUNA, thereby lowering the circulating supply of UST and raising its price towards a dollar.

Following the launch of the Terra Classic Blockchain, users began to use the network, develop and use applications, and acquire Luna Classic and UST. At various times, TFL also created other protocols and cryptocurrencies.

### b) De-Peg and Launch of New Terra Blockchain

UST experienced at least two significant "de-pegging" events during its existence. First, in May of 2021, the market price of UST declined below $1, and within a few days rose back to near a dollar (the "**May '21 De-peg**"). On January 19, 2022, the formation of LFG (described above) was announced, and the Debtors contributed Luna Classic tokens and UST tokens to LFG. Over the course of the following months, LFG converted those tokens into $3 billion of BTC, stablecoins, and a small number of other digital assets, which digital assets were held as a reserve.

Second, on or about May 6, 2022, the price of UST started to drop below $1 USD and its price began to decline steeply. UST collapsed to nearly zero, and the price of Luna Classic collapsed in parallel (the "**De-peg**").

Following the De-peg, in late May 2022, TFL created a new blockchain to facilitate transactions within the Terra community ("**Terra**" or the "**Terra Blockchain**"), which included a new token "LUNA" ("**Luna**") which was "airdropped" to Luna Classic and UST token holders on the Terra Classic Blockchain. A portion of the newly issued Luna was placed in a "community pool" on the Terra Blockchain.

### c) Prepetition Business Operations

Leading up to and as of the Petition Date, TFL was a software development company that developed and supported (i) software used to create and run the Terra Blockchain, and (ii) tools, protocols, and applications that operate on the Terra Blockchain.

As of the Petition Date, TFL employed 43 full-time employees and utilized the services of approximately 15 independent contractors (the "**Workforce**"). The Workforce, as well as current and former employees and contractors (together with the Workforce, the "**Employees**") are located around the world. TFL is and was the employer of record for Employees in located in Singapore, where TFL is incorporated, while Deel, Inc. ("**Deel**", and such Employees, the "**EOR Employees**") a human capital management firm, is the employer of record for those Employees located outside of Singapore.

#### (i) Terra Blockchain

The Terra Blockchain is a public blockchain developed by TFL. It includes (i) a digital public "ledger" that records and enables secure peer-to-peer transactions, and (ii) a blockchain protocol (*i.e.*, the rules that govern the operation of the blockchain network). A community of users use the Terra Blockchain. The Terra Blockchain also includes numerous applications and tools created by TFL and other developers that operate on the Terra Blockchain. It has a governance mechanism that allows community stakeholders to propose changes to the network and its operation, which are then voted on via voting mechanisms available to token owners and implemented if they are approved.

#### (ii) Terra Community

As of the Petition Date, the Terra community consisted of over half a million stakeholders (measured by wallets) and 37,000 monthly active users (measured by unique wallets), who participated in the Terra network in various capacities. Various members of the Terra community participated in a number of activities, including, among others, recording and verifying transactions (validators), staking their tokens

to support the validators (stakers), developing tools and applications for use on the Terra Blockchain (developers), utilizing the various applications TFL developed, and participating in the governance of the Terra Blockchain.  Community members were able to submit, vote on, and implement various proposals, including, for example, making changes to the Terra Blockchain, deploying funds from the community pool on the Terra Blockchain, and entering into agreements with regard to the intellectual property held in the Terra community trust.

(iii) <strong><em>Development of Applications</em></strong>

Following the De-peg, TFL developed applications designed to be used on the Terra Blockchain and "cross-chain" (i.e. on other blockchains).

(a) <u>Applications Current as of the Petition Date:</u>

- **Station**.  A "cross-chain" wallet (*i.e.*, compatible with third-party blockchains) that allows users to access, in addition to the Terra Blockchain, other chains and applications built within the third-party Cosmos blockchain network.

- **Foundation**.  Foundation is an infrastructure offering that pairs the TFL infrastructure and user experience framework with the newly-acquired Pulsar's (defined below) data indexing capabilities.

- **Enterprise Protocol.**  Enterprise Protocol is suite of Terra applications that allow users to conduct business in "Web 3.0".

- **Warp**.  Warp is an automation tool designed for Web 3.0 protocols, which allows economic activity automated by "bots" from centralized services to be brought on to the Terra Blockchain.

- **Alliance**.  Alliance is an open-source Cosmos SDK module that leverages interchain staking to form economic alliances among blockchains.

(b) <u>Historical Applications (not current as of the Petition Date):</u>

- **Bridge Protocol.**  The Bridge Protocols allowed users of Terra related tokens to use the wrapped versions of those tokens (the "**Wrapped Tokens**") on the Harmony One network, the Binance Smart Chain Network, and the Ethereum Network instead of on the native Terra Blockchain.[11] Users of the Bridge Protocol could send their Terra Classic Blockchain tokens to a wallet associated with the Bridge Protocols operated by TFL (such wallet, a "**Bridge Wallet**"), which users interact with to obtain wrapped assets on a corresponding destination chain, and could redeem the Terra Classic Blockchain tokens automatically upon request.  As disclosed in its monthly operating reports throughout its chapter 11 case, TFL has not and does not use or include any of these tokens in its treasury.[12]

---

[11]  Wrapped Tokens are digital assets on one blockchain representing interests in digital assets on a different blockchain.

[12]  See Chapter 11 Monthly Operating Report for the Month Ending: February 29, 2024 (Docket No. 202), Chapter 11 Monthly Operating Report for the Month Ending: March 31, 2024 (Docket No. 245), Chapter 11 Monthly Operating Report for the Month Ending: April 30, 2024 (Docket No. 341), Chapter 11 Monthly Operating Report for the Month Ending: May 31, 2024 (Docket No. 412), and Chapter 11 Monthly Operating Report for the Month Ending: June 30, 2024 (Docket No. 495).

B.    **Terraform Labs Limited's History and Business**

TLL is a British Virgin Islands ("**BVI**") company limited by shares and a wholly-owned subsidiary of TFL. It was incorporated on June 25, 2018.

TLL entered into token sale agreements (collectively, the "**Token Sale Agreements**") and other agreements with third parties. TFL and TLL entered into "subscription agreements" with each other (collectively, the "**Subscription Agreements**") that permitted TFL to accept payments for certain tokens from third parties that otherwise would have been payable to TLL pursuant to the Token Sale Agreements and other agreements. Consequently, for token sales, third parties paid TFL, not TLL, for Luna Classic under the Token Sale Agreements, and in accordance with the Subscription Agreements, TFL was permitted to collect and use this money. In exchange, TLL was granted a "perpetual security." Following the May '21 De-peg, TLL contributed billions of Luna Classic tokens to LFG.

On May 18, 2023, shortly after the SEC commenced the SEC Enforcement Action (which did not name TLL as a defendant), TLL's registered agent in the BVI, Overseas Company Services Limited, issued a notice of its intent to resign as TLL's registered agent because of TLL's purported failure to keep its due diligence information up to date, as required under BVI law. That same day, the BVI Financial Services Commission provided notice to TLL (the "**Notice**") that TLL would be "struck off the register" pursuant to the BVI Business Companies Act of 2004 (as amended, the "**BVI Act**"), unless the company appointed a replacement registered agent within sixty (60) days from the date of the Notice.

TLL did not appoint a new registered agent within such sixty-day period. Under the BVI Act, a company struck off the register after January 1, 2023 is dissolved on the date of such strike-off. Accordingly, on July 18, 2023, TLL was "struck off" the BVI register of companies and dissolved by operation of BVI law as a consequence of the resignation of its previous registered agent without a replacement.

TLL was restored effective as of June 21, 2024 after TFL filed an application to restore TLL in the BVI.

C.    **Debtors' Organizational Structure**

A diagram reflecting the Debtors' current corporate structure is provided below.



- **Proximity Panorama, LDA Transaction.**  In November 2023, TFL acquired the stock of Proximity Panorama, LDA ("**Proximity**"), a Portuguese private limited liability company, pursuant to a sale and purchase of share agreement.  Proximity owned valuable intellectual property—cross-chain portfolio management and analytics software called Pulsar Finance ("**Pulsar**"), which it transferred to TFL pursuant to the transaction.  TFL paired its Foundation application with Pulsar analytics software and data indexing capabilities to create a user interface product that is unavailable on any of TFL's competitors' blockchain platforms.  Proximity is a wholly-owned subsidiary of TFL.  As described herein, TFL is currently in the process of selling Proximity.

    Since its acquisition of Proximity, TFL has funded Proximity's operating expenses, including Proximity's lease, office maintenance, hosting and technology costs, and insurance (the "**Proximity Intercompany Transactions**").  Proximity's operating expenses average approximately $40,000 per month.  The Debtors are authorized, pursuant to an interim order of the Bankruptcy Court (Docket No. 211), to fund Proximity's operating expenses in an amount not to exceed $40,000 per month until the entry of any final order or other interim order.  Furthermore, TFL pays for Proximity's payroll expenses, through Proximity's payroll service provider, of approximately $175,000 per month.

- **Moon Landing Ventures I Ltd.**  Moon Landing Ventures I Ltd. ("**Moon Landing Ventures**") is a British Virgin Islands entity and wholly-owned subsidiary of TFL.  It was dissolved in May 2023.

    In 2022, Moon Landing Ventures invested approximately $3 million in a certain venture investment.

    After consultation with the Advisors, as of the date hereof, the Special Committee and TFL are evaluating whether to pursue the restoration of Moon Landing Ventures.

- **Terraform Labs Korea.**  Terraform Labs Korea is a South Korean entity and wholly-owned subsidiary of TFL.  Terraform Labs Korea underwent dissolution through a shareholder resolution on April 30, 2022, with Mr. Kwon designated as the liquidator; however, the liquidation process and closure have not been completed.

D.    **Governance**

        *a)*        ***Terraform Labs Pte. Ltd.***

        (i)        **As of the Petition Date**

As of the Petition Date, TFL's Board consisted of three (3) directors:  Chris Amani, Ashwin Mathialagan, and John S. Dubel.  Mr. Dubel was appointed to the Board as an independent director on January 19, 2024.  Mr. Dubel has extensive restructuring experience and a strong history serving as an independent director on the Boards of troubled companies, including those that have been accused of misconduct prior to him joining, and the Board believed that Mr. Dubel's experience would be beneficial to TFL as it navigated through the restructuring process.

TFL's management team consisted of the following individuals: Chris Amani, Head of Company Operations; Mark Chan, Chief Operations Officer; Cayden Bernstein, Vice President-People; Peter Hsieh, General Counsel; and Javier Su, Core Engineer.

On January 21, 2024, the Board approved the formation of a special committee comprised of Mr. Dubel (the "**Special Committee**").  The Special Committee is authorized to, among other things, conduct and oversee an investigation of TFL's and its subsidiaries' assets, liabilities, and claims.

The Special Committee and the Debtors will continue to work collaboratively with the Creditors' Committee and the Plan Administrator to ensure any work undertaken by the Special Committee regarding potential causes of action can be handed over to the Wind Down Trustee, at the direction of the Plan Administrator for consideration on behalf of the Wind Down Trust.

        (ii)        **Postpetition Changes in Governance**

Pursuant to the terms of the SEC Settlement, on June 25, 2024, Chris Amani and Ashwin Mathialagan resigned as directors of TFL and were replaced by two new independent directors approved by the SEC, Mr. Thong, a Singapore resident, and Mr. Nelms, a former U.S. bankruptcy judge.  Mr. Thong is a Managing Director at Perun Consultants and leads the firm's Singapore Office.  Mr. Thong has 20 years of experience in consulting, including financial and forensics due diligence and divestment advisory, governance, compliance, risk management, forensic and Foreign Corrupt Practices Act investigation and litigation support, valuation, and financial advisory.  Mr. Nelms is a former United States bankruptcy judge (2004-2018) from the Northern District of Texas, Fort Worth Division, who serves on boards of directors and advisory boards to facilitate complex corporate restructurings.  Mr. Nelms also serves as mediator in complex chapter 11 and chapter 7 bankruptcy proceedings.

        *b)*        ***Terraform Labs Limited***

TLL's sole director and shareholder is TFL.  Pursuant to the laws of the BVI, TLL is legally obligated to retain a registered agent until dissolution.  Following the Restoration, FFP (BVI) Limited was appointed as the registered agent as of June 21, 2024.

E.    **Assets**

As of the Petition Date, the Debtors had a combination of cash (albeit frozen or deposited in a court account), cryptocurrency assets, and interests in amounts held by its law firms.  This liquidity was sufficient to self-fund the Chapter 11 Cases.

(i)    **Digital Assets and Cash in Treasury**

As of the Petition Date the Debtors held approximately $34 million of BTC, $42 million of various other cryptocurrencies, and $92 million in Luna.

As of the date of filing of this Disclosure Statement, the Debtors hold approximately $19.5 million in cash in the Western Alliance Account, $3.8 million in restricted cash, $72.6 million of non-Terra digital cryptocurrencies, and $66.1 million of Terra Crypto.

(ii)    **Law Firm Fee Advances**

As of the Petition Date the Debtors had interests in fee advances it paid to law firms, the unapplied amounts of which exceeded $95 million.  The majority of this amount was held by the TFL's litigation counsel, Dentons US LLP ("**Dentons**").  Following entry of a consensual order from the Bankruptcy Court (Docket No. 179), Dentons returned $48 million to TFL and agreed that any unused amounts in its retainer would be returned.  As of the date hereof, the Debtors understand the remainder of Dentons' retainer to be approximately $10,340,000 (including $1,035,000 of interest), which is expected to be used in full to pay Dentons' postpetition fees.  The remaining unapplied fee advances paid to law firms, as of the date hereof, totals approximately $18 million (this amount excludes Dentons' advance payment).

(iii)    **Foreign Bank and Custody Account**

Up until March 2023, TFL had access to bank accounts and investment accounts (the "**Accounts**") with various financial institutions (listed below, the "**Financial Institutions**") across different continents.  The Accounts were used for operating purposes and TFL transmitted fiat currency or digital assets through the Accounts, as applicable.  Following the commencement of the SEC Enforcement Action, in July 2023, the Financial Institutions began freezing the Accounts (hereinafter, the "**Restricted Accounts**") and ceased conducting business with TFL.  Since the Petition Date, TFL has made efforts to seek the release of the assets in the Restricted Accounts.  These efforts are described below in more detail.  The table below lists the Restricted Accounts with their respective jurisdictions and deposit amounts as of the Petition Date.  The Debtors expect that the Plan Administrator will continue these efforts after the Effective Date, with any such recoveries becoming Post-Effective Date Available Cash.

| Financial Institution | Jurisdiction | Amount[13] |
|---|---|---|
| Sygnum Bank AG | Switzerland | • $2,546,346.00 USD<br>• (-₣639.00 CHF)<br>• €37,850.00 EURO<br>• $1,246,554.00 SGD |
| Aspire FT Pte. Ltd. | Singapore | • $438,381.00 SGD |

---

[13]    "**USD**": United States Dollars; "**CHF**": Swiss Francs; "**SGD**": Singapore Dollars

| Hex Trust Ltd.[14] | Hong Kong | • $15,082,994 USD |
| Volopay Co. Pte. Ltd. | Singapore | • $10,198.00 SGD |

### (iv)    Venture Investments

Prior to the Petition Date, the Debtors invested in several technology-related ventures in digital assets, and early-stage and growth-stage companies.

Specifically, TFL is a limited partner or member, stockholder or other investor in fourteen (14) such ventures, ten (10) of which are Delaware limited partnerships, Delaware limited liability companies, or Delaware corporations (together, the "**Venture Investments**").  The remaining four (4) ventures are located in Hong Kong, the United Kingdom, the United Arab Emirates, and the British Virgin Islands.  These Venture Investments invest in companies involved in various sectors, including consumer technology, gaming, financial technology, enterprise software, blockchain, digital/virtual assets/currencies, and healthcare information technology.  TLL is a limited partner in one such venture.

In the last few years prior to the Petition Date, TFL invested an aggregate of approximately $82 million in the Venture Investments.  TLL invested $10 million in total in its Venture Investment.  Pursuant to the applicable agreements, as of the Petition Date, TFL is further committed to contribute a total of approximately $33 million to certain of the Venture Investments.  TFL has not made any capital contributions since the Petition Date.  However, since the Petition Date, certain of the Venture Investments have made capital calls, and TFL has agreed with those parties to extend the time for payment of such capital calls, subject to the rights of the parties under the organizational documents governing the Venture Investments.

Subject to the terms of the applicable agreements, TFL may be entitled to receive distributions from the Venture Investments on account of the profitability and success of such Venture Investments.  Indeed, TFL has received $281,000 and $55,000 from distributions and returns of capital from liquidations, respectively, relating to the Venture Investments since the Petition Date.  The Debtors understand that TLL is not owed any distributions with respect to its Venture Investment.

The Debtors are exploring a potential sale process in respect to their interests in the Venture Investments.

### (v)    Foreign Litigation Costs

As of the date of filing of this Disclosure Statement, due to a dispute with Wintermute (defined below) as to liability on costs in the Wintermute litigation, Rahman Ravelli has not yet requested the return of the Security for Costs equal to £580,064.88 BPS, or approximately $742,494.68 USD (converted as of the date of this Disclosure Statement) to the Debtors' estates (discussed in greater detail below).  Regarding the dispute with Wintermute on the liability for costs in the Wintermute litigation, as of the date hereof, Rahman Ravelli is currently awaiting instructions as to whether to seek a full costs hearing in the dispute.  As of the date hereof, the Debtors are considering their options with respect to this litigation.

---

[14]    TFL deposited BTC, Ethereum, USDT, Luna Classic, and other Terra Crypto in the Hex Trust account held by Hex Trust.  Hex Trust provides customers a digital asset online custody platform that allows institutions to integrate digital assets into their business operations in a secure, scalable, and compliant way.  TFL's Hex Trust account is currently frozen and inaccessible to TFL.  As of the Petition Date, the account held $6,871,805 in non-Terra Crypto and $8,211,189 of Terra Crypto.

Following litigation in the Cayman Islands involving Binance Holdings Limited, the Debtors are also expecting a $43,776.55 costs payment to be made in their favor, and approximately $13,000 for costs related to Binance's appeal of the order.

      F.      **Prepetition Liabilities and Litigation**

          a)      *SEC Enforcement Action*

The SEC commenced the SEC Enforcement Action on February 16, 2023 by filing a complaint naming TFL and its founder, Mr. Kwon, as defendants, alleging six (6) claims for violations of the Securities Act of 1933 (the "**Securities Act**"), and the Securities Exchange Act of 1934 (the "**Exchange Act**").  In the SEC Enforcement Action, the SEC asserted that prior to May 2022 TFL unlawfully offered and sold unregistered securities and securities-based swaps, and committed securities fraud.  The action sought permanent injunctions, disgorgement, and civil monetary penalties.

In response, on April 21, 2023, TFL and Mr. Kwon moved to dismiss the SEC's complaint entirely, principally arguing that the SEC lacks jurisdiction because the offerings of UST, Luna Classic, WLUNA[15], and MIR tokens allegedly were not "securities".[16]  On July 31, 2023, the District Court denied the motion to dismiss.[17]

On December 28, 2023, the District Court partially granted the SEC's motion for summary judgment.[18]  Specifically, the District Court found that TFL and Mr. Kwon "offered and sold unregistered securities, in violation of Sections 5(a) and 5(c) of the Securities Act".[19]  In reaching that finding, the District Court relied on *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), and held that there was "no genuine dispute that UST, LUNA, WLUNA, and MIR are securities because they are investment contracts."[20]  The District Court granted summary judgment to TFL and Mr. Kwon on the SEC's securities-based swap claims relating to the Mirror Protocol, finding that the transactions involving mAssets did not constitute securities-based swaps.

The District Court denied the parties' cross motions for summary judgment with respect to the securities fraud claims, finding that "genuine disputes of material fact linger," particularly with regard to the element

---

[15]    WLUNA tokens, or "Wrapped Luna," was a Terra Classic Blockchain-native token whose value was pegged to the value of Ethereum on the Ethereum blockchain.  Generally speaking, "wrapped" tokens make it possible to use cryptocurrencies from one blockchain on a different blockchain.

[16]    Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended Complaint, SEC v. Terraform Labs Pte. Ltd., et al., Civil Action No. 1:23-cv-013460-JSR (S.D.N.Y. Apr. 21, 2023) (Docket No. 29), at 7 et seq.

[17]    Opinion and Order, SEC v. Terraform Labs Pte. Ltd., et al., Civil Action No. 1:23-cv-013460-JSR (S.D.N.Y. July 31, 2023) (Docket No. 51)

[18]    Opinion and Order, SEC v. Terraform Labs Pte. Ltd., et al., Civil Action No. 1:23-cv-013460-JSR (S.D.N.Y. December 28, 2023) (Docket No. 149) (the "MSJ Order"), at p. 2-3.

[19]    MSJ Order at p. 43-44.

[20]    MSJ Order at p. 36 et seq.

of scienter required under both securities fraud claims.[21]  As of the Petition Date, the parties were preparing for a jury trial on the remaining counts, as discussed below in more detail.

### b)   DOJ Investigation

In addition to the SEC Enforcement Action, prior to the Petition Date, in March 2023, the United States Department of Justice (the "**DOJ**") began conducting a grand jury investigation in the Southern District of New York into TFL's business and certain of its current and former employees (the "**DOJ Investigation**"). The DOJ indicted Mr. Kwon[22] on criminal charges and has stated that it is continuing its investigation of individuals and entities involved in the Terra Blockchain, including TFL and some of its current and former employees.  The DOJ's investigation is ongoing as of the date of filing this Disclosure Statement.

### c)   Singapore Legal Proceeding (Beltran Action)

Other than the SEC Enforcement Action (described above), as of the Petition Date, TFL was a defendant in only one other litigation, an action in Singapore in which approximately 377 individuals (subsequently reduced to 370 individuals) claiming to be purchasers of UST filed a representative action in the High Court of the Republic of Singapore (the "**Singapore High Court**") against TFL, LFG, Mr. Kwon, and former TFL employee, Nikolaos Platias (the "**Beltran Action**").

The claimants in the Beltran Action alleged they were misled into purchasing UST and/or misled into staking it on Anchor Protocol based on certain alleged representations by Mr. Kwon and/or TFL, suffering claimed damages of approximately $65 million.  The Singapore High Court rejected TFL's challenge on jurisdictional grounds (similar to a motion to compel arbitration) on the basis that TFL took a step in the Singapore High Court proceedings.  However, the Singapore High Court did make a finding as to the prima facie applicability of the terms of service associate with TFL's website and the Anchor Protocol.  The Debtors note that the claimants in the Beltran Action disagree with the foregoing description of the Singapore High Court finding.

Prior to the Petition Date, TFL deposited with the Singapore High Court approximately $57 million in the Beltran Escrow Deposit, pending the outcome of the Beltran Action.  The deposit was made to terminate an emergency injunction issued by the Singapore High Court (the "**Mareva Injunction**") over all of TFL's operations.

TFL believes the amount in the Beltran Escrow Deposit is arguably in excess of its judgment exposure, because, among other reasons, the claimants' Mareva Injunction was not properly presented to the Singapore Court, the claimants failed to comply with certain Singapore rules regarding representative actions, and a number of claimants have significant defects in their claims.  In the event that the Singapore High Court agrees with some of these potential arguments, this might lead to a reduction of the sum to be paid from the Beltran Escrow Deposit to plaintiffs in the Beltran Action.

Pursuant to the terms of the Plan, summarized above, the holders of Beltran Allowed Secured Claims can recover up to the amount held in the Beltran Escrow Deposit.  To the extent the Bankruptcy Court determines that claims asserted against TFL in the Beltran Action are not Secured Claims, such Claims shall not be Beltran Allowed Secured Claims but shall be Crypto Loss Claims.  Any portion of any Allowed

---

[21]   MSJ Order at p. 50.  The SDNY District Court also partially granted TFL and Mr. Kwon's motion for summary judgment, finding that TFL and Mr. Kwon "did not offer or effect transactions in security-based swaps" by creating and maintaining the Mirror Protocol through which others could mint mAssets.  MSJ Order at p. 47.

[22]   USA v. Kwon, Case No. 1:23-cr-151 (S.D.N.Y. March 23, 2023).

Claim asserted against TFL in the Beltran Action that exceeds its allocated portion of the Beltran Escrow Deposit shall be treated as an Allowed Crypto Loss Claim.

> ### d)    *US Class Actions*

Prior to the Petition Date, TFL was named as a defendant in two class actions, one in the District Court (*Albright v. Terraform Labs, Pte. Ltd.*, Civil Action No. 1:22-cv-07281 (SDNY)) ("**Albright**"), and the other in the Northern District of California (*Patterson v. Terraform Labs, Pte. Ltd.*, Case No. 3:22-cv-03600 (N.D. Cal.)) ("**Patterson**", together with Albright, the "**Class Actions**").  The plaintiffs in Albright dismissed the case on January 10, 2023.[23]  In Patterson, the plaintiffs dismissed only the claims against TFL and Mr. Kwon, and the case remains pending in the 9th Circuit against the remaining defendants.[24]

> ### e)    *Prepetition Foreign Discovery Litigation*

In connection with its defense of the SEC Enforcement Action, TFL sought third-party discovery in foreign jurisdictions under a federal law that empowers U.S. Federal Courts to make letters of request of foreign courts to allow discovery within their jurisdictions at the parties' request.  All of the parties receiving the discovery request in the various foreign jurisdictions contested such requests in their local courts.

TFL incurred certain prepetition and postpetition costs associated with litigating the various discovery requests in foreign jurisdictions.  During its chapter 11 case, TFL sought relief from the Bankruptcy Court to pay certain these costs, which was granted in the Litigation Payments Order (as defined below).

> #### (i)    **Okcoin Hong Kong Litigation**

On August 15, 2023, Judge Rakoff issued a letter of request to Okcoin Technology Company Ltd. ("**Okcoin**") in Hong Kong to gather more information in that jurisdiction (the "**Okcoin Letter of Request**").  The Okcoin Letter of Request sought information and documents about significant UST trading volume and a large volume of Luna Classic transactions on the Okcoin exchange. TFL, through Dentons, subsequently retained the Howse Williams law firm ("**Howse Williams**") to bring an application in the High Court of the Hong Kong Special Administrative Region (the "**Hong Kong Court**") to enforce the Okcoin Letter of Request.  Howse Williams brought an *ex parte* summons to enforce the Okcoin Letter of Request.  The Hong Kong Court granted the request and ordered disclosure on November 21, 2023; however, after counsel for Okcoin filed an application to set aside the disclosure order, the Hong Kong Court sided with Okcoin and granted the application to set aside TFL's disclosure order on January 19, 2024.  It also ordered TFL to pay costs of HK$1,068,700 (approximately USD $137,000 as of February 14, 2024).  As described below, the Bankruptcy Court entered the Litigation Payments Order (as defined below) authorizing the Debtor to pay these costs in an amount not to exceed $100,000 (such amount reflecting a settlement with Okcoin in respect to costs).

> #### (ii)    **British Virgin Islands Litigation**

Judge Rakoff issued letters of request to two BVI entities: (a) iFinex Inc. d/b/a Bitfinex ("**Bitfinex**") on August 15, 2023 (the "**Bitfinex Letter of Request**") and (b) Primary Digital Master Fund Ltd. ("**Primary Digital**") on October 12, 2023 (the "**Primary Digital Letters of Request**" together with the Bitfinex Letter of Request, the "**BVI Letter of Requests**").  The letter of request to Bitfinex sought documents and

---

[23]  Notice of Dismissal, *Albright v. Terraform Labs, Pte. Ltd.*, Civil Action No. 1:22-cv-07281 JSR-BCM (SDNY) (Docket No. 80)

[24]  Notice of Dismissal, *Patterson v. Terraform Labs, Pte. Ltd.*, Case No. 22-cv-03600 PCP (N.D. Cal. September 28, 2023) (Docket No. 146)

information about crypto wallets and the trading accounts involved in trading UST that were hosted by the Bitfinex cryptocurrency exchange.  TFL, through Dentons, retained the Collas Crill law firm ("**Collas**") to bring an application in the Eastern Caribbean Supreme Court in the High Court of Justice, Virgin Islands (the "**BVI Court**") to enforce the BVI Letter of Requests.

After Collas filed the application to enforce the Bitfinex Letter of Request, TFL agreed to a consent order with Bitfinex to produce the requested material, which the BVI Court approved (the "**Bitfinex Order**").  In accordance with BVI law, the Bitfinex Order provided that TFL would pay for Bitfinex's reasonable costs if Bitfinex complied with the terms of the Bitfinex Order, with the costs being assessed if not agreed by TFL and Bitfinex.  Bitfinex produced all agreed-upon materials and identified to TFL its costs as $37,840.45 (the "**Bitfinex Costs Order**").  After the Petition Date, TFL further negotiated with Bitfinex and agreed to pay $26,488.36 to settle Bitfinex's costs of complying with the terms of the Bitfinex Order.  As described below, the Bankruptcy Court entered the Litigation Payments Order (as defined below) authorizing the Debtor to pay these costs in an amount not to exceed $27,000, and the Debtors made such payment.

Subsequently, Collas brought an application to enforce the Primary Digital Letter of Request against Primary Digital to produce the requested material, which BVI Court approved (the "**Primary Digital Order**").  Similarly to the Bitfinex Order, the Primary Digital Order provided that TFL would pay for Primary Digital's reasonable costs if Primary Digital complied with the terms of Primary Digital Order.  Primary Digital complied with the Primary Digital Order and produced the requisite documents, incurring costs of $57,000, including further costs from negotiating the execution of a declaration confirming the authenticity of the produced documents.  As described below, following the Petition Date, the Bankruptcy Court entered the Litigation Payments Order (as defined below) authorizing the Debtor to pay these costs in an amount not to exceed $57,000, and the Debtors made such payment.

(iii)    <strong>Wintermute United Kingdom Litigation</strong>

Judge Rakoff issued a letter of request (the "**Wintermute Letter of Request**") for records and testimony from Wintermute Trading Ltd. ("**Wintermute**"), a global algorithmic crypto-trading firm based in London, the United Kingdom.  Dentons retained Rahman Ravelli Solicitors ("**Rahman Ravelli**"), which engaged barristers to litigate the Wintermute Letter of Request in the High Court of Justice, King's Bench Division (the "**English High Court**").

Wintermute consistently resisted the production of relevant information related to the execution of trades during the De-peg, despite the Wintermute Letter of Request.  Rahman Ravelli requested that the English High Court compel Wintermute to produce the requested information under threat of criminal penalty, known as a penal notice, on an expedited basis (the "**Motion for Penal Notice**"), which the English High Court granted.[25]  On appeal, however, the High Court of Justice, King's Bench Division, Mr. Justice Lavender, reversed the grant of the penal notice and ordered costs of the appeal in favor Wintermute (the "**Wintermute Costs Award**").  Accordingly, on January 29, 2024, as a consequence of TFL losing the appeal relating to the penal notice, the English High Court awarded Wintermute £143,000 (approximately $183,042.87 as of the date hereof) in costs related to the Motion for Penal Notice.

As described below, on February 27, 2024, the Bankruptcy Court entered an order (Docket No. 83) authorizing the Debtors to pay the Wintermute Costs in an amount not to exceed £793,064.88.  Moreover, after TFL commenced its Chapter 11 Case, Wintermute served a security for costs application on TFL, asserting that security in the amount of £892,407.50 (approximately $1,142,299.50 as of the date hereof) was needed because TFL was "impecunious" due to its status as a chapter 11 debtor (the "**Wintermute**

---

[25]    In the English courts, seeking a penal notice in connection with a production request means that if the party fails to produce evidence as required, the party can be jailed for not doing so.

27

**Security for Costs**" and together with the Wintermute Costs Award, the "**Wintermute Costs**").[26]  After obtaining an order authorizing the payment of the Wintermute Costs in an amount not to exceed £793,064.88, TFL made such payment pursuant to the order (Docket No. 83).

In March 2024, the English High Court ruled in favor of TFL with respect to the Wintermute Letter of Request.  As of the date of filing of this Disclosure Statement, the Debtors, in consultation with Rahman Ravelli and the Creditors' Committee, are actively reviewing their strategic options as to the return of the Wintermute Security for Costs to the Debtors' estates, in the expected total amount of £580,064.88 (approximately $742,494.68 as of the date hereof).

