<pre>
 1                      UNITED STATES BANKRUPTCY COURT
                            DISTRICT OF DELAWARE
 2

 3   IN RE:                       .  Chapter 11
                                  .  Case No. 24-10070 (BLS)
 4   TERRAFORM LABS PTE. LTD.,    .
                                  .
 5                                .  Courtroom No. 1
                                  .  824 North King Street
 6             Debtor.            .  Wilmington, Delaware 19801
                                  .
 7                                .  Wednesday, August 7, 2024
     . . . . . . . . . . . . . .  .  11:00 a.m.
 8

 9                           TRANSCRIPT OF HEARING
                 BEFORE THE HONORABLE BRENDAN L. SHANNON
10                   UNITED STATES BANKRUPTCY JUDGE

11   APPEARANCES:

12   For the Debtor:           Zachary Shapiro, Esquire
                               RICHARDS, LAYTON & FINGER, P.A.
13                             One Rodney Square
                               920 North King Street
14                             Wilmington, Delaware 19801

15                             Ronit Berkovich, Esquire
                               F. Gavin Andrews, Esquire
16                             Clifford Carlson, Esquire
                               WEIL, GOTSHAL & MANGES LLP
17                             767 Fifth Avenue
                               New York, New York 10153
18
     (APPEARANCES CONTINUED)
19
     Audio Operator:          Dana L. Moore, ECRO
20

21   Transcription Company:   Reliable
                               The Nemours Building
22                             1007 N. Orange Street, Suite 110
                               Wilmington, Delaware 19801
23                             Telephone: (302)654-8080
                               Email:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.
</pre>

```
1   APPEARANCES CONTINUED:

2   For the U.S. Trustee:     Linda Richenderfer, Esquire
                              OFFICE OF THE UNITED STATES TRUSTEE
3                             844 King Street, Suite 2207
                              Lockbox 35
4                             Wilmington, Delaware 19801

5   For the Committee:        Darren Azman, Esquire
                              MCDERMOTT WILL & EMERY
6                             One Vanderbilt Avenue
                              New York, New York 10017
7
                              Jeffrey Sabin, Esquire
8                             VENABLE LLP
                              151 West 42nd Street
9                             New York, New York 10036

10  For the SEC:              Therese Scheuer, Esquire
                              UNITED STATES SECURITIRES
11                              AND EXCHANGE COMMISSION
                              100 F. Street, NE
12                            Washington, DC 20549

13  For the Singapore
    Claimants:                Erin Diers, Esquire
14                            HUGHES HUBBARD & REED LLP
                              One Battery Park Plaza
15                            New York, New York 10004

16

17

18

19

20

21

22

23

24

25
```

1                                    INDEX

2   <u>MOTIONS</u>:                                              <u>PAGE</u>

3   Agena
    Item 4: Motion of Debtors for Entry of Order          11
4           (I) Approving Proposed Disclosure
            Statement and Form and Manner of Notice
5           of Disclosure Statement Hearing, (II)
            Establishing Solicitation and Voting
6           Procedures, (III) Establishing Cure
            Procedures, (IV) Scheduling
7           Confirmation Hearing, (V) Establishing
            Notice and Objection Procedures for
8           Confirmation of Proposed Plan, and (VI)
            Granting Related Relief [Docket No. 480
9           – filed July 17, 2024]

10          Court's Ruling:                               38

11  Agenda
    Item 3: Motion of Debtor for Entry of Order          40
12          Approving Stipulation Between Debtor
            and Singapore Action Claimants
13          Regarding Relief from the Automatic
            Stay [Docket No. 344 – filed May 22,
14          2024]

15          Court's Ruling:                               60

16

17

18

19

20

21

22

23

24

25

1      (Proceedings commence at 11:19 a.m.)

2          THE COURTROOM DEPUTY:  All rise.

3          THE COURT:  Please be seated.  Good morning.

4          Ms. Berkovich, good morning.  Good to see you.  My

5   apologies for any inconvenience from juggling the calendar a

6   little bit and now we have juggled the floor.  That wasn't my

7   idea, but I appreciate your patience.  Good morning, it's

8   good to see you.

9          MS. BERKOVICH:  Good morning, Your Honor.  Nice to

10  see you too and no problem at all.  Actually, it was

11  beneficial for us, as these things go.

12         For the record Ronit Berkovich from Weil, Gotshal &

13  Manges for the two debtors now, Terraform Labs PTE Ltd., and

14  Terraforms Labs Limited.  I am joined in the courtroom by my

15  partner, Clifford Carlson, who you will probably see more in

16  this case as he's been very helpful in the last few months to

17  us.  We also have, from my firm, Gavin Andrews and Ismail

18  Buffins.  We have from the RLF firm Zach Shapiro and Matt

19  Milana.  Then we have our financial advisor, Michael Leto.

20         THE COURT:  Very good.

21         MS. BERKOVICH:  So, thank you for making time for

22  us this morning.  It's actually been a long time since we

23  have been before the Court.

24         THE COURT:  It has.

25         MS. BERKOVICH:  It's hard to believe we were last

1  here in early to mid-March.  Since that time, we have not had

2  to come before the Court because we have been working very

3  cooperatively with the primary constituents in this case and

4  we have been able to reach consensual resolution on all

5  matters that we were seeking relief on.

6          THE COURT:  I will never fault a debtor for not

7  meeting here.

8          MS. BERKOVICH:  So, we do want to thank counsel for

9  the committee from McDermott.  We want to thank Mr. Uptegrove

10  from the SEC, as well as the Office of the U.S. Trustee, Ms.

11  Richenderfer and Ms. Leamy for her being so helpful for us.

12  But it is good to be back in front of the Court and we have a

13  short agenda, I think, for today. The agenda itself was filed

14  on Monday at Docket 549.

15          THE COURT:  I have it.

16          MS. BERKOVICH:  There's two items on the agenda.

17  The first one on the agenda is the motion to approve the

18  stipulation with the Beltran claimants at Docket 344.

19          THE COURT:  Right. I have seen that as well as the

20  United States Trustees opposition to that or limited

21  objection.

22          MS. BERKOVICH:  Correct, Your Honor. If it's okay

23  with the Court, we would like to do that last and start with

24  the second item on the agenda which is the approval of the

25  disclosure statement at Item 556.  I believe that is

1  uncontested.  As always, there is sort of last minute changes

2  that parties have asked for, but I think we are good, but we

3  will see what happens in the next hour or so.

4       Before we get to the agenda items, we do have a

5  case update since it has been a while.

6       THE COURT:  That would be great.

7       MS. BERKOVICH:  If the Court could please give Mr.

8  Milana access to the Zoom we could put it up for everybody.

9  I think we can just --

10       THE COURT:  We should be set.  Thank you, Madam

11  Court Reporter.

12       MS. BERKOVICH:  If we could jump to slide 3.  Would

13  Your Honor like it on the screen or take a hard copy?

14       THE COURT:  I will take a hard copy if you have got

15  it.

16       MS. BERKOVICH:  May I approach?

17       THE COURT:  Of course.  Thank you.  Actually, this

18  isn't bad.  I normally want a hard copy because if it's on

19  the screen I have no idea how long it is.

20       MS. BERKOVICH:  It's not long and we can, I think,

21  breeze through it.  So, we can jump to slide 3.  Since last

22  March a lot has happened.  First, we did have the trial, the

23  jury trial, on the SEC action.  That resulted in a verdict

24  against the debtor and its co-founder and former CEO and

25  shareholder, Mr. Kwon, on April 5th.  Following that, we

1   entered into discussions with the SEC and the UCC, and we

2   made substantial progress in the case, and accomplished a

3   lot, I think.

4        So, number one, we reached a settlement with the

5   SEC fully resolving the SEC's claims and leading to the

6   Chapter 11 plan with meaningful creditor recoveries.  I will

7   discuss that shortly.

8        THE COURT:  Okay.

9        MS. BERKOVICH:  Secondly, we have filed the plan of

10  liquidation which implements the SEC settlement and has a

11  winddown of the debtors operations.  We, of course, filed the

12  disclosure statement and we are on path, subject to the end

13  of this hearing, for a confirmation hearing on September

14  19th.  We also, following the investigation of the affairs

15  with our BVI subsidiary, TLL, we did restore that entity on

16  the BVI register of companies.  We filed that entity for

17  Chapter 11 and we filed a recognition proceeding in the BVI.

18       Next slide, so the SEC settlement.  I think what is

19  important here is that there was a summary judgment ruling

20  prepetition and when we filed, we were somewhat on the eve of

21  the jury trial.  After the jury verdict there was briefing.

22  The SEC sought substantial damages leading the debtor to

23  determine that a settlement with the SEC was in the best

24  interest of the estate.  Portions of the settlement required

25  us to act prepetition and we did have a motion before the

1   Court about a month ago on certain winddown actions that the

2   debtors sought and that was approved.  The rest of the

3   settlement is really incorporated into the Chapter 11 plan.

4   It was approved by the District Court already, but we do need

5   this Court's approval as well.

6           So, among the key agreements that the debtor agreed

7   to, and now we're going to slide 5, we replaced the two non-

8   independent members of the board who are company employees,

9   with two new independent directors.  One is a Singapore

10  resident, Ben Fong (phonetic). It is required under Singapore

11  law to have a Singapore resident director.

