## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------- x

| | | |
|---|---|---|
| In re | : | **Chapter 11** |
| | : | |
| **TERRAFORM LABS PTE. LTD.,** *et al.*, | : | **Case No. 24–10070 (BLS)** |
| | : | |
| | : | |
| **Debtors.**[1] | : | **(Jointly Administered)** |

------------------------------------------------------------- x

## DEBTORS' MEMORANDUM OF
## LAW IN SUPPORT OF CONFIRMATION OF
## SECOND AMENDED CHAPTER 11 PLAN OF LIQUIDATION OF
## TERRAFORM LABS PTE. LTD. AND TERRAFORM LABS LIMITED

**WEIL, GOTSHAL & MANGES LLP**
Ronit Berkovich (admitted *pro hac vice*)
Jessica Liou (admitted *pro hac vice*)
Clifford W. Carlson (admitted pro *hac vice*)
F. Gavin Andrews (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

**RICHARDS, LAYTON & FINGER, P.A.**
Paul N. Heath (No. 3704)
Zachary I. Shapiro (No. 5103)
Matthew P. Milana (No. 6681)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile:  (302) 651-7701

*Counsel for the Debtors*
*and Debtors in Possession*

Dated:  September 17, 2024
          Wilmington, Delaware

---

[1]    The Debtors in these chapter 11 cases are: Terraform Labs Pte. Ltd. and Terraform Labs Limited.  The Debtors' principal offices are located at 10 Anson Road, #10-10 International Plaza, Singapore 079903.

**TABLE OF CONTENTS**

**Page**

Preliminary Statement .................................................................................................2

Jurisdiction, Venue, and Core Proceeding ...................................................................7

Background .................................................................................................................7

    1.   Wind Down Trust ..........................................................................................13

    2.   Limited Substantive Consolidation ................................................................14

    3.   Claims Pools ..................................................................................................14

    4.   Key Classes and Treatment ............................................................................15

    5.   Waterfall ........................................................................................................15

Argument ...................................................................................................................22

I.   Plan Satisfies Bankruptcy Code Requirements for Confirmation and Should Be Approved. ..................................................................................................................22

A.   Plan Satisfies Bankruptcy Code Section 1129(a)(1) ..........................................22

B.   Classification of Claims and Interests Complies with Bankruptcy Code Section 1122 ..........23

C.   Plan Complies with Bankruptcy Code Section 1123(a) .......................................27

    1.   Section 1123(a)(1): Designation of Classes of Claims and Interests ..................................27

    2.   Section 1123(a)(2): Specified Unimpaired Classes ......................................27

    3.   Section 1123(a)(3): Specified Treatment of Impaired Classes .......................................28

    4.   Section 1123(a)(4): Equal Treatment ............................................................28

    5.   Section 1123(a)(5): Implementation of the Plan ...........................................28

        (a)   Asset Sales .........................................................................................29

        (b)   Substantive Consolidation ..................................................................29

    6.   Section 1123(a)(6): Non-Voting Equity Securities .......................................34

    7.   Section 1123(a)(7): Designation of Directors and Officers ..............................................35

    8.   Section 1123(a)(8): Postpetition Person Service Payments .........................36

D.   Plan Complies with Bankruptcy Code Section 1123(b) .......................................36

    1.   Section 1123(b)(1): Impairment/Unimpairment of Classes of Claims and Interests ..............36

2.    Section 1123(b)(2): Assumption, Assignment, and Rejection of Executory Contracts and Unexpired Leases.....................................................................36

3.    Section 1123(b)(3): Settlement and Retention of Claims and Causes of Action. ...............................................................................................................38

    a.    Debtor Releases. ...................................................................................38

    b.    Retention of Causes of Action and Reservation of Rights............................................................................................................38

4.    Section 1123(b)(4): Sale of Substantially all Assets......................................39

5.    Section 1123(b)(5): Modification of Rights...................................................39

6.    Section 1123(b)(6): Additional Plan Provisions. ..........................................40

7.    Plan Releases Should Be Approved. ..............................................................40

    a.    The Debtor Releases Are Appropriate and Should be Approved. .............................................................................................42

    b.    Plan Exculpation Provision Should be Approved...............................................................................................................49

    c.    Injunction Provisions Are Narrowly Tailored and Should Be Approved. ...........50

E.    Section 1123(c): Non-Debtor Proposed Sales. ......................................................51

F.    Section 1123(d): Cure of Defaults. ........................................................................51

G.    Plan Satisfies Bankruptcy Code Section 1129(a)(2).............................................51

1.    Section 1125: Disclosure Statement and Solicitation. ..................................51

2.    Section 1126: Acceptance of the Plan...........................................................52

H.    Plan Has Been Proposed in Good Faith in Compliance with Bankruptcy Code Section 1129(a)(3). ................................................................................................54

I.    Plan Complies with Bankruptcy Code Section 1129(a)(4)....................................57

J.    Debtors Complied with Bankruptcy Code Section 1129(a)(5)...............................57

K.    Plan Does Not Contain Any Rate Changes............................................................60

L.    Plan Is in Best Interests of All Creditors and Equity Interest Holders, in Satisfaction of Bankruptcy Code Section 1129(a)(7)............................................60

M.    Plan Satisfies Bankruptcy Code Section 1129(a)(8) as to Each Class of Claims or Interests, or Satisfaction of Section 1129(a)(8) is Excused Under Bankruptcy Code Section 1129(b) .............................................................................................63

N.    Plan Provides for Payment in Full of All Allowed Priority Claims, in Satisfaction of Bankruptcy Code Section 1129(a)(9).........................................................................64

O.    Plan Satisfies Bankruptcy Code Section 1129(a)(10)...........................................64

P.    Plan Is Feasible and Satisfies Bankruptcy Code Section 1129(a)(11)...................65

RLF1 31513333V.1

Q.  Plan Complies with Bankruptcy Code Section 1129(a)(12). ...................................67

R.  Bankruptcy Code Sections 1129(a)(13), 1129(a)(14), 1129(a)(15), and 1129(a)(16) Are Not Applicable to the Plan. ............................................................................................67

S.  Plan Satisfies "Cram Down" Requirements under Bankruptcy Code Section 1129(b) for Non-Accepting Classes. ................................................................................................68

    1.  The Plan Does Not Discriminate Unfairly. .......................................................69

    2.  The Plan is Fair and Equitable. .........................................................................70

T.  Section 1129(c): The Plan is the Only Plan Currently on File .................................71

U.  Section 1129(d): Principal Purpose of Plan is Not Avoidance of Taxes................................72

V.  Section 1129(e) is Inapplicable.................................................................................72

W.  Section 1127: Modification of the Plan. ...................................................................72

II.  Objections Should be Overruled. ........................................................................................74

A.  Holders of Class 5 Claims Are Barred from Objecting to the Plan on the Basis that the Requirements of Section 1129(b) Are Not Met Because Class 5 Voted to Accept the Plan.............................................................................................................................75

B.  Separate Classification and Treatment of Claims in Class 4 and Class 5 Claims is Permissible and Justified.............................................................................................77

C.  Objecting Parties' Assertion that Certain Crypto Loss Claims Should Receive Better Treatment than Other Crypto Loss Claims Should be Overruled...........................................81

D.  The Absolute Priority Rule Prohibits Distributions to Holders of Class 5 Claims Ahead of Holders of Class 3 Claims (Beltran Allowed Secured Claims)..........................................84

III.  Cause Exists to Waive Stay of the Proposed Confirmation Order.................................85

IV.  Conclusion. ........................................................................................................................87

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 710 Long Ridge Rd. Operating Co. II, LLC*,
  No. 13-13653 (DHS), 2014 WL 886433 (Bankr. D.N.J. Mar. 5, 2014) ......................................46

*In re Abeinsa Holding, Inc.*,
  562 B.R. 265 (Bankr. D. Del. 2016) ....................................................................................46, 63

*In re Adelphia Comm'cns, Corp.*,
  368 B.R. 140 (Bankr. S.D.N.Y. 2007)..........................................................................................58

*In re Aegerion Pharm.*,
  605 B.R. 22 (Bankr. S.D.N.Y. 2019) ............................................................................................74

*In re Affiliated Foods, Inc.*,
  249 B.R. 770 (Bankr. W.D. Mo. 2000).........................................................................................59

*In re Aleris Int'l, Inc.*,
  No. 09-10478 (BLS), 2010 WL 3492664 (Bankr. D. Del. May 13, 2010)....................................42

*In re Am. Solar King*,
  90 B.R. 808 (Bankr. W.D. Tex. 1988)..........................................................................................56

*In re Amcast Auto. of Ind., Inc.*,
  No. 05- 33322 (FJO), (Bankr. S.D. Ind. Apr. 10, 2007), ECF No. 1423......................................26

*In re AOV Indus., Inc.*,
  792 F.2d 1140 (D.C. Cir. 1986)....................................................................................................23

*In re Armstrong World Indus., Inc.*,
  348 B.R. 111 (D. Del. 2006)....................................................................................................67, 81

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
  526 U.S. 434 (1999)......................................................................................................................58

*In re Boy Scouts of Am. and Del. BSA, LLC*,
  642 B.R. 504 (Bankr. D. Del. 2022) .............................................................................................23

*In re Cajun Elec. Power Coop., Inc.*,
  230 B.R. 715 (Bankr. M.D. La. 1999) ..........................................................................................63

*In re Celsius Network LLC, et al.*,
  No. 22-10964 (MG) (Bankr. S.D.N.Y. November 9, 2023) (Docket No. 3972)..........................78

iv

*In re Chemtura Corp.*,
    439 B.R. 561 (Bankr. S.D.N.Y. 2010) .................................................................53

*In re Clark-Cutler- McDermott Co.*,
    No. 16-41188 (CJP) (Bankr. D. Mass. Mar. 31, 2017), ECF No. 668 ..........................27

*In re Coastal Broad. Sys., Inc.*,
    570 F. App'x 188 (3d Cir. 2014) ...........................................................23, 68

*In re Combustion Eng'g, Inc.*,
    391 F.3d 190 (3d Cir. 2004) ...............................................................53

*In re Comfort Co., Inc.*,
    No. 08-12305 MFW, 2009 WL 7146282 (Bankr. D. Del. Feb. 4, 2009) .......................54

*In re Coram Healthcare Corp.*,
    315 B.R. 321 (Bankr. D. Del. 2004) ...................................................24, 76

*In re Drexel Burnham Lambert Grp., Inc.*,
    138 B.R. 723 (Bankr. S.D.N.Y. 1992) ................................................50, 59

*In re Energy Future Holdings Corp.*,
    No. 14-10979 (CSS) (Bankr. D. Del. Dec. 3, 2015) .......................................46

*In re EV Energy Partners, L.P.*,
    No. 18-10814 (CSS) (Bankr. D. Del. May 17, 2018) (Docket No. 238) .....................48

*In re Finlay Enters., Inc.*,
    No. 09-14873 (JMP), 2010 WL 6580629 (Bankr. S.D.N.Y. May 18, 2010) ...............64, 69

*Franklin High Yield Tax-Free Income Fund v. City of Stockton* (*In re City of Stockton*),
    542 B.R. 261 (B.A.P. 9th Cir. 2015) .......................................................74

*In re Frascella Enters., Inc.*,
    360 B.R. 435 (Bankr. E.D. Pa. 2007) ...................................................53

*In re Genco Shipping & Trading Ltd.*,
    513 B.R. ...................................................................................45

*In re Greate Bay Hotel & Casino, Inc.*,
    251 B.R. 213 (Bankr. D.N.J. 2000) .......................................................22

*In re Idearc Inc.*,
    423 B.R. 138 (Bankr. N.D. Tex. 2009), *aff'd sub nom. Spencer ad hoc Equity
    Comm. v. Idearc, Inc. (In re Idearc, Inc.)*, 662 F.3d 315 (5th Cir. 2011) ...................23

*In re Jersey City Med. Ctr.*,
    817 F.2d 1055 (3d Cir. 1987).................................................................23, 74, 76

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*,
    987 F.2d 154 (3d Cir. 1993)..........................................................................23, 26

*In re Johns-Manville Corp.*,
    68 B.R. 618 (Bankr. S.D.N.Y. 1986), *aff'd in part*, 78 B.R. 407 (S.D.N.Y. 1987),
    *aff'd sub nom. Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 843
    F.2d 636 (2d Cir. 1998)......................................................................................67

*In re Johns-Manville (Manville I)*,
    837 F.2d 89 (2d Cir. 1988)..................................................................................42

*In re Journal Register Co.*,
    407 B.R. 520 (Bankr. S.D.N.Y 2009) ................................................................64

*JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re Charter
    Commc'ns)*,
    419 B.R. 221 (Bankr. S.D.N.Y. 2009) ...............................................24, 56, 61

*Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*,
    843 F.2d 636 (2d Cir. 1988)................................................................................63

*In re LBI Media, Inc.*,
    No. 18-12655 (CSS) (Bankr. D. Del. Apr. 17, 2019) (Docket No. 839) .........48

*Lisanti v. Lubektin (In re Lisanti Foods, Inc.)*,
    329 B.R. 491 (D.N.J. 2005), *aff'd sub nom. In re Lisanti Foods, Inc.*, 241 F.
    App'x 1 (3d Cir. 2007)........................................................................................55

*In re Maremont Corp.*,
    601 B.R. 1 (Bankr. D. Del. 2019) .......................................................................55

*Marvel Ent. Grp., Inc. v. MAFCO Holdings, Inc. (In re Marvel Ent. Grp., Inc.)*,
    273 B.R. 58 (D. Del. 2002).................................................................................41

*In re Master Mortg. Inv. Fund, Inc.*,
    168 B.R. 930 (Bankr. W.D. Mo. 1994)..............................................................45

*In re Maxus Energy Corp.*,
    No. 16-11501 (CSS) (Bankr. D. Del. May 22, 2017) (Docket No. 1460) .........48

*In re Mercedes Homes, Inc.*,
    431 B.R. 869 (Bankr. S.D. Fla. 2009) ................................................................46

*In re Model Reorg Acquisition, LLC*,
    No. 17-11794 (CSS) (Bankr. D. Del. Oct. 6, 2017) (Docket No. 222).............48

*In re Nutritional Sourcing Corp.*,
398 B.R. 816 (Bankr. D. Del. 2008) ..................................................................22

*In re Nuverra Env't Sols., Inc.*,
590 B.R. 75 (D. Del. 2018), *aff'd*, 834 F. App'x 729 (3d Cir. 2021), *as amended*
(Feb. 2, 2021) ..................................................................................75, 76, 77

*In re One2One Commc'ns, LLC*,
Case No. 12-27311, 2016 WL 3398580 (D. N.J. June 14, 2016) ..................................46

*In re Oneida Ltd.*,
351 B.R. 79 (Bankr. S.D.N.Y. 2006) ..................................................................48

*In re Owens Corning*,
419 F.3d 195 (3d Cir. 2005)..........................................................................31

*In re Paragon Offshore PLC*,
No. 16- 10386 (CSS), 2016 WL 6699318 (Bankr. D. Del. Nov. 15, 2016) ...............................63

*Pizza of Haw., Inc. v. Shakey's, Inc. (In re Pizza of Haw., Inc.)*,
761 F.2d 1374 (9th Cir. 1985) .......................................................................63

*In re PWS Holding Corp.*,
228 F.3d 224 (3d Cir. 2000).........................................................42, 45, 47, 50

*In re Rexford Props. LLC*,
558 B.R. 352 (Bankr. C.D. Cal. 2016).................................................................24

*In re Rubicon U.S. REIT, Inc.*,
434 B.R. 168 (Bankr. D. Del. 2010) ..................................................................69

*Schaefer v. Superior Offshore Int'l, Inc.* (*In re Superior Offshore Int'l, Inc.*),
591 F.3d 350 (5th Cir. 2009) ........................................................................80

*In re Seaside Eng'g & Surveying, Inc.*,
780 F.3d 1070 (11th Cir. 2015) .....................................................................46

*SEC v. Terraform Labs Pte. Ltd., et al.*,
Case No. 1:23-cv-013460-JSR (S.D.N.Y.) ....................................................... *passim*

*In re Seegrid Corp.*,
Case No. 14-12391 (BLS) (Bankr. D. Del. 2014) .......................................................74

*In re SPC Seller*,
No. 09-12647 (BLS) (Bankr. D. Del. Dec. 9, 2010).....................................................64

*In re SunEdison, Inc.*,
575 B.R. 220 (Bankr. S.D.N.Y. 2017).................................................................69

*In re Superior Air Charter, LLC*,
   No. 20-11007 (CSS) (Bankr. D. Del. Sept. 4, 2020) (Docket No. 212) .......................................48

*In re TCI 2 Holdings, LLC*,
   428 B.R. 117 (Bankr. D.N.J. 2010) ...........................................................................................55

*In re TK Holdings Inc.*,
   Case No. 17-11375 (BLS) (Bankr. D. Del. 2017) .......................................................................80

*In re Tribune Co.*,
   464 B.R. 126 (Bankr. D. Del. 2011) .....................................................................................46, 54

*In re Tribune Co.*,
   476 B.R. 843 (Bankr. D. Del. 2012), *aff'd as modified*, No. 12-CV-1072 GMS,
   2014 WL 2797042 (D. Del. June 18, 2014), *aff'd in part, rev'd in part*, 799 F.3d
   272 (3d Cir. 2015) ................................................................................................................23

*U.S. Bank Nat'l Assoc. v. Wilmington Tr. Co. (In re Spansion, Inc.)*,
   426 B.R. 114 (Bankr. D. Del. 2010) .....................................................................................41, 58

*In re U.S. Truck Co., Inc.*,
   47 B.R. 932 (E.D. Mich. 1985), *aff'd*, 800 F.2d 581 (6th Cir. 1986) ............................................63

*United States v. Energy Res. Co.*,
   495 U.S. 545 (1990) ................................................................................................................63

*In re W.R. Grace & Co.*,
   475 B.R. 34 (D. Del. 2012), *aff'd*, 532 F. App'x 264 (3d Cir. 2013), 729 F.3d 311
   (3d Cir. 2013), 729 F.3d 332 (3d Cir. 2013) ...................................................................... *passim*

*In re Wash. Mut. Inc.*,
   461 B.R. 200 (Bankr. D. Del. 2011) .....................................................................................47, 53

*In re Washington Mut., Inc.*,
   442 B.R. 314 (Bankr. D. Del. 2011) .....................................................................................47, 81

*In re WorldCom, Inc.*,
   No. 02-13533 (AJG), 2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31, 2003) ...........................67

*In re Zenith Elecs. Corp.*,
   241 B.R. 92 (Bankr. D. Del. 1999) .................................................................................44, 45, 46

## Statutes

11 U.S.C. § 101, et seq. ........................................................................................................ *passim*

28 U.S.C. §§ 157 ........................................................................................................................6

28 U.S.C. §§ 1334 ......................................................................................................................6

RLF1 31513333V.1

28 U.S.C. § 157(b) .......................................................................................................7

28 U.S.C. §§ 1408 .......................................................................................................7

28 U.S.C. §§ 1408 .......................................................................................................7

28 U.S.C. § 1930 ....................................................................................................33, 65

**Other Authorities**

Bankruptcy Rule 1015 ..................................................................................................7

Bankruptcy Rule 3019 ............................................................................................70, 72

Bankruptcy Rule 3020(e) .......................................................................................21, 83

Bankruptcy Rules 6004 ..............................................................................................83

Bankruptcy Rules 6006 ..............................................................................................83

Fed. R. Bankr. P. 3019(a) .......................................................................................70, 72

Fed. R. Bankr. P. 3020(e) ..........................................................................................83

H.R. Rep. No. 95-595 .............................................................................................22, 50

Local Rules of Bankruptcy Rule 1015-1 .......................................................................7

Local Rules Rule 9013-1(f) ..........................................................................................7

Terraform Labs Pte. Ltd. ("**TFL**") and Terraform Labs Limited ("**TLL**"), as debtors and debtors in possession (each, a "**Debtor**" and together, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**") pending in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), hereby submit this memorandum of law (the "**Memorandum**") in support of their request for entry of an order confirming the *Second Amended Chapter 11 Plan of Liquidation of Terraform Labs Pte. Ltd. and Terraform Labs Limited* (Docket No. [•]) (including all schedules and exhibits thereto, and as may be modified, amended or supplemented from time to time the "**Plan**"),[2] including the agreements and other documents set forth in those certain supplements to the Plan, dated August 29, 2024 (Docket No. 653) (the "**First Plan Supplement**"), September 5, 2024 (Docket No. 664) (the "**Second Plan Supplement**"), and September 12, 2024 (Docket No. 684) (the "**Third Plan Supplement**," and collectively with the First Plan Supplement, the Second Plan Supplement, the Third Plan Supplement, and any further supplement thereto filed on the docket, the "**Plan Supplement**"), pursuant to section 1129 of title 11 of the United States Code (the "**Bankruptcy Code**"), and omnibus reply to objections, joinders, responses, and reservation of rights (collectively, the "**Objections**")[3] to confirmation of the Plan, as supported by the *Declaration of Michael Leto in Support of Confirmation of Amended Chapter 11 Plan of Liquidation of Terraform Labs Pte. Ltd. and Terraform Labs Limited* (the "**Leto Declaration**"), to be filed contemporaneously herewith, and respectfully represent as follows:

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan, the Plan Supplement, or the Disclosure Statement (each as defined herein).

[3] Objections to confirmation of the Plan are listed on the chart (the "**Objection Response Chart**") attached hereto as **Exhibit A** (collectively, the "**Objections**," and the parties filing such Objections, the "**Objecting Parties**").

**Preliminary Statement**

1.    The Debtors are pleased to be before the Court seeking confirmation of a Plan that is supported by the official committee of unsecured creditors (the "**Creditors' Committee**"), the U.S. Securities and Exchange Commission (the "**SEC**"), and the three Voting Classes (as defined below)—each of which has overwhelmingly voted to accept the Plan, as set forth below:

| Class | Amount Voting in Favor | Number Voting In Favor | Amount Voting Against | Number Voting Against | Class Voting Result |
|---|---|---|---|---|---|
| Class 4 General Unsecured Claims | $1,957,014.93 / 100% | 4 / 100% | $0.00 / 0% | 0 / 0% | Accepted |
| Class 5 Crypto Loss Claims | $306.00 / 96.23% | 306 / 96.23% | $12.00 / 3.77% | 12 / 3.77% | Accepted |
| Class 6 SEC Claim | $4,473,828,306.00 / 100% | 1 / 100% | $0.00 / 100% | 0 / 0% | Accepted |

2.    TFL filed its chapter 11 case to preserve value and maximize creditor recoveries in light of a judgment in the action the SEC commenced against TFL and its founder, former director, and former chief executive officer, Kwon Do Hyeong ("**Mr. Kwon**"), in the District Court for the Southern District of New York (the "**District Court**"), titled *SEC v. Terraform Labs Pte. Ltd.*, *et al.*, Case No. 1:23-cv-013460-JSR (S.D.N.Y.) (the "**SEC Enforcement Action**"). Following the Jury Verdict (as defined herein) in the SEC Enforcement Action, the Debtors entered into negotiations with the SEC, which culminated in a settlement with the SEC (the "**SEC Settlement**") memorialized by a consent agreement signed by TFL (the "**Consent**") and the *Final Judgment Against Terraform Labs Pte. Ltd. and Do Hyeong Kwon*, No. 1:23-cv-1346 (JSR) (Docket No. 273) (the "**Final Judgment**," and together with the Consent, the "**SEC Judgment**"), approved and entered by the District Court on June 12, 2024.

