IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------x
|                                                  |                                                      |
| In re                                            | Chapter 11                                           |
|                                                  | Case No. 24-10070 (BLS)                              |
| **TERRAFORM LABS PTE. LTD.,** *et al.*           | (Jointly Administered)                               |
|                                                  |                                                      |
| Debtors.[1]                                      | Re: D.I. 904                                         |
|                                                  | Hearing Date: February 26, 2025 at 11:00 a.m. (ET)   |

---------------------------------------------------x

**SINGAPORE ACTION CLAIMANTS' LIMITED OBJECTION TO THE
MOTION OF THE PLAN ADMINISTRATOR SEEKING ENTRY OF AN ORDER
(I) SETTING THE BAR DATE FOR FILING PROOFS OF CLAIM ON ACCOUNT
OF CRYPTO LOSS CLAIMS, (II) APPROVING THE FORM OF AND MANNER FOR
FILING PROOFS OF CLAIM, (III) APPROVING THE FORM AND MANNER OF
NOTICE THEREOF, AND (IV) APPROVING RELATED PROCEDURES**

Julian Moreno Beltran, on behalf of himself and the other claimants (collectively, the "Claimants") in the action against, among other parties, Terraform Labs Pte. Ltd. ("TFL") in the Singapore International Commercial Court, which litigation is captioned Case No. SIC/OA 3/2024 (the "Singapore Action"), by and through his undersigned counsel, hereby files this limited objection (the "Objection") to the *Motion of the Plan Administrator Seeking Entry of an Order (I) Setting the Bar Date for Filing Proofs of Claim on Account of Crypto Loss Claims, (II) Approving the Form of and Manner for Filing Proofs of Claim, (III) Approving the Form and Manner of Notice Thereof, and (IV) Approving Related Procedures* (D.I. 904, the "Motion"),[2] and respectfully states as follows:

---

1. The Post-Effective Date Debtors in these chapter 11 cases are: Terraform Labs Pte. Ltd. and Terraform Labs Limited. The Post-Effective Date Debtors' principal offices are located at 10 Anson Road, #10-10 International Plaza, Singapore 079903. The Plan Administrator of the Post-Effective Date Debtors is Todd R. Snyder. The Plan Administrator's principal office is located at 1251 Avenue of the Americas, New York, New York 10020.

2. Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion.

1

**PRELIMINARY STATEMENT**

1.  Through the Motion, the Plan Administrator seeks to subvert the procedural and substantive safeguards established for the claim objection process in the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules by seeking to unilaterally disallow entire categories of Crypto Loss Claims through what is otherwise a routine bar date motion. The Claimants do not object to the setting of a bar date for Crypto Loss Claims, but object to the Motion to the extent that it purports to determine which Crypto Loss Claims are eligible to recover from the TFL estate.

2.  The Plan Administrator acknowledges that almost all holders of Crypto Loss Claims are "unknown creditors" (Mot. ¶ 42), and therefore could not have received notice of the Motion and proposed CLC Procedures. Without affording notice and due process to holders of Crypto Loss Claims, the CLC Procedures purport to define "eligible" Crypto Loss Claims as a subset of all Crypto Loss Claims (a term defined in the Plan). By doing so, the proposed CLC Procedures would disallow a significant portion of Crypto Loss Claims without affording holders of such Crypto Loss Claims any of the notice and due process protections afforded to claimants through the established claim objection process mandated by Section 502(a) of the Bankruptcy Code and Bankruptcy Rule 3007.

3.  One of the proposed eligibility criteria set forth in the CLC Procedures—the appropriate "cutoff" date and time for determining whether a claimant reasonably relied on TFL's misstatements in purchasing currency—is a hotly contested and fact-intensive question. Indeed, it is a question that the Plan Administrator is currently litigating in the Singapore Action against the Claimants. Rather than permit holders of Crypto Loss Claims to litigate this significant issue one-on-one through claim objections, the Plan Administrator seeks to impose an arbitrary and unsupported cutoff date for all Crypto Loss Claims *before any Crypto Loss Claims have even been filed*. The proposed cutoff date—more than 20 months prior to the Petition Date—is based on the

moment of a single ambiguous social media post and is not supported by the facts or law relied on by the Plan Administrator. The appropriate time and procedural posture to litigate the question of whether a holder of a Crypto Loss Claim reasonably relied on TFL's misstatements is through a contested matter *after* holders of Crypto Loss Claims have filed their proofs of claim—which are entitled to *prima facie* validity—and an objection to such claim has been filed in accordance with Bankruptcy Rule 3007.

