**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| TERRAFORM LABS PTE. LTD., *et al.*,[1] | ) Case No. 24-10070 (BLS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**REPLY OF THE
PLAN ADMINISTRATOR IN
SUPPORT OF THE CRYPTO LOSS CLAIMS
MOTION AND IN RESPONSE TO RELATED OBJECTIONS**

The Terraform Plan Administrator (the "Plan Administrator") of the jointly-administered estates of Terraform Labs Pte. Ltd., *et al.* (collectively, the "Post-Effective Date Debtors" and, prior to the Effective Date, the "Debtors") submits this reply (the "Reply") in support of the *Motion of the Plan Administrator Seeking Entry of an Order (I) Setting the Bar Date for Filing Proofs of Claim on Account of Crypto Loss Claims, (II) Approving the Form and Manner for Filing Proofs of Claim, (III) Approving Form and Manner of Notice Thereof, and (IV) Approving Related Procedures* [Docket No. 904] (the "CLC Procedures Motion")[2] and in response to the Objections,[3] and submits as follows:

---

[1] The Post-Effective Date Debtors in these chapter 11 cases are: Terraform Labs Pte. Ltd. and Terraform Labs Limited. The Post-Effective Date Debtors' principal offices are located at 10 Anson Road, #10-10 International Plaza, Singapore 079903. The Plan Administrator of the Post-Effective Date Debtors is Todd R. Snyder. The Plan Administrator's principal office is located at 1251 Avenue of the Americas, New York, New York 10020.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the CLC Procedures Motion or the *Second Amended Chapter 11 Plan of Liquidation of Terraform Labs Pte. Ltd. and Terraform Labs Limited* [Docket No. 717] (the "Plan") or the CLC Procedures Motion, as applicable.

[3] As used herein, "Objections" means, collectively, the *Objection of the Foreign Representatives of Three Arrows Capital Ltd. (in Liquidation) to the Motion of the Plan Administrator Seeking Entry of an Order (I) Setting the Bar Date for Filing Proofs of Claim on Account of Crypto Loss Claims, (II) Approving the Form and Manner for Filing Proofs of Claim, (III) Approving the Form and Manner of Notice Thereof, and (IV) Approving Related Procedures* [Docket No. 928] (the "Three Arrows Objection") and the *Singapore Action Claimants' Limited Objection to the Motion of the Plan Administrator Seeking Entry of an Order (I) Setting the Bar Date for Filing Proofs of Claim on Account of Crypto Loss Claims, (II) Approving the Form and Manner for Filing Proofs of*

**Preliminary Statement**

1.      The Plan Administrator was appointed to "carry out and implement all provisions of the Plan."[4]  To fulfill these responsibilities, the Plan Administrator was granted the authority, and tasked with the responsibility, to establish the Crypto Loss Claim Procedures (the "CLC Procedures")[5] to facilitate an efficient claims process.  The Plan contemplates that the CLC Procedures will include substantive rules about validity and valuation of individual Crypto Loss Claims.  Specifically, the Plan requires "[t]he Crypto Loss Claim Procedures Motion [to] provide the process and procedures that the Plan Administrator will use ***to determine whether a Crypto Loss Claim should be allowed or disallowed, and, to the extent Allowed, the value of such Claim***."[6]  The Plan is also clear that the CLC Procedures, once approved by the Bankruptcy Court, will be "binding on all creditors."[7]

2.      The CLC Procedures carry out this mandate by including the methodology by which the Plan Administrator will evaluate the validity and value of claims.  Specifically, the CLC Procedures value Crypto Loss Claims by the actual amounts invested and lost by claimants in Eligible Loss Cryptocurrency, after offsetting for any gains the claimant had from other transactions involving Eligible Loss Cryptocurrency.  This valuation methodology aligns with how

---

*Claim, (III) Approving the Form and Manner of Notice Thereof, and (IV) Approving Related Procedures* [Docket No. 931] (the "Beltran Objection") (such objecting parties, collectively, the "Objectors", and each, an "Objector").

4    *See* Plan § 5.4.

5    *See* Plan § 1.41 (defining Crypto Loss Claims Procedures as, "the procedures pursuant to which (i) holders of the Crypto Loss Claims may assert such Claims, and (ii) the Plan Administrator will establish a general process and timeline, in accordance with the Wind Down Trust Agreement, for administering and determining the Allowed Claim for each holder of a Crypto Loss Claim, through the filing of Crypto Loss Claims Procedure Motion and subject to Bankruptcy Court approval . . . ").

6    *See* Plan § 5.7 (emphasis added).

7    *Id.*

securities law claims are valued and puts claimants on an equal footing with each other based on the money each claimant lost by investing in Eligible Loss Cryptocurrency. Alternative methodologies could provide value for market value at the time of the loss or consider consequential damages. The Plan Administrator determined to evaluate actual money lost as the most fair and equitable way to evaluate the claims under the circumstances. The Debtors' enterprise was entirely fraudulent, and as such, the inflated market values of the coins were not real. Accordingly, valuing claims as of these inflated values would not be fair and would overcompensate creditors who bought into the coins early. Given how difficult it is to value cryptocurrency assets (as recognized by the bankruptcy courts in *FTX* and *Celsius*), the CLC Procedures set forth a fair and equitable process that avoids protracted litigation regarding the values of cryptocurrency that the SEC Enforcement Action determined were fraudulent and violations of the securities laws.