### f)    *Indemnification Claims*

Pursuant to Article 141 of TFL's Constitution (the "**Constitution**") (TFL's governing document, similar to a charter or articles of incorporation), the Debtors believe TFL is obligated to indemnify Employees for costs incurred arising from the carrying out of their duties as follows:

> Subject to the provisions of and so far as may be permitted by the Act, every Director, manager, Secretary and other officer or servant of the Company shall be indemnified by the Company against, and it shall be the duty of the Directors out of the funds of the Company to pay, all costs, losses and expenses which any such officer or servant may incur or become liable to incur by reason of any contract entered into or act or deed done by him as such officer or servant or in any in the discharge of his duties, including reasonable hotel, travelling and other expenses.

Pursuant to the laws of Singapore, TFL may not be obligated to indemnify an Employee and is permitted to seek recovery of the legal costs paid to an Employee under its indemnification obligations under various circumstances, such as if: (i) an Employee's conduct resulted in a criminal conviction as determined by a final order of a court of competent jurisdiction, (ii) an Employee commits a form of wrongful conduct against the Debtor, such as fraud or misappropriating funds, or (iii) the acts the subject of indemnification were outside the scope of an Employee's duties.[27]

---

[26]    A defendant in a U.K. lawsuit may apply for a security for costs, which forces the plaintiffs to pay to the court a fixed sum that the court determines is appropriate to secure the defendant's costs of and incidental to the proceeding should the defendant prevail.  Security for costs orders serve as protection for defendants with a legitimate concern that a plaintiff may not be able to pay the defendant's costs of the proceeding if so ordered by the court.  If the court approves the application for security of costs, the proceedings are effectively stayed until the plaintiffs provides the security.

[27]    Sections 172(2) of the Singapore Companies Act 1967 renders void any provision by which a company directly or indirectly provides an indemnity (to any extent) for an officer of the company (as regards "officers" of the company, defined to include any "person employed in an executive capacity" by the company) against any liability attaching to him or her in connection with any negligence, default, breach of duty or breach of trust in relation to the company.  Section 172B of the Companies Act 1967 provides that an indemnity against liability incurred by the officer to a person other than the company may be valid, except where the indemnity is against, inter alia, any liability incurred by the officer in defending criminal proceedings in which he or she is convicted. See also Chee Kheong Mah Chaly and others v Liquidators of Baring Futures (Singapore) Pte Ltd [2003] 2 SLR(R) 571, where the Singapore Court of Appeal held that a firm of auditors could not be indemnified in respect of legal expenses in defending a claim brought by the company for alleged negligence, as such costs were not incurred in the execution of their duties.  See also the English case Coulson v News Group Newspapers Ltd [2012] EWCA Civ 1547 (which though not binding in Singapore is highly persuasive), where the court held a newspaper editor was entitled to be indemnified for expenses in defending criminal charges for engaging in telephone

In addition, to the extent Employees are, or were, EOR Employees, the Debtors believe Deel is obligated to indemnify such EOR Employees for costs incurred arising from the carrying out of their duties, according to the EOR Employee employment agreements with Deel (each, a "**Deel Employment Agreement**").  The Employer of Record Master Services Agreement between Deel and TFL (the "**Deel MSA**") provides that the Debtor will indemnify Deel for costs and expenses arising from the indemnification provisions in the Deel Employment Agreements between the EOR Employees and Deel.  Accordingly, the Debtors believe TFL is obligated to indemnify EOR Employees for costs incurred arising from the carrying out of their duties, pursuant to the Deel Employment Agreements and the Deel MSA.

(i)      **Employee Counsel for Interviews**

Certain Employees have retained legal counsel to represent them in connection with attending interviews and depositions and responding to subpoenas issued by TFL, the SEC, and the DOJ in the SEC Enforcement Action and/or the DOJ Investigation, and have sought or may seek indemnification claims against TFL arising from TFL's obligations to indemnify such employees.[28]  As of the Petition Date, sixteen (16) Employees retained such separate counsel for their individual representation in connection with the SEC Enforcement Action and/or the DOJ Investigation, as well as civil and criminal proceedings in South Korea.  Such legal counsel have incurred fees representing the Employees and expect to incur additional fees representing the employees going forward.  As described below, TFL has paid some of these amounts, but others may be outstanding.

(ii)     **Mr. Kwon**

Mr. Kwon is currently detained in Montenegro awaiting extradition.[29]  The Debtors understand that the Montenegro Appeals Court has upheld a ruling by a lower court to extradite Mr. Kwon to South Korea.  Mr. Kwon, as a former officer of TFL, is an Employee who may be entitled to indemnification pursuant to the Constitution for necessary fees and expenses for matters related to TFL's business, including legal fees for proceedings involving actions take in his capacity as an Employee.  The results of the SEC Enforcement Action, particularly the jury finding as to intentional fraud, may impact Mr. Kwon's indemnification claims.

---

hacking, but not for presenting fraudulent claims for expenses to the company.  The court there held that the alleged hacking was "a misguided attempt to fulfil his duty to obtain accurate and authentic information upon all matters and questions dealt with by [newspaper]" and could fall within the scope of the indemnity.  On the other hand, the costs of defending a criminal allegation in respect of a fraudulent claim for expenses presented to the company fell outside the scope of indemnity, as that conduct was "for a purpose not related to the employment, is not an attempt to do the job at all" (at [47]).

28  For further information regarding TFL's indemnification obligations, please refer to the *Motion of Debtor for Entry of Orders Pursuant to Sections 363, 503(b), and 105(a) of the Bankruptcy Code Authorizing Debtor to Pay Certain Amounts in Furtherance of Litigation and Granting Related Relief* (Docket No. 61) and *Supplemental Motion of Debtor for Entry of Order Pursuant to Sections 363, 503(b), and 105(a) of the Bankruptcy Code Authorizing Debtor to Pay Certain Amounts in Furtherance of Litigation and Granting Related Relief* (Docket No. 301).

29  In March 2023, Mr. Kwon was arrested in Montenegro and charged with forging official documents.  Mr. Kwon stepped down as Chief Executive Officer of TFL on March 31, 2023 and resigned his position as director of TFL shortly thereafter, appointing a new locally resident director, Ashwin Mathialagan, on May 27, 2023.  On June 19, 2023, a court in Montenegro sentenced Mr. Kwon to four months in prison for using forged passports.  TFL's only communication with Mr. Kwon is through his legal counsel.

Mr. Kwon's counsel, Kim & Chang, sent a request for indemnification to TFL on June 21, 2024, in the amount of $5,900,000 relating to proceedings in South Korea following Mr. Kwon's extradition from Montenegro.  TFL is considering its response to this request.

(iii)  <b>CJ Han</b>

TFL's former Chief Financial Officer, Han Chang Joon ("**CJ Han**"), was also detained in Montenegro with Mr. Kwon and retained the same legal counsel as Mr. Kwon.

CJ Han was extradited to South Korea in February 2024, where he has been represented by Kim & Chang with respect to criminal proceedings brought against him by the Korean authorities.  There is a likelihood that CJ Han and other Employees who are defendants in Korean criminal proceedings may file claims against TFL for legal fees incurred in such proceedings pursuant to indemnification obligations outlined above.  The results of the SEC Enforcement Action, particularly the jury finding as to fraud, may impact Mr. Han's indemnification claims.

CJ Han's counsel at Kim & Chang sent a request for indemnification to TFL on June 11, 2024, in the amount of $6,500,000 relating to the Korean criminal proceedings.  TFL is considering its response to this request.

(iv)  <b>Subordinated Claims</b>

The Plan treats indemnification claims as Allowed General Unsecured Claims, unless the Bankruptcy Court determines by Final Order that any such claim is subject to equitable subordination pursuant to section 510(c) of the Bankruptcy Code, in which case the indemnification claim is a "**510(c) Subordinated Claim**".  Pursuant to <u>Section 8.5</u> of the Plan, the Wind Down Trustee (under the direction of the Plan Administrator) reserves all legal and equitable rights and defenses in respect of any claims asserted by any current or former officers or directors of the Debtors.  For the avoidance of doubt, the Plan does not in any way prevent the Wind Down Trustee from disputing any indemnification claim.

<i>g)  Other Claims and Liabilities</i>

(i)  <b>Unsecured Claims</b>

The Debtors have limited general unsecured creditors, consisting of outstanding unpaid professional fees, vendors, and other miscellaneous creditors owed money not pertaining to crypto claims, intercompany claims, or subordinated claims.

TFL's Schedules list $1,041,187.73 in known Class 4 General Unsecured Claims.  As the General Bar Date has not yet occurred, the Debtor does not know the asserted amount of General Unsecured Claims.

(ii)  <b>Terraform Labs Limited</b>

TFL purportedly owed TLL the Intercompany Payable, approximately $450.5 million in total to TLL as of the Petition Date, resulting primarily from TFL's use of TLL's assets (discussed in detail below).  Prior to the Petition Date, TFL had executed crypto transactions with TLL.

## III.
## CIRCUMSTANCES LEADING TO COMMENCEMENT OF THIS CHAPTER 11 CASE

As discussed above, the De-peg occurred in 2022, and in 2023, the SEC commenced the SEC Enforcement Action.  In late December 2023, the District Court granted partial summary judgment to the SEC.  Leading up to and following the summary judgment decision, the Debtors retained Weil as appellate and then restructuring counsel beginning in November 2023, Wong as special foreign counsel in January 2024, and A&M as financial advisors in January 2024.  In addition, the Board unanimously appointed John Dubel as an independent director.

In the SEC Enforcement Action, the SEC sought over four billion dollars in disgorgement, making its potential claim the largest in TFL's Chapter 11 Case.  Facing a significant liability in the form of the SEC money judgment, and given TFL would not have been able to afford the supersedeas bond of 110% of the total judgment necessary to stay the judgment pending an appeal, TFL sought chapter 11 relief to gain the protection of the automatic stay of section 362 of the Bankruptcy Code while it sought to obtain vacatur of the District Court decision on appeal.  TFL's Chapter 11 Case was critical to preserving value for creditors and for TFL's stakeholders, and for providing an orderly process for resolving competing claims against it.

## IV.
## OVERVIEW OF THE CHAPTER 11 CASES

### A.    Commencement of The Chapter 11 Cases and First-Day Motions

TFL commenced its chapter 11 case in the Bankruptcy Court on January 21, 2024.  Subsequently, TLL commenced it chapter 11 case in the Bankruptcy Court on July 1, 2024.  The Debtors continue to manage their estates as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  To that end, the Debtors filed various motions seeking relief from the Bankruptcy Court to promote a seamless transition between the Debtors' prepetition and postpetition business operations and minimize any disruptions to the Debtors' operations (the "**First Day Motions**").

On an interim basis, the Bankruptcy Court authorized the Debtors to continue to use their treasury management system, bank accounts, and business forms (Docket No. 40) (see discussion of Treasury Management Motion and Order below).  On an interim and final basis, the Bankruptcy Court authorized the Debtors to continue paying employee wages and benefits (Docket No. 35, 149).

The First Day Motions and all orders for relief granted in the Chapter 11 Cases can be viewed free of charge at https://dm.epiq11.com/case/terraform.

### B.    Treasury Management Motion and Orders

On January 30, 2024, the Debtors filed with the Bankruptcy Court a motion (Docket No. 21) (the "**Treasury Management Motion**") requesting to (a) use the Debtor's digital asset and fiat currency management system including, without limitation, using its existing wallets and accounts and opening new wallets and accounts, (b) process and receive transfers of digital assets or cash from third parties, and (c) process any intracompany transactions as well as intrawallet transactions.

On February 2, 2024, the Bankruptcy Court entered an interim order (Docket No. 40) (the "**First Interim Treasury Management Order**") authorizing the Debtors to maintain its treasury management system as well as accept and send transfers to third parties and between the Debtors and their wallets.  The First Interim Treasury Management Order also required that the Debtors open a bank account

with a bank that has executed a Uniform Depository Agreement with the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**").

Prior to the Petition Date, TFL was unable to find a U.S. bank willing to do business with it; however, with the filing of the Chapter 11 Case and the protection of the Bankruptcy Court, TFL was able to open a bank account in compliance with the Treasury Management Orders. Specifically, on February 7, 2024, TFL opened a bank account with Western Alliance (the "**Western Alliance Account**"), which has executed a Uniform Depository Agreement with the U.S. Trustee. TFL thereafter made all cash payments through the Western Alliance Account.

On June 28, 2024 TLL opened a bank account with Western Alliance (the "**TLL Western Alliance Account**") to pay expenses related to TLL, including to pay a portion of a postpetition intercompany between TLL and TFL.

On April 8, 2024, the Bankruptcy Court entered a second interim treasury management order (Docket No. 211) ("**Second Interim Treasury Management Order**" and, collectively, with the First Interim Treasury Management Order, the "**Treasury Management Orders**") allowing for the funding of the Proximity Intercompany Transactions, as described herein.

The Debtors anticipate proposing additional changes to the Second Interim Treasury Management Order and have been in active negotiations with the SEC, the Creditors' Committee, and the U.S. Trustee regarding a further revised treasury management order.

### C.   <u>Procedural Motions and Retention of Professionals</u>

TFL also filed several other motions that are common to chapter 11 proceedings of similar size and complexity as the Chapter 11 Cases, including applications to retain various professionals to assist TFL in the Chapter 11 Cases.

TFL also obtained procedural relief to facilitate further the smooth and efficient administration of the Chapter 11 Cases and reduce the administrative burdens associated therewith, including:

- Extension of Time to File Schedules and SOFAs. TFL obtained an order granting it an extension of time to file its schedules of assets and liabilities and statement of financial affairs detailing known Claims against the Debtors (the "**Schedules and SOFAs**") and the Bankruptcy Rule 2015.3 reports (Docket No. 219).

- Retention of Chapter 11 Professionals. TFL obtained orders authorizing the retention of various professionals to assist it in carrying out its duties under the Bankruptcy Code during the Chapter 11 Cases, including: (i) Weil, as attorneys for the Debtors (Docket No. 98); (ii) Richards, Layton & Finger, P.A. as co-counsel for the Debtors (Docket No. 96); (iii) Alvarez and Marsal ("**A&M**"), as financial advisor (Docket No. 127); (iv) Dentons, as special counsel (Docket No. 179); (v) Rahman Ravelli, as special foreign counsel (Docket No. 205); and (vi) WongPartnership LLP, as special foreign counsel (Docket No. 156). The above orders authorizing the retention of various professionals during the Chapter 11 Cases were extended to TLL through the Relief Extension Order.

- Ordinary Course Professionals Order. TFL obtained entry of an order establishing procedures for the retention and compensation of certain professionals utilized in the ordinary course operations of its business (Docket No. 206). This order was extended to TLL through the Relief Extension Order.

- Interim Compensation Procedures.  TFL obtained entry of an order establishing procedures for interim compensation and reimbursement of expenses of estate professionals (Docket No. 99).  This order was extended to TLL through the Relief Extension Order.

### D.    Appointment of the Creditors' Committee

On February 29, 2024, the U.S. Trustee the Creditors' Committee pursuant to section 1102 of the Bankruptcy Code to represent the interests of unsecured creditors in the Chapter 11 Cases (Docket No. 101).

The members of the Creditors' Committee are (i) Celsius Network LLC, c/o Litigation Oversight Committee, (ii) Josh Golder, and (iii) Francisco Javier Reina Barragan.

The Creditors' Committee retained McDermott Will & Emery LLP as its attorneys; Genesis Credit Partners LLC f/k/a Force Ten Partners LLC, and Stout Risius Ross, LLC as its cryptocurrency tracing consultant.

The Debtors have continued to coordinate and work cooperatively with the Creditor's Committee throughout these Chapter 11 Cases.

### E.    Automatic Stay Letters to Foreign Banks and Custody Account

To regain control of the assets in the Accounts with the Financial Institutions, TFL issued letters (the "**Stay Letters**") to each Financial Institution informing each Financial Institution of the Chapter 11 Cases and explaining that the Financial Institution had violated the automatic stay of section 362 of the Bankruptcy Code by continuing to freeze the Accounts under their control.  The Stay Letters demanded that each Financial Institution remove all restrictions placed on its accounts within a certain time period.

The Debtors have continued their efforts to unfreeze the Accounts.  As part of such efforts, the Debtors and A&M, in coordination with the SEC and the Creditors' Committee, are working with certain local counsel in certain jurisdictions for approval of authority to remove all restrictions placed on accounts by the Financial Institutions.  The Debtors are in the process of retaining counsel to assist with efforts to unfreeze assets related to TFL's Hex Trust account.  In addition, the Debtors intend to issue a letter to the Switzerland prosecutor requesting that Sygnum be authorized to unfreeze accounts held by TFL and Mr. Kwon.  The Debtors are continuing to explore avenues to unfreeze assets in the other Accounts.

The Debtors expect that the Plan Administrator will continue these efforts after the Effective Date, with any such recoveries becoming Post-Effective Date Cash.

### F.    Litigation Related Motions

#### a)    Litigation Payments Motion

As described in more detail herein, TFL was a named defendant in the SEC Enforcement Action, and is the subject of the DOJ Investigation in the Southern District of New York.  The Debtor sought court authority to pay certain litigation costs pursuant to the *Motion of Debtor for Entry of Orders Pursuant to Sections 363, 503(B), and 105(A) of the Bankruptcy Code Authorizing Debtor to Pay Certain Amounts in Furtherance of Litigation and Granting Related Relief* (Docket No. 61) (the "**Litigation Payments Motion**"), which was filed on February 14, 2024.

The litigation costs TFL sought to pay were categorized into three broad categories (i) counsel for Employees ("**Employee Counsel**"), (ii) critical vendors necessary to assist TFL in its defense of in the SEC

Enforcement Action and DOJ Investigation, and (iii) litigation related claims and costs related to the SEC Enforcement Action incurred in foreign jurisdictions.

First, due to the nature of the SEC Enforcement Action and DOJ Investigation, various Employees received subpoenas from either the SEC or the DOJ, or in some cases both, to interview the Employees. The Employees hired counsel to represent them in these proceedings to, among other things, attend interviews and to produce various documents requested in the subpoenas. As discussed above, the Debtors believe TFL was obligated to indemnify current and former employees for any legal fees incurred as part of the carrying out of their duties, as discussed further above. Moreover, TFL believed that if it did not pay the legal fees incurred by Employee Counsel, its defense to the SEC Enforcement Action and DOJ Investigation would be significantly hindered. Thus, paying such amounts improved TFL's defense in the SEC Enforcement Action and cooperation with the DOJ Investigation, thus benefitting the estate.

TFL, via Dentons, retained numerous vendors (the "**Critical Vendors**") that provided services essential to the TFL's defense of the SEC Enforcement Action (including the Jury Trial, as defined below) and DOJ Investigation. Such services included: provision of external and/or internal expert witnesses (such as crypto experts and trading experts), expert testimony, expert reports, analyses, opinion, and/or conclusions, translation services, videographers, court reporters, discovery related services, consulting services, and investigation services regarding third parties and witnesses.

As described in more detail above, in connection with its defense of the SEC Enforcement Action, TFL sought third-party discovery in foreign jurisdictions under a federal law that empowers U.S. Federal Courts to make letters of request of foreign courts to allow discovery within their jurisdictions at the parties' request. All of the parties receiving the discovery request in the various foreign jurisdictions contested such requests in their local courts. TFL incurred certain prepetition and postpetition costs associated with litigating the various discovery requests in foreign jurisdictions.

On March 12, 2024, the Bankruptcy Court entered an order (Docket No. 178) (the "**Litigation Payments Order**") authorizing the Debtors to make requested prepetition and prepetition payments to in relation to three categories of litigation payments outlined above. Specifically, the Bankruptcy court authorized payments to: (i) Employee Counsel for prepetition fees outstanding, in an amount not to exceed $355,366.31, and postpetition fees for three (3) months after the Petition Date up to $2,908,388, as well as a cap for any future indemnification payments up to $225,000 over a three month period[30]; (ii) prepetition claims of Critical Vendors up to $1,065,000 on the condition that the Critical Vendors waived an amount of their prepetition claims; and (iii) the prepetition foreign litigation costs.[31]

On May 23, 2024, the Bankruptcy Court entered a supplemental order (Docket No. 347) authorizing the Debtors to make further requested postpetition payments to Employee Counsel for three (3) additional months up to an amount not to exceed $1,837,000.

On July 24, 2024, the Bankruptcy Court entered a further supplemental order (Docket No. 497) authorizing the Debtors to make further requested postpetition payments to: (i) Employee Counsel through September 30, 2024 in an amount not to exceed $1,677,000, as well as a cap for any future indemnification

---

[30]  All invoices submitted by Employee Counsel are subject to "Payment Procedures" (as defined in the Litigation Payments Motion), whereby the Special Committee, Creditors' Committee and the U.S. Trustee have the opportunity to review and object to any invoice.

[31]  On February 27, 2024, the Bankruptcy Court entered the "**WinterMute Emergency Order**" (Docket No. 83) authorizing the Debtors to pay Wintermute Costs in an amount not to exceed £793,064.88.

payments up to $225,000 over a three-month period; and (ii) Rodic Fees and Expenses[32] in an amount not to exceed €602,000.  Pursuant to the terms of the further supplemental order the Debtors are not authorized to reimburse Chris Amani's counsel for fees and expenses incurred in representing Chris Amani in connection with the DOJ Investigation between July 24, 2024 and the Effective Date, and instead Mr. Amani's counsel is authorized to draw down on the funds it holds on behalf of Mr. Amani in a segregated escrow account through the Effective Date.

### b)    JS Held Motion

On June 3, 2024, the Debtors filed with the Bankruptcy Court a motion (Docket No. 365) requesting to pay certain indemnification amounts totaling $200,000 to JS Held LLC ("**JS Held**"), a critical vendor that provided expert witness and consulting services regarding cryptocurrency transaction tracing and analysis in relation to TFL's defense of the SEC Enforcement Action and its cooperation with the DOJ Investigation. In the course of its retention and engagement, JS Held received subpoenas requesting the production of documents related to its work for TFL, for which JS Held retained counsel. On July 30, 2024, the Bankruptcy Court entered an order (Docket No. 517) authorizing the Debtors to pay such indemnification amounts subject to the Payment Procedures.

### G.    **Postpetition SEC Enforcement Action**

### a)    Jury Trial

On March 25, 2024, a ten (10)-day jury trial in the SEC Enforcement Action (the "**Jury Trial**") began in the District Court.  The Jury Trial included testimony from former and current Terraform employees, SEC whistleblowers, individuals who asserted that they had lost money in the De-peg (as defined below) and experts in the blockchain and financial industry.

At the end of the Jury Trial, on April 5, 2024, the jury found TFL and Mr. Kwon respectively liable for reckless and intentional misconduct constituting the violations of securities law and, including civil securities fraud charges (the "**Jury Verdict**").  Specifically, the Jury Verdict found TFL civilly liable for recklessly violating (i) Section 17 of the Securities Act, and (ii) Rule 10b-5 of the Exchange Act[33].

### b)    Remedies

Following the Jury Verdict, Judge Rakoff directed TFL and the SEC to file briefs and replies with the District Court detailing the appropriate remedies and penalties to be imposed on TFL.  The District Court further set an oral argument for the appropriate remedies on May 22, 2024 (the "**Remedies Hearing**").

In its opening brief filed on April 19, 2024,[34] the SEC sought relief enjoining Mr. Kwon and TFL from further violation of the securities laws and the disgorgement of $4,192,147,847 plus $545,748,909 in prejudgment interest, among other injunctive and punitive relief.  In addition, the SEC sought $420,000,000 in civil penalties against TFL and a conduct injunction (the "**Proposed Conduct Injunction**") prohibiting TFL from (i) "participating, directly or indirectly, in the purchase, offer, or sale of any crypto asset securities, including but not limited to UST, MIR, LUNA, wLUNA, and LUNA 2.0;" or (ii) "engaging in activities for purposes of inducing or attempting to induce the purchase, offer, or sale of any crypto asset

---

[32]   As defined in the Litigation Payments Motion and the supplemental order (Docket No. 347).

[33]   17 C.F.R. § 240.10b-5.

[34]   Opening Brief In Support of the SEC Motion For Final Judgement (Docket No. 232, Case No. 1:23-cv-1346 (JSR).

securities by others." On May 6, 2024, the SEC filed a supplemental brief revising its request for monetary relief against TFL to disgorgement totaling $3,586,875,883, plus prejudgment interest, and a civil enforcement penalty of $420,000,000.[35]

Given the broad scope of the Proposed Conduct Injunction, if the District Court entered it as proposed, it would have prevented the Debtors from continuing to operate in the ordinary course and caused irreparable harm to TFL's business. Therefore, TFL determined in its business judgment, that engaging in settlement negotiations with the SEC was the best course of action for the benefit of its estate and all stakeholders. At the request of the Debtor and the SEC to enable the settlement discussions to continue, Judge Rakoff adjourned the Remedies Hearing to allow the parties to reach a written settlement.

TFL ultimately reached an agreement with the SEC, as described in detail above. Specifically, on May 29, 2024, TFL and Mr. Kwon agreed to the Consent with respect to the SEC Enforcement Agreement, which was subsequently revised based on further discussions. On June 6, 2024, TFL and Mr. Kwon signed the revised Consent.

Following the execution of the Consent, the SEC, TFL, and Mr. Kwon submitted a proposed Final Judgment to the District Court, which encompassed the key terms of the Consent. Pursuant to the Final Judgment, TFL agreed to waive the right of any appeal of the SEC Enforcement Action.

The District Court entered the Final Judgment approving the SEC Settlement on June 12, 2024.

### c)   *Transfer of Digital Assets by Mr. Kwon*

As noted, pursuant to the SEC Settlement, Mr. Kwon is obligated to transfer certain AVAX tokens (held by LFG) and Pyth tokens (in which Mr. Kwon has a personal interest) to the Debtors' estates. The Debtors have been working closely with Mr. Kwon's litigation counsel Hecker Fink regarding the transfer of these assets; however, the Debtors and Mr. Kwon have faced certain obstacles regarding the transferability of those tokens.

### (i)   **AVAX Tokens from LFG**

The Debtors and Hecker Fink are in ongoing discussions with counsel to Avalanche (BVI), Inc. ("**Avalanche**"), a contract counterparty and purported creditor of LFG, regarding LFG's ability to transfer the AVAX tokens to TFL's estate pursuant to the terms of the SEC Settlement. LFG is supposed to transfer 1,973,554 of such AVAX tokens (valued at approximately $41,800,000 as of the date hereof). Avalanche has asserted that the proposed transfer of the AVAX tokens by LFG to TFL is prohibited under the terms of a token sale agreement between Avalanche and LFG, dated April 7, 2022, through which LFG acquired the AVAX tokens. The Debtors and Mr. Kwon reserve all of their rights, including to challenge the validity or enforceability of any alleged restrictions in the token sale agreement. Avalanche filed a reservation of rights on July 15, 2024 (the "**Reservation of Rights**") in connection with the Wind Down Motion asserting its position (Docket No. 466). In the Reservation of Rights, Avalanche requested, among other things, the preservation of its rights to assert claims on account of the proposed transfer of LFG's AVAX tokens, including potential fraudulent transfer claims against the Debtors. The Debtors are evaluating these assertions and are in ongoing discussions with Avalanche to try to resolve these issues consensually.

---

[35]   Supplemental Brief in Support of SEC Motion for Final Judgment (Docket No. 246, Case No. 1:23-cv-1346 (JSR)).

(ii)     **Pyth Tokens from Mr. Kwon**

Further, the Debtors are in discussions with Hecker Fink regarding Mr. Kwon's ability to transfer to the Debtors' estates Mr. Kwon's ownership interest in all Pyth tokens he obtained pursuant to a May 18, 2021 token grant agreement between Mr. Kwon and Tribal Invest Corp, a Panamanian corporation ("**Tribal Invest**").   Mr. Kwon is supposed to transfer 500,000,000 PYTH tokens (valued at approximately $137,000,000 as of the date hereof).   Pyth Data Association, a Panamanian foundation (the "**Pyth Foundation**") and Tribal Invest's parent, has asserted that Mr. Kwon forfeited his interests in the Pyth tokens by failing to comply with a "know-your-customer" ("**KYC**") process.   According to the Pyth Foundation, Mr. Kwon was required to complete the KYC process to obtain replacement Pyth tokens for his original Pyth tokens by December 7, 2023, which Mr. Kwon was unable to do given his detention in Montenegro.   According to an email dated September 7, 2023 from the Pyth Foundation, any holder who failed to complete the KYC process for replacement Pyth tokens by December 7, 2023 forfeited their entitlement to replacement Pyth tokens, and their Pyth tokens would be reallocated and delivered to the Pyth Data Association, a Swiss association that minted the Pyth tokens.   Hecker Fink and the Debtors are investigating the Pyth Foundation's assertions about forfeiture, and if Mr. Kwon is able to pass the KYC process, whether the Pyth Foundation can reallocate them.

H.     **Lease Related Motions**

On March 1, 2022, TFL, as tenant, entered into a certain Lease Agreement with TPC Commercial Pte. Ltd., as the landlord (the "**Landlord**"), to provide TFL access and use of the premises located at Wallich Street #37-01 Guoco Tower, Singapore 078881 (the "**Singapore Office**") commencing August 1, 2022 until the lease expiration date of July 31, 2025 (the "**Singapore Office Lease**").   On December 18, 2023 (prior to the Petition Date), TFL entered into a *Lease Deed of Surrender* with the Landlord, whereby TFL agreed to surrender the Singapore Office to the Landlord on July 31, 2024 (the "**Surrender Date**"), subject to certain conditions.   TFL vacated the Singapore Office as of April 30, 2024.

a)     *Motion to Extend*

On May 1, 2024, TFL filed with the Bankruptcy Court a motion (Docket No. 265) requesting entry of an order (i) granting an extension of the period of time to assume or reject the Singapore Office Lease for an additional seventy-two (72) days, from May 20, 2024, through and including July 31, 2024 (*i.e.*, the Surrender Date), and (ii) granting related relief.   Although TFL expected the Singapore Office Lease to expire as of the Surrender Date, TFL wanted to preserve their option of rejecting the lease should it be in the best interest of their estate to do so.   TFL sought to prevent the Singapore Office Lease from being rejected by operation of law prior to the Surrender Date.

On May 13, 2024, the Bankruptcy Court entered the *Order (I) Extending Time to Assume or Reject Unexpired Lease of Nonresidential Real Property and (II) Granting Related Relief* (Docket No. 304), which extended the time for TFL to assume or reject the Singapore Office Lease until July 31, 2024.

b)     *Abandonment Motion*

On June 3, 2024, TFL filed with the Bankruptcy Court a motion (Docket No. 366) requesting (i) authority (a) to abandon certain furniture and equipment at the TFL's Singapore Office (as defined below), (b) to enter into that certain reinstatement agreement for the Singapore Office (the "**Reinstatement Agreement**"),

between TFL and Project Solutions Pte. Ltd. ("**Project Solutions**"),[36] and (ii) related relief (the "**Abandonment Motion**").

Under the Reinstatement Agreement, Project Solutions will restore the Singapore Office pursuant to terms in a reinstatement clause in the Singapore Office Lease. The principal terms and conditions of the Reinstatement Agreement include, among other things, the (i) demolition and disposal of all walls, ceilings, blinds, fixtures & fittings; (ii) termination of all existing mechanical and electrical services, removal of mechanical and electrical fixtures, fittings, and cables; (iii) supply and installation of light fittings; and (iv) cleaning work. Project Solutions also agreed to remove and dispose of furniture and equipment and has done so as of the date of filing the Abandonment Motion.

On June 21, 2024, the Bankruptcy Court entered an order (Docket No. 399), authorizing the Debtors to (i) abandon furniture and equipment effective as of April 30, 2024, without liability to any party; (ii) enter into the Reinstatement Agreement; and (iii) remit the Reinstatement Agreement Fee[37] to Project Solutions.

I.    **Singapore Recognition and Beltran Stay Motion**

a)    *Singapore Recognition Proceedings*

On April 8, 2024, the Debtors filed a proceeding in the Singapore International Commercial Court of the Republic of Singapore (the "**Singapore Court**") requesting the recognition of TFL's Chapter 11 Case under Singapore Law.

On May 29, 2024, TFL appeared in a hearing in the Singapore Court before the Honorable Justice James Peck. On May 31, 2024, Judge Peck entered an order recognizing the Chapter 11 Cases under the United Nations Commission on International Trade Law (UNCITRAL) Model Law on Cross-Border Insolvency, as adopted in Singapore, and adopted a stay on all proceedings in Singapore while the Chapter 11 Cases continue. The stay does not apply to the Beltran Action, as requested by the Debtors.