12          THE COURT:  I am aware.

13          MS. BERKOVICH:  The other director is former

14  Bankruptcy Judge, Russell Nelms.  So, those two individuals

15  have been on the board over the last couple of months and

16  they've added value in the case.

17          THE COURT:  Very good.

18          MS. BERKOVICH:  The debtor also agreed to wind down

19  its business as quickly as reasonably possible and liquidate

20  its assets in a value maximizing and cost-effective manner.

21  Just to preview, we will have some motions maybe coming up

22  along the way to effectuate that.  That does involve

23  converting certain digital assets including bitcoin to U.S.

24  dollars and selling various other assets.

25          Maybe most importantly, for this process, we were

1  required to file a Chapter 11 plan of liquidation with the

2  liquidating trust. The liquidating trustee, who is really

3  going to be the plan administrator, will be selected by the

4  creditors committee with the debtors consent and the SEC's

5  consent.  We negotiated the form of release with the SEC

6  which will be limited with appropriate carveouts.

7         There are some very big benefits to the company

8  coming out of the settlement. Mr. Kwon, who is the proprietor

9  of Luna Foundation Guard, which is an entity set up in

10 Singapore and holds significant sums of various

11 cryptocurrency tokens, some of which were contributed by the

12 debtor prepetition, he is the proprietor of LFG and he is

13 required to transfer all crypto assets in LFG's name to the

14 TFL estate for the benefit of creditors.

15         THE COURT:  Okay.

16         MS. BERKOVICH:  That process has been -- has

17 encountered some hiccups.  We have been cooperating with Mr.

18 Kwon and the relevant parties and the SEC is aware and we are

19 working very hard to get those assets into the estate.  That

20 is disclosed in the disclosure statement, so this is not new

21 information but I did want to highlight that.

22         THE COURT:  Right.

23         MS. BERKOVICH:  We did set the amount of the SEC

24 general unsecured claim. It's got different components, but

25 the top number is an almost $4.5 billion claim.  What is

1  beneficial for the estate is that that claim is deemed

2  satisfied upon distributions to creditors.  In other words,

3  the SEC is not recovering directly under our plan.  It is

4  allowing creditors to recover what would have gone to the

5  SEC.  And we also agreed that the debtor would not receive a

6  discharge under the plan which is consistent with a

7  liquidating plan.

8            THE COURT:  Sure.

9            MS. BERKOVICH:  There is a few plan related

10  milestones and we are on track.  We did get the plan on file

11  by June 30th and we have to use best efforts to confirm the

12  plan by September 30th.

13            THE COURT:  You're already on my calendar, right,

14  for the 19th?

15            MS. BERKOVICH:  We have time on the calendar,

16  whether its official or otherwise, have reserved that date.

17  I think we need entry of the order today to set that as the

18  official confirmation hearing date.  And we agreed the

19  effective date would occur no later than October 31st.

20            That is the end of my section. If Your Honor

21  doesn't have any questions, I will turn it over to Mr.

22  Andrews to walk through the rest of the update.

23            THE COURT:  That would be great.

24            MS. BERKOVICH:  Okay.  Thank you.

25            THE COURT:  Good morning.

1         MR. ANDREWS:  Good morning, Your Honor.  Gavin

2  Andrews for the debtors.

3         Your Honor, just to follow on from Ronit's

4  presentation, as Your Honor is aware, and as Ronit eluded to,

5  the Court did order back in July -- the Court did authorize

6  the order back in July steps for the debtors to take to

7  comply with the consent and final judgment.  It has very

8  significantly allowed the debtors to undertake a number of

9  key actions in furtherance of the SEC settlement.  This

10  included:

11         Converting substantially all of the debtors bitcoin

12  to be at currency; liquidating certain of the debtors non-

13  bitcoin digital assets in a manner not objectionable to the

14  SEC; marketing the debtors non-digital assets such as

15  proximity, that is the Portuguese wholly-owned subsidiary,

16  and the debtors investments as well for so; as well as

17  continue to operate of certain of the debtors applications to

18  allow third parties to withdrawal, unwind, and/or stake their

19  positions and redeem assets on the Terra blockchain; destroy

20  or burn all tokens related to the Terra blockchain, these are

21  all tokens that are in the debtors possession; and destroy,

22  importantly, all of the private keys in the debtors

23  possession to those wallets or blockchain addresses that hold

24  those tokens; and then also direct the transfer of assets

25  received from Mr. Kwon and/or LFG into a designated

1  segregated bank account or custodial account for the

2  distribution under the Chapter 11 plan.

3             THE COURT:  I understand.

4             MR. ANDREWS:  So, following this order and

5  following the consent, and as Ronit mentioned, the debtors

6  have continued to undertake significant steps in order to

7  windown the operations.  We, obviously, filed our plan on

8  June 30th which I can highlight very shortly for Your Honor.

9  We have, obviously, and why we're here today, subsequently

10  filed the disclosure statement on July 3rd which my

11  colleague, Cliff Carlson, will walk through with you.

12             All of those documents, Your Honor, we have worked

13  cooperatively with the SEC and the creditors committee on the

14  terms of these documents. And I understand we will be filing

15  a disclosure statement which will include a letter of support

16  from the creditors committee also.

17             THE COURT:  I understand.

18             MR. ANDREWS:  We have already touched on the

19  changing of the board that happened back in June, but also,

20  Your Honor, the sale process, which I mentioned before, is

21  underway in respect to the proximity sale that --

22             THE COURT:  That is contemplated under the debtor's

23  plan and discussed in the disclosure statement, right?

24             MR. ANDREWS:  Correct. It is, Your Honor.

25             THE COURT:  I just have a question about mechanics

 1   and I am not taking a position one way or the other, this is

 2   the disclosure statement and the update is actually really

 3   particularly helpful.  This has been, from the Court's point

 4   of view, you know, blessedly quiet, but it is not a simple

 5   case.  Is the sale process going to continue past

 6   confirmation?

 7          MR. ANDREWS:  There --

 8          THE COURT:  I would imagine it would.  I mean,

 9   confirmation is just four or five weeks away, right?

10          MR. ANDREWS:  Yes.  I would say it likely would,

11   Your Honor.  There are two different sale processes.  One is

12   in respect to the venture investments and another one is

13   proximity.  The proximity sale is a bit further along. Of

14   course, we will come back and seek Your Honor's approval for

15   that sale.  Then the venture investments may slip past

16   confirmation.  I mean, I can't say -- it's not as -- I would

17   say it would go past confirmation, Your Honor.

18          THE COURT:  Look, it's not a today issue and it may

19   not be a significant consideration, but I don't know that I

20   have been asked to deal with what I would assume would be a

21   full-blown 363 sale with free and clear protections and good

22   faith findings. I assume that that is what we are talking

23   about.  I just want the debtor to, at least, be cognizant.

24          Again, it may not be an issue.  There may be a

25   mountain of case law that says that Courts can easily do this

1  if a plan contemplates it.  I just don't recall having seen

2  it.  I just want to make sure that everybody is on the same

3  page and that there is not a surprise in connection with, you

4  know, confirmation, the effective date, and then a question

5  of the Court's authority because post-confirmation authority

6  is circumscribed a little bit more, but, again, I am at your

7  pleasure on that.

8        I saw that in terms of the timing and I want to be

9  clear when I hint you will know, but I am not hinting.  I

10  just have not seen this before and I think we need to be

11  comfortable that the debtors timeline -- I don't have any

12  issue with what you are proposing and the sooner a

13  confirmation order is entered here I think the better, but I

14  just don't want to necessarily get procedurally boxed in

15  somehow.  So, that is a you problem right now, but I at least

16  wanted to raise it.

17        MR. ANDREWS:  Understood loud and clear, Your

18  Honor.  We will take that back.

19        I will keep moving through our winddown checklist.

20  So, we did mention before, and as Your Honor is aware TFL is

21  now a debtor. Those proceedings, the recognition proceedings

22  in the BBI, are currently pending and no order has been

23  entered in those proceedings now that the BBI Court has a

24  holiday during August.  So, we are waiting for the Court to

25  come back.  So, that sounds nice.

1          Your Honor, in addition to the general case updates
2   we do want to disclose something to the Court, an unfortunate
3   event that occurred last week.  On July 31st the Terra
4   blockchain was the target of a malicious attack exploiting a
5   cosmos chain vulnerability resulting in the minting of
6   numerous tokens on the Terra network and subsequently the
7   unauthorized withdrawal from the Terra network for
8   approximately $5 million worth of assets.

9          These assets are owned by users of the Terra
10  blockchain, not the debtors; however, the debtors Estro
11  holdings, which is a particular type of token, was devalued
12  as a result of the breach.  As far as the mechanics and our
13  communication post-breach, the debtors were alerted to the
14  attack very shortly thereafter in the early hours of the
15  morning in Singapore that the team immediately coordinated
16  with the Terra blockchain, validated to respond to the attack
17  and rectify the breach.