3.    As detailed in the Disclosure Statement, the SEC Settlement contemplates, among other things, a chapter 11 plan of liquidation, a wind down of the Debtors' business

2

operations (the "**Wind Down**"), and sales of TFL's assets through organized marketing and sale processes (the "**Sale Processes**").    On July 17, 2024, the Bankruptcy Court entered the *Order Approving Implementation Steps in Compliance with TFL Consent and Final Judgment in SEC Enforcement Action* (Docket No. 479), authorizing the Debtors take certain actions to effectuate the SEC Settlement.  The Wind Down and Sale Processes, which are largely effectuated through the Plan, are integral to the Debtors' goal of maximizing recoveries for the Debtors' creditors.

4.    The Plan was negotiated with the Creditors' Committee and the SEC in good faith and at arm's length.  It provides for an orderly liquidation of the Debtors' assets, as well as a value-maximizing consensual arrangement between the Debtors and the SEC, resolving the SEC's claims and providing recoveries to the Debtors' creditors, including investors in the Debtors' digital currencies.  Because, among other reasons, the SEC has agreed to allow creditors to obtain recoveries from funds that would otherwise be paid on the SEC claim, the Plan enables greater creditor distributions than would be possible absent the SEC Settlement and an orderly Wind Down, as set forth in the Leto Declaration.

5.    The Plan includes the following key terms (among other things):

a.    Provides for the transfer of all the Debtors' assets and liabilities to the Wind Down Trust established for the purpose of liquidating or monetizing assets (including pursuing estate causes of action), making distributions to creditors, and winding down and dissolving the Debtors and their estates;

b.    Provides for the limited substantive consolidation of the Debtors solely for purposes relating to the Plan, including voting, claims allowance, and distributions;

c.    Classifies certain impaired claims in Classes 4 through 10 consistent with the SEC Settlement;

d.    Holders of allowed Class 4 claims (General Unsecured Creditors) will receive their pro rata share of the GUC Pool (as defined herein), up to the full allowed amount of such claim;

3

e.  Holders of allowed Class 5 claims (Crypto Loss Claims) will receive their share of the Crypto Loss Claim Pool (as defined herein) in accordance with the Crypto Loss Claim Procedures (as defined herein); and

f.  The Class 6 claim (SEC Claim) shall be treated as an allowed general unsecured claim; however, distribution made to holders of allowed Class 4 claims and allowed Class 5 claims shall be deemed to satisfy the SEC Claim.

6.  The success of the Plan and the SEC Settlement is also evidenced by the support and acceptance of the Plan by the Debtors' creditors.  The Plan is supported by the Debtors' two primary constituents:  the Creditors' Committee (representing all general unsecured creditors) and the SEC.  In addition, the Plan has been accepted by ***all*** of the Voting Classes.  A table summarizing the voting results on the Plan is set forth on **Exhibit A** to the *Declaration of Emily Young, On Behalf Epiq Corporate Restructuring, LLC, Regarding Voting and Tabulation of Ballots Cast on the Amended Chapter 11 Plan of Liquidation of Terraform Labs Pte. Ltd. and Terraform Labs Limited* (Docket No. 699) (as may be amended, modified, or supplemented, the "**Voting Declaration**" and, together with the Leto Declaration, the "**Confirmation Declarations**").

7.  The Plan is subject to only a few remaining Objections.  Several parties reached out to the Debtors with informal comments to the Plan, and certain Objecting Parties filed formal Objections.  The Debtors have incorporated certain resolutions to the informal comments and certain of the filed Objections in the Debtors' Plan and proposed order confirming the Plan (the "**Proposed Confirmation Order**"), filed contemporaneously herewith.  However, as of the date hereof, not all Objections have been resolved, and though the Debtors are continuing to work to narrow the outstanding issues in advance of the Confirmation Hearing, the Debtors believe that certain Objections to confirmation will remain.

8.  The Objection Response Chart identifies each of the filed Objections and the Debtors' responses thereto and notes which of the Objections have been resolved in full or in

4

part and have been or will be withdrawn.  Certain Objections and informal comments are addressed in more detail in Part II herein.

9.        The Objections that remain unresolved include a formal Objection filed by the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**"), Objections filed by certain individuals who appear to assert Class 5 claims (Crypto Loss Claims).[4] Prior to the expiration of the objection deadline for confirmation of the Plan, the Debtors granted Avalanche (BVI), Inc. ("**Avalanche**") an extension to 5:00 p.m. ET on September 17, 2024 to file an objection, as the parties continued to negotiate a resolution.  The Debtors have reviewed Avalanche's draft Objection and will file a reply thereto should it be necessary, given that the Debtors will have filed this Memorandum in advance of Avalanche's objection deadline.  As set forth below, the Debtors believe that the Plan, including the classification and treatment of claims thereunder, satisfies the Bankruptcy Code and provides for Class 5 claims than such creditors would otherwise receive absent the SEC Settlement, including through the establishment and funding of the SEC Settlement Fund (as defined herein) for the exclusive benefit of holders of Class 5 claims.  The Debtors also note that of the 318 holders of Crypto Loss Claims that submitted valid ballots on the Plan, 306 (or 96.23%) voted to accept the Plan, demonstrating the overwhelming support from holders of Crypto Loss Claims for this Plan.  *See* Voting Declaration, Ex. A.

10.        The Class 5 Objecting Parties generally make the following primary points in opposition to the Plan:  (1) the Plan discriminates unfairly and inequitably treats holders of Class 5 claims as lower priority than Class 4 claims (General Unsecured Claims); (2) holders of certain Class 5 claims, such as UST holders and small investors, should receive higher recoveries than

---

[4]    Certain Objecting Parties filed their Objections after the deadline; however, the Debtors have nevertheless addressed those Objections herein and in the Objection Response Chart.

holders of other Crypto Loss Claims, including LUNA holders institutional investors; and (3) holders of Class 3 claims (Beltran Allowed Secured Claims) should not receive priority ahead of holders of Class 5 claims.

11.    The unresolved Objections should be overruled for the following reasons, as set forth in more detail in Part II herein.  As a thresholder matter, holders of Class 5 claims are barred from objecting to the Plan on the basis that the requirements of section 1129(b) are not met (*i.e.*, that the Plan discriminates unfairly) because Class 5 voted to accept the Plan and is not being "crammed down."  Even so, while both Class 4 claims and Class 5 claims are unsecured, there is a legal and factual basis for their separate classification and different treatment, including the nature of the claims (trade/contract-based versus litigation/tort based), the fact that Class 5 claims are arguably securities-based claims, and the separate consideration to which holders of Class 5 Claims have priority (the SEC Settlement Fund).

12.    As to the internal treatment among holders of Class 5 claims, for purposes of the Plan, all Crypto Loss Claims are properly classified together and, accordingly, must receive the same treatment.  Further, the Plan provides that the Plan Administrator (as defined herein) will develop and implement the Crypto Loss Claim Procedures (as defined herein) after the Effective Date, which will ultimately determine Class 5 allowed claims and recovery amounts.  The Plan does not limit which factors the Plan Administrator may consider in developing the Crypto Loss Claim Procedures, and holders of Class 5 claims will have the opportunity to be heard and object to the proposed Crypto Loss Claim Procedures prior to approval by the Bankruptcy Court.  Thus, the Plan Administrator may decide, subject to Bankruptcy Court approval, that the factors the Objectors cite should impact the allowed amounts of Class 5 claims.  Accordingly, the Objections that argue certain Crypto Loss Claims should receive priority treatment over certain other Crypto Loss Claims are not ripe at this time.

13.     As set forth more fully below, the Debtors believe that the Plan, including the SEC Settlement embodied therein and as supplemented by the Plan Supplement, is in the best interests of creditors and should be confirmed.  *See* Leto Declaration ¶41.  The Debtors submit that, as reflected herein and in the Objection Response Chart, certain Objections have been addressed, withdrawn or otherwise resolved, and the outstanding Objections are without merit as to any remaining issues and should be overruled.

14.     For the reasons set forth herein and in the Confirmation Declarations, the Plan satisfies each applicable requirement for confirmation under the Bankruptcy Code and should be confirmed.

### Jurisdiction, Venue, and Core Proceeding

15.     The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

16.     Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), the Debtors consent to the entry of a final order by the Court in connection with this matter to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Background

17.     The pertinent facts relating to the commencement of these Chapter 11 Cases and information regarding the Debtors' business and operations are set forth in the (i) *Declaration of Chris Amani in Support of the Debtor's Chapter 11 Petition and First Day Relief* (Docket No.

18) and (ii) *Disclosure Statement for Amended Chapter 11 Plan of Liquidation of Terraform Labs Pte. Ltd. and Terraform Labs Limited* (Docket No. 569) (including all schedules and exhibits thereto, and as may be modified, amended or supplemented from time to time, the "**Disclosure Statement**"), which are incorporated herein by reference.

18.     On January 21, 2024 (the "**TFL Petition Date**") and July 1, 2024 (the "**TLL Petition Date**" and, together with the TFL Petition Date, the "**Petition Date**"), respectively, TFL and TLL commenced with the Bankruptcy Court voluntary cases under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

19.     The Chapter 11 Cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Local Rule 1015-1.

20.     On February 29, 2024, the U.S. Trustee appointed the Creditors' Committee.  No trustee or examiner has been appointed in these Chapter 11 Cases.

**A.  Bar Dates**

21.     On  July  9,  2024,  the  Court  entered  an  order (the "**General Bar Date Order**") (Docket No. 437) establishing certain deadlines and procedures for the filing of proofs of claim in the Chapter 11 Cases.[5]  The General Bar Date Order did not

---

[5]     On July 10, 2024, the Debtors served notice of the General Bar Date on creditors in the Chapter 11 Cases and on July 19, 2024 executed an expansive publication and noticing protocol, which included the publication of the notice of the General Bar Date  in the national edition of *The New York Times*, and *CoinDesk* (CoinDesk.com), and pinning the notice of the Confirmation Hearing on the Debtors' X accounts (https://twitter.com/terra_money and https://twitter.com/terrac_money), the Debtors' Medium account (https://medium.com/terra-money), the Debtors' Discord channel (https://discord.com/invite/terra-money), and the Debtors' Telegram channel (@terra_announcements).  *See Certificate of Service* (Docket No. 482; *Proof of Publication* Docket No. 489).

establish a bar date with respect to Crypto Loss Claims for allowance and distribution purposes. Pursuant to the Plan, as negotiated with the Creditors' Committee, the bar date and proof of claim process for holders of Crypto Loss Claims to assert a claim (the "**Crypto Loss Claim Bar Date**") for claim allowance and distribution purposes will be established by the Plan Administrator upon motion and notice, *provided that* such date shall be no more than one hundred twenty (120) calendar days after the Effective Date, unless such time is extended by the Plan Administrator upon filing a notice on the docket, as described below in more detail.

22. On July 19, 2024, the Court entered an order (the "**Preliminary Crypto Loss Claim Bar Date Order**" and, together with the General Bar Date Order, the "**Bar Date Orders**") (Docket No. 491) establishing certain deadlines and procedures for the filing of proofs of claim for holders of Crypto Loss Claims in the Chapter 11 Cases, solely for voting purposes[6].

23. In addition, the Plan establishes certain deadlines and procedures for filing proofs of claim for Administrative Expense Claims, certain deadlines and procedures for filing proofs of claim for rejection damages (the "**Rejection Damages Claim Bar Date**"), and certain deadlines by which Private Wallet Crypto Holders and Bridge Wallet Crypto Holders must withdraw or redeem their tokens, as applicable (such deadlines under the General Bar Date Order, the Preliminary Crypto Loss Claim Bar Date Order, and the Plan, and the Crypto Loss Claims Bar

---

[6]     On July 22, 2024, the Debtors served notice of the Preliminary Crypto Loss Claim Bar Date on creditors in the Chapter 11 Cases and on July 25, 2024 executed an expansive publication and noticing protocol, which included the publication of the notice of the General Bar Date in the national edition of *The New York Times*, and *CoinDesk* (CoinDesk.com), and pinning the notice of the Confirmation Hearing on the Debtors' X accounts (https://twitter.com/terra_money and https://twitter.com/terrac_money), the Debtors' Medium account (https://medium.com/terra-money), the Debtors' Discord channel (https://discord.com/invite/terra-money), and the Debtors' Telegram channel (@terra_announcements). *See Certificate of Service* (Docket No. 543; *Proof of Publication* Docket No. 674).

Date, collectively, the "**Bar Dates**").  Specifically, the Bar Date Orders established and the Plan would establish, among other things, the following deadlines for asserting claims against the estates:

- **General Bar Date**: August 9, 2024 at 5:00 p.m. (Prevailing Eastern Time) as the deadline for all creditors, other than Governmental Units with claims against TLL and holders of Crypto Loss Claims, to file proofs of claim against the Debtors.[7]

- **Preliminary Crypto Loss Claim Bar Date**: August 21, 2024 at 5:00 p.m. (Prevailing Eastern Time) as the deadline for holders of Crypto Loss Claims to file preliminary proofs of claim against the Debtors, solely for voting purposes.

- **TLL Governmental Bar Date**: December 30, 2024 at 5:00 p.m. (Prevailing Eastern Time) as the deadline for all Governmental Units with claims against TLL to file proofs of claim against TLL.

- **Administrative Expense Claims Bar Date**: the applicable deadline for filing requests for payment of Administrative Expense Claims (other than Fee Claims) is the date that is sixty (60) days after the effective date of the Plan (the "**Effective Date**").

- **Rejection Damages Claim Bar Date**: the applicable deadline for parties asserting claims arising from the rejection of an executory contract or unexpired lease by any of the Debtors pursuant to Section 8.1 of the Plan is no later than (i) thirty (30) days after a filing and service of the Notice of Effective Date (as defined in the Proposed Confirmation Order); or (ii) thirty (30) days following service of an order approving rejection of any executory contract or unexpired lease of the Debtors if such contract or lease is the subject of a pending assumption dispute.

- **Private Wallet Crypto Holder Bar Date**: the applicable deadline for Private Wallet Crypto Holders to withdraw tokens held in wallets or accounts owned or controlled by such token holder which are no longer readily accessible through the Debtors' applications or protocols as a result of the Debtors' Wind Down is the date that is thirty (30) days after the Effective Date.

- **Bridge Wallet Crypto Holder Bar Date**: the applicable deadline for Bridge Wallet Crypto Holders to redeem Terra Crypto held in the Bridge Wallets is the date that is thirty (30) days after the Effective Date.

- **Crypto Loss Claim Bar Date**:  The applicable deadline for holders of Crypto Loss Claims to assert a claim, which will be established pursuant to the approval of the Crypto Loss Claim Procedures Motion (as defined herein) and will be no more than

---

[7]   The deadline for the SEC to file proofs of claim against TFL is November 1, 2024, pursuant to the *Order Approving Stipulation Extending Governmental Bar Date for the U.S. Securities and Exchange Commission* (Docket No. 583).

one hundred twenty (120) calendar days after the Effective Date.   The Plan Administrator may extend such deadline upon filing a notice on the docket.

**B.   SEC Judgment and SEC Settlement**

24.     On April 5, 2024, after a ten (10)-day jury trial in the SEC Enforcement Action, the jury found TFL and Mr. Kwon respectively liable for reckless and intentional misconduct constituting the violations of securities law, including civil securities fraud charges (the "**Jury Verdict**").   In connection with determining the remedies and penalties to be imposed on TFL, the SEC sought relief (a) enjoining Mr. Kwon and TFL from further violation of the securities laws and the disgorgement of approximately $3.5 billion plus prejudgment interest, among other injunctive and punitive relief; (b) $420 million in civil penalties against TFL; and (c) a conduct injunction (the "**Proposed Conduct Injunction**") prohibiting TFL from (i) "participating, directly or indirectly, in the purchase, offer, or sale of any crypto asset securities, including but not limited to UST, MIR, LUNA, wLUNA, and LUNA 2.0;" or (ii) "engaging in activities for purposes of inducing or attempting to induce the purchase, offer, or sale of any crypto asset securities by others."[8]   Given the broad scope of the Proposed Conduct Injunction, if the District Court entered it as proposed, it would have prevented the Debtors from continuing to operate in the ordinary course and caused irreparable harm to TFL's business.   Accordingly, the Debtors determined that engaging in settlement negotiations with the SEC was the best course of action for the benefit of their estates and all stakeholders.   *See* Leto Declaration ¶7.   After a period of negotiations, TFL and the SEC reached the SEC Settlement.

25.     On June 12, 2024, the District Court entered the SEC Judgment, which approved the terms of the SEC Settlement.   The salient terms of the SEC Settlement are as follows:

---

[8]     Opening Brief In Support of the SEC Motion For Final Judgement (Docket No. 232, Case No. 1:23-cv-1346 (JSR)); Supplemental Brief in Support of SEC Motion for Final Judgment (Docket No. 246, Case No. 1:23-cv-1346 (JSR)).

11

- The SEC shall be allowed a general unsecured claim (*i.e.*, the SEC Claim) that recovers after the claims of creditors and investors. The SEC Claim shall be deemed satisfied upon a distribution by the liquidating trustee to creditors and investors pursuant to a confirmed liquidating chapter 11 plan, provided that if the allowed claims, including any applicable interest, of creditors (including any "harmed investors"), are satisfied in full under the chapter 11 plan, distributions shall be made on account of the SEC Claim until paid in full before any distribution is made to any TFL Equity Holder.

- TFL is required to wind down its business as quickly as reasonably possible and liquidate its assets in a value-maximizing and cost-efficient manner, which may include taking the following actions: (a) marketing and selling TFL's equity interest in Proximity Panorama LDA ("**Proximity**") and its Venture Investments; (b) converting certain digital assets within its possession and control into U.S. dollars; (c) continuing to operate its applications and protocols for a limited time to allow third parties the opportunity to withdraw, unwind, and/or unstake their positions; and (d) otherwise destroy or burn all tokens in its possession or control native to the Debtors' blockchain network.

- TFL was required to file a chapter 11 plan of liquidation by June 30, 2024 that provides for: (a) a liquidating trust or surviving estate to which all of the Debtors' assets (including assets transferred from Luna Foundation Guard ("**LFG**") to the Debtors' estates, chapter 5 claims, and causes of action) shall be transferred and assigned free and clear upon the Effective Date; and (b) a liquidating trustee, selected by the Creditors' Committee with the consent of the Debtors and the SEC, to preside over the liquidating trust.

- The Debtors are permitted to seek inclusion of a legally permissible Plan release, limited in scope and time for the Debtors' current directors, officers, employees, and professionals, and customary legally permissible exculpations for estate fiduciaries, including the Creditors' Committee, its members, and its professionals; both shall include a carve-out for criminal acts, fraud, gross negligence, and willful misconduct, as well as a government carve-out.

- The Debtors shall not receive a discharge under the Plan.

- The Debtors were required to replace the non-independent directors, Chris Amani and Ashwin Mathialagan, on its board of directors (the "**Board**") with two new independent directors.

- The Debtors must use their best efforts to confirm the Plan by September 30, 2024 and the Effective Date must occur no later than October 31, 2024.

- Mr. Kwon, as the proprietor of LFG, is required to transfer all cryptocurrency assets in LFG's name to the Debtors' estate, among other personal assets. LFG's assets include, among others, a significant amount of AVAX tokens minted by Avalanche.

26.    The Plan complies with each relevant term of the SEC Settlement and is supported by the SEC, which voted to accept the Plan.    *See* Voting Declaration, Ex. A. Confirmation of the Plan and satisfying the conditions precedent to the Effective Date are key steps in complying with the terms of the SEC Settlement, which will provide the highest recoveries for all of the Debtors' stakeholders, including Class 5 claims.

## C.  Summary of Plan

### 1.    Wind Down Trust.

27.    In compliance with the terms of the SEC Settlement, the Plan provides for the liquidation and winding down of the Debtors' business, through the creation of a liquidating trust organized under the laws of the Cayman Islands (the "**Wind Down Trust**").  On the Effective Date, the Debtors' assets and liabilities will be transferred to and vest in the Wind Down Trust. The Wind Down Trust will assume sole and exclusive responsibility and liability for all claims against the Debtors, as well as the Debtors' operating expenses, and such claims shall be liquidated, resolved, or paid by the Wind Down Trust.  The Wind Down Trust will be governed by the Wind Down Trust Agreement.  Pursuant to the Wind Down Trust Agreement, the plan administrator (the "**Plan Administrator**") has authority to direct the trustee (the "**Wind Down Trustee**") to, among other things, effectuate the wind down of the Debtors' estates, reconcile claims, and make distributions to holders of allowed claims, subject to the oversight of an advisory board (the "**Advisory Board**").

28.    Pursuant to the Plan, the Debtors must establish and fund a reserve (the "**Wind Down Reserve**") with sufficient cash to fund (i) the wind down process until the Wind Down Completion Date (as defined in the Plan), taking into account funds that are not yet in the Debtors' estates, but are likely to be available after the Effective Date, as provided in the Wind Down Budget (as defined in the Plan), and (ii) obligations of the Debtors or the Wind Down Trust,

as applicable, to indemnify John S. Dubel, Russell Nelms, and Thong Kum Keen Benjamin, each in his capacity as an independent director of TFL, including in TFL's capacity as director of TLL, in accordance with the TFL constitution and TLL's articles of association.

> **2.      Limited Substantive Consolidation.**

29.      For the ease of administration of the Wind Down, the Plan contemplates a limited substantive consolidation of the estates of TFL and TLL, solely for Plan-related purposes, including voting, confirmation, claim allowance, and distributions (as described more fully below).

> **3.      Claims Pools.**

30.      Pursuant to the Plan, on the Effective Date, the Debtors will establish and fund a pool with cash estimated to be necessary to pay holders of secured and/or priority claims (*i.e.*, Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, and Other Secured Claims) ("**Senior Claims**") a 100% recovery, plus any amounts necessary to pay holders of disputed Senior Claims (the "**Senior Claim Pool**").

31.      The Plan also provides for the establishment and funding of a pool for the benefit of holders of allowed General Unsecured Claims (the "**GUC Pool**"), which shall be funded (i) on the Effective Date, with available cash that is not otherwise reserved for another fund/pool and (ii) after the Effective Date, with (a) cash received after the Effective Date, such as proceeds from the sale of estate assets, proceeds from causes of action, and cash recovered from restricted bank accounts, but not the SEC Settlement Fund (as defined below), (b) surplus cash from the Wind Down Reserve, and (c) surplus cash from the Senior Claim Pool.

32.      Pursuant to the Plan and the SEC Settlement, the Debtors are required to establish a fund reserved for distribution solely to holders of Class 5 claims (*i.e.*, Crypto Loss Claims), which shall be funded with amounts transferred to the Debtors by Mr. Kwon and LFG under the SEC Settlement (the "**SEC Settlement Fund**").  The Plan also requires the Debtors to

establish a pool, funded initially with (i) the funds in the SEC Settlement Fund and (ii) thereafter, with any remaining cash in the GUC Pool upon the time at which all allowed General Unsecured Claims are indefeasibly paid in full in cash and there are no disputed General Unsecured Claims (the "**Crypto Loss Claims Pool**").  Pursuant to the Plan and the Wind Down Trust Agreement, the Wind Down Trustee, at the direction of the Plan Administrator, shall make distributions to holders of allowed claims from such claim pools.

### 4.    Waterfall.

33.    Pursuant to the Plan, distributions of cash received by the Wind Down Trust after the Effective Date, excluding the assets in the SEC Settlement Fund, are to be made (i) first, to fund any deficits in the Wind Down Reserve, as determined in the sole discretion of the Plan Administrator, (ii) second, to fund any deficits in the Senior Claim Pool, as determined in the sole discretion of the Plan Administrator, and (iii) third, to fund the GUC Pool, until the time at which all allowed General Unsecured Claims are indefeasibly paid in full in cash and there are no disputed General Unsecured Claims (the "**Waterfall**").  As noted above, once all general unsecured claims are paid in full, funds in the GUC Pool will be available to holders of Crypto Loss Claims, and holders of Crypto Loss Claims will have exclusive access to the SEC Settlement Fund.