4. Determination of the methodology for calculating Crypto Loss Claims is likewise premature and the procedure proposed by the Plan Administrator is flawed. The CLC Procedures propose to reduce "Eligible Crypto Loss Claims" by the value of the interest that holders of Crypto Loss Claims earned by staking their tokens on the Anchor Protocol, which is inconsistent with the treatment of such claims under applicable law.

5. Pursuant to the Plan and the Amended Stipulation (defined below), the Claimants will recover first from the Singapore Escrow (defined below) for the claims asserted in the Singapore Action. The Claimants file this Objection to protect their right to recover from TFL's bankruptcy estate to the extent that the Singapore Escrow is insufficient to satisfy their claims. For the avoidance of doubt, the procedure for determining an Eligible Crypto Loss Claim in these chapter 11 cases shall have no preclusive, *res judicata*, judicial estoppel, or similar effect on the claims in the Singapore Action. The Plan Administrator does not argue otherwise; nor could he.

**RELEVANT BACKGROUND**

6. On September 7, 2022, the Claimants—370 individuals who purchased Terra USD ("UST")—filed the Singapore Action as a representative action against various parties including TFL, Kwon Do Hyeong, and Luna Foundation Guard Ltd. in the High Court of the Republic of Singapore. The Claimants allege they were misled into purchasing UST and staking it on the Anchor Protocol based on representations on TFL's website, and that as a result, they suffered

damages exceeding $57 million. As required by order of the Singapore Court, prior to the Petition Date, TFL placed $57 million of fiat currency in a Singapore escrow account (the "Singapore Escrow"), pending the outcome of the Singapore Action.

7. On May 22, 2024, TFL and the Claimants entered into a stipulation (the "Original Stipulation") where, subject to this Court's approval, the parties agreed to a modification of the automatic stay pursuant to Section 362 of the Bankruptcy Code to allow the parties to proceed with the Singapore Action on the terms set forth therein. TFL filed a motion seeking the Court's approval of the Original Stipulation (D.I. 344), and on July 24, 2024, the United States Trustee filed an objection to that motion (D.I. 499). Following a hearing on August 7, 2024 pursuant to which the motion was approved subject to certain modifications, on September 4, 2024, this Court entered the *Order Approving Amended Stipulation Between Debtors and Singapore Action Claimants Regarding Relief from the Automatic Stay* (D.I. 661) (the "Amended Stipulation"). Pursuant to the Amended Stipulation, the Claimants are entitled to recover against the Singapore Escrow following entry of a Final Order in the Singapore Action or the full and final settlement of the Singapore Action. (Amended Stipulation ¶ 5.) The Claimants are entitled to submit a claim in these chapter 11 cases for any outstanding amounts due by TFL following application of the Singapore Escrow. (*Id*. ¶ 6.)

8. Likewise, pursuant to the Plan, "any portion of any Allowed Claim asserted against TFL in the Beltran Action that exceeds its allocated portion of the Beltran Escrow Deposit shall be treated as an Allowed Crypto Loss Claim." (Plan § 1.16.) To the extent that claims arising out of the Beltran Action are not Beltran Allowed Secured Claims, they are Crypto Loss Claims.