3.      Despite receiving approximately 700 preliminary Crypto Loss Claims that were entitled to vote, the Plan Administrator received just two objections to the CLC Procedures. The Objectors, Three Arrows and the Singapore Action Claimants (the "Beltran Claimants"), are two parties who have sought to jump the line to advance their own recoveries at the expense of other claimants throughout these cases and the Objections are nothing more than specific arguments regarding each Objector's own Crypto Loss Claim.

4.      The Objectors raise similar concerns with the CLC Procedures in arguing that the CLC Procedures cannot alter their rights to pursue their Crypto Loss Claims. But, as explained above, the Plan actually requires that the CLC Procedures include "[t]he process and procedures that the Plan Administrator will use to determine whether a Crypto Loss Claim should be allowed or disallowed, and, to the extent Allowed, the value of such Claim," and that the Plan provides that

the CLC Procedures are binding on all creditors once approved by the Bankruptcy Court.[8]    The

Plan Administrator determined, with the consent of the Advisory Board, that the CLC Procedures

should evaluate claims based on the actual amounts invested and lost by claimants for purchases

prior to May 13, 2022, and should not allow compensatory damages for the reasons set forth in

more detail herein.    These components of the CLC Procedures are reasonable and should be

approved.

5.    Notwithstanding this clear authority in the Plan, after reviewing the Objections, the

Plan Administrator has revised the CLC Procedures to provide additional process for claimants

who disagree with his determinations regarding their individual Crypto Loss Claims.[9]    Those

changes are summarized as follows:

- The Plan Administrator will provide an Initial Determination of a Crypto Loss
  Claim to a claimant, who will have 30 days to affirmatively opt out of the amount
  that the Plan Administrator proposes for the claimant's Crypto Loss Amount.  If a
  claimant timely opts out, it will have the opportunity to provide additional argument
  or evidence to the Plan Administrator, who will review these additional materials
  (the "<u>Supplemental Evidence</u>").

- After the Plan Administrator reviews the Supplemental Evidence, he will provide
  a Final Determination of his view of the claimant's Crypto Loss Amount.  A
  creditor who seeks to object to this Final Determination will have to both
  (a) affirmatively opt out of the Final Determination within 30 days, <u>and</u> (b) file an
  objection to the Final Determination (a "<u>Final Determination Objection</u>") with the
  Bankruptcy Court within 90 days.

- At a hearing on a Final Determination Objection, the burden of proof shall be on
  the claimant to demonstrate why the claimant's Asserted Crypto Loss Claim
  Amount should overturn the Final Determination, which shall be entitled to the
  deference of the Plan Administrator's judgment and a presumption of validity.
  Moreover, the claimant can only present the evidence that was presented to the Plan
  Administrator in its original Crypto Loss Claim or the Supplemental Evidence (*i.e.*,
  the creditor cannot present any new evidence that was not presented to the Plan

---

[8]    *See Plan* § 5.7.

[9]    The Plan Administrator is submitting revised versions of the CLC Procedures and related documents
contemporaneously with this Reply.

Administrator prior to the Final Determination). The Court will resolve the objection and make a "Final Adjudication" on the claim.

- The Plan Administrator shall have the right to seek to offset the Plan Administrator's costs of a Final Adjudication against any distribution to be sent to a claimant if the claimant is unsuccessful in overturning the Final Determination.

6.     These revisions to the CLC Procedures are intended to be responsive to the Objections by allowing for additional process for claimants who wish to present their case for allowance to the Bankruptcy Court. At the same time, the CLC Procedures are an appropriate way to evaluate claims (and include the general rules for validity and valuation that are contemplated by the Plan), so any creditor that seeks to pursue overturning the Final Determination before the Bankruptcy Court must demonstrate reasons why its view of its Crypto Loss Claim Amount should overcome the deference to the Plan Administrator's judgment and the presumption of validity of the Final Determination. Moreover, the Plan Administrator reserves the right to seek attorneys' fees or costs for any such adjudication by the Bankruptcy Court. Such a provision is common in the mass tort context in bankruptcy; otherwise it is a "free option" for claimants to litigate their case, which will deplete the assets of the Wind Down Trust and reduce distributions to other creditors whose claims complied with the CLC Procedures.

7.     For the reasons set forth herein, the Plan Administrator respectfully submits that the revised CLC Procedures are appropriate and should be approved, and the Court should overrule the Objections.

## <u>Reply</u>

8.     The Objectors raise several arguments as to why the CLC Procedures should not be approved. Both Three Arrows and the Beltran Claimants assert that the CLC Procedures are improper under the Plan because the proposed procedures "modify" the plain language of the Plan and deprive claimants of due process. Both Objectors also argue that the substantive rules

proposed in the CLC Procedures are inappropriate—Three Arrows argues that the CLC Procedures impermissibly limit the scope of damages for Crypto Loss Claims, and the Beltran Claimants argue that the proposed cutoff date of May 13, 2022 for purchases of Eligible Loss Cryptocurrency is improper.  The Beltran Claimants also argue that the noticing process for the CLC Procedures was improper and that the Plan Administrator's methodology for valuing Crypto Loss Claims is inappropriate.  Each of these arguments fail for the reasons set forth herein.