TFL is obligated to update the Singapore Court every three (3) months from the date of the recognition order on the progress of its restructuring activities and disclose any developments that have affected, or have a real prospect of affecting, the interests of creditors in Singapore.

b)    *Beltran Stay Motion*

On May 22, 2024, TFL filed with the Bankruptcy Court a motion (Docket No. 344) (the "**Beltran Motion**") requesting entry of an order (the "**Proposed Order**") approving the *Stipulation Between Debtor and Singapore Action Claimants Regarding Relief from the Automatic Stay* (the "**Stipulation**"). The Stipulation was negotiated between TFL and the claimants in the Beltran Action (the "**Beltran Claimants**') to modify the automatic stay to permit the Beltran Action to proceed in the Singapore Court, subject to the entry of the Proposed Order. The Stipulation provided, among other things, that the Beltran Claimants in the Beltran Action would be allowed to continue the Beltran Action subject to the terms and conditions of the Stipulation, and following entry of a final order, the Beltran Claimants may (i) enforce any judgment or settlement in connection to the Beltran Action against the Beltran Escrow Deposit, and (ii) file a proof of claim in the Chapter 11 Cases in respect to any outstanding funds payable under any judgment or settlement

---

[36]    Project Solutions is not an insider of, or otherwise affiliated with, the Debtors.

[37]    Pursuant to the Reinstatement Agreement, the Debtor will pay a sum of S$293,880.00 (approximately US$218,000) (the "Reinstatement Agreement Fee") to Project Solutions. As of June 3, 2024, TFL already paid fifty percent (50%) of the Reinstatement Agreement Fee to Project Solutions to ensure it began work promptly and continued the reinstatement work on schedule.

in connection with the Beltran Action in the circumstance that the Beltran Escrow Deposit has been fully paid out to such claimants.

On July 24, 2024, the U.S. Trustee filed an objection (Docket No. 499) to the Beltran Motion.  On August 1, 2024, the Debtors filed a reply (Docket No. 538) to such objection.  Also on August 1, 2024, the Beltran Claimants filed a statement (Docket No. 540) in support of the Beltran Motion.

A hearing on the Beltran Motion was held on August 7, 2024 at 11:00 a.m. (ET). At the hearing, the Debtors, the U.S. Trustee, the Creditors' Committee and the Beltran Claimants agreed to the following in resolution of the U.S. Trustee's objection (the "**Beltran Resolution**"):

- The automatic stay would be modified to allow TFL and the Claimants to prosecute the Beltran Action but would not be modified to allow the Beltran Claimants to enforce any judgment or settlement in connection with the Beltran Action against the Beltran Escrow Deposit;

- The Debtors would stipulate that the Beltran Claimants have a valid security interest in the Beltran Escrow Deposit (the "**Debtors' Stipulation**"), subject to the rights of all parties in interest (other than the Debtors) to challenge such stipulation (each, a "**Challenge**");

- Any Challenge must be commenced or otherwise filed with the Bankruptcy Court by no later than August 28, 2024 (the "**Challenge Deadline**");

- If no Challenge is commenced or otherwise filed by the Challenge Deadline, the Debtors' Stipulation would be binding on all parties in interest and the Beltran Claimants shall be entitled to enforce any judgment or settlement in connection with the Beltran Action against the Beltran Escrow Deposit; and.

- If a Challenge is commenced by the Challenge Deadline, the hearing on such challenge will be heard at the Confirmation Hearing.

The Bankruptcy Court agreed to enter the Proposed Order as modified by the Beltran Resolution.  The Debtors expect to submit such modified order to the Bankruptcy Court for approval shortly.[38]

J.      **Terraform Labs Limited**

*a)      Investigation*

The Special Committee conducted and oversaw an investigation (the "**Investigation**") of TFL and its subsidiaries' assets and liabilities, including investigating the assets and liabilities of TLL.  As part of the Investigation, the Special Committee, with the assistance of the Advisors (i) determined, based on the Debtors' books and records, that TFL owed approximately $450.5 million in total liabilities to TLL as of the Petition Date, as an intercompany payable (the "**Intercompany Payable**"); and (ii) confirmed the ownership of certain of TFL's digital asset wallets as between TFL and TLL, as well as certain digital assets contained therein.

As mentioned above (described in greater detail in section II.B), in exchange for TFL's ability to accept third-party payments otherwise due to TLL, as well as certain advances TLL made to TFL, both under the Subscription Agreements, TLL was granted a "perpetual security" which constituted "direct, irrevocable,

---

[38]   For the avoidance of doubt, the summary of the Beltran Resolution is qualified in its entirety by the order approving the Beltran Resolution.

unsubordinated, unconditional and unsecured obligations of [the Debtor]"[39] Pursuant to the Subscription Agreement, TFL had access to funds totaling $45,700,000, which were treated as advances from TLL. TFL also used other of TLL's assets and booked them as liabilities to TLL under the Subscription Agreements. TFL continued using TLL's assets resulting in the Intercompany Claims that are the subject of the Investigation.

As discussed in greater detail above, on July 18, 2023, TLL was "struck off" the BVI register of companies and dissolved by operation of BVI law as a consequence of the resignation of its previous registered agent without a replacement. Following the Investigation, TFL took steps to begin the restoration process of TLL including consulting with BVI counsel and a retained registered agent to take the necessary steps to restore TLL.

### b)    Restoration Motion

On June 3, 2024, the Debtors filed with the Bankruptcy Court a motion (Docket No. 367) (the "**TLL Restoration Motion**") requesting to restore TLL in the BVI and to make certain payments related to the Restoration, including payments to TLL's proposed registered agent, as the retention of an agent is a requirement for a BVI company to be restored to the BVI register of companies. TFL also sought approval to open and fund a bank account for TLL once TLL completed the restoration process. On June 21, 2024, the Bankruptcy Court entered an order (Docket No. 400) (the "**TLL Restoration Order**") approving the TLL Restoration Motion.

### c)    Restoration

TLL was restored effective as of June 21, 2024 after TFL filed an application to restore TLL in the BVI.

On June 28, 2024 TLL opened a bank account with Western Alliance (the "**TLL Western Alliance Account**"), and TFL made a payment to TLL for a portion of the postpetition intercompany payable it owes to TLL.

### d)    TLL's Chapter 11 Filing and First Day Motions

On July 1, 2024, TLL filed for chapter 11 relief. The Debtors filed several First Day Motions seeking relief from the Bankruptcy Court to promote a seamless transition of TLL into chapter 11 and coordination with TFL's chapter 11 case.

### (i)    Joint Administration Motion

On July 12, 2024, the Debtors filed with the Bankruptcy Court the *Motion of Debtors for Entry of Order Directing Joint Administration of Related Chapter 11 Cases* (Docket No. 453) (the "**Joint Administration Motion**") requesting the joint administration of their Chapter 11 Cases under the case name Terraform Labs Pte. Ltd.

On July 17, 2024, the Bankruptcy Court entered an order (Docket No. 476) approving the Joint Administration Motion.

---

[39]    *See* Subscription Agreement (Dec 17, 2021), Schedule 1 ¶ 1.

(ii)    <em><strong>Relief Extension Motion</strong></em>

On July 12, 2024, TLL filed with the Bankruptcy Court the *Motion of Terraform Labs Limited for Entry of an Order Extending to It Certain Relief Granted to the Original Debtor* (Docket No. 454) requesting the application of all orders entered in TFL's Chapter 11 Case to TLL (the "**Relief Extension Motion**").

On July 17, 2024, the Bankruptcy Court entered an order (Docket No. 478) approving the Relief Extension Motion.

(iii)    <em><strong>Foreign Representative Motion</strong></em>

On July 12, 2024, the Debtors filed with the Bankruptcy Court the *Motion of Debtors for Entry of an Order Authorizing Terraform Labs Limited to Act on Behalf of Terraform Labs Limited's Estate Pursuant to 11 U.S.C. § 1505* (Docket No. 455) requesting authorization of TLL to act as "foreign representative" on behalf of TLL's estate, with authority to, among other things, commence and participate in proceedings for recognition and assistance under applicable BVI law (the "**Foreign Representative Motion**").

On July 17, 2024, the Bankruptcy Court entered an order (Docket No. 477) approving the Foreign Representative Motion.

(iv)    <em><strong>BVI Recognition Proceedings</strong></em>

On July 29, 2024, TLL commenced proceedings in the Eastern Caribbean Supreme Court in the BVI (the "**BVI Court**") to seek statutory assistance and/or common law recognition and assistance in respect to TLL's Chapter 11 Case (the "**BVI Recognition Proceedings**").

As of the date of the filing of this Disclosure Statement, the BVI Court had not made any order in respect to the BVI Recognition Proceedings.

K.    <u>**Schedules and Statements and Bar Date**</u>

a)    <em><strong>Statements and Schedules, and Rule 2015.3 Financial Reports</strong></em>

TFL filed its (i) schedule of assets and liabilities (the "**TFL Schedule**") and (ii) statement of financial affairs (the "**TFL Statement**") on April 30, 2024 (Docket Nos. 260-261).  TFL also filed its Rule 2015.3 financial report on May 3, 2024 (Docket No. 281).  On July 2, 2024, TLL filed certain schedules of secured and unsecured claims held against TLL (Docket No. 422), and filed the remainder of its schedules of assets and liabilities and its statement of financial affairs on July 29, 2024 (Docket Nos. 514-15).

b)    <em><strong>Bar Date</strong></em>

On May 24, 2024, the Debtors filed with the Bankruptcy Court a motion (Docket No. 349) (the "**Bar Date Motion**") seeking authority to establish certain deadlines for filing proofs of claims in the Chapter 11 Cases.

On July 9, 2024, the Bankruptcy Court entered an order, among other things, approving August 9, 2024 at 5:00 p.m. (Eastern Time) as the deadline for each person or entity (including individuals, partnerships, corporations, joint ventures, trusts, and governmental units) to file Proofs of Claims against the Debtors (the "**General Bar Date**") (Docket No. 437) (the "**General Bar Date Order**").

The General Bar Date does not apply to Crypto Loss Claims. *See* discussion of Crypto Loss Claim Bar Date *infra*.

As of July 24, 2024, 87 Proofs of Claim have been filed against the Debtors. The Debtors continue to review and refine its analysis of the filed Proofs of Claim.

c)    **Crypto Claims**

(i)    *Crypto Loss Claims*

The General Bar Date Order did not establish any bar date with respect to Crypto Loss Claims. Pursuant to the Plan, the bar date and proof of claim process for holders of Crypto Loss Claims to assert a claim (the "**Crypto Loss Claims Bar Date**") for claim allowance and distribution purposes will be established by the Plan Administrator upon motion and notice, *provided that* such date shall be no more than one hundred twenty (120) calendar days after the Effective Date. In particular, the Plan Administrator will file a motion seeking approval of the Crypto Loss Claim Procedures (the "**Crypto Loss Claim Procedures Motion**"), which, once approved by the Court after notice and a hearing, will be binding on all creditors. The Crypto Loss Claim Procedures shall include: (A) notice of the Crypto Loss Claim Procedures and an opportunity to object thereto; (B) notice of the hearing to consider approval of the Crypto Loss Claim Procedures, if necessary; (C) the deadline to file Crypto Loss Claims; (D) instructions for submitting a Crypto Loss Claim; (E) a modified Proof of Claim form specifically as to Crypto Loss Claims; and (F) a notice for holders of Crypto Loss Claims to "opt in" to being a Contributing Claimant (as defined below) (the "**Crypto Loss Claim Procedures**").

The Crypto Loss Claim Procedures Motion will provide the process and procedures that the Plan Administrator will use to determine whether a Crypto Loss Claim should be allowed or disallowed and, to the extent allowed, the value of such claim. Moreover, the Crypto Loss Claim Procedures will explain (i) how creditors can submit a Crypto Loss Claim; (ii) the deadline to submit a Crypto Loss Claim; and (iii) what information creditors submitting Crypto Loss Claims must include with their submission. The Plan Administrator will also include a modified Proof of Claim form to be submitted by creditors asserting Crypto Loss Claims.

The Plan Administrator will publish notice of the Crypto Loss Claim Procedures and the Crypto Loss Claim Bar Date on CoinDesk, as well as any other related publications, exchanges, or through distribution lists (as necessary) in the Plan Administrator's discretion. Moreover, any creditors that have submitted claims in connection with the Preliminary Crypto Loss Claims Bar Date Motion (as defined below) will receive notice of the Crypto Loss Claim Procedures via email (if an email was provided) or regular mail (if an email was not provided). The Crypto Loss Claim Procedures will also include a notice for creditors to "opt in" to being a Contributing Claimant.

(ii)    *Preliminary Crypto Loss Claims Bar Date*

To conduct a preliminary assessment of the universe of holders of potential Crypto Loss Claims for the purpose of voting on a chapter 11 plan, on July 9, 2024, the Debtors filed with the Bankruptcy Court a motion (Docket No. 445) (the "**Preliminary Crypto Loss Claims Bar Date Motion**"). The Preliminary Crypto Loss Claims Bar Date Motion sought, among other things, authority to establish the Preliminary Crypto Loss Claim Bar Date for holders of potential Crypto Loss Claims against TFL and TLL to file proofs of claim for chapter 11 plan *voting purposes only*. As stated above, the Plan Administrator will establish the Crypto Loss Claims Bar Date separate to the Preliminary Crypto Loss Claim Bar Date. For the avoidance of doubt, the Preliminary Crypto Loss Claim Bar date is for chapter 11 plan *voting purposes*

*only*, not for allowance or distribution, which will be addressed by the Crypto Loss Claims Bar Date and Crypto Loss Claim Procedures.

On July 19, 2024 the Bankruptcy Court entered an order (Docket No. 491) approving the Preliminary Crypto Loss Claims Bar Date Motion, and setting August 21, 2024 at 5:00 p.m. Eastern Time as the Preliminary Crypto Loss Claims Bar Date.

(iii)   <strong><em>Private Wallet Crypto Holders Bar Date</em></strong>

The Plan provides that Token Holders with Tokens held in wallets or accounts owned or controlled by such Token Holder which are no longer readily accessible through the Debtors' applications or protocols as a result of the Debtors' Wind Down ("**Private Wallet Crypto Holders**") may request the withdrawal of tokens held in wallets or accounts owned by such Private Wallet Crypto Holder, up to 30 days after the Effective Date (the "**Private Wallet Bar Date**") or be forever barred, estopped, and enjoined from withdrawing such Tokens and asserting any Claims relating to the loss of access to such Tokens against the Debtors or the Wind Down Trust, as applicable, or their respective assets or properties.  Any tokens remaining in wallets or accounts owned or controlled by such Private Wallet Crypto Holders after the Private Wallet Bar Date and that are accessible to the Debtors' estates after the Private Wallet Bar Date, shall automatically be deemed property of the Debtors' estates, and will be distributed to other creditors holding Allowed Claims.

(iv)   <strong><em>Bridge Wallet Bar Date</em></strong>

In addition, the Plan provides that Token Holders entitled to redeem Terra Crypto held in the Bridge Wallets (each a "**Bridge Wallet Crypto Holder**") shall have until 30 days after the Effective Date (the "**Bridge Wallet Bar Date**") to redeem Terra Crypto held in the Bridge Wallets or be forever barred, estopped, and enjoined from redeeming such Terra Crypto and asserting any Claims relating to the loss of access to such Terra Crypto against the Debtors or the Wind Down Trust, as applicable, or their respective assets or properties.  Any Terra Crypto remaining in the Bridge Wallets after the Bridge Wallet Bar Date to which the Debtors or the Wind Down Trust has access or control after the Bridge Wallet Bar Date shall be burned.

L.   <strong><u>Asset Sales</u></strong>

As noted, one of the key terms of the SEC Settlement was that the Debtors are required to wind-down their business as quickly as reasonably possible and liquidate their assets in a value-maximizing and cost-effective manner, including the marketing and selling the Debtors' interests in Proximity, Pulsar, and other applications developed by the Debtors (the "**Business Assets**"), as well as the Debtors' interests in the Venture Investments.

a)   <strong><em>Business Assets</em></strong>

The Debtors anticipate filing with the Bankruptcy Court an application shortly seeking authority to retain Cavu Securities LLC ("**Cavu**") as investment banker for the Debtors to conduct a marketing and sale process of the Debtors' Business Assets.  Cavu is assisting the Debtors with, among other things, the following: (i) assist in the development of financial data, analysis, and presentations to the  Board of Directors, the Creditor's Committee, and other parties; (ii) prepare marketing materials for the sale of the Business Assets, including: presentations, virtual data rooms, and relevant analyses for potential acquirers; (iii) identify and engage with potential acquirers to market the potential sale of the Business Assets; (iv) assist the Debtors and potential acquirers in performing due diligence for the Business Assets; (v) analyze and present any proposals submitted related to the Business Assets; and (vi) assist the Debtors in evaluating potential proposals for acquisition of the Business Assets.

Cavu is currently conducting outreach to potential bidders interested in purchasing Proximity and Pulsar. Any sale of the Debtors' interests in such assets will be subject to further order of the Bankruptcy Court.

> ### b)    *Venture Investments*

The Debtors also anticipate filing with the Bankruptcy Court an application seeking authority to retain PGP Capital Advisors, LLC ("**PGP**") as investment banker for the Debtors to conduct a marketing and sale process for the Debtors' interests in the Venture Investments. The Debtors, with the assistance of PGP and their other advisors, are or shortly will be in the process of marketing their interests in the Venture Investments for with the Debtors have remaining obligations to make capital contributions (the "**Marketed Venture Investments**"). Any such sale would be undertaken in consultation with the Creditors' Committee. Once the Debtors and their advisors have determined the amount of market interest in the Marketed Venture Investments, the Debtors (in consultation with the Creditors' Committee) will determine in their reasonable business judgment the most value-maximizing path for the Debtors' interests in such Venture Investments. Any sale of the Debtors' interests in such assets will be subject to further order of the Bankruptcy Court. Moreover, the Debtors anticipate that the Debtors' interests in the Venture Investments other than the Marketed Venture Investments (*i.e.*, where the Debtors no longer have any remaining obligations to make capital contributions) shall remain a part of the Debtors' estates or otherwise be transferred pursuant to Section 5.3 of the Plan.

> ### M.    <u>Coordination with Creditors' Committee Regarding Causes of Action Against Third Parties</u>

To ensure efficiency, the Debtors have been coordinating closely with the Creditors' Committee's advisors regarding information and documents relating to potential estate causes of action that may augment creditor recoveries.

In coordination with the Debtors, the Creditors' Committee has been investigating potential claims and causes of action the Debtors may have against third parties for the benefit of Debtors' estate and its creditors. While the investigation is ongoing and subject to change based on newly discovered facts, the Creditors' Committee is examining, among other things, the events surrounding the De-peg and all subsequent de-pegs. For example, the Creditors' Committee has sought formal and informal discovery from most of the key parties who provided documents and information in connection with the SEC Enforcement Action, the Debtors, and from other entities, such as LFG. In connection with this investigation, the Creditors' Committee has also employed expert cryptocurrency tracers to identify potential fraudulent transfers, stolen crypto, and other assets that should be fairly attributable to the Debtors' estate. In connection with this investigation, the Creditors' Committee has cast a wide net in determining whether there are wrongdoers who should be held accountable for their role in the failure of the Debtors and have not agreed to release any party to which the Creditors' Committee suspects has fault and the means to satisfy a judgment. To avoid any doubt, the Creditors' Committee has refused to release Mr. Kwon, other key executives, market makers, liquidity providers, joint-marketing partners, centralized crypto exchanges, decentralized crypto exchanges, and other protocols in which Terra Crypto was traded.

> ### N.    **Terra Blockchain Breach**

On July 31, 2024, the Terra Blockchain was the target of a malicious attack exploiting a Cosmos chain vulnerability, resulting in the minting of axlUSDC, axlUSDT, axlUSDT, axlWBTC and ASTRO and, subsequently, the unauthorized withdrawal from the Terra network of approximately $5 million worth of assets, including: axlUSDC (3.5m tokens); axlUSDT (500,000 tokens); axlWBTC: (2.7m tokens); and

ASTRO (59.7m tokens). These assets are owned by the users of the Terra Blockchain, not the Debtors; however, the Debtors' ASTRO was devalued as a result of the breach.[40]

The Debtors were alerted to the attack on July 31, 2024, early in the morning local time, and immediately coordinated with Terra Blockchain validators to respond to the attack and rectify the breach.

Within hours of the attack, a software upgrade was released, and validators representing 67% of voting powers on the Terra network had upgraded their nodes, effectively preventing the reoccurrence of the attack.  On that same morning, the Debtors notified the U.S. Trustee, the Department of Justice, the SEC, and the Creditors' Committee of the breach and subsequently held calls with each such party to provide further details and answer questions.  The Debtors also alerted their stakeholders and creditors shortly after the breach, making posts on their various social media and Terra specific platforms, including but not limited to: Twitter, Telegram, and Discord.

The perpetrator left a digital trail following the breach, which a number of teams across the Terra ecosystem are attempting to track; however, as of the date of filing of this Disclosure Statement, there is no conclusive evidence as to the perpetrator's identity.  The Debtors continue to investigate the source of the attack.

The Debtors are investigating how this attack was able to be carried out and are actively reviewing TFL's software and security systems to prevent this type of incident in the future.  The Debtors are also evaluating whether and to what extent this incident may result in any claims against the Debtors' estates.

On August 1, 2024, with the support of the Debtors, the Creditors' Committee issued a letter to Private Project Facilitators LTD d/b/a eXch.cx, stating that 70 ETH in the perpetrator's possession was transferred to digital wallets attributable to eXch.cx, and requested the return of such assets to the Debtors' estate immediately.  Discussions with eXch.cx are ongoing.

On August 2, 2024, the Debtors filed a police report with the Singapore Police and are working with the Singapore Police to respond to their inquiries.

O.    **Severance**

On August 7, 2024, the Debtors filed a motion with the Bankruptcy Court (the "**Severance Motion**") seeking authority to pay severance equal to three (3) months' base salary to certain non-insider employees and contractors in connection with the Debtors' severance program, subject to each employee's and/or contractor's agreement to execute a mutual termination agreement ("**Mutual Termination Agreement**"), which provides for (i) a release of any claims held by the employee or contractor against the Debtors, Proximity, and/or Deel, as applicable, and (ii) certain obligations of the employee and/or contractor to cooperate with the Debtors and Wind Down Trust in connection with the wind-down of the Debtors' estates and implementation of the SEC Settlement for a period of up to three (3) months following execution of the Mutual Termination Agreement.  The hearing to consider the Severance Motion is scheduled for August 21, 2024 at 9:30 a.m. (prevailing ET).

---

[40]    The Debtors own 24,699,290 ASTRO tokens.  Prior to the breach, each ASTRO token was trading at $0.049, valuing TFL's ASTRO tokens at US$1.21M.  Following the breach, each ASTRO token is trading at $0.026, valuing TFL's ASTRO tokens at US$0.64M.

# V.
## SUMMARY OF PLAN

This section of the Disclosure Statement summarizes the Plan, a copy of which is annexed hereto as **Exhibit A**.

### A.    **Substantive Consolidation**

#### a)    *Consolidation of the Debtors*

Substantive consolidation is a judicially created equitable doctrine that treats separate legal entities as if they were merged into a single consolidated surviving entity, with all the assets and liabilities (other than inter-entity liabilities, which are extinguished) permanently becoming assets and liabilities of the consolidated survivor.  The effect of substantive consolidation is the pooling of the Debtors' assets, and the claims against the Debtors, and in turn, satisfying liabilities from a common fund and combining the creditors of the Debtors for the purposes of voting on the Plan.  In the absence of consolidation, the creditors of an individual debtor could only look to the assets of that particular individual debtor to satisfy such creditor's claim.

The Plan effectuates a limited substantive consolidation of the Debtors for certain specified purposes, including for the purpose of implementing the Plan, for voting, for assessing whether Confirmation standards have been met, for calculating and making distributions under the Plan, and for filing post-Confirmation reports and paying quarterly fees to the U.S. Trustee.  The Plan shall serve as a motion by the Debtors seeking entry of a Bankruptcy Court order deeming the substantive consolidation of the Debtors' Estates into a single Estate for certain limited purposes relating to the Plan, including voting, Confirmation, and Distribution.  As a result of the limited substantive consolidation of the Estates, (a) each Class of Claims and Interests shall be treated as against a single consolidated Estate without regard to the separate legal existence of the Debtors, (b) as set forth in Section 4.7 of the Plan, no Distributions under the Plan shall be made on account of Intercompany Claims, and (c) for purposes of determining the availability of the right of setoff under section 553 of the Bankruptcy Code, the Debtors shall be treated as one consolidated entity so that, subject to the other provisions of section 553, debts due to one Debtor may be set off against the debts of the other Debtor.  The limited substantive consolidation of the Debtors under the Plan shall not affect (i) the legal and organizational structure of the Debtors, including for corporate, tax or any other purpose, (ii) the ability of the Wind Down Trust and the Wind Down Trustee to subordinate or otherwise challenge Claims on an entity-by-entity basis, (iii) any Causes of Action or defenses thereto, which in each case shall survive entry of the Confirmation Order as if there had been no substantive consolidation of the Estates, and (iv) payments from any insurance policies or the proceeds thereof.

#### b)    *The Basis for Consolidation*

The limited substantive consolidation of the Debtors is an important element of the successful implementation of the Plan.  It is well established that section 105(a) of the Bankruptcy Code empowers the Bankruptcy Court to substantively consolidate multiple debtors.  The Debtors believe that the Plan's proposed consolidation structure is supported by the applicable legal standards, practical considerations, and the Debtors' prepetition and postpetition operations and financial affairs.  The particular facts and circumstances of these Chapter 11 Cases present unique arguments warranting substantive consolidation.  Further, based on the facts of this case, the Creditors' Committee supports the substantive consolidation of the Debtors and believes it is in the best interest of all parties.

As mentioned above, TLL was incorporated on June 25, 2018 as a wholly-owned subsidiary of TFL.  The Investigation revealed that TLL was established in connection with the distribution of Luna Classic.  TLL

entered into the Token Sale Agreements for Luna Classic's initial coin offering. TFL and TLL entered into the Subscription Agreements on March 20, 2019, February 1, 2021, and December 17, 2021 that permitted TFL to accept payments from third parties that otherwise would have been payable to TLL pursuant to the Token Sale Agreements with third parties. Consequently, for initial token sales, third parties paid TFL, not TLL, for the distribution of Luna Classic under the Token Sale Agreements, and in accordance with the Subscription Agreements, TFL was permitted to collect and use this money.

In exchange for TFL's ability to accept third-party payments otherwise due to TLL, as well as certain advances TLL made to TFL, both under the Subscription Agreements, TLL was granted a "perpetual security" which constituted "direct, irrevocable, unsubordinated, unconditional and unsecured obligations of the Debtor".[41] Pursuant to the Subscription Agreements, TFL had access to funds totaling $45.7 million, which the parties treated as forty-two (42) separate advances from TLL. Moreover, during 2022 and 2023, TFL used other of TLL's assets, primarily believed to be digital assets, and booked them as liabilities to TLL under the Subscription Agreements. By 2024, TFL continued using the digital assets in its possession, which may have been TLL's assets, with TFL's use of such digital assets resulting in an intercompany claim. In total, TFL entered on its general ledger more than 130 transactions for salaries, legal fees, investments in third party funds, advanced retainers to professional advisors, and other operating expenses, which resulted in the Intercompany Payable of $404.8 million from TFL to TLL as of the Petition Date.[42] When combined with the advances under the Subscription Agreements, TFL's financial records reflect a total of approximately $450.5 million in total liabilities owed to TLL as of the Petition Date.

Notwithstanding that TLL issued LUNA Classic and was arguably the party engaged in the conduct at issue in the SEC Enforcement Action, the SEC Enforcement Action named only TFL and not TLL as a corporate defendant. In addition, the SEC asserted the SEC Claim against TFL, not TLL, and as discussed above, pursuant to the Final Judgment, the SEC has agreed to allocate funds that TFL disgorges and pays in penalties to the creditors that are holders of Class 5 Crypto Loss Claims. As a result of the foregoing, it is difficult to determine which creditors' claims pertain to which Debtor. The prepetition litigation and liabilities against the Debtors related to the SEC Enforcement Action and Crypto Loss Claims would be difficult and time consuming, to apportion to any one Debtor.

The Debtors believe that attempting to disentangle their estates would result in significant difficulties and enormous costs that would be borne by their estates, which would deplete the recoveries for all creditors and cause unnecessary and costly delays in the confirmation of the Plan and Distributions to creditors. Indeed, the Debtors likely would be unable to meet milestones under the SEC Settlement, such as filing the Plan by June 30, 2024, if they undertook such an endeavor. The Debtors believe that the result would likely be worse recoveries for all creditors. As such, the Debtors believe that consolidation of the Debtors will expedite the conclusion of the Chapter 11 Cases.

### c) Consolidation Order

The Plan will serve as a motion seeking entry of an order consolidating the Debtors, as described and to the extent set forth in Section 5 of the Plan. Unless an objection to such consolidation is made in writing by any creditor or Claimant affected by the Plan and timely filed and served on or before the Plan Objection Deadline, or such other date as may be fixed by the Bankruptcy Court, the order approving consolidation

---

[41] *See* Subscription Agreement (Dec. 17, 2021), Schedule 1, ¶ 1.

[42] TFL's expenditure of digital assets postpetition resulted in additional Intercompany Claims in favor of TLL in the approximate amount of $700,000. Since TFL was able to open a bank account and use a portion of the retainer paid to Dentons US LLP, TFL has been paying most of its expenses in cash from such funds, which does not impact the Intercompany Payable between TFL and TLL.

(which may be the Confirmation Order) may be entered by the Bankruptcy Court. In the event any such objections are timely filed, a hearing with respect thereto will occur at the Confirmation Hearing. This, however, will not affect the obligation of the consolidated Debtors to (a) pay a single quarterly fee to the U.S. Trustee in accordance with 28 U.S.C. § 1930 based upon the consolidated disbursements made by the substantively consolidated Debtors or (b) seek the closing of their substantively consolidated Chapter 11 Cases.

B.     **Administrative Expense, Priority Claims, Private Wallet Crypto Holders, and Bridge Wallet Crypto Holders.**

a)     *Administrative Expense Claims Bar Date*

Except as provided for herein or in any order of the Bankruptcy Court, and subject to section 503(b)(1)(D) of the Bankruptcy Code, holders of Administrative Expense Claims (other than holders of Administrative Expense Claims paid in the ordinary course of business, holders of Administrative Expense Claims arising under section 1930 of chapter 123 of title 28 of the United States Code, and holders of Fee Claims) must file and serve on the Debtors requests for payment of such Administrative Expense Claims not already Allowed by a Final Order in accordance with the procedures specified in the Confirmation Order on or before the Administrative Expense Claims Bar Date or be forever barred, estopped, and enjoined from asserting such Claims against the Debtors or their assets or properties.

b)     *Allowance of Administrative Expense Claims*

An Administrative Expense Claim with respect to which a request for payment has been properly and timely filed pursuant to Section 2.1 of the Plan shall become an Allowed Administrative Expense Claim if no objection to such request is filed by the Plan Administrator with the Bankruptcy Court on or before one hundred twenty (120) days after the Effective Date, or on such later date as may be fixed by the Bankruptcy Court. If an objection is timely filed, the Administrative Expense Claim shall become an Allowed Administrative Expense Claim only to the extent allowed by Final Order or such Claim is settled, compromised, or otherwise resolved by the Plan Administrator pursuant to Section 7.2 of the Plan.

c)     *Payment of Allowed Administrative Expense Claims*

Except to the extent that a holder of an Allowed Administrative Expense Claim (other than a Fee Claim) agrees to a different treatment, the holder of such Allowed Administrative Expense Claim shall receive, on account of such Allowed Claim, Cash in an amount equal to the Allowed amount of such Claim from the Senior Claims Pool, within thirty (30) days following the later to occur of (i) the Effective Date and (ii) the date on which such Administrative Expense Claim shall become an Allowed Claim; *provided, however,* that Allowed Administrative Expense Claims against any of the Debtors representing liabilities incurred in the ordinary course of business by the Debtors, as debtors in possession, shall be paid by the Wind Down Trustee, at the direction of the Plan Administrator, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents establishing, such liabilities. For the avoidance of doubt, Administrative Expense Claims shall be paid in full in cash to the extent Allowed.

d)     *Fee Claims*

(i)     All entities seeking an award by the Bankruptcy Court of Fee Claims (i) shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is thirty (30) days after the Effective Date, and (ii) shall be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court or authorized to be paid

in accordance with the order(s) allowing any such postpetition, Estate-retained professional fee and expense claim (A) upon the later of the Effective Date and the date upon which the order relating to any such Allowed Fee Claim is entered or (B) upon such other terms as may be mutually agreed upon between the holder of such an Allowed Fee Claim. All entities seeking an award by the Bankruptcy Court of Fee Claims (i) shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is sixty (60) days after the Effective Date, and (ii) shall be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court or authorized to be paid in accordance with the order(s) allowing any such postpetition, Estate-retained professional fee and expense claim (A) upon the later of the Effective Date and the date upon which the order relating to any such Allowed Fee Claim is entered or (B) upon such other terms as may be mutually agreed upon between the holder of such an Allowed Fee Claim and the Debtor or the Plan Administrator, as applicable.  The Wind Down Trustee, at the direction of the Plan Administrator, is authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval.