18          I am told, Your Honor, that within hours of the
19  attack a software upgrade was released and validators on the
20  Terra blockchain representing 67 percent of the voting powers
21  had operated their (indiscernible) effectively preventing the
22  recurrence of the attack.  On that same morning, Your Honor,
23  we did notify the U.S. Trustee, the SEC, and the creditors
24  committee of the breach and we subsequently held calls with
25  each of those parties, and to provide further details, to the

1   extent known and, of course, to field any questions to the

2   extent we could.  I am also advised, Your Honor, that the

3   debtors alerted their stakeholders and creditors shortly

4   after the breach by making posts on their various social

5   media platforms and Terra specific platforms as well.

6          The perpetrator did leave a digital trail following

7   the breach which a number of teams across the wider Terra

8   ecosystem are attempting to track; however, at this current

9   time there is no conclusive evidence as to the perpetrators

10  identity, but the debtors continue to investigate the source

11  of the attack.  I sort of reminisce of Liam Neeson in Taken

12  "We will find you."  We're trying to track them down.

13          THE COURT:  Okay.

14          MR. ANDREWS:  The debtors are investigating how

15  this attack was able to be carried out and actively reviewing

16  TFL software and security systems to prevent this type of

17  incident in the future, of course.  The debtors are

18  evaluating as to what extent this incident may result in

19  claims against the estate.

20          I think it very important to point out, Your Honor,

21  this breach does not impact the solicitation or confirmation

22  timeline and, importantly, does not present any issues in

23  respect to confirmation.

24          THE COURT:  Very good.  I appreciate the disclosure

25  and I would hear from any of the parties that wish to be

1  heard in connection with this at the appropriate time.

2  Absent a request for relief for action by this Court I will

3  be guided by the parties going forward, but, again, I think

4  it is appropriate and necessary to make prompt disclosures to

5  the United States Trustee, the UCC and the SEC.

6          These cases have had -- this is not the first time

7  that we have run into issues like this and I think it's part

8  of the world that we live in, but I am also acutely aware of

9  the tension of how broadly to communicate the issue of a hack

10  or breach and my understanding is from other proceedings that

11  I have very recently conducted that broad disclosure in the

12  crypto world of a hack such as that can actually exacerbate

13  the original injury.

14          So, again, I make no comment on the issues that you

15  have described. I, again, very much appreciate the disclosure

16  and the care with which it has been both presented to

17  stakeholders and the Court.  As I said, I will be guided by

18  parties if there is further proceedings that would require

19  the involvement of the Court.  Okay.

20          MR. ANDREWS:  Understood. Thank you.

21          So, finally, Your Honor, if you would like I can

22  walk you through some of the key features of the plan.

23          THE COURT: I actually -- yeah, let's do that but do

24  it from a high level.

25          MR. ANDREWS:  Of course, Your Honor.

1          THE COURT:  I have been through all the materials

2   and, again, I appreciate very much getting the most recent

3   submissions that came in yesterday and I have been through

4   all of that, but given, again, how quiet the case has been,

5   at least by vision of the docket, it probably makes sense for

6   purposes of today's hearing to just walk through, again, at a

7   high level what we are looking for.

8          MR. ANDREWS:  Sounds good, Your Honor.  Subsequent

9   to that there also -- we also do have some amendments to the

10  plan that we have been working with the creditors committee

11  on.  We intend to file these subsequent to the hearing, but I

12  have got a hard copy if Your Honor would like and I can walk

13  you through them at the end of that summary.

14         THE COURT:  That would be great at the appropriate

15  time.

16         MR. ANDREWS:  Sounds good.  Your Honor, from a very

17  high level the plan provides for a liquidation of all the

18  debtor's assets, as was mentioned, and distribution of the

19  value to the debtor's creditors pursuant to the claims

20  waterfall.  On the effective date the debtors assets and

21  liabilities will be transferred and invest in the winddown

22  trust.  There are still some discussions as to what this

23  trust will look like.  We are contemplating what is called a

24  STAR Trust under the laws of the Cayman Islands; however, we

25  reserve the right under the plan to change the form of that

1  trust pursuant to compensations with the creditors committee

2  on the specifics.

3  The plan contemplates a plan administrator and it

4  will be subject to the oversight of an advisory board which

5  will be selected by the creditors committee in consultation

6  with the debtors and not objectionable to the SEC also.  The

7  plan administrator has broad authority to do a number of

8  things including control the winddown, control and effectuate

9  the claims reconciliation process, prosecute all causes of

10  action of the debtors, and direct the winddown trustee to

11  make distributions pursuant to the plan.

12  THE COURT:  Let's focus for a second, let's move to

13  the next page, page 12, where we are talking about the

14  mechanics of the crypto loss claims and the SEC claims.  I

15  think that is really the meat of the plan.

16  MR. ANDREWS:  Sounds good.  I think to put it

17  simply, leaving general unsecured claims aside, who are also

18  impaired in voting, to put it simply the crypto loss claims

19  are claims asserted against the debtors arising from the

20  debtors negative cryptocurrency.  There is a lengthy

21  definition there, but that is really what it means.

22  The plan administrator will establish a bar date

23  and proof of claim process for holders of those claims to

24  assert claims and determine the allowance of distribution on

25  account of those claims.  This deadline will be no later than

1  120 days after the effective date in respect of the bar date.

2  The plan contemplates that the administrator will also file a

3  motion seeking approval of a set of procedures in respect to

4  the crypto loss claims which were defined in the plan as the

5  crypto loss claim procedures.  This will provide the process

6  and procedures in which to determine whether a claim should

7  be allowed or disallowed, and to the extent allowed the value

8  of that claim.

9           THE COURT:  Okay.

10          MR. ANDREWS:  The plan also contemplates two other

11  bar dates which I appreciate can be a little bit technical,

12  but each -- 30 days after the effective date --

13          THE COURT:  I understand the private wallet.  Can

14  you explain to me a little bit what a bridge wallet is?

15          MR. ANDREWS:  A bridge wallet is a wallet in which

16  people deposit -- and you're testing my crypto knowledge

17  here, Your Honor, but my understand is a bridge wallet --

18          THE COURT:  They ask me to ask these questions.

19          MR. ANDREWS:  I think overall a bridge wallet, and

20  we do have Mr. Leto from A&M here if you have any specific

21  questions, but I understand it's a wallet that allows a user

22  to bridge tokens to another blockchain.

23          THE COURT:  Okay.

24          MR. ANDREWS:  That is how I understand it will

25  actually work.  And, again, this wallet is contemplated in

1  the winddown motion and order, but this is really to allow

2  those claimants to come in take their assets before we shut

3  it off, essentially.

4        THE COURT:  And then turning to the SEC claim,

5  which is allowed at almost $4.5 billion, that claim is going

6  to be deemed satisfied if, essentially, the debtor performs

7  under the plan and treats the customers.  Is that right?

8        MR. ANDREWS:  That is my understanding.  Yes, Your

9  Honor.

10        THE COURT:  All right. I think I understand the

11  plan.  Can we go over our timeline for the disclosure

12  statement.

13        MR. ANDREWS:  Sure.  Your Honor, if I may, before

14  we got the disclosure statement do you want me to approach

15  you and hand over the changes to the plan?

16        THE COURT:  Yeah, that would be good.  Thank you,

17  Mr. Andrews.

18        MR. ANDREWS:  So just very quickly, Your Honor, at

19  a very high level the two key changes here, with respect to

20  the releases, we removed, in consultation with the creditors

21  committee, the schedule of retained -- of parties to be

22  released.  Then we also, again in consultation with the

23  creditors committee, add some consent rights for the

24  creditors committee with reasonable qualities in respect of

25  the confirmation order and the plan supplement.

1          THE COURT:  Okay.  The rest of these are just

2    change numbers till we get to, I think, page 28.

3          MR. ANDREWS:  That's right, Your Honor.  This is --

4    these two comments are really getting to the heart of

5    providing incentives in respect to any contributing

6    claimants.  Then also just making clear as to what claims the

7    plan administrator can acquire.

8          THE COURT:  All right.  Most of that seems

9    technical and conforming. I understand.

10          MR. ANDREWS:  Your Honor, unless you have any other

11    further questions about the winddown process or the plan I

12    will hand over to my colleague, Cliff Carlson, to run you

13    through the disclosure statement.

14          THE COURT:  Very good.  Mr. Carlson, welcome.

15          MR. CARLSON:  Good morning, Your Honor.  Cliff

16    Carlson for the debtors.

17          So, why don't we move straight to the schedule if

18    that is okay.  We are -- I think we are all agreed with the

19    parties on this timeline.  Ms. Richenderfer may have comments

20    to one thing here, but if I could hand up -- actually I think

21    what you have here is good enough, but the one change that we

22    made to the timeline at the request of the creditors

23    committee was to bifurcate the plan supplement deadline such

24    that the deadline for filing all of the documents except for

25    the identity of the plan administrator or winddown trustee

1 and the advisory board, that piece will be September 5th.

2 The rest of the plan supplement documents will be August

3 29th.

4          THE COURT:  Okay.  I understand.

5          MR. CARLSON:  Otherwise, the form of order that we

6 filed yesterday, the schedule that we proposed there, is

7 unchanged.

8          THE COURT:  Mr. Carlson, can I ask a question. Its

9 nothing specific to this case.  I know that Rule 3018 motion

10 deadlines are typical in a disclosure statement order.  Does

11 the debtor intend or expect to file motions to -- file

12 objections to claims pursuant to 3018?