### 5.    Key Classes and Treatment.

34.    The Plan contemplates ten (10) classes and the establishment of the asset pools described above, from which holders of allowed claims will receive distributions.  The key classes include Class 3 (Beltran Allowed Secured Claims), Class 4 (General Unsecured Claims), Class 5 (Crypto Loss Claims), Class 6 (SEC Claim), and Class 9 (510(c) Subordinated Claims).

35.    <u>Class 3.</u>  Class 3 is comprised of holders of Beltran Allowed Secured Claims.  These are claimants in the representative action (the "**Beltran Action**") filed against TFL,

15

among certain other defendants, prior to the Petition Date in the High Court of the Republic of Singapore (the "**Singapore High Court**"), alleging certain claims related to the purchase and sale of UST, among other things.  As described in the Disclosure Statement, the Singapore High Court issued a Mareva Injunction (as defined in the Disclosure Statement) over all of TFL's operations. To lift the Mareva Injunction to continue TFL's operations, prior to the Petition Date, TFL deposited approximately $57 million into an escrow account in the Singapore High Court (the "**Beltran Escrow Deposit**").  Pursuant to Singapore law, the claims underlying the Beltran Action are secured by the Beltran Escrow Deposit.

36.    Pursuant to the *Order Approving Amended Stipulation Between Debtors and Singapore Action Claimants Regarding Relief from the Automatic Stay* (Docket No. 661) (the "**Beltran Stipulated Order**"), the Debtors stipulated and agreed that the claimants in the Beltran Action (*i.e.*, holders of Class 3 claims) have a valid, enforceable, non-voidable and perfected lien and security interest in the Beltran Escrow Deposit, to the extent of their allowed claim as determined by the Singapore High Court, up to the amount of the Beltran Escrow Deposit. *See* Beltran Stipulated Order ¶ 3; Plan § 1.16.  The Beltran Stipulated Order provided for an objection deadline of August 28, 2024 to object.  No party in interest raised an objection to the Beltran Stipulated Order prior to the objection deadline (or since).[9]  Accordingly, the Beltran Stipulated Order is binding on all parties in interest, and the holders of Class 3 claims are entitled to enforce any final and non-appealable order in the Beltran Action or settlement in the Beltran Action against the Beltran Escrow Deposit to the extent set forth in the Beltran Stipulated Order. Thus, holders of Class 3 claims are secured claimants as a matter of both Singapore law and pursuant to order of the Bankruptcy Court.

---

[9]    While the Objection filed at Docket No. 689 also objects to the Beltran Stipulated Order, this Objection was not filed before the objection deadline and is therefore without effect.

37.     Accordingly, pursuant to the Plan, holders of allowed Class 3 claims, on the later of the Effective Date and the date that is thirty (30) days after the date that (i) such claim becomes an allowed claim, and (ii) a final order of the courts of the Republic of Singapore is made permitting the release of the Beltran Escrow Deposit to the holders of the Class 3 claims, or as soon thereafter as is reasonably practicable, each holder of a Class 3 claim will receive payment from the Beltran Escrow Deposit as determined by the final order of the courts of the Republic of Singapore.

38.     Class 4.  Class 4 is comprised of holders of General Unsecured Claims, many of which hold claims incurred by contract in connection with services provided to the Debtors.  Pursuant to the Plan, holders of allowed Class 4 claims (General Unsecured Claims) will receive their pro rata share of the GUC Pool up to the full amount of such claim.

39.     Class 5.  Class 5 is comprised of claims ("**Crypto Loss Claims**") asserted against the Debtors arising from (a) the purchase, sale, or rescission of the purchase or sale of cryptocurrency, including (i) Terra Crypto (as defined in the Plan), (ii) any wrapped or bridged version on any blockchain of any Terra Crypto, (iii) any staked or bonded Terra Crypto on any blockchain, (iv) any Terra Crypto on any centralized or decentralized liquidity, lending, or borrowing application or protocol on any blockchain, (v) any receipt or derivative of any Terra Crypto on any blockchain, (vi) any derivatives trading or perpetual swaps of Terra Crypto, or any other Cryptocurrency that derives a value from Terra Crypto, and (vii) any other Cryptocurrency that was transacted or made available on the TerraLunaClassic and TerraLuna blockchains, and (b) any reimbursement or contribution claims allowed under section 502 of the Bankruptcy Code on account of such claims.  Pursuant to the Plan, holders of allowed Class 5 claims will receive their share of the Crypto Loss Claim Pool according to the Crypto Loss Claim Procedures (as

defined below). Class 5 claims will be administered in accordance with the Crypto Loss Claim Procedures to be established after the Effective Date.

40. The Plan provides that the Plan Administrator will file a motion (the "**Crypto Loss Claim Procedures Motion**") seeking approval of the Crypto Loss Claim Bar Date and certain procedures that will outline the process and timeline for administering and determining the allowed claim for each holder of a Crypto Loss Claim (the "**Crypto Loss Claim Procedures**"). Once approved by the Court after notice and a hearing, the Crypto Loss Claim Procedures will be binding on all creditors. The Crypto Loss Claim Procedures Motion shall include: (A) notice of the Crypto Loss Claim Procedures and an opportunity to object thereto; (B) notice of the hearing to consider approval of the Crypto Loss Claim Procedures, if necessary; (C) the Crypto Loss Claim Bar Date; (D) instructions for submitting a Crypto Loss Claim; (E) a modified proof of claim form specifically as to Crypto Loss Claims; and (F) a notice for holders of Crypto Loss Claims to "opt in" to being a Contributing Claimant (as defined in the Plan).

41. <u>Class 6.</u> Class 6 is comprised of the SEC Claim. As described above, under the SEC Settlement, the SEC has a claim of $4,473,828,306 in total aggregate amount. Pursuant to the Plan and the SEC Settlement, by consent of the SEC, the SEC Claim shall be treated as an allowed general unsecured claim. Any distributions made to holders of allowed Class 4 claims (General Unsecured Claims) and allowed Class 5 claims (Crypto Loss Claims) shall be deemed to satisfy the SEC Claim. For the avoidance of doubt, (i) there shall be no distributions on the SEC Claim unless allowed claims in Class 4 and Class 5 are satisfied in full and (ii) if the allowed claims in Class 4 and Class 5 are satisfied in full under the Plan, distributions shall be made on account of any remaining unsatisfied portion of the SEC Claim until paid in full before any distribution is made to holders of 510(c) Subordinated Claims or holders of TFL Equity Interests.

42.     Class 9.  Class 9 is comprised of 510(c) Subordinated Claims, which include any claim against the Debtors that has been determined by final order to be subject to equitable subordination pursuant to section 510(c) of the Bankruptcy Code.  The Wind Down Trustee, as directed by the Plan Administrator, shall have the right to object to any claim, including indemnification claims, on the basis that such claim should be equitably subordinated  pursuant to section 510(c) of the Bankruptcy Code and should be classified as a 510(c) Subordinated Claim. Under the Plan, 510(c) Subordinated Claims are subordinated to other creditor classes and are unlikely to receive a recovery under the Plan.

**D.  Disclosure Statement Order**

43.     On August 8, 2024, the Court entered the *Order (I) Approving Proposed Disclosure Statement and Form and Manner of Notice of Disclosure Statement Hearing, (II) Establishing Solicitation and Voting Procedures, (III) Establishing Cure Procedures, (IV) Scheduling Confirmation Hearing, (V) Establishing Notice and Objection Procedures for Confirmation of Proposed Plan, and (VI) Granting Related Relief* (Docket No. 572) (the "**Disclosure Statement Order**").

44.     By the Disclosure Statement Order, the Court, among other things, (i) established the solicitation and voting procedures with respect to the Plan; (ii) established cure procedures (as detailed in Section 8.2 of the Plan); (iii) scheduled the Confirmation Hearing to commence on September 19, 2024 at 10:00 a.m. (Eastern Time); (iv) established notice and objection procedures with respect to the Plan; (v) set September 12, 2024 at 4:00 p.m. (Eastern Time) as the voting deadline for Classes 4 and 6; (vi) set September 16, 2024 at 12:00 p.m. (Eastern Time) as the voting deadline for Class 5; (vii) set September 12, 2024 at 4:00 p.m. (Eastern Time) as the Plan objection deadline; (viii) set August 20, 2024 as the deadline to object

to claims for voting purposes; and (iv) set September 3, 3024 as the deadline for claimants to file a motion under Bankruptcy Rule 3018(a).

45.    Upon entry of the Disclosure Statement Order, and in accordance with its terms, on August 14, 2024, the Debtors, through their solicitation agent, Epiq Corporate Restructuring, LLC, caused the applicable Solicitation Packages (as defined in, and approved by, the Disclosure Statement Order) to be transmitted to and served on holders of claims in the Voting Classes. *See Certificate of Service of Solicitation Materials*, dated August 27, 2024 (Docket No. 638) (the "**Solicitation Affidavit**").   In particular, through First Class Mail, the Debtors solicited votes on the Plan from the holders of claims in the classes of claims entitled to vote to accept or reject the Plan: Class 4 (General Unsecured Claims), Class 5 (Crypto Loss Claims Claims), and Class 6 (SEC Claim) (each a "**Voting Class,**" and collectively, the "**Voting Classes**"). *See generally,* Solicitation Affidavit.  In addition, on August 19, 2024, the Debtors published notice of the Confirmation Hearing once in the national edition of *The New York Times* and *CoinDesk* (CoinDesk.com), and pinned the notice of the Confirmation Hearing on the Debtors' X accounts (https://twitter.com/terra_money) and (https://twitter.com/terrac_money), the Debtors' Medium account (https://medium.com/terra-money), the Debtors' Discord channel (https://discord.com/invite/terra-money), and the Debtors' Telegram channel (@terra_announcements). *See Proof of Publication* (Docket No. 693).

46.    The Debtors filed two omnibus substantive claim objections, solely for voting purposes, to reclassify certain claims as Crypto Loss Claims and to reduce or disallow certain General Unsecured Claims.  *See* Docket Nos. 619, 620.  No party filed a motion under Bankruptcy Rule 3018(a) in response.[10]

---

[10]   The Debtors received an email from a *pro se* individual (the holder of claim nos. 10135, 10136, 10137) requesting that the communication be treated as a motion under Bankruptcy Rule 3018(a).  The Debtors had sought to reclassify this individual's claims as Crypto Loss Claims pursuant to the *Debtors' First Omnibus (Substantive)*

### E. Plan Supplements

47.     On August 29, 2024, the Debtors filed the First Plan Supplement (Docket No. 653), containing the following documents and information:

- <u>Ex. A</u>: Wind Down Trust Agreement;

- <u>Ex. B</u>: Wind Down Budget;

- <u>Ex. C</u>: Assumption Schedule; and

- <u>Ex. D</u>: Schedule of Retained Causes of Action.

48.     On September 5, 2024, the Debtors filed the Second Plan Supplement (Docket No. 664), containing the following documents and information:

- <u>Ex. A</u>: Identity of the Plan Administrator and Other Disclosures;

- <u>Ex. B</u>: Identity of the Wind Down Trustee and Other Disclosures; and

- <u>Ex. A</u>: Identity of the Advisory Board Members and Other Disclosures.

49.     On September 12, 2024, the Debtors filed the Third Plan Supplement (Docket No. 684), containing the following documents and information:

- <u>Ex. A</u>: Amended Assumption Schedule; and

- <u>Ex. B</u>: Additional Section 1129(a)(5) Disclosures.

50.     Except as set forth herein, the pertinent and salient facts relating to these Chapter 11 Cases and the Plan are set forth in the Plan, the Disclosure Statement, and the Plan Supplement.   In addition, contemporaneously with this Memorandum, the Debtors filed the Confirmation Declarations in support of confirmation of the Plan.

---

*for Reclassification of Certain Disputed Claims as Crypto Loss Claims Solely for Voting Purposes* (Docket No. 619) (the "**Reclassification Objection**").  The Debtors responded to the individual via email, clarifying the basis for scheduling his claims in the Reclassification Objection.  The Debtors notified the individual that if the individual sought to have the claims treated for voting purposes in the manner in which they were filed, as Priority Non-Tax Claims (Class 1), the Debtors would treat his email as a Rule 3018(a) motion, but that Class 1 claims would not be entitled to vote on the Plan.  As of the date hereof, the Debtors have received no subsequent communication from the individual, who was solicited as holding Crypto Loss Claims.

21
RLF1 31513333v.1

## Argument

51.     As set forth herein and as will be demonstrated at the Confirmation Hearing, the Plan satisfies all of the requirements for confirmation set forth in § 1129 of the Bankruptcy Code.  The Objections are not supported by the facts and applicable law and should be overruled. This Memorandum is divided into three parts.  Part I addresses the requirements for confirmation of the Plan under section 1129 of the Bankruptcy Code and demonstrates the satisfaction of each requirement and achievement of the objectives of chapter 11.  Part II addresses the Debtors' replies to the Objections and demonstrates why they should be overruled.  Part III addresses the Debtors' request for a waiver of the 14-day stay imposed by Bankruptcy Rule 3020(e).

## I.   Plan Satisfies Bankruptcy Code Requirements for Confirmation and Should Be Approved.

52.     To achieve confirmation of the Plan, the Debtors must demonstrate that the Plan satisfies section 1129(a) of the Bankruptcy Code by a preponderance of the evidence.[11]  For the reasons set forth herein and in the Leto Declaration, the Plan satisfies all provisions of section 1129 of the Bankruptcy Code and complies with all other applicable sections of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and applicable non-bankruptcy law.

### A.   Plan Satisfies Bankruptcy Code Section 1129(a)(1).

53.     Pursuant to section 1129(a)(1) of the Bankruptcy Code, a plan of reorganization must comply with all applicable provisions of the Bankruptcy Code.  11 U.S.C. § 1129(a)(1).  The legislative history of section 1129(a)(1) explains that this provision encompasses the requirements of sections 1122 and 1123 of the Bankruptcy Code governing

---

[11]   *See In re W.R. Grace & Co.*, 475 B.R. 34, 114 (D. Del. 2012), *aff'd*, 532 F. App'x 264 (3d Cir. 2013), *aff'd*, 729 F.3d 311 (3d Cir. 2013), and *aff'd*, 729 F.3d 332 (3d Cir. 2013); *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 824 (Bankr. D. Del. 2008) (citing *In re Armstrong World Indus., Inc.*, 348 B.R. 111, 120 (D. Del. 2006)).

classification of claims and contents of the plan, respectively.[12] As demonstrated below, the Plan fully complies with the requirements of sections 1122 and 1123 of the Bankruptcy Code, as well as with all other applicable provisions of the Bankruptcy Code and thereby satisfies section 1129(a)(1) of the Bankruptcy Code.

**B.      Classification of Claims and Interests Complies with Bankruptcy Code Section 1122.**

54.      Section 1122(a) of the Bankruptcy Code provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."  11 U.S.C. § 1122(a).  The plan proponent is afforded significant flexibility in classifying claims into different classes, provided there is a rational legal or factual basis to do so and all claims within a particular class are "substantially similar[.]"[13] To determine whether claims are "substantially similar," courts have held that the proper focus is on "the legal character of the claim as it relates to the ***assets of the debtor***."[14] And, although claims classified together must be sufficiently similar, the Bankruptcy Code does not forbid the presence of similar claims in different classes.[15] Even though "the legislative history behind [section] 1122 is inconclusive regarding the significance (if any) of this omission, it remains clear that Congress

---

[12]   *See* H.R. Rep. No. 95-595, at 412 (1977); S. Rep. No. 95-989, at 126 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5912; *see also In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 223 (Bankr. D.N.J. 2000) ("The legislative history reflects that 'the applicable provisions of chapter 11 [includes sections] such as section 1122 and 1123, governing classification and contents of plan." (alteration in original) (quoting H.R. Rep. 95-595, at 412)).

[13]   *See In re Coastal Broad. Sys., Inc.*, 570 F. App'x 188, 193 (3d Cir. 2014); *see also In re Idearc Inc.*, 423 B.R. 138, 160 (Bankr. N.D. Tex. 2009) ("[A] plan may provide for multiple classes of claims or interests so long as each claim or interest within a class is substantially similar to other claims or interests in that class."), *aff'd sub nom. Spencer ad hoc Equity Comm. v. Idearc, Inc. (In re Idearc, Inc.)*, 662 F.3d 315 (5th Cir. 2011).

[14]   *In re AOV Indus., Inc.*, 792 F.2d 1140, 1150 (D.C. Cir. 1986) (emphasis in original) (citation omitted); *see also In re Tribune Co.*, 476 B.R. 843, 855 (Bankr. D. Del. 2012) (concluding that the phrase "substantially similar" reflects "the legal attributes of the claims, not who holds them"), *aff'd as modified*, No. 12-CV-1072 GMS, 2014 WL 2797042 (D. Del. June 18, 2014), *aff'd in part, rev'd in part*, 799 F.3d 272 (3d Cir. 2015), and *aff'd*, 587 B.R. 606 (D. Del. 2018 (citation omitted).

[15]   *In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1060–61 (3d Cir. 1987).

RLF1 31513333v.1

intended to afford bankruptcy judges broad discretion to decide the propriety of plans in light of the facts of each case."[16]  The Third Circuit has held that separate classification of similar claims is impermissible where the sole purpose of the classification scheme is to gerrymander votes and create an artificial impaired consenting class.[17]  On the other hand, similar claims may be placed in multiple classes "if there is a rational basis to do so."[18]

55.    With the exception of Administrative Expense Claims, Fee Claims, and Priority Tax Claims (all of which need not be classified pursuant to section 1123(a)(1) of the Bankruptcy Code), Section 3 of the Plan classifies ten (10) classes of claims against and interests in the Debtors, based on differences in the legal nature or priority of such claims against, and interests in, the Debtors.  The Plan designates the following ten (10) classes of claims and interests:

| Class | Designation | Treatment | Entitled to Vote |
|-------|-------------|-----------|------------------|
| 1 | Priority Non-Tax Claims | Unimpaired | No (Presumed to accept) |
| 2 | Other Secured Claims | Unimpaired | No (Presumed to accept) |
| 3 | Beltran Allowed Secured Claims | Unimpaired | No (Presumed to accept) |
| 4 | General Unsecured Claims | Impaired | Yes |
| 5 | Crypto Loss Claims | Impaired | Yes |
| 6 | SEC Claim | Impaired | Yes |
| 7 | Intercompany Claims | Impaired | No (Deemed to reject) |
| 8 | Intercompany Interests | Unimpaired / Impaired | No (Deemed to accept/reject) |
| 9 | 510(c) Subordinated Claims | Impaired | No (Deemed to reject) |
| 10 | TFL Equity Interests | Impaired | No (Deemed to reject) |

56.    The classification structure of the Plan is rational and complies with the Bankruptcy Code.  All claims and interests within a class have the same or similar rights against the Debtors.[19]  In addition, to the extent that claims or interests of equal priority are placed in

---

[16]    *Id.*

[17]    *See John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.,* 987 F.2d 154, 159 (3d Cir. 1993).

[18]    *In re Boy Scouts of Am. and Del. BSA, LLC,* 642 B.R. 504, 633 (Bankr. D. Del. 2022) (citing *John Hancock,* 987 F.2d at 158–59).

[19]    *In re Coram Healthcare Corp.,* 315 B.R. 321, 350 (Bankr. D. Del. 2004) (evaluating the "legal attributes of the claims, not who holds them" in determining if claims were substantially similar).

different classes, valid business, factual, and legal reasons exist for separately classifying the various classes of claims and interests created under the Plan.  The classifications were not implemented for improper purposes.  The Plan provides for the separate classification of claims and interests based upon the different legal nature and priority of such claims and interests as against the Debtors' assets.[20]

57.    The Debtors have sound justifications for the separate classification of Class 3 (Beltran Allowed Secured Claims), Class 4 (General Unsecured Claims), Class 5 (Crypto Loss Claims), Class 6 (SEC Claim), and Class 9 (510(c) Subordinated Claims).  Class 3 claims are secured by the Beltran Escrow Deposit, as determined by the Singapore High Court in connection with the Beltran Action, and are accordingly classified and treated as secured claims.[21]  Class 3 claims are only secured up to the amount of the Beltran Escrow Deposit and any portion of any allowed Class 3 claim that exceeds its allocated portion of the Beltran Escrow Deposit shall be treated as a Class 5 claim.  After Class 3 claims are satisfied, TFL and/or the Plan Administrator shall request of the Singapore High Court that any excess amount of the Beltran Escrow Deposit shall be returned to the Wind Down Trust.

58.    The classification and treatment of Classes 4 and 5 under the Plan takes into account various factors, including (i) holders of Crypto Loss Claims and holders of General Unsecured Claims hold different legal rights against the Debtors, including pursuant to the SEC

---

[20]    *See In re Rexford Props. LLC*, 558 B.R. 352, 361 (Bankr. C.D. Cal. 2016); *JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns)*, 419 B.R. 221, 264 (Bankr. S.D.N.Y. 2009) ("[D]isparate legal rights and payment expectations" of similarly situated claims can serve as a legitimate basis for separate classification).

[21]    Pursuant to the *Order Approving Amended Stipulation Between Debtors and Singapore Action Claimants Regarding Relief from the Automatic Stay* (Docket No. 661), the Bankruptcy Court approved a stipulation between the Debtors and the claimants in the Beltran Action (the "**Beltran Claimants**"), whereby the Debtors, among other things, stipulated and agreed that "the [Beltran] Claimants have a valid, enforceable, non-avoidable and perfected lien and security interest in the Singapore Escrow."  That stipulation became binding on all parties in interest when no party objected by the deadline set forth therein.

Settlement, and (ii) the potential that some or all Crypto Loss Claims could be subordinated pursuant to section 510(b) of the Bankruptcy Code. Crypto Loss Claims involve litigation/tort/securities-based claims against the Debtors. Consistent with the SEC Settlement, holders of Crypto Loss Claims shall receive distributions from certain assets that are not available for distribution to General Unsecured Claims, *i.e.,* the SEC Settlement Fund. As such, holders of Crypto Loss Claims in Class 5 shall receive their share of the Crypto Loss Claim Pool, which is comprised of the funds in the SEC Settlement Fund and any remaining cash in the GUC Pool upon payment in full of all allowed General Unsecured Claims. Class 4 is primarily comprised of claims incurred by contract in connection with services provided to the Debtors and will be paid out of the GUC Pool (which shall not include the SEC Settlement Fund). Accordingly, the nature and legal character of General Unsecured Claims in Class 4 vary significantly from those Crypto Loss Claims in Class 5; therefore, the separate classification is permissible and justified.

59.    With respect to Class 6, pursuant to the SEC Settlement, the SEC has consented to treatment of the SEC Claim as an allowed general unsecured claim that would only receive a distribution after holders of allowed Class 4 and Class 5 claims are paid in full. Specifically, any distributions made to holders of allowed Class 4 and allowed Class 5 claims shall be deemed to satisfy the SEC Claim in the aggregate amount of such allowed Class 4 and allowed Class 5 claims. The Plan provides that there shall be no distributions on the SEC Claim unless allowed claims in Class 4 and Class 5 are satisfied in full. If the allowed claims in Class 4 and Class 5 are satisfied in full under the Plan, distributions shall be made on account of any remaining unsatisfied portion of the SEC Claim until paid in full before any distribution is made to holders of 510(c) Subordinated Claims or holders of TFL Equity Interests.