9. In the Plan, Crypto Loss Claims are defined broadly to include:

> [A]ny Claim asserted against the Debtors arising from (a) the purchase, sale, or rescission of the purchase or sale of Cryptocurrency, including

4

> (i) Terra Crypto, (ii) any wrapped or bridged version on any blockchain of any Terra Crypto, (iii) any staked or bonded Terra Crypto on any blockchain, (iv) any Terra Crypto on any centralized or decentralized liquidity, lending, or borrowing application or protocol on any blockchain, (v) any receipt or derivative of any Terra Crypto on any blockchain, (vi) any derivatives trading or perpetual swaps of Terra Crypto, or any other Cryptocurrency that derives a value from Terra Crypto, and (vii) any other Cryptocurrency that was transacted or made available on the TerraLunaClassic and TerraLuna blockchains, and (b) any reimbursement or contribution claims allowed under section 502 of the Bankruptcy Code on account of such claims.

(*Id*. § 1.38.) The definition of Crypto Loss Claims in the Plan does not limit claims based on the date of the purchase or sale of Cryptocurrency.

10. The General Bar Date Order did not establish any bar date with respect to Crypto Loss Claims. (*Id*. § 5.7.) The Plan provides that the Plan Administrator shall file a Crypto Loss Claim Procedures Motion seeking approval of the Crypto Loss Claim Procedures. (*Id*.) "Crypto Loss Claim Procedures" are defined as:

> [P]rocedures pursuant to which (i) holders of Crypto Loss Claims may assert such Claims, and (ii) the Plan Administrator will establish a general process and timeline, in accordance with the Wind Down Trust Agreement, for administering and determining the Allowed Claim for each holder of a Crypto Loss Claim, through the filing of the Crypto Loss Claim Procedures Motion and subject to Bankruptcy Court approval, which procedures shall include: (A) notice of the Crypto Loss Claim Procedures and an opportunity to object thereto; (B) notice of the hearing to consider approval of the Crypto Loss Claim Procedures, if necessary; (C) the deadline to file Crypto Loss Claims; (D) instructions for submitting a Crypto Loss Claim; (E) a modified Proof of Claim form specifically as to Crypto Loss Claims; and (F) a notice for holders of Crypto Loss Claims to "opt in" to being a Contributing Claimant.

(*Id*. § 1.41.) The Plan does not define Crypto Loss Claim Procedures to include determinations or limitations on the scope of Crypto Loss Claims.

11. The Motion exceeds the scope of the Crypto Loss Claim Procedures in the Plan by pre-determining what constitutes an "Eligible Crypto Loss Claim" in several ways. (Mot. ¶¶ 13,

16.) Most notably, the Crypto Loss Claim Procedures proposed by the Plan Administrator would (i) limit Crypto Loss Claims to losses suffered as a result of purchases or investments made prior to May 13, 2022, or the "Second De-Peg" that occurred more than twenty months before the Petition Date and (ii) reduce Crypto Loss Claims by the value received by holders of Crypto Loss Claims, including interest earned by staking their UST on the Terra ecosystem.

## ARGUMENT

### I.    The Motion Is Not a Proper Forum to Determine Crypto Loss Claims.

12.    Approval of the Plan Administrator's requested relief would upset the careful balance between the interests of debtors and creditors in the statutory claim objection process. Instead of permitting all holders of Crypto Loss Claims to file proofs of claim based on the entirety of their Crypto Loss Claims and resolving any objections to such claims through a properly filed claim objection, the Plan Administrator seeks to unilaterally predetermine what constitutes an "eligible claim" through what is otherwise a routine bar date motion served on only a subset of affected claimants. The CLC Procedures should not be approved.

### A. Holders of Crypto Loss Claims Have Not Received Notice of the Motion.

13.    Holders of Crypto Loss Claims were not provided notice of the Motion that seeks to significantly limit the scope of compensable Crypto Loss Claims. The Plan Administrator concedes in the Motion that "almost all of [the holders of Crypto Loss Claims] are unknown creditors." (Mot. ¶ 42.) Accordingly, the Plan Administrator provided notice of the Motion only to those holders of Crypto Loss Claims who filed a Preliminary Crypto Loss Proof of Claim in connection with the *voluntary* bar date established for such claims solely for purposes of voting on the Plan. While the Plan Administrator intends to provide publication notice of the proposed Bar Date in a manner designed to provide notice to unknown holders of Crypto Loss Claims, no attempt was made to provide *any* notice to unknown creditors of the Motion that purports to

disallow a portion of Crypto Loss Claims. Holders of Crypto Loss Claims cannot be bound to substantive limitations of Crypto Loss Claims for which they were not provided notice.