I.      **The CLC Procedures Are Appropriate and Should Be Approved.**

      A.      **The Plan Contemplates and Authorizes Additional Requirements in the CLC Procedures.**

9.      Both Three Arrows and the Beltran Claimants assert that the CLC Procedures should be denied because they conflict with the Plan.  The opposite is true, and the CLC Procedures carry out the explicit intent of the Plan.

10.      The Plan delegates authority to the Plan Administrator to include in the Crypto Loss Claims Procedures Motion "the process and procedures that the Plan Administrator will use ***to determine whether a Crypto Loss Claim should be allowed or disallowed, and, to the extent Allowed, the value of such Claim***"[10]—a provision Three Arrows fails to even mention in its Objection.  The Plan also provides that the CLC Procedures will be "binding on all creditors" once approved by the Court.[11]  The Plan's definition of Crypto Loss Claims is broad, but it must be read in the context of the Plan as a whole, which provides for the Plan Administrator to impose limitations on the allowance and value of Crypto Loss Claims.  Ignoring the full context of the Plan, both Three Arrows and the Beltran Claimants argue that the Plan essentially requires that the

---

[10]    *Id.* §§ 1.41, 5.7 (emphasis added).

[11]    *Id.* § 5.7.

CLC Procedures allow all Crypto Loss Claims and can only impose a submission and deadline process on claimants. This argument fails because it ignores other key provisions of the Plan, which the Objectors do not even address.

11. Without the limitations proposed in the CLC Procedures, as directed in the Plan, the Crypto Loss Claims process would require a likely insurmountable heavy administrative burden to the Plan Administrator in determining the validity and value of claims. Such process could deplete the assets of the Wind Down Trust through the costs of litigating claims, which assets could be used instead for distributions to Allowed claims. For that reason, the CLC Procedures include clear rules about which cryptocurrency is eligible and how losses should be valued—only those that are on the Terra Ecosystem and only amounts creditors invested and lost as the result of the Debtors' fraud. These rules about validity and valuation are exactly what the Plan contemplates for the CLC Procedures.

### (i) The CLC Procedures are Not a Modification of the Plan.

12. Three Arrows' argument that the CLC Procedures modify the Plan is nothing more than an untimely objection to the Plan, the deadline for which has long passed. If Three Arrows believed that the Plan's treatment of Crypto Loss Claims was ambiguous or contained insufficient detail regarding recoveries, it should have objected to confirmation of the Plan or appealed the Confirmation Order on the basis that the Plan could not be confirmed without clarification as to the treatment of Crypto Loss Claims. It failed to do so.

13. Moreover, even if the proposed CLC Procedures modified the plain language of the Plan (which they do not), the appropriate remedy would be to alter the CLC Procedures, not resolicit the Plan. The plain language of section 1127(b) of the Bankruptcy Code only allows

modification of a plan *prior to substantial consummation of the plan*,[12] which courts have confirmed means that the inverse is also true—a reorganized debtor or plan proponent may not modify the plan after substantial consummation.[13]

### (ii) The CLC Procedures Do Not Infringe the Objectors' Due Process Rights.

14.    The Beltran Objection attempts to bolster its assertion that the Plan does not allow the proposed CLC Procedures by arguing that the CLC Procedures "would disallow Crypto Loss Claims without due process" because the CLC Procedures do not follow the requirements for an objection to a proof of claim.[14]   This argument is incorrect—the CLC Procedures and the limitations set forth therein do what the Plan directed the Plan Administrator to do,[15] and are in no way an attempt to sidestep claimants' due process rights.

15.    The Beltran Objection's general assertion that the CLC Procedures deprive the Beltran Claimants of their Crypto Loss Claims without due process mischaracterizes the intent of the CLC Procedures, which is to place the Beltran Claimants on equitable footing with all other holders of Crypto Loss Claims.   It is for this exact reason that the CLC Procedures require a "cutoff" to establish reasonable reliance, as is discussed more fully below.

---

[12]   11 U.S.C. § 1127(b) ("the proponent of a plan or the reorganized debtor may modify such plan at any time after confirmation of such plan and before substantial consummation of such plan . . . .").

[13]   *See In re NorthEast Gas Generation, LLC*, 639 B.R. 914, 922 (Bankr. D. Del. 2022) ("In addition, many of the Code cases dealing with this issue do not base their holdings on a finding that the change was material and adverse but on the fact that section 1127(b) is an absolute bar to modification after substantial consummation.") (citing *In re WBY, Inc.*, 2019 WL 3713686, at *10–11 (Bankr. N.D. Ga. Aug. 5, 2019) ("Regardless of the nature of the requested change, a plan cannot be modified once it has been substantially consummated.")); *In re Rickel & Assocs.*, 260 B.R. 673, 677 (Bankr. S.D.N.Y. 2001) ("Here, the parties agree that the plan has been substantially consummated.  Hence, the literal terms of § 1127(b) bar any effort to modify the Plan."); *see also In re JCP Properties, Ltd.*, 540 B.R. 596, 606 (Bankr. S.D. Tex. Nov. 2015).

[14]   Beltran Objection ¶ 15.

[15]   *See infra* ¶¶ 9–10.