(ii)     Prior to the Effective Date, the Debtors shall establish the Fee Escrow Account and fund such account with an amount of Cash sufficient to pay all Fee Claims as determined by Section 2.4(c) of this Plan.  On the date the Wind Down Trust is established or as soon as reasonably practicable thereafter, the Debtors will cause title to the Fee Escrow Account to be transferred to the Wind Down Trust.

(iii)     At least three (3) business days prior to the Effective Date, holders of Fee Claims shall provide a reasonable estimate of unpaid Fee Claims incurred in rendering services before the Effective Date to the Debtor, and the Debtor shall separately escrow such estimated amounts in the Fee Escrow Account (less any retainers) for the benefit of the holders of the Fee Claims until the fee applications related thereto are resolved by Final Order or agreement of the parties.  If a holder of a Fee Claim does not provide an estimate, the Debtor may estimate the unpaid and unbilled reasonable and necessary fees and out-of-pocket expenses of such holder of a Fee Claim.  When all such Allowed Fee Claims have been paid in full, any remaining amount in such escrow shall promptly be released from such escrow and revert to, and ownership thereof shall vest in, the Wind Down Trust and the Wind Down Trustee without any further action or order of the Bankruptcy Court, shall be deemed Post-Effective Date Available Cash, and may, for the avoidance of doubt, be used to administer the Wind Down Trust subject to and in accordance with the Wind Down Budget.

(iv)     Funds held in the Fee Escrow Account shall not be considered property of the Debtors' Estates or property of the Wind Down Trust, but shall revert to the Wind Down Trust and be deemed Post-Effective Date Available Cash, in accordance with Section 2.4(c) of the Plan, only after all Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full.  The Fee Escrow Account shall be held in trust for Estate-retained professionals and for no other parties until all Fee Claims Allowed by the Bankruptcy Court have been paid in full.

*e)*     ***Priority Tax Claims***

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction of such Allowed Priority Tax Claim, at the sole option of the Debtor or the Wind Down Trustee, as applicable, (a) Cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of (i) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date; (ii) the first Business Day after the date that is forty-five (45) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim; and (iii) the date such Allowed Priority Tax Claim is due and payable in the ordinary course as such obligation becomes due; or (b) equal annual Cash payments in

an aggregate amount equal to the amount of such Allowed Priority Tax Claim, together with interest at the applicable rate under section 511 of the Bankruptcy Code, over a period not exceeding five (5) years from and after the Petition Date; *provided*, that the Debtor reserves the right to prepay all or a portion of any such amounts at any time under this option without penalty or premium.

### f)        *Private Wallet Crypto Holders and Private Wallet Bar Date*

Private Wallet Crypto Holders shall have until the Private Wallet Bar Date to request withdrawal of Tokens held in wallets or accounts owned or controlled by such Private Wallet Crypto Holder or be forever barred, estopped, and enjoined from withdrawing such Tokens and asserting any Claims relating to the loss of access to such Tokens against the Debtors or the Wind Down Trust, as applicable, or their respective assets or properties.  Any such Tokens remaining in wallets or accounts owned or controlled by such Private Wallet Crypto Holder after the Private Wallet Bar Date and that are accessible to the Debtors or the Wind Down Trust after the Private Wallet Bar Date, shall automatically become property of the Wind Down Trust and deemed Post-Effective Date Cash.

### g)        *Bridge Wallet Crypto Holders and Bridge Wallet Bar Date*

Bridge Wallet Crypto Holders shall have until the Bridge Wallet Bar Date to redeem Terra Crypto held in the Bridge Wallets or be forever barred, estopped, and enjoined from redeeming such Terra Crypto and asserting any Claims, including Crypto Loss Claims, relating to the loss of access to such Terra Crypto against the Debtors or the Wind Down Trust, as applicable, or their respective assets or properties.  Any Terra Crypto remaining in the Bridge Wallets after the Bridge Wallet Bar Date to which the Debtors or the Wind Down Trust has access or control after the Bridge Wallet Bar Date shall be burned.

### C.        <u>Classifications of Claims and Interests</u>

### a)        *Classification in General*

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under the plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided*, that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

### b)        *Summary of Classification*

The following table designates the Classes of Claims against, and Interests in, each of the Debtors and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan, (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (c) deemed to reject the Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in <u>Section 3</u> of the Plan.

The classification and treatment of Claims under the plan takes into account various factors, including (i) the potential that some or all Crypto Loss Claims could be subordinated pursuant to section 510(b) of the Bankruptcy Code, and (ii) that holders of Crypto Loss Claims shall receive distributions of certain assets, including those in the SEC Settlement Fund, pursuant to the SEC Settlement, some of which might otherwise be assets available for distribution to the GUC Pool.

| Class | Designation | Treatment | Entitled to Vote |
|-------|-------------|-----------|------------------|
| 1 | Priority Non-Tax Claims | Unimpaired | No (Presumed to accept) |
| 2 | Other Secured Claims | Unimpaired | No (Presumed to accept) |
| 3 | Beltran Allowed Secured Claims | Unimpaired | No (Presumed to accept) |
| 4 | General Unsecured Claims | Impaired | Yes |
| 5 | Crypto Loss Claims | Impaired | Yes |
| 6 | SEC Claim | Impaired | Yes |
| 7 | Intercompany Claims | Impaired | No (Deemed to reject) |
| 8 | Intercompany Interests | Unimpaired / Impaired | No (Deemed to accept/reject) |
| 9 | 510(c) Subordinated Claims | Impaired | No (Deemed to reject) |
| 10 | TFL Equity Interests | Impaired | No (Deemed to reject) |

     *c)*    **Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtor the Plan Administrator, or the Wind Down Trustee, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

     *d)*    **Claims Arising Out of the Beltran Action**

For the avoidance of doubt, nothing in the Plan shall be interpreted to mean that Claims arising out of the Beltran Action are Secured Claims.  To the extent Claims arising out of the Beltran Action are not Beltran Allowed Secured Claims, TFL and/or the Plan Administrator shall request of the Singapore High Court that the Beltran Escrow Deposit be returned to the Wind Down Trust.  Further, to the extent Claims arising out of the Beltran Action are Beltran Allowed Secured Claims, then after such Claims are satisfied, TFL and/or the Plan Administrator shall request of the Singapore High Court that any excess amount of the Beltran Escrow Deposit be returned to the Wind Down Trust.  For the avoidance of doubt, nothing in the Plan shall be deemed to Allow the Claims arising out of the Beltran Action.

     *e)*    **Elimination of Vacant Classes**

Any Class of Claims or Interests that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

     *f)*    **Voting Classes; Presumptions**

     (i)    **Acceptance by Certain Impaired Classes**

Only holders of Allowed Claims in Classes 4, 5, and 6 are entitled to vote to accept or reject the plan.  An Impaired Class of Claims shall have accepted the plan if (i) the holders of at least two-thirds (2/3) in amount of the Allowed Claims actually voting in such Class have voted to accept the plan and (ii) the holders of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept the plan.  Holders of Claims in Classes 4, 5, and 6 shall receive Ballots containing detailed voting instructions.

(ii)        **Presumed Acceptance by Unimpaired Classes**

Holders of Claims and Interests in Classes 1, 2, 3 and 8 (if so treated) are conclusively deemed to have accepted the plan pursuant to section 1126(f) of the Bankruptcy Code.  Accordingly, such holders are not entitled to vote to accept or reject the plan.

(iii)        **Deemed Rejection by Certain Impaired Classes**

Holders of Claims and Interests in Classes 7, 8 (if so treated), 9, and 10 are deemed to have rejected the plan pursuant to section 1126(g) of the Bankruptcy Code.  Accordingly, such holders are not entitled to vote to accept or reject the plan.

If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Debtor shall request the Bankruptcy Court at the Confirmation Hearing to deem the Plan accepted by the holders of such Claims or Interests in such Class.

g)        ***Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code***

The Debtor shall seek Confirmation of the plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtor reserves the right to modify the plan in accordance with <u>Section 12.4</u> of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

h)        ***No Waiver***

Nothing contained in the plan shall be construed to waive a Debtor's, the Wind Down Trustee's, or other Person's right to object on any basis to any Claim, except as provided for in the Plan.

D.        <u>**Treatment of Claims and Interests**</u>

a)        ***Priority Non-Tax Claims (Class 1).***

(i)        *Classification*:  Class 1 consists of Priority Non-Tax Claims against the Debtors.

(ii)        *Treatment*:  On or as soon as practicable after the Effective Date, except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to less favorable treatment, each holder thereof shall be paid in full in Cash or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

(iii)        *Voting*:  Class 1 is Unimpaired, and holders of Priority Non-Tax Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Priority Non-Tax Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Priority Non-Tax Claims.

b)      ***Other Secured Claims (Class 2).***

(i)      *Classification*:  Class 2 consists of the Other Secured Claims against the Debtors.  To the extent that Other Secured Claims are secured by different collateral or different interests in the same collateral, such Claims shall be treated as separate subclasses of Class 2.

(ii)      *Treatment*:

(a)      Except to the extent that a holder of an Allowed Other Secured Claim agrees to different treatment, on the later of the Effective Date and the date that is thirty (30) days after the date such Other Secured Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Other Secured Claim will receive, on account of such Allowed Claim, at the sole option of the Debtors or the Plan Administrator, as applicable:  (i) Cash in an amount equal to the Allowed amount of such Claim; (ii) such other treatment sufficient to render such holder's Allowed Other Secured Claim Unimpaired; or (iii) return of the applicable collateral in satisfaction of the Allowed amount of such Other Secured Claim.

(b)      Except as otherwise specifically provided herein, upon the payment in full in Cash of an Other Secured Claim, any Lien securing an Other Secured Claim that is paid in full, in Cash, shall be deemed released, and the holder of such Other Secured Claim shall be authorized and directed to release any collateral or other property of the Debtors held by such holder and to take such actions as may be requested by the Plan Administrator, to evidence the release of such Lien, including the execution, delivery and filing or recording of such releases as may be requested by the Plan Administrator.

(iii)      *Voting*:  Class 2 is Unimpaired, and holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Other Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Other Secured Claims.

c)      ***Beltran Allowed Secured Claims (Class 3).***

(i)      *Classification*:  Class 3 consists of the Beltran Allowed Secured Claims against the Debtors.

(ii)      *Treatment*:  Except to the extent that a holder of an Allowed Beltran Allowed Secured Claim agrees to different treatment, on the later of the Effective Date and the date that is thirty (30) days after the date that: (i) such Beltran Allowed Secured Claim becomes an Allowed Claim, and (ii) a Final Order of the courts of the Republic of Singapore is made permitting the release of the Beltran Escrow Deposit to the holders of the Beltran Allowed Secured Claims, or as soon thereafter as is reasonably practicable, each holder of a Beltran Allowed Secured Claim will receive payment from the Beltran Escrow Deposit as determined by the High Court of the Republic of Singapore.

(a)      Voting: Class 3 is Unimpaired, and holders of Beltran Allowed Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Beltran Allowed Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Beltran Allowed Secured Claims.

d)      **General Unsecured Claims (Class 4).**

(i)      *Classification*:  Class 4 consists of General Unsecured Claims against the Debtor.

(ii)      *Treatment*:  Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment of such Claim, each holder of an Allowed General Unsecured Claim will receive its Pro Rata share of the GUC Pool up to the full amount of such Allowed General Unsecured Claim.

(iii)      *Voting*:  Class 4 is Impaired, and the holders of General Unsecured Claims are entitled to vote to accept or reject the Plan.

e)      **Crypto Loss Claims (Class 5)**

(i)      *Classification*:  Class 5 consists of Crypto Loss Claims against the Debtor.

(ii)      Each holder of an Allowed Crypto Loss Claim will receive its share of the Crypto Loss Claim Pool according to the Crypto Loss Claim Procedures.  Except as provided for herein or in any order of the Bankruptcy Court, holders of Crypto Loss Claims must file and serve on the Wind Down Trust Proofs of Claim consistent with the procedures to be specified in the motion seeking to establish a Crypto Loss Claims Bar Date or be forever barred, estopped, and enjoined from asserting such Claims against the Wind Down Trust or their assets or properties.

(iii)      *Voting*:  Class 5 is Impaired, and the holders of Crypto Loss Claims are entitled to vote to accept or reject the Plan.

f)      **SEC Claim (6)**

(i)      *Classification*:  Class 6 consists of the SEC Claim against the Debtors.

(ii)      *Treatment*:  By consent of the SEC, pursuant to the SEC Settlement, the SEC Claim shall be treated as an Allowed general unsecured claim.  Any distribution made to holders of Allowed Class 4 Claims and Allowed Class 5 Claims shall be deemed to satisfy the SEC Claim in the aggregate amount of such Allowed Class 4 Claims and Allowed Class 5 Claims.  For the avoidance of doubt, (i) there shall be no distributions on the SEC Claim unless Allowed Claims in Class 4 and Class 5 are satisfied in full, and (ii) if the Allowed Claims in Class 4 and Class 5 are satisfied in full under the Plan, distributions shall be made on account of any remaining unsatisfied portion of the SEC Claim until paid in full before any distribution is made to holders of 510(c) Subordinated Claims or holders of TFL Equity Interests.

(iii)      *Voting*:  Class 6 is Impaired, and the holder of the SEC Claim is entitled to vote to accept or reject the Plan.

g)      **Intercompany Claims (Class 7)**

(i)      *Classification*:  Class 7 consists of Intercompany Claims against the Debtor.

(ii)      *Treatment*:  On or after the Effective Date, all Intercompany Claims will either be reinstated or cancelled and released at the option of the Debtor or otherwise treated as determined

by the Plan Administrator; *provided* that no such distributions shall be made on account of such Intercompany Claims on the Effective Date.

(iii)    *Voting*:  Class 7 is Impaired, and the holders of Intercompany Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, holders of Intercompany Claims are not entitled to vote to accept or reject the plan, and the votes of such holders will not be solicited with respect to such Intercompany Claims.

h)    ***Intercompany Interests (Class 8)***

(i)    *Classification*:  Class 8 consists of Intercompany Interests in the Debtors.

(ii)    *Treatment*:  On the Effective Date, Intercompany Interests shall receive no recovery or distribution and be reinstated solely to maintain the Debtors' corporate structure, as necessary.

(iii)    *Voting*:  Allowed Intercompany Interests are either Unimpaired, in which case the holders of such Intercompany Interests conclusively are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or Impaired, in which case the holders of such Intercompany Interests conclusively are presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, holders of Allowed Intercompany Interests are not entitled to vote to accept or reject the plan, and the votes of such holders will not be solicited with respect to such Allowed Intercompany Interests.

i)    ***510(c) Subordinated Claims (Class 9).***

(i)    *Classification*: Class 9 consists of 510(c) Subordinated Claims.

(ii)    *Treatment*: Class 9 510(c) Subordinated Claims are subordinated pursuant to the plan and section 510(c) of the Bankruptcy Code.  510(c) Subordinated Claims shall be deemed expunged, released, and extinguished without further action by or order of the Bankruptcy Court, and shall be of no further force or effect.

(iii)    Voting:  Class 9 is Impaired, and the holders of TFL Equity Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, holders of 510(c) Subordinated Claims are not entitled to vote to accept or reject the plan, and the votes of such holders will not be solicited with respect to such 510(c) Subordinated Claims.

j)    ***TFL Equity Interests (Class 10).***

(i)    *Classification*: Class 10 consists of TFL Equity Interests.

(ii)    *Treatment*:  On the Effective Date, the Debtors shall cause TFL to issue the TFL Additional Stock in favor of the Wind Down Trust, pursuant to Section 5.5(c) of this Plan, solely for the purposes of facilitating the orderly administration of the Wind Down and dissolution of the Debtors.  Holders of TFL Equity Interest shall retain their TFL Stock, subject to dilution by the issuance of the TFL Additional Stock in favor of the Wind Down Trust, pursuant to Section 5.5(c) of this Plan.  Holders of TFL Equity Interests are not expected to receive distributions under the Plan.

(iii)    *Voting*:  Class 10 is Impaired, and the holders of TFL Equity Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

Therefore, holders of TFL Equity Interests are not entitled to vote to accept or reject the plan, and the votes of such holders will not be solicited with respect to such TFL Equity Interests.

E.   **Means for Implementation**

a)   ***Limited Substantive Consolidation of the Debtors***

The Plan shall serve as a motion by the Debtors seeking entry of a Bankruptcy Court order deeming the substantive consolidation of the Debtors' Estates into a single Estate for certain limited purposes relating to the Plan, including voting, Confirmation, and Distribution.   As a result of the limited substantive consolidation of the Estates, (a) each Class of Claims and Interests shall be treated as against a single consolidated Estate without regard to the separate legal existence of the Debtors, (b) as set forth in Section 4.7 of the Plan, no Distributions under the Plan shall be made on account of Intercompany Claims, and (c) for purposes of determining the availability of the right of setoff under section 553 of the Bankruptcy Code, the Debtors shall be treated as one consolidated entity so that, subject to the other provisions of section 553, debts due to one Debtor may be set off against the debts of the other Debtor.   The limited substantive consolidation of the Debtors under the Plan shall not affect (i) the legal and organizational structure of the Debtors, including for corporate, tax or any other purpose, (ii) the ability of the Wind Down Trust and the Wind Down Trustee, as directed by the Plan Administrator, to subordinate or otherwise challenge Claims on an entity-by-entity basis, (iii) any Causes of Action or defenses thereto, which in each case shall survive entry of the Confirmation Order as if there had been no substantive consolidation of the Estates, and (iv) payments from any insurance policies or the proceeds thereof.

b)   ***Sources of Consideration for Plan Distribution***

The Debtors and the Wind Down Trustee, as applicable, shall fund Distributions under the Plan as set forth herein with the (a) Effective Date Available Cash, (b) Post-Effective Date Cash, (c) the Senior Claim Pool, (d) the SEC Settlement Fund, and (e) the Surplus Reserved Cash.

c)   ***Implementation***

(i)   Prior to the Effective Date, the Debtors shall use commercially reasonable efforts to sell its interest in Proximity, all related assets of Proximity, and the Venture Investments.

(ii)   On the Effective Date, the Wind Down Trust shall be established

(iii)   On the Effective Date, the Senior Claim Pool shall be established and funded pursuant to the Plan.

(iv)   On the Effective Date, the SEC Settlement Fund shall be established and funded.

(v)   On the Effective Date, the GUC Pool shall be established and funded pursuant to the Plan.

(vi)   Prior to the Effective Date, the Fee Escrow Account shall be established and funded with an amount of Cash sufficient to pay Fee Claims, based upon estimates provided by the Professionals, as set forth in Section 2.4 of the Plan.

(vii)   On the Effective Date, the Wind Down Reserve and the Wind Down Trust shall be funded in accordance with the Wind Down Budget for the Wind Down process and be funded with

the Wind Down Amount.  An initial Wind Down Budget shall be filed with the Plan Supplement and may be amended, modified, or supplemented from time to time by the Plan Administrator.

(viii)    On the Effective Date, any remaining assets and any Causes of Action of the Debtors' Estates shall transfer to the Wind Down Trust automatically and without further action of the Bankruptcy Court.

(ix)    On or before the Effective Date, TFL shall transfer all remaining non-Terra Crypto, if any, held in private wallets or accounts controlled or owned by the Debtors to a third party custodian wallet or account held in the name of the Wind Down Trustee.

(x)    Up to the Private Wallet Bar Date, the Debtors shall provide Private Wallet Crypto Holders access to such Private Wallet Crypto Holders' wallets or accounts for the sole purpose of allowing such Private Wallet Crypto Holder to withdraw Tokens held in such wallets or accounts, which, for the avoidance of doubt, shall be deemed property of the Estates, to the extent such Tokens have not been withdrawn by the applicable Private Wallet Crypto Holder by the Private Wallet Bar Date and are accessible to the Debtors after the Private Wallet Bar Date.

(xi)    Up to the Bridge Wallet Bar Date, the Debtors shall provide Bridge Wallet Crypto Holders ability to redeem the Terra Crypto held in the Bridge Wallets; *provided* that, to the extent such Terra Crypto have not been redeemed by the Bridge Wallet Bar Date and are accessible to the Debtors or the Wind Down Trust after the Bridge Wallet Bar Date, the Wind Down Trust shall burn all such Terra Crypto remaining in the Bridge Wallets;

(xii)    At the conclusion of the Wind Down, any residual amounts remaining in the Wind Down Reserve shall be transferred to the GUC Pool for final distribution.  Upon the General Unsecured Claims Payment Completion, any residual amounts remaining in the Wind Down Reserve shall be transferred to the Crypto Loss Claims Pool.

(xiii)    In accordance with Section 5.4 of the Plan, the Plan Administrator may allocate Surplus Reserved Cash pursuant to the Waterfall.

(xiv)    In accordance with Section 5.4 of the Plan, the Plan Administrator may allocate Surplus Senior Claim Pool Cash pursuant to the Waterfall.

### d)    *Plan Administrator*

(a)    *Appointment*.  The Plan Administrator's retention shall commence on the Effective Date and shall continue until: (i) the Bankruptcy Court enters an order closing the Chapter 11 Cases, unless otherwise set forth in such order; (ii) the Bankruptcy Court enters an order removing the Plan Administrator for cause; or (iii) the Plan Administrator resigns, dies, dissolves, is incapacitated, or is removed in accordance with the Wind Down Trust Agreement, and a successor Plan Administrator is appointed in accordance with the Wind Down Trust Agreement.

(b)    *Authority*.  Subject to Section 5.4(b) and (c) of the Plan, and in accordance with the Wind Down Trust Agreement, the Plan Administrator shall have the authority and right on behalf of the Debtor, and the directors of TFL shall be deemed to have delegated their authority, rights, powers and discretions under the constitution, Singapore Companies Act of 1967 or any applicable law, without the need for Bankruptcy Court approval (unless otherwise indicated), in furtherance of the Plan Administrator's fiduciary duties to the creditor beneficiaries of the Wind Down Trust (until all Allowed Claims have been satisfied in full in accordance with the Bankruptcy Code and the Plan), and subject to

any consent or consultation rights of the Wind Down Trustee and/or the Advisory Board, as set forth herein and in the Wind Down Trust Agreement, to carry out and implement all provisions of the Plan, including, without limitation, to do any of the following or, where applicable to procure or direct that the Wind Down Trustee does so:

(i)    subject to <u>Section 7</u> of the Plan, except to the extent Claims have been previously Allowed, control and effectuate the Claims reconciliation process in accordance with the terms of the Plan, including to Allow, object to, or seek to subordinate, compromise, or settle any and all Claims against the Debtors, including indemnification claims;

(ii)    direct the Wind Down Trustee to calculate and make Distributions in accordance with the Plan;

(iii)    withhold from the amount distributable to any person the maximum amount needed to pay any tax or other charge that the Plan Administrator has determined may be required to be withheld from such Distribution under the income tax or other laws of the United States or of any state or political subdivision thereof;

(iv)    exercise its reasonable business judgment to direct and control the Wind Down under the Plan and in accordance with applicable law as necessary to maximize Distributions to holders of Allowed Claims, including receiving, maintaining, conserving, supervising, prosecuting, collecting, settling, managing, investing, protecting, and where appropriate, causing the Wind Down Trust to abandon the Wind Down assets;

(v)    marshal, market for sale, and wind down any of the remaining assets of the Wind Down Trust;

(vi)    prepare, file, and prosecute any necessary filings or pleadings with the Bankruptcy Court to carry out the duties of the Plan Administrator as described herein;

(vii)    investigate any assets of the Wind Down Trust, and any other potential Causes of Action and Contributed Third-Party Claims;

(viii)    offer and provide incentives to Contributing Claimants, including an increase of up to 10% of Allowed Claims of Contributing Claimants;

(ix)    other than any Causes of Action released by the Debtor pursuant to the Plan or otherwise, prosecute all Causes of Action and Contributed Third-Party Claims on behalf of the Debtor, elect not to pursue any Causes of Action and Contributed Third-Party Claims, and determine whether and when to compromise, settle, abandon, dismiss, or otherwise dispose of any such Causes of Action and Contributed Third-Party Claims, as the Plan Administrator may determine is in the best interests of the Debtors and their Estates;

(x)    acquire, including, without limitation, through purchase, settlement, or contribution, litigation and other claims, including, without limitation, Contributed Third Party Claims, related to the Debtors, and prosecuting such claims;

(xi)    develop and use creditor communication procedures, including a creditor portal (if necessary);

(xii)    review and compel turnover of the property of the Debtors or the Wind Down Trust;

(xiii)    pursuant to any investigation related to a Cause of Action, seek the examination of any person pursuant to Federal Rule of Bankruptcy Procedure 2004;

(xiv)    retain professionals, disbursing agents, and other agents, independent contractors, and third parties pursuant to the Wind Down Trust Agreement to assist in performing its duties and the duties of the Wind Down Trustee under the Plan;

(xv)    maintain the books and records and accounts of the Debtors and the Wind Down Trust;

(xvi)    incur and pay reasonable and necessary expenses in connection with the performance of duties under the Plan, including the reasonable fees and expenses of professionals retained by the Wind Down Trustee or the Plan Administrator;

(xvii)    protect and enforce the rights to the assets of the Wind Down Trust (including any Causes of Action and Contributed Third-Party Claims) vested in the Wind Down Trust and the Plan Administrator by any method deemed appropriate, including, without limitation, by judicial proceedings or otherwise;

(xviii)    open and maintain bank accounts on behalf of or in the name of the Wind Down Trust;

(xix)    purchase and carry all insurance policies that the Plan Administrator deems reasonably necessary or advisable to pay all associated insurance premiums and costs;

(xx)    take such actions as described in Section 5.4(c) of the Plan;

(xxi)    pay Statutory Fees in accordance with Section 12.1 of the Plan;

(xxii)    amend, modify, or supplement the Wind Down Budget or the Wind Down Trust Agreement;

(xxiii)    to the extent not already determined and implemented, determine the procedure by which a holder of a Claim or Interest may contribute its Contributed Third-party Claims to the Wind Down Trust;

(xxiv)    determine, from time to time, whether the amounts available in the Wind Down Reserve are in excess of the amount necessary to satisfy the purpose for which such reserve was established and amend, modify, or supplement the Wind Down Budget accordingly.  If the Plan Administrator determines that a surplus exists in the Wind Down Reserve as of the date of such determination, the Plan Administrator may allocate such Surplus Reserved Cash pursuant to the Waterfall; *provided*, that the amount reserved on account of the D&O Indemnification Obligations shall diminish only as payments are made on account of the D&O Indemnification Obligations;

(xxv)    determine, from time to time, whether the amounts available in the Senior Claim Pool are in excess of the amount necessary to pay holders of Allowed Senior Claims,

plus any such Disputed Claims until final Allowance or Disallowance.  If the Plan Administrator determines that a surplus exists in the Senior Claim Pool as of the date of such determination, the Wind Down Trustee may allocate the Surplus Senior Claim Pool Cash pursuant to the Waterfall;

(xxvi)   enter into any agreement or execute any document or instrument required by or consistent with the Plan, the Confirmation Order, the Wind Down Trust Agreement, and to perform all obligations thereunder;

(xxvii) perform other duties and functions that are consistent with the implementation of the Plan; and

(xxviii) close the Chapter 11 Cases.

For the avoidance of doubt, until all Allowed Claims have been satisfied in full in accordance with the Bankruptcy Code and the Plan, the Plan Administrator shall owe no fiduciary duties to TFL Existing Equity Interests on account of the TFL Additional Shares maintained by the Wind Down Trustee, and shall instead owe fiduciary duties to creditor beneficiaries of the Wind Down Trust.

(c)      *Tax Power for Debtors.*

The Wind Down Trustee, in its capacity as the trustee of the Wind Down Trust and as directed by the Plan Administrator, shall have full and exclusive authority and responsibility with respect to all taxes of the Debtors (including, without limitation, as the common parent or other agent of any consolidated, combined, or unitary tax group of which the Debtors were the agent), to the same extent as if the Wind Down Trustee were the debtor-in-possession.  Without limiting the foregoing, each of the Debtors shall execute, on or prior to the Effective Date, a power of attorney authorizing the Plan Administrator and/or the Wind Down Trustee, in its capacity as the trustee of the Wind Down Trust, to correspond with any taxing authority on behalf of such Debtor and to sign, collect, negotiate, settle, and administer tax payments and tax returns.  In furtherance of the foregoing:

(i)      Following the Effective Date, the Plan Administrator shall (a) prepare and file (or cause to be prepared and filed), on behalf of the Debtors, all tax returns, informational returns, reports, statements, returns or disclosures relating to the Debtor that are required to be filed, by any Governmental Unit or applicable law or that the Plan Administrator otherwise deems appropriate, including the filing of amended tax returns or requests for refunds for all taxable periods; (b) request, if necessary, an expedited determination of any unpaid tax liability of each Debtor or its Estate under Bankruptcy Code section 505(b) for all taxable periods of such Debtor ending after the Petition Date through the liquidation of such Debtor as determined under applicable tax laws; and (c) represent the interest and account of each Debtor or its Estate before any taxing authority in all matters including, without limitation, any action, suit, proceeding or audit.

(ii)      The Wind Down Trust shall be entitled to all tax refunds of the Debtors, and the Wind Down Trust shall bear responsibility for all tax liabilities of the Debtors for all taxable years, to the extent not satisfied or otherwise released by the Plan.  For the avoidance of doubt, the Wind Down Trustee and the Plan Administrator shall not be personally liable for any tax liabilities of the Debtors.

(d)      *Boards of Directors and Officers*.

Upon the Effective Date, (i) the officers and directors of the Debtors existing prior to the Effective Date shall be relieved of any and all duties with the respect to the Debtors and shall be deemed to have resigned

without the requirement of having to take any further action and (ii) the Plan Administrator shall be the sole officer, director, or manager, as applicable, of each of the Debtors without the requirement of having to take any further action, *provided, that*, TFL shall have one director who is ordinarily resident in Singapore, and who shall also be a member of the Advisory Board, for the purpose of ensuring compliance with any corporate governance and reporting requirements of TFL under Singapore law including, among other things, the holding of an annual general meeting and laying of financial statements at the annual general meeting (section 201 of the Singapore Companies Act 1967), the lodgment of annual returns (section 197 of the Singapore Companies Act 1967), any tax obligations of TFL under the Singapore Income Tax Act 1947 and the maintenance of registers of the company and lodging of documents as required under Singapore law. The Plan Administrator shall cooperate with and assist TFL's Singapore-resident director to ensure compliance with the aforementioned Singapore law requirements.

(e)     *Wind Down*.   After the Effective Date, pursuant to the Plan, the Wind Down Trustee, and the Plan Administrator shall effectuate the Wind Down according to the Wind Down Budget without any further approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, *provided, that*, the Wind Down Trustee and the Plan Administrator shall not effectuate the Wind Down in a manner inconsistent with any express requirements of the Wind Down Trust Agreement, including with respect to any consent or consultation rights of the Advisory Board.  The Wind Down (as determined for federal income tax purposes) shall occur in an expeditious but orderly manner after the Effective Date.

(f)     *Indemnification*.   The Wind Down Trust shall indemnify and hold harmless the Wind Down Trustee, the Plan Administrator, and the Advisory Board, each solely in its capacity as such, for any losses incurred in such capacity, except to the extent such losses were the result of the such party's bad faith, gross negligence, willful misconduct or criminal conduct.