13          MR. CARLSON:  We do, Your Honor.  We need to -- you

14 know, the crypto bar date for preliminary voting purposes is

15 coming up on August 21st for reviewing those on a rolling

16 basis, but the short answer is we do intend to file some

17 objections.

18          THE COURT:  So, the only question I have, and again

19 I leave this within your hands, is sometimes there is a

20 little bit of time. I mean, obviously, the deadline is the

21 10t of September.  Normally these issues get negotiated and

22 worked out for purposes of, you know, voting, but I have just

23 had experiences over the years where 3018 litigation actually

24 got complicated because it was days before a confirmation

25 hearing and parties wanted to brief it and there were plan

1  effecting issues.

2         So, again, I am fine with the timeline that you

3  identified, but if this turns into litigation, you guys are

4  very good about this, just let me know if there are emergency

5  proceedings or hearings that we need to have in advance or in

6  connection with confirmation, I just need to know what is

7  coming down the pike.  Okay.

8         MR. CARLSON:  Of course, Your Honor.  No promises,

9  but we will try very hard and not have to litigate these

10 issues in front of the Court.

11        THE COURT:  That sounds fine.  Thank you, Mr.

12 Carlson.

13        MR. CARLSON:  So, Your Honor, I'm happy to go

14 through any other questions you have or other portions of the

15 order that we had submitted.

16        THE COURT:  No, I do not have questions. I have

17 been through it. I actually went through it pretty carefully

18 because I had heard, frankly, in terms of litigation or

19 proceedings I had heard so little in the case and the case

20 is, again, given its business and given its issues far from

21 typical.  So, I have been through the disclosure statement

22 and I got, again, the blacklines that were helpful.  So, I

23 don't have questions right now.  I understand the schedule.

24        I think you mentioned Ms. Richenderfer may have an

25 issue with the schedule.  While we are talking about the

1  schedule why don't we talk about that and then I would hear

2  from any other parties on any other issues.

3          MR. CARLSON:  Sure.  I will turn it over to -- I

4  know she had a comment she wanted to make, but I think,

5  otherwise, I'm not aware of any other comments.  Oh, I'm

6  sorry, I do want to make one statement into the record.

7  While the SEC is supportive of entry of the order, they do

8  want to reserve rights with respect to certain plan

9  provisions that are ongoing.

10          THE COURT:  I will hear from Ms. Scheuer at the

11  appropriate time.

12          Ms. Richenderfer, good morning.  Good to see you.

13          MS. RICHENDERFER:  Good morning, Your Honor.  Good

14  to see you also in this new courtroom for you.

15          THE COURT:  This thing is huge.  You could play

16  golf in here.

17          MS. RICHENDERFER:  I have to say though, we do

18  appreciate there being four tables instead of two.

19          THE COURT:  I prefer the intimacy.

20          MS. RICHENDERFER:  Your Honor, I think I'm a little

21  at a disadvantage.  Last week I was able to take a few days

22  off while Ms. Leamy dealt with these issues and now this

23  week, she's taking some time off while I deal with this

24  hearing. So, the 14-day period for the plan supplement had

25  been negotiated while she was handling this last week.

1        Now there have been certain changes, certain things

2   that were in the plan supplement before have now been taken

3   out and so I think the issue still remains.  When you have a

4   constituency like we have here and just like we have in FTX

5   where you have an awful lot of foreign creditors, this is an

6   unusual process for them, they need some time to look at

7   things.  Some of them don't speak English very well or speak

8   it at all.  We really do like to have the two-week period and

9   that is why we asked for it.

10       So, we are having the two-week period on everything

11  except for the identity of the trustee.  So, while there

12  could be a draft agreement in the 14-day plan supplement,

13  it's not going to be specific possibly as to the amount of

14  fees for the trustee because the trustee is not going to

15  finally be determined until seven days before the objection

16  deadline.  Sometimes that can be an issue for creditors as to

17  who the trustee is because this is a very vocal group of

18  individuals.

19       THE COURT:  As I see these deadlines though, the

20  deadline to file a plan supplement, other then as to the

21  identify of these individuals post-confirmation, is the 29th

22  which is 20 days before plan confirmation, right?

23       MS. RICHENDERFER:  Your Honor, I was always looking

24  at it versus the date for the objection and for the voting.

25       THE COURT:  Okay.  Deadline to object, which is the

1  12th.

2          MS. RICHENDERFER:  Yes, Your Honor.

3          THE COURT:  So, that is your issue is you want --

4  you are concerned about the timeline to object. I understand

5  the concern.

6          MS. RICHENDERFER:  Yes.  So, I know that -- I have

7  been told that there needs to be some additional time in

8  order to conduct the interviews. I know there are a good

9  number of these crypto cases out there right now that are

10  occupying the time of an awful lot of people who would be

11  appropriate to fill these roles. I just don't know what is

12  going to go on in this regard.

13          So, not objecting to it, just wanted to explain to

14  the Court why we were so adamant that we wanted the 14-day

15  period.  I am hopeful that they can reach an agreement with a

16  plan administrator or winddown trustee and that the identity

17  can be sent out even prior to the seven-day deadline before

18  the voting date.  I just wanted to advise because what

19  happens is my office, we are the ones that get the emails

20  from the people who miss deadlines sometimes.

21          THE COURT:  No, I understand.  Let's do this, I am

22  actually -- I am not going to require a change to it.  I do

23  understand the trustees concern in this respect.  I think it

24  is helpful to have a plan supplement filed as far in advance

25  as you have directed.  That has been, I know, a consistent

1  beef over the years of this telephone book, to the extent

2  people remember what a telephone looked like, being filed on

3  the eve of plan confirmation. So, I think this is an

4  improvement.

5          With respect to the identity of the plan

6  administrator and winddown trustee I had every confidence

7  that the debtor would coordinate with you.  If it's possible

8  or practical to disclose that earlier then I am confident

9  that they will and if they don't do so and you have concerns

10 about whether or not there has been an adequate process here

11 those rights are all reserved.

12         MS. RICHENDERFER:  And I know, Your Honor, that

13 while the person is to be chosen, as I understand it, by the

14 committee, both the debtor and the SEC.

15         THE COURT:  Then we get to see puffs of white smoke

16 and all that.

17         MS. RICHENDERFER:  Yes.  Then the SEC and the

18 debtor have rights to come.

19         THE COURT:  Okay.

20         MS. RICHENDERFER:  I don't necessarily need rights,

21 just wait and see what they all agree upon.

22         THE COURT:  There's going to be no shortage of

23 cooks standing around this pot.

24         MS. RICHENDERFER:  Yes.  So, Your Honor, those are

25 the comments that I had to pass on that issue and I will make

1  some other comments later on.  Thank you.

2         THE COURT:  I am satisfied that the trustees

3  comments with respect to timing as the plan administrator

4  issue in this plan supplement were couched more as a

5  reservation of rights in an advisory or heads up to the Court

6  and a helpful one. I don't believe that it is an objection

7  and, again, until I hear from other folks the timeline that

8  has been laid out by the debtor is certainly satisfactory to

9  me and the Court has, I have checked now, actually set the

10 hearing for 10 a.m. on the 19th of September. So, I think we

11 should be all set there.

12         I think I would like to hear from the committee.

13 Mr. Azman.

14         MR. AZMAN:  Good morning, Your Honor.  Darren Azman

15 from McDermott for the committee.  Its good to see you again.

16 As Ms. Berkovich said, it's been a little while.

17         I thought it would be helpful to say a few words

18 and give you an update on where the committee is at with this

19 case if that is all right.

20         THE COURT:  That would be great.

21         MR. AZMAN:  So, Your Honor, I think as you now all,

22 and as we all know from the verdict, this case revolves

23 around a massive, massive fraud in the crypto world. It's a

24 fraud that has caused billions of dollars in damages.

25 Candidly, we won't really know the full extent of the damage

1   until those future crypto loss claims procedures are approved

2   and the real crypto loss proofs of claim are filed, but we

3   know that there is enormous damage that was caused here.

4        We also know that there are entities and

5   individuals outside of the debtors who were responsible for

6   some of the harm, if not all of it, that was caused here and

7   that is subject to the ongoing investigation by the committee

8   which has been well underway for some time now.  So, from the

9   outset of the case our goal has really been to move quickly

10  to a post-confirmation vehicle to marshal assets and pursue

11  those claims against third parties.  That has really been our

12  primary goal here.

13       If everything goes according to plan this will be

14  one of the fastest crypto cases that gets in and out of

15  bankruptcy. Importantly, this plan has some of the most

16  narrow releases that I have seen and I think Your Honor has

17  probably seen.  We represent a lot of committees.  I think

18  the debtors and their independent directors, thankfully,

19  recognize that this case is unique and we need to be able to

20  preserve claims against parties that might otherwise

21  typically get releases.  Even the release of the debtors

22  professionals, by the way, is narrow in that there are only

23  four professionals of the debtors getting released as opposed

24  to a much longer list of something like 75 professionals that

25  have performed work for the debtors.  Again, all of that is

1  going to be subject to an investigation.

2          We also have a mechanism in the plan, Your Honor,

3  that allows crypto loss claimants to contribute direct claims

4  that they may have against third parties that relate in some

5  way here.  That is super important and we have been very

6  successful with those claims in other cases.  And perhaps

7  most importantly, as you have already heard, the committee

8  has the right to select the plan administrator and control

9  the winddown process.  Of course, that was a critical

10  component of the plan for the committee.