60.    Class 9 Section 510(b) Claims are properly separately classified, as such claims are subordinated to other general unsecured creditors under the Bankruptcy Code.

61.     Each of Classes 4, 5, and 6 is a Voting Class that represents "a voting interest that is sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed."[22]  In addition, these classes and non-voting classes 3 and 9 constitute distinct groups with varying claims and the classification scheme is necessary to implement the settlements contemplated in the Plan.  Affording each such class its own voice in these Chapter 11 Cases is both reasonable and appropriate.[23]

62.     Accordingly, the classification scheme of the Plan complies with section 1122 of the Bankruptcy Code.

### C.    Plan Complies with Bankruptcy Code Section 1123(a).

63.     Section 1123(a) of the Bankruptcy Code sets forth seven (7) requirements that the proponent of a chapter 11 plan must satisfy.  11 U.S.C. § 1123(a).  The Plan fully complies with each such requirement:

### 1.    Section 1123(a)(1): Designation of Classes of Claims and Interests.

64.     Section 1123(a)(1) of the Bankruptcy Code requires a plan to designate, subject to section 1122 and certain exceptions, classes of claims and equity interests.  The Plan designates classes of claims and classes of interests, as required by section 1123(a)(1).  Plan § 3.

### 2.    Section 1123(a)(2): Specified Unimpaired Classes.

65.     Section 1123(a)(2) of the Bankruptcy Code requires a plan to specify which classes of claims or interests are unimpaired by the plan.  The Plan specifies each class of claims or interests that is unimpaired under the Plan, as required by section 1123(a)(2).  Plan §§ 3, 4.

---

[22]   *John Hancock*, 987 F.2d at 159.

[23]   *Cf. In re Amcast Auto. of Ind., Inc.*, No. 05- 33322 (FJO), (Bankr. S.D. Ind. Apr. 10, 2007), ECF No. 1423 (order confirming plan of debtor automotive supplier which classified the general unsecured claims of the debtor's largest customer and revenue source separately from other general unsecured claims); *In re Clark-Cutler-McDermott Co.*, No. 16-41188 (CJP) (Bankr. D. Mass. Mar. 31, 2017), ECF No. 668 (same).

### 3. Section 1123(a)(3): Specified Treatment of Impaired Classes.

66. Section 1123(a)(3) of the Bankruptcy Code requires a plan to specify how it will treat impaired classes of claims or interests. The Plan specifies each class of claims or interests that is impaired under the Plan, as required by section 1123(a)(3). Plan §§ 3, 4.

### 4. Section 1123(a)(4): Equal Treatment.

67. Section 1123(a)(4) of the Bankruptcy Code requires a plan to provide the same treatment for each claim or interest within a particular class, unless a holder of a claim or interest agrees to receive treatment that is less favorable to the treatment afforded to the other class members. Except as otherwise agreed to by a holder of a particular claim or interest, the treatment of each claim or interest in each particular class is the same as the treatment of each other claim or interest in such class, as required by section 1123(a)(4). Plan § 4.

### 5. Section 1123(a)(5): Implementation of the Plan.

68. Section 1123(a)(5) of the Bankruptcy Code requires that a plan provide "adequate means for the plan's implementation." 11 U.S.C. § 1123(a)(5). The Plan and the various documents and agreements set forth in the Plan Supplement provide adequate and proper means for the implementation of the Plan, thereby satisfying section 1123(a)(5) of the Bankruptcy Code, including, without limitation: (i) the transfer of assets and liabilities to the Wind Down Trust; (ii) the appointment of the Wind Down Trustee and the establishment of the Wind Down Trust to administer the Plan; (iii) the appointment of the Plan Administrator to direct the Wind Down Trustee in the administration of the Wind Down Trust; (iv) appointment of the Advisory Board, which shall oversee the administration of the Wind Down Trust in accordance with the Wind Down Trust Agreement; (v) the substantive consolidation of the Debtors for certain purposes related to the Plan, including distributions under the Plan; and (vi) the funding of the various funds and

reserves contemplated under the Plan for purposes of administration of the Wind Down Trust and

distributions.  Plan §§ 4, 5.

> **(a)** *Asset Sales.*

69.    Pursuant to the Plan, prior to the Effective Date, the Debtors, and after the

Effective Date, the Plan Administrator shall use commercially reasonable efforts to sell the

Debtors' interests in Proximity, all related assets of Proximity, and the Venture Investments

pursuant to section 363 of the Bankruptcy Code or otherwise.  In addition, the Plan provides that

the Bankruptcy Court shall retain jurisdiction over all matters arising in, arising under, and related

to the Chapter 11 Cases, including to hear and determine motions and/or applications for the sale,

assumption and/or assumption and assignment of estate assets, including the Debtors' or the Wind

Down Trust's interest, as applicable, in Proximity, all related assets of Proximity, and the Venture

Investments pursuant to, among other things, sections 363 and 365 of the Bankruptcy Code.

Courts in this district have confirmed chapter 11 plans that have provided for the bankruptcy court

to retain jurisdiction over post-effective date sales.  *See*, *e.g.*, In re *Filene's Basement, LLC, et al*.,

No. 11-13511 (KJC) (Bankr. D. Del. May 16, 2014) (Order approving post-effective date sale

pursuant to section 363 of the Bankruptcy Code); *In re Food Processing Liquidation Holdings,*

*LLC*, No. 11-13139 (KG) (Bankr. D. Del. Apr. 26, 2012) (Docket No. 794) (Order approving post-

effective date sale pursuant to section 363 of the Bankruptcy Code).

> **(b)** *Substantive Consolidation.*

70.    The prompt, efficient conclusion of the Debtors' Chapter 11 Cases is

premised on the proposed implementation of a limited substantive consolidation of the Debtors for

certain purposes relating to the Plan, to which there are no objections.  As detailed below, the

Debtors submit that substantive consolidation is supported by the facts and circumstances

involving these Debtors and their Chapter 11 Cases, and facilitates efficient resolution of claims

and distributions of assets. The Debtors respectfully submit that the limited substantive consolidation simplifies and streamlines the treatment of Intercompany Claims (as defined in the Plan) among TFL and TLL without the need for unnecessarily costly processes and, as a result, provides improved recoveries to creditors.

71.    The Plan will consolidate each of the Debtors for the purposes of implementing the Plan, voting, assessing whether confirmation standards have been met, and calculating and making distributions under the Plan.

72.    Pursuant to the Plan and the Proposed Confirmation Order, as of the Effective Date: (a) all assets and liabilities of the Debtors will be deemed merged; (b) all guarantees by one Debtor of the obligations of any other Debtor will be deemed eliminated so that any claim against either Debtor and any guarantee thereof executed by any other Debtor and any joint or several liability of any of the Debtors shall be deemed to be a single obligation of the Debtors; (c) each and every claim filed or to be filed in the Chapter 11 Case of either Debtor will be deemed filed against the Debtors and will be deemed one claim against and a single obligation of the Debtors, and the Debtors may file and the Bankruptcy Court will sustain objections to claims for the same liability that are filed against multiple Debtors; and (d) Intercompany Claims between either Debtor will be deemed eliminated and extinguished in accordance with Section 4.7 of the Plan, and no distributions shall be made under the Plan on account of any Intercompany Claim.

73.    This consolidation will not: (a) affect the legal and corporate organizational structures of the Debtors; (b) affect the vesting of assets in the Wind Down Trust; (c) affect the rights of any claimant with respect to collateral securing any claim, if any; (d) constitute a change of control of either Debtor for any purpose; (e) cause a merger or consolidation of any legal entity; (f) affect executory contracts that were entered into during the Chapter 11 Cases or that have been or will be assumed, assumed and assigned, or rejected; (g) affect the Debtors' or the Wind Down

Trust's ability to subordinate or challenge claims on an entity by entity basis; or (h) prejudice the rights of either Debtor with respect to the prosecution or defense of any cause of action including, but not limited to, preferential transfers and fraudulent conveyances, against any person or entity as if there was no substantive consolidation, including payments or transfers by and among the Debtors and any related or affiliated entity prior to the Petition Date.

74.     Substantive consolidation is a judicially created equitable doctrine that treats separate legal entities as if they were merged into a single consolidated surviving entity, with all the assets and liabilities (other than inter-entity liabilities, including the Intercompany Claims, and guarantees, which are extinguished) permanently becoming assets and liabilities of the consolidated survivor.  The effect of consolidation is the pooling of the Debtors' assets, and the claims against the Debtors, and in turn, satisfying liabilities from a common fund and combining the creditors of the Debtors for the purposes of voting on the Plan.  In the absence of consolidation, the creditors of an individual Debtor could only look to the assets of that particular individual Debtor to satisfy such creditor's claim.  As a result of the consolidation, a creditor of one individual Debtor is treated as a creditor of the Debtors, and issues of individual corporate ownership of assets and individual corporate liability on obligations are no longer pertinent.

75.     Substantive consolidation of the Debtors is an important element of the successful implementation of the Plan.  It is well established that section 105(a) of the Bankruptcy Code empowers the Bankruptcy Court to substantively consolidate multiple debtors.  In the Third Circuit, bankrupt entities can be substantively consolidated on a consensual basis under a chapter 11 plan or, "what must be proven (absent consent)" regarding the entities for whom substantive consolidation is sought, is that (a) the debtors disregarded separateness "so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity," in the

prepetition period or (b) postpetition the entities assets and liabilities are "so scrambled that separating them is prohibitive and hurts all creditors."[24]

76.     The Debtors believe the Plan's proposed consolidation structure is supported by the applicable legal standards, practical considerations, and the Debtors' prepetition and postpetition operations and financial affairs.   Further, the Creditors' Committee supports substantive consolidation as part of an efficient administration of the post-Effective Date estates and the Wind Down Trust, and as in the best interest of all parties.

77.     As set forth in the Leto Declaration, each of the Debtors has historically engaged in a distinct aspect of the overall business such that they depended upon each of the other Debtors and were not intended to—and did not—function as stand-alone businesses.   *See* Leto Declaration ¶ 14.   TLL was incorporated on June 25, 2018 as a wholly-owned subsidiary of TFL and was established in connection with the distribution of the Luna Classic token.   TLL entered into token sale agreements (collectively, the "**Token Sale Agreements**") and other agreements with third parties.   *Id.*   TFL and TLL then entered into "subscription agreements" with each other (collectively, the "**Subscription Agreements**") that permitted TFL to accept payments for certain tokens from third parties that otherwise would have been payable to TLL pursuant to the Token Sale Agreements and other agreements.   *Id.*   Consequently, for token sales, third parties paid TFL, not TLL, for Luna Classic under the Token Sale Agreements, and in accordance with the Subscription Agreements, TFL was permitted to collect and use the money received from third parties.   *Id.*   In exchange for TFL's ability to accept third-party payments otherwise due to TLL, as well as certain advances TLL made to TFL, TLL was granted a perpetual security which

---

[24]   *In re Owens Corning*, 419 F.3d 195, 211 (3d Cir. 2005).

constituted direct, irrevocable, unsubordinated, unconditional and unsecured obligations of TFL under the Subscription Agreements.  *Id.*

78.     Pursuant to the Subscription Agreements, TFL had access to funds totaling $45.7 million, which the parties treated as forty-two (42) separate advances from TLL.  Moreover, during 2022 and 2023, TFL used other of TLL's assets, primarily believed to be digital assets, and booked them as liabilities to TLL under the Subscription Agreements.  *See* Leto Declaration ¶ 15. By 2024, TFL continued using the digital assets in its possession, with TFL's use of such digital assets resulting in an intercompany claim by TLL.  *Id.*  In total, TFL entered on its general ledger more than 130 transactions for salaries, legal fees, investments in third party funds, advanced retainers to professional advisors, and other operating expenses, which resulted in the intercompany payable of $404.8 million from TFL to TLL as of the TFL Petition Date.  *Id.*  When combined with the advances under the Subscription Agreements, TFL's financial records reflect a total of approximately $450.5 million in total liabilities owed to TLL as of the TFL Petition Date. *Id.*  As a result, the Debtors' balance sheets reflect large intercompany balances made up of multiple components, and tracking each balance's origination would likely be an onerous and costly endeavor.  *Id.*

79.     In addition, notwithstanding that TLL issued Luna Classic and was arguably the party engaged in the conduct at issue in the SEC Enforcement Action, the SEC Enforcement Action named only TFL and not TLL as a corporate defendant.  *See* Leto Declaration ¶ 16.  The SEC asserted the SEC Claim against TFL, not TLL, and pursuant to the SEC Judgment, the SEC has agreed to allocate funds that TFL disgorges and pays in penalties to the creditors that are holders of Class 5 Crypto Loss Claims.  *Id.*  As a result, apportioning the liabilities against the Debtors related to the SEC Enforcement Action and Crypto Loss Claims to either Debtor would be difficult and time consuming.  *Id.*

80.    In the event that a particular creditor may receive a better recovery in the absence of substantive consolidation, that recovery is likely to be consumed by the costs associated with investigating and litigating any (i) inter-creditor claims and (ii) inter-creditor allocation disputes regarding those recoveries.  *See* Leto Declaration ¶ 17.  Furthermore, the consolidation of the Debtors will expedite the conclusion of the Chapter 11 Cases.  *Id.*  Accordingly, the Debtors believe that attempting to disentangle their estates would result in significant difficulties and enormous costs that would be borne by the estates, which would deplete the recoveries for all creditors and cause unnecessary and costly delays in the confirmation of the Plan and distributions.  *Id.*  The Debtors believe that the result would likely be reduced recoveries for all creditors.  The particular facts and circumstances of these Chapter 11 Cases present unusual circumstances warranting substantive consolidation.  *Id.*

81.    The Plan serves as a motion seeking entry of an order consolidating the Debtors, as described and to the extent set forth in Section 5.1 of the Plan.  Substantive consolidation will not affect the obligations of the consolidated Debtors to (a) pay a single quarterly fee to the U.S Trustee in accordance with 28 U.S.C. § 1930 based upon the consolidated disbursements made by the substantively consolidated Debtors, or (b) seek the closing of their substantively consolidated Chapter 11 Cases.  Accordingly, the Debtors respectfully request that the Court approve substantive consolidation in accordance with the terms of the Plan.

82.    Accordingly, the Plan, together with the documents and agreements set forth in the Plan Supplement, provide the means for implementation of the Plan as required by section 1123(a)(5) of the Bankruptcy Code.

**6.    Section 1123(a)(6): Non-Voting Equity Securities.**

83.    Section 1123(a)(6) of the Bankruptcy Code prohibits the issuance of nonvoting equity securities and requires amendment of a debtor's charter to so provide.  The Plan

34

provides that the only new securities to be issued under Section 5.5(c) of the Plan will be the TFL Additional Stock that will be issued to the Wind Down Trust, to allow the Wind Down Trustee to control TFL.  Accordingly, the requirements of section 1123(a)(6) are satisfied.

> **7.    Section 1123(a)(7): Designation of Directors and Officers.**

84.    Section 1123(a)(7) of the Bankruptcy Code requires that a plan "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee[.]" 11 U.S.C. § 1123(a)(7).  The Debtors filed with this Court, as part of the Plan Supplement, the identity of each of the Wind Down Trustee, the Plan Administrator, and certain members of the Advisory Board, which were selected by the Creditors' Committee, subject to the consent of the Debtors and the SEC.  *See* Second Plan Supplement Exs. A–C; Third Plan Supplement Ex. B.  The selected individuals are disclosed and discussed below.

85.    As set forth in the Plan, the Advisory Board will be compromised of five (5) voting members and one (1) non-voting member.  As set forth in the Exhibit C to the Second Plan Supplement, the initial two (2) members of the Advisory Board shall be selected by the Creditors' Committee in consultation with the Debtors and not objectionable to the SEC.  The one (1) non-voting member of the Advisory Board shall be ordinarily resident in Singapore.  The initial members and the Plan Administrator will solicit resumes and materials form potential Advisory Board candidates and conduct interviews to determine the remaining three (3) Advisor Board members.  The Plan and Plan Supplement provisions concerning the selection or appointment of any officer, director, or manager under the Plan and Plan Supplement are consistent with the interests of creditors and equity security holders and with public policy in accordance with section 1123(a)(7) of the Bankruptcy Code.

8.      **Section 1123(a)(8): Postpetition Person Service Payments.**

86.      The Debtors are not "individuals" (as that term is defined in the Bankruptcy Code) and, accordingly, section 1123(a)(8) of the Bankruptcy Code is inapplicable to the Plan.

87.      For the foregoing reasons, the Debtors have satisfied the requirements of section 1123(a) of the Bankruptcy Code.

D.      **Plan Complies with Bankruptcy Code Section 1123(b).**

88.      Section 1123(b) of the Bankruptcy Code sets forth permissive provisions that may be incorporated into a chapter 11 plan.  As demonstrated herein, each provision of the Plan is consistent with section 1123(b).

1.      **Section 1123(b)(1): Impairment/Unimpairment of Classes of Claims and Interests.**

89.      Section 1123(b)(1) of the Bankruptcy Code provides that a plan may "impair or leave unimpaired any class of claims, secured or unsecured, or of interests[.]" 11 U.S.C. § 1123(b)(1).  Pursuant to Sections 3 and 4 of the Plan, consistent with section 1123(b)(1) of the Bankruptcy Code, and pursuant to section 1124 of the Bankruptcy Code, Class 1 (Priority Non-Tax Claims), Class 2 (Other Secured Claims), and Class 3 (Beltran Allowed Secured Claims) are unimpaired, and Class 4 (General Unsecured Claims), Class 5 (Crypto Loss Claims), Class 6 (SEC Claim), Class 7 (Intercompany Claims), Class 8 (Intercompany Interests), Class 9 (510(c) Subordinated Claims), and Class 10 (TFL Equity Interests) are impaired.

2.      **Section 1123(b)(2): Assumption, Assignment, and Rejection of Executory Contracts and Unexpired Leases.**

90.      Section 1123(b)(2) of the Bankruptcy Code permits a plan to provide for the assumption, assumption and assignment, or rejection of executory contracts and unexpired leases, subject to section 365 of the Bankruptcy Code.   Section 8 of the Plan addresses the assumption and rejection of executory contracts and unexpired leases, and meets the requirements

of section 365(b) of the Bankruptcy Code.  Consistent with section 1123(b)(2) of the Bankruptcy Code, Section 8.1 of the Plan provides that, on the Effective Date, except as otherwise provided in the Plan, each executory contract and unexpired lease not previously rejected, assumed, or assumed and assigned shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such executory contract or unexpired lease (i) was previously assumed or rejected by the Debtors pursuant to the a Bankruptcy Court order; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a motion to assume filed by the Debtors on or before the Effective Date; (iv) is identified in Sections 8.4 and 8.6 of the Plan, which pertain to insurance policies and intellectual property; or (v) is identified on the Assumption Schedule included in the Plan Supplement for assumption, or assumption and assignment to the Wind Down Trust or another party.

91.    In accordance with the Disclosure Statement Order and Section 8.2 of the Plan, the Debtors filed and served as Exhibit C to the First Plan Supplement (Docket No. 653) and as Exhibit A to the Third Plan Supplement (Docket No. 684), the Assumption Schedule and the Amended Assumption Schedule, respectively.  The Debtors also filed and served a notice on counterparties to the Debtors' executory contracts and unexpired leases to be assumed or assumed and assigned reflecting the Debtors' intention to potentially assume or assume and assign the contract or lease in connection with the Proposed Plan and, where applicable, setting forth the proposed cure amount (the "**Cure Notices**") (Docket Nos. 654 and 683). *See Certificate of Service*, dated September 16, 2024 (Docket No. 694) and *Certificate of Service*, dated September 16, 2024 (Docket No. 696).  Any objection by a counterparty to an executory contract or unexpired lease to the proposed assumption, assumption and assignment, or related cure amount must be filed, served, and actually received by the Debtors within fourteen (14) days of the service of the assumption notice (including any supplemental assumption notice), or such shorter period as agreed to by the

parties or authorized by the Bankruptcy Court.  The time given to parties in interest to object to the assumption, assumption and assignment, and rejection of their executory contracts or expired leases was good and sufficient and no other or further notice is required.

      **3.**      **Section 1123(b)(3): Settlement and Retention of Claims and Causes of Action.**

      *a.*      <u>Debtor Releases</u>.

92.      As discussed in section I.D.7.a below, and as permitted by section 1123(b)(3)(A) of the Bankruptcy Code, Section 10.6 of the Plan provides for a release of certain claims and causes of action owned by the Debtors or the Debtors' estates.  For each of the reasons set forth in section II.D.7.a herein, these releases are permissible under, and consistent with, section 1123(b)(3)(A) of the Bankruptcy Code.

      *b.*      <u>Retention of Causes of Action and Reservation of Rights</u>.

93.      Section 1123(b)(3)(B) of the Bankruptcy Code permits a chapter 11 plan to provide for the retention and enforcement of any claim or interest by the debtor, a trustee, or a representative of the estate.  Section 5.12 of the Plan provides that, other than causes of action that are waived, relinquished, exculpated, released, compromised, transferred, or settled pursuant to this Plan, the Proposed Confirmation Order, or another Bankruptcy Court order, the Debtors reserve any and all causes of action.  The Debtors further filed, as part of the Plan Supplement, a Schedule of Retained Causes of Action.  *See* First Plan Supplement Ex. D (Docket No. 653). Except with respect to findings in the Proposed Confirmation Order relating to Section 10.9 of the Plan, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion (judicial, equitable, or otherwise), or laches, shall apply to such causes of action upon, after, or as a consequence of the Confirmation or the Effective Date.

94.      Prior to the Effective Date, the Debtors, and on and after the Effective Date, the Wind Down Trustee shall retain and shall have, including through their authorized agents or

representatives, the exclusive right, authority, and discretion, subject to this Plan, to determine and

to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to

judgment any such causes of action and to decline to do any of the foregoing, as the Wind Down

Trustee in consultation with the Plan Administrator may determine is in the best interest of the

estates, without the consent or approval of any third party or further notice to or action, order, or

approval of the Bankruptcy Court.

95.    Accordingly, the Plan is consistent with section 1123(b)(3)(B) of the

Bankruptcy Code.

**4.    Section 1123(b)(4): Sale of Substantially all Assets.**

96.    Section 1123(b)(4) of the Bankruptcy Code provides that a plan may

"provide for the sale of all or substantially all of the property of the estate, and the distribution of

the proceeds of such sale among holders of claims or interests[.]" 11 U.S.C. § 1123(b)(4).  The

Plan does not provide for the sale of all or substantially all of the Debtors' property and, therefore,

section 1123(b)(4) of the Bankruptcy Code is inapplicable.

**5.    Section 1123(b)(5): Modification of Rights.**

97.    Section 1123(b)(5) of the Bankruptcy Code permits a plan to modify or

leave unaffected the rights of holders of any class of claims.  In accordance and in compliance

with section 1123(b)(5) of the Bankruptcy Code, the Plan properly modifies the rights of holders

of claims in Class 4 (General Unsecured Claims), Class 5 (Crypto Loss Claims), Class 6 (SEC

Claim), Class 7 (Intercompany Claims), Class 8 (Intercompany Interests), Class 9 (510(c)

Subordinated Claims), and Class 10 (TFL Equity Interests).  The Plan leaves unaffected the rights

of holders of claims in Class 1 (Priority Non-Tax Claims), Class 2 (Other Secured Claims), and

Class 3 (Beltran Allowed Secured Claims).  Thus, the Plan complies with section 1123(b)(5) of

the Bankruptcy Code.