**B. The CLC Procedures Would Disallow Crypto Loss Claims Without Due Process.**

14. Even if holders of Crypto Loss Claims were provided notice of the Motion, the relief requested would still be impermissible and effect an end-run around the claim objection process.

15. Pursuant to the Plan, holders of Crypto Loss Claims are not required to file a proof of claim until the separate Crypto Loss Claim Bar Date is established. (Plan § 1.39.) The Motion seeks to establish such a bar date. Bankruptcy Rule 3001(f) provides that the proof of claim "constitute[s] prima facie evidence of the validity and amount of the claim." Fed. R. Bankr. P. 3001(f); *see In re Lampe*, 665 F. 3d 506, 514 (3d Cir. 2011). Following the timely filing of a proof of claim, Section 502(a) of the Bankruptcy Code provides that the proof of claim "is deemed allowed, unless a party in interest . . . objects." 11 U.S.C. § 502(a). Bankruptcy Rule 3007 implements that statutory framework by requiring that an objection to a proof of claim be filed and served on the creditor at least 30 days before the hearing on the objection.[3] Fed. R. Bankr. P. 3007. The claim objection process is a "contested matter," which provides parties with the opportunity to conduct discovery consistent with the procedures incorporated in the Bankruptcy Rules. *See* Fed. R. Bankr. P. 9014(c).

16. The Plan Administrator cannot circumvent the claim objection process in Rule 3007 through the Motion. "[A]n objection under Rule 3007 is required in order to change the amount of a claim, over a creditor's objection in a chapter 11 case." *See, e.g., Varela v. Dynamic Brokers,*

---

3. Parties were provided only 19 days to respond to the Motion, and the Plan Administrator denied the Claimants' request for a modest extension of the deadline by two days.

*Inc. (In re Dynamic Brokers, Inc.)*, 293 B.R. 489, 496 (B.A.P. 9th Cir. 2003). In *Varela*, the Ninth Circuit Appellate Panel noted that deviating from the Rule 3007 requirements for a claim objection "presents troubling policy issues in the face of rules of procedure that appear to require formal objections to claims." *Id*. at 497. The court explained that because "[t]he construct of the statute and rules that is held out to the public is that claims are deemed allowed unless there is an objection in accordance with rules that prescribe a precise procedure for objecting," it would be a "material disservice to public confidence in the integrity of the bankruptcy system" if a debtor could "sandbag" a creditor by "sneaking an objection" into a separate process. *Id*. at 497. Instead, "considerations of due process mandate great caution and require that the creditor receive specific notice . . . of at least the quality of specificity, and be afforded the same opportunity to litigate one-on-one, as would be provided with a straightforward claim objection under Rule 3007." *Id*. Here, unknown holders of Crypto Loss Claims did not receive notice at all regarding the proposed CLC Procedures, much less notice of the kind required in Rule 3007 and Local Rule 3007-1.

17. The Claimants recognize the Plan Administrator's desire to "streamline" the claims process and produce a less costly process. (Mot. ¶ 19.) However, the proper way to do so is through this Court's streamlined omnibus objection procedures set forth in Local Rule 3007-1. These detailed procedures permit the Plan Administrator to object to up to 100 claims filed by different claimants, and, significantly, provide claimants an opportunity to respond to such omnibus claim objections. The Plan Administrator has not and cannot provide any basis to deviate from these rules.