16. Additionally, as discussed further below, in response to the Objections and in consultation with the SEC, the Plan Administrator has also revised the CLC Procedures to address certain of the Objectors' concerns. These revisions to the CLC Procedures provide the process that the Objectors are looking for—if, after the Plan Administrator issues a Final Determination, a claimant still disagrees with the Plan Administrator's Crypto Loss Amount, the claimant may object to the amount of its Allowed Crypto Loss Claim and have such amount adjudicated by this Court. Claimants will need to overcome the deference to the Plan Administrator's Final Determination but will have the opportunity to present their argument to the Court. This appropriately balances the need for the limitations set forth in the CLC Procedures with claimants' due process rights by allowing Claimants to argue the merits of their claim in court if the Plan Administrator cannot agree with the amount of their Crypto Loss Claim.

**B.     The Substantive Provisions of the CLC Procedures Are Appropriate.**

17. The Objectors also take issue with specific substantive rules set forth in the CLC Procedures. They do so without any compelling argument for why their unique claims should govern the entirety of the Crypto Loss Claims administration process.

**(i)  The Requirement that Eligible Loss Cryptocurrency Be Purchased Prior to May 13, 2022 is Appropriate.**

18. As set forth in the CLC Procedures Motion and reiterated in this Reply, the Crypto Loss Claims stem directly from the action brought by the SEC alleging violations of the Securities Act and the Exchange Act. The SEC Complaint asserted that from at least April 2018 through May 2022, the Debtors unlawfully offered and sold unregistered securities and securities-based swaps, as well as engaged in securities fraud.[16] The entire structure of the Plan, including the

---

[16]  *See* SEC Complaint ¶ 1.

treatment of Crypto Loss Claims in their own class, are a result of the SEC Enforcement Action and the SEC Settlement.  In fact, the inclusion of the relevant terms of the SEC Enforcement Motion in the Plan was a key reason the Unsecured Creditors' Committee encouraged creditors to vote to confirm the Plan.[17]

19.    The SEC Enforcement Action made clear how the Debtors' actions gave rise to the Crypto Loss Claims—the Debtors falsely represented to potential investors that Terraform had created a stablecoin which was able to maintain its price though an algorithm controlling the supply of tokens.[18]  The Debtors' representations about the functionality of this algorithmic stablecoin incentivized investors to purchase UST and engage with the Terra Ecosystem.[19]  This constitutes reasonable reliance under securities law—investors acted reasonably when relying on the Debtors' representations about the stablecoin when investing.  The fraudulent nature of the Debtors' enterprise came to light when their alleged algorithmic stablecoin de-pegged in May of 2022, as it became clear that the algorithmic stable coin did not function as it was held out to investors.[20]  May 13, 2022, is the most appropriate cutoff date for Crypto Loss Claims because it targets the moment at which investors could no longer reasonably rely on the Debtors' fraud.  Any harm

---

[17]   *See Disclosure Statement for Amended Chapter 11 Plan of Liquidation of Terraform labs Pte. Ltd. and Terraform Labs Limited* [Docket No. 569] (the "Disclosure Statement") Article I (detailing that one of the reasons the creditors' committee urges creditors to vote for the Plan is because the Plan embodies the SEC Settlement).

[18]   For a more in-depth discussion regarding the Terra Ecosystem *see* the *Declaration of Chris Amani in Support of the Debtor's Chapter 11 Petition and First Day Relief* [Docket No. 18] (the "First Day Declaration").

[19]   *See e.g.* SEC Complaint ¶¶ 32–33 (describing representations by the Debtors in April of 2019 regarding the functionality of the algorithm and the creation of a "stable coin")*; id*. at ¶ 50 (describing statements by the Debtors in April of 2021 stating that the value of Terra Cryptocurrency would increase as more investors engaged with the Terraform Ecosystem because of the Debtors' development and maintenance); *id*. at ¶ 118 (stating "[i]n particular, from at least mid-2019 through at least March 2022, the Defendants misled investors and prospective investors into believing that the Terraform blockchain was being used to process and settle real world purchases by retail consumers in Korea"); *id.* (noting that when Terra cryptocurrency briefly de-pegged in May of 2021, the Debtors falsely represented that the peg was restored due to the success of UST's algorithm, and not because a third-party had bought large amounts of UST to restore its value).

[20]   *See* SEC Complaint ¶ 1.

claimants allege after that date is simply not the type of harm the Crypto Loss Claims are intended to compensate—those harms are the result of risks that opportunistic investors took after the Debtors' fraud was revealed, not based on reasonable reliance on the Debtors' misrepresentations.

20.    The Beltran Objection correctly notes that reasonable reliance is a "fact-intensive inquiry."[21]  But they argue that evaluating reasonable reliance must be done on a case-by-case basis, is not how reasonable reliance is usually determined.  To the contrary, the Third Circuit has "[r]ecogniz[ed] that the requirement of showing direct reliance presents an unreasonable evidentiary burden in a securities market where face-to-face transactions are rare and lawsuits are brought by classes of investors [and] . . . adopted a rule that creates a presumption of reliance in certain cases."[22]  Just as courts allow presumptions of reliance for securities class actions, the Plan Administrator is seeking to provide a presumption of reliance to ease the evidentiary burden for the class of Crypto Loss Claims.

21.    There are several factors that support the Plan Administrator's decision requiring that Eligible Loss Cryptocurrency be purchased prior to May 13, 2022.  ***First***, by May 13, 2022, the prices of Terra cryptocurrency had continued to drop drastically for a full week.[23]  The occurrence of the Second De-Peg itself made clear that the Debtors' representations regarding the stability of the Terra Ecosystem were false (if the Debtors' representations were true, Terra cryptocurrency could not have de-pegged).  ***Second***, on May 13, 2022, at 6:15 p.m., (prevailing Eastern Time) Mr. Kwon tweeted "I still believe that decentralized economies deserve

---

[21]    Beltran Objection ¶ 20.