(g)     *Dissolution*.   After the Effective Date, the Wind Down Trustee and the Plan Administrator shall, subject to applicable non-bankruptcy law and consistent with the implementation of the Plan, merge, dissolve, liquidate, or take such other similar action with respect to each Debtor (including the cancellation of all Interests in each Estate) and complete the winding up of such Estate as expeditiously as practicable without the necessity for any other or further actions to be taken by or on behalf of such Estate or its shareholders or members, as applicable, or any payments to be made in connection therewith subject to the filing of a certificate of dissolution with the appropriate Governmental Unit.  The Wind Down Trustee may, to the extent required by applicable non-bankruptcy law, maintain a Debtor as a corporate entity in good standing until such time as such Debtor is dissolved or merged out of existence in accordance with the Plan.  After (i) all Disputed Claims have been resolved, (ii) all Assets have been liquidated, (iii) all distributions from the Wind Down Trust required to be made by the Wind Down Trustee under the Plan and the Wind Down Trust Agreement have been made, and (iv) all necessary obligations with regard to Singaporean and/or British Virgin Islands corporate and tax laws have been fulfilled, the Wind Down Trustee shall expeditiously dissolve each Debtor, which shall be no later than December 31, 2025; *provided*, that such date may be extended by order of the Bankruptcy Court.

e)     **Wind Down Trust**

(a)     *Establishment of Wind Down Trust.*  On or before the Effective Date, the Debtors, the Plan Administrator, and/or the Wind Down Trustee shall take all necessary steps to establish the Wind Down Trust for the benefit of holders of Claims against the Debtors, including executing the Wind Down Trust Agreement and the Wind Down Transfer Agreement, and all Assets held by the Debtors shall transfer to, and vest exclusively in, the Wind Down Trust.  With respect to actions taken in this Section 5.5, the Wind Down Trustee is acting solely in its capacity as trustee of the Wind Down Trust.

(b)     *Wind Down Trust Agreement*.    For the avoidance of doubt, the establishment, obligations, and governance of the Wind Down Trust, the rights, obligations, and duties of the Wind Down Trustee and the Plan Administrator, and the rights of creditors, including consent and consultation rights, shall be set forth fully in the Wind Down Trust Agreement, and the consent and consultation rights set forth in Section 5.4 of the Plan are cumulative to those set forth in the Wind Down Trust Agreement.  In the event of a conflict between the consent rights set forth in this Section 5.4 of the Plan on the one hand, and the Wind Down Trust Agreement or any other document on the other, the document containing the broadest consent or consultation rights shall control.  For the further avoidance of doubt, and notwithstanding anything to the contrary herein, any consent or consultation rights set forth in the Wind Down Trust Agreement shall not limit, dilute, or otherwise impair those set forth in this Section 5.4 of the Plan.

(c)     *Issuance of TFL Additional Stock to Wind Down Trust*.  On the Effective Date, after the transfer of the Estates' Assets to the Wind Down Trust pursuant to Section 5.5(e) of this Plan, the Debtors and/or the Wind Down Trustee shall cause TFL to issue the TFL Additional Stock to the Wind Down Trust.  Upon issuance of the TFL Stock to the Wind Down Trust, the Wind Down Trust shall be the majority shareholder of TFL, from and after the Effective Date.  The holders of TFL Equity Interests hereby agree to, or shall be deemed to, waive all of their pre-emption rights under the TFL constitution in respect of the issuance of the TFL Additional Stock to the Wind Down Trust.  The holders of TFL Equity Interests hereby appoint, or shall be deemed to appoint, the Wind Down Trustee as their true and lawful attorney and agent and irrevocably authorize, direct, instruct and empower the Wind Down Trustee to enter into, execute, and deliver (whether as a deed or otherwise) any resolution, filing, or document which is necessary or appropriate to effect the issuance of the TFL Additional Stock.

(d)     *Purpose of Wind Down Trust*.  The Wind Down Trust shall be established for the purposes described in this Plan (including, without limitation, to allow the Wind Down Trustee and the Plan Administrator to carry out the acts described in Sections 5.4(b) and (c) of this Plan) and any others more fully described in the Wind Down Trust Agreement.  The Wind Down Trust shall retain all rights to commence and pursue all Causes of Action that are not released under the Plan.  The Wind Down Trust shall have no objective to continue or engage in the conduct of a trade or business.  The Plan Administrator shall administer the Wind Down, subject to the terms of the Wind Down Trust Agreement, this Plan, and the Confirmation Order.  The Wind Down Trust shall be administered and implemented by the Plan Administrator and, where applicable, the Wind Down Trustee with the oversight of the Advisory Board, as provided in the Plan and the Wind Down Trust Agreement.

(e)     *Transfer of Estate Assets to Wind Down Trust*.  On the Effective Date, the Estate Assets will be transferred to and vest in the Wind Down Trust in accordance with the term set forth herein and the Wind Down Trust Agreement; provided, however, that to the extent certain Assets, because of their nature or because such Assets will accrue or become transferable subsequent to the Effective Date, and cannot be transferred to, vested in, and assumed by the Wind Down Trust on such date, such Assets shall be automatically, and without further act or deed, transferred to, vested  in, or assumed by the Wind Down Trust as soon as reasonably practicable after such date.  Notwithstanding anything in this Plan to the contrary, no monies, choses in action, and/or assets comprising the Estate Assets that have been transferred, granted, assigned, or otherwise delivered to the Wind Down Trust shall be used for any purpose other than in accordance with the Plan and the Wind Down Trust Agreement.  Such transfer of the Estate Assets shall be free and clear of all Claims, Interests, Liens, other encumbrances, and liabilities of any kind.

(f)     *Funding of the Wind Down Reserve, SEC Settlement Fund, Senior Claim Pool, GUC Pool, and Crypto Loss Claim Pool*.  On the Effective Date, the Debtors shall establish and fund the Wind Down Reserve with the Wind Down Amount and transfer the Wind Down Reserve to the Wind Down Trust to satisfy the Wind Down Budget.  On or prior to the Effective Date, the Debtors shall establish

and fund the SEC Settlement Fund.  On the Effective Date, the Debtors shall establish and fund each of the Senior Claim Pool, GUC Pool, and Crypto Loss Claim Pool.  The Plan Administrator may, from time to time, amend, modify, or supplement the Wind Down Budget and either fund any deficit in the Wind Down Reserve with Surplus Senior Claim Pool Cash or release any Surplus Reserved Cash from the Wind Down Reserve, in each case in accordance with the Waterfall.  A separate account will be established by the Wind Down Trustee for the Wind Down Reserve.

(g)    *Wind Down Expenses*.  The Wind Down Trustee, the Plan Administrator, and any other Professionals engaged by the Wind Down Trust shall be entitled to compensation and reimbursement of costs, expenses, and fees, as provided in the Wind Down Trust Agreement and the Wind Down Budget, which may only be paid pursuant to the terms of this Plan.  The Wind Down Trust shall pay for expenses incurred, as provided in the Wind Down Budget.

(h)    *Administrative Obligations and Assumption of Liabilities.*  In furtherance of the purposes of the Wind Down Trust, and subject to the Wind Down Trust Agreement, the Wind Down Trust shall expressly (i) assume all responsibility and liability for (A) all Claims against the Debtors and (B) operating expenses of the Wind Down Trust and (ii) undertake to administer and pay the foregoing with Effective Date Available Cash, Post-Effective Date Cash, and funds in the Fee Escrow Account, Senior Claim Pool, and Wind Down Reserve, each in accordance with the Plan.  The Wind Down Trust shall have all defenses, cross-claims, offsets, and recoupments regarding Claims that the Debtors have, or would have had, under applicable law; provided, however, that no such claims, defenses, or rights may be asserted against the Debtors.

(i)    *Advisory Board*.  The Advisory Board will be compromised of [#] (#) members appointed to hold the rights and powers in respect of the Wind Down Trust as set out in the Wind Down Trust Agreement, such rights and powers relating to the supervision of the Wind Down Trust and enforcement of the terms of the Wind Down Trust Agreement.  The members shall be selected by the Creditors' Committee in consultation with the Debtors and not objectionable to the SEC.  The composition of the Advisory Board will be set forth in the Plan Supplement.  The Advisory Board will be authorized to retain corporate counsel on such terms as the Advisory Board deems appropriate without Bankruptcy Court approval, subject to the provisions of the Wind Down Trust Agreement.

(j)    *Periodic Reporting*.  The Plan Administrator shall provide periodic reporting to the Wind Down Trustee and the Advisory Board (which shall be filed with the Bankruptcy Court in summary form) of (i) the determination and any re-determination, as applicable, of the total amounts allocated to the Wind Down Reserve and Senior Claim Pool Reserve, (ii) the status of any ongoing sales processes or Causes of Action, and (iii) the status of the claims reconciliation process, as set forth in the Wind Down Trust Agreement.

(k)    *Institution and Maintenance of Legal and Other Proceedings*.  As of the date upon which the Wind Down Trust is established, the Wind Down Trust shall be empowered to initiate, prosecute, defend, and resolve all legal actions and other proceedings related to any asset, liability, or responsibility of the Wind Down Trust.  The Wind Down Trust shall be empowered to initiate, prosecute, defend, and resolve all such actions in the name of the Debtors if deemed necessary or appropriate by the Plan Administrator.  The Wind Down Trust shall be responsible for the payment of all damages, awards, judgments, settlements, expenses, costs, fees, and other charges incurred subsequent to the date up on which the Wind Down Trust is established arising from, or associated with, any legal action or other proceeding brought pursuant to this Section of the Plan.  For the avoidance of doubt, the Wind Down Trust, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and applicable state corporate law, is appointed as the successor-in-interest to, and representative of, the Debtors and their Estates for the retention, enforcement, settlement, or adjustment of all Claims.

(l)    *Dissolution*.  The Wind Down Trust shall be dissolved and the Wind Down Trustee, the Plan Administrator, and the Advisory Board shall be discharged from their duties with respect to the Wind Down Trust upon completion of their duties as set forth in the Plan and the Wind Down Trust Agreement which, for the avoidance of doubt, shall be no earlier than the date on which (i) all Disputed Claims have been resolved, (ii) all Assets have been liquidated, and (iii) all distributions from the Wind Down Trust required to be made by the Wind Down Trustee under the Plan and the Wind Down Trust Agreement have been made, unless dissolution on an earlier date is authorized pursuant to a Final Order of the Bankruptcy Court.

(m)    *Expedited Determination of Taxes*.  The Wind Down Trustee may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all tax returns filed by or on behalf of the Wind Down Trust through the date upon which the Wind Down Trust is terminated, and for all tax returns filed by or on behalf of the Debtors for al taxable period of the Debtors.

(n)    *Exculpation of Advisory Board*.  The Advisor Board shall be exculpated (subject to exceptions for willful misconduct, bad faith, gross negligence, or fraud) to the fullest extent allowable by applicable law with respect to the liquidating of the Estates' Assets and administration of the Wind Down Trust.

(o)    *Transferability of Distribution Rights*.  Any beneficial interest in the Wind Down Trust (if any) or any right to receive a Distribution from the Wind Down Trust shall not be evidenced by any certificate, security, receipt, or in any other form or manner whatsoever, except as maintained on the books and records of the Wind Down Trust by the Wind Down Trustee.  Further, any beneficial interest in the Wind Down Trust (if any) or any right to receive a Distribution from the Wind Down Trust shall be nontransferable and non-assignable except by will, intestate, succession, or operation of law.  Any beneficial interest in the Wind Down Trust (if any) or any right to receive a Distribution from the Wind Down Trust shall not constitute Securities and shall not be registered pursuant to the Securities Act of 1933, as amended.  If it is determined that such beneficial interests (if any) or rights constitute Securities, the exemption provisions of section 1145(a)(1) of the Bankruptcy Code would be satisfied and such securities would be exempt from registration.

### f)    *Vesting of Liabilities in the Wind Down Trust*

Except as provided in this Plan, the transfer to, vesting in, and assumption by the Wind Down Trust of the Estates Assets as contemplated by this Plan shall, as of the date of such transfer and assumption, bar recovery or any action against the Debtors and the Debtors' Estates for, or with respect to, all Claims.  The Trusts shall, as of the date upon which the Wind Down Trust is established, assume sole and exclusive responsibility and liability for all Claims against the Debtors, and such Claims shall be liquidated, resolved, or paid by the Wind Down Trust.

### g)    *Administration of Crypto Loss Claims*

The General Bar Date Order did not establish any bar date with respect to Crypto Loss Claims.  Pursuant to the Plan, the Crypto Loss Claim Bar Date for Claim allowance and distribution purposes will be established by the Plan Administrator upon motion and notice, *provided that* such bar date shall be no more than one hundred twenty (120) calendar days after the Effective Date.  In particular, the Plan Administrator, consistent with the Wind Down Trust Agreement, will file the Crypto Loss Claim Procedures Motion, which, once approved by the Bankruptcy Court after notice and hearing, will be binding on all creditors.

The Crypto Loss Claim Procedures Motion will provide the process and procedures that the Plan Administrator will use to determine whether a Crypto Loss Claim should be Allowed or Disallowed and,

to the extent Allowed, the value of such Claim. Moreover, the Crypto Loss Claim Procedures will explain (i) how creditors can submit a Crypto Loss Claim; (ii) the deadline to submit a Crypto Loss Claim; and (iii) what information creditors submitting Crypto Loss Claims must include with their submission. The Plan Administrator will also include a modified Proof of Claim form to be submitted by creditors asserting Crypto Loss Claims.

The Plan Administrator will publish notice of the Crypto Loss Claim Procedures and the Crypto Loss Claim Bar Date on CoinDesk, as well as any other related publications, exchanges, or through distribution lists (as necessary) in the Plan Administrator's discretion. Moreover, any creditors that have submitted Claims in connection with the Preliminary Crypto Loss Claim Bar Date Order will receive notice of the Crypto Loss Claim Procedures via email (if an email was provided) or regular mail (if an email was not provided). The Crypto Loss Claim Procedures will also include a notice for creditors to "opt in" to being a Contributing Claimant.

### h)   *Corporate Action*

Upon the Effective Date, by virtue of entry of the Confirmation Order, all actions contemplated by the Plan (including any action to be undertaken by the Wind Down Trustee, including by or at the direction of the Plan Administrator) shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by holders of Claims or Interests, the Debtors, or any other Entity or Person. All matters provided for in the Plan involving the corporate structure of the Debtors, and any corporate action required by the Debtors in connection therewith, shall be deemed to have occurred and shall be in effect as of the Effective Date, without any requirement of further action by the Debtors or the Estates.

### i)   *Withholding and Reporting Requirements*

(i)   *Withholding Rights*. In connection with the Plan, any party issuing any instrument or making any distribution described in the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements. Any amounts withheld pursuant to the preceding sentence shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan. Notwithstanding the foregoing, each holder of an Allowed Claim or any other Person that receives a distribution pursuant to the Plan shall have responsibility for any taxes imposed by any Governmental Unit, including, without limitation, income, withholding, and other taxes, on account of such distribution. Any party issuing any instrument or making any distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations. Additionally, in the case of a non-Cash distribution that is subject to withholding, the distributing party has the right, but not the obligation, to withhold an appropriate portion of such distributed property and either (i) sell such withheld property to generate Cash necessary to pay over the withholding tax (or reimburse the distributing party for any advance payment of the withholding tax), or (ii) pay the withholding tax using its own funds and retain such withheld property.

(ii)   *Forms*. Any party entitled to receive any property as an issuance or distribution under the Plan shall, upon request, deliver to the Plan Administrator, the Wind Down Trustee, or such other Person designated by the Plan Administrator or the Wind Down Trustee (which entity shall subsequently deliver to the Wind Down Trustee any applicable IRS Form W-8 or Form W-9 received) an appropriate Form W-9 or Form W-8, as applicable, unless such Person is exempt from information reporting under the Tax Code and provides to the Plan Administrator notice and evidence of such exemption. If such request is made by the Plan Administrator, the Wind Down Trust, or such other Person designated by the

Plan Administrator or the Wind Down Trust and the holder fails to comply within three hundred sixty-five (365) calendar days after the request is made, the amount of such distribution shall irrevocably revert to the Wind Down Trust and any Claim in respect of such distribution shall be forever barred from assertion against any Debtor, the Wind Down Trust and their respective property.

### j)    *Exemption From Certain Transfer Taxes*

To the maximum extent provided by section 1146(a) of the Bankruptcy Code: (i) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors; or (ii) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, in each case to the extent permitted by applicable bankruptcy law, and the appropriate state or local government officials or agents shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### k)    *Effectuating Documents; Further Transactions*

(i)    On or as soon as practicable after the Effective Date, the Plan Administrator and/or the Wind Down Trustee, as applicable, shall take such actions as may be or become necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, subject to any consent or consultation rights of the Advisory Board, as set forth in the Wind Down Trust Agreement, including (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, financing, conversion, disposition, transfer, dissolution, transition services, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may determine; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any Asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (iv) the issuance of securities, all of which shall be authorized and approved in all respects, in each case, without further action being required under applicable law, regulation, order, or rule; (v) the execution, delivery, or filing of contracts, instruments, releases, and other agreements to effectuate and implement the Plan without the need for any approvals, authorizations, actions, or consents; (vi) making any required lodgements and filing with the Accounting and Corporate Regulatory Authority to effect the appropriate changes to the electronic register of members to give effect to Section 4.10 of the Plan; and (vii) all other actions that the applicable Entities determine to be necessary or appropriate.

(ii)    Each officer, manager, or member of the board of directors of the Debtors is (and each officer, manager, or member of the board of directors of the Plan Administrator and/or the Wind Down Trustee, if applicable, shall be) authorized and directed to issue, execute, deliver, file, or record such contracts, securities, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of, and on behalf of, the Wind Down Trust, all of which shall be authorized and approved in all respects, in each case, without the need for any approvals, authorization, consents, or any further action required under applicable law,

regulation, order, or rule (including, without limitation, any action by the stockholders or directors or managers of the Debtors, or the Wind Down Trust) except for those expressly required pursuant to the Plan.

(iii)     All matters provided for herein involving the corporate structure of the Debtor or the Wind Down Trust, to the extent applicable, or any corporate or related action required by the Debtors or the Wind Down Trust in connection herewith shall be deemed to have occurred and shall be in effect, without any requirement of further action by the stockholders, members, or directors or managers of the Debtors and with like effect as though such action had been taken unanimously by the stockholders, members, directors, managers, or officers, as applicable, of the Debtors or the Wind Down Trust.

### l)        Preservation of Rights of Action

Other than Causes of Action against an Entity that are waived, relinquished, exculpated, released, compromised, transferred, or settled pursuant to the Plan, the Confirmation Order, or by another Bankruptcy Court order, the Debtors reserve any and all Causes of Action.  On and after the Effective Date, the Wind Down Trustee, as directed by the Plan Administrator, may pursue such Causes of Action on behalf of the Wind Down Trust.  No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtor or the Wind Down Trustee, as applicable will not pursue any and all available Causes of Action against them.  Except with respect to findings in the Confirmation order relating to Section 10.9 of the Plan no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or the Effective Date.  Prior to the Effective Date, the Debtor, and on and after the Effective Date, the Wind Down Trustee shall retain and shall have, including through its authorized agents or representatives, the exclusive right, authority, and discretion, subject to the Plan, to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing, as the Wind Down Trustee in consultation with the Plan Administrator may determine is in the best interest of the Estates, without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.  Notwithstanding anything contained herein to the contrary, the settlement of any Claims and Causes of Action which are expressly to be settled by Confirmation of the Plan itself shall be resolved only by Confirmation of the Plan itself.

### m)       Certificate of Incorporation and By-Laws.

As of the Effective Date, the certificate of incorporation and by-laws, or other organizational documents, as applicable, of the Debtor shall be amended to the extent necessary to carry out the provisions of the Plan.

### n)        Cancellation of Existing Securities and Agreements

Except for the purpose of evidencing a right to a distribution under the Plan and except as otherwise set forth in the Plan, all notes, instruments, other securities, and other evidence of debt issued, and any rights of any holder in respect thereof shall be deemed cancelled and of no force or effect and the obligations of the Debtor thereunder shall be deemed fully satisfied.

### o)        Subordinated Claims.

The allowance, classification, and treatment of all Allowed Claims and Interests, and the respective distributions and treatments under the Plan, take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination,

section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right for the Wind Down Trustee to seek to re-classify any Allowed Claim or Interest other than the SEC Claim, including indemnification claims, in accordance with any contractual, legal, or equitable subordination relating thereto. Nothing in this Section 5.15 shall abridge in any way the Wind Down Trust's obligations to promptly satisfy the D&O Indemnification Obligations.

### p) *Equitable Subordination Under Bankruptcy Code 510(c).*

The Wind Down Trustee shall have the right to object to any Claim, including indemnification claims, on the basis that such Claim should be equitably subordinated pursuant to section 510(c) and should be classified as a Section 510(c) Subordinated Claim. A Claim shall be deemed a Section 510(c) Subordinated Claim only upon a Final Order of the Bankruptcy Court. Nothing in this Section 5.16 shall abridge in any way the Wind Down Trust's obligations to promptly satisfy the D&O Indemnification Obligations.

### q) *Election to Contribute Third-Party Claims*

The Plan Administrator will investigate whether the Debtors hold Claims against various third parties that had relationships with the Debtors. It may be the case that the Debtors' creditors also hold Claims against the same third parties (or others). Such Claims may have insufficient value for creditors to pursue individually; however, such Claims in the aggregate may have sufficient value to pursue. Accordingly, creditors will have the ability, through the Crypto Loss Claim Procedures, to contribute such claims (the "**Contributed Third-Party Claims**") to the Wind Down Trust. The holders of Claims or Interests that contribute their Contributed Third-Party Claims to the Wind Down Trust (the "**Contributing Claimants**") will not be responsible for the cost of investigation or pursuing the Contributed Third-Party Claims. However, any recoveries on the Contributed Third-Party Claims will be transferred to the Wind Down Trust to be distributed in accordance with the Plan. Thus, all holders of Claims will benefit from recoveries based on Contributed Third-Party Claims regardless of whether such holders opted in to contributing their Contributed Third-Party Claims. The procedure by which a holder of a Claim or Interest may contribute its Contributed Third-Party Claims to the Wind Down Trust shall be determined by the Plan Administrator and will be set forth in the Crypto Loss Claim Procedures. By contributing its Claim or Interest, each Contributing Claimant agrees that it will be deemed, without further action, (i) to have irrevocably contributed its Contributed Third-Party Claims to the Wind Down Trust, and (ii) to have agreed to execute any documents reasonably requested by the Debtors or the Wind Down Trust to memorialize and effectuate such contribution.

### r) *Contribution of Contributed Third-Party Claims*

Upon election, all Contributed Third-Party Claims will be irrevocably contributed to the Wind Down Trust and shall thereafter be assets of the Wind Down Trust for all purposes. No Person may rely on the absence of a specific reference in the Plan, the Disclosure Statement, the Confirmation Order, the Wind Down Trust Agreement, the Plan Supplement, or any other document as any indication that the Wind-Down Trust will or will not pursue any and all available Contributed Third-Party Claims against such Person. The Wind-Down Trust shall have, retain, reserve, and be entitled to assert all Contributed Third-Party Claims fully to the same extent that the Contributing Claimants could have asserted such Claims prior to the Effective Date. For the avoidance of doubt, the Contributed Third-Party Claims shall not include the rights of any of the Contributing Claimants to receive the distributions under the Plan on account of their Claims or Interests.

### s) *Closing of Chapter 11 Cases.*

After an Estate has been fully administered, the Wind Down Trust of the Plan Administrator shall seek authority from the Bankruptcy Court to close the applicable Chapter 11 Case(s) in accordance with the Bankruptcy Code and Bankruptcy Rules.

### t) *Notice of Effective Date.*

As soon as practicable, but not later than three (3) Business Days following the Effective Date, the Debtor shall file a notice of the occurrence of the Effective Date with the Bankruptcy Court.

### u) *Corporate Form*

On the Effective Date, each of the Debtors shall maintain its current corporate form, which may be modified or changed at any time after the Effective Date by the Wind Down Trustee in accordance with the terms of the Plan and applicable law.

### v) *Separability.*

Notwithstanding the combination of the separate plans of liquidation for the Debtors set forth in the Plan for purposes of economy and efficiency, the Plan constitutes a separate chapter 11 plan for each Debtor. Accordingly, if the Bankruptcy Court does not confirm the Plan with respect to one or more Debtors, it may still, subject to the consent of the applicable Debtors, confirm the Plan with respect to any other Debtor that satisfies the confirmation requirements of section 1129 of the Bankruptcy Code.

## F.   **Distributions**

### a) *Distributions Generally*

Except as otherwise provided in the Plan, one or more Disbursing Agents shall make all distributions under the Plan to the appropriate holders of Allowed Claims in accordance with the terms of the Plan.

### b) *Distribution Record Date.*

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtors or their respective agents shall be deemed closed for purposes of determining whether a holder of such a Claim or Interest is a record holder entitled to distributions under the Plan, and there shall be no further changes in the record holders or the permitted designees of any such Claims or Interests.  The Debtor, the Plan Administrator, or the Wind Down Trustee, as applicable, shall have no obligation to recognize any transfer or designation of such Claims or Interests occurring after the close of business on the Distribution Record Date.  In addition, with respect to payment of any Cure Amounts or Assumption Disputes, neither the Debtors nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease as of the close of business on the Distribution Record Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure Amount.

### c) *Distributions on the Effective Date or as Soon as Reasonably Practicable Thereafter.*

The Disbursing Agent shall make Distributions, as applicable, on the Effective Date or as soon as reasonably practicable thereafter, of Cash on the Effective Date:

(a)     of Cash in the Senior Claim Pool to holders of Allowed Senior Claims, each to the extent Allowed as of the Effective Date;

(b)     of Cash in the Fee Escrow to holders of Fee Claims in accordance with Section 2.4 of the Plan; and

(c)     of Cash in the GUC Pool to holders of Allowed General Unsecured Claims, to the extent Allowed as of the Effective Date and there are funds in the GUC Pool;

> d)     ***Periodic Distributions from the Senior Claim Pool, GUC Pool, and Crypto Loss Claim Pool.***

The Disbursing Agent shall make periodic Distributions, in the frequency determined by the Plan Administrator in its sole discretion, as applicable:

(a)     of Cash in the Senior Claim Pool to holders of Allowed Senior Claims, each to the extent Allowed after the Effective Date;

(b)     of Cash in the GUC Pool to (i) holders of Allowed General Unsecured Claims, to the extent Allowed after the Effective Date and (ii) as Disputed General Unsecured Claims are resolved, resulting in additional funds being available in the GUC Pool for holders of Allowed General Unsecured Claims, to holders of previously Allowed General Unsecured Claims that have not been paid in full; and

(c)     of Cash in the Crypto Loss Claim Pool to holders of Allowed Crypto Loss Claims, in accordance with the allocation procedures set forth in the Crypto Loss Claim Procedures, to the extent Allowed after the Effective Date and as Disputed Crypto Loss Claims are Allowed; and

(d)     of Cash in the Crypto Loss Claim Pool to the SEC, to the extent all Allowed Crypto Loss Claims have been satisfied in full and all Disputed Crypto Loss Claims have been resolved.

> e)     ***Date of Distributions.***

(a)     In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

(b)     (i) Except as set forth in Section 6.5(c) of the Plan, prior to any distributions by the Wind Down Trustee, as directed by the Plan Administrator, of any Surplus Senior Claim Pool Cash pursuant to the Waterfall, the Wind Down Trustee shall make distributions to holders of all Allowed Senior Claims until such Allowed Claims are indefeasibly paid in full, (ii) prior to any distributions by the Wind Down Trustee of any surplus funds in the GUC Pool to the holders of Crypto Loss Claims, the General Unsecured Claim Payment Completion shall have occurred; *provided* that the Wind Down Trustee may make distributions to holders of Allowed Crypto Loss Claims prior to the General Unsecured Claim Payment Completion, solely to the extent such distributions are funded with the SEC Settlement Fund, and (iii) prior to any distributions by the Wind Down Trustee to the SEC, the Wind Down Trustee shall make distributions to holders of Crypto Loss Claims.

(c) After the resolution of a Disputed Senior Claim, the Wind Down Trustee, as direct by the Plan Administrator, may treat any amounts that were reserved on account of such Disputed Senior Claim that is Disallowed or does not become an Allowed Claim as Surplus Senior Claim Pool Cash and such amounts shall be allocated pursuant to the Waterfall.

### f) *Disbursing Agent.*

Other than as contemplated in <u>Section 6.2</u> of the Plan, all distributions under the Plan shall be made by the Disbursing Agent on and after the Effective Date as provided herein. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties. The Plan Administrator shall use all commercially reasonable efforts to provide the Disbursing Agent with the amounts of Claims and the identities and addresses of holders of Claims, in each case, as set forth in the books and records of the Debtors or the Wind Down Trust, as applicable. The Plan Administrator and the Wind Down Trustee shall cooperate in good faith with the applicable Disbursing Agent to comply with the reporting and withholding requirements outlined in <u>Section 5.7</u> of the Plan.

### g) *Rights and Powers of Disbursing Agent.*

(a) From and after the Effective Date, the Disbursing Agent, solely in its capacity as Disbursing Agent, shall be exculpated by all Entities, including, without limitation, holders of Claims against, and Interests in, the Debtors and other parties in interest, from any and all Claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Disbursing Agent by the Plan or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or ultra vires acts of such Disbursing Agent. No holder of a Claim or Interest, or other party in interest, shall have or pursue any claim or Cause of Action against the Disbursing Agent, solely in its capacity as Disbursing Agent, for making distributions in accordance with the Plan or for implementing provisions of the Plan, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or ultra vires acts of such Disbursing Agent.

(b) The Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder; (ii) make all distributions contemplated hereby; and (iii) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

### h) *Expenses of Disbursing Agent.*

Except as otherwise ordered by the Bankruptcy Court, any reasonable and documented fees and expenses incurred by the Disbursing Agent acting in such capacity (including reasonable documented attorneys' fees and expenses) on or after the Effective Date shall be paid in Cash.

### i) *No Postpetition Interest on Claims.*

Except as otherwise provided in the Plan, the Confirmation Order, another order of the Bankruptcy Court, or the Bankruptcy Code (including postpetition interest in accordance with sections 506(b) and 726(a)(5) of the Bankruptcy Code), interest shall not accrue or be paid on any Claims on or after the Petition Date; *provided*, that if interest is payable pursuant to the preceding clause, interest shall accrue at the federal judgment rate pursuant to 28 U.S.C. § 1961 on a non-compounded basis from the date the obligation underlying the Claim becomes due and is not timely paid through the date of payment.

j)      **Delivery of Distributions.**

Subject to Bankruptcy Rule 9010, all distributions to any holder or permitted designee, as applicable, of an Allowed Claim or Interest shall be made to a Disbursing Agent, who shall transmit such distribution to the applicable holders or permitted designees of Allowed Claims or Interests on behalf of the Debtors.  In the event that any distribution to any holder or permitted designee is returned as undeliverable, no further distributions shall be made to such holder or such permitted designee unless and until such Disbursing Agent is notified in writing of such holder's or permitted designee's, as applicable, then-current address, at which time all currently-due, missed distributions shall be made to such holder as soon as reasonably practicable thereafter without interest.  Nothing herein shall require the Disbursing Agent to attempt to locate holders or permitted designees, as applicable, of undeliverable distributions and, if located, assist such holders or permitted designees, as applicable, in complying with Section 5.12 of the Plan.

k)      **Distributions after Effective Date.**

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date, but which later become Allowed Claims, shall be deemed to have been made on the Effective Date.

l)      **Unclaimed Property.**

Undeliverable distributions or unclaimed distributions shall remain in the possession of the Debtors or the Wind Down Trust, as applicable, until such time as a distribution becomes deliverable or the holder accepts the distribution, or such distribution reverts back to the Debtors or the Wind Down Trust, as applicable, and shall not be supplemented with any interest, dividends, or other accruals of any kind.  Such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of ninety (90) days from the date of distribution.  After such date all unclaimed property or interest in property shall revert to the Wind Down Trust and the Claim of any other holder to such property or interest in property shall be discharged and forever barred.

m)      **Time Bar to Cash Payments.**

Checks issued by the Disbursing Agent in respect of Allowed Claims shall be null and void if not negotiated within one hundred and twenty (120) days after the date of issuance thereof.  Thereafter, the amount represented by such voided check shall irrevocably revert to the Wind Down Trust, and any Claim in respect of such voided check shall be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.  Requests for re-issuance of any check shall be made to the Disbursing Agent by the holder of the Allowed Claim to whom such check was originally issued.

n)      **Manner of Payment under Plan.**

Except as otherwise specifically provided in the Plan, at the option of the Debtors or the Plan Administrator, as applicable, any Cash payment to be made hereunder may be made by a check or wire transfer, or ACH transfer, or as otherwise required or provided in applicable agreements or customary practices of the Debtor.

o)      **Satisfaction of Claims.**

Except as otherwise specifically provided for in the Plan and to the extent permitted by law, any distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete and final satisfaction of, and exchange for, such Allowed Claims.

p)      ***Minimum Cash Distributions.***

The Disbursing Agent shall not be required to make any distribution in an amount less than One Hundred Dollars ($100) to any holder of an Allowed Claim; *provided*, that if any distribution is not made pursuant to <u>Section 6.16</u> of the Plan, such distribution shall be added to any subsequent distribution to be made on behalf of the holder's Allowed Claim.

q)      ***Setoffs and Recoupments.***

The Debtors or the Wind Down Trust, as applicable, or such entity's designee (including, without limitation, the Disbursing Agent) may, but shall not be required to, set off or recoup against any Claim, and any distribution to be made on account of such Claim, any and all claims, rights, and Causes of Action of any nature whatsoever that the Debtors or the Wind Down Trust, as applicable, may have against the holder of such Claim pursuant to the Bankruptcy Code or applicable non-bankruptcy law; *provided*, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by a Debtor or its successor of any claims, rights, or Causes of Action that a Debtor or its successor or assign may possess against the holder of such Claim.

r)      ***Allocation of Distributions between Principal and Interest.***

Except as otherwise required by law (as reasonably determined by the Plan Administrator), distributions with respect to an Allowed Claim shall be allocated first to the principal portion of such Allowed Claim (as determined for U.S. federal income tax purposes) and, thereafter, to the remaining portion of such Allowed Claim, if any.

s)      ***No Distribution in Excess of Amount of Allowed Claim.***

Except as provided in <u>Section 6.9</u> of the Plan, no holder of an Allowed Claim shall receive, on account of such Allowed Claim, distributions in excess of the Allowed amount of such Claim.