11          So, look, those are just a few of the important

12  aspects of this plan that we negotiated and that is why the

13  committee is fully supportive of the plan and for today's

14  purposes of the disclosure statement and we, of course,

15  encourage all creditors to vote to accept this plan.

16          THE COURT:  And the committee is sending a letter

17  with the plan.

18          MR. AZMAN:  That is right, Your Honor.

19          THE COURT:  Very good.

20          MR. AZMAN:  I don't have anything else, Your Honor,

21  unless you have questions.

22          THE COURT:  I do not have questions.

23          I would ask, Ms. Richenderfer, I did hear from you

24  on the scheduling issues, did you have anything to add with

25  respect to the debtors' request for approval of a disclosure

1  statement and solicitation process?

2          MS. RICHENDERFER:  The only thing, Your Honor, is

3  I do need to put a further reservation of rights on the

4  record here.  The first one has to do with the sale process,

5  and Your Honor already took some of the wind out of my sails

6  by making those observations.  I don't know how that process

7  is going to unfold here, I don't know if we're looking at a

8  private sale, I don't know if we're going to have a bid

9  procedures order because, to me --

10          THE COURT:  But I do want to be really transparent

11 here:  I don't have a position on this.  I just don't recall

12 being asked this question and I can, shooting from the hip,

13 think of a bunch of good reasons why it's not an issue, but I

14 wouldn't presume that the concept of post-confirmation

15 jurisdiction weighs in on this somehow.

16          And so my point was just that I didn't -- it's

17 rare that I come up with something that people haven't

18 thought of --

19          MS. RICHENDERFER:  Yes.

20          THE COURT:  -- and, obviously, you've thought of

21 it and I'm sure the debtors have, but I have on occasion been

22 pained to see us get to a particular point and then somebody

23 says, just procedurally, this is something that may be an

24 issue.

25          Again, I make no comment.  I don't know the answer

1  to this and, again, I'm the last person to want to get in the

2  way of moving the process forward.  1123 expressly

3  contemplates that you can sell things through a plan.  So I

4  understand the point and the parties are, I think,

5  appropriately focused on the issue.

6          MS. RICHENDERFER:  And, Your Honor, I don't mean

7  to suggest that we think there's anything for or against it.

8  I don't know the answer either.  So that was just the point,

9  reserving our rights, and whatever the debtor decides to do,

10  hopefully they'll be able to share some research with us and

11  we can all feel comfortable with it.

12          And then the other point is, Your Honor, as you

13  may have already seen in some of your cases or are about to

14  see, after the Supreme Court's ruling in Purdue --

15          THE COURT:  Did they rule?

16          MS. RICHENDERFER:  They did, Your Honor.

17      (Laughter)

18          MS. RICHENDERFER:  You can't turn on your computer

19  without being invited to a seminar about it.  There are

20  certain things we just want to make sure and we need to take

21  a very careful look at.  And we know that there have been

22  certain positions already expressed by Judges in our district

23  here and some of those we may try to persuade otherwise,

24  we'll wait and see, depending how Purdue marches on.  And,

25  you know, we've seen some rulings from Judges in other

1  jurisdictions that one would not have seen a month ago.

2          THE COURT:  It's a hot topic.

3          MS. RICHENDERFER:  It's a very hot topic.  And so,

4  Your Honor, we just want to make it clear that there were

5  other items we raised during this process and we're satisfied

6  that they are confirmation issues.  We'll see if they can be

7  resolved and to what, you know, extent they can be;

8  otherwise, we may be having some discussion of those points

9  come -- I'm looking at the date here --

10         THE COURT:  September 19th.

11         MS. RICHENDERFER:  -- September 19th.

12         THE COURT:  That sounds fine.  Those rights are

13  reserved.

14         MS. RICHENDERFER:  Okay.  Thank you, Your Honor.

15         THE COURT:  Can I hear from the United States --

16  from the Securities and Exchange Commission?

17         Ms. Scheuer, good to see you.  Welcome back.

18         MS. SCHEUER:  Thank you, Your Honor.  Your Honor,

19  for the record, Therese Scheuer for the U.S. Securities and

20  Exchange Commission.  With me by Zoom is William Uptegrove,

21  also from the U.S. Securities and Exchange Commission.

22         Your Honor, as has been discussed, the SEC sued

23  Terraform, alleging a years-long fraud that led to billions

24  in devastating losses, including to retail investors in the

25  United States.  After the District Court granted partial

1  summary judgment to the SEC and a jury found Terraform and

2  Mr. Kwon liable for violating the securities laws, including

3  fraud, we engaged in settlement discussions which resulted in

4  the consent and final judgment that were attached to the

5  implementation steps motion filed at Docket Number 435.

6         Your Honor, as Ms. Berkovich and Mr. Andrews

7  indicated, key terms of the consent and final judgment are

8  that the SEC has an allowed general unsecured claim of almost

9  $4.5 billion, which will be deemed satisfied by distributions

10 to harmed investors and creditors in the bankruptcy case.

11 Terraform is to wind down its business and file a plan of

12 liquidation, and Mr. Kwon is to transfer at least $204

13 million in assets to Terraform's estate for distribution to

14 harmed investors.

15        Your Honor, we're still reviewing certain of the

16 plan provisions, including changes that the debtors filed

17 yesterday afternoon, but the debtors have agreed that these

18 issues are preserved to confirmation.  We will continue to

19 review the documents and raise any issues as appropriate.

20        Thank you, Your Honor.

21        THE COURT:  Very good.  Thank you, Ms. Scheuer.

22        All right, I would ask if anyone else wishes to be

23 heard with respect to the debtors' request for approval of

24 the disclosure statement and approval of solicitation

25 procedures.

1          Mr. Sabin, good to see you.  It's been a little

2    while.

3          MR. SABIN:  It's a pleasure, Your Honor.  Thank

4    you very much.  I am relatively new to this case; I represent

5    one of the representatives for a member of the committee.

6    First and foremost, I want to thank Mr. Azman and everyone

7    else he's working with for getting us here with the debtors

8    on a consensual basis.

9          I want to highlight three things that are new for

10   the record but are in the disclosure statement, and I think

11   represent additional reasons for approval and one that's --

12   two things that are responsive to your question.

13         First, if you look at the amended plan, Section

14   5.4(b) and, in particular, 5.4(b)(v), it does contemplate

15   that one of the duties and rights and powers of the plan

16   administrator is to marshal, market for sale, and wind down,

17   so that if indeed the answer to the question is the sale

18   processes that are ongoing are not finished or are yet to

19   start, the plan administrator under this process is to finish

20   that.  And having been involved in at least two or three

21   cases in this court where we retained post-effective date

22   jurisdiction for use of 363, you might note that under

23   5.4(b), although there is language in the first sentence that

24   says without the need of court approval, unless otherwise

25   indicated, is in a parenthetical in that section.  So I'm

1   going to assume that the relevant parties here take full heed

2   of your comments and if 363 is a tool that the plan

3   administrator wants, it will be in the wind-down trust.

4           THE COURT:  Very good.

5           MR. SABIN:  The second thing I want to highlight

6   is that as part of the plan supplement for August 29th is a

7   wind-down budget and, although the committee processes

8   leading to the identity of a plan administrator and identity

9   of the advisory board, some of the concerns about the costs

10  may very well be addressed in the wind-down budget by way of

11  assumptions, and that would be available for everybody.  So

12  concerns that you did hear articulated, and rightfully so,

13  from the U.S. Trustee I think are going to be allayed in part

14  by portions of the wind-down budget.

15          Third and finally, Your Honor, there is an

16  interesting mechanism in the plan that differentiates between

17  two classes, pure general unsecured creditors and the crypto

18  loss creditors.  And the crypto loss creditors are to be the

19  sole beneficiaries of certain assets pursuant to the SEC and

20  debtor consent decree that Do Kwon has otherwise agreed to

21  transfer over.  As you heard alluded to, there have been some

22  concerns and delays with transferring over those assets to

23  the debtors, and I believe the disclosure statement has

24  current -- most current numbers and current information about

25  where that process stands, which is relevant to voting for

1  any of the creditors themselves.

2          For all those reasons, Your Honor, we do support

3  and thank you and hope that the disclosure statement gets

4  approved today, so we can see you again for confirmation on

5  the 19th.

6          THE COURT:  In just a few weeks.

7          MR. SABIN:  Thank you.

8          THE COURT:  Very good.

9          I would ask if anyone else wishes to be heard with

10  respect to the request for approval of the disclosure

11  statement.

12      (No verbal response)

13          THE COURT:  Very well.

14          As counsel noted at the outset, this disclosure

15  statement is being presented to the Court on essentially a

16  consensual basis.  There was a colloquy with the United

17  States Trustee with regard to objection deadlines and filing

18  deadlines, and the Court has dealt with that issue, but I

19  don't think that that was interposed as an objection.

20          The Court also notes that all rights are reserved

21  with respect to the request for confirmation that will occur

22  in the middle of August, I believe -- or September, on the

23  19th of September.