6.    **Section 1123(b)(6): Additional Plan Provisions.**

98.    Section 1123(b)(6) permits a plan to include "any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]." 11 U.S.C. § 1123(b)(6).  The permissive provisions of the Plan are appropriate and consistent with the applicable provisions of the Bankruptcy Code, consistent with section 1123(b)(6) of the Bankruptcy Code.  The failure to address specifically a provision of the Bankruptcy Code in this Memorandum or the Proposed Confirmation Order shall not diminish or impair the effectiveness of the Proposed Confirmation Order.

7.    **Plan Releases Should Be Approved.**

99.    The Plan provides for the release of claims and causes of action held by the Debtors and their estates.  The release provisions are integral components of the Plan, are consistent with the Bankruptcy Code, and comply with applicable case law and, as such, should be approved.  Notably, the Plan does not contemplate the release of claims and causes of action held by holders of claims and interests (*i.e.*, third-party releases).

100.    In accordance with sections 1123(b)(3)(A) and 1123(b)(6) of the Bankruptcy Code, Section 10 of the Plan provides for (1) releases of certain claims held by the Debtors and their estates (the "**Debtor Releases**") against (a) John S. Dubel, Russell Nelms, Thong Kum Keen Benjamin, and TFL, each in their capacity as members of the Board of Directors of TFL or TLL; (b) the Wind Down Trustee; (c) the Creditors' Committee and each of its members, solely in their capacity as such; (d) the Advisory Board and each of its members, solely in their capacity as such; (e) the Plan Administrator in its capacity as such; (f) Weil, Gotshal & Manges LLP; (g) Alvarez & Marsal North America, LLC; (h) Epiq Corporate Restructuring, LLC; (i) Richards, Layton & Finger, P.A.; and (j) with respect to each of the foregoing, such Person's officers and directors, principals, members, and employees, in each case who served in such

40

capacity on or after the Petition Date (but for the avoidance of doubt, not TFL's current or former shareholders, officers, or directors (other than John S. Dubel, Russell Nelms, and Thong Kum Keen Benjamin)) (collectively, the "**Released Parties**"), and (2) an exculpation of the Debtors, the Debtors' officers and directors who served in such capacity on or after the Petition Date, the Creditors' Committee, and certain other parties (the "**Exculpated Parties**").[25]  *See* Plan §§ 1.1, 10.6, 10.7.

101.    The parties receiving releases under the Plan from the Debtors, their estates, the Wind Down Trust, the Plan Administrator, and the Wind Down Trustee are exceedingly limited in scope, to only those Persons described in the "Released Parties" definition, which includes the Debtors' independent directors solely in their capacity as such, the fiduciaries administering the Wind Down Trust, and some, but not all, professionals that were retained pursuant to sections 327 or 1102 of the Bankruptcy Code in these Chapter 11 Cases.  The identity of the Released Parties was heavily negotiated with each of the SEC and the Creditors' Committee, with each such party further limiting the initial list proposed by the Debtors.

102.    In addition to the narrow scope of the Released Parties, the scope of the claims released by the Debtor Releases is limited.  The Debtor Releases carve out claims and causes of action arising from actual fraud, willful misconduct, criminal misconduct, or gross negligence.  Moreover, pursuant to Section 10.8 of the Plan, nothing in the Plan or Confirmation Order shall preclude (i) the SEC from enforcing its police or regulatory powers or (ii) enjoin, limit, impair, ore delay the SEC from commencing or continuing any claims, causes of action, proceedings or investigations against any non-debtor person or entity in any forum.

---

[25]    "Exculpated Parties" means, collectively: (a) the Debtors; (b) the Board of Directors and each of its members who served in such capacity on or after the Petition Date; (c) the Debtors' officers who served in such capacity on or after the Petition Date; (d) the Creditors' Committee and each of its members, solely in their capacity as such; and (e) the Professionals retained in these cases.

103.    The Exculpated Parties are similarly limited in scope and are limited to fiduciaries of the estates.

104.    As discussed further below, the releases under the Plan are integral components of the Plan, are unusually limited as to whom they apply, are appropriate and necessary under the circumstances, are consistent with the Bankruptcy Code, and comply with applicable law.  Accordingly, the releases should be approved.

a.    <u>The Debtor Releases Are Appropriate and Should be Approved</u>.

105.    First, the Debtors note that only the U.S. Trustee has objected to the Debtor Releases.  The U.S. Trustee objected on the grounds that: (1) the Debtor Release must demonstrate a substantial contribution, among other things, by the Released Parties; (2) the Exculpation Provision (defined below) is overly broad; (3) the Plan cannot exculpate the members of the Advisory Board; and (4) the Injunction Provisions (defined below) provides the Debtors with a discharge, contrary to section 1143(d) of the Bankruptcy Code.  The U.S. Trustee's Objection has largely been resolved and any unresolved issues are addressed in the Objection Response Chart.

106.    In the context of a chapter 11 plan, the release of a claim of the estate should be approved if the release "is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate."[26]  As an exercise of its business judgment, a debtor's decision to release claims against third parties under a plan is afforded deference.[27]  Furthermore, "[w]here such releases are an active part of the plan negotiation and formulation process, it is a

---

[26]    *U.S. Bank Nat'l Assoc. v. Wilmington Tr. Co. (In re Spansion, Inc.),* 426 B.R. 114, 143 (Bankr. D. Del. 2010) (citation omitted).

[27]    *See, e.g.*, *Spansion*, 426 B.R. at 140 ("It is not appropriate to substitute the judgment of the objecting creditors over the business judgment of the [d]ebtors . . . ."); *Marvel Ent. Grp., Inc. v. MAFCO Holdings, Inc. (In re Marvel Ent. Grp., Inc.)*, 273 B.R. 58, 78 (D. Del. 2002) ("'[U]nder the business judgment rule . . . a court will not interfere with the judgment of a board of directors unless there is a showing of gross and palpable overreaching.' Thus, under the business judgment rule, a board's 'decisions will not be disturbed if they can be attributed to any rational purpose' . . . .") (internal citations omitted).

42

valid exercise of the debtor's business judgment to include a settlement of any claims a debtor might own against third parties as a discretionary provision of a plan."[28]    Under Third Circuit precedent, a release by a debtor is appropriate if, in the debtor's judgment, any claims of the estate being released are of only marginal viability.[29]

107.    Moreover, claims held by a debtor against third parties are property of the estate and may be released in exchange for settlement.[30]    Section 1123(b)(3)(A) of the Bankruptcy Code allows a plan to provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."[31]    In accordance therewith, Section 10.6 of the Plan contains the Debtor Releases—the release of certain claims or causes of action of the Debtors and the estates against the Released Parties in exchange for good and valuable consideration and valuable compromises made by the Released Parties.    Such consideration includes, without limitation, the service of the Released Parties before and during the Chapter 11 Cases to facilitate the liquidation of the Debtors and the formation of the Wind Down Trust.    The Debtor Releases do not release, and the Wind Down Trust shall retain, claims or causes of action arising out of, or related to, any act or omission of a Released Party that is a criminal act or constitutes fraud, gross negligence, or willful misconduct.    In addition, the Debtors do not release, and the Wind Down Trust shall retain, causes of action against, among others, current or former employees of the Debtors and certain professionals.

---

[28]    *In re Aleris Int'l, Inc.*, No. 09-10478 (BLS), 2010 WL 3492664, at *20 (Bankr. D. Del. May 13, 2010) (citation omitted).

[29]    *See In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir. 2000) (approving release by debtor of potential avoidance claims in connection with a prepetition leveraged recapitalization because the claims were "of only marginal viability" and not worth pursuing.).

[30]    *See PWS Holding Corp.*, 228 F.3d at 242 (3d Cir. 2000); *In re MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 91–92 (2d Cir. 1988); *see also* 11 U.S.C. § 541(a)(1).

[31]    11 U.S.C. § 1123(b)(3)(A).

108.    Here, there is no reason to divert from the business judgment standard and analyze the Debtor Releases of any party under heightened scrutiny, as such releases were each approved by independent and disinterested individuals.  Pursuant to the SEC Settlement, the Board consisted of three (3) independent directors, including John S. Dubel ("**Mr. Dubel**"), Russell Nelms ("**Mr. Nelms**"), and Thong Kum Keen Benjamin ("**Mr. Thong**").

109.    Mr. Dubel, who joined the Board shortly before the Petition Date, has extensive restructuring experience and a strong history of servicing as an independent director on the boards of directors of troubled companies, including those that have been accused of misconduct prior to him joining such boards.  The Debtors added the other two Board members, with the SEC's consent, as part of the SEC Settlement. Mr. Nelms is a former United States bankruptcy judge (2004-2018) from the Northern District of Texas, Fort Worth Division, who serves on boards of directors and advisory boards to facilitate complex corporate restructurings. Mr. Thong, a Singapore resident, is a Managing Director of Perun Consultants and has twenty (20) years of experience in governance, compliance, risk management, forensic and Foreign Corrupt Practices Action investigation and litigation support, valuation, and financial advisory.  The Board reviewed and approved the decision to grant the Debtor Releases.    Accordingly, the business judgment standard applies.

110.    The Debtor Releases represent a valid exercise of business judgment, and should be approved for two main reasons.  <u>First</u>, the Debtors concluded that the Debtor Releases would not extinguish any claims with a sufficient likelihood of success and prospect of recovery (whether in the form of monetary damages or amounts paid in settlement) that could warrant the costs, expenses, and litigation risk of pursuing those claims.

111.    In addition, the Debtors assessed that claims not subject to the Releases would be retained by the Wind Down Trust, and that as part of the deal, they agreed not to cause

the Wind Down Trust to bring claims against the Released Parties except for any act or omission constituting actual fraud, willful misconduct, criminal misconduct, or gross negligence. The Debtors concluded in their reasonable business judgment that the Debtor Releases contemplated through the Plan are justified because they are an integral component of Plan that was bargained for and agreed to by the key stakeholders in the Chapter 11 Cases, including the Creditors' Committee and the SEC.

112.    <u>Second</u>, the Released Parties' contributions and support are vital to the Debtors' prosecution of the Chapter 11 Cases and the orderly wind down contemplated by the Plan. The Debtors' newly appointed independent directors, the Debtors' retained chapter 11 professionals, and the Creditors' Committee were instrumental in negotiating the Plan, which provides for: (a) agreed-upon treatment to the holder of the claim in Class 6 (SEC Claim), including SEC's consent to allow distributions made to holders of allowed Class 4 and Class 5 claims to be deemed to satisfy the SEC Claim; (b) payment in full of, or otherwise rendering unimpaired, all Allowed Claims in Class 1 (Priority Non-Tax Claims), and Class 3 (Beltran Allowed Secured Claims); and (c) the orderly liquidation of the Debtors' business as a going concern, including the Wind Down and Sale Processes, maximizing value for creditors.

113.    The Released Parties, which, as noted, are very limited, have been critical to the success of the Chapter 11 Cases through (a) maximizing value for the Debtors' estates by proposing and implementing a sale process for the Debtors' assets; (b) negotiating the SEC Settlement and the orderly and value-maximizing liquidation contemplated by the Plan; (c) preserving value for unsecured creditors through the expeditious resolution of these Chapter 11 Cases; and (d) with respect to the Debtors' independent directors, devoting significant time to navigating the Debtors through these Chapter 11 Cases in addition to their regular duties. Given the highly litigious nature of the SEC Enforcement Action and the sensitive issues surrounding the

Debtors' circumstances, the Released Parties arguably took on more than normal risk in agreeing to continue to serve the Debtors during these Chapter 11 Cases.  Moreover, in light of the complicated nature of these cases, the continued involvement in the Chapter 11 Cases of those persons and professionals involved with the Debtors prepetition was critical to the success of these Chapter 11 Cases and maximizing recoveries to creditors.  These monumental efforts should not now expose the Released Parties to a constant threat of litigation persisting after confirmation of the Plan.

114.    For these reasons, the Debtor Releases are justified, fair, and reasonable, in the best interests of the estates and creditors, are an integral part of the Plan, and satisfy the applicable standard.

115.    Some courts in this District also consider the non-exclusive and disjunctive factors set forth in *In re Zenith Elecs. Corp.*, 241 B.R. 92 (Bankr. D. Del. 1999) ("**Zenith Factors**") when considering a debtor release.  These factors were first articulated as the standard for approving a third-party release,[32] and the test conflicts in several ways with the test under *PWS* for considering a debtor release.  Specifically, if the debtor has determined in the exercise of its business judgment that a claim is not worth pursuing, it is not relevant that the release of the claim be "essential to reorganization" or that the non-debtor has contributed "substantial assets to the reorganization," or that the creditors have "overwhelmingly" voted to accept the plan.  Moreover, if the released claims are not worth pursuing, it should not matter how much the plan is paying creditors.  The Zenith Factors are tailored for a non-debtor release, and the proper standard to assess a debtor release is the business judgment standard.

---

[32]    *See In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994).

116.    Nonetheless, the Debtors note that the Debtor Releases also satisfy the Zenith Factors, if applied.  <u>First</u>, an identity of interest exists between the Debtors and each of the Released Parties.  An identity of interest may be established where the non-debtor is entitled to indemnification from the debtor.  Under the corporate constitution of TFL, the Debtors owe indemnification obligations to their current and former directors, managers, secretaries, or any other officers or servants to the fullest extent permitted by law in connection with defending against claims and causes of action arising out of the discharge of their duties.  *Constitution of Terraform Labs Pte. Ltd.*, Art. 141.  The release of claims against the independent directors is appropriate, given that such claims would be subject to indemnification by TFL.[33]  Separately, all of the Released Parties share an identity of interest with the Debtors because they all have collaborated toward and share the common goal of confirming the Plan.[34]

117.    <u>Second</u>, the Released Parties have made a substantial contribution to the Chapter 11 Cases in exchange for the Debtor Releases.  Courts have emphasized that "[a]n analysis of 'substantial contribution' is necessarily fact specific'" and must be approached on a case-by-case basis.[35]  As already stated herein, the Released Parties were instrumental in getting the estates

---

[33]    *See In re Genco Shipping & Trading Ltd.*, 513 B.R. 233, 271 (Bankr. S.D.N.Y. 2014) (quoting *Adelphia*, 368 B.R. at 268 ("Some people and entities (*e.g.,* by employment contracts, corporate bylaws, or retention or loan agreements) must be indemnified by the estate with respect to their services. To the extent that the third party releases are congruent with the indemnification obligations, and the Debtors would be liable for any liability imposed on such persons, [the] third-party releases are acceptable.")).

[34]    S*ee In re Abeinsa Holding, Inc.*, 562 B.R. 265, 284 (Bankr. D. Del. 2016); *In re 710 Long Ridge Rd. Operating Co. II, LLC*, No. 13-13653 (DHS), 2014 WL 886433, at *15 (Bankr. D.N.J. Mar. 5, 2014) (finding identity of interest where debtor and non-debtor released parties shared common goal of "confirming [plan] and implementing the transactions contemplated thereunder"); *In re Tribune Co.,* 464 B.R. 126, 187 (Bankr. D. Del. 2011).

[35]    *See In re One2One Commc'ns, LLC*, No. 12-27311 (JLL), 2016 WL 3398580, at *8 (D. N.J. June 14, 2016) (surveying cases and noting that courts frequently reach different conclusions about whether similar types of contributions are substantial in the context of different cases); *In re 710 Long Ridge Rd. Operating Co. II*, No. 13-13653 (DHS), 2014 WL 886433, at *16 (Bankr. D.N.J. Mar. 5, 2014) (undertaking a fact-specific analysis and finding that a waiver of claims held by certain non-debtor affiliates, among other things, constituted a substantial contribution because such waiver allowed for "enhanced distribution to general unsecured creditors"); *see also In re Indianapolis Downs*, 486 B.R. 206, 303–04 (Bankr. D. Del. 2013) (describing the release analysis in the Third Circuit as "fact-specific").

to the Confirmation Hearing with a Plan overwhelmingly supported by the Voting Classes, including by negotiating the Plan and making it consensual with the SEC and the Creditors' Committee, maximizing value for creditors during the Chapter 11 Cases, and minimizing costs. The participation by the Released Parties in the negotiation, structuring, and implementation of the orderly liquidation Wind Down contemplated by the Plan constitutes a substantial contribution.[36] As a result, the list of Released Parties is narrow, excludes any Persons that may have added to the Debtors' prepetition financial situation, and includes only those parties that contributed to these Chapter 11 Cases.

118.    Third, the Creditors' Committee and the SEC support the Debtor Releases. The limited Releases were negotiated with the Creditors' Committee—an independent estate fiduciary—as well as other key constituencies, including the SEC. The Debtor Releases are essential to the Plan because they allowed the Debtors to move forward with a consensual Plan and avoid lengthy, complex, and value-destructive litigation with creditors

119.    Fourth, the Plan provides for meaningful payments to holders of Claims in the Classes affected by the Debtor Releases and holders of General Unsecured Claims, Crypto Loss Claims, and the SEC Claim have voted to accept the Plan.

120.    Accordingly, the Debtor Releases are appropriate and should be approved regardless of the standard applied.

---

[36]    See, e.g., In re Zenith Elecs, Corp., 241 B.R. 92, 111 (Bankr. D. Del. 1999) (finding substantial contribution by officers and directors who, among other things, designed and implemented the operational restructuring and negotiated the financial restructuring); Hr'g Tr. at 68, In re Energy Future Holdings Corp., No. 14-10979 (CSS) (Bankr. D. Del. Dec. 3, 2015) [D.I. 7255] (finding that debtors' directors and officers made critical contribution to plan based on extensive participation in board and committee meetings); In re Seaside Eng'g & Surveying, Inc., 780 F.3d 1070, 1079–80 (11th Cir. 2015) (debtors' professionals provided substantial contribution in the form of skilled labor and services); In re Mercedes Homes, Inc., 431 B.R. 869, 881 (Bankr. S.D. Fla. 2009) (finding substantial contribution in the form of debtors' directors' and officers' continued provision of expertise and knowledge to reorganized debtors).

48

b.     Plan Exculpation Provision Should be Approved.

121.    Section 10.7 of the Plan (the "**Exculpation Provision**") exculpates the Exculpated Parties for claims arising out of, or relating to, among other things, the Debtors, the Chapter 11 Cases, the SEC Settlement and the Debtors' wind down, and the agreements made in connection therewith.  As noted herein, the Exculpation Provision does not exculpate or release any Exculpated Party with respect to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted bad faith, fraud, willful misconduct, criminal misconduct, or gross negligence.  *See* Plan § 10.7.

122.    Exculpation provisions similar to the Exculpation Provision in the Plan are appropriate where the exculpated parties are estate fiduciaries and have acted in good faith in negotiating and working toward the implementation of a chapter 11 plan.[37]  Here, each of the Exculpated Parties are estate fiduciaries and have participated in the Debtors' Chapter 11 Cases in good faith.  Without the support of the Exculpated Parties, the Debtors would not have been able to execute their chapter 11 strategy, commence these Chapter 11 Cases, and propose a Plan backed and accepted by each of the Voting Classes.

123.    The Exculpation Provision is necessary to protect parties that have made substantial contributions to the Debtors' Chapter 11 Cases from collateral attacks related to good faith acts or omissions during the Chapter 11 Cases.  Further, the scope of the Exculpation Provision is appropriately tailored to cover only certain acts or omissions occurring between the Petition Date and the Effective Date and will not affect any liability that arises from fraud, gross

---

[37]    *See, e.g.*, *PWS Holding*, 228 F.3d at 246–47 (observing that creditors providing services to the debtors are entitled to a "limited grant of immunity . . . for actions within the scope of their duties . . . ."). *Wash. Mut. Inc.*, 442 B.R. at 350 (noting that the "Third Circuit has held that a creditors' committee, its members, and estate professionals may be exculpated under a plan for their actions in the bankruptcy case except for willful misconduct or gross negligence"); *In re Oneida Ltd.*, 351 B.R. 79, 94 & n.22 (Bankr. S.D.N.Y. 2006) (approving exculpation provision that covered prepetition lenders, DIP lenders, creditors' committees and their members, and the respective affiliates of each, except in cases of gross negligence, willful misconduct, fraud, or criminal conduct).

49

negligence, or willful misconduct, as determined by final order.  Courts in this and other districts have approved similar exculpation provisions in chapter 11 plans of similarly-situated debtors.[38]

124.    Accordingly, the Exculpation Provision is appropriate and should be approved.

      c.    <u>Injunction Provisions Are Narrowly Tailored and Should Be Approved</u>.

125.    The injunction provisions set forth in Section 10.3 of the Plan (the "**Injunction Provisions**") are narrowly tailored to preserve estate assets and implement the Plan's release and exculpation provisions, in part, by enjoining all applicable entities from, among other things, solely with respect to any claims, interests, and causes of action that will be or are treated by the Plan, from commencing, conducting, or continuing in any manner  action against or affecting the Debtors (but only until the Debtors' assets vest in the Wind Down Trust), the Wind Down Trust, the Plan Administrator, or the Wind Down Trustee, as applicable, or the property of any of the estates, the Wind Down Trust, the Plan Administrator, or the Wind Down Trustee, as applicable.  Accordingly, the Debtors believe that the Injunction Provisions are appropriate and therefore should be approved.

126.    Based upon the foregoing, the Plan complies fully with the requirements of sections 1122 and 1123 and, therefore, satisfies the requirement of section 1129(a)(1) of the Bankruptcy Code and should be approved.

---

[38]    *In re Superior Air Charter, LLC*, No. 20-11007 (CSS) (Bankr. D. Del. Sept. 4, 2020) (Docket No. 212); *In re LBI Media, Inc.*, No. 18-12655 (CSS) (Bankr. D. Del. Apr. 17, 2019) (Docket No. 839); *In re EV Energy Partners, L.P.*, No. 18-10814 (CSS) (Bankr. D. Del. May 17, 2018) (Docket No. 238); *In re Model Reorg Acquisition, LLC*, No. 17-11794 (CSS) (Bankr. D. Del. Oct. 6, 2017) (Docket No. 222); *In re Maxus Energy Corp.*, No. 16-11501 (CSS) (Bankr. D. Del. May 22, 2017) (Docket No. 1460).

E.     **Section 1123(c): Non-Debtor Proposed Sales.**

127.    The Debtors are not individuals. Accordingly, section 1123(c) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases.

F.     **Section 1123(d): Cure of Defaults.**

128.    Section 1123(d) of the Bankruptcy Code provides that "if it is proposed in a plan to cure a default[,] the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law." 11 U.S.C. § 1123(d).    Section 8.2 of the Plan provide for the satisfaction of default Claims associated with each executory contract and unexpired lease to be assumed pursuant to the Plan in accordance with section 365(b)(1) of the Bankruptcy Code.    All cure amounts will be determined in accordance with the underlying agreements and applicable non-bankruptcy law, and applicable contract counterparties have received notice of such intention and any cure amounts.  *See* Cure Notices.  Thus, the Plan complies with section 1123(d) of the Bankruptcy Code.

G.     **Plan Satisfies Bankruptcy Code Section 1129(a)(2).**

129.    Section 1129(a)(2) of the Bankruptcy Code requires that plan proponents comply with the applicable provisions of the Bankruptcy Code.  11 U.S.C. § 1129(a)(2).  The legislative history to section 1129(a)(2) indicates that this provision is intended to encompass the disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code.[39] As set forth in greater detail below, the Debtors submit that the requirements of section 1129(a)(2) of the Bankruptcy Code have been satisfied.

1.     **Section 1125: Disclosure Statement and Solicitation.**

130.    Section 1125(b) of the Bankruptcy Code provides, in pertinent part, that:

---

[39]   *See* H.R. Rep. No. 95-595, at 412 (1977) ("Paragraph (2) [of § 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure."); *see also PWS Holding*, 228 F.3d at 248; *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 759 (Bankr. S.D.N.Y. 1992).