**C. The Plan Does Not Support the Plan Administrator's Proposed CLC Procedures.**

18. The Plan Administrator's reliance on Section 5.7 of the Plan to support imposing the CLC Procedures on the holders of Crypto Loss Claims is misplaced. Section 5.7 of the Plan authorizes the Plan Administrator to seek authorization of the "process and procedures that the

Plan Administrator will use to determine whether a Crypto Loss Claim should be Allowed or Disallowed." (Plan § 5.7.) The Plan does *not* authorize the Plan Administrator to substantively disallow certain Crypto Loss Claims without any due process. The Plan instead contemplates that Disputed Claims (as defined in the Plan) will be resolved pursuant to the customary claim objection process. (*See* Plan § 7.1 (the Plan Administrator "shall be entitled to object to Claims"); *see also* Plan § 7.3 (authorizing the Plan Administrator to "file, withdraw, or litigate to judgment, objections to Claims"); Plan § 11.1(p) (Bankruptcy Court retains jurisdiction to "resolve disputes concerning Disputed Claims or the administration thereof").)

19. Even if the Plan did purport to allow the Plan Administrator to unilaterally disallow Crypto Loss Claims (it did not), such a provision would not be enforceable. *See In re Jankins*, 184 B.R. 488, 493 (Bankr. E.D. Va. 1995) (holding that chapter 11 plan provision requiring refiling of claims is not enforceable because "[w]hile the debtor has broad latitude in drafting a chapter 11 plan, the plan may include only provisions 'not inconsistent with the applicable provisions of this title.'"); *see also Varela*, 293 B.R. at 497 (holding that chapter 11 plan provision could not trump requirements of the claim objection process in Rule 3007).

## II. The Plan Administrator's Proposed Guardrails on Crypto Loss Claims Are Improper.

20. Even if it was appropriate to make determinations regarding allowability of and calculation of claims through a routine bar date motion (it is not), the procedures proposed by the Plan Administrator should not be approved. Determining reasonable reliance is a fact-intensive inquiry, and the Plan Administrator's proposal to make that determination on the basis of a single ambiguous tweet is not supported by the facts or the law. Likewise, the proposed calculation methodology improperly reduces Crypto Loss Claims in a manner that is inconsistent with applicable law.

### A. Determining Reasonable Reliance Is a Fact-Intensive Inquiry.

21.     The determination of the proper cut-off date for reasonable reliance on TFL's statements is hotly contested and is being actively litigated by the Plan Administrator in the Singapore Action. As the Plan Administrator acknowledges, "the determination of reasonableness is made on a case-by-case basis, considering all of the circumstances" (Mot. ¶ 13 n.11) (citing *In re Daimlerchrysler AG Secs. Litig.*, 294 F. Supp. 2d 616, 620 (D. Del. 2003) (quoting *AES Corp. v. The Dow Chemical Co.*, 325 F.3d 174, 179 (3d Cir. 2003)).[4] There are numerous factors a court may consider in such an analysis, such as: "(1) the existence of a fiduciary relationship; (2) the plaintiff's opportunity to detect the fraud; (3) the sophistication of the plaintiff; (4) the existence of a longstanding business or personal relationship; and (5) the plaintiff's access to the relevant information." *Daimlerchrysler AG Secs. Litig.*, 294 F. Supp. 2d at 620 (internal citation omitted). Further, the Third Circuit has recognized that "the absence of reasonable reliance 'is in the nature of an affirmative defense,' and therefore, the defendant bears the burden of establishing that the plaintiff's reliance was unreasonable." *Id.* at 620–21 (quoting *Straub v. Vaisman & Co.*, 540 F.2d 591, 598 (3d Cir. 1976)).

22.     The reliance element for each Crypto Loss Claimant is thus a fact-intensive inquiry that must consider the unique circumstances of each holder of a Crypto Loss Claim, for which the Plan Administrator bears the ultimate burden. The use of a fixed date, purportedly based on the Plan Administrator's unilateral "business judgment" (Mot. ¶ 14), to determine this element for all claimants is arbitrary and improper. Indeed, the Plan Administrator recognizes that the cutoff date

---

4.  The Claimants do not concede that Third Circuit law is applicable to the Claimants' claims. As the Plan Administrator relies on Third Circuit law in the Motion, the Claimants refer to such law merely to show that the determination of the proper cutoff date for reasonable reliance is a fact-intensive analysis that must be performed on a case-by-case basis, rather than a perfunctory determination that can be resolved through a procedures motion.

may be different for each claimant. Notably, while seeking to establish a universal cutoff date which would disallow all Crypto Loss Claims resulting from purchases made after the Second De-Peg, the Plan Administrator also reserves for himself the right to test the reliance of individual claimants for claims made for purchases before the Second De-Peg. (Mot. ¶ 15 (reserving the right to "review and inquire as to any claimant's reasonable reliance on representations by the Debtors").)