[22]    *Semerenko v. Cendant Corp.*, 223 F.3d 165, 178 (3d Cir. 2000) (citing *Peil v. Speiser*, 806 F.2d 1154, 1160 (3d Cir. 1986)).

[23]    For a more in-depth discussion of these events see the *First Day Declaration*.

decentralized money – but it is clear that $UST in its current form will not be that money."[24]  Given that the prior messages coming from Mr. Kwon—the very tweets to which the Beltran Objection refer—discussed attempts to re-peg UST to the U.S. Dollar, it is baffling that the Beltran Claimants assert that "$UST in its current form will not be that money" can mean anything except that the Debtors were no longer trying to re-peg UST.  Furthermore, as noted by the Beltran Claimants in their own Statement of Claim in the Singapore proceedings, May 13, 2022 was the date on which the Debtors disabled the function on the Terra Ecosystem that allowed holders to swap one UST for one U.S. Dollar's worth of LUNA.[25]  This alone put claimants on notice that the UST peg and its underlying algorithm had failed, but when coupled with Mr. Kwon's tweet, it is unclear how any alternative meaning can be gleaned other than that UST had failed, and the algorithm did not work as the Debtors had said it would.

22.    The Beltran Objection argues that in the days following May 13, 2022, Mr. Kwon represented to the public that the Terra ecosystem would remain viable and that holders of UST would be compensated.[26]  The communications highlighted by the Beltran Claimants are entirely focused on rebuilding the Terra Ecosystem following the collapse of UST.[27]  Even in these messages, which are intended to convey hope for the future of the Terra Ecosystem on a new blockchain, Mr. Kwon discussed the danger of "remaining in entropy" following the failed

---

[24]    Tim Hakki, *This Week on Crypto Twitter: Do Kwon Takes Heat for UST Failure*, decrypt, https://decrypt.co/100423/this-week-on-crypto-twitter-do-kwon-takes-heat-for-ust-failure (May 15, 2022) (referring to Mr. Kwon's tweet as "personally hammer[ing] the last nail in UST's coffin").

[25]    Statement of Claim (Amendment No. 2) ¶ 40, *Beltran et. Al. v. Terraform Labs Pte. Ltd, Kwon Do Hyeong, and Luna Foundation Guard, Ltd.*, SIC/OA 3/2024.

[26]    *See* Beltran Objection ¶ 26.

[27]    *See* Beltran Objection Exhibit A.

algorithm and collapse of UST, and the need to "build it back up again" which would be unnecessary if the Debtors' representations regarding the algorithm and UST had been true.[28]

23.     Any decisions the Beltran Claimants made to invest based on the messages in Exhibit A to the Beltran Objection were calculated decisions made by investors who chose to continue to interact with the Terra Ecosystem because of the possibility that it could rebound or provide value.  At that point, if investors did choose to engage, they did so aware of the risks of the Terra-Created Crypto.  These are not the investors the Crypto Loss Clams are designed to compensate.[29]

**(ii) Valuations of Losses of Eligible Loss Cryptocurrency are Appropriate.**

24.     Three Arrows asserts that it should recover consequential damages and damages based on inflated market recoveries, and that the CLC Procedures improperly limit the scope of damages for Crypto Loss Claims.  This is no more than an attempted grab at additional recoveries beyond what it is entitled to, at the expense of all other claimants without any justifiable legal basis.  Crypto Loss Claims should be limited to actual losses suffered as a result of the Debtors' fraud.

25.     Courts often recognize that in the bankruptcy context, it is of the utmost importance to protect scarce resources for the distribution to all creditors[30] because "equality of distributions

---

[28]  *See id.*

[29]  *See SEC Complaint* ¶ 9; *see also id.* ¶ 172 (highlighting the retail investors who lost their life savings and ended up in debt as a result of the Second De-Peg in May of 2022, including a pharmacist who borrowed $400,000 against the value of his home to purchase Terra cryptocurrency and lost his entire investment, as well as a painter in Vermont who invested $20,000 in Terra cryptocurrency set aside for his son's college education, and lost it all following the collapse).

[30]  *See In re Bremer*, 562 B.R. 903, 906 (Bankr. W.D. Mich. 2017) ("The American bankruptcy laws are intended to ensure that the assets of a bankrupt are efficiently and fairly distributed among its creditors in a single proceeding[.]") (citations omitted).

among creditors of the assets of the estate is the primary goal of bankruptcy."[31]    Limiting the administrative costs of the Wind Down Trust "protects the finite assets of the estate for the benefit of the [crypto loss claimants'] interest."[32]    The CLC Procedures are proposed for the exact purpose of limiting administrative costs and running an efficient Crypto Loss Claims process.

26.    ***First***, as the Plan Administrator noted in the CLC Procedures Motion and in the CLC Procedures themselves, Crypto Loss Claims are akin to damages under securities fraud actions brought under section 10(b) of the Securities Exchange Act of 1934.[33]    The SEC Settlement, which resolved the SEC's securities fraud claims against the Debtors, is the underlying deal that governed the formation of the approved Plan.    The argument that Three Arrows' consequential damages should be Allowed Crypto Loss Claims is inappropriate based on the securities law concepts underlying Crypto Loss Claims.[34]

27.    As a matter of law, securities fraud plaintiffs are typically limited to the "out of pocket loss" that they suffered due to the fraud.[35]    While plaintiffs recovering for fraud have been able to plead consequential damages in some cases, such consequential damages are usually limited to damages actually arising as a result of the fraud, such as attorney's fees and expenses.[36]

---

[31]    *In re Beyond Worlds Corp.*, 193 B.R. 540, 543 (N.D. Cal. 1996) (citations omitted).