G.      <u>**Procedures for Disputed Claims**</u>

a)      ***Objections to Claims.***

The Debtors or the Wind Down Trustee on behalf of the Wind Down Trust and as directed by the Plan Administrator shall be entitled to object to Claims.  After the Effective Date, the Wind Down Trustee shall have and retain any and all rights and defenses that the Debtor had with regard to any Claim to which they may object, except with respect to any Claim that is Allowed.  Except as otherwise provided herein, all Proofs of Claim filed after the earlier of: (x) the Effective Date for all Claims other than Fee Claims and Claims subject to the Other Bar Dates or (y) the Other Bar Dates, with respect to such applicable Claims, shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Debtor or Wind Down Trust, without the need for any objection by the Debtors, the Wind Down Trust, or the Plan Administrator or any further notice to or action, order, or approval of the Bankruptcy Court.  For the avoidance of doubt, a Proof of Claim or Interest filed after the applicable bar date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-filed Claim.

b)      ***Allowance of Claims.***

Except as otherwise set forth in the Plan, after the Effective Date, the Wind Down Trustee and the Plan Administrator, as applicable, shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim immediately before the Effective Date.  Except as specifically provided in

the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed in accordance with the Plan.

c)      *Resolution of Disputed Claims.*

The Wind Down Trustee, on behalf of each of the Wind Down Trust as directed by the Plan Administrator and subject to the terms of the Wind Down Trust Agreement, shall have the authority to (a) file, withdraw, or litigate to judgment, objections to Claims; (b) settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court, other than respect to Fee Claims in all respects. For the avoidance of doubt, except as otherwise provided in the Plan, from and after the Effective Date, the Plan Administrator shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim, including related to Causes of Action retained pursuant to the Plan.

d)      *Adjustment to Claims or Interests Without Objection.*

Any Claim or Interest that has been paid or satisfied (including pursuant to the Plan) may be adjusted or expunged on the Claims Register at the direction of the Debtors, the Wind Down Trustee, or the Plan Administrator without the Debtors, the Wind Down Trustee, or the Plan Administrator having to file an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest so long as notice of satisfaction is filed with the Bankruptcy Court and served on the affected parties.

e)      *Reservation of Rights to Object to Claims*

The failure of the Debtors, the Wind Down Trustee, or the Plan Administrator, as applicable, to object to any Claim shall not be construed as an admission to the validity or amount of any such Claim, any portion thereof, or any other claim related thereto, whether or not such claim is asserted in any currently pending or subsequently initiated proceeding, and shall be without prejudice to the right of the Debtors, the Wind Down Trustee, or the Plan Administrator, as applicable, to contest, challenge the validity of, or otherwise defend against any such claim in the Bankruptcy Court or non-bankruptcy forum.

f)      *Payments and Distributions with Respect to Disputed Claims.*

Notwithstanding anything herein to the contrary, if any portion of a Claim is a Disputed Claim, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

g)      *Distributions after Allowance.*

After such time as a Disputed Claim becomes, in whole or in part, an Allowed Claim, the holder thereof shall be entitled to distributions, if any, to which such holder is then entitled as provided in the Plan, without interest, as provided in <u>Section 7.8</u> of the Plan. Such distributions shall be made as soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing such Disputed Claim (or portion thereof) becomes a Final Order.

h)      *Estimation of Claims.*

The Debtors or the Wind Down Trustee (on behalf of the Wind Down Trust as directed by the Plan Administrator), as applicable, shall determine, resolve and otherwise adjudicate all contingent,

74

unliquidated, and Disputed Claims. The Debtors or the Wind Down Trustee (on behalf of the Wind Down Trust), with respect to such Disputed Claims, may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim or Class of Claims pursuant to section 502(c) of the Bankruptcy Code or otherwise, including to establish a reserve for distribution purposes, regardless of whether such, or any, Person had previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court will retain jurisdiction to estimate any Claim or Class of Claims at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim or Class of Claims, the amount so estimated shall constitute either the Allowed amount of such Claim or Class of Claims, or a maximum limitation on such Claim or Class of Claims, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim or Class of Claims, the Debtors or the Wind Down Trustee, as applicable, may pursue supplementary proceedings to object to the allowance of such Claims; *provided*, that such limitation shall not apply to Claims requested by the Debtors to be estimated for voting purposes only.

For the avoidance of doubt, there shall be no estimation of the SEC Claim.

### i) *No Distributions Pending Allowance.*

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

### j) *Claim Resolution Procedures Cumulative.*

All of the objection, estimation, and resolution procedures in the Plan are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently settled, compromised, withdrawn, or resolved in accordance with the Plan without further notice or Bankruptcy Court approval.

### k) *Interest.*

To the extent that a Disputed Claim becomes an Allowed Claim after the Effective Date, the holder of such Claim shall not be entitled to any interest that accrued thereon from and after the Effective Date, except as provided in Section 6.9 of the Plan.

### H. **Executory Contracts and Unexpired Leases**

### a) *Rejection of Executory Contracts and Unexpired Leases.*

(a)    As of and subject to the occurrence of the Effective Date, all executory contracts and unexpired leases to which any of the Debtors are parties shall be deemed rejected, unless such contract or lease (i) was previously assumed or rejected by the Debtors pursuant to an order of the Bankruptcy Court; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a motion to assume filed by the Debtors on or before the Effective Date; (iv) is identified in Sections 8.4 and 8.6 of the Plan; or (v) is identified on the Assumption Schedule included in the Plan Supplement for assumption, or assumption and assignment to the Wind Down Trust or another party.

(b)    Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions, assumptions and assignments,

or rejections provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code and a determination by the Bankruptcy Court that the Wind Down Trust or another party, as applicable, has provided adequate assurance of future performance under such assumed or assumed and assigned executory contracts and unexpired leases.  Each executory contract and unexpired lease assumed or assumed and assigned to the Wind Down Trust, pursuant to the Plan shall vest in and be fully enforceable by the Wind Down Trust or such other party, as applicable, in accordance with its terms, except as modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption or assumption and assignment, or applicable law.

### b)    *Determination of Assumption Disputes and Deemed Consent.*

(a)    Any Cure Amount shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Amount, as reflected in the applicable cure notice, in Cash on the Effective Date, subject to the limitations described below, or on such other terms as the parties to such executory contracts or unexpired leases and the Debtors may otherwise agree.

(b)    The Debtors shall file, as part of the Plan Supplement, the Assumption Schedule.  At least twenty-one (21) days before the Confirmation Hearing, the Debtors shall serve a notice on parties to executory contracts or unexpired leases to be assumed or assumed and assigned to the Wind Down Trust or another party, reflecting the Debtors' intention to potentially assume or assume and assign the contract or lease in connection with the Plan and, where applicable, setting forth the proposed Cure Amount (if any).  **Any objection by a counterparty to an executory contract or unexpired lease to the proposed assumption, assumption and assignment, or related Cure Amount must be filed, served, and actually received by the Debtors within fourteen (14) days of the service of the assumption notice (including any supplemental assumption notice), or such shorter period as agreed to by the parties or authorized by the Bankruptcy Court.**  Any counterparty to an executory contract or unexpired lease that does not timely object to the notice of the proposed assumption or assumption and assignment of such executory contract or unexpired lease shall be deemed to have assented to the assumption or assumption and assignment of the applicable executory contract or unexpired lease notwithstanding any provision thereof that purports to (i) prohibit, restrict, or condition the transfer or assignment of such contract or lease; (ii) terminate or modify, or permit the termination or modification of, a contract or lease as a result of any direct or indirect transfer or assignment of the rights of any Debtor under such contract or lease or a change, if any, in the ownership or control to the extent contemplated by the Plan; (iii) increase, accelerate, or otherwise alter any obligations or liabilities of any Debtor, or the Wind Down Trust, under such executory contract or unexpired lease; or (iv) create or impose a Lien upon any property or Asset of any Debtor, or the Wind Down Trust, as applicable.  Each such provision shall be deemed to not apply to the assumption or assumption and assignment of such executory contract or unexpired lease pursuant to the Plan and counterparties to assumed or assumed and assigned executory contracts or unexpired leases that fail to object to the proposed assumption or assumption and assignment in accordance with the terms set forth in Section 8.2(b) of the Plan, shall forever be barred and enjoined from objecting to the proposed assumption or assumption and assignment or to the validity of such assumption or assumption and assignment (including with respect to any Cure Amounts or the provision of adequate assurance of future performance), or taking actions prohibited by the foregoing or the Bankruptcy Code on account of transactions contemplated by the Plan.

(c)    If there is an Assumption Dispute pertaining to assumption or assumption and assignment of an executory contract or unexpired lease (other than a dispute pertaining to a Cure Amount), such dispute shall be heard by the Bankruptcy Court prior to such assumption or assumption and assignment being effective; *provided*, that the Debtors or the Wind Down Trust, as applicable, may settle any Assumption Dispute without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

(d)        To the extent an Assumption Dispute relates solely to the Cure Amount, the Debtor may assume and/or assume and assign the applicable executory contract or unexpired lease prior to the resolution of the Assumption Dispute; *provided*, that the Debtors or the Wind Down Trust, as applicable, reserve Cash in an amount sufficient to pay the full amount reasonably asserted as the required cure payment by the non-Debtor party to the extent such executory contract or unexpired lease (or such smaller amount as may be fixed or estimated by the Bankruptcy Court or otherwise agreed to by such non-Debtor party and the applicable Debtor or the Wind Down Trust, as applicable). The Debtors or the Wind Down Trust, as applicable, may settle any dispute regarding the Cure Amount or the nature thereof without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

(e)        Assumption or assumption and assignment of any executory contract or unexpired lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims against any Debtor or defaults by any Debtor, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed or assumed and assigned executory contract or unexpired lease at any time before the date that the Debtors assume or assume and assign such executory contract or unexpired lease. Any proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed or assumed and assigned shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, upon the assumption of such executory contract or unexpired leases.

### c)        *Rejection Damages Claims.*

**In the event that the rejection of an executory contract or unexpired lease hereunder results in damages to the other party or parties to such contract or lease, any Claim for such damages shall be classified and treated in Class 4 (General Unsecured Claims). A proof of such Claim must be filed with the Bankruptcy Court by the later of (i) thirty (30) days after the filing and service of the notice of occurrence of the Effective Date; (ii) the general bar date or governmental bar date, as applicable; and (iii) thirty (30) days following service of an Order approving rejection of any executory contract or unexpired lease of the Debtors if such contract or lease is the subject of a pending Assumption Dispute.**

### d)        *Insurance Policies.*

Notwithstanding anything to the contrary in the Definitive Documents, the Plan, the Plan Supplement, any bar date notice, or claim objection, and any other document related to any of the foregoing, and any other order of the Bankruptcy Court, on the Effective Date: (a) all insurance policies issued or providing coverage to the Debtors shall (subject to the applicable insurer's right to object to such a designation) be assumed in their entirety by the Debtors pursuant to sections 365 and 1123 of the Bankruptcy Code, and coverage for defense costs and indemnification under the D&O Policies shall remain available to all individuals within the definition of "Insured" in the D&O Policies, and the Wind Down Trust, the Plan Administrator, or the Wind Down Trustee, as applicable, shall remain liable in full for any and all now existing or hereinafter arising obligations, liabilities, terms, provisions and covenants of any of the Debtors under such insurance policies, without the need or requirement for an insurer to file a Proof of Claim, Administrative Expense Claim or objection to any cure amount; (b) nothing shall alter or modify the terms and conditions of and/or any rights, obligations, benefits, claims, rights to payments, or recoveries under the insurance policies without the express written consent of the applicable insurer; and (c) the automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in the Plan, if and to the extent applicable, shall be deemed lifted without further order of this Court, solely to permit: (i) claimants with valid workers' compensation claims or direct action claims against an insurer under applicable nonbankruptcy law to proceed with their claims; (ii) insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without

further order of the Bankruptcy Court, (I) workers' compensation claims, (II) claims where a claimant asserts a direct claim against any insurer under applicable non-bankruptcy law, or an order has been entered by the Bankruptcy Court granting a claimant relief from the automatic stay to proceed with its claim, and (III) all costs in relation to each of the foregoing; (iii) the insurers to cancel any insurance policies, and take other actions relating thereto, to the extent permissible under applicable non-bankruptcy law, and in accordance with the terms of the insurance policies; and (iv) holders of Allowed Claims to pursue insurance recovery.

### e)    *Indemnification Obligations*

Any obligations of the Debtors pursuant to a contract, instrument, agreement, certificate of incorporation, constitution, by-law, comparable organizational document or any other document or applicable law, to indemnify, reimburse, or limit the liability of any director, officer, or employee of the Debtors, pursuant to the foregoing in respect of any claims, demands, suits, causes of action, or proceedings against such director, officer, or employee based upon any act or omission related to such director or officer's service with, for, or on behalf of the Debtors prior to the Effective Date with respect to all present and future actions, suits, and proceedings relating to the Debtors shall survive Confirmation of the Plan and except as set forth herein, remain unaffected thereby, and shall not be discharged, irrespective of whether such defense, indemnification, reimbursement, or limitation of liability accrued or is owed in connection with an occurrence before or after the Petition Date; *provided*, however, that all monetary obligations under this provision shall, to the extent Allowed, except for the D&O Indemnification Obligations, be treated as General Unsecured Claims or 510(c) Subordinated Claims, as determined by the Court.  The Wind Down Trustee reserves all legal and equitable rights and defenses in respect of any claims asserted by any current or former officers, directors, or employees of the Debtors.  For the avoidance of doubt, the scope of the Debtors' indemnification obligations in <u>Section 8.5</u> of the Plan shall be conterminous with applicable non-bankruptcy law and to the extent provided by such law.  For the avoidance of doubt, any claim for indemnification for amounts payable after the Effective Date shall not constitute an Allowed Claim unless approved by the Bankruptcy Court.  Nothing in this Section 8.5 shall abridge in any way the Wind Down Trust's obligations to promptly satisfy the D&O Indemnification Obligations.

### f)    *Intellectual Property Licenses and Agreements.*

Notwithstanding anything to the contrary in the Definitive Documents, the Plan, the Plan Supplement, any bar date notice or claim objection, and any other document related to any of the foregoing, all intellectual property contracts, licenses, royalties, or other similar agreements to which the Debtors have any rights or obligations in effect as of the date of the Confirmation Order shall be deemed assumed by the Debtors and the Wind Down Trust and shall continue in full force and effect unless any such intellectual property contract, license, royalty, or other similar agreement otherwise is specifically rejected pursuant to a separate order of the Bankruptcy Court or is the subject of a separate rejection motion filed by the Debtors in accordance with <u>Section 8.1</u> of the Plan.  Unless otherwise noted hereunder, all other intellectual property contracts, licenses, royalties, or other similar agreements shall vest in the Wind Down Trust, and the Wind Down Trust may take all actions as may be necessary or appropriate to ensure such vesting as contemplated herein.

### g)    *Assignment.*

To the extent provided under the Bankruptcy Code or other applicable law, any executory contract or unexpired lease transferred and assigned to the Wind Down Trust hereunder, if applicable, shall remain in full force and effect for the benefit of the transferee or assignee in accordance with its terms, notwithstanding any provision in such executory contract or unexpired lease (including those of the type set forth in section 365(b)(2) of the Bankruptcy Code) that prohibits, restricts, or conditions such transfer

or assignment.  To the extent provided under the Bankruptcy Code or other applicable law, any provision that prohibits, restricts, or conditions the assignment or transfer of any such executory contract or unexpired lease or that terminates or modifies such executory contract or unexpired lease or allows the counterparty to such executory contract or unexpired lease to terminate, modify, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon any such transfer and assignment, constitutes an unenforceable anti-assignment provision and is void and of no force or effect with respect to any assignment pursuant to the Plan.

> h)      ***Modifications, Amendments, Supplements, Restatements, or Other Agreements.***

Unless otherwise provided herein or by separate order of the Bankruptcy Court, each executory contract and unexpired lease that is assumed shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument, or other document is listed in the notice of assumed contracts.

> i)      ***Reservation of Rights.***

> (a)      The Debtors may amend the Assumption Schedule, with the consent of the Creditors' Committee, not to be unreasonably withheld, and any cure notice until five (5) Business Days immediately prior to the commencement of the Confirmation Hearing in order to (i) add, delete, or reclassify any executory contract or unexpired lease or amend a proposed assumption or assumption and assignment and/or (ii) amend the proposed Cure Amount; *provided*, that if the Confirmation Hearing is adjourned for a period of more than two (2) consecutive calendar days, the Debtors' right to amend such schedules and notices shall be extended to the Business Day immediately prior to the adjourned date of the Confirmation Hearing, with such extension applying in the case of any and all subsequent adjournments of the Confirmation Hearing.  The Debtors shall provide notice of such amendment to any affected counterparty as soon as reasonably practicable.

> (b)      Neither the exclusion nor inclusion of any contract or lease by the Debtors on any exhibit, schedule, or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, will constitute an admission by the Debtors that any such contract or lease is or is not in fact an executory contract or unexpired lease or that the Debtors, or the Wind Down Trust, or their respective affiliates have any liability thereunder.

> (c)      Except as otherwise provided in the Plan, nothing herein shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, Claims, Causes of Action, or other rights of the Debtors and the Wind Down Trust, under any executory or non-executory contract or any unexpired or expired lease.

> (d)      Nothing in the Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors, or the Wind Down Trust, as applicable, under any executory or non-executory contract or any unexpired or expired lease.

I.      **Conditions Precedent to the Effective Date**

> a)      ***Conditions Precedent to the Effective Date.***

The occurrence of the Effective Date of the Plan is subject to the following conditions precedent:

(a)    the Bankruptcy Court shall have entered the Confirmation Order, the Confirmation Date shall have occurred, and no stay of the Confirmation Order shall be in effect;

(b)    all agreements necessary to implement the Plan, shall have (i) been tendered for delivery and (ii) been effected or executed by all Entities party thereto, and all conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements;

(c)    the documents contained in the Plan Supplement will contain terms and conditions consistent in all material respects with the Plan;

(d)    all conditions precedent to the consummation of the Wind Down Trust Formation Transactions (other than effectiveness of the Plan) have been satisfied or waived by the party or parties entitled to waive them in accordance with the terms of the Wind Down Trust Agreement;

(e)    the Wind Down Trust shall have been established;

(f)    the Fee Escrow Account shall have been established and funded;

(g)    the Wind Down Reserve shall have been funded with the Wind Down Amount in accordance with the Wind Down Budget;

(h)    the SEC Settlement Fund shall have been established and funded;

(i)    the Senior Claim Pool shall have been established and funded; and

(j)    the GUC Pool shall have been established and funded with Effective Date Available Cash (if any).

Notwithstanding when a condition precedent to the Effective Date occurs, for purposes of the Plan, such condition precedent shall be deemed to have occurred simultaneously upon the completion of the applicable conditions precedent to the Effective Date; *provided*, that to the extent a condition precedent (a "***Prerequisite Condition***") may be required to occur prior to another condition precedent (a "***Subsequent Condition***") then, for purposes of the Plan, the Prerequisite Condition shall be deemed to have occurred immediately prior to a Subsequent Condition regardless of when such Prerequisite Condition or Subsequent Condition shall have occurred.

### b)    *Waiver of Conditions Precedent.*

(a)    Except as otherwise provided herein, all actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action.  Each of the conditions precedent in Section 9.1 of the Plan other than the conditions set forth in Section 9.1(b) of the Plan may be waived in writing by the Debtors, with the consent of the Creditors' Committee, not to be unreasonably withheld, without leave of or order of the Bankruptcy Court.

(b)    The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

### c) *Effect of Failure of Conditions to Effective Date.*

Unless otherwise extended by the Debtors, if the Effective Date does not occur on or before the date that is one hundred and eighty (180) days after the date on which the Confirmation Order is entered or if the Confirmation Order is vacated, (a) no distributions under the Plan shall be made, (b) the Debtors and all holders of Claims and Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (c) all the Debtors' obligations with respect to the Claims and the Interests shall remain unchanged and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other entity or to prejudice in any manner the rights of the Debtors or any other entity in any further proceedings involving the Debtor or otherwise.

### J.    **Effect of Confirmation**

### a) *Vesting of Assets.*

(a)    On the Effective Date pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all remaining property of the Debtors' Estates and any Estate Causes of Action, including the SEC Settlement Fund, shall vest in the Wind Down Trust free and clear of all Claims, Liens, encumbrances, charges, and other interests, subject to treatment of Other Secured Claims under the Plan and subject to the terms herein and in the Plan.  The Wind Down Trust shall own such Assets, as of the Effective Date, free and clear of all Claims, Interests, Liens, other encumbrances, and liabilities of any kind. On and after the Effective Date, the Wind Down Trust may take any action, including, without limitation, the operation of their businesses; the use, acquisition, sale, lease and disposition of property; and the entry into transactions, agreements, understandings, or arrangements, whether in or other than in the ordinary course of business, and execute, deliver, implement, and fully perform any and all obligations, instruments, documents, and papers or otherwise in connection with any of the foregoing, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and in all respects as if there was no pending case under any chapter or provision of the Bankruptcy Code, except as expressly provided herein.  Without limiting the foregoing, the Wind Down Trust may pay the charges that they incur on or after the Effective Date for professional fees, disbursements, expenses, or related support services without application to the Bankruptcy Court. Notwithstanding the foregoing, vesting of property in which any governmental unit holds an interest, and for which title vests in the Debtors subject to regulatory requirements under a governmental grant or award, including but not limited to, the requirements of 10 C.F.R. 600.321, shall be limited to the extent of the Debtors' interest in such property; and the Wind Down Trust may only take action, including but not limited to the use, acquisition, sale, lease, and disposition of such property, in accordance with applicable non-bankruptcy law.

### b) *Term of Injunctions or Stays.*

Unless otherwise provided herein, the Confirmation Order, or in a Final Order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

### c) *Injunction.*

**From and after the Effective Date through and until Wind Down Completion Date:**

(a)     **All Persons and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, holding Claims, Liens, Interests, charges, encumbrances, and other interests of any kind or nature whatsoever, including rights or Claims based on any successor or transferee liability, against the Debtors, the Wind Down Trust, or the assets transferred thereto (whether legal or equitable, secured or unsecured, matured or unmatured, contingent, or noncontingent, known or unknown), arising under or out of, in connection with, or in any way relating to the Debtors, the Estates' Assets, the operation of the Estates' Assets prior to the Effective Date, or the Wind Down Trust Formation Transactions, shall be forever barred, estopped, and permanently enjoined from taking any actions to interfere with the implementation or consummation of the Plan in relation to any Claim extinguished or released pursuant to the Plan.**

(b)     **Except as expressly provided in the Plan, the Definitive Documents, the Confirmation Order, or a separate order of the Bankruptcy Court or as agreed to by the Debtors and a holder of a Claim against or Interest in the Debtors, all Entities who have held, hold, or may hold Claims against or Interests in the Debtors (whether proof of such Claims or Interests has been filed or not and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan) and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates are permanently enjoined (but, as to the Debtors, solely to the extent such action is brought against the Debtors to directly or indirectly recover upon any Assets of the Estates, or the Wind Down Trust), solely with respect to any Claims, Interests, and Causes of Action that will be or are treated by the Plan from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors, the Wind Down Trust, the Plan Administrator, or the Wind Down Trustee, as applicable, or the property of any of the Debtors, the Wind Down Trust, the Plan Administrator, or the Wind Down Trustee, as applicable; (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtors, the Wind Down Trust, the Plan Administrator, or the Wind Down Trustee, or the property of any of the Debtors, or the Wind Down Trust, as applicable; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors, the Wind Down Trust, or the property of any of the Debtors, the Wind Down Trust, the Plan Administrator, or the Wind Down Trustee, as applicable; (iv) asserting any right of setoff, directly or indirectly, against any obligation due from the Debtors, or the Wind Down Trust, as applicable, or against property or interests in property of any of the Debtors, or the Wind Down Trust, except as contemplated or Allowed by the Plan; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.**

(c)     **Each holder of a Claim or Interest will be bound by the Plan pursuant to section 1141(a) of the Bankruptcy Code, including, without limitation, the injunctions set forth in <u>Section 10.3</u> of the Plan.**

(d)     **The injunctions in <u>Section 10.3</u> of the Plan shall extend to any successors of the Debtor, or the Wind Down Trust, as applicable, and their respective property and interests in property.**

(e)     **Notwithstanding the foregoing, nothing in <u>Section 10.3</u> of the Plan shall enjoin the assertion of a defensive right of recoupment.**

(f)      **Nothing in the Plan or Confirmation Order shall (1) enjoin, release, impair or otherwise preclude the United States (i) from pursuing, commencing, continuing or enforcing any criminal action or any police or regulatory action against the Debtors or any non-debtor person or entity, (ii) from pursuing any liability to the United States that is not a Claim, (iii) from exercising any rights of setoff or recoupment subsequent to confirmation of the Plan or any order granting substantive consolidation, and such rights are preserved, and (iv) from pursuing any claim of the United States arising on or after the Confirmation Date; and (2) grant the Debtors a discharge pursuant to section 1141(d) of the Bankruptcy Code.**

### d)      *Debtors Are Not Entitled to a Discharge*

Nothing in the Plan or the Confirmation Order shall grant the Debtors a discharge pursuant to section 1141(d) of the Bankruptcy Code.

### e)      *Binding Effect*

As of the Effective Date, the Plan shall bind all holders of Claims against and Interests in the Debtors and their respective successors and assigns, notwithstanding whether any such holders were (a) Impaired or Unimpaired under the Plan; (b) deemed to accept or reject the Plan; (c) failed to vote to accept or reject the Plan; (d) voted to reject the Plan; or (e) received any distribution under the Plan.

### f)      *Releases by the Debtors*

Effective as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties before and during the Chapter 11 Case to facilitate the liquidation of the Debtors and the implementation of the Wind Down Trust Formation Transactions, to the fullest extent allowed by applicable law, as such law may be extended subsequent to the Effective Date, each Released Party is hereby deemed conclusively, absolutely, unconditionally, irrevocably, and forever released by each and all of the Debtors, their Estates, the Wind Down Trust, the Plan Administrator, and the Wind Down Trustee, as may be applicable, and any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, as may be applicable, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Persons or Entities who may purport to assert any claim or Cause of Action, directly or derivatively, by, through, or for the foregoing Entities, from any and all Released Claims.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any obligations arising on or after the Effective Date of any party or Entity under the Plan, the Confirmation Order, or any document, instrument, or agreement (including those set forth in any Plan Supplement) executed to implement the Plan, (b) any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, willful misconduct, criminal misconduct, or gross negligence, (c) Causes of Action against Released Parties, if any, listed on the Schedule of Retained Causes of Action; (d) rights reserved under the Dentons Retention Order; (e) any avoidance actions relating to private wallet transactions that occurred prior to the Petition Date other than payment of legal fees and related vendors who provided services and acted in good faith in receiving fees from private wallets related or relating to the Chapter 11 Cases, the defense of the SEC Enforcement Action and the investigation that preceded it, the defense of civil claims brought against TFL that have been dismissed, and the pending criminal proceedings and investigations, except for any avoidance actions subject to the reservation of rights set forth in (d) hereof which are fully preserved; (f) the SEC Settlement.

g)      *Exculpation*

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting the Releases by the Debtors, no Exculpated Party shall have or incur liability for, and each Exculpated Party hereby is exculpated from any claim, Cause of Action, obligation, suit, judgment, damage, demand, loss, or liability for any claim related to, any act or omission taken on or after the Petition Date and prior to the Effective Date in connection with, relating to, or arising out of the Chapter 11 Cases, the preparation for, filing, negotiation, solicitation, confirmation, execution, or implementation (to the extent on or after the Petition Date and prior to the Effective Date) of, as applicable, the Plan (including, for the avoidance of doubt, any Plan Supplement), the Disclosure Statement, or any restructuring transaction, contract, instrument, release, or other agreement or document created, filed, or entered into during the Chapter 11 Cases in connection with the Chapter 11 Cases, the management of the Debtors' cash and cryptocurrency assets during the Chapter 11 Cases (including the trading and sales of cryptocurrencies and tokens in connection with the Chapter 11 Cases), the Debtors' or Wind Down Trust's receipt of assets from LFG pursuant to the SEC Settlement, the annual financial statements prepared pursuant to Singapore Companies Act requirements, the recognition application for recognition proceedings in Singapore, the Plan, the Disclosure Statement, the SEC Settlement, the Definitive Documents, the pursuit or consummation of any sale transactions during the Chapter 11 Cases, the administration and implementation of the Wind Down, the pursuit of Confirmation, the pursuit of Consummation, the Wind Down Trust Formation Transactions, the administration and implementation of the Plan, including the distribution of property under the Plan or any other related agreement, or upon any other related act, or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or after the Petition Date and before the Effective Date , except for claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted bad faith, fraud, willful misconduct, criminal misconduct, or gross negligence.

The Exculpated Parties who have participated in any conduct referenced in Section 1125(e) of the Bankruptcy Code and on terms compliant therewith, are not, and on account of such conduct, shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer, issuance, sale or purchase of a security under the Plan, to the extent permitted by Section 1125(e) of the Bankruptcy Code.  This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable laws, rules, or regulations protecting such Exculpated Parties from liability.  Notwithstanding anything to the contrary in the foregoing, the exculpation set forth above shall not be construed as exculpating any party or entity from its post-Effective Date obligations under the Plan, or any document, instrument, or agreement (including those set forth in any Plan Supplement) executed to implement the Plan.

h)      *Additional Provisions Regarding Governmental Units*

Notwithstanding any language to the contrary contained in the Plan, and/or the Plan Confirmation Order, no provision of the Plan or the Plan Confirmation Order shall (i) preclude the SEC from enforcing its police or regulatory powers; or (ii) enjoin, limit, impair, or delay the SEC from commencing or continuing any claims, causes of action, proceedings or investigations against any non-debtor Person or entity in any forum.

i)      *Solicitation of the Plan*

As of and subject to the occurrence of the Confirmation Date, to the extent they have participated in any conduct referenced in section 1125(e) of the Bankruptcy Code and on terms compliant therewith, the Debtors and each of their respective directors, who served in such capacity on or after the Petition Date, officers, employees, claims and noticing agents, financial advisors, investment bankers, professionals, accountants, and attorneys (but for the avoidance of doubt, not the Debtors' current or former shareholders)

shall not be liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer, issuance, sale or purchase of a security under the Plan, to the extent provided in section 1125(e) of the Bankruptcy Code.

### j)    *Corporate Action.*

Upon the Effective Date, by virtue of the solicitation of votes in favor of the Plan and entry of the Confirmation Order, all actions contemplated by the Plan (including any action to be undertaken by the Wind Down Trustee and/or the Plan Administrator) shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by holders of Claims or Interests, the Debtors, or any other Entity or Person. All matters provided for in the Plan involving the corporate structure of the Debtors, and any corporate action required by the Debtors in connection therewith, shall be deemed to have occurred on the Effective Date and shall be in effect, without any requirement of further action by the Debtors or the Estates.