24          With respect to the disclosure statement, again,

25  counsel has ably provided the Court and parties with

1  blacklines that I identify the most recent changes, and the

2  parties' submissions also do identify the elements of the

3  plan and the disclosure statement, and how the disclosure

4  statement itself satisfies the requirements of Bankruptcy

5  Code Section 1125.  I am prepared to find and would enter an

6  order so providing that the disclosure statement contains

7  information adequate to permit a hypothetical investor to

8  make an informed decision to vote for or against the plan.

9          And, again, given the voluminous documentation

10 here and the absence of objection, I'm not going to burden

11 the record with extensive findings.

12          I also find that the proposed timeline, as well as

13 the related materials, the ballots, the instructions, and the

14 notices, are all compliant with applicable provisions of the

15 Bankruptcy Code and the Rules, as well as established

16 practice in this Court, and I would again be prepared to

17 approve and authorize the debtor to commence a solicitation

18 process consistent with that which has been described to me

19 today, identified in terms of the calendar, and also laid out

20 with particularity in what I believe will be the proposed

21 form of order.

22          The disclosure statement is approved and I will

23 look forward to seeing the parties on the morning of the

24 19th.

25          Are there any questions?

1       (No verbal response)

2           THE COURT:  Very well.  I'll look for the order to

3   be uploaded when it's finalized.

4           Ms. Berkovich?  Oh.  Mr. Shapiro?

5           MR. SHAPIRO:  Good morning, Your Honor.  For the

6   record, Zach Shapiro, Richards Layton & Finger, also

7   appearing on behalf of the debtors today.  I am presenting

8   the other item on the agenda, that's the motion to approve a

9   stipulation to consensually lift the stay in what is referred

10  to in the motion as the representative action in Singapore.

11  That was Docket Number 344, if I'm not mistaken.  So I'll be,

12  at least initially, very brief.

13          THE COURT:  Okay.

14          MR. SHAPIRO:  We filed the motion back in late

15  May.  The motion sought two aspects of stay relief, one

16  typical, one not so typical.  The first -- the typical part

17  of the motion was stay relief to proceed with the litigation,

18  Your Honor sees that, I think, all the time; second, the less

19  typical part was stay relief to allow the claimants to

20  collect on account of any final judgment or settlement from

21  an escrow.

22          THE COURT:  And the escrow is set up under the

23  authority of the Singapore court, is that correct?

24          MR. SHAPIRO:  That's correct, yes.

25          THE COURT:  And so the idea is that money is

1  there, the Singapore -- this issue will get litigated in

2  Singapore, and to the extent that a claim is liquidated, the

3  proposal would be to permit the party, the prevailing party

4  to apply its judgment against whatever is in the escrow.  Do

5  I follow that?

6          MR. SHAPIRO:  That's correct.

7          THE COURT:  Okay.

8          MR. SHAPIRO:  So, if the judgment is less than the

9  escrow, then we would get the money back; if it's more, then

10 they would have a claim in the bankruptcy, it would be -- I

11 think it would be a Class 5 crypto loss claim.

12          At the time we filed the motion, we -- and still,

13 we thought it made sense for a few reasons.  I think the

14 first one is Singapore seems like the right court for that

15 dispute, it's been there for -- pending there for quite some

16 time, you know, pleadings have been filed, discovery has

17 commenced.  It's complex issues of Singapore law, things I

18 think that Your Honor would perhaps avoid learning at this

19 time in your judicial career.

20      (Laughter)

21          MR. SHAPIRO:  Also --

22          THE COURT:  Your instincts are excellent, Mr.

23 Shapiro.

24      (Laughter)

25          MR. SHAPIRO:  Also, even if the stay remained in

1  place, we think it would be difficult to enforce this stay

2  there for obvious reasons; in fact, our recognition order

3  carved that out expressly.  And we also thought it -- we also

4  were told, or at least we understood, that if we filed the

5  motion here it would avoid an objection to the recognition

6  proceeding in Singapore.  Now it turned out it didn't, they

7  ended up objecting anyway, but that was part of the reason

8  why we entered into the stip.

9          And then, finally, perhaps going to the more

10  unusual aspect of the motion, it was our understanding based

11  off of discussions with our Singapore counsel that the

12  claimants were in fact secured, so allowing them to collect

13  on account of any judgment or settlement was in accordance

14  with the absolute priority rule.  So, no one was being

15  prejudiced.

16          So that was why we filed the motion.  That was,

17  like as I mentioned back in late May, the UST initially had

18  informed us of their issues.  We had many discussions with

19  Ms. Richenderfer over the last few months and, ultimately, I

20  think she -- and, ultimately, she objected.  And Ms.

21  Richenderfer will not be shy to correct me, but I will say

22  that I think her primary issue -- she may have other issues,

23  but her primary issue is with respect to the, quote, you

24  know, unusual aspect of the relief that we're seeking, that's

25  the enforcement aspect, you know, the extra step that we're

1  going that Your Honor doesn't normally see.

2          And on that point -- again, this is where I'm

3  going to be brief, again -- I think we stand by what we said

4  in the motion.  We think it's appropriate because the

5  claimants are secured, but the one thing I would add -- and I

6  think Your Honor saw this from the pleadings that were filed

7  -- the claimants' counsel is really primarily going to be

8  addressing that for Your Honor.

9          And so, for now, I think I'll sit down, and I'll

10  turn the podium over to Ms. Richenderfer so she can present

11  her objection.

12          THE COURT:  I think that would be fine.

13          Ms. Richenderfer?

14          MS. RICHENDERFER:  Thank you, Your Honor, Linda

15  Richenderfer from the Office of the United States Trustee.

16          I think one of the first reactions I had when I

17  saw this was I was a little bewildered because it's not the

18  normal course in which we see people asking for stay relief.

19  It was -- I'm used to seeing stipulations to resolve a motion

20  for stay relief, but we didn't really have a motion for stay

21  relief here.  So we had a motion to approve an agreement that

22  was already reached, and so we're starting a little bit

23  behind the eight ball, I felt like.  And in reading it, it's

24  one thing, I think, for debtor to decide in its business

25  judgment that something should go forward and the stay should

1  be lifted, but there was another piece of the puzzle, which

2  was that the debtors were giving in on whether this was

3  secured.

4        And I guess, you know, they're secured, I think,

5  under the U.S. Bankruptcy Code and under the UCC, and as I

6  have come to understand -- and, believe me, I am no expert

7  whatsoever in Singapore law and this was, I think the

8  stumbling block here -- that under Singapore law, which I now

9  understand a lot of the commonwealth countries follow this

10 process, including in Canada -- that once an action is filed

11 the plaintiffs can essentially seek what's called a Mareva --

12 I'm probably saying that wrong -- injunction, which basically

13 says to the company, you're frozen, you can't do anything

14 anywhere in the world.  And then, in order to lift that

15 freezing injunction, you can go in and pay money into the

16 court into an escrow fund.

17        And so, you know, I envision all the ways that

18 under U.S. bankruptcy law, under the UCC, a party establishes

19 that they have a security interest and this doesn't fit

20 within those parameters; it might fit under Singapore law,

21 but I don't see it fitting within the Bankruptcy Code.

22        THE COURT:  Can I ask a question?

23        MS. RICHENDERFER:  Yes, Your Honor.

24        THE COURT:  Is there any significance to attribute

25 to where we are procedurally today versus where we were when

1  the motion was filed?

2          When the motion was filed -- and I assume your

3  view was similar to mine -- there was relatively little

4  visibility into what was going on in the case.  Obviously,

5  there were proceedings that were described that were active

6  in Singapore.  This is, as Counsel noted, a significant piece

7  of litigation that has been pending for a while over there,

8  but now, at this point, we have a plan on file, a disclosure

9  statement that contemplates this, an expectation of treatment

10  for all creditors, not just this litigation creditor, is that

11  -- does that impact how I would view this?  Rather than sort

12  of out of the blue the debtor says, we're going to sock $57

13  million away and, if they win over there, that's the end of

14  it, and if they lose, some of it may show up, but, Judge, you

15  don't have any look into this.

16          Look, I completely -- when I read your objection,

17  I certainly understood -- and Mr. Shapiro, I think, has

18  candidly acknowledged that this piece of it is unusual, but

19  are we in a slightly different situation right now, maybe

20  with a little more confidence about where we stand, given

21  where we are procedurally in the case today versus when the

22  motion was filed?

23          MS. RICHENDERFER:  Your Honor, I think we are, and

24  that was part of the discussions -- and I'm not going to go

25  into details, of course, because these were settlement

1  discussions -- but discussions I had with both debtors, their

2  Singapore counsel also, debtors' Singapore counsel, and also

3  U.S. counsel for the -- I guess we call them the Beltran

4  plaintiffs because the lead person is named Beltran -- and as

5  I understand it, this is not a class action, this is a

6  representative action, there's 377 people over there.  I

7  believe we're going to find that the crypto victims' claims

8  pool is going to be extremely in excess of 377 people, but

9  we'll wait and see when everything gets sent in.

10        Your Honor, a couple of things have happened.  One

11  is the debtors' schedules have been filed, they don't

12  schedule this as a secured claim, it's not on CDIT.  I have

13  seen -- I didn't check for all 377, I checked a couple names

14  and I found them on Schedule E/F, and like Mr. Beltran -- I

15  think it's a Mr., I'm sorry if not -- they're listed as

16  contingent un-liquidated disputed claims.  And even though in

17  the Singapore complaint there's attachments where amounts are

18  attributed by count to different individuals, those amounts

19  don't even make it onto E/F, they're just listed as

20  undetermined, and that's the way the debtor has treated them.