> An acceptance or rejection of a plan may not be solicited after the commencement of [a] case under [the Bankruptcy Code] from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information. . . .

11 U.S.C. § 1125(b).

131.    By entry of the Disclosure Statement Order on August 8, 2024, the Court approved the Disclosure Statement as containing "adequate information" pursuant to section 1125(b).  As set forth in the Solicitation Affidavit, the Debtors solicited votes on the Plan from holders of claims in the Voting Classes consistent with the Court-approved Disclosure Statement Order.  In compliance with section 1125(b), the Debtors did not solicit acceptances of the Plan from any holder of a claim or Interest prior to entry of the Disclosure Statement Order.

### 2.    Section 1126: Acceptance of the Plan.

132.    Section 1126 of the Bankruptcy Code sets forth the procedures for soliciting votes on a chapter 11 plan and determining acceptance thereof.  Pursuant to section 1126, only holders of allowed claims or equity interests, as the case may be, in impaired classes of claims or equity interests that will receive or retain property under a plan on account of such claims or equity interests may vote to accept or reject such plan.[40]

---

[40]    Section 1126 provides, in pertinent parts, that:

    (a)    The holder of a claim or interest allowed under section 502 of [the Bankruptcy Code] may accept or reject a plan.

               *        *        *

    (f)    Notwithstanding any other provision of this section, a class that is not impaired under a plan, and each holder of a claim or interest of such class, are conclusively presumed to have accepted the plan, and solicitation of acceptances with respect to such class from the holders of claims or interests of such class is not required.

    (g)    Notwithstanding any other provision of this section, a class is deemed not to have accepted a plan if such plan provides that the claims or interests of such class do not entitle the holders of such claims or interests to receive or retain any property under the plan on account of such claims or interests.

133.    As set forth in the Voting Declaration, the Debtors solicited acceptances of the Plan from the holders of claims against the Debtors in each Voting Class under the Plan in accordance with section 1126 of the Bankruptcy Code.  The Voting Classes are Class 4, Class 5, and Class 6.

134.    The Debtors did not solicit votes for the Plan from any holder of claims in Class 1 (Priority Non-Tax Claims), Class 2 (Other Secured Claims), or Class 3 (Beltran Allowed Secured Claims), as such classes are unimpaired and, therefore, deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Further, the Debtors also did not solicit votes for the Plan by any holder of claims or Interests, as applicable, in Class 7 (Intercompany Claims), Class 8 (Intercompany Interests), Class 9 (510(c) Subordinated Claims), or Class 10 (TFL Equity Interests), as such classes will not receive or retain any property on account of their claims or interests and, therefore, are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code.

135.    Section 1126(c) of the Bankruptcy Code specifies the requirements for acceptance of a plan by impaired classes of claims entitled to vote to accept or reject the plan:

> A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of this section, that have accepted or rejected such plan.

11 U.S.C. § 1126(c).

136.    All Voting Classes have voted to accept the Plan in accordance with section 1126(c) of the Bankruptcy Code.  *See* Voting Declaration Ex. A.

---

11 U.S.C. § 1126(a), (f), (g).

137.    In sum, the Debtors have complied with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, applicable non-bankruptcy law, and the Disclosure Statement Order in transmitting the Disclosure Statement, the Plan, the Plan Supplement, the Ballots, and related documents and notices, and in soliciting and tabulating votes on the Plan.    Based upon the foregoing, the Debtors submit that the requirements of section 1129(a)(2) of the Bankruptcy Code have been satisfied.

**H.    Plan Has Been Proposed in Good Faith in Compliance with Bankruptcy Code Section 1129(a)(3).**

138.    Section 1129(a)(3) of the Bankruptcy Code requires that a chapter 11 plan be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3).  The Third Circuit has held that for a plan to be proposed in good faith, it must "fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code."[41]  The determination of whether a plan has been proposed in good faith requires a factual inquiry into the totality of the circumstances surrounding the plan's proposal,[42] and "the requirement of [s]ection 1129(a)(3) 'speaks more to the process of plan development than to the content of the plan.'"[43]  Accordingly, the examination must be done on a case-by-case basis and the court is given "considerable discretion in finding good faith."[44]  In this Circuit, to establish that a plan was proposed in good faith, the plan proponent must establish that the plan "(1) fosters a result consistent with the Bankruptcy Code's objectives; (2) has been proposed with honesty and good intentions and with

---

[41]    *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 247 (3d Cir. 2004) (quoting *PWS Holding*, 228 F.3d at 242).

[42]    *W.R. Grace*, 475 B.R. at 87.

[43]    *In re Chemtura Corp.*, 439 B.R. 561, 608 (Bankr. S.D.N.Y. 2010) (quoting *In re Bush Indus., Inc.*, 315 B.R. 292, 304 (Bankr. W.D.N.Y. 2004)).

[44]    *W.R. Grace*, 475 B.R. at 87 (citing *In re Coram Healthcare Corp.*, 271 B.R. 228, 234 (Bankr. D. Del. 2001)).

a basis for expecting that reorganization can be effected; and (3) exhibited a fundamental fairness in dealing with the creditors."[45]  Here, each of these factors is met.

139.    The Debtors' good faith is evident from the facts and record of these Chapter 11 Cases, including the Confirmation Declarations and other pleadings filed in support of confirmation of the Plan, and the record of the Confirmation Hearing and these Chapter 11 Cases.

140.    First, the Plan was proposed with the legitimate and honest purpose of maximizing the value of the Debtors' estates and recoveries to holders of claims under the circumstances of the Chapter 11 Cases, consistent with the Bankruptcy Code's objectives.[46]  Here, the Plan maximizes the value of the Debtors' estates for the benefit of creditors by providing for the orderly liquidation of the Debtors' assets, including through certain sales processes, and effectuating the terms of the SEC Settlement, which is intended to provide recoveries to holders of General Unsecured Claims and holders of Crypto Loss Claims.

141.    Second, "[i]n analyzing whether a plan has been proposed for honest and good reasons, courts routinely consider whether the debtor intended to abuse the judicial process, whether the plan was proposed for ulterior motives, or if no realistic probability for effective reorganization exists."[47]  Here, the Plan (including the Plan Supplement and all other documents necessary to effectuate the Plan) were negotiated at arm's length primarily among representatives of the Debtors, the Creditors' Committee, the SEC, and other stakeholders, and their respective sophisticated professionals for the purpose of effectuating the terms of the SEC Settlement and

---

[45]   *Id.* at 87–88 (cleaned up) (citing *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 609 (Bankr. D. Del. 2001)); *In re Wash. Mut. Inc.*, 461 B.R. 200, 239 (Bankr. D. Del. 2011); *accord In re Frascella Enters., Inc.*, 360 B.R. 435, 446 (Bankr. E.D. Pa. 2007).

[46]   *See W.R. Grace*, 475 B.R. at 88 ("The Supreme Court of the United States has specifically identified two purposes of Chapter 11 as: (1) preserving going concerns; and (2) maximizing property available to satisfy creditors.") (citing *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 453 (1999)).

[47]   *W.R. Grace*, 475 B.R. at 88.

providing for the orderly liquidation of the Debtors assets, thereby maximizing value for all stakeholders.[48]  The facts support no other conclusion.  The Debtors have upheld their fiduciary duties to stakeholders before and throughout these Chapter 11 Cases by seeking to maximize the value of the Debtors' estates.  The Plan is a good faith and sound effort by the Debtors to liquidate their assets so that value is maximized for the benefit of all stakeholders.

142.  <u>Third</u>, the Plan is supported by the Debtors' key creditor constituencies, as it has the support of the Creditors' Committee and the SEC and the Voting Classes voted overwhelmingly to accept the Plan.[49]  That the Plan has such wide support from the Debtors' creditor constituencies is alone sufficient to demonstrate that the Plan is fundamentally fair to creditors.[50]  In addition, the Plan's classification, indemnification, exculpation, release, and injunction provisions have been negotiated in good faith and at arm's length, are consistent with sections 105, 1122, 1123(b)(3)(A), 1123(b)(6), 1129, and 1142 of the Bankruptcy Code, and are each integral to the Plan, supported by valuable consideration, and necessary for the Debtors' successful liquidation.  Accordingly, each of the Debtors, the Creditors Committee, and the SEC have acted in good faith in all aspects with respect to the Plan, and the Plan was proposed in good faith in compliance with section 1129(a)(3) of the Bankruptcy Code.

---

[48]  *See id.* at 89 ("There is no evidence that Grace was dishonest or had ulterior motives when it proposed the Joint Plan.  Nor is there any indication that Grace intended to abuse the judicial process.  Rather, the record shows that the Joint Plan was the result of years of litigation and extensive arms-length negotiations."); *see also Tribune*, 464 B.R. at 156 ("Without any tangible evidence of actual wrongdoing or harm to the Debtors, suspicion of a potential conflict is not sufficient to demonstrate bad faith.") (citing *Wash. Mut.*, 442 B.R. at 327).

[49]  *See, e.g., In re Comfort Co., Inc.*, No. 08-12305 MFW, 2009 WL 7146282, at *8 (Bankr. D. Del. Feb. 4, 2009) ("The Plan is the result of extensive good faith, arm's-length negotiations among the Debtors and certain of their principal constituencies, including the First Lien Lenders, the Second Lien Lenders and the Committee, and reflects substantial input from the principal constituencies having an interest in these Chapter 11 Cases and, as evidenced by the overwhelming acceptance of the Plan, achieves the goal of consensual reorganization embodied by the Bankruptcy Code.").

[50]  *W.R. Grace*, 475 B.R. at 89 ("Further, the Creditor Committee's participation in the settlement negotiations is highly relevant when considering whether the DCL Plan Settlements were negotiated in good faith"); *see also In re Maremont Corp.*, 601 B.R. 1, 20 (Bankr. D. Del. 2019) ("The [d]ebtors' good faith is evident from the facts and record of the [c]hapter 11 [c]ases," which demonstrate "that the [d]ebtors engaged in extensive good-faith, arm's length negotiations with [major stakeholders], which led to the [p]lan's formulation.").

RLF1 31513333v.1

I.      **Plan Complies with Bankruptcy Code Section 1129(a)(4).**

143.    Section 1129(a)(4) requires that "[a]ny payment made or to be made by the proponent . . . for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable."  11 U.S.C. § 1129(a)(4).  Section 1129(a)(4) has been construed to require that all payments of professional fees made from estate assets be subject to review and approval as to their reasonableness by the court.[51]

144.    Any payment made or to be made by any of the Debtors or the Wind Down Trust, as applicable, for services or for costs and expenses in or in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been approved by, or is subject to the approval of, the Court as reasonable.  Specifically, Section 2.4 of the Plan subjects payment of all Professionals to the filing and approval of final fee applications seeking awards for services rendered or reimbursement of expenses incurred through and including the Effective Date.  *See* Plan § 2.4.  Further, Section 11.1(a)(i) of the Plan provides that the Court shall retain jurisdiction to hear and determine all Fee Claims.  *See* Plan § 11.1(a)(i). Based on the foregoing, the Plan complies with the requirements of section 1129(a)(4) of the Bankruptcy Code.

J.      **Debtors Complied with Bankruptcy Code Section 1129(a)(5).**

145.    Section 1129(a)(5) of the Bankruptcy Code requires that the plan proponent disclose the identity and affiliations of the proposed officers and directors of the successor to the debtors under the plan; that the appointment or continuance of such officers and directors be

---

[51]    *See In re TCI 2 Holdings, LLC*, 428 B.R. 117, 145 (Bankr. D.N.J. 2010) ("Under its clear terms, 'any payment' made or to be made by the plan proponent or the debtor for services 'in or in connection with' the plan or the case must be approved by or 'subject to the approval of' the bankruptcy court as 'reasonable.'"); *accord Lisanti v. Lubektin (In re Lisanti Foods, Inc.)*, 329 B.R. 491, 503 (D.N.J. 2005) ("Pursuant to § 1129(a)(4), a Plan should not be confirmed unless fees and expenses related to the Plan have been approved, or are subject to the approval, of the Bankruptcy Court."), *aff'd sub nom. In re Lisanti Foods, Inc.*, 241 F. App'x 1 (3d Cir. 2007).

consistent with the interests of creditors and equity security holders and with public policy; and, to the extent that there are any insiders that will be retained or employed by the successors to the debtors, that there be disclosure of the identity and nature of any compensation of any such insiders. *See* 11 U.S.C. § 1129(a)(5).  If, at the time of confirmation, the debtor is unable to identify these individuals by name, a debtor still satisfies this requirement so long as directors will be appointed consistent with the company's organizational documents and applicable state and federal law (in this case, applicable non-bankruptcy foreign laws).[52]

146.    As disclosed in the Plan Supplement, the Creditors' Committee has selected and proposed, subject to the Debtors' and the SEC's consent and/or consultation, as applicable, the following:

a.    JTC (Cayman) Limited as the Wind Down Trustee;

b.    Todd R. Snyder as the Plan Administrator; and

c.    R. Christian Wyatt, Celsius Network LLC, c/o Litigation Oversight Committee and Francisco Javier Reina Barragan as the initial members of the Advisory Board, and Thong Kum Keen Benjamin as the non-voting member of the Advisory Board.

*See* Second Plan Supplement, Exs. A-C.  The Debtors have approved the selection of each of the individual selected as the Wind Down Trustee, the Plan Administrator, and the initial members and the non-voting member of the Advisory Board.  The SEC approval has not been finalized as of the date hereof, but is expected shortly.  As set forth in the Exhibit C to the Second Plan Supplement, the initial members and the Plan Administrator will solicit resumes and materials

---

[52]    *See In re Charter Commc'ns*, 419 B.R. at 260 n.30 (emphasis in original) ("Although section 1129(a)(5) requires the plan to identify all directors of the reorganized entity, that provision is satisfied by the Debtors' disclosure at this time of the identities of the *known* directors."); *In re Am. Solar King*, 90 B.R. 808, 815 (Bankr. W.D. Tex. 1988) ("The subsection does not (and cannot) compel the debtor to do the impossible, however.  If there is no proposed slate of directors as yet, there is simply nothing further for the debtor to disclose under subsection (a)(5)(A)(i).").

form potential Advisory Board candidates and conduct interviews to determine the remaining three (3) Advisor Board members.

147.    Prior to the Confirmation Hearing, the Debtors will have publicly disclosed the affiliations and compensation of each of the proposed Wind Down Trustee, the proposed Plan Administrator, and the proposed initial members, and proposed non-voting member, of the Advisory Board. *See* Second Plan Supplement, Exs. A-C.

148.    In addition, to assist with the efficient transition of the Plan Administrator and avoid delays in pursuing assets and making distributions that could result if the Plan Administrator waits until the Effective Date to become familiar with key facts and issues of these Chapter 11 Cases, the Debtors, through their counsel, intend to enter into a consulting, independent contractor, or other similar agreement (any such agreement, the "**Consulting Agreement**") with Mr. Todd S. Snyder effective as of the date of his selection as the Plan Administrator on September 5, 2024 through and including the Effective Date.  It is expected that the Consulting Agreement will permit Mr. Snyder to use the firm Piper Sandler & Co. ("**Piper Sandler**") to assist him with such services.   The consulting Agreement will also provide for customary and standard indemnification provisions and the reimbursement of Mr. Snyder's reasonable and documented expenses, including any fees owed to Piper Sandler in connection with providing transition services and any fees and expenses owed to Mr. Snyder's counsel that were incurred in connection with negotiating the terms of the Wind Down Agreement, with any such fees and expenses incurred prior to the Effective Date to be paid by the Debtors on the Effective Date.

149.    As the identity and affiliations of the persons proposed to serve as Wind Down Trustee, the Plan Administrator, and each member of the Advisory Board upon the Effective Date of the Plan, and the identity of and nature of any compensation for any insider to be employed or retained by the Wind Down Trustee, the Plan Administrator, and the Advisory Board, as

applicable, have been fully disclosed, to the extent such information is available and applicable, and the appointment to, such offices of such persons is consistent with the interests of holders of claims against and interests against the Debtors and with public policy, the Debtors have complied with section 1129(a)(5) of the Bankruptcy Code.

**K.    Plan Does Not Contain Any Rate Changes.**

150.    Section 1129(a)(6) of the Bankruptcy Code provides that "[a]ny governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval."  11 U.S.C. § 1129(a)(6).  The Plan does not provide for any rate changes and is therefore consistent with section 1129(a)(6).

**L.    Plan Is in Best Interests of All Creditors and Equity Interest Holders, in Satisfaction of Bankruptcy Code Section 1129(a)(7).**

151.    Section 1129(a)(7) of the Bankruptcy Code, commonly referred to as the "best interests" test, requires that each individual holder of an impaired claim or interest has either accepted the plan or will receive or retain property having, as of the effective date of the plan, a present value of not less than what such holder would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code at that time.  *See* 11 U.S.C. § 1129(a)(7).  The best interests test is satisfied where the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation are less than or equal to the estimated recoveries for a holder of an impaired claim or interest under the debtor's plan of reorganization that rejects the plan.[53]

152.    Under the best interests test:

The court must measure what is to be received by rejecting creditors . . . under the plan against what would be received by them in the event of liquidation under chapter 7.  In doing so, the court must take into consideration the applicable rules of distribution of

---

[53]    *See LaSalle*, 526 U.S. at 441 n.13.

the estate under chapter 7, as well as the probable costs incident to such liquidation.[54]

The Court must evaluate the evidence presented, cognizant of the fact that "[t]he hypothetical liquidation entails a considerable degree of speculation about a situation that will not occur unless the case is actually converted to chapter 7.[55] As section 1129(a)(7) makes clear, the liquidation analysis applies only to non-accepting holders of impaired claims or equity interests.[56] Accordingly, the best interests test does not apply to the holders of claims or interests in the unimpaired classes.

153.    The liquidation analysis attached to the Disclosure Statement as Exhibit B (the "**Liquidation Analysis**") and other evidence proffered or adduced at the Confirmation Hearing (i) are persuasive and credible, (ii) have not been controverted by other evidence, and (iii) establish that each holder of an impaired claim or interest either has accepted the Plan or will receive or retain under the Plan, on account of such claim or interest, property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.  As detailed in the Liquidation Analysis, in a hypothetical liquidation scenario, the holders of claims in Class 4 (General Unsecured Claims) would receive an estimated recovery of approximately 5%, holders

---

[54]   *In re Adelphia Comm'cns, Corp.*, 368 B.R. 140, 252 (Bankr. S.D.N.Y. 2007) ("[T]he court must measure what is to be received by rejecting creditors . . . under the plan against what would be received by them in the event of liquidation under chapter 7. In doing so, the court must take into consideration the applicable rules of distribution of the estate under chapter 7, as well as the probable costs incident to such liquidation."); *see also Spansion*, 426 B.R. at 140 (citation omitted) ("[I]n order to meet their obligations under Section 1129(a)(7) of the Bankruptcy Code, Plan Proponents must prove that the distribution to creditors under the Plan is no less valuable, as of the Effective Date of the Plan, than the distribution such creditors would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code.").

[55]   *In re Affiliated Foods, Inc.*, 249 B.R. 770, 788 (Bankr. W.D. Mo. 2000) (quotation marks and citation omitted); *W.R. Grace*, 475 B.R. at 142 (citation omitted) ("[T]he court need only make a well-reasoned estimate of the liquidation value that is supported by the evidence on the record.  It is not necessary to itemize or specifically determine precise values during this estimation procedure.  Requiring such precision would be entirely unrealistic because exact values could only be found if the debtor actually underwent Chapter 7 liquidation.").

[56]   *See Drexel Burnham Lambert*, 138 B.R. at 761 ("[T]he liquidation analysis applies only to non-accepting impaired claims or interests.").

RLF1 31513333v.1

of claims in Class 5 (Crypto Loss Claims), and holders of claims in Class 6 (SEC Claim) would receive no recovery (assuming it continued to agree that other creditors could receive recoveries ahead of it, which is uncertain). *See* Liquidation Analysis at 13.  Pursuant to the Plan, however, holders of claims in Class 4 (General Unsecured Claims) are expected to receive a recovery of between 51.5–100%, and holders of claims in Class 5 are expected to receive a recovery of between 0.1–100% (the total amount of allowed Class 5 claims being impossible to estimate). *See id.*  Class 6 voted to accept the plan.

154.    The Liquidation Analysis is sound and reasonable and incorporates justified assumptions and estimates regarding the liquidation of the Debtors' assets and claims, including (a) the additional costs and expenses that would be incurred by the Debtors as a result of a chapter 7 trustee's fees; (b) the additional costs and expenses that would be incurred by the Debtors as a result of a chapter 7 trustee's retention of financial and legal advisors to assist in the administration of the chapter 7 liquidation; (c) the additional costs associated with the wind-down of the Debtors' remaining operations after the chapter 7 conversion and through the completion of the sale of the Debtors' assets; and (d) the SEC's agreed subordination of its claim is conditioned upon confirmation of the Plan; and (e) the Debtors are better positioned to maximize value of the assets under the Plan due to the highly complex nature of the Debtors' business and the Chapter 11 Cases, and the Debtors' institutional knowledge of the business. *See id.* at 11-13.

155.    The assumptions and estimates in the Liquidation Analysis are appropriate in the context of these Chapter 11 Cases and are based upon the knowledge and familiarity of the Debtors' advisors with the Debtors' business and their relevant expertise in chapter 11 cases. *See*

*id.*; Leto Declaration ¶ 41.  Accordingly, the Debtors' Liquidation Analysis should be afforded deference.[57]  The Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code.

**M.     Plan Satisfies Bankruptcy Code Section 1129(a)(8) as to Each Class of Claims or Interests, or Satisfaction of Section 1129(a)(8) is Excused Under Bankruptcy Code Section 1129(b).**

156.     Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests is unimpaired by the plan or has accepted the plan.  *See* 11 U.S.C. § 1129(a)(8).  As set forth above, the holders of claims or interests in the unimpaired classes are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

157.     Section 1126 of the Bankruptcy Code provides that a plan is accepted by an impaired class of claims if the accepting class members hold at least two-third in amount and more than one-half in number of the claims in their respective class that have voted.  11 U.S.C. § 1126(c).  As reflected in the Voting Declaration, each of the Voting Classes has voted to accept the Plan in accordance with section 1126(c) of the Bankruptcy Code.

158.     Finally, pursuant to section 1126(g) of the Bankruptcy Code, impaired classes that neither receive nor retain property under a plan are deemed to have rejected the plan.  11 U.S.C. § 1126(g).  Holders of claims and interests in Classes 7, 8, 9, and 10 are not entitled to receive or retain any property on account of their claims or interests and, as such, are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  As to these classes, the Plan may be confirmed under the "cram down" provisions of section 1129(b) of the Bankruptcy Code, as explained below.

---

[57]     *See JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns)*, 419 B.R. 221, 261–62 (Bankr. S.D.N.Y. 2009) (discrediting creditors' objection to liquidation analysis because it consisted of a "largely speculative exercise of listing possible incremental recoveries and offered no reliable opinions as to the likelihood that any of these identified sources of possible extra value would ever materialize").

**N.      Plan Provides for Payment in Full of All Allowed Priority Claims, in Satisfaction of Bankruptcy Code Section 1129(a)(9).**

159.    Section 1129(a)(9) of the Bankruptcy Code requires that claims entitled to priority under section 507(a) of the Bankruptcy Code be paid in full in cash unless the holders thereof agree to a different treatment with respect to such claims.  *See* 11 U.S.C. § 1129(a)(9).