### B. The Selection of May 13, 2022 as the Cutoff Date Is Unreasonable.

23. The Plan Administrator's selection of May 13, 2022 at 6:15 p.m. (prevailing Eastern Time) as the appropriate "cutoff" date and time is unreasonable. Although the Plan Administrator has claimed that "investors knew or should have known of the collapse of UST and the Terra ecosystem" by this point in time and that any purchaser of Eligible Loss Cryptocurrency did so "'on notice' of the failed algorithm" after that date (*id.*), this is not borne out by the facts.

24. On May 9 and 10, 2022, Mr. Kwon posted a series of tweets that TFL and/or the Luna Foundation Guard would be deploying more capital and that he was close to announcing a recovery plan for UST.[5] On May 11, 2022, Mr. Kwon tweeted that "Terra's return to form will be a sight to behold. We're here to stay. And we're gonna keep making noise."[6] Mr. Kwon's tweets clearly represented to the public, including to the holders of Crypto Loss Claims, that with the rescue plan that TFL was coming up with, UST could be restored to its $1 pegged value, and that

---

5. *See* Do Kwon (@stablekwon), X (May 9, 2022, 2:36 PM ET), https://x.com/stablekwon/status/1523733542492016640 ("Deploying more capital – steady lads."); Do Kwon (@stablekwon), X (May 10, 2022, at 11:32 AM ET), https://x.com/stablekwon/status/1524049689510694916 ("Close to announcing a recovery plan for $UST.  Hang tight."); Do Kwon (@stablekwon), X (May 10, 2022, 7:09 PM ET), https://x.com/stablekwon/status/1524164780189126657 ("Getting close … stay strong, lunatics"). For convenience, screenshots of all referenced tweets are included as **Exhibit A** hereto.

6. Do Kwon (@stablekwon), X (May 11, 2022, 6:10 AM ET), https://x.com/stablekwon/status/1524331171189956609.

the Terra ecosystem would continue to remain viable.  The Plan Administrator has conceded that during this time, "there was still a realistic possibility that the algorithm underlying UST's pegging could work to restore UST to its $1 pegged value."  (Mot. ¶ 14.)

25.     To support his proposed cutoff date, the Plan Administrator is relying on a single tweet from Mr. Kwon on May 13, 2022, in which Mr. Kwon stated that he still believed "that decentralized economies deserve decentralized money – but it is clear that $UST in its current form will not be that money," as evidence that the investors would have known by that point in time of the collapse of UST and the Terra ecosystem.  (Mot. ¶¶ 14, 15.)  However, the tweet that the Plan Administrator relied on did not state that Mr. Kwon believed that UST and/or the Terra ecosystem had collapsed, or that UST would not be restored to its $1 pegged value.  To the contrary, the tweet simply stated that Mr. Kwon no longer believed that UST could serve as a decentralized currency for decentralized economies.  Seen in the context of Mr. Kwon's earlier tweets, made less than two days earlier, about the potential for UST to be restored to its $1 pegged value, it is not reasonable for the Plan Administrator to rely on this single tweet to presume that those who had purchased Eligible Loss Cryptocurrency after that date do not satisfy the requirements for reasonable reliance on the TFL's misrepresentations, and/or made their purchases "on notice" of the failed algorithm.  (Mot. ¶ 15.)