[32]    *Id.* at 544 (citing *In re Dant Russell, Inc.*, 853 F.2d 700, 706 (9th Cir. 1988)).

[33]    The CLC Procedures are not designed, nor could they be, to compensate claimants for each and every loss they claim is somehow indirectly related to the Second De-Peg; rather, to ensure fairness to all claimants and to preserve assets for equitable distribution, the CLC Procedures compensate claimants for the losses that are directly attributable to the Second De-Peg.

[34]    11 U.S.C. § 78bb(a)(1) (2011) ("No person permitted to maintain a suit for damages under the provisions of this chapter shall recover . . . a total amount in excess of the *actual damages* to that person on account of the act complained of.") (emphasis added).

[35]    *Blackie v. Barrack*, 534 F.2d 891, 909 (9th Cir. 1975) ("[O]ut of pocket loss is the ordinary standard in a 10b-5 suit.") (citations omitted).

[36]    *See, e.g.*, *Pure Earth, Inc. v. Call*, 618 Fed. Appx. 119, 123–24 (3d Cir. 2015) ("damages cannot be 'too speculative, vague or contingent' upon some unknown factor") (quoting *ATACS Corp. v. Trans World Commc'ns, Inc.*, 155 F.3d 659, 669 (3d Cir. 1998)); *Mazuma Holding Corp. v. Bethke*, 21 F. Supp. 3d 221, 236 (E.D.N.Y.

Such damages do not include, as Three Arrows asserts, the "catastrophic failure of 3AC."[37]  The costs of the failure of Three Arrows' fund other than its investments in Eligible Loss Cryptocurrency should not now be borne by the other holders of Crypto Loss Claims.

28.    ***Second***, the facts of this case support that claimants should only recover on account of actual out-of-pocket losses from Eligible Loss Cryptocurrency.  By way of example, Three Arrows has already filed a proof of claim form for its general unsecured claim (the "3AC General Unsecured Claim").  In total, Three Arrows asserts losses exceeding $1.3 billion:  $190 million from its investment in LUNA; approximately $2 million for asserted losses due to the crash in market value of UST; approximately $272 million for asserted losses related to the crash in market value of LUNA; and approximately $858 million for losses on assets wholly other than UST and LUNA "incurred due to the crash in UST value."[38]

29.    Most notably, Three Arrows seeks to pin the decline in value of all of its other holdings—including holdings wholly unrelated to the Debtors—on the collapse of LUNA and UST, to the tune of over $850 million.[39]  Three Arrows misses the target—its inability to meet its capital calls, resulting decline in valuation, and ultimate liquidation were the result of flawed portfolio management, not the collapse of LUNA and UST. [40]  Providing Three Arrows with a

---

May 19, 2014) (allowing interest, penalties, and legal fees incurred in connection with an SEC investigation); *Esplin v. Hirschi*, 402 F.2d 94, 105 (10th Cir. 1968) (allowing recovery of outlays attributable to the defendant's conduct); *The Limited, Inc. v. McCrory Corp.*, 683 F. Supp. 387, 393 (consequential damages available if plaintiff establishes the required "causal nexus with a good deal of certainty") (quoting *Zeller v. Bogue Elec. Mfg. Corp.*, 476 F.2d 795, 803 (2d Cir. 1973)); *see also In re Washington Pub. Power Supply Sys. Sec. Litig.*, 650 F. Supp. 1346 (W.D. Wash. Dec. 20, 1986) ("[t]he essential concept of loss causation is that the damages must be the direct result of the misrepresentations or omissions").

[37]  3AC General Unsecured Claim ¶ 62

[38]  *Id.* ¶ 65.

[39]  *Id.* ¶ 65.

[40]  *Id.* ¶ 61 ("Leading up to May 2022, the 3AC estate was comprised of almost entirely cryptocurrencies and other digital assets, with LUNA and UST forming a substantial portion of 3AC's investment portfolio.").

claim for all of those unrelated losses is particularly inappropriate given that such an inflated claim would drastically reduce recoveries to all other holders of Crypto Loss Claims who only have claims for their investment losses in Eligible Loss Cryptocurrency.

30.     To be clear, the portion of Three Arrows' claim referring to their loss of investment in Eligible Loss Cryptocurrency may be allowable, subject to complying with the other provisions of the CLC Procedures, including reasonable reliance.  Like every other crypto loss claimant who can comply with the CLC Procedures, Three Arrows will have a claim for the money it spent on Eligible Loss Cryptocurrency that it can prove it purchased, less any Crypto Earnings or Airdropped Earnings.  But under the CLC Procedures, Three Arrows will not, and should not, be entitled to a claim for its mismanagement of its own investment portfolio.[41]  Those losses are Three Arrows' alone to bear and are the consequence of Three Arrows' investment strategy.