### k)    *Ipso Facto and Similar Provisions Ineffective.*

Any term of any policy, contract, or other obligation applicable to a Debtor shall be void and of no further effect with respect to any Debtor to the extent such policy, contract, or other obligation is conditioned on, creates an obligation of the Debtor as a result of, or gives rise to a right of any Person based on any of the following: (i) the insolvency or financial condition of a Debtor; (ii) the commencement of the Chapter 11 Cases; (iii) the confirmation or consummation of this Plan, including any change of control that shall occur as a result of such consummation; or (iv) the Wind Down Trust Formation Transactions.

### l)    *No Successor Liability.*

Except as otherwise expressly provided in this Plan and the Confirmation Order, the Wind Down Trust (i) is not, and shall not be deemed to assume, agree to perform, pay, or otherwise have any responsibilities for any liabilities or obligations of the Debtors or any other Person relating to or arising out of the operations or the Assets of the Debtors on or prior to the Effective Date; (ii) is not, and shall not be, a successor to the Debtors by reason of any theory of law or equity or responsible for the knowledge or conduct of any Debtor prior to the Effective Date; and (iii) shall not have any successor or transferee liability of any kind or character.

### K.    **Retention of Jurisdiction**

### a)    *Retention of Jurisdiction.*

On and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Cases for, among other things, the following purposes:

(a)    to hear and determine motions and/or applications for the assumption or rejection of executory contracts or unexpired leases, including Assumption Disputes, and the allowance, classification, priority, compromise, estimation, or payment of Claims resulting therefrom;

(b)    to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date;

(c)    to ensure that distributions to holders of Allowed Claims are accomplished as provided for in the Plan and Confirmation Order, including to ensure that an Allowed Claim does not receive consideration in excess of the Allowed amount of such Claim, and to adjudicate any and all disputes

arising from or relating to distributions under the Plan, including, cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely paid;

(d)    to resolve any cases, controversies, suits, disputes, Causes of Action, Contributed Third-Party Claims, or other matters that may arise in connection with the Causes of Action or Contributed Third-Party Claims brought by the Plan Administrator or the Wind Down Trustee in the Bankruptcy Court;

(e)    to consider the allowance, classification, priority, compromise, estimation, or payment of any Claim or Class of Claims;

(f)    to enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(g)    to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Entity with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(h)    to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(i)    to hear and determine all applications and proceedings to approve Fee Claims;

(j)    to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Plan Supplement, or the Confirmation Order, or any agreement, instrument, or other document governing or relating to any of the foregoing;

(k)    to take any action and issue such orders as may be necessary to construe, interpret, enforce, implement, execute, and consummate the Plan;

(l)    to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(m)    to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(n)    to hear, adjudicate, decide, or resolve any and all matters related to <u>Section 10</u> of the Plan, including, without limitation, the releases, discharge, exculpations, and injunctions issued thereunder;

(o)    to resolve disputes concerning Disputed Claims or the administration thereof;

(p)    to hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(q)    to enter one or more final decrees closing the Chapter 11 Cases;

(r)    to recover all Assets of the Debtors and property of the Debtors' Estates, wherever located and adjudicate any disputes with respect thereto;

(s)    to resolve any disputes concerning whether an Entity had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any bar date established in the Chapter 11 Cases, or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose of determining whether a Claim or Interest is discharged hereunder or for any other purpose;

(t)    to hear and resolve any dispute over the application to any Claim of any limit on the allowance of such Claim set forth in sections 502 or 503 of the Bankruptcy Code, other than defenses or limits that are asserted under non-bankruptcy law pursuant to section 502(b)(1) of the Bankruptcy Code; and

(u)    to enforce all orders previously entered by the Bankruptcy Court in the Chapter 11 Cases.

b)    ***Courts of Competent Jurisdiction.***

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal, or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

L.    **Miscellaneous Provisions**

a)    ***Payment of Statutory Fees.***

(a)    All Statutory Fees that are due and payable for each Debtor's case shall be paid by the Debtors on the Effective Date.  After the Effective Date, the Debtors and the Wind Down Trustee shall be jointly and severally liable to pay any and all Statutory Fees when due and payable.  The Debtors shall file all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-MOR.  After the Effective Date, the Debtors and the Wind Down Trustee, on behalf of the Wind Down Trust, as directed by the Plan Administrator, shall file with the Bankruptcy Court separate UST Form 11-PCR reports when they become due.  Notwithstanding anything called for in the Plan to the contrary, the Debtors and the Wind Down Trust shall remain obligated to pay Quarterly Fees to the Office of the U.S. Trustee and make such reports until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.  The U.S. Trustee shall not be required to file any Administrative Claim in the case and shall not be treated as providing any release under the Plan.  The obligations under this <u>Section 12.1</u> shall remain for each Debtor until such time as a final decree is entered closing the Chapter 11 Case for such Debtor, a Final Order converting such Debtor's Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code is entered, or a Final Order dismissing such Debtor's Chapter 11 Case is entered.

b)    ***Substantial Consummation.***

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

        *c)*        ***Dissolution of Creditors' Committee.***

On the Effective Date, the Creditors' Committee, if any, shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases; *provided, however,* that after the Effective Date, the Creditors' Committee shall exist and its professionals shall continue to be retained and shall continue to be entitled to reasonable compensation by the Debtors without the need for further application to the Bankruptcy Court with respect to all applications filed pursuant to sections 330 and 331 of the Bankruptcy Code and any related hearings.

        *d)*        ***Amendments.***

        (a)        *Plan Modifications*.  The Debtors reserve the right, with the consent of the Creditors' Committee, not to be unreasonably withheld, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan (i) prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code, and (ii) after entry of the Confirmation Order, the Debtors may, upon order of the Court, amend, modify or supplement the Plan in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, in each case without additional disclosure pursuant to section 1125 of the Bankruptcy Code.  In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims or Allowed Interests pursuant to the Plan, the Debtors may remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes or effects of the Plan, and any holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan as amended, modified, or supplemented.

        (b)        *Other Amendments*.  Before the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan and the documents contained in the Plan Supplement without further order or approval of the Bankruptcy Court.

        *e)*        ***Revocation or Withdrawal of the Plan.***

The Debtors reserve the right to revoke or withdraw the Plan, including the right to revoke or withdraw the Plan for any Debtor of all Debtors, prior to the Confirmation Date.  If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, in each case with respect to a Debtor, then, with respect to such Debtor: (a) the Plan shall be null and void in all respects; (b) any assumption or rejection of executory contracts or unexpired leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (c) nothing contained in the Plan shall: (i) constitute a waiver or release of any Claims or Interests; (ii) prejudice in any manner the rights of the Debtors, the Estates, or any other Entity; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors, the Estates, or any other Entity.

        *f)*        ***Severability of Plan Provisions upon Confirmation.***

If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination

and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the Wind Down Trust (as the case may be); and (3) nonseverable and mutually dependent.

g)    *Governing Law.*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated herein, the laws of the State of Delaware, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided*, that corporate or limited liability company governance matters relating to the Debtors shall be governed by the laws of the state of incorporation or formation (as applicable) of the applicable Debtor.

h)    *Time.*

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

i)    *Additional Documents*

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors and all holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest are authorized to prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

j)    *Retention of Books and Records*

Neither the Debtor nor the Wind-Down Trust shall destroy or otherwise abandon any such books, records, electronically stored information, or other documents without authorization from the Bankruptcy Court and without providing advance notice to the SEC (c/o Therese A. Scheuer and Michael Kelly, U.S. Securities and Exchange Commission, 100 F Street, NE, Washington, DC 20549, Scheuert@sec.gov; Kellymich@sec.gov  and William M Uptegrove, U.S. Securities and Exchange Commission, 950 East Paces Ferry Road, NE, Suite 900, Atlanta, GA 30326, UptegroveW@SEC.GOV), which shall have seven (7) days to object to any proposed destruction or abandonment,; *provided* that, nothing in the Plan or the Confirmation Order shall affect the obligations of the Debtor, the Wind-Down Trust, and/or any transferee or custodian to maintain any books and records that are subject to any governmental subpoena, document preservation letter, or other investigative request from a governmental agency. The Wind Down Budget shall include an amount appropriate to fund this obligation.

k)    *Immediate Binding Effect.*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the Wind Down Trust, the holders of Claims and Interests, the Released Parties, the Exculpated Parties, and each of their respective successors and assigns, including, without limitation, the Wind Down Trustee.

l)      ***Successors and Assigns.***

The rights, benefits, and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or permitted assign, if any, of each Entity.

m)      ***Entire Agreement.***

On the Effective Date, the Plan, the Plan Supplement and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

n)      ***Notices.***

All notices, requests and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

(i)      If to the Debtors, prior to the Effective Date:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attn:    Ronit Berkovich
         Jessica Liou
         Clifford W. Carlson
         F. Gavin Andrews
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

- and –

Richards, Layton & Finger, P.A.
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Attn:    Paul N. Heath
         Zachary I. Shapiro
         Matthew P. Milana
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

(ii)     If to the Wind Down Trust or the Plan Administrator, after the Effective Date:

An address to be identified in the Plan Supplement.

After the Effective Date, the Debtors have authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Debtors are authorized to limit the list of

Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

## VI.
## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF PLAN

A.    **General**

The following discussion summarizes certain material U.S. federal income tax consequences of the implementation of the Plan to the Debtors and to certain holders of Relevant Claims (as defined below). This summary does not address the U.S. federal income tax consequences to (1) holders of Claims who are deemed to have rejected the Plan in accordance with the provisions of section 1126(g) of the Bankruptcy Code, (2) holders whose Claims are Unimpaired or otherwise entitled to payment in full in Cash under the Plan or (3) purchasers of Claims following the Effective Date.  Thus, this summary applies only to holders of Allowed General Unsecured Claims and Allowed Crypto Loss Claims (collectively, with Allowed General Unsecured Claims, the "**Relevant Claims**").  This summary does not address the U.S. federal income tax consequences to holders of a Claim that is not treated as debt for U.S. federal income tax purposes.  This summary is based on the Internal Revenue Code of 1986, as amended (the "**Code**"), existing and proposed U.S. Treasury regulations thereunder (the "Treasury Regulations"), judicial decisions, published administrative rules, pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date of this Disclosure Statement and all of which are subject to change, possibly on a retroactive basis.  Any such change could significantly affect the U.S. federal income tax consequences described below.

The U.S. federal income tax consequences of the Plan are complex and subject to significant uncertainties. The Debtors have not requested, and do not plan to request, an opinion of counsel or a ruling from the IRS with respect to any of the tax aspects of the Plan.  This summary does not address state, local, or foreign income or other tax consequences of the Plan, nor does it purport to address the U.S. federal income tax consequences of the Plan to special classes of taxpayers (such as governmental authorities or agencies, broker-dealers, banks, mutual funds, insurance companies, financial institutions, thrifts, small business investment companies, regulated investment companies, real estate investment trusts, tax-exempt organizations, retirement plans, individual retirement and other tax-deferred accounts, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes, persons holding Claims as part of a hedging, straddle, conversion or constructive sale transaction or other integrated investment, traders in securities that elect to use a mark-to-market method of accounting for their security holding, dealers in securities or foreign currencies, persons whose functional currency is not the U.S. dollar, certain expatriates or former long term residents of the United States, persons who received their Claim as compensation or who acquired their Claim in the secondary market, persons who use the accrual method of accounting and report income on an "applicable financial statement," and persons subject to the alternative minimum tax or the "Medicare" tax on net investment income).  Additionally, this discussion does not address U.S. federal taxes other than income taxes, nor does it address the Foreign Account Tax Compliance Act.

This discussion assumes that the applicable holder has not claimed a bad debt deduction with respect to a Claim (or any portion thereof) in the current or any prior year and that such Claim did not become completely or partially worthless in a prior taxable year.  Additionally, this discussion assumes that (1) the various debt and other arrangements to which any of the Debtors is a party will be respected for U.S. federal income tax purposes in accordance with their forms and (2) except where otherwise indicated, the Claims are held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the Code.  In the event that an instrument denominated as debt were treated as equity for U.S. federal income tax purposes, the tax consequences described herein could be materially different.

**ACCORDINGLY, THE FOLLOWING SUMMARY IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING OR FOR ADVICE BASED UPON THE PARTICULAR CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. EACH HOLDER OF A CLAIM SHOULD CONSULT ITS OWN TAX ADVISORS FOR THE U.S. FEDERAL, STATE, LOCAL, AND NON-U.S. INCOME AND OTHER TAX CONSEQUENCES APPLICABLE TO IT UNDER THE PLAN.**

      B.      <u>Certain U.S. Federal Income Tax Consequences to the Debtors</u>

Generally, the Plan is not expected to have any material U.S. federal income tax consequences to the Debtors as the Debtors are not subject to U.S. taxation. Accordingly, this discussion does not address any U.S. federal income tax consequences relevant to the implementation of the Plan to the Debtors.

      C.      <u>Certain U.S. Federal Income Tax Consequences to U.S. Holders of Relevant Claims</u>

The discussion below applies only to U.S. holders. As used herein, the term "U.S. holder" means a beneficial owner of a Relevant Claim that is for U.S. federal income tax purposes:

      (i)      an individual who is a citizen or resident of the United States;

      (ii)      a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

      (iii)      an estate the income of which is subject to U.S. federal income taxation regardless of its source; or a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. person.

If a partnership or other entity or arrangement taxable as a partnership for U.S. federal income tax purposes holds a Relevant Claim, the U.S. federal income tax treatment of a partner in such partnership generally will depend upon the status of the partner and the activities of the partnership. If you are a partner in such a partnership holding any of such Claims, you are urged to consult your tax advisor.

      a)      *The U.S. Federal Income Tax Treatment to U.S. Holders of Relevant Claims May Vary Depending on the Characterization of the Wind Trust for U.S. Federal Income Tax Purposes*

On the Effective Date, the Debtors' assets and liabilities will be transferred to and vest in the Wind Down Trust. However, whether the Wind Down Trust qualifies as a liquidating trust for U.S. federal income tax purposes is subject to some uncertainty. To the extent the Wind Down Trust does not qualify as a liquidating trust for U.S. federal income tax purposes, U.S. holders of Relevant of Claims will be treated as receiving a direct distribution of assets from the Wind Down Trust in full satisfaction of their claims as discussed herein in the section entitled "*Certain U.S. Federal Income Tax Consequences to U.S. Holders of Relevant Claims Treated as Receiving a Direct Distribution of Assets from the Wind Down Trust*." However, if the Wind Down Trust qualifies as a liquidating trust for U.S. federal income tax purposes, U.S. holders of Relevant of Claims will be treated as receiving an interest in the Wind Down Trust on the Effective Date

in full satisfaction of their claims as discussed more fully herein in the section entitled "*Consequences to U.S. Holders Treated as Receiving an Interest in a Liquidating Trust*."

>    b)    ***Consequences to U.S. Holders of Allowed General Unsecured Claims Treated as Receiving Direct Distributions of Assets from the Wind Down Trust***

To the extent the Wind Down Trust does not qualify as a liquidating trust for U.S. federal income tax purposes, a U.S. holder of an Allowed General Unsecured Claim will viewed as receiving in full and final satisfaction of their Claim on the Effective Date its *pro rata* share of the GUC Pool to be comprised of: (i) Effective Date Available Cash, (ii) any Post-Effective Date Cash, (iii) any Surplus Reserved Cash, (iv) any Surplus Senior Claim Pool Cash or (v) some combination of the consideration described in (i) through (iv) (the consideration contemplated in (ii) to (iv), collectively "**GUC Pool CVR**").

>    (i)    **Treatment of Gain or Loss**

U.S. holders of Allowed General Unsecured Claims treated as receiving an interest in the GUC Pool generally should recognize gain or loss in a taxable transaction.  Such gain or loss should generally be equal to the difference, if any, between (i) the sum of the Effective Date Available Cash received and the fair market value of the GUC Pool CVR received by such holder in respect of such holder's Claim, and (ii) the U.S. holder's adjusted basis, if any, in such Allowed General Unsecured Claims.

The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. holder, the nature of the Claim in such U.S. holder's hands and whether the Claim was purchased at a discount.  If any recognized gain is capital gain, it generally would be long-term capital gain if the U.S. holder held its Claim for more than one year at the time of the exchange.  The deductibility of capital losses is subject to certain limitations.  Each U.S. holder of an Allowed General Unsecured Claims should consult its own tax advisor to determine whether gain or loss recognized by such U.S. holder will be long-term capital gain or loss and the specific tax effect thereof on such U.S. holder.  Furthermore, the amount of gain or loss a U.S. holder recognizes, and the timing and potential character of such gain or loss, will also depend on the U.S. federal income tax treatment of the GUC Pool CVRs, with respect to which there is a significant amount of uncertainty.  U.S. holders receiving GUC Pool CVRs should carefully review the information provided in the section herein entitled "Treatment of U.S. Holders Receiving CVRs" for a more detailed discussion of the U.S. federal income tax consequences associated with such interests.

>    c)    ***Consequences to U.S. Holders of Allowed Crypto Loss Claims Treated as Receiving Direct Distributions of Assets from the Wind Down Trust***

To the extent the Wind Down Trust does not qualify as a liquidating trust from U.S. federal income tax purposes, a U.S. holder of a Allowed Crypto Loss Claim will be viewed as receiving in full and final satisfaction of their Claim its *pro rata* share of (a) any remaining funds in the GUC Pool after the full satisfaction of all Allowed General Unsecured Claims (the "**GUC Pool Remaining** CVR") and (b) the SEC Settlement Fund.  The SEC Settlement Fund is comprised of (i) Cash, cash equivalents, Tokens, and other Assets transferred to the Wind Down Estates as of the Effective Date and (ii) such other funds, Cash, cash equivalents, or other Assets transferred to the Wind Down Estates after the Effective Date (the "**SEC Settlement CVR**").

>    (i)    **Treatment of Gain or Loss**

U.S. holders of Allowed Crypto Loss Claims treated as receiving an interest in the GUC Pool Remaining CVR and the SEC Settlement Fund CVR generally should recognize gain or loss in a taxable transaction.

Such gain or loss should generally be equal to the difference, if any, between (i) the fair market value of the GUC Pool Remaining CVRs received by such holder in respect of such holder's Claim, and the fair market value of the SEC Settlement Fund CVR received by such holder in respect of such holder's Claim, and (ii) the U.S. holder's adjusted basis, if any, in such Allowed Crypto Loss Claim(s).

The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. holder, the nature of the Claim in such U.S. holder's hands and whether the Claim was purchased at a discount.  If any recognized gain is capital gain, it generally would be long-term capital gain if the U.S. holder held its Claim for more than one year at the time of the exchange.  The deductibility of capital losses is subject to certain limitations.  Each U.S. holder of an Allowed Crypto Loss Claims should consult its own tax advisor to determine whether gain or loss recognized by such U.S. holder will be long-term capital gain or loss and the specific tax effect thereof on such U.S. holder.  Furthermore, the amount of gain or loss a U.S. holder recognizes, and the timing and potential character of such gain or loss, will also depend on the U.S. federal income tax treatment of the SEC Settlement CVRs, with respect to which there is a significant amount of uncertainty.  U.S. holders receiving SEC Settlement CVRs should carefully review the information provided in the section herein entitled "Treatment of U.S. Holders Receiving CVRs" for a more detailed discussion of the U.S. federal income tax consequences associated with such interests.

(ii)      **Treatment of U.S. Holders Receiving CVRs**

The following summary is for informational purposes only and it is not a substitute for careful tax planning or for advice based upon the particular circumstances pertaining to a holder of a Relevant Claim.  The amount of gain or loss a U.S. holder recognizes, and the timing and potential character of such gain or loss, will depend on the U.S. federal income tax treatment of the GUC Pool CVRs, GUC Pool Remaining CVRs, and SEC Settlement CVRs (collectively the "**CVRs**"), with respect to which there is a significant amount of uncertainty.  The tax treatment of a CVR will depend, in part, on whether the receipt of a CVR is a "closed transaction" or an "open transaction" for U.S. federal income tax purposes and whether the rights afforded under the CVR s are treated as rights to payments under a contract or a debt instrument.  Each U.S. holder is strongly encouraged to consult its own tax advisors regarding the proper characterization, method of tax accounting, tax reporting and other tax consequences applicable to such holder's receipt of a CVR under the Plan.

The receipt of CVRs by a U.S. holder in exchange for their Claims should be treated as a taxable transaction for U.S. federal income tax purposes.  The amount of gain or loss a U.S. holder recognizes, and the timing and potential character of such gain or loss, will depend on the U.S. federal income tax treatment of the CVRs, with respect to which there is a significant amount of uncertainty.

For example, the treatment of the CVRs will depend, in part, on whether the receipt of such CVRs is a "closed transaction" or an "open transaction" for U.S. federal income tax purposes.  Pursuant to Treasury Regulations dealing with contingent payment obligations that are analogous to a CVR, if the fair market value of the CVRs is "reasonably ascertainable," a U.S. holder should generally treat the transaction as a "closed transaction" and treat the fair market value of the CVRs received as part of the consideration received for purposes of determining gain or loss.  On the other hand, if the fair market value of the CVRs cannot be reasonably ascertained, a U.S. holder could treat the transaction as an "open transaction" for purposes of determining gain or loss.  These Treasury Regulations state that only in "rare and extraordinary" cases would the value of contingent payment obligations not be reasonably ascertainable.  There is no authority directly addressing whether contingent payment obligations with characteristics similar to the rights of the CVRs here should be treated as "open transactions" or "closed transactions," and such question is inherently factual in nature.

In addition, the U.S. federal income tax treatment of the rights to proceeds from the CVRs will also depend, in part, on whether the right to payments under a CVR are treated as payments made under a contract or a debt instrument. For purposes of this disclosure, we have assumed that the CVRs, and the payments made thereunder, are not treated as a debt instrument for U.S. federal income tax purposes and, therefore, the discussion provided below does not address the tax consequences of such a characterization. The IRS is not bound by any such position, and may characterize the CVRs as a debt instrument or otherwise. If the IRS were to take a contrary position, the tax treatment to U.S. holders receiving CVRs may be materially different from the treatment described herein. U.S. holders are therefore urged to consult their own tax advisors regarding the proper characterization, method of tax accounting and tax reporting with respect to the receipt of a CVR under either the "closed transaction" method or "open transaction" method, as applicable to their respective case.

Assuming closed transaction treatment applies with respect to a U.S. holder's receipt of a CVR, such U.S. holder should generally recognize gain or loss, taking into account the "reasonably ascertainable" fair market value of the CVR (determined on the date the CVR is received), as an additional amount realized (subject to the separate treatment of any amounts received and tax basis allocable to accrued but unpaid interest or amortized original issue discount). The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. holder, the nature of the Claim in such U.S. holder's hands and whether the Claim was purchased at a discount. If any recognized gain is capital gain, it generally would be long-term capital gain if the U.S. holder held its Claim for more than one year at the time of the exchange. The deductibility of capital losses is subject to certain limitations.

Under such treatment, a U.S. holder should obtain a tax basis in the CVRs, other than any such amounts treated as received in satisfaction of accrued but untaxed interest, equal to the fair market value thereof as of the date such CVR is received by such holder. The tax basis of any CVRs determined to be received in satisfaction of accrued but untaxed interest should equal the amount of such accrued but untaxed interest. The holding period for any such CVRs would begin on the day following the date a CVR is received.

There is no authority directly addressing the U.S. federal income tax treatment of receiving payments in respect of the CVRs and, therefore, the amount, timing and character of any gain, income or loss of such CVRs is uncertain. For example, payments made with respect to the CVRs could be treated as payments with respect to a sale or exchange of a capital asset or as giving rise to ordinary income. In addition, it is unclear how a U.S. holder of a CVR would recover its adjusted tax basis in a CVR. It is possible that a holder may not be able to recover its adjusted basis in a CVR until the last payment on the CVR is made or until such a CVR is disposed of by such holder. It is also possible that, were a payment to be treated as being made with respect to the sale of a capital asset, a portion of such payment could constitute imputed interest, which would be ordinary income to the U.S. holder of a CVR.

However, if open transaction treatment is applied by a U.S. holder on its receipt of a CVR (because the value cannot be "reasonably ascertained" as of the Effective Date), such U.S. holder generally would not take the CVRs into account on the Effective Date for purposes of determining gain with respect to the exchange, generally would take no tax basis in the CVRs (and accordingly would generally realize gain as they receive any payments pursuant to the CVRs in excess of their adjusted tax basis in the Claims exchange therefor) and generally would not recognize any loss until the receipt of final payments under, or other disposition of, a CVR. In addition, a portion of the payments made pursuant to a CVR may also be treated as imputed interest, which would be ordinary income to the U.S. holder of a CVR.

        *d)*      ***Consequences to U.S. Holders Treated as Receiving an Interest in a Liquidating Trust***

Although not free from doubt, the Wind Down Trust may qualify as a "foreign liquidating trust", and thus a grantor trust, for U.S. federal income tax purposes. In general, a liquidating trust is not a separate taxable entity but rather is treated for U.S. federal income tax purposes as a "grantor" trust (i.e., a pass-through entity). No ruling is currently being requested from the IRS concerning the tax status of the Wind Down Trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Wind Down Trust as a grantor trust. If the IRS were to take a contrary position, the tax treatment to U.S. holders may be materially different from the treatment described herein.

To the extent that the Wind Down Trust is treated as a liquidating trust for U.S. federal income tax purposes, U.S. holders would be treated as grantors of the Wind Down Trust and thus deemed owners thereof and, for U.S. federal income tax purposes, any such holders would be treated as if they had received from the Debtors a distribution of an undivided interest in the assets transferred to the Wind Down Trust (i.e., cash and/or CVRs) in satisfaction of their respective claims and then contributed such undivided interest in such assets to the Wind Down Trust. If this treatment applies, the treatment of the deemed transfer of assets to the applicable U.S. holder of Relevant Claims should generally be consistent with the treatment described above with respect to the receipt of the applicable assets directly. To the extent any taxable income and loss is generated by the Wind Down Trust from such assets, such taxable income or loss (if any) will be allocated among, and treated as directly earned and incurred by, the holders of Claims with respect to such holder's interest in the Wind Down Trust. The character of any income and the character and ability to use any loss would depend on the particular situation of such U.S. holder. Furthermore, the U.S. federal income tax obligations of a holder that is deemed to receive an interest in the Wind Down Trust are not dependent on the Wind Down Trust distributing any cash. Thus, a holder of an interest in the Wind Down Trust may incur a U.S. federal income tax liability with respect to its allocable share of the Wind Down Trust's income (if any) even if the Wind Down Trust does not make a concurrent distribution to such holders.

The U.S. federal tax laws applicable to foreign grantor trusts require such foreign grantor trusts and any U.S. beneficiaries of such trusts to comply with specific tax reporting and filing requirements. For example, a foreign grantor trust is generally required to annually file IRS Form 3520-A and furnish certain information to such U.S. beneficiaries, and each U.S. beneficiary of such foreign grantor trust is also responsible for annually filing an IRS Form 3520. Failure to comply with these specific tax reporting and filing obligations (other than due to reasonable cause and not willful neglect) may result in U.S. holders of an interest in the Wind Down Trust being subject to potentially significant penalties. While the Debtors intend for the Wind Down Trust to comply with the aforementioned tax reporting and filing requirements, there can be no assurance that all such information will be furnished or that all such tax forms will be timely or appropriately filed.

Accordingly, U.S. holders are urged to consult their own tax advisors regarding the proper characterization, method of tax accounting and tax reporting with respect to the receipt of an interest in the Wind Down Trust pursuant to the Plan.

      **D.**      **<u>Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Relevant Claims, and CVRs</u>**

This section applies to you if you are a non-U.S. holder. For purposes of this discussion, a "non-U.S. holder" is a beneficial owner (other than a partnership or an entity or arrangement characterized as a partnership for U.S. federal income tax purposes) of Relevant Claims that is not a U.S. holder, including a nonresident alien individual (other than certain former citizens and residents of the United States), a non-

U.S. corporation, or a non-U.S. estate or trust.  This section generally does not apply to an individual who is present in the United States for 183 days or more in a taxable year.

### a)   *In General*

In the case of the delivery of cash, Tokens, CVRs, interests in a liquidating trust, or other assets, as the case may be, in full satisfaction, settlement, discharge and release of a Relevant Claim, a non-U.S. holder of Relevant Claims generally should not be subject to U.S. federal income tax on any gain recognized as a result of the exchange, unless (i) the non-U.S. holder is an individual present in the United States for 183 days or more in the taxable year of the disposition and certain other conditions are met, or (ii) the gain is effectively connected with the non-U.S. holder's conduct of a trade or business in the United States (or if required by an applicable tax treaty, is attributable to a permanent establishment maintained by the non-U.S. holder in the United States).

### b)   *Ownership and Disposition of CVRs by Non-U.S. Holders*

A non-U.S. holder of CVRs, will not be subject to U.S. federal income or withholding tax on payments made with respect to CVRs unless such income is effectively connected with the conduct by the non-U.S. holder of a trade or business in the United States.  A non-U.S. holder of CVRs should not be subject to U.S. federal income or withholding tax on any gain realized on the sale or other taxable disposition of any such interests unless (i) the holder is an individual present in the United States for 183 days or more in the taxable year of the disposition and certain other conditions are met, or (ii) the gain is effectively connected with the holder's conduct of a trade or business in the United States (or if required by an applicable tax treaty, is attributable to a permanent establishment maintained by the non-U.S. holder in the United States).

### E.   **Information Reporting and Backup Withholding**

Distributions or payments made (or treated as made) to a U.S. holder of a Relevant Claim may be subject to information reporting to the IRS and U.S. backup withholding.

A U.S. holder may be eligible for an exemption from backup withholding if the U.S. holder furnishes a correct taxpayer identification number and makes any other required certification or is otherwise exempt from backup withholding.  U.S. holders who are required to establish their exempt status may be required to provide such certification on IRS Form W-9.  U.S. holders should consult their tax advisors regarding the application of the U.S. information reporting and backup withholding rules.

Backup withholding is not an additional tax.  Amounts withheld as backup withholding may be credited against a U.S. holder's U.S. federal income tax liability, and such U.S. holder may obtain a refund of any excess amounts withheld under the backup withholding rules by timely filing an appropriate claim for refund with the IRS and furnishing any required information.

In addition, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  U.S. holders are urged to consult their own tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the U.S. holders' tax returns.

U.S. holders should also be aware that additional reporting requirements may apply with respect to the holding of certain non-U.S. financial assets.  U.S. holders are encouraged to consult their own tax advisors regarding the application of these additional reporting requirements to their particular situations.

The U.S. federal income tax consequences of the Plan are complex. The foregoing summary does not discuss all aspects of U.S. federal income taxation that may be relevant to a particular holder in light of such holder's circumstances and income tax situation. All holders of Claims and interests should consult with their tax advisors as to the particular tax consequences to them of the transactions contemplated by the Plan, including the applicability and effect of any state, local, or foreign tax laws, and of any change in applicable tax laws.

**The U.S. federal income tax consequences of the Plan are complex. The foregoing summary does not discuss all aspects of U.S. federal income taxation that may be relevant to a particular holder in light of such holder's individual circumstances and income tax situation. All holders of Claims and interests should consult with their tax advisors as to the particular tax consequences to them of the transactions contemplated by the Plan, including the applicability and effect of any federal, state, local, or foreign tax laws, and of any change in applicable tax laws.**

## VII.
## CERTAIN SINGAPOREAN TAX CONSEQUENCES OF PLAN

Any gains considered to be in the nature of capital will generally not be taxable in Singapore. However, any gains derived by any person which are gains from any trade, business, profession or vocation carried on by that person, if accruing in or derived from Singapore, may be taxable as such gains are considered revenue in nature.

There are no specific laws or regulations which deal with the characterization of capital gains. The characterization of any gains arising from the transactions contemplated by the Plan will depend on the individual facts and circumstances of the particular holder of Claims.

Further, subject to exceptions, income that is sourced outside of Singapore, and that is received in Singapore from outside Singapore, would also generally be subject to Singapore income tax.

**Any holders of Claims who are resident in Singapore or otherwise may be subject to Singapore tax should consult their own tax advisors regarding the tax consequences of the Plan in Singapore (and elsewhere, if they are subject to tax in a jurisdiction outside Singapore).**

## VIII.
## CERTAIN RISK FACTORS TO BE CONSIDERED

THIS SECTION PROVIDES INFORMATION REGARDING POTENTIAL RISKS IN CONNECTION WITH THE PLAN. THE FACTORS BELOW SHOULD NOT BE REGARDED AS THE ONLY RISKS ASSOCIATED WITH THE PLAN OR ITS IMPLEMENTATION. NEW FACTORS, RISKS AND UNCERTAINTIES EMERGE FROM TIME TO TIME AND IT IS NOT POSSIBLE TO PREDICT ALL SUCH FACTORS, RISKS AND UNCERTAINTIES.