21        And so this is an about-face -- not totally, but I

22  understand that the debtor had other maybe issues in mind,

23  but it doesn't meet with the way the debtor presented this

24  case.

25        My second point is, Your Honor, that I don't --

1   from the perspective of the U.S. Trustee's Office, lifting

2   the stay now to go to Singapore to litigate issues that one

3   might say have already been determined under a settlement

4   agreement with the SEC, on liability, I question -- and when

5   I finish, Counsel for the UCC is going to step forward with a

6   plan, an idea that he came up with that I think the debtors

7   are in agreement with, I know I'm in agreement with, but I

8   understand that the Beltran plaintiffs are not in agreement

9   with -- because I don't understand why -- I'm told it's

10  Singapore law that applies here and it's going to look at

11  these claims differently, I don't know what that means, Your

12  Honor, but I do know that the SEC has a $4 billion claim for

13  damages caused by the actions of the debtor, and the actions

14  that are listed in the complaint in Singapore echo the SEC's

15  complaint.

16          And so then I'm thinking, well, then why aren't we

17  just liquidating here in the U.S., because there's going to

18  be a process to do that, and maybe the issue is access to

19  this fund of money, but there's ways to deal with that in a

20  settlement or even though the plan.

21          So maybe I'm going a little far afield here, Your

22  Honor, but those were just some of my thoughts, the U.S.

23  Trustee's thoughts about, okay, what's the most practical way

24  of dealing with this scenario.  And I think that -- like I

25  said, committee counsel, I think, came up with a practical

1  solution, but the Beltran plaintiffs, as I understand it,

2  have not agreed with that.

3       And I will mention, Your Honor, too, it's not like

4  nothing has been going on in Singapore.  Despite the fact

5  that this Court has not yet granted stay relief, if I look at

6  the fees, the fee applications from debtors' Singapore

7  counsel, there have been things they've been forced to deal

8  with in the Singapore matter, in the Singapore litigation.  I

9  mean, one of the things that happened was that the case was

10 transferred to the Singapore International Commercial Court

11 after this bankruptcy was filed, and there have been various

12 filings that have occurred over in Singapore.  I've been

13 reading the Wong partnership fee applications.  And so things

14 have been going on over there despite the fact that there has

15 been no stay relief granted yet by this Court.

16       I'm not here to, you know, seek damages or to

17 chastise people, but I'm here to just observe that this is

18 not proceeding in the normal way that it usually proceeds

19 that stay relief matters come before this Court.  And, again,

20 I'm trying --

21       THE COURT:  But don't we -- I mean, maybe as a

22 principled matter, but as a practical matter there is a

23 difference between dealing with stay relief in litigation

24 that is pending in Missouri and litigation that is pending in

25 Singapore, or Canada, for that matter.

1          MS. RICHENDERFER:  I agree, Your Honor.  I don't

2   know to what extent, though -- I'm not faulting debtors'

3   counsel for perhaps having to react to things as a defendant

4   over there, I'm just saying there were things -- initiation

5   of events that occurred over there before this Court has

6   considered this issue.  And it's clear, though, that the

7   Beltran plaintiffs knew they needed to get stay relief, but

8   we're here at a point when we have a plan and we have ways in

9   which to deal with things and I just have not been able to

10  bridge the gap between money in escrow to release a freezing

11  order, basically, versus a security interest to be recognized

12  under our Bankruptcy Code and U.S. law.

13          And I know there were some cases that were

14  attached and some of them concerned bankruptcy, but those are

15  bankruptcy in Singapore, as I read, I don't think that any of

16  them concerned bankruptcy proceedings in the United States,

17  and I don't think any of them were the same situation here.

18  I think the first came came the closest, I guess the wife had

19  instituted bankruptcy proceedings or something and they

20  weren't recognized.  This is certainly real bankruptcy

21  proceedings moving forward in this case.

22          So, unfortunately, I think that puts the burden on

23  the Court.  It's -- I can understand why the Court may see

24  fit to lift the stay, I'm just concerned about money being

25  spent to defend claims in Singapore that seem to have been

1  resolved here in the U.S., and I think that whether or not

2  that amount of money should be treated as a secured claim for

3  people that brought claims under Singapore law is an issue

4  for the Singapore court.  I'm not suggesting that this Court

5  order that the money be brought back into the estate, I'm

6  just suggesting that at this point in time that there is --

7  it's premature for this Court --

8          THE COURT:  I understand.

9          MS. RICHENDERFER:  -- to issue a ruling on that

10  because, as I understand it, liability may or may not be

11  covered by the SEC rulings, the Beltran plaintiffs

12  (indiscernible) it's not, but there's the amount of the

13  damages too, the liquidation of the damages and, until that

14  occurs and somebody has the right to receive funds, we don't

15  know to what extent, and whether or not that amount is a fund

16  only for them, so to speak, is an issue.  And, again, I think

17  that's under Singapore law.

18          THE COURT:  Okay, I understand.  Thank you.

19          Mr. Azman?

20          MR. AZMAN:  Your Honor, Darren Azman from

21  McDermott for the committee.

22          We have looked at the strengths and weaknesses of

23  the various arguments, and before the hearing we were trying

24  to find a way to bridge the gap and sort of bring this to a

25  consensual resolution of some kind.  I think what I would

1  suggest to the Court is that, to resolve the U.S. Trustee's

2  issues, the Court should simply lift the stay to allow this

3  claim to proceed to judgment and a liquidated amount over in

4  Singapore.  There's no way that should be heard here, that

5  doesn't make any sense.  But I think that the remaining piece

6  of this, which is the priority of the claim, the plan

7  actually contains provisions that would allow for a process

8  and reserves the rights of parties to dispute whether or not

9  the claim is actually secured.

10          And so I think that a good resolution to the U.S.

11 Trustee's position here would be to bifurcate this, and allow

12 the judgment to go forward and liquidate the claim amount.

13 And the parties can argue later on about whether it's

14 secured, whether that should be determined by this Court or

15 the Singapore court, I suspect it probably will be decided

16 under Singapore law, but I'm not sure that's a -- that's not

17 an issue that I don't think you need to decide today.  But

18 that's what our suggestion would be for --

19          THE COURT:  Very good.  Thank you.

20          MR. AZMAN:  Thank you, Your Honor.

21          THE COURT:  Can I hear from the Singapore

22 claimants, please?

23          Ms. Diers, welcome.

24          MS. DIERS:  Good afternoon, Your Honor, Erin Diers

25 with Hughes Hubbard & Reed for the Singapore claimants.  With

1  me in the courtroom is Katie Good from Potter Anderson, and

2  with me by phone, if they've made it, it's past midnight

3  there, our Singapore counsel Mahesh Rei and Tammy Kor (ph)

4  from Drew & Napier.  I think someone is appearing on camera,

5  so Mahesh is there.

6         Frankly, I'm a bit surprised that we're being

7  offered consensual resolutions at this stage because I think,

8  from our perspective, we reached a consensual resolution back

9  in May, and we entered a stipulation in which the debtors and

10  our claimants agreed that the Singapore action would be

11  unaffected by the Chapter 11 proceeding, and we would

12  continue in the Singapore court and be able to collect on the

13  funds that are specifically escrowed for purposes of

14  collection of a judgment.  It was never in dispute.  I think

15  the reason that the debtors' motion didn't go into the

16  factual or legal bases for the secured nature of the claim is

17  because everyone agreed that it was secured.

18         In response to the U.S. Trustee's objection that

19  we needed more, we provided more, and we provided the

20  Singapore court orders that make it clear that this money was

21  set aside in order to secure the judgment -- those were TFL's

22  own words in their --

23         THE COURT:  Let me ask a question.  I have an

24  objection and I'm being asked to do something that is not

25  necessarily typical.  I send people off all the time to go

1  litigate somewhere and, if you succeed, then you recover

2  whatever you may recover, and if you don't succeed then so be

3  it, and I've done it in cases that have had escrows or funds

4  that have been set aside and segregated.  Why do I need to do

5  this second piece, to approve this second piece right now

6  over an objection at this point?

7            MS. DIERS:  I guess in part it's because no one

8  has given me a clear answer on what it is that we would be

9  litigating in the future, what the second part would be.

10  Like I said, both the debtor and our claimants agree the

11  claim is secured, we think that the legal and factual bases

12  for that are very clear.  And when we're told we should kick

13  the can, we should do this another day, I don't know when

14  that day is.  There's a trial in Singapore starting in April

15  of next year, we're being told that the plan administrator is

16  not even going to be in existence until the effective date.

17            THE COURT:  What does the plan -- does the plan

18  deal with this claim at all?

19            MS. DIERS:  It provides that they're a secured

20  claim unless you decide they're not.

21            THE COURT:  Won't we know the answer to that

22  question in four weeks?

23            MS. DIERS:  I don't think that the debtors intend

24  to tee this up as part of their plan confirmation process.

25            THE COURT:  The plan provides that it's a secured

1  claim; if the plan is confirmed, you have a secured claim.