160.    The treatment of allowed Administrative Expense Claims and Fee Claims pursuant to Sections 2.3 and 2.4, respectively, of the Plan satisfies the requirements of section 1129(a)(9)(A) of the Bankruptcy Code.  The treatment of Priority Non-Tax Claims pursuant to Section 4.1 of the Plan satisfies the requirements of section 1129(a)(9)(B) of the Bankruptcy Code.  The treatment of Priority Tax Claims pursuant to Section 2.5 of the Plan satisfies the requirements of section 1129(a)(9)(C) of the Bankruptcy Code.  The Debtors and/or Wind Down Trust, as applicable, has sufficient cash to pay allowed Administrative Expense Claims, Fee Claims, Priority Tax Claims, and Priority Non-Tax Claims. *See* Leto Declaration ¶ 38.  Accordingly, the Plan satisfies the requirements of section 1129(a)(9) of the Bankruptcy Code.

**O.      Plan Satisfies Bankruptcy Code Section 1129(a)(10).**

161.    Section 1129(a)(10) of the Bankruptcy Code requires the affirmative acceptance of the Plan by at least one class of impaired claims, "determined without including any acceptance of the plan by any insider."  11 U.S.C. § 1129(a)(10).  As discussed above, the Voting Classes are Impaired and each Voting Class has voted to accept the Plan, even excluding the acceptance of the Plan by any insiders in such Class.  Accordingly, at least one class of claims against the Debtors that is impaired under the Plan has voted to accept the Plan by the requisite majorities, determined without including any acceptance of the Plan by any insider in such classes, as set forth in the Voting Declaration, thereby satisfying the requirements of section 1129(a)(10) of the Bankruptcy Code.  *See* Voting Declaration Ex. A.

P.      **Plan Is Feasible and Satisfies Bankruptcy Code Section 1129(a)(11).**

162.    Section 1129(a)(11) of the Bankruptcy Code requires the Court to determine that the plan is feasible as a condition precedent to confirmation.  Specifically, it requires that confirmation is not likely to be followed by liquidation of the debtor, unless such liquidation is proposed in the plan.  *See* 11 U.S.C. § 1129(a)(11).  The feasibility test set forth in section 1129(a)(11) requires the Court to determine whether the plan may be implemented and has a reasonable likelihood of success.[58]  The key element of feasibility is whether there is a reasonable probability that the provisions of the plan can be performed.[59]  The Plan does not contain any visionary scheme, but is rather a practical plan for the orderly wind down and liquidation of the Debtors' estates.  Moreover, "just as speculative prospects of success cannot sustain feasibility, speculative prospects of failure cannot defeat feasibility.  The mere prospect of financial uncertainty cannot defeat confirmation on feasibility grounds . . . ."[60]

163.    The feasibility standard is greatly simplified when a liquidating chapter 11 plan is tested against section 1129(a)(11) of the Bankruptcy Code.  In the context of a liquidating chapter 11 plan, feasibility is established by demonstrating that a debtor is able to satisfy the conditions precedent to the effective date and otherwise has sufficient funds to make the payments

---

[58]    *See United States v. Energy Res. Co.*, 495 U.S. 545, 549 (1990); *Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 843 F.2d 636, 649 (2d Cir. 1988) ("Success need not be guaranteed."); *see also Abeinsa*, 562 B.R. at 276 (citations omitted) ("Feasibility does not require that success be guaranteed but rather only a 'reasonable assurance of compliance with plan terms.'").

[59]    *See Pizza of Haw., Inc. v. Shakey's, Inc. (In re Pizza of Haw., Inc.)*, 761 F.2d 1374, 1382 (9th Cir. 1985) (citation omitted) ("The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation."); *see also W.R. Grace & Co.*, 475 B.R. at 114 (same).

[60]    *In re Cajun Elec. Power Coop., Inc.*, 230 B.R. 715, 745 (Bankr. M.D. La. 1999); *see also In re U.S. Truck Co., Inc.*, 47 B.R. 932, 944 (E.D. Mich. 1985), *aff'd*, 800 F.2d 581 (6th Cir. 1986); *In re Paragon Offshore PLC*, No. 16- 10386 (CSS), 2016 WL 6699318, at *16 (Bankr. D. Del. Nov. 15, 2016) (internal quotations and citations omitted) ("[The] [d]ebtors are not required to view [their] business and economic prospects in the worst possible light.").

required under such plan and to meet its post-effective date obligations to pay for the costs of administering and fully consummating the plan and closing the chapter 11 case.[61]

164.    The Debtors have analyzed their ability to fulfill their obligations under the Plan and have taken into consideration their estimated costs of administration.  As set forth in the Leto Declaration, the evidence shows that the Debtors expect to have sufficient funds in the Wind Down Reserve, pursuant to the Wind Down Budget, to administer and consummate the Plan, to effectively Wind Down the Debtors' estates through the Wind Down Trust in accordance with the Plan and the Wind Down Trust Agreement, and to close the Chapter 11 Cases.  *See* Leto Declaration ¶ 47.  Further, the Plan is straightforward and provides for the payment in full of all allowed Administrative Expense Claims, allowed Priority Tax Claims, allowed Priority Non-Tax Claims, and allowed Fee Claims, as well as for distributions to certain holders of claims pursuant to the Plan and the disposition of the Debtors' remaining assets.  The Plan provides various mechanisms for accomplishing all of these objectives, including the appointment of the Wind Down Trustee and the Plan Administrator.  Accordingly, the information in the Disclosure Statement, the Leto Declaration, and the evidence proffered or adduced at the Confirmation Hearing (i) are persuasive and credible, (ii) have not been controverted by other evidence, and (iii) establish that the Plan is feasible and provides adequate and appropriate means for its implementation and an orderly wind down and liquidation of the Debtors' estates, as contemplated by the Plan, thereby satisfying the requirements of section 1129(a)(11) of the Bankruptcy Code.

---

[61]    *See, e.g.*, *In re Finlay Enters., Inc.*, No. 09-14873 (JMP), 2010 WL 6580629, at *2–6 (Bankr. S.D.N.Y. May 18, 2010); *In re ie Corp.*, No. 10-11061 (PJW) (Bankr. D. Del. Oct. 27, 2010) Docket No. 285, at 11 (finding that the debtor's liquidating plan satisfied section 1129(a)(11) of the Bankruptcy Code and was feasible because the plan provided for the liquidation and distribution of the debtors' assets); *In re SPC Seller*, No. 09-12647 (BLS) (Bankr. D. Del. Dec. 9, 2010) D.I. 513, at 13 (finding that "[b]ecause the [p]lan is a plan of liquidation, pursuant to 1129(a)(11), the [p]lan is feasible."); *In re Journal Register Co.*, 407 B.R. 520, 539 (Bankr. S.D.N.Y 2009) (quotation marks and citation omitted) (explaining that the feasibility test is "whether the things which are to be done after confirmation can be done as a practical matter under the facts. . . .").

**Q.**      **Plan Complies with Bankruptcy Code Section 1129(a)(12).**

165.     Section 1129(a)(12) requires the payment of "[a]ll fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan . . . ." 11 U.S.C. § 1129(a)(12).   Section 507(a)(2) of the Bankruptcy Code provides that "any fees and charges assessed against the estate under [section 1930] of title 28" are afforded priority as administrative expenses.  11 U.S.C. § 507(a)(2).  In accordance with sections 507 and 1129(a)(12) of the Bankruptcy Code, the Plan provides that "[a]ll Statutory Fees that are due and payable for each Debtor's case shall be paid by the Debtors on the Effective Date.  After the Effective Date, the Debtors and the Wind Down Trust shall be jointly and severally liable to pay any and all Statutory Fees when due and payable."  Plan, § 12.1.  The Plan further requires the Debtors to file monthly operating reports when they come due prior to the Effective Date, and after the Effective Date, the Wind Down Trust, on behalf of the Wind Down Trust, as directed by the Plan Administrator, shall file with the Court separate UST Form 11-MOR reports when they become due.  *Id.*  Accordingly, the Plan satisfies the requirements of section 1129(a)(12).

**R.**      **Bankruptcy Code Sections 1129(a)(13), 1129(a)(14), 1129(a)(15), and 1129(a)(16) Are Not Applicable to the Plan.**

166.     Section 1129(a)(13) of the Bankruptcy Code relates to the payment of retiree benefits.  The Debtors are not subject to any retiree benefit obligations (as defined in section 1114 of the Bankruptcy Code) and, as such, section 1129(a)(13) is inapplicable to the Chapter 11 Cases.

167.     Section 1129(a)(14) of the Bankruptcy Code relates to the payment of domestic support obligations.  The Debtors are not subject to any domestic support obligations and, accordingly, section 1129(a)(14) is inapplicable.

67

168.    Section 1129(a)(15) of the Bankruptcy Code applies only in cases in which the debtor is an "individual" (as that term is defined in the Bankruptcy Code).  None of the Debtors are "individuals," and, accordingly, section 1129(a)(15) is inapplicable.

169.    Section 1129(a)(16) of the Bankruptcy Code provides that property transfers by a corporation or trust that is not a moneyed, business, or commercial corporation or trust must be made in accordance with any applicable provisions of nonbankruptcy law.  Each Debtor is a moneyed, business, or commercial corporation; accordingly, section 1129(a)(16) is inapplicable.

**S.    Plan Satisfies "Cram Down" Requirements under Bankruptcy Code Section 1129(b) for Non-Accepting Classes.**

170.    Section 1129(b) of the Bankruptcy Code provides a mechanism (known colloquially as "cram down") for confirmation of a chapter 11 plan in circumstances where the plan is not accepted by all impaired classes of claims and interests.  Under section 1129(b), the court may "cram down" a plan over the dissenting vote of an impaired class or classes of claims or interests as long as (i) the plan satisfies the requirements of section 1129(a) of the Bankruptcy Code, other than section 1129(a)(8), and (ii) the plan does not "discriminate unfairly" and is "fair and equitable" with respect to such dissenting class or classes.

171.    Each Voting Class has voted to accept the Plan.  Furthermore, the unimpaired classes are deemed to accept the Plan.  Therefore, section 1129(b) of the Bankruptcy Code is inapplicable to the voting and unimpaired classes in these Chapter 11 Cases.

172.    The Debtors' Plan provides that Classes 7–10 (the "**Deemed Rejecting Classes**") will receive no recovery under the Plan, are deemed to reject the Plan, and do not vote on the Plan.  Section 1129(b) of the Bankruptcy Code provides in pertinent part that:

> [I]f all of the applicable requirements of [section 1129(a) of the Bankruptcy Code] other than [the requirement contained in section 1129(a)(8) that a plan must be accepted by all impaired classes] are

> met with respect to a plan, the court, on request of the proponent of
> under the plan, shall confirm the plan notwithstanding the
> requirements of such paragraph if the plan does not discriminate
> unfairly, and is fair and equitable, with respect to each class of
> claims or interests that is impaired under, and has not accepted, the
> plan.

11 U.S.C. § 1129(b)(1).  Under section 1129(b) of the Bankruptcy Code, a bankruptcy court may

"cram down" a plan over the rejection or deemed rejection of a plan by impaired class or classes

of claims or interests as long as the plan does not "discriminate unfairly" and is "fair and equitable"

with respect to such rejecting class or classes.

173.    The Plan does not "discriminate unfairly" and is "fair and equitable" with

respect to the Deemed Rejecting Classes as no class senior to any Deemed Rejecting Class is being

paid more than in full and the Plan does not provide a recovery on account of any claim or interest

that is equal or junior to claims in such Deemed Rejecting Classes.[62]    Thus, the Plan may be

confirmed notwithstanding the Deemed Rejecting Classes.

## 1.    The Plan Does Not Discriminate Unfairly.

174.    The unfair discrimination standard of section 1129(b) ensures that a plan

does not unfairly discriminate against a dissenting class with respect to the value the dissenting

class will receive under a plan when compared to the value given to all other similarly situated

classes.[63]    The standard does not, however, prohibit discrimination among classes.  Rather, it

prohibits discrimination that is unfair.  Under section 1129(b) of the Bankruptcy Code:

---

[62]    The Deemed Rejecting Classes are junior to the Voting Classes, as the Deemed Rejecting Classes consist of either subordinated claims (Class 9), Intercompany Claims or Interests (Classes 7 and 8), or equity interests (Class 10).

[63]    *See Armstrong World Indus.*, 348 B.R. at 121 (noting that "[t]he hallmarks of the various tests have been whether there is a reasonable basis for the discrimination, and whether the debtor can confirm and consummate a plan without the proposed discrimination" (quoting *In re Lernout & Hauspie Speech Prods., N.V.*, 301 B.R. 651, 660 (Bankr. D. Del. 2003), *aff'd sub nom. Stonington Partners, Inc. v. Official Comm. of Unsecured Creditors (In re Lernout & Hauspie Speech Prods., N.V.)*, 308 B.R. 672 (D. Del. 2004)); *accord In re WorldCom, Inc.*, No. 02-13533 (AJG), 2003 WL 23861928, at *59 (Bankr. S.D.N.Y. Oct. 31, 2003); *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd in part*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom. Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 843 F.2d 636 (2d Cir. 1988); *Coastal Broad. Sys.*, 570 F. App'x at

69

> A rebuttable presumption of unfair discrimination arises when there is: (1) a dissenting class; (2) another class of the same priority; and (3) a difference in the plan's treatment of the two classes that results in either (a) a materially lower percentage recovery for the dissenting class (measured in terms of the net present value of all payments), or (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution." [64]

However, "[t]he Court need only reach the question of whether the discrimination is unfair and utilize the rebuttable presumption test if it first finds that the Plan discriminates at all.[65]

176.    As stated above, with respect to the Deemed Rejecting Classes, no other classes of equal priority are provided a recovery under the Plan.  Specifically, Class 9 claims (510(c) Subordinated Claims) are subordinated pursuant to the Plan and section 510(c) of the Bankruptcy Code.  Accordingly, it is not unfair discrimination for other unsecured creditors to be paid ahead of them.  Class 10 is comprised of holders of TFL Equity Interests.  Holders of TFL Equity Interests shall retain their TFL Stock, subject to dilution by the issuance of the TFL Additional Stock (as defined in the Plan) in favor of the Wind Down Trust.  Holders of TFL Equity Interests are not expected to receive distributions under the Plan.  Accordingly, there is no presumption of unfair discrimination with respect to these classes and the Plan does not "discriminate unfairly" with respect to any impaired classes of claims or interests.

## 2.    The Plan is Fair and Equitable.

176.    Pursuant to section 1129(b)(2) of the Bankruptcy Code, a plan must be fair and equitable with respect to each class that rejects such plan.  The definition of "fair and equitable" varies based on the priority of the claims or interest of such rejecting class.  Section 1129(b)(2)(B)(ii) of the Bankruptcy Code provides that a plan is fair and equitable with

---

193 ("[G]rouping of similar claims in different classes is permitted so long as the classification is reasonable.") (internal quotation marks omitted).

[64]    *Id*. (citing *In re Dow Corning Corp*., 244 B.R. 696, 702 (Bankr. E.D. Mich. 1999)).

[65]    *Id*. at 122.

respect to a class of impaired unsecured claims that did not accept such plan if, pursuant to the plan, no holder of a claim or interest that is junior to the interests of such class will receive or retain any property on account of their junior interest.  11 U.S.C. § 1129(b)(2)(B)(ii).  Similarly, section 1129(b)(2)(C)(ii) of the Bankruptcy Code provides that a plan is fair and equitable with respect to a class of impaired interests that did not accept the plan if, pursuant to the plan, no holder of an interest that is junior to the interests of such class will receive or retain any property on account of their junior interest.  11 U.S.C. § 1129(b)(2)(C)(ii).  These requirements are often referred to as the "absolute priority rule."

177.     Distributions under the Plan are made in the order of priority prescribed by the Bankruptcy Code and in accordance with the absolute priority rule.  With respect to the Deemed Rejecting Classes, no claims or interests junior to these classes will receive recoveries under the Plan on account of such Claims or Interests.[66]  The Plan also satisfies the "unwritten corollary to the absolute priority rule . . . that a senior class cannot receive more than full compensation for its claims."[67]  No class of claims will receive more than a full recovery under the Plan.  Accordingly, the Plan is "fair and equitable" and, therefore, satisfies section 1129(b) of the Bankruptcy Code.

T.     **Section 1129(c):  The Plan is the Only Plan Currently on File.**

178.     The Plan is the only plan currently on file in the Chapter 11 Cases and, accordingly, complies with section 1129(c) of the Bankruptcy Code.

---

[66]   *See, e.g., In re Rubicon U.S. REIT, Inc.*, 434 B.R. 168, 179 (Bankr. D. Del. 2010) (finding a plan was fair and equitable in its treatment of equity interests under section 1129(b)(2)(C) of the Bankruptcy Code because there was no class junior to the equity class); *Finlay Enters.*, 2010 WL 6580628, at *7 (holding that the fair and equitable test was satisfied where no interest junior to the interests of the rejecting class received any property under the plan).

[67]   *In re SunEdison, Inc.*, 575 B.R. 220, 227 (Bankr. S.D.N.Y. 2017).

RLF1 31513333v.1

**U.     Section 1129(d):  Principal Purpose of Plan is Not Avoidance of Taxes.**

179.    The principal purpose of the Plan is not the avoidance of taxes or the avoidance of section 5 of the Securities Act, and no party has objected on any such grounds.  The Plan, therefore, satisfies the requirements of section 1129(d) of the Bankruptcy Code.

**V.     Section 1129(e) is Inapplicable.**

180.    The provisions of section 1129(e) of the Bankruptcy Code apply only to "small business cases" as defined therein.  These Chapter 11 Cases are not "small business cases," and section 1129(e) of the Bankruptcy Code is inapplicable.

**W.     Section 1127: Modification of the Plan.**

181.    Pursuant to section 1127 of the Bankruptcy Code, a plan proponent may modify a plan at any time before confirmation so long as the plan, as modified, satisfies the requirements of sections 1122 and 1123 of the Bankruptcy Code and the proponent of the modification complies with section 1125 of the Bankruptcy Code.  In addition, with respect to modifications made after acceptance but prior to confirmation of the plan, Bankruptcy Rule 3019 provides, in relevant part:

> [A]fter a plan has been accepted and before its confirmation, the proponent may file a modification of the plan.  If the court finds after hearing on notice to the trustee, any committee appointed under the Code, and any other entity designated by the court that the proposed modification does not adversely change the treatment of the claim of any creditor or the interest of any equity security holder who has not accepted in writing the modification, it shall be deemed accepted by all creditors and equity security holders who have previously accepted the plan.

Fed. R. Bankr. P. 3019(a).

182.    The Debtors modified the Plan, among other things, to (i) incorporate certain informal comments the Debtors received and (ii) resolve certain objections to confirmation.

The following changes to the Plan resolved the Creditors' Committee's and the SEC's informal

comments to the Plan and partially resolved the U.S. Trustee's formal Objection to the Plan.

- The Debtors made technical modifications to clarify the Wind Down Trust's compliance with securities laws and SEC staff guidance regarding liquidating trusts.

- The Debtors included in Section 4.6(b) of the Plan certain reservation of rights language the SEC requested related to whistleblower awards in connection with SEC Enforcement Action under the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 and all applicable SEC rules.

- At the Creditors' Committee's request, the Debtors made technical modifications to provisions related to the Crypto Loss Claim Bar Date to provide the Plan Administrator with the authority to extend the Crypto Loss Claim Bar Date.

- The Debtors made clarification modifications to permit holders of General Unsecured Claims to sell, transfer, and assign their General Unsecured Claims.

- The Debtors included certain language confirming that the Bankruptcy Court shall retain jurisdiction over any post-Effective Date sales of the Debtors' assets and authorizing the Plan Administrator to conduct such sales after the Effective Date.

- To resolve certain U.S. Trustee objections, the Debtors (i) revised the definitions of "Released Parties" and "Exculpated Parties" to narrow the scope of the Debtor Releases and exculpation, (ii) removed the provision providing exculpation for the Advisory Board, and (iii) revised certain language in the Injunction Provisions to narrow the scope of the injunction.

- The Debtors made certain revisions related to the Beltran Allowed Secured Claims to account for the Beltran Stipulated Order (as defined in the Plan).

- At the request of the Creditors' Committee, the Debtors modified the provisions detailing the selection and composition of the Advisory Board.

- The Debtors added certain tax-related provisions relevant to the Wind Down Trust.

- To resolve certain U.S. Trustee objections, the Debtors modified certain language related to the procedures for disputed claims so that the Plan does not provide for the automatic disallowance of late claims.

- The Debtors made certain technical modifications related to the assumption and assignment of executory contracts.

183.    As described above, the Plan, as modified on September 17, 2024, complies

with sections 1122 and 1123 of the Bankruptcy Code, and the Debtors have complied with section

1125 of the Bankruptcy Code.  Accordingly, the requirements of section 1127 have been satisfied.

Moreover, Bankruptcy Rule 3019 is satisfied because the modifications do not "adversely change

the treatment of the claim of any creditor or the interest of any equity security holder who has not

accepted in writing the modification."  Fed. R. Bankr. P. 3019(a).

## II.   **Objections Should be Overruled**.

184.   Of the unresolved Objections, including the Objections filed by the U.S.

Trustee, which has been largely resolved, and Avalanche's forthcoming Objection (if filed), the

remaining unresolved Objections were raised by holders of Crypto Loss Claims Class 5.  As set

forth below and in the Objection Response Chart attached hereto as **Exhibit A**, the Objections fail

as a matter of law for a number of reasons and should be overruled.  First, holders of Class 5 claims

are barred from objecting to the Plan on the basis that the requirements of section 1129(b) are not

met (including unfair discrimination of the Class 5 treatment as compared to Class 3 or Class 4)

because Class 5 voted to accept the Plan. Second, the separate classification of Class 4 and Class

5 claims is permissible and justified due to the different nature of such claims and the SEC

Settlement.  Third, objections regarding the treatment of particular Crypto Loss Claims in Class 5

as compared to others are premature, as the Plan provides that the Plan Administrator will propose

the Crypto Loss Claims Procedures after the Effective Date, and all parties will have the

opportunity to object at that time.  Moreover, there is no basis for any Objecting Party to compel

the Debtors to classify or treat certain Crypto Loss Claims differently than other Crypto Loss

Claims. Fourth, the separate classification of Class 3 and Class 5 claims is permissible and justified

because allowed Class 3 claims are secured claims entitled to receive distributions from the Beltran

Escrow Deposit (*i.e.,* the Class 3 collateral), to the extent such claims are allowed by the Singapore

High Court.

185.    Not only is the Plan supported by the Creditors' Committee, which represents the interests of all general unsecured creditors, including holders of Crypto Loss Claims, it was accepted by over 95% of holders of Crypto Loss Claims who voted on the Plan – for good reason.  The Plan offers holders of Crypto Loss Claims exclusive access to potentially significant recoverable funds via the SEC Settlement Fund, *i.e.*, funds being transferred by Mr. Kwon personally and by Mr. Kwon via Luna Foundation Guard.  Moreover, the Debtors' largest creditor, the SEC, has consented to recover its over $4 billion claim *behind* holders of Crypto Loss Claims pursuant to the SEC Settlement.[68]  Absent the Plan and the SEC Settlement (which requires the Plan to go effective by October 30, 2024), given the adverse Jury Verdict in the SEC Enforcement Action, the SEC could likely otherwise be entitled to a multi-billion dollar claim against the Debtors and it is uncertain whether Mr. Kwon's and LFG's assets would be available for holders of Class 5 claims.  In that scenario, holders of Class 5 claims could recover very little on account of their claims.  Accordingly, the Plan not only maximizes value for all stakeholders, but represents a remarkable deal that will provide "harmed investors" with actual recoveries.