26.     Furthermore, even *after* Mr. Kwon's May 15, 2022 tweet, Mr. Kwon continued to represent to the public, including holders of Crypto Loss Claims, that the Terra ecosystem would continue to remain viable and that holders of UST would be compensated.  On May 16, 2022 at 12:48 p.m. (prevailing Eastern time), Mr. Kwon tweeted that "Terra is more than $UST," and

12

followed up with a chain of tweets about the next steps for the Terra ecosystem.[7] Among other things, Mr. Kwon tweeted that the Terra chain would be "forked" into two co-existing chains, and that new $LUNA tokens would be airdropped to "residual UST holders" (among others). Mr. Kwon claimed that "this token distribution, in addition to best efforts by LFG to make $UST holders whole, best solves for the varying interests and time preferences for each stakeholder group, and most important, creates the most viable path to revive the Terra ecosystem."[8] Thus, it is incorrect for the Plan Administrator to arbitrarily and universally hold that claimants who purchased UST after May 13, 2022 knew or should have known of the collapse of the Terra ecosystem. The Claimants are prepared to provide further legal and factual support regarding their reasonable reliance on TFL's statements in connection with the Singapore Action and, if necessary, as part of a contested matter regarding the determination of Crypto Loss Claims in these chapter 11 cases.

### C. The Plan Administrator's Proposed Methodology for Determining the "Crypto Loss Amount" Is Also Flawed.

27. The Plan Administrator's proposed methodology for determining the "Crypto Loss Amount"—proposed without notice to holders of Crypto Loss Claims—is also improper and inconsistent with applicable law.

28. The Plan Administrator seeks to reduce each Crypto Loss Claim by "the value received after the claimant's Eligible Loss Cryptocurrency was acquired and prior to the Petition Date." (Mot. ¶ 16(c).) This would improperly reduce each Eligible Crypto Loss Claim by the

---

7. Do Kwon (@stablekwon), X (May 16, 2022, 1:48 PM ET), https://x.com/stablekwon/status/1526258273820651520.

8. Do Kwon (@stablekwon), X (May 16, 2022, 1:48 PM ET), https://x.com/stablekwon/status/1526258286751731714.

value of the interest that claimants earned by staking their tokens on the Anchor Protocol.[9]  This would effectively deduct from Crypto Loss Claims all *pre-petition* interest earned based on their decision to hold onto the UST after purchase (as opposed to selling, transferring, or otherwise investing the tokens) and to stake the tokens on the Anchor Protocol in the Terra ecosystem.  Under applicable law, Crypto Loss Claims should not be reduced by the value of such earned interest.

### **RESERVATION OF RIGHTS**

29.     Nothing in this Objection is intended or should be construed as (a) an admission as to the validity of any assertion by the Plan Administrator in the Motion, (b) a waiver of the Claimants' rights to dispute any objection to a Crypto Loss Claim on any grounds, or (c) a waiver of any of the Claimants' rights, objections, defenses, arguments, interests, or claims in the chapter 11 cases or the Singapore Action, including, but not limited to, those in connection with the Amended Stipulation.  The Claimants expressly reserve the right to supplement, modify, and amend this Objection at any time, including at the hearing to consider the Motion.

---

9.  The Anchor Protocol is a lending and borrowing platform on the Terra ecosystem where users can "stake" their UST in consideration for promised returns calculated on an annualized yield basis.  This is akin to placing deposits in a bank to earn interest.

**CONCLUSION**

30. For the foregoing reasons, this Court should deny the Motion with respect to the CLC Procedures to the extent that they seek to determine eligibility or calculation of any Crypto Loss Claim.

Dated: February 19, 2025  
       Wilmington, Delaware

Respectfully Submitted,

*/s/ Katherine Good*
L. Katherine Good (No. 5101)
**POTTER ANDERSON & CORROON LLP**
1313 N. Market Street, 6th Floor
Wilmington, Delaware 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192
Email: kgood@potteranderson.com

-and-

**HUGHES HUBBARD & REED LLP**
Amina Hassan
Erin E. Diers
One Battery Park Plaza
New York, New York 10004
Telephone:    (212) 837-6000
Facsimile:     (212) 422-4726
Email: amina.hassan@hugheshubbard.com
       erin.diers@hugheshubbard.com

*Attorneys for the Claimants*