31.     Finally, both Objectors will have the opportunity to object to the Crypto Loss Amount in their Initial Determination and provide Supplemental Evidence to support their Crypto Loss Claims.  They will also have the opportunity to object to their Final Determination and have their claims heard before the Court if they disagree with the Final Determination.  The modifications the Plan Administrator has made ensure that claimants will be able to argue for alternative treatment for their Crypto Loss Claim, though the CLC Procedures will afford the Plan Administrator deference in determining such claimants' Crypto Loss Amounts by providing Final Determinations with a presumption of validity.  The Plan provides that the Plan Administrator will determine a process for allowing and valuing claims, and the CLC Procedures do just that.  If the Objectors disagree with the results of that process, they can object at that time.

---

[41]     *See Erlich v. First Nat. Bank of Princeton*, 208 N.J. Super. 264, 291 (N.J. Super. Ct. Dec. 12, 1984) (in the context of advice from an investment manager, "prudent advice includes . . . diversifying investments").

II.      **Other Portions of the Objections Should Be Overruled.**

A.      **Notice of the CLC Procedures Motion Was Proper.**

32.      The noticing concerns that the Beltran Claimants raise on behalf of unknown creditors has no bearing on their own claims, as known claimants, and it is inappropriate for the Beltran Claimants to presume to speak on behalf of claimants that their group does not represent. Additionally, the Plan Administrator provided notice and an opportunity to object to the CLC Procedures in accordance with the Bankruptcy Rules, the Federal Rules of Bankruptcy Procedures, and the Local Rules.  Approximately 700 claimants filed preliminary crypto loss claims, and the Plan Administrator served the CLC Procedures Motion on each preliminary crypto loss claim holder as well as on the entire 2002 list of creditors.[42]  The Beltran Claimants' assertion that the Plan Administrator must somehow notice unknown creditors is the equivalent to trying to prove a negative; the Plan Administrator cannot serve the CLC Procedures Motion on claimants who are by definition unknown.

B.      **The Plan Administrator's Valuation Methodology Is Appropriate.**

33.      Finally, the Beltran Objection argues that the Plan Administrator's proposed methodology for determining the Crypto Loss Amount is improper and inconsistent with applicable law.[43]  Specifically, the Beltran Claimants argue that the methodology would "improperly reduce each Eligible Crypto Loss Claim by the value of the interest that claimants

---

[42]   *See Certificate of Mailing of Claims Agent re Notice of Filing of December Statement of Fees Paid to Bitgo in Connection with Order Approving Implementation Steps in Compliance with TFL Consent and Final Judgment in SEC Enforcement Actions; Motion of the Plan Administrator Seeking Entry of an Order (I) Setting the Bar Date for Filing Proofs of Claim on Account of Crypto Loss Claims, (II) Approving the Form of and Manner for Filing Proofs of Claim, (III) Approving The Form and Manner of Notice Thereof, and (IV) Approving Related Procedures* [Docket No. 910].

[43]   *See* Beltran Objection ¶ 27.

earned by staking their tokens on the Anchor Protocol."[44]  The Plan Administrator's proposed methodology for determining the Crypto Loss Amount is appropriate and consistent with case law regarding damages in securities fraud violations.[45]

34.     This proposed valuation method allows the Plan Administrator to compensate claimants for the financial harm suffered because of the Debtors' fraudulent activities while excluding harm suffered for reasons other than the Debtors' statements, such as the volatility of the cryptocurrency industry generally and the risks taken by sophisticated, opportunistic investors. The CLC Procedures use the valuation methodology proposed therein because it is fair, equitable, and avoids litigation around an inflated and inherently unstable asset.  As the Court noted in *In re FTX Trading, Ltd.*, cryptocurrency valuation is complicated by a number of factors, including that cryptocurrencies have no inherent value, that there are questions of reliability and trustworthiness of the sources of the valuation data, and that certain coins are difficult to value because they are locked on exchanges and unable to be sold.[46]  Similarly, in *In re Celsius Network, LLC*, the Debtors litigated a multi-day trial at confirmation regarding the inherent value of Celsius' fraudulently manipulated token.[47]

35.     The Beltran claimants are unsatisfied with the methodology proposed in the CLC Procedures because it takes into account Crypto Earnings, such as the value of interest earned by claimants from staking their tokens on the Anchor Protocol,[48] and it will not allow the Beltran

---

[44]  *See* Beltran Objection ¶ 28.

[45]  For a more in-depth discussion of the Plan Administrator's proposed method for calculating claimants' Crypto Loss Amount *see* <u>Exhibit 1</u> to the proposed CLC Bar Date Order.

[46]  *In re FTX Trading Ltd.*, No. 22-11068 (JTD), 2024 WL 3191668, at *1 (Bankr. D. Del. June 26, 2024) (describing valuing cryptocurrency as an "arduous task").

[47]  Hr'g Tr. at 21:9–23:1, *In re Celsius Network, LLC*, No. 22-10964 (MG) (Bankr. S.D.N.Y. Oct. 20, 2023).

[48]  *See* Beltran Objection ¶ 28.

Claimants to recover above the losses they suffered.  But, as previously discussed, there is no requirement in the Plan that the CLC Procedures must allow all Crypto Loss Claims, particularly those claims that would result in certain claimants receiving an unjustified recovery that would minimize the amount of funds available for distribution to other holders of Crypto Loss Claims.