Prior to voting to accept or reject the Plan, holders of Claims should read and carefully consider the risk factors set forth below, in addition to the other information set forth in this Disclosure Statement including any attachments, exhibits, or documents incorporated by reference.

A.      **Certain Bankruptcy Law Considerations**

     *a)*      ***Risk of Non-Confirmation of Plan***

Although the Debtors believe that the Plan satisfies all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate re-solicitation of votes. Moreover, even if the Voting Classes (as defined herein) voted in favor of the Plan, the Bankruptcy Court, which may exercise substantial discretion as a court of equity, may choose not to confirm the Plan. If the Plan is not confirmed, it is unclear what distributions (if any) holders of Claims or Interests ultimately would receive with respect to their Claims or Interests in a subsequent plan under chapter 11 of the Bankruptcy Code.

     *b)*      ***Risk of Failing to Satisfy Vote Requirement***

Although the Debtors believe that the Plan will satisfies all requirements necessary for confirmation by the Bankruptcy Court, the Debtors can make no assurances that it will receive the requisite acceptances to confirm the Plan. Under the Plan, only holders of Allowed Claims in Classes 4, 5, and 6 are voting on the Plan. In the event that Classes 4, 5, and 6 all do not vote to accept the Plan, the Plan for the Debtors may not be confirmed.[43] In the event that the Debtors are unable to get sufficient votes from the Voting Classes, the Debtors may seek to accomplish an alternative chapter 11 plan with the consultation of the Creditors' Committee and SEC. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to holders of Claims as those proposed in the Plan.

     *c)*      ***Risk of Non-Occurrence of Effective Date***

There can be no assurance as to the timing of the Effective Date. If the conditions precedent to the Effective Date set forth in the Plan have not occurred or have not been waived as set forth in Section 9 of the Plan, then the Confirmation Order may be vacated, in which event no distributions would be made under the Plan, the Debtors and all holders of Claims or Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtors' obligations with respect to Claims and Interests would remain unchanged. This includes obligations relating to the SEC Claim.

     *d)*      ***Risk Related to Possible Objections to Plan***

There is a risk that certain parties could oppose and object to the Plan in the Bankruptcy Court either in its entirety or to specific provisions of the Plan. While the Debtors believe that the proposed Plan complies with all relevant Bankruptcy Code provisions, there can be no guarantee that a party in interest will not file an objection to the Plan or that the Bankruptcy Court will not sustain such an objection.

     *e)*      ***Conversion to Chapter 7***

If a chapter 11 plan cannot be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of holders of Claims and Interests, this Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a chapter 7 trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy

---

[43]     The Debtors reserve the right to argue that the Plan may be confirmed as long as there is one impaired accepting class of creditors in the joint plan. *See In re Transwest Resort Properties Inc.*, 881 F.3d 724 (9th Cir. 2018).

Code.  See Exhibit B hereof, as well as the liquidation analysis, for a discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of Claims and Interests (the "**Liquidation Analysis**").

The terms of the Plan and the distribution to creditors therein encapsulates the terms of the SEC Settlement.  As described above, the Plan therefore contemplates a material distribution to Crypto Loss Claims via the Assets that Mr. Kwon transfers, including from LFG.  The SEC Settlement specifically contemplates such distributions being made pursuant to the Plan; therefore, holders of Crypto Loss Claims, as outlined in the Liquidation Analysis, would receive a less favorable distribution in a chapter 7 liquidation.

### f)      SEC Enforcement Action Related Risks

Pursuant to the terms of the Consent, nothing in the Plan limits the SEC's ability to seek the conversion of the Chapter 11 Cases to chapter 7 cases, the dismissal of the Chapter 11 Cases, or the appointment of a trustee or examiner in the Chapter 11 Cases.  If the SEC were to undertake these actions, the Debtors would be unable to confirm the Plan and there would be no assurance of distributions to creditors.

### B.     **Additional Factors**

### a)      Claims Could be More than Projected

There can be no assurance that the estimated Allowed amount of Claims in certain Classes will not be significantly more than projected, which, in turn, could cause the value of distributions to be reduced substantially.  Some assumptions may not materialize, and unanticipated events and circumstances may affect the ultimate results.  Therefore, the actual amount of Allowed Claims may vary from the Debtors' projections and feasibility analysis, and that variation may be material.

### b)      Administrative and Wind-Down Costs Could be More than Projected

The potential recoveries set forth in this Disclosure Statement are based on estimates of the Senior Claims Pool and the costs of the Wind-Down, all of which are paid ahead of the General Unsecured Claims and Crypto Loss Claims under the Plan.  If the total amount of the Senior Claims Pool or Wind-Down costs are higher than the Debtors' estimates, the percentage recovery to holders of General Unsecured Claims and Crypto Loss Claims maybe be less than projected.

### c)      Debtors Could Withdraw Plan

The Plan may be revoked or withdrawn prior to the Confirmation Date.

### d)      Debtors Have No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

### e)      No Representations Outside Disclosure Statement are Authorized

No representations concerning or related to the Debtors, these Chapter 11 Case, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than

those contained in, or included with, this Disclosure Statement should not be relied upon in making the decision to accept or reject the Plan.

### f)     *No Reliance on Failure to Identify Crypto Loss Claims or Projected Objections*

As outlined above, as of the date of filing of this Disclosure Statement, the General Bar Date will not occur until August 9, 2024, two (2) days after the Disclosure Statement Hearing (defined below), and the Crypto Loss Claims Bar Date will not be established by the Disclosure Statement Hearing, but will be provided for in the Plan Supplement.

Given that the General Bar Date and Crypto Loss Claims Bar Date will occur after the Disclosure Statement Hearing and the quantum of the Crypto Loss Claims will likely not be known until after the Effective Date, no reliance should be placed on the fact that a particular Crypto Loss Claim or projected objection to a particular Crypto Loss Claim is, or is not, identified in this Disclosure Statement.  Further, the Debtors intend to seek, investigate, file, and prosecute Crypto Loss Claims and object to Crypto Loss Claims after the Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Crypto Loss Claims or objections to such Crypto Loss Claims.

### g)     *Asset Recovery Issues*

The Debtors may be unable to access, recover, or monetize all of the assets described in Section I.B.a hereof to the extent contemplated, resulting in fewer proceeds being available for distributions.  For example, as described in Section IV.G.c hereof, there are certain impediments to the receipt of significant assets from LFG and Mr. Kwon.

### h)     *No Legal or Tax Advice is Provided by Disclosure Statement*

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each Claim or Interest holder should consult their own legal counsel and accountant as to legal, tax, and other matters concerning their Claim or Interest.

This Disclosure Statement is not legal advice to you.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

### i)     *No Admission Made*

Nothing contained herein or in the Plan will constitute an admission of, or will be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or on holders of Claims or Interests.

### j)     *Certain Tax Consequences*

For a discussion of certain tax considerations to the Debtors and certain holders of Claims in connection with the implementation of the Plan, *see* Section VII hereof.

## IX.
## VOTING PROCEDURES AND REQUIREMENTS

Before voting to accept or reject the Plan, each holder of a Claim in Class 4 (General Unsecured Claims), Class 5 (Crypto Loss Claims), and Class 6 (SEC Claim) (each, an "**Eligible Holder**" and, collectively, the "**Eligible Holders**") as of (i) August 9, 2024 (the "**Voting Record Date**") for holders of claims in all voting classes except Class 5 (Crypto Loss Claims), or (ii) August 21, 2024 (the "**Preliminary Crypto**

**Loss Claims Bar Date**") for holders of claims in Class 5 (Crypto Loss Claims), as applicable, should carefully review the Plan annexed hereto as **Exhibit A**.

A.       **Voting Deadline**

All Eligible Holders as of the Voting Record Date or the Preliminary Crypto Loss Claims Bar Date, as applicable, will be provided with a Ballot together with this Disclosure Statement to vote to accept or reject the Plan (a "**Ballot**"). Only Eligible Holders are entitled to vote to accept or reject the Plan. Because Classes 1, 2, 3, and 8 (if so treated) are unimpaired and deemed to accept, and Classes 7, 8 (if so treated), 9, and 10 are conclusively deemed to reject, only Classes 4, 5, and 6 are entitled to vote.

The Debtors have engaged Epiq Corporate Restructuring, LLC as its voting agent (the "**Voting Agent**") to assist in the transmission of voting materials and in the tabulation of votes with respect to the Plan.

EACH BALLOT CONTAINS DETAILED VOTING INSTRUCTIONS AND SETS FORTH IN DETAIL, AMONG OTHER THINGS, THE DEADLINES, PROCEDURES, AND INSTRUCTIONS FOR VOTING TO ACCEPT OR REJECT THE PLAN, THE VOTING RECORD DATE FOR VOTING PURPOSES, AND THE APPLICABLE STANDARDS FOR TABULATING BALLOTS. ELIGIBLE HOLDERS SHOULD READ THE BALLOT CAREFULLY AND FOLLOW THE INSTRUCTIONS THEREIN.

THE VOTING DEADLINE IS 4:00 P.M., PREVAILING EASTERN TIME, ON SEPTEMBER 12, 2024, UNLESS EXTENDED BY THE DEBTORS (THE "**VOTING DEADLINE**"). FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE EXECUTED IN ACCORDANCE WITH THE INSTRUCTIONS INCLUDED IN THE BALLOT AND MUST BE ACTUALLY RECEIVED BY THE VOTING AGENT ON OR BEFORE THE VOTING DEADLINE. IF A BALLOT IS DAMAGED OR LOST, YOU MAY CONTACT THE VOTING AGENT AT THE NUMBER SET FORTH BELOW TO RECEIVE A REPLACEMENT BALLOT. ANY BALLOT THAT IS EXECUTED AND RETURNED BUT WHICH DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN WILL NOT BE COUNTED.

UNLESS THE BALLOT IS SUBMITTED TO THE VOTING AGENT ON OR PRIOR TO THE VOTING DEADLINE, SUCH BALLOT WILL BE REJECTED AS INVALID AND WILL NOT BE COUNTED AS AN ACCEPTANCE OR REJECTION OF THE PLAN; *PROVIDED*, *HOWEVER*, THAT THE DEBTORS RESERVE THE RIGHT, IN THEIR SOLE DISCRETION, TO ALLOW SUCH BALLOT TO BE COUNTED.

If you have any questions concerning voting procedures, you may contact the voting agent at:

**Epiq Corporate Restructuring, LLC**
**E-mail: TerraformLabs@epiqglobal.com with "Terraform Labs" in the subject line**

**Website: https://dm.epiq11.com/Terraform**

Additional copies of this Disclosure Statement are available upon a request made to the Voting Agent, at the telephone numbers or e-mail address set forth immediately above.

B.       **Voting Procedures**

The Debtors are providing copies of this Disclosure Statement (including all exhibits and appendices), the Plan, and a Ballot (collectively, a "**Solicitation Package**") to Eligible Holders. The Debtors will distribute

a Ballot to all holders of General Unsecured Claims in Voting Class 4, Crypto Loss Claims in Voting Class 5, and SEC Claims in Voting Class 6.

Solely for the purpose of voting, holders of Class 5 (Crypto Loss Claims) who have timely filed a Preliminary Crypto Loss Proof of Claim or timely filed a Proof of Claim asserting a Crypto Loss Claim (based on the face of such proof of claim or as determined upon the review of the Debtors or the Voting Agent), are accorded one (1) vote valued at One Dollar ($1.00) for voting purposes only, and not for purposes of allowance or distribution.

Because Solicitation Packages will be mailed by the Solicitation Date, which falls before the Preliminary Crypto Loss Claims Bar Date, to ensure that all holders of Class 5 Crypto Loss Claims who file timely proofs of claim receive notice and an opportunity to vote, the Debtors will, within three (3) business days after the Preliminary Crypto Loss Claims Bar Date (the "**Supplemental Solicitation Date**"), cause to be served a Solicitation Package upon any party who files a proof of claim by the Preliminary Crypto Loss Claims Bar Date on account of a Class 5 (Crypto Loss Claim) and, at the time of the Preliminary Crypto Loss Claims Bar Date, did not previously receive a Solicitation Package.

To vote, Eligible Holders should provide all of the information requested by the Ballot and, as applicable, should complete and deliver their completed Ballots so that they are actually received by the Voting Agent no later than the Voting Deadline.

###    C.    <u>Parties Entitled to Vote</u>

Under the Bankruptcy Code, only holders of claims or interests in "impaired" classes are entitled to vote on a plan.  Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless: (i) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof, or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

If, however, the holder of an impaired claim or interest will not receive or retain any distribution under the plan on account of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan, and, accordingly, holders of such claims and interests do not actually vote on the plan.  If a claim or interest is not impaired by the plan, the Bankruptcy Code deems the holder of such claim or interest to have accepted the plan and, accordingly, holders of such claims and interests are not entitled to vote on the Plan.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

The Bankruptcy Code defines "acceptance" of a plan by a class of:  (i) claims as acceptance by creditors in that class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the claims that cast ballots for acceptance or rejection of the plan; and (ii) interests as acceptance by interest holders in that class that hold at least two-thirds (2/3) in dollar amount of the interests that cast ballots for acceptance or rejection of the plan.

Claims in Classes 4, 5, and 6 are impaired under the Plan and the only Classes of Claims or Interests entitled to vote to accept or reject the Plan (the "**Voting Class**" or the "**Voting Claims**").

Claims and Interests in all other Classes are either unimpaired and deemed to accept or impaired and deemed to reject the Plan and are not entitled to vote. For a detailed description of the treatment of Claims and Interests under the Plan, *see* Section I of this Disclosure Statement.

The Debtors will request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code over the deemed rejection of the Plan by all classes deemed to reject. Section 1129(b) of the Bankruptcy Code permits the confirmation of a chapter 11 plan notwithstanding the rejection of such plan by one or more impaired classes of claims or interests. Under section 1129(b), a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each rejecting class. For a more detailed description of the requirements for confirmation of a nonconsensual plan, *see* Section X of this Disclosure Statement.

### a) *Miscellaneous*

All Ballots must be signed by the Eligible Holder, or any person who has obtained a properly completed Ballot proxy from the Eligible Holder by the Voting Record Date. Unless otherwise ordered by the Bankruptcy Court, Ballots that are signed, dated, and timely received, but on which a vote to accept or reject the Plan has not been indicated, will not be counted. The Debtors, in its sole discretion, may request that the Voting Agent attempt to contact such voters to cure any such defects in the Ballots. Any Ballot marked to both accept and reject the Plan will not be counted. If an Eligible Holder casts more than one Ballot voting the same Claim(s) before the Voting Deadline, the last valid Ballot received on or before the Voting Deadline will be deemed to reflect such Eligible Holder's intent, and thus, will supersede any prior Ballot. If an Eligible Holder casts Ballots received by the Voting Agent on the same day, but which are voted inconsistently, such Ballots will not be counted. An otherwise properly executed Ballot that attempts to partially accept and partially reject the Plan will likewise not be counted.

The Ballots provided to Eligible Holders will reflect the amount of such Eligible Holder's Claim; however, when tabulating votes, the Voting Agent may adjust the amount of such Eligible Holder's Claim by multiplying that amount by a factor that reflects all amounts accrued between the Voting Record Date and the Petition Date including, without limitation, interest.

Under the Bankruptcy Code, for purposes of determining whether the requisite votes for acceptance have been received, only holders of Claims in Classes 4, 5, and 6 who actually vote will be counted. The failure of a holder to deliver a duly executed Ballot to the Voting Agent will be deemed to constitute an abstention by such holder with respect to voting on the Plan and such abstentions will not be counted as votes for or against the Plan.

Except as provided below, unless the Ballot is timely submitted to the Voting Agent before the Voting Deadline, together with any other documents required by such Ballot, the Debtors may, in its sole discretion, reject such Ballot as invalid, and therefore decline to utilize it in connection with seeking confirmation of the Plan.

### b) *Fiduciaries and Other Representatives*

If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or another, acting in a fiduciary or representative capacity, such person should indicate such capacity when signing and, if requested, must submit proper evidence satisfactory to the Debtors of authority to so act. Authorized signatories should submit a separate Ballot of each Eligible Holder for whom they are voting.

> c)      *Agreements Upon Furnishing Ballots*

The delivery of an accepting Ballot pursuant to one of the procedures set forth above will constitute the agreement of the creditor with respect to such Ballot to accept:  (i) all of the terms of, and conditions to, the solicitation; and (ii) the terms of the Plan including the injunction, releases, and exculpations set forth in <u>Section 10</u> of the Plan.  All parties in interest retain their right to object to confirmation of the Plan pursuant to section 1128 of the Bankruptcy Code.

> d)      *Change of Vote*

Any party who has previously submitted to the Voting Agent prior to the Voting Deadline a properly completed Ballot may revoke such Ballot and change its vote by submitting to the Voting Agent prior to the Voting Deadline a subsequent, properly completed Ballot voting for acceptance or rejection of the Plan.

> e)      *Waivers of Defects, Irregularities, etc.*

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawals of Ballots will be determined by the Voting Agent and/or the Debtors, as applicable, in their sole discretion, which determination will be final and binding.  The Debtors reserve the right to reject any and all Ballots submitted by any of their respective creditors not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, as applicable, be unlawful.  The Debtors further reserve its rights to waive any defects or irregularities or conditions of delivery as to any particular Ballot by any of their creditors.  The interpretation (including the Ballot and the respective instructions thereto) by the Debtors, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties.  Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determine.  Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification.  Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived.  Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

## X.
## CONFIRMATION OF PLAN

### A.      Disclosure Statement Hearing and Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a confirmation hearing upon appropriate notice to all required parties.  The Debtors will request that the Bankruptcy Court schedule a hearing to consider final approval of the Disclosure Statement (the "**Disclosure Statement Hearing**").  Subject to the Bankruptcy Court's availability, the Disclosure Statement Hearing will be held on **August 7, 2024 at 10:00 a.m. (Eastern Time)**.

The Debtors will also request that the Bankruptcy court schedule a hearing to consider confirmation of the Plan and any objections thereto (the "**Confirmation Hearing**").  Subject to the Bankruptcy Court's availability, the Confirmation Hearing will be held on **September 19, 2024 at 10:00 a.m. (Eastern Time)**.

Notice of the Disclosure Statement Hearing and the Confirmation Hearing will be provided to all known creditors and equity holders or their representatives.  The Disclosure Statement Hearing and the Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice

except for the announcement of the adjourned date made at the Disclosure Statement Hearing and the Confirmation Hearing, at any subsequent adjourned Disclosure Statement Hearing or Confirmation Hearing, or pursuant to a notice filed on the docket of this Chapter 11 Case.

B.  **Objections to Confirmation and Final Approval of Disclosure Statement**

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan.  Objections to final approval of the Disclosure Statement, if any, must be served and filed as to be received on or before the Disclosure Statement Objection Deadline on **July 29, 2024 at 4:00 p.m. (Eastern Time)** (the **"Objection Deadline"**).  Objections to the confirmation of the Plan, if any, must be served and filed as to be received on or before the Plan Objection Deadline on **September 12, 2024 at 4:00 p.m. (Eastern Time)** (the **"Objection Deadline"**).

Objections, if any, to final approval of the Disclosure Statement and/or confirmation of the Plan (including objections to the releases and exculpation provisions provided therein) must: (i) be in writing; (ii) conform to the Bankruptcy Rules and the Local Rules; (iii) set forth the name of the objecting party, the nature and amount of Claims or Interests held or asserted by the objecting party against the Debtors' estate or property; (iv) set forth the basis for the objection and the specific grounds therefor, and provide proposed language that, if accepted and incorporated by the Debtors, would obviate such objection; and (v) be filed, together with proof of service. Registered users of the Bankruptcy Court's case filing system must electronically file their objections and responses.  All other parties in interest must file their objections and responses in writing with the United States Bankruptcy Court Clerk's Office, 824 North Market Street, 6th Floor, Wilmington, Delaware 19801.  Pursuant to Bankruptcy Rule 3017, any objection or response must also be served upon and received by the following parties no later than the Objection Deadline:

| | |
|---|---|
| ***Debtors*** | ***Office of the U.S. Trustee*** |
| Terraform Labs Pte. Ltd., *et al*. | Office of the U.S. Trustee for |
| 1 Wallich Street, #37-01, | the District of Delaware |
| Guoco Tower, | 844 King Street, Suite 2207, Lockbox 35, |
| Singapore 078881 | Wilmington, Delaware 19801 |
| | Attn: Linda Richenderfer |
| | |
| ***Attorneys to the Debtors*** | ***Attorneys to the Debtors*** |
| Weil, Gotshal & Manges LLP | RICHARDS, LAYTON & FINGER, P.A. |
| 767 Fifth Avenue | One Rodney Square |
| New York, New York 10153 | 920 North King Street |
| Attn:  Ronit J. Berkovich (admitted *pro hac vice*) | Wilmington, Delaware 19801 |
|  Jessica Liou (admitted *pro hac vice*) | Attn:  Paul N. Heath (No. 3704) |
|  Clifford W. Carlson (admitted *pro hac vice*) |  Zachary I. Shapiro (No. 5103) |
|  F. Gavin Andrews (admitted *pro hac vice*) |  Matthew P. Milana (No. 6681) |
| Email: ronit.berkovich@weil.com | Email:heath@rlf.com |
|  jessica.liou@weil.com |  shapiro@rlf.com |
|  f.gavin.andrews@weil.com |  milana@rlf.com |

*Attorneys to the Creditors' Committee*
McDermott Will & Emery LLP
The Brandywine Building
1000 N. West Street, Suite 1400
Wilmington, Delaware 19801
Attn.: David R. Hurst (No. 3743)
   Dante Pavan (No. 7095)
Email: dhurst@mwe.com
   dpavan@mwe.com

One Vanderbilt Avenue
New York, New York 10017
Attn: Darren Azman
   Joseph B. Evans
Email: dazman@mwe.com
   jbevans@mwe.com

333SE 2nd Avenue, Suite 4500
Miami, Florida 33131
Attn: Gregg A. Steinman
Email: gsteinman@mwe.com

> **UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

  C.  **Requirements for Confirmation of Plan**

    (i)  Requirements of Section 1129(a) of Bankruptcy Code

    (a)  General Requirements

At the Confirmation Hearing, the Bankruptcy Court will determine whether the confirmations requirements in section 1129(a) of the Bankruptcy Code have been satisfied, including, without limitation, whether:

    (i)  the Plan complies with the applicable provisions of the Bankruptcy Code;

    (ii)  the Debtors have complied with the applicable provisions of the Bankruptcy Code;

    (iii)  the Plan has been proposed in good faith and not by any means forbidden by law;

    (iv)  any payment made or promised by the Debtors or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with this Chapter 11 Case, or in connection with the Plan and incident to this Chapter 11 Case, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

    (v)  the Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Debtors, an affiliate of the Debtors participating in a Plan with the Debtors, or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of the holders of Claims and Interests and with public policy, and the Debtors have disclosed the identity of any insider who will be employed or retained by the Debtors, and the nature of any compensation for such insider;

    (vi)  with respect to each Class of Claims or Interests, each holder of an impaired Claim or impaired Interest has either accepted the Plan or will receive or retain under the Plan, on account of such holder's Claim or Interest, property of a value, as of the Effective Date of the Plan, that is

not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date of the Plan under chapter 7 of the Bankruptcy Code;

(vii)    except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (as discussed further below), each Class of Claims either accepted the Plan or is not impaired under the Plan;

(viii)    except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that administrative expenses and priority Claims, other than Priority Tax Claims, will be paid in full on the Effective Date, and that Priority Tax Claims will receive either payment in full on the Effective Date or deferred cash payments over a period not exceeding five years after the Petition Date, of a value, as of the Effective Date of the Plan, equal to the Allowed amount of such Claims;

(ix)    at least one Class of impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class;

(x)    confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan; and

(xi)    all fees payable under section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Combined Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

(b)    Best Interests Test

As noted above, with respect to each impaired class of claims and equity interests, confirmation of a plan requires that each such holder either (i) accept the plan, or (ii) receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the value such holder would receive or retain if the debtors were liquidated under chapter 7 of the Bankruptcy Code.  This requirement is referred to as the "best interests test."

This test requires a Bankruptcy Court to determine what the holders of allowed claims and allowed equity interests in each impaired class would receive from a liquidation of the debtors' assets and properties in the context of a liquidation under chapter 7 of the Bankruptcy Code.  To determine if a plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the liquidation of the debtor's assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of claims and equity interests under the plan.

The Debtors believe that under the Plan all holders of impaired Claims and Interests will receive property with a value not less than the value such holder would receive in a liquidation under chapter 7 of the Bankruptcy Code.  The Debtors' belief is based primarily on: (i) consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to holders of impaired Claims, and (ii) the Liquidation Analysis annexed hereto as **Exhibit B**.

The Debtors believe that any liquidation analysis is speculative, as it is necessarily premised on assumptions and estimates which are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Debtors.  The Liquidation Analysis annexed hereto as **Exhibit B** is provided solely for the purpose of disclosing to holders of Claims and Interests the effects of a hypothetical chapter 7 liquidation of the Debtors, subject to the assumptions set forth therein and was prepared on a

Debtor-by-Debtor basis with a summary on a consolidated basis.  There can be neither any  assurance as to values that would actually be realized in a chapter 7 liquidation, nor can there be any assurance that a bankruptcy court will accept the Debtors' conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

(c)     <u>Feasibility</u>

Section 1129(a)(11) of the Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation, or the need for further financial reorganization, unless such liquidation or reorganization is proposed in the Plan.  Because the Plan provides for the liquidation of the Debtors, the Bankruptcy Court will find that the Plan is feasible if it determines that the Debtors will be able to satisfy the conditions precedent to the Effective Date and otherwise have sufficient funds to meet its post-Confirmation Date obligations to pay for the costs of administering and fully consummating the Plan, including sufficient funds for the Plan Administrator to liquidate the Debtors' remaining assets.  Accordingly, the Debtors believe the Plan satisfies the feasibility requirement imposed by the Bankruptcy Code.  Moreover, Section VIII hereof sets forth certain risk factors that could impact the feasibility of the Plan.

(i)     <b><u>Additional Requirements for Non-Consensual Confirmation Under Section 1129(b) of the Bankruptcy Code</u></b>

In the event that any impaired Class of Claims or Interests does not accept, or is deemed to reject the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Debtors if, as to each impaired Class of Claims or Interests that has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such Class, pursuant to section 1129(b) of the Bankruptcy Code.  Both of these requirements are in addition to other requirements established by case law interpreting the statutory requirements.

(d)     <u>Unfair Discrimination Test</u>

The "unfair discrimination" test applies to Classes of Claims or Interests that are of equal priority and are receiving different treatment under the Plan.  A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting Class are treated in a manner consistent with the treatment of other Classes whose legal rights are substantially similar to those of the dissenting Class and if no Class of Claims or Interests receives more than it legally is entitled to receive for its Claims or Interests.  This test does not require that the treatment be the same or equivalent, but that such treatment is "fair."

The Debtors believe that, under the Plan, all impaired classes of Claims are treated in a manner that is fair and consistent with the treatment of other classes of Claims having the same priority.  The Plan provides that Claims of equal priority will receive comparable treatment and the Debtors believe such treatment is fair under the circumstances.  Accordingly, the Debtors believe the Plan does not discriminate unfairly as to any impaired class of Claims.

(e)     <u>Fair and Equitable Test</u>

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured), and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class.  As to dissenting classes, the test sets different standards depending on the type of claims in such class.  The Debtors believe that the Plan satisfies the "fair and equitable" test with respect to any rejecting class, as further explained below.

109

(i)     *Unsecured Creditors*

The Bankruptcy Code provides that either (i) each holder of an impaired unsecured claim receives or retains under the plan of reorganization, property of a value equal to the amount of its allowed claim or (ii) the holders of claims and equity interests that are junior to the claims of the dissenting class will not receive any property under the plan of reorganization.  Pursuant to the SEC Settlement, the Plan also provides that holders of Crypto Loss Claims receive distributions of certain assets, including those in the SEC Settlement Fund, some of which might have been assets available for distribution to the GUC Pool but for the SEC Settlement.  The SEC Settlement requires the Debtors to allocate the SEC Settlement Funds solely to the Crypto Loss Claims  The Plan provides, however, that holders of Claims in Class 4 shall receive their Pro Rata share of the GUC Pool up to the full amount of such Allowed General Unsecured Claim.  Therefore, the Debtors submit that the Plan satisfies the "fair and equitable" test with respect to holders of unsecured claims.

(ii)     *Equity Interests*

The Bankruptcy Code requires that either: (a) each holder of an equity interest receive or retain under the plan property of a value equal to the greater of (i) the fixed liquidation preference or redemption price, if any, of such stock, and (ii) the value of the stock, or (b) the holders of equity interests that are junior to any dissenting class of equity interests not receive any property under the plan.  Pursuant to the Plan, all Interests in Class 10 will be cancelled, *provided*, that in the event that all Allowed Claims have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each former holder of a TFL Existing Equity Interests may receive its share of any remaining assets of TFL consistent with such holder's rights of payment existing immediately prior to the Petition Date; *provided* that, for the avoidance of doubt, no former holder of TFL Existing Equity Interests shall retain any voting rights in the Wind Down Trust.  Therefore, the Debtors submit that the Plan satisfies the "fair and equitable" test with respect to holders of equity interests.

# XI.
## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF PLAN

The Debtors have evaluated several alternatives to the Plan.  After studying these alternatives, the Debtors have concluded that the Plan is the best alternative and will maximize recoveries to parties in interest, assuming confirmation and consummation of the Plan.  If the Plan is not confirmed and consummated, the alternatives to the Plan are (i) preparation and presentation of an alternative plan of reorganization, or (ii) liquidation under chapter 7 of the Bankruptcy Code.

A.     **Alternative Plan**

If the Plan is not confirmed, the Debtors (or if the Debtors' exclusive period in which to file a plan of reorganization has expired, any other party in interest) could attempt to formulate a different plan of reorganization.  The Debtors, however, believe that the Plan, as described herein, enables holders of Claims and Interests to realize the greatest possible value under the circumstances and that, compared to any alternative plan, the Plan has the greatest chance to be confirmed and consummated.

B.     **Liquidation Under Chapter 7 or Applicable Non-Bankruptcy Law**

If no plan can be confirmed, this Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code.  In a chapter 7 case, a trustee is appointed to liquidate a debtor's assets and make distributions to creditors in accordance with the priorities established in the Bankruptcy Code.  Generally, secured creditors are paid first from the proceeds of sales of their collateral.  If any assets remain in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative

expenses are next to be paid.  Unsecured creditors are paid from any remaining proceeds, according to their respective priorities.  Unsecured creditors with the same priority share Pro Rata to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority.  Finally, interest holders receive the balance that remains, if any, after all creditors are paid.

The Debtors submit that liquidation under chapter 7 would result in smaller distributions to creditors than those provided for in the Plan because of the delay resulting from the conversion of this Chapter 11 Case and the additional administrative expenses associated with the appointment of a trustee and the trustee's retention of professionals who would be required to become familiar with the many legal and factual issues in this Chapter 11 Case.  The Debtors believe that in a liquidation under chapter 7, before creditors received any distribution, the additional administrative expenses involved in the appointment of a chapter 7 trustee and its retained professionals would cause a substantial diminution in the value of the Debtors' assets.  The assets available for distribution to creditors would be reduced by such additional expenses and by the claims, some of which would be entitled to priority, which would arise by reason of the liquidation.  The SEC Settlement specifically contemplates such distributions being made pursuant to the Plan; therefore, holders of Crypto Loss Claims, as outlined in the Liquidation Analysis, would receive a less favorable distribution in a chapter 7 liquidation.

The effect a chapter 7 liquidation would have on the recovery of holders of Allowed Claims and Interests will be set forth in the Liquidation Analysis annexed hereto as **<u>Exhibit B</u>**.

## XII.
## CONCLUSION AND RECOMMENDATION

The Debtors believe the Plan is in the best interests of all stakeholders and urge the holders of Claims in the voting classes to vote in favor thereof.

Dated:  August 8, 2024

By:      */s/ Chris Amani*_____

      Name:  Chris Amani

      Title:    Head of Company Operations of TFL


**TERRAFORM LABS PTE. LTD.**


By:      */s/ Chris Amani*_____

      Name:  Chris Amani

      Title:    Head of Company Operations of Terraform Labs Pte. Ltd., Director of TLL


**TERRAFORM LABS LIMITED**