2         MS. DIERS:  The plan provides it's a secured claim

3  unless the Bankruptcy Court decides otherwise.  We would be

4  happy I think if the plan was revised to say that we have a

5  secured claim because we and the debtors agree on that point,

6  but my understanding is that that's not what was negotiated

7  with the other parties.

8         THE COURT:  Okay, a couple things.  The debtor has

9  entered into a stipulation.  So the debtor has agreed that

10  that $57 million is not theirs and it's available for

11  recovery, and I think the debtor has made that position and I

12  assume the debtor is going to remain wedded to that position.

13  I don't know if the committee is a party to that stipulation,

14  I don't think that they are --

15         MS. DIERS:  They're not a party to the

16  stipulation.  They did stand up in Singapore International

17  Court and said they had no objections to the stipulation.  I

18  understand that they may be changing course now, which is one

19  of the reasons we think it's important for --

20         THE COURT:  Well, you're worried --

21         MS. DIERS:  -- the benefit of our bargain --

22         THE COURT:  -- about a bait-and-switch.

23         MS. DIERS:  -- from May to be --

24         THE COURT:  Yeah, you're worried about a bait-and-

25  switch.

1          MS. DIERS:  And Judge Peck, when he was deciding

2     the recognition proceedings, he knew that we were not

3     objecting on reliance on the fact that we had entered this

4     stipulation, and he gave us great comfort by saying that it

5     was a certainty that this would be entered and then it's

6     pushed out repeatedly.  And now we're here today and being

7     told why don't we continue to kick the can and that's -- it's

8     a hard thing for our claimants to hear because we don't think

9     that's the benefit of our bargain.

10         THE COURT:  I'd like to hear from the debtor with

11    respect to the plan.  I understand the bid and the ask on the

12    stip, the issue -- I'm being asked to rule on something that

13    I shouldn't necessarily have to rule on if the debtor

14    confirms its plan and treats this as a secured claim, and I

15    have no reason to believe that it isn't necessarily a secured

16    claim.  As a practical matter, I think it would be

17    exceedingly difficult to get this $57 million out for general

18    distribution, at least from what parties have told me.  But

19    I'm being asked to do something extraordinary, and I have a

20    direct objection from the United States Trustee and a veiled

21    objection from the committee, and so I'd like guidance on

22    whether or not there's another way to skin this cat.

23         Mr. Shapiro?

24         MR. SHAPIRO:  So, you know, the debtor is kind of

25    in an awkward position.  We signed the stipulation, what

1  we're asking Your Honor to approve today is a stipulation.

2  So I think, ultimately, you're going to have to decide

3  whether you're going to approve it or not, I can't change

4  what I agreed to or what I didn't agree to it.  So I just

5  want to be very clear on that.

6        But as far as how the plan works, there's a

7  separate class for what we call -- I think it's called

8  Beltran secured claims, and if this Court ultimately

9  determines that those claims are in fact secured -- that's

10  not at confirmation, that may be as part of the claims

11  process -- then their recovery is in that class.

12        THE COURT:  So if I'm being asked today to approve

13  the stipulation that says that those claims are secured, then

14  doesn't that -- wouldn't somebody be collaterally estopped

15  from arguing post-confirmation or objecting to these claims

16  and saying they're not secured?

17        MR. SHAPIRO:  Absolutely, you know, that -- you

18  would be making that decision today.  So the way the plan --

19  the plan wouldn't work right now as it's drafted,

20  essentially, because you would be making the decision right

21  now that they are in fact secured because the plan provides

22  that you wouldn't have to make that later.

23        THE COURT:  Okay.  I want to take a short break

24  until 1 o'clock, and I'd like the parties to confer.  And I'm

25  not accusing anybody of anything and -- I really am not, I

1  mean, $57 million is a significant sum of money, but the

2  debtor many months ago agreed that it would agree and it

3  achieved benefits, this wasn't just a gift to a litigation

4  claimant, it managed to resolve what would likely be perhaps

5  complicated, multi-jurisdictional litigation, et cetera.

6           I'm not necessarily satisfied that I have a

7  sufficient record to make a determination finally today that

8  these are secured claims.  I certainly have a sufficient

9  record to grant the stipulation, if I wish, and overrule the

10 objection, but I'm a little troubled by a disconnect in the

11 plan about the plan says that these will get potentially

12 litigated, except that I'm being asked to dispose of that

13 litigation as to any allowed claim or any judgment today.

14 That's not typical, I think I'm missing something, and we're

15 going to take a short break and you people will make me smart

16 by 1 o'clock.  All right?

17           We stand in recess.

18      (Recess taken at 12:21 p.m.)

19      (Proceedings resumed at 1:11 p.m.)

20           THE COURT:  Please be seated.

21           Mr. Shapiro, good afternoon.

22           MR. SHAPIRO:  Good afternoon.  I think we have a

23 resolution.

24           THE COURT:  Okay.

25           MR. SHAPIRO:  Actually, I know we do, subject to

1    Your Honor.

2         (Laughter)

3              MR. SHAPIRO:  So what we would propose is the

4    stipulation would be modified to allow the action to proceed,

5    that would be, you know, we would submit it today or

6    tomorrow, whenever Your Honor enters the order.  That

7    stipulation would then include a further stipulation by the

8    debtor that we believe that the claimants are secured in the

9    escrow, and so that would be *prima facie* valid, and then

10   parties would have until August 28th to object to that

11   stipulation, not unlike in a DIP order.  And if there are

12   objections, then that would be heard at -- they cannot be

13   resolved --

14             THE COURT:  In the context of confirmation?

15             MR. SHAPIRO:  That would be heard in the context

16   of confirmation.  That does not necessitate -- perhaps

17   anticipating your next question -- that does not necessitate

18   changes to the plan because the change just says to the

19   extent the Court determines that it's allowed, so that it

20   would be would determine it's allowed as part of this

21   process.

22             THE COURT:  That sounds like an elegant resolution

23   to me.  I'd like to hear from Ms. Diers -- or Diers, I'm

24   sorry.  Good afternoon again.

25             MS. DIERS:  Good afternoon.  We agree with the

 1  proposal that Mr. Shapiro has set out.  We would just like to

 2  state on the record that the history of the stipulation is

 3  that it's been moved successively for each year, we're

 4  hopeful and we expect that the September 19th hearing date

 5  would stick.

 6              THE COURT:  Very good.

 7              Can I hear from the committee, Mr. Azman?

 8              MR. AZMAN:  It's good for the committee, Your

 9  Honor.  Thank you.

10              THE COURT:  All right.  Ms. Richenderfer, anything

11  to add?

12              MS. RICHENDERFER:  Not at this time, Your Honor.

13  Perhaps on August 28th I'll be filing something, but until

14  then nothing further, Your Honor.

15              THE COURT:  That sounds fine.

16              All right, I would ask if anyone else wishes to be

17  heard.

18              MR. AZMAN:  Your Honor, just one clarification --

19              THE COURT:  Can you get to the podium?  Let's just

20  make sure --

21              MR. AZMAN:  Oh, yes.

22              THE COURT:  -- let's just make sure we pick you up

23  on the --

24              MR. AZMAN:  Yes, Darren Azman, again, for the

25  committee.   The one clarification is the 28th would be the

1  date for parties to file anything, whether it's an objection

2  to the stip or something else that they might want to tee up

3  related to this, if that makes sense.

4         THE COURT:  The stipulation is going to say

5  whatever it says about what people will do by the 28th, I

6  will leave that to the collective candle power in this room

7  to figure out how to write that down.  I'm not making any

8  comment on what it is that you've agreed to.  We have a

9  deadline of the 28th.  If there are issues that the Court

10  needs to deal with, the Court will deal with that at

11  confirmation.

12         MR. AZMAN:  Thank you, Your Honor, perfect.

13         THE COURT:  Okay.  I think I understand the deal.

14         Mr. Shapiro, do I have it right?

15         MR. SHAPIRO:  You do, but I want to clarify one

16  thing I said.  Mr. Carlson corrected me one time before, but

17  I forgot.  We are not stipulating to allowance, we're

18  stipulating that they are secured.  Obviously, allowance will

19  be determined in Singapore.  I just wanted to clarify that.

20         THE COURT:  Yeah, no, that much I understood.  I

21  appreciate the clarification, but I -- okay.

22         I would be prepared to enter a stipulation

23  consistent with Counsel's representations.  Again, I think it

24  resolves issues for purposes of today and puts us in a format

25  that allows this issue to get figured out, if it needs to get

1 figured out, or hopefully satisfactorily resolved to

2 everyone's satisfaction.

3          So I would look for that order to be submitted

4 under certification.  I know that I've approached the

5 disclosure statement, I expect that's probably in the works

6 as well, and I will go ahead and enter that order at your --

7 as soon as it's up, but I think you are on the clock for

8 purposes of disclosure and solicitation.  And, other than

9 that, I think we'll look forward to seeing everyone on the

10 19th.

11          COUNSEL:  Thank you, Your Honor.

12          THE COURT:  All right, very well.  With that, we

13 are adjourned.  Thank you, Counsel.

14      (Proceedings concluded at 1:14 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1                              CERTIFICATION

2              I certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of my

5    knowledge and ability.

6

7    /s/ Tracey J. Williams                    August 14, 2024

8    Tracey J. Williams, CET-914

9    Certified Court Transcriptionist

10   For Reliable

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25