A.    **Holders of Class 5 Claims Are Barred from Objecting to the Plan on the Basis that the Requirements of Section 1129(b) Are Not Met Because Class 5 Voted to Accept the Plan.**

186.    As a threshold matter, because Class 5 voted to accept the Plan, holders of Crypto Loss Claims in Class 5 are foreclosed from raising certain objections, including on the basis that the Plan unfairly discriminates against holders in Class 5 (or any other argument that the Plan violates section 1129(b)).  Therefore, each of the arguments raised by holders of Crypto Loss Claims in Class 5 that the Plan unfairly discriminates or provides inequitable treatment as compared to holders of General Unsecured Claims in Class 4 is wrong as a matter of law.  *See,*

---

[68]    The SEC has voted to accept the Plan. *See* Voting Declaration Ex. A.

*e.g.,* Objection filed at Docket No. 676 (arguing that the Plan's classification and treatment of Crypto Loss Claims as different from General Unsecured Claims is improper).  Any arguments that the Plan unfairly discriminates or provides inequitable treatment as compared to holders of Beltran Allowed Secured Claims in Class 3, such arguments similarly fail for the reasons set forth herein (because Class 3 consists of secured claims).

187.    Objecting Parties appear to be invoking the "cram-down" requirements under section 1129(b) of the Bankruptcy Code, which provides that a plan proponent may only confirm a plan that does not unfairly discriminate, and is fair and equitable, with respect to each *impaired dissenting* class. 11 U.S.C. § 1129(b)(1) (emphasis added).  The Bankruptcy Code and case law are clear that claimants in classes that have voted in accept a chapter 11 plan cannot invoke unfair discrimination and fair and equitable arguments pursuant to section 1129(b) of the Bankruptcy Code if such class has voted to accept the plan.  *See In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1062 (3d Cir. 1987) (holding that section 1129(b) provided no protection for individual creditor in a class that voted to accept the plan); *In re Seegrid Corp.*, Case No. 14-12391 (BLS) (Bankr. D. Del. Oct. 21, 2014) (Docket No. 244), *Transcript of Court Decision* at 9:19-11:4 (excluding evidence that the plan was not fair and equitable pursuant to section 1129(b) because all classes voted to accept the plan).[69]  Accordingly, holders of Class 5 claims are barred from

---

[69]    *See also In re W.R. Grace & Co.*, 475 B.R. 34, 175 (Bankr. D. Del. 2012) (emphasis in original) ("It is inconsequential that these Appellants object to the Plan on an individual basis because application of the fair and equitable test only depends on how an impaired class *as a whole* voted. . . . As such, the fair and equitable requirements of § 1129(b) do not apply here because the impaired classes and interests in this case all voted to accept the Plan."); *In re Aegerion Pharm.*, 605 B.R. 22, 29 (Bankr. S.D.N.Y. 2019) ("Dissenting creditors in an accepting class are only protected by section 1129(a)(7)—the best interests test—which requires that dissenting creditors receive at least as much as they would in a chapter 7 liquidation. . . . If the [dissenting creditors'] claims were properly classified in [their class], [the creditors] who voted against the Plan are dissenting members of the accepting [class], and they gained no protection from section 1129(b)(1)."); *Franklin High Yield Tax-Free Income Fund v. City of Stockton, California* (*In re City of Stockton, California*), 542 B.R. 261, 283 (B.A.P. 9th Cir. 2015)("The bankruptcy court noted [the creditor's] contrary vote but found that the [the creditor's] class . . . voted in favor of the Plan.  [The creditor] is merely a dissenting creditor in the accepting class of general unsecured creditors.  In these circumstances, 'cramdown' analysis under § 1129(b) is not required, and [the Court does] not consider further [the creditor's] 'unfair discrimination' argument based on § 1129(b).").

objecting to the Plan on the basis that the Plan unfairly discriminates against such class or treats such class unfairly and inequitable, as the class is not being "crammed down" under the Plan and the requirements of section 1129(b) are not at issue.

**B.**      **Separate Classification and Different Treatment of Claims in Class 4 and Claims in Class 5 are Permissible and Justified.**

188.    In any event, the separate classification and different treatment of holders of General Unsecured Claims in Class 4 and holders of Crypto Loss Claims in Class 5 claims are permissible and justified by the facts and circumstances of these Chapter 11 Cases.  While both Class 4 claims and Class 5 claims are unsecured, the classes are not substantially similar and there is a legal and factual basis for their separate classification.  *In re Nuverra Env't Sols., Inc.*, 590 B.R. 75, 96 (D. Del. 2018), *aff'd*, 834 F. App'x 729 (3d Cir. 2021), *as amended* (Feb. 2, 2021) ("Courts have held that there is significant flexibility in classifying claims and interests into different classes as long as a rational legal or factual basis for separate classification exists and all claims or interests within a particular class are substantially similar."); *In re W.R. Grace & Co.*, 475 B.R. at 109-10 ("[I]n analyzing whether claims within a given class are substantially similar, the focus of the classification should be on the legal character of the claim as it relates to the assets of the debtor.").

189.    Here, there are several sound legal and factual bases for separately classifying and treating General Unsecured Claims in Class 4 differently from Crypto Loss Claims in Class 5.  First, the separate classification and treatment of these claims are the result of a settlement the Debtors reached with the SEC, which provides special treatment for Crypto Loss Claims.  *See* Final Judgment at 5 (providing that the assets transferred by Mr. Kwon to the liquidating trust shall be distributed to "*harmed investors*" pursuant to the confirmed chapter 11 plan but remaining silent as to distributions to the Debtors' other creditors).  Pursuant to the SEC Settlement, the Plan provides that certain assets—particularly those in the SEC Settlement Fund—

are to be distributed solely to holders of Crypto Loss Claims (Class 5). *Id.* This necessitates separate classification. In contrast, the Plan provides that holders of claims in Class 4 shall receive other assets of the estate (the GUC Pool) up to the full amount of such Allowed General Unsecured Claim prior to such assets being available to Class 5 claims.

190.    <u>Second</u>, the nature and legal character of General Unsecured Claims in Class 4 differ significantly from those Crypto Loss Claims in Class 5. Class 4 claims are primarily contract-based claims that arose from services creditors performed prior to the Petition Date. *See* Leto Declaration ¶ 19. The Crypto Loss Claims in Class 5, on the other hand, are litigation claims based on alleged tortious conduct by the Debtors relating to cryptocurrency assets/securities. It is well settled that it is permissible for a chapter 11 plan to classify trade or vendor claims separately from litigation or tort claims. *See*, *e.g.*, *In re Jersey City Med. Ctr.*, 817 F.2d at 1061 (separately classifying trade creditors from tort claimants); *In re Coram Healthcare Corp.*, 315 B.R. 321, 348 (Bankr.D.Del.2004) (noting that the Bankruptcy Code "does not expressly prohibit placing 'substantially similar' claims in separate classes.").

191.    Indeed, these facts are analogous to *Nuverra*, where the court upheld the separate classification of unsecured noteholder claims from other unsecured claims related to activities arising out of the day-to-day operations of the company. *In re Nuverra Env't Sols., Inc.*, 590 B.R. at 97-98 (noting that the noteholder claims were legally distinct in nature from claims in other classes of general unsecured claims). Accordingly, because Class 4 claims are legally distinct in nature from Class 5 claims, the separate classification under the Plan is warranted.

192.    The separate classification and treatment of Class 4 and Class 5 claims is further justified given the potential argument that holders of Crypto Loss Claims in Class 5 are subject to subordination under section 510(b) of the Bankruptcy Code, which provides for the subordination of certain claims relating to damages arising from the purchase or sale of a security

of the debtor.  11 U.S.C. § 510(b).[70]  Pursuant to the Final Judgment, the District Court found that certain of the Debtors' native cryptocurrency are securities.  *See* Final Judgment at p. 5.  Here, the Crypto Loss Claims are defined under the Plan as claims asserted against the Debtors arising from (a) the purchase, sale, or rescission of the purchase or sale of Cryptocurrency, including (i) Terra Crypto, (ii) any wrapped or bridged version on any blockchain of any Terra Crypto, (iii) any staked or bonded Terra Crypto on any blockchain, (iv) any Terra Crypto on any centralized or decentralized liquidity, lending, or borrowing application or protocol on any blockchain, (v) any receipt or derivative of any Terra Crypto on any blockchain, (vi) any derivatives trading or perpetual swaps of Terra Crypto, or any other Cryptocurrency that derives a value from Terra Crypto, and (vii) any other Cryptocurrency that was transacted or made available on the TerraLunaClassic and TerraLuna blockchains, and (b) any reimbursement or contribution claims allowed under section 502 of the Bankruptcy Code on account of such claims.

193.    Accordingly, it is possible that Crypto Loss Claims in Class 5, many of which arise out of the rescission of a purchase or sale of the Debtors' native cryptocurrency are for damages arising from the purchase or sale of such cryptocurrency, may be subordinated pursuant to section 510(b).  Courts have subordinated similar claims in other cryptocurrency-related chapter 11 cases.  *See In re Celsius Network LLC, et al.,* No. 22-10964 (MG) (Bankr.

---

[70]    Section 510(b) provides:

> For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

11 U.S.C. § 510(b).

S.D.N.Y. Nov. 9, 2023) (Docket No. 3972) (confirming a plan of reorganization that subordinated a class of crypto claimants under Section 510(b)).[71]

194.    The allocation of the GUC Pool to Class 4 is also justified by the fact that holders of Class 5 claims are entitled to recover exclusively from the SEC Settlement Fund pursuant to Section 1.106 the Plan and the SEC Settlement.   The SEC Settlement Fund is a significant source of assets—potentially the largest source of recovery in the Debtors' estates— and absent the SEC Settlement, certain assets therein could otherwise be available, through recoveries on estate causes of action, to all other creditors, including holders of General Unsecured Claims.   It is also not the case, contrary to the Objecting Parties' contentions, that holders of Class 4 claims are "guaranteed" a materially higher recovery than holders of Class 5 claims.   The Plan and Liquidation Analysis simply provide recovery *estimates*, particularly as the allowed amount of the Crypto Loss Claims is not currently known.   *See* Leto Declaration ¶ 42.

195.    Further, the purported risk that Class 4 claims will absorb the majority of available distributable assets is misguided.   The Debtors estimate that the range of known allowed Class 4 Claims is approximately $1 million to $21 million (not including unliquidated indemnification claims, some or all of which could ultimately be subordinated Section 510(c) Claims, if not allowed as General Unsecured Claims).   *See* Leto Declaration ¶ 39.   Thus, there may nor not be sufficient assets to pay Class 4 Claims in full. .   If Class 4 claims are more than estimated due to the ultimate allowance of certain unliquidated claims, or the costs of liquidating

---

[71]   The late-filed Objection filed at Docket No. 695 asserts that certain claims arising out of the purchase or sale of certain Terra Crypto should not be subject to subordination pursuant to section 510(b) because such Terra Crypto are not *registered* securities, but merely unregistered securities as determined by the District Court.   First, the Plan does *not* subordinate Crypto Loss Claims.   Rather, it embodies a compromise that provides different assets to each of General Unsecured Claims and Crypto Loss Claims, taking into account, among other factors, a potential argument on subordination.   It also provides certain assets only to holders of Crypto Loss Claims, which is not consistent with subordination.   In any case, section 510(b) does not require that securities must be registered to be subject to subordination.   Accordingly, just as in *Celsius*, where certain claims based on the purchase or sale of certain cryptocurrency that were not *registered* securities were subordinated under section 510(b), the Crypto Loss Claims here are arguably subject to subordination under section 510(b).

the estate (including reconciling Class 5 claims) are higher than estimated, then it is possible Class 4 Claims would not be paid in full.   If there are sufficient assets to pay Class 4 Claims, any excess estate assets would be available for Class 5 claims, along with the SEC Settlement Fund, to which Crypto Loss Claims are entitled to exclusive access.   Under these circumstances, the allocation of value between the two classes is a fair and equitable compromise that further justifies the separate classification of the two classes.   Moreover, both the Creditors' Committee and the SEC support the Plan, including the separate classification and treatment of the two classes.

> **C.**    **Objecting Parties' Assertion that Certain Crypto Loss Claims Should Receive Better Treatment than Other Crypto Loss Claims Should be Overruled.**

196.    Certain Objecting Parties object to the Plan on the basis that certain claims within Class 5 should receive better treatment than other claims in Class 5.   These Objecting Parties' arguments in this regard fall into two categories: (i) UST holders should receive higher recoveries than holders of other Crypto Loss Claims and (ii) holders of small claims should receive higher recoveries than institutional investors holding large claims.   These objections fail for a number of reasons.

197.    First, any objections regarding the claims allowance and distribution procedures for holders of Crypto Loss Claims in Class 5 are premature.   Specifically, Section 5.7 of the Plan provides that, following the Effective Date, the Plan Administrator will file the Crypto Loss Claim Procedures Motion, seeking approval of the Crypto Loss Claim Procedures, as well as the Crypto Loss Claim Bar Date, and such bar date and procedures will only become binding once approved by the Court after notice and a hearing.   *See* Plan § 5.7.   As described above, the Crypto Loss Claim Procedures will outline the process and timeline for administering and determining the allowed claims for each holder of a Crypto Loss Claim.   The Crypto Loss Claim Procedures Motion will include: (a) a notice of the Crypto Loss Claim Procedures and an opportunity to object thereto; (b) notice of the hearing to consider approval of the Crypto Loss Claim Procedures, if

necessary; (c) the deadline to file Crypto Loss Claims; (d) instructions for submitting a Crypto

Loss Claim; (e) a modified proof of claim form specifically as to Crypto Loss Claims; and (f) a

notice for holders of Crypto Loss Claims to "opt in" to being a Contributing Claimant (as defined

in the Plan).  Therefore, once a motion seeking approval of the Crypto Loss Claim Procedures is

filed, any holder of a Crypto Loss Claim will have the opportunity to object and be heard by the

Court, including on the bases the Objectors note above.  While such procedures are typically

addressed in connection with plan confirmation, case law supports that the Bankruptcy Court may

address the Crypto Loss Claim Procedures Motion after the Plan is confirmed.  *See Schaefer v.*

*Superior Offshore Int'l, Inc.* (*In re Superior Offshore Int'l, Inc.*), 591 F.3d 350, 353 n.3 (5th Cir.

2009) (upholding the confirmation of a plan that provided for the establishment of procedures

regarding the distribution to certain classes to occur following confirmation).

198.    Importantly, the Plan does not limit or dictate what factors the Plan

Administrator may consider in developing the Crypto Loss Claim Procedures.  Accordingly, the

Plan Administrator may, for example, take into account the very issues the Objectors raised in

their Objections, such as the nature of UST as a stablecoin, the expectations of investors, and the

reliance on certain public representations, among other things, in determining whether certain

Crypto Loss Claims should receive higher recoveries than other Crypto Loss Claims.

199.    Moreover, as unsecured claims of the same basic nature

(litigation/tort/securities claims), all Crypto Loss Claims, whether UST holders, Luna holders,

small claim holders, or institutional investors, are substantially similar in nature to one another.

Accordingly, under the Plan, all Crypto Loss Claims are properly classified together in Class 5.

11 U.S.C. § 1122(a) ("[A] plan may place a claim or an interest in a particular class only if such

claim or interest is substantially similar to the other claims or interests of such class.").

200.    As a single class of claims, the Plan must provide the same treatment for each Crypto Loss Claim, unless the holder of a particular claim agrees to a less favorable treatment of such particular claim.  11 U.S.C. § 1123(a)(4).  Any arguments seeking to provide better treatment to non-institutional investors differently than institutional investors within Class 5 would violate section 1123(a)(4) of the Bankruptcy Code. *See*, *e.g.*, *In re Washington Mut., Inc.*, 442 B.R. 314, 360-61 (Bankr. D. Del. 2011) (holding that plan violated section 1123(a)(4) where creditor did not meet the minimum threshold necessary to participate in rights offering to purchase stock in the reorganized debtor and thereby received less than other creditors in the same class).

201.    Nevertheless, Crypto Loss Claims are inherently difficult to value, and the flexible nature of the Crypto Loss Procedures permits the Plan Administrator to propose to allow claims in different amounts taking into account certain factors relating to the claims, including potentially those the Objectors raised.  In this way, the Crypto Loss Claim Procedures are akin to the trust distribution procedures found in many mass tort cases, which take into account different factors in setting procedures for the allowance of claims.  For example, in the "PSAN PI/WD Trust Distribution Procedures" implemented in the Takata chapter 11 case valued claims differently depending on, among other things, the type of injury the claimant suffered.  *See In re TK Holdings Inc.*, Case No. 17-11375 (BLS) (Bankr. D. Del. 2017) (Docket No. 2505-2).

202.    Certain Objecting Parties reference a handful of cases for the general assertions that the Bankruptcy Court should prioritize recoveries for investors holding small claims or who were misled by fraudulent misrepresentations.  The Debtors do not entirely agree with the Objecting Parties' characterization of all these cases.  More importantly, each case was decided on a different set of facts and circumstances than those in these Chapter 11 Cases.  In general, the classification and treatment of claims in the cited cases were the product of negotiations among the stakeholders in those cases.  The Bankruptcy Court is not obligated to follow here what was

negotiated among completely different parties in cases with completely different facts and circumstances.  However, as stated above, the Plan Administrator may consider the arguments and reasoning set forth in these cases when developing the Crypto Loss Claim Procedures.

203.    In sum, as noted above, the relative recovery to holders of Crypto Loss Claims will be subject to the Crypto Loss Claim Procedures, which will be determined later, with the opportunity for all affected parties in interest to be heard.  However, for purposes of Plan Confirmation, the Objecting Parties' arguments regarding claims allowance and distribution procedures for Crypto Loss Claims in Class 5 should be overruled.

**D.    Class 3 Claims (Beltran Allowed Secured Claims) Are Secured Claims Entitled To Priority Treatment Ahead of Unsecured Claims.**

204.    Certain Objecting Parties object to the Plan on the basis that holders of Class 3 claims should not receive priority treatment ahead of holders of Class 5 claims.  *See* Objections filed at Docket Nos. 675, 678 and 689.  These Objections should be overruled because holders of Class 3 claims are secured claims based on their interest in the Beltran Escrow Deposit.  11 U.S.C. § 506(a).[72]  Accordingly, Class 3 claims cannot be classified together with unsecured claims, such as those in Class 4 and Class 5.  11 U.S.C. § 1122(a) ("[A] plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.").

205.    As outlined herein, pursuant to Section 1.16 of the Plan, holders of Class 3 claims (Beltran Allowed Secured Claims) are secured creditors.  As described in the Disclosure

---

[72]    Pursuant to section 506(a)(1):

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . .  is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim.

11 U.S.C. § 506(a)(1).

Statement, prior to the Petition Date, the Debtors deposited approximately $57 million into the Beltran Escrow Deposit in a connection with lifting the Mareva Injunction in the Beltran Action. Pursuant to Singapore law, the claims underlying the Beltran Action (*i.e.*, the Class 3 claims) are secured by the Beltran Escrow Deposit.  S*ee also Langlais v. Pennmont Benefit Servs., Inc.*, Case No. 11- 5275, 2014 WL 1327581, at *7 (E.D. Pa. Apr. 3, 2014) (holding that a supersedeas bond posted in a court's registry for the benefit of certain creditors prior to the commencement of a bankruptcy case was no longer "property of the estate" and ordering the release of such bond funds to those certain creditors).  As discussed above in paragraph 36, no parties objected to the Beltran Stipulated Order, wherein the Debtors stipulated and agreed that the holders of Class 3 claims) have a valid, enforceable, non-voidable, and perfected lien and security interest in the Beltran Escrow Deposit, to the extent of their allowed claim as determined by the Singapore High Court up to the amount of the Beltran Escrow Deposit.  *See* Beltran Stipulated Order ¶ 3; Plan § 1.16. Accordingly, the Beltran Stipulated Order is binding on all parties in interest and Class 3 claims are secured claims.

206.    Notwithstanding the foregoing, the Plan does not prevent the Plan Administrator from considering any number of factors in developing the Crypto Loss Claim Procedures relating to the unsecured portion of any Class 3 claims, to the extent such claims exceed their allocated portion of the Beltran Escrow Deposit.

207.    Accordingly, holders of Class 3 claims are therefore properly separately classified and treated differently than holders of Class 4 and Class 5 claims, and holders Class 3 claims have priority over such unsecured claims with respect to the Beltran Escrow Deposit.

III.    **Cause Exists to Waive Stay of the Proposed Confirmation Order**.

208.    The Debtors respectfully request that the Court direct that the Proposed Confirmation Order shall be effective immediately upon its entry, notwithstanding the 14-day stay

imposed by operation of Bankruptcy Rules 3020(e).  Bankruptcy Rule 3020(e) provides that: "[a]n order confirming a plan is stayed until the expiration of [fourteen] (14) days after the entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 3020(e).  Further, as the Advisory Committee notes to Bankruptcy Rule 3020(e) state, "the court may, in its discretion, order that Rule 3020(e) is not applicable so that the plan may be implemented and distributions made immediately."  Fed. R. Bankr. P. 3020(e), Adv. Comm. Notes, 1999 Amend.  Bankruptcy Rules 6004(h) and 6006(d) provide similar stays to orders authorizing the use, sale or lease of property (other than cash collateral) and orders authorizing a debtor to assign an executory contract or unexpired lease under section 365(f) of the Bankruptcy Code.  Each rule also permits modification of the imposed stay upon court order.

209.    The Debtors intend to seek to consummate the Plan as soon as possible after confirmation.  Each day the Debtors remain in chapter 11, they incur significant administrative and professional costs—expenses that are unnecessary in light of the support for the Plan.  Under the circumstances, it is appropriate for the Court to exercise its discretion to order that Bankruptcy Rules 3020(e), 6004, and 6006 are not applicable so as to permit the Debtors to consummate the Plan and commence the Plan's implementation without delay following the entry of the Proposed Confirmation Order.  Such relief is in the best interests of the Debtors' estates, creditors, and other parties in interest, and will not prejudice the rights of any of the Debtors' parties in interest.

210.    No party has objected to the waiver of the stay.  Accordingly, for the reasons set forth above, the Debtors have demonstrated that the Proposed Confirmation Order should be made effective immediately upon its entry, notwithstanding the 14-day stay imposed by operation of Bankruptcy Rules 3020(e).

**IV.**     <u>**Conclusion.**</u>

211.    Based upon the foregoing, the Plan complies with and satisfies all the requirements for confirmation set forth in section 1129 of the Bankruptcy Code and represents the culmination of extensive efforts on behalf of the Debtors, the Creditors' Committee, and the SEC to salvage the best possible outcome for the Debtors' creditors from a difficult situation.  The Objections should, therefore, be overruled, and the Plan should be confirmed.

Accordingly, the Debtors respectfully request entry of the Proposed Confirmation Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: September 17, 2024
        Wilmington, Delaware

/s/ Matthew P. Milana

**RICHARDS, LAYTON & FINGER, P.A.**
Paul N. Heath (No. 3704)
Zachary I. Shapiro (No. 5103)
Matthew P. Milana (No. 6681)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Email:      heath@rlf.com
            shapiro@rlf.com
            milana@rlf.com

-and-

**WEIL, GOTSHAL & MANGES LLP**
Ronit J. Berkovich (admitted *pro hac vice*)
Jessica Liou (admitted *pro hac vice*)
Clifford W. Carlson (admitted pro *hac vice*)
F. Gavin. Andrews (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Email: ronit.berkovich@weil.com
       jessica.liou@weil.com
       clifford.carlson@weil.com
       f.gavin.andrews@weil.com

*Attorneys for the Debtors*
*and Debtors in Possession*