36.     Furthermore, in their Objection the Beltran claimants argue that the Plan Administrator's proposed methodology for calculating Crypto Loss Amount is inconsistent with applicable law, despite the fact that the Beltran Objection cites to no law for this proposition.[49]  In fact, the Plan Administrator's decision to minimize claims for the value earned is supported by securities caselaw on rescissory damages, which are designed to provide an equitable remedy whereby the transaction is unwound.[50]  Courts have upheld the use of rescissory damages in the securities context.[51]  Like a rescissory damages approach, the Plan Administrator's proposed methodology allows for claimants' Crypto Loss Amount to consider the profits received by the claimant and ensure that the claimants are being compensated for the losses they suffered.[52]

## III.     The Changes to the CLC Procedures Provide Additional Due Process Protections.

37.     Notwithstanding the arguments set forth herein, the Plan Administrator has also modified the proposed CLC Procedures in response to the Objections to ensure that the process is fair and clear for all claimants.

38.     In sum, the changes provide for the following:

---

[49]   *See* Beltran Objection ¶ 27.

[50]   *See Randall v. Loftsgaarden*, 478 U.S. 647, 656 (1986)

[51]   *See e.g. Rolf v. Blyth, Eastman Dillon & Co., Inc.*, 570 F.2d 38, 49 & n.21 (2d Cir. 1978); *Clark v. John Lamula Invs., Inc.*, 583 F.2d 594, 604 (2d Cir. 1978).

[52]   *See Clark*, 583 F.2d at 604 (holding that the plaintiff's damages were the difference between her purchase price and the price she achieved on resale of her security, with some minor adjustments related to interest paid and received on the security).

- The Plan Administrator will provide an Initial Determination of a Crypto Loss Claim to a claimant, who will have 30 days to affirmatively opt out of the amount that the Plan Administrator proposes for the claimant's Crypto Loss Amount.  If a claimant timely opts out, it will have the opportunity to provide additional argument or evidence to the Plan Administrator, who will review any Supplemental Evidence provided.

- After the Plan Administrator reviews the Supplemental Evidence, he will provide a Final Determination of his view of the claimant's Crypto Loss Amount.  A creditor who seeks to object to this Final Determination will have to both (a) affirmatively opt out of the Final Determination within 30 days, and (b) file an Final Determination Objection with the Bankruptcy Court within 90 days.

- At a hearing on a Final Determination Objection, the burden of proof shall be on the claimant to demonstrate why the claimant's Asserted Crypto Loss Claim Amount should overturn the Final Determination, which shall be entitled to deference to the Plan Administrator's judgment in setting the Final Determination and a presumption of validity.  Moreover, the claimant can only present the evidence that was presented to the Plan Administrator in its original Crypto Loss Claim or the Supplemental Evidence (*i.e.*, the creditor cannot present any new evidence that was not presented to the Plan Administrator prior to the Final Determination).  The Court will resolve the objection and make a "Final Adjudication" on the claim.

- The Plan Administrator shall have the right to seek to offset the Plan Administrator's costs of a Final Adjudication against any distribution to be sent to a claimant if the claimant is unsuccessful in overturning the Final Determination.[53]

39.    For all of the foregoing reasons, the CLC Procedures are appropriate, and the Plan Administrator has worked to ensure that the process set forth therein will be fair and efficient. Accordingly, the Plan Administrator requests that the Court overrule the Beltran Objection and the Three Arrows Objection and grant the relief requested in the CLC Procedures Motion.

---

[53] Such features are commonly used in similar trust distribution procedures, where there a finite number of resources for distribution to a large number of claimants. *See, e.g.*, *In re Boy Scouts of Am.*, No. 20-10343 (LSS) (Bankr. D. Del. Sept. 8, 2022) [Docket No. 10316] (trust distribution procedures requiring costs of independent review to be paid by claimant, not trust, and requiring payment by claimant of administrative fee for reconsideration of claim); *In re HONX, Inc.*, No. 22-90035 (MI) (Bankr. S.D. Tex. July 14, 2023) [Docket No. 890] (requiring claimant to pay all costs associated with arbitration including arbitrator's fees, and noting that the trust shall not pay interest, fees, costs, or expenses); *In re Imerys Talc Am., Inc.*, No. 19-10289 (LSS) (Bankr. D. Del. Aug. 2, 2024) [Docket No. 6439-1] (requiring payment of a filing fee for claim processing, refundable upon claim payment).

Dated:  February 23, 2025
Wilmington, Delaware

*/s/ Zachary I. Shapiro*
<div style="display:flex">
<div>

**RICHARDS, LAYTON & FINGER, P.A.**
Zachary I. Shapiro (No. 5103)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Email:      shapiro@rlf.com

*Co-Counsel for the Plan Administrator*

</div>
<div>

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Christopher T. Greco, P.C. (admitted *pro hac vice*)
Elizabeth Helen Jones (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile:  (212) 446-4900
            christopher.greco@kirkland.com
            elizabeth.jones@kirkland.com

-and-

Michael F. Williams, P.C. (admitted *pro hac vice*)
1301 Pennsylvania Ave., NW
Washington, DC 20004
Telephone:    (202) 389-5000
Facsimile:    (202) 389-5200
Email:        michael.williams@kirkland.com

-and-

Christopher S. Koenig (admitted *pro hac vice*)
Casey McGushin (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email         chris.koenig@kirkland.com
              casey.mcgushin@kirkland.com

*Co-Counsel for the Plan Administrator*

</div>
</div>