```
 1                      UNITED STATES BANKRUPTCY COURT
                             DISTRICT OF DELAWARE
 2
     IN RE:                         .  Chapter 11
 3                                  .  Case No. 24-10070 (BLS)
     TERRAFORM LABS PTE., LTD.,     .
 4                                  .  (Jointly Administered)
                                    .
 5                                  .  Courtroom No. 1
                                    .  824 Market Street
 6               Debtor.            .  Wilmington, Delaware 19801
                                    .
 7                                  .  Wednesday, February 26, 2025
     . . . . . . . . . . . . . . .  .  11:00 a.m.
 8
                             TRANSCRIPT OF HEARING
 9             BEFORE THE HONORABLE BRENDAN L. SHANNON
                  CHIEF UNITED STATES BANKRUPTCY JUDGE
10

11   APPEARANCES:

12   For the Plan
     Administrator:              Christopher S. Koenig, Esquire
13                               KIRKLAND & ELLIS, LLP
                                 333 West Wolf Point Plaza
14                               Chicago, Illinois 60654

15   For Three Arrows
     Capital:                    Richard W. Riley, Esquire
16                               PASHMAN STEIN WALDER HAYDEN, P.C.
                                 824 North Market Street, Suite 800
17                               Wilmington, Delaware 19801

18   (APPEARANCES CONTINUED)

19   Audio Operator:             Dana L. Moore, ECRO

20   Transcription Company:      Reliable
                                 The Nemours Building
21                               1007 N. Orange Street, Suite 110
                                 Wilmington, Delaware 19801
22                               Telephone: (302)654-8080
                                 Email:  gmatthews@reliable-co.com
23

24   Proceedings recorded by electronic sound recording,
     transcript produced by transcription service.
25
```

1    APPEARANCES (CONTINUED):

2    For Three Arrows
     Capital:                    Richard A. Bixter, Jr., Esquire
3                                HOLLAND & KNIGHT, LLP
                                 150 North Riverside Plaza
4                                Suite 2700
                                 Chicago, Illinois 60606
5

6    For the Singapore
     Claimants/Beltran           Erin Diers, Esquire
7                                HUGHES HUBBARD & REED, LLP
                                 One Battery Park Plaza
8                                New York, New York, 10004-1482

9    For the SEC:                Michael Kelly, Esquire
                                 U.S. SECURITIES AND EXCHANGE
10                               COMMISSION
                                 100 F. Street, NE
11                               Washington, DC 20549

12                               William Uptegrove, Esquire
                                 U.S SECURITIES AND EXCHANGE
13                               COMMISSION
                                 950 East Paces Ferry Road, NE
14                               Suite 900
                                 Atlanta, Georgia 30326
15

16

17

18

19

20

21

22

23

24

25

1

2

## INDEX

MOTIONS:                                                      PAGE

Agenda      Motion of the Plan Administrator Seeking
Items: 3    Entry of an Order (1) Setting the Bar Date         4
            for Filing Proofs of Claim on Account of
            Crypto Loss Claims, (II) Approving the Form
            of and Manner for Filing Proofs of Claim,
            (III) Approving Form and Manner of Notice
            Thereof, and (IV) Approving Related
            Procedures [Docket No. 904 – filed January
            31, 2025].

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Proceedings commenced at 11:10 a.m.)

2              THE CLERK:  All rise.

3              THE COURT:  Please be seated.  Good morning.

4              MR. KOENIG:  Good morning, Your Honor.

5              Chris Koenig of Kirkland & Ellis, appearing on

6    behalf of Todd R. Snyder as the Plan Administrator.

7              It's great to be in your courtroom.

8              THE COURT:  Good to see you.

9              MR. KOENIG:  We haven't had an -- thank you, Your

10   Honor.

11             We haven't had an opportunity to be here since Mr.

12   Snyder was appointed as Plan Administrator on October 1, and

13   that's because the matter that we're here on today is one of

14   the more important matters in Mr. Snyder's role as Plan

15   Administrator, and that's the Crypto Loss Claims Procedures.

16             THE COURT:  Very good.

17             MR. KOENIG:  So before getting into the argument

18   and the objections that were raised and are still pending, I

19   wanted to just take a moment to provide some context to Your

20   Honor about the claims process more generally.

21             This claims process is very unusual due to the

22   nature of the debtor's business, in cryptocurrency more

23   generally.

24             In a typical case, a debtor has books and records

25   and there are various documents that govern claims that can

1  be reviewed.  There's contracts.  There's invoices with

2  vendors.  There's complaints and other legal documents.

3  Here, we don't have any of those sorts of documents for the

4  crypto loss claims due to their very nature and the nature of

5  cryptocurrency.

6           We don't have books and records here.  The

7  cryptocurrency at issue traded on the debtor's blockchain but

8  the debtors don't have any records in their systems, other

9  than the blockchain itself.

10          For these reasons, this is not a typical claims

11  process in Chapter 11, which is why the Plan included

12  provisions that you don't normally see in a Chapter 11 Plan.

13          THE COURT:  Right.  But I want to be sure -- this

14  is not my first crypto case.

15          MR. KOENIG:  Um-hum.

16          THE COURT:  And this is certainly not the first

17  crypto case to file in this jurisdiction or others.  The -- I

18  agree entirely with the points that you're making -- and,

19  again, I don't want to interrupt and I would appreciate all

20  of the context you can give me about the implementation of

21  the Plan because it has been a little while since I've seen

22  the parties.

23          But the points that you're raising are not unique

24  to this case.  They are -- they're a feature of crypto cases

25  generally, is that fair?

1          MR. KOENIG:  I actually disagree with Your Honor.

2          THE COURT:  Okay.  Yeah, I'm positing and I'll be

3    guided.

4          MR. KOENIG:  Absolutely.  So the difference

5    between this case and most of the other crypto cases -- those

6    were cryptocurrency exchanges.

7          THE COURT:  Right.

8          MR. KOENIG:  And so there were accounts.  There

9    were records.  If I was a --

10          THE COURT:  I had the Bittrex case, which was an

11    exchange --

12          MR. KOENIG:  Right.

13          THE COURT:  -- and, you know, actually, the issues

14    in that were both, in terms of finding who the holders were

15    and proving up their actuality and -- so I mean that had its

16    own collection of peculiar issues.

17          But I interrupted you and I'd appreciate your

18    thoughts.

19          MR. KOENIG:  No worries, Your Honor.

20          So, for example, Celsius is a cryptocurrency

21    exchange that my firm handled and that I worked on.  If I was

22    a customer of Celsius, there would be a record in Celsius'

23    systems that says Chris Koenig has, you know, ten bitcoin as

24    of the petition date and I can use that.

25          THE COURT:  Yeah.  And I wrote an -- in Bittrex, I

1   had an Opinion which, again, was an exchange.  I had an

2   Opinion that talked about enforcing the terms of service --

3           MR. KOENIG:  Right.

4           THE COURT:   -- that involved I think Iranian

5   claimants.  That was a -- I think it's on appeal so I'll

6   stop.

7           MR. KOENIG:  Understood.

8           THE COURT:  Yeah, that was something.

9           MR. KOENIG:  Understood, Your Honor.

10          So the difference between this debtor here and the

11  exchanges is that the debtor created these coins and they

12  sort of went out into the universe and at that point, they

13  weren't being tracked on the debtor's systems, other than the

14  fact that they were traded on the blockchain, which is itself

15  public, but the debtor didn't have books and records of

16  accounts that says Chris Koenig has X, my colleague, Ms.

17  Jones, has Y.  So we are really sort of shooting in the dark.

18          Those coins were minted and originally given out

19  very early in time and then if trading occurred, we have no

20  record of who the owner is.

21          Now, a neat feature of cryptocurrency is the fact

22  that if it trades on the blockchain, it is generally public.

23  So it's a public ledger that says this address sent on

24  bitcoin to another address but I don't know who owns the

25  addresses.  It's just hexadecimal address and so, you know,

1    1234ABC -- it's more complicated than that, but just for

2    purposes of argument, you know, transferred to 546XYZ.

3         We need to figure out who owns those wallets and

4    they need to prove them up, and that's one of the challenging

5    things that we're facing here.

6         We -- the debtor, before the effective date, ran a

7    preliminary crypto claims -- crypto loss claims bar date

8    process for purposes of voting only.  We received something

9    like 700 proofs of claim at that time, and a review of those

10   claims revealed that many of the claimants were claiming

11   coins that could not possibly have been theirs.  They were

12   claiming a wallet that was an omnibus wallet owned by

13   Coinbase and they said it was theirs.

14        And so we are very attenuated to the potential for

15   fraud here because, as I'm sure Your Honor is familiar, fraud

16   is more prevalent in this industry than in many others and so

17   it's important that we have data that is reliable, that can

18   be counted on, because we need to be sure that the claimants

19   are who they say they are and they own what they say that

20   they own.

21        And so I recognize that the Crypto Loss Claims

22   Procedures are complicated and it's different than what it is

23   in a normal case.  But in a normal case, as I opened with,

24   people could attach invoices.  People could attach contracts.

25        We don't have that here.  And so what we've done

1  is we've tried to build an analogous process that is as easy

2  for claimants as possible, and I think for the vast majority

3  of claimants, they will be able to give us data that we have

4  confidence is valid, verifiable, and belongs to them.

5        But there has to be a process because, put

6  frankly, Your Honor, we have throw a tent around the circus

7  because if we don't, we're going to be here for many, many

8  years trying to untangle the claims and figure out whether

9  somebody actually owns what they say they own and we think

10  that, you know, an ounce of prevention is worth a pound of

11  cure here and we thought that putting the procedures in place

12  at the outset would guide people to providing us with the

13  evidence that we need in order to do our job in the right

14  way.

15        THE COURT:  Okay.

16        MR. KOENIG:  Unless Your Honor has any other

17  questions on that context, I can turn a little bit more to

18  the Plan and the procedures and some of the objections.

19        THE COURT:  The one thing I'd like to confirm --

20  I'm expecting that this is basically going to be argument

21  that I don't need or am not expecting to take evidence.  Is

22  that consistent with your expectation?

23        MR. KOENIG:  We are not presenting any evidence.

24  I don't believe this is an evidentiary hearing today.

25        THE COURT:  Okay.  I'm just trying to figure out

1  exactly what my dance card looks like.  So, no, you may

2  proceed.

3          MR. KOENIG:  Thank you, Your Honor.

4          So as I mentioned before we got off on the

5  colloquy, the Plan included provisions that you don't

6  normally see for a Chapter 11 process because this claims

7  process is different and because this debtor is different.

8          Specifically, Section 5.7 of the Plan provided

9  that the Plan Administrator would file the Crypto Loss Claims

10  Procedures Motion -- that's the motion before Your Honor

11  today, which would "provide the process and procedures that

12  the Plan Administrator will use to determine whether a crypto

13  loss claim should be allowed or disallowed, and, to the

14  extent allowed, the value of such claim."

15          The same provision of the Plan, Section 5.7

16  provides that, once approved, the crypto loss claims

17  procedures would be "binding on all creditors."

18          And the Plan also contemplated that the claims

19  process would be different from what's typical in that it

20  authorized the Plan Administrator to modify the typical proof

21  of claim form for the facts and circumstances of these cases,

22  and that's exactly what we did here, Your Honor.

23          These provisions require the Plan Administrator to

24  consider how to best run this claims process and to propose

25  procedures for the Court's approval upon notice to parties in

1  interest and that those procedures are appropriate under the

2  circumstances.  And, as I said, that's exactly what the Plan

3  Administrator did here.

4        He used the time since his appointment in October

5  to consider appropriate procedures and what should be in

6  those procedures to provide for a process that is fair,

7  equitable, and also efficient.

8        As I mentioned, given the nature of the debtor's

9  business here, there are likely tens of thousands of

10  creditors with crypto loss claims.  We need to have a process

11  that is clear, easy to follow, and fair and equitable to all

12  parties.

13        We are very aware this is a liquidating debtor.

14  We are distributing a set pot of funds to those claimants.

15  We don't want to use up all the assets for distribution

16  litigating about what the claims are.

17        So going back to the fact that we have no records

18  and there are tens of thousands of creditors, it's critical

19  that we have procedures that lay out the path clearly and we

20  need to largely rely on the information that claimants

21  provide to us and because we don't have books and records and

22  we don't have many ways of independent verification, we need

23  to try to make sure that the data that we get hasn't been

24  tampered with.

25        Now, the good news is there's a lot of evidence

1  that claimants can provide us with that we have a lot of

2  faith in.  There's two types of evidence.  Preferred

3  evidence, defined term, capital P, capital E --

4           THE COURT:  Right.

5           MR. KOENIG:  -- in the claims procedures and

6  manual evidence.

7           Preferred evidence is evidence that we have

8  confidence is verifiable and cannot be tampered with.  If

9  someone provides us with preferred evidence, that generally

10 leads to what I'll call a fast lane of consideration and they

11 will get a prompt proposal from the Plan Administrator on the

12 allowed amount of the claim, and that's because whatever they

13 gave us, we believe is verifiable, and I'll come back to

14 that.

15          Manual evidence is all other types of evidence

16 other than preferred evidence, and I'll come back to that as

17 well.

18          So let's talk about the preferred evidence.  One

19 type of preferred evidence is blockchain records.  As I

20 mentioned, the blockchain is a ledger and so if you give --

21          THE COURT:  And it's public.

22          MR. KOENIG:  Pardon me, Your Honor?

23          THE COURT:  And it's public.

24          MR. KOENIG:  And it's public.  So if somebody

25 provides us with a blockchain address, we can pull that

1   ledger and we can investigate all of the transactions that

2   that address entered into, you know, from its inception.

3          Now, we have to be able to figure out to whom that

4   address belongs.  The procedures have a process for that.

5   Basically, the claimant can sign a transaction.  They don't

6   have to actually transfer any crypto, but they can sort of

7   put a stamp on a transaction that says hi, this is me, I

8   actually own this wallet, which will give us confidence that

9   if Chris Koenig says he owns this wallet, he actually does.

10          THE COURT:  Um-hum.

11          MR. KOENIG:  But that blockchain evidence is great

12  evidence because we know that it is valid and verifiable and

13  reliable.  So to the extent the cryptocurrency moved on the

14  blockchain, there is a public record.

15          The more challenging piece of it is if the coins

16  didn't trade on the public blockchain but it traded in an

17  exchange, the way that that works technically, Your Honor, is

18  the exchange is sort of a black box.  They don't have a

19  separate wallet for each of their individual claimants --

20  their individual customers, I guess I should say.

21          So if Coinbase has 10,000 customers -- I'm sure

22  they have far more than that, but if one customer trades

23  Bitcoin to another, you want to actually see that move on the

24  blockchain because it's just all held in the same omnibus

25  aggregate wallet inside the exchange, Coinbase.

1          So if you're an exchange customer, we won't have

2    that same type of preferred evidence on the blockchain.  We

3    need to rely on something else.

4          Now, the good news is that most of the large

5    exchanges have this type of verifiable data that we can

6    access directly through what's called an API key.  An API key

7    -- basically, it's a read-only key that I can give to -- if

8    I'm a claimant, I can give to somebody else and say you can

9    basically pull down my transaction history.  This is like

10   accessing a bank account statement.

11          THE COURT:  Right.

12          MR. KOENIG:  But, you know, if I were to take my

13   bank account statement and submit it in a claims process, I

14   could've altered the PDF.  I could've edited the document.

15   We see this type of fraud all the time in cryptocurrency

16   cases.  We experienced quite a bit of it in Celsius.  I can

17   speak to that.

18          And so the great thing about the API key is it

19   allows the Plan Administrator to go and pull the data

20   directly from the exchange.  So we have confidence that it is

21   true, valid, verifiable, not altered by the claimant.  And,

22   as I said, most of the large exchanges have that

23   functionality.

24          One of the attachments to the Crypto Loss Claims

25   Procedures are detailed instructions on how claimants can go

1  and pull this data and give it to us.

2            We filed a Revised Proposed Order just before the

3  hearing.  One of the things we did is we added additional

4  instructions for other exchanges that come into that system.

5            THE COURT:  You know, I saw that you filed that.

6  Actually, do you have another copy of it?  I think I left

7  mine on my desk.

8            MR. KOENIG:  We do.  The only thing that we

9  changed were the procedures themselves so we'll hand up a

10  redline of just the procedures.

11            THE COURT:  Yeah, I saw that.  I just left it on

12  the --

13            MR. KOENIG:  No worries, Your Honor.  This is a

14  redline, not a clean --

15            THE COURT:  Very good.  That's fine.  Thank you.

16            MR. KOENIG:  Oh, and I'm sorry.  Here is the form

17  as well.  We just -- we added a couple of fields to the form.

18            THE COURT:  Sure.  Thank you.

19            MR. KOENIG:  Thank you.

20            Okay, Your Honor.  So I think what I was getting

21  to was the API key is preferred evidence and we have

22  confidence because we get to pull that ourselves.

23            THE COURT:  Right.

24            MR. KOENIG:  And then manual evidence is

25  everything else.

1          If you are on an exchange that has an API key

2   available, our position is you need to give it to us because

3   it is a simple way for us to pull the data

4          If you're on an exchange that doesn't have an API

5   key, we can't force you to do that because the technology

6   just isn't available.

7          So that's the manual evidence.  Provide us with

8   whatever you have.  If you have PDFs, if you have trading

9   logs, we'll review it.  I mean, candidly, I'm a little bit

10  concerned about what we're going to see because of the

11  potential for fraud, but we're not there today.

12         We'll review the claims.  The Plan Administrator

13  will determine how he wants to proceed and we'll be there,

14  you know, at a point in the future.

15         But we believe that the strong majority of claims

16  are likely to come from people that either traded on the

17  Terraform blockchain and so we can read the public ledger

18  directly, or they will be from one of these large exchanges

19  that have the API keys.

20         That was all that I wanted to remark on for that

21  portion of the argument.

22         THE COURT:  Okay.

23         MR. KOENIG:  I just want to make sure Your Honor

24  doesn't have any questions because I know it's --

25         THE COURT:  No, I don't.  I think I understand the

1  concerns the Plan Administrator is trying to address.

2        MR. KOENIG:  Wonderful.  Thank you, Your Honor.

3        So that brings me to the two objections that we

4  have for the motion today, one from Three Arrows and one from

5  the Beltran claimants in Singapore.

6        These objections I think are pretty similar.  They

7  basically complaint that the CLC procedures substantively

8  disallow their claims on the merits before they have an

9  opportunity to present their case to Your Honor.

10        As we explained in our reply, our view is this is

11  exactly what the Plan contemplated.  I read Section 5.7 into

12  the record a moment ago.  I won't do it again.  But what that

13  language says is that there would be procedures that have

14  substantive rules about what counts and doesn't count for

15  allowance and disallowance and valuation.

16        But that being said, we read the objections, we

17  heard what they said, and we modified the procedures to allow

18  for claimants to present their case to Your Honor in a

19  contested claims proceeding even if their argument conflicts

20  with something that's in the procedures.

21        No one's claim is being finally disallowed today

22  by the procedures.  They can argue in the future that they

23  should have an allowed claim and that their particular facts

24  and circumstances should overcome the presumption in the

25  procedures.

1          But there is a presumption that the Plan

2  Administrator's final determination is valid and the claimant

3  will have to overcome that in a contested claims matter.

4          We think that that's appropriate here given the

5  language in Section 5.7 of the Plan about how the CLC

6  procedures will include rules for how the Plan Administrator

7  will determine allowance.

8          So the objectors asked for additional process

9  before their claims are disallowed.  We gave them that

10  process and we think that that should resolve their concerns.

11          One item I do want to flag is we did reserve the

12  right to seek authority to charge attorneys' fees and costs

13  if, after a contested matter on a final determination,

14  they're not successful.

15          This is just an option that we certainly would not

16  exercise in every single case.  Frankly, we want to have that

17  option to make sure that there isn't an abuse of the process,

18  that if somebody --

19          THE COURT:  Does that option need to be spelled

20  out?

21          MR. KOENIG:  Well, we want it to be clear, Your

22  Honor, to claimants that --

23          THE COURT:  I mean I get requests for fees all the

24  time -- outside of contractual allowance.  I get requests for

25  fees all the time because the other side dragged this out or

1  this was burdensome, et cetera.  I'm just -- I saw that in

2  the -- you know, in your -- I guess it's paragraph 6 of your

3  reply and I understand the concern.  If somebody's litigation

4  tactics are abusive, et cetera, that's all right.  I guess my

5  question is would that right exist if it's not expressly

6  spelled out or you wanted to do that?

7          MR. KOENIG:  Your Honor, I think it does exist.

8  What I think is helpful is the deterrent effect and to make

9  sure the claimants, who may not be familiar with the

10  bankruptcy process, understand what is possible at the end of

11  the day.  I certainly wouldn't want somebody to be surprised

12  if -- you know, I would think most of these creditors are

13  probably not super-sophisticated.  They may not be as

14  familiar as Your Honor is and as more sophisticated parties

15  are and what's possible in bankruptcy and I wouldn't want

16  there to be a surprise.

17          So we think the deterrent effect is, frankly,

18  helpful to us.

19          THE COURT:  Okay.  I understand.

20          MR. KOENIG:  Okay.  So, again, we think that

21  that's appropriate.  We -- it's intended to make sure it's

22  not a free option for claimants to litigate positions to the

23  ends of the earth that are just, you know, difficult to

24  square with reality.

25          At the end of the day, it's just an option.  Your

1  Honor would have to decide if it's appropriate --

2         THE COURT:  Of course.

3         MR. KOENIG:  -- in any particular case.

4         The two items that the objectors wanted to argue

5  were that consequential damages should be allowed and that

6  there should be valid claims for purchases of cryptocurrency

7  after May 13, 2022.

8         We address those items in detail in our reply, but

9  given what we did to amend the procedures to contemplate this

10 additional process and that the procedures are not

11 substantively disallowing any of those claims today, I'm not

12 sure that we have to resolve those issues today.

13        I'm happy to address either of those items in

14 argument if Your Honor wants, but I'd submit that that's not

15 an issue that we have to decide today.  We only need to

16 decide if the procedures are appropriate.

17        THE COURT:  Why don't we do this.  Rather than

18 have you walk through it, I'll hear the objections.  One of

19 the questions I have is whether or not the objectors'

20 positions have evolved at all based upon -- I mean the final

21 submission was your reply which, again, lays out some

22 additional proposals and I understand the matter remains

23 contested, that's perfectly fine, but whether or not the

24 additional proposals address any of those or evolve.

25        It would probably make more sense for them to make

1 | their argument --

2 |         MR. KOENIG:  Great.

3 |         THE COURT:  -- crystalize exactly what it is we're

4 | fighting over and then have you respond to that.

5 |         MR. KOENIG:  Wonderful.  I'll sit down then, Your

6 | Honor.

7 |         THE COURT:  Very good.

8 |         MR. KOENIG:  Thank you.

9 |         THE COURT:  Can I hear from the objectors?

10 |         Mr. Riley, good morning.  Good to see you.

11 |         MR. RILEY:  Good morning, Your Honor.

12 |         Richard Riley from Pashman Stein on behalf of the

13 | foreign representatives of Three Arrows Capital.

14 |         Richard Bixter from Holland & Knight will present

15 | the argument.

16 |         THE COURT:  Very good.

17 |         MR. RILEY:  He's been admitted pro hac.

18 |         THE COURT:  Welcome, sir.

19 |         MR. BIXTER:  Good morning, Your Honor.

20 |         THE COURT:  Thanks for coming down.

21 |         MR. BIXTER:  Thank you.

22 |         The first 15 minutes of the presentation regarding

23 | the procedures, the four representatives have no objection.

24 |         This is a unique case, similar in a lot of ways to

25 | mass tort cases or situations where debtors don't have books

1  and records and you can't necessarily rely on the prima facie

2  validity of a claim.

3          THE COURT:  Yeah, Form --

4          MR. BIXTER:  It's not that --

5          THE COURT:  Form 10 doesn't work.

6          MR. BIXTER:  It does not work here, and we agree.

7  And when it comes to the procedures, putting the onus on

8  potential creditors, does it supply the information that only

9  they would have, there's no objection to that.

10         What there is an objection to is using a

11 procedural motion to substantively alter the terms of the

12 Plan.  The Plan is not ambiguous as to one's crypto loss

13 claim.  It clearly defines that any claim, any claim,

14 relating to Terra crypto of anything on the Terra blockchain,

15 anything where the -- your -- you suffer damages, even

16 derivatively, connected to Terra cryptocurrency, you have a

17 claim.

18         And perhaps to lower claim amounts or, you know,

19 to make, you know, admittedly, their job easier, this

20 procedurals motion of -- gets into -- tries to limit what is

21 a crypto claim by creating a subset, eligible cryptocurrency,

22 of setting a date where the second depeg, saying that any

23 claim for, you know, crypto purchasers sold after that date

24 is out, the only types of claims are based on the cost basis.

25 That's the only kind of claim you can make, and in the reply

1  papers of relating that to what, you know, you would see in

2  the SEC enforcement action, that could've been put in the

3  Plan.

4          They could have amended and put in as the

5  definition of a crypto loss claim, claims of similar or

6  analogous to what a holder of securities could get through

7  restitution in the SEC action, but that's not what the Plan

8  says.

9          And we can't go post-confirmation, have a trustee

10  basically modify what all creditors thought and relied on was

11  what they were entitled to assert post-confirmation.  That

12  just -- this is procedurally upside-down to do it this way.

13          And then -- when it comes to the reply and this

14  new language --

15          THE COURT:  So your point would be that --

16          MR. BIXTER:  Yeah.

17          THE COURT:  -- it should be that the Crypto Loss

18  Procedures should say if you've got any sort of a claim that

19  you have, file it, use this form, and then the Plan

20  Administrator could object on grounds of the date upon which

21  it arose or whether the cost basis is the appropriate

22  calculus?  I'm trying to figure out what the -- if I've got a

23  bid and the ask, what's the ask?

24          MR. BIXTER:  The ask is we have no objection to us

25  providing more information then that would be typical.

1        But to use this claims process to limit what can

2   be asserted as a crypto loss claim, to modify that

3   definition, is improper.

4        THE COURT:  Okay.

5        MR. BIXTER:  The reply brief and the proposed

6   modifications don't really change anything regarding foreign

7   representatives' objections.  It sets forth certain

8   presumptions.

9        There's a one-way fee shifting provision that I

10  don't think is appropriate.  But it doesn't address the

11  fundamental issue, which is claims that arose after this

12  second depeg, which is, in short, a tweet by Mr. Kwon, of are

13  out, of consequential damages are out.

14       And I guess we could assert it in a claim but the

15  Plan Administrator would certainly point to a procedural --

16  CLC Procedures Order that basically says those claims is out.

17  So it's kind of putting the cart before the horse.  Again, it

18  doesn't really address the issue.

19       And with that, I'll -- unless Your Honor has any

20  more questions --

21       THE COURT:  No, I don't think I do.

22       MR. BIXTER:  Okay.  Thank you.

23       THE COURT:  Ms. Diers? Good to see you again.  I

24  think we were here on a previous --

25       MS. DIERS:  Yes, good morning.

1            THE COURT:  Downstairs, right?  In Dorsey's

2  courtroom?

3            MS. DIERS:  Yes, exactly.  Good morning.

4            THE COURT:  Good to see you.

5            MS. DIERS:  Good to see you as well.

6            Erin Diers with Hughes Hubbard & Reed on behalf of

7  the Singapore claimants or the Beltran claimants.

8            So we also agree that there needs to be a process

9  and fully agree with what was laid out as the context here

10  and that it's appropriate for the claimants to have to

11  provide information.

12            I think where we deviate from where the Plan

13  Administrator's procedures have now been changed to is who

14  gets the benefit of the doubt on the claim and where the

15  presumption of validity lies.

16            So my understanding of the new procedures is that

17  the determinations that the Plan Administrator makes in these

18  Plan procedures that are approved today, if they're

19  successful, those will get a presumption of validity and our

20  clients, if we do object to them, which we do, will be on the

21  back foot when we ultimately have to make our case to you on

22  what the scope of our claims are.

23            I think the opt-out process would work if there's

24  not that presumption of validity and a fee shifting

25  requirement.  But because of those two features, it doesn't

1  actually really change anything.  It's just I think words.

2          I think particularly the fee shifting -- I

3  understand it's a deterrent and I think it will be a

4  successful deterrent.

5          And to the fact that claimants probably won't

6  actually exercise the rights that are given to them, and this

7  would be entirely illusory, the examples that they give --

8  that the Plan Administrator gives of other cases where there

9  is fee shifting, are generally the mass tort trust

10 distribution procedures.  In those cases, it's generally a

11 fixed fee, it's not a huge fixed fee, and claimants know up

12 front exactly what they pay to get the benefit of individual

13 review.

14          Here, it would be the cost of a large law firm

15 litigating, uncapped, without any discretion over how much is

16 appropriate.  So I don't think any claimant can really do an

17 accurate risk analysis in is it worth it for me to object to

18 this because I think my position is right as a matter of law,

19 but I might have to pay for Kirkland & Ellis to litigate this

20 matter.

21          And I also don't think it's necessary.  There's,

22 in our system already, fee sharing and there's skin in the

23 game because any claimant who's going to object to a final

24 determination is going to have to pay for their own lawyer,

25 and that works.

1          That's how omnibus objections are litigated in

2    courts with thousands of claims on the claims register.  Many

3    omnibus objections go without any response.  Some of them get

4    objected to and turn into contested matters.  But it's not --

5    that works and I think it can work here and there's no reason

6    to sort of stack the deck against claimants if they think

7    that they have a valid argument.

8          I think also we didn't get into the

9    appropriateness of using the second depeg as the cutoff for

10   claims.

11         I think the fact that this isn't an evidentiary

12   hearing and that there has been no evidence submitted to you

13   is exactly the reason that a determination made today

14   shouldn't be entitled to any presumption of validity.

15         Both parties agree that it is a fact-specific

16   matter, a fact-intensive inquiry.  It's the issue that in

17   securities cases is the most hotly contested issue, tons of

18   discovery, tons of argument.

19         So to decide it on a couple of paragraphs in what

20   I think is viewed as a bar date motion seems in appropriate

21   and unfair to claimants who ultimately have they think a good

22   factual dispute as to whether that second depeg is the

23   appropriate cutoff.

24         And the same applies to the calculation of claims.

25   If there's ultimately going to be a back-ended process to

1  resolve these claims, everyone should come in with whatever

2  burdens they have to day and there shouldn't be any burden-

3  shifting beyond what's in the Bankruptcy Code and the

4  Bankruptcy Rules in a 3007 objection process or under these

5  local rules for omnibus objections.  It just -- that wouldn't

6  be fair.

7          I think one other point I wanted to raise, and

8  it's one -- something that we're working with Mr. Koenig on.

9  The -- our clients have privacy concerns with the information

10  that would be provided to the Plan Administrator.

11          THE COURT:  You know, I meant to ask Mr. Koenig

12  about that.  The mechanics of this is a little bit fraud when

13  you're asking somebody -- again, I understand why it's asked

14  for, but the mechanics of getting that information,

15  transferring that information -- I meant to ask him and

16  forgot, but I'd like your thoughts on that and, obviously,

17  I'll hear from the debtor on it as well -- or the --

18          MS. DIERS:  Sure.

19          THE COURT:  -- Plan Administrator.

20          MS. DIERS:  So I'm a little bit over my skis in

21  talking about things like API keys, so I'm going to do my

22  best.

23          My understanding is by giving the Plan

24  Administrator your API key for your exchange, you're not only

25  providing your Terra cryptocurrency, your eligible

1  cryptocurrency --

2          THE COURT:  Whatever else you have on that --

3          MS. DIERS:  You're providing every single

4  cryptocurrency transaction that you've ever engaged in.

5          THE COURT:  Um-hum.

6          MS. DIERS:  And there would be no mechanism to

7  limit that to only the information that's relevant.

8          And I think part of the concern that we have is

9  that we have seen in other cryptocurrency cases with the same

10 Claims Administrator, Kroll, that there's been security

11 breaches, in Genesis, FTX, and I think -- I forgot what the

12 third cryptocurrency case -- but there was an attempt to --

13         THE COURT:  Happened in mine, in Bittrex.

14         MS. DIERS:  Yeah.  So it's been an issue.  So I

15 think the claimants are uncomfortable with giving all of

16 their information, all of their cryptocurrency transactions,

17 which are transactions that generally are presumed to be

18 private, other than the expectation that they're on the

19 blockchain, which is sort of anonymous, but there's an

20 expectation that those are private and then suddenly there's

21 this risk that they go to the Plan Administrator and they're

22 used for some other purpose or they're breached.

23         So we've proposed -- and, again, over my skis on

24 the technical data, but whether there's like some sort of

25 script that can be used or software that can be used to

1   ensure that when a claimant puts in their API key it's only

2   the Terra-based cryptocurrency that is being extracted and we

3   think that would be appropriate to mitigate the concerns

4   about all of the information of the claimants that are -- is

5   not relevant at all to the Plan Administrator or the claims

6   process being provided and being potentially available.

7              THE COURT:  Okay.  I understand.

8              I just also want to confirm you represent the

9   Singapore claimants so you would be looking first to the

10  escrow that I think was approved months ago by the Court and

11  then anything that's not covered by that escrow is sort of a

12  further claim that you would be seeking to pursue in this

13  case?

14             MS. DIERS:  That's exactly right.

15             THE COURT:  Do I understand?  Okay.

16             MS. DIERS:  This is -- and primarily to reserve

17  our rights --

18             THE COURT:  I understand.

19             MS. DIERS:  And it's insufficient.

20             THE COURT:  Okay.

21             MS. DIERS:  So, I -- just in conclusion, the

22  procedures we don't think should be approved as they are

23  because they're inconsistent with the statutory claims

24  process.  And if they are approved, the opt-out procedures

25  should be revised to eliminate the presumed validity of the

1   Plan Administrator's determination and eliminate the fee

2   shifting provision.

3            THE COURT:  Okay.

4            MS. DIERS:  Thank you.

5            THE COURT:  Mr. Kelly?

6            MR. KELLY:  Good morning, Judge.

7            Mike Kelly here from the Securities and Exchange

8   Commission.  My colleague --

9            THE COURT:  Oh, welcome.  Good to see you.

10            MR. KELLY:   Good to see you as well.

11            If I may be heard?

12            THE COURT:  Of course.

13            MR. KELLY:  The Commissions has a short statement

14   to read.  My colleague, Bill Uptegrove, is appearing

15   remotely.

16            So the Commission is the largest creditor in this

17   case.  It's claim is based on more than a $4 billion dollar

18   judgment.

19            THE COURT:  My recollection is -- and again, it's

20   been a little while, but my recollection was that that

21   judgment came from litigation in the Southern District?

22            MR. KELLY:  That's right.

23            THE COURT:  And then in the Plan, that has been

24   largely subordinated, is that correct?

25            MR. KELLY:  We wouldn't describe it as

1  subordinated.  We would describe it slightly differently.

2  And so you're correct.  It was litigated.  There was a jury

3  verdict on liability and then the settlement on remedies and

4  then that settlement also included provisions to address the

5  bankruptcy --

6            THE COURT:  Right.

7            MR. KELLY:  -- matter.  And those were all

8  incorporated into the Plan.  And so the portion of the Plan

9  that I think you were just referring to had to do with the

10 following.

11           So under the settlement agreement, the non-debtor,

12 Kwon, he agreed to transfer assets to the bankruptcy estate

13 to be distributed to harmed investors.  Kwon is a non-debtor

14 and so those assets are available to distribute in this case

15 only because of the Commission seeking that term in its

16 settlement.

17           In the bankruptcy case, the Commissions agreed to

18 have its claim deemed satisfied by distributions to harmed

19 investors and so that's the mechanism that allows the victims

20 to recover on those claims before any distribution would be

21 made by the -- be made to the Commission.

22           And given the size of the Commission's claim, that

23 features were necessary in order for that.

24           THE COURT:  That's why we're not in Chapter 7.

25           MR. KELLY:  Yes.

1          THE COURT:  Yeah.

2          MR. KELLY:  Right.  Right.

3          And so throughout the Plan process, the Commission

4   has consulted with the debtors back before the Plan was

5   confirmed to ensure that the Plan carried out the

6   settlement's terms.  It concluded that it would and so,

7   therefore, the Commissions supported confirmation of the

8   Plan.

9          It's -- the Commissions remained involved post-

10  confirmation because its interest is the same.  It's ensuring

11  that the liquidating trust, the Plan Administrator, addresses

12  claims the way that it will return funds to the harmed

13  investors and do so in a manner that's efficient and limits

14  expenditures and administrative expenses.

15         And so after careful review and extensive

16  submission of comments and conversations with the Plan

17  Administrator, the Commission is satisfied that the

18  procedures that they effectuate those goals and the conform

19  to the settlement in the Plan and, therefore, the Commission

20  supports approval of those procedures.

21         THE COURT:  Very good.  Thank you.

22         Mr. Uptegrove, good morning.  It's good to see

23  you.  Do you have anything to add, sir?

24         MR. UPTEGROVE:  Good morning, Your Honor.

25         I think the only other thing I would add is just

1  in response to some of the comments of the objectors is I

2  think the way we look at it is the procedures are doing

3  largely what I think they want in great respect.  But it's --

4  we're creating sort of a fast-lane reasoning of presumption

5  or the debtor is using a presumption to fast-track certain

6  claims that align with the jury verdict in the Southern

7  District of New York case.

8          So just adding that one point, but thank you, Your

9  Honor.

10         THE COURT:  Can I ask -- and again, I don't want

11  to put anybody on the spot and, obviously, you've advised

12  that you are supportive.  Ms. Diers' comments covered the

13  concerns with respect to tying a cutoff date to the second

14  depeg and her reference was to sort of how this issue comes

15  up in securities litigation.  Obviously, I've seen my share,

16  but I'm certainly no expert in it.

17         But I would like to know whether the SEC has any

18  position or thoughts on that concern raised by the objectors

19  about using that date for purposes of kind of structuring the

20  crypto loss claims.  Do you understand my question?

21         MR. KELLY:  I think so.  In the Commissions'

22  views, that date is appropriate.  And just to be clear,

23  reliance isn't something that was specifically adjudicated in

24  the enforcement action.  That's because the case law is that

25  the Commission does not need to show reliance to prevail on

1  its actions.

2            But the Commission's enforcement case was based on

3  like two sets -- two different like fraud schemes.  One had

4  to do with false statements being made about LUNA being used

5  to power this payment app called Chime (phonetic) and the

6  other set having to do with the interrelationship between

7  LUNA and UST and the claim was that US -- they had this

8  algorithm that allowed for the exchange of tokens back and

9  forth that was supposed to cause UST to also -- always be

10  permanently equally valued to one U.S. dollar.

11            In fact, that was not the case.  The UST was --

12            THE COURT:  I recall.

13            MR. KELLY:  -- being propped up by trading

14  pressures.

15            And so those were the two frauds and our view is

16  they were outed at the time of the depeg and whether you pick

17  the exact date on March where the depeg started or towards

18  the end where this tweet happened, that's a bit of a judgment

19  call.  We're satisfied that picking the time of the tweet is

20  a reasonable exercise of judgment.

21            THE COURT:  Okay.  I understand.

22            MR. UPTEGROVE:  And --

23            THE COURT:  Mr. Uptegrove?

24            MR. UPTEGROVE:  -- Your Honor, for the record,

25  William Uptegrove on behalf of the SEC.

1          Your Honor, just to add to what Mr. Kelly said, I

2    think we also think that the other claimants, if they have a

3    different -- the way the -- as Mr. Koenig pointed out, the

4    way the procedures work is if someone has a different type of

5    claim, they can still submit that.  Again, it's a presumption

6    and a fast-track for people that meet that criteria that was

7    set forth by the District Court.

8          THE COURT:  Very good.  Thank you, Mr. Uptegrove.

9          Thank you, counsel.  Mr. Kline.

10          MR. KELLY:  Thank you, sir.

11          MR. UPTEGROVE:  Thank you, Your Honor.

12          THE COURT:  -- or Mr. Kelly.  Sorry.

13          MR. KOENIG:  Your Honor, for the record again,

14    Chris Koenig, Kirkland & Ellis, for the Plan Administrator.

15          So let me start with what you just discussed with

16    the Commission's lawyers.

17          So I agree with Mr. Uptegrove.  This is just a

18    presumption.  It doesn't prevent anybody from arguing that

19    some purchase post-May 13th is compensable.

20          Now, we have a strong view that it shouldn't be

21    compensable, and, you know, that's why the procedures lay

22    that out.

23          This isn't an evidentiary hearing, but just to be

24    clear, it's more than just a tweet.

25          On that same day, the exchange -- a swap mechanism

1  of LUNA and UST was disabled.  The price of LUNA was -- or

2  the price of UST was all the way down around ten cents.  It

3  had been depegged for almost a week.

4       It's hard to pick exactly the moment that the

5  depeg occurred.  The Plan Administrator, frankly, took a very

6  conservative approach because in the motion, we attached the

7  graph of the price --

8            THE COURT:  I saw.

9            MR. KOENIG:  -- as an exhibit and it did sort of

10  go up and down there for a couple of days.  And then around

11  May 13th, it dropped and stayed low for the reason that, you

12  know, the founder tweeted it's over, it's all over, I believe

13  in decentralized finance but it's clear that UST in its

14  present form won't be the solution here.  I'm paraphrasing a

15  little bit.

16            THE COURT:  I understand.

17            MR. KOENIG:  But all of the facts taken together

18  led the Plan Administrator to believe that that is the last

19  point in time when a general person could reasonably rely on

20  the statements that were being made.

21       Now, again, the procedures allow people to try to

22  overcome that presumption and maybe there would be facts that

23  would be appropriate.  For example, if somebody entered into

24  a contract on May 1 to purchase LUNA but it didn't close

25  until after May 13th, that would, presumably, be an exception

1  to the presumption that we would either agree to or Your

2  Honor would agree to because they entered into a binding

3  contract before the fraud was revealed.

4          But again, I don't think that Your Honor needs to

5  decide that right now.  I just wanted to clarify the record

6  that this is not some, you know, specious date that the Plan

7  Administrator picked out of thin air.  We went through quite

8  a deliberative process internally, speaking to former

9  employees of the debtors, speaking with our advisory board

10 that was appointed pursuant to the Plan, and we tried to take

11 a very conservative approach.

12          But, frankly, folks -- our view is that folks that

13 bought after May 13th when the price has been low and the

14 founder has thrown in the towel and the key functionality of

15 the coin has been turned off, those people are speculators.

16 They were harmed in a different way than the people that

17 reasonably relied on the misstatements of the debtors and we

18 don't believe that it's appropriate for those speculators to

19 have allowed claims in the same way that everybody that was

20 harmed by the fraud was.

21          I know that we're not deciding that issue today.

22 I just wanted to make clear --

23          THE COURT:  The thought process.

24          MR. KOENIG:  -- the thought process there.

25          THE COURT:  I understand.

1       MR. KOENIG:  So let me turn back to what counsel

2  said.  So Three AC suggested we're using a procedural motion

3  to substantively alter a crypto loss claim.  I just don't

4  think that we're doing that.  I think what we are doing is

5  creating a fast lane and creating a presumption.

6       But, frankly -- and this is in response both to

7  Three AC and the Singapore claimants, I think that what we

8  are doing is very similar to what the normal 3007 objection

9  process is, right?

10      There is a presumption of validity for a claimant.

11 However, that presumption is very easily overcome by an

12 objection that, on its face, states some sort of basis why

13 the claim should not be allowed and then the burden shifts

14 back to the claimant.

15      The way that we view the way that the procedures

16 work is the final determination is, in essence, our

17 objection.  It's saying we have reviewed your claim.  We thin

18 it fails for the following reasons.  If you want to further

19 pursue it, you may do it and the burden is now on you, the

20 claimant, to prove up your claim.

21      I think that that is exactly the way that it would

22 work in a 3007 proceeding.  The one difference is the

23 claimant has to decide whether they want to pursue it and the

24 Plan Administrator doesn't have to file an objection.  We

25 just think that that makes more sense given the circumstances

1  here, but I don't feel super strongly about it.

2              If Your Honor believes that it's important that

3  the Plan Administrator be the one to file the objection,

4  we're happy to.  I think we honestly land in the same place.

5              What I'll -- Three C's counsel referred to the

6  broad definition of a crypto loss claim.  But I had read

7  Section 5.7 of the Plan.  Section 1.41 of the Plan is the

8  definition of the crypto loss claims procedures, which says

9  that there will be a general process and timeline -- sorry,

10  this is a quote, "in accordance with the line down trust

11  agreement for administering and determining the allowed claim

12  for each holder of a crypto loss claim."

13              This is more than just mere procedures.  But,

14  again, all of the claimants will have their right to try to

15  prove their case at the end of -- the end of the day if they

16  so decide.

17              We gave an escape valve here in response to the

18  objections.  The one way --

19              THE COURT:  When you say escape valve, you mean

20  the proposals that you've added in your reply?

21              MR. KOENIG:  Correct.

22              THE COURT:  Yeah.  I understand.

23              MR. KOENIG:  Thank you.  Thank you, Your Honor.

24              There was a comment about the fee shifting being

25  one way.  I sort of took a little bit of umbrage to that

1 because the only way that we end up there is if the claimant

2 brings the objection, if the claimant pursues their rights.

3 So I think that the one-way rachet is actually appropriate in

4 this case.  But they can assert whatever they want in their

5 claim.  These are just procedures that establish a fast-track

6 and a presumption of validity.

7          What else?  I think that that's all I had on Three

8 AC's argument unless you had anything for me there.

9          THE COURT:  The -- I wanted to touch on the

10 question of -- that counsel raised with respect to privacy of

11 the API key --

12          MR. KOENIG:  Yes.

13          THE COURT:  -- and --

14          MR. KOENIG:  Certainly.

15          THE COURT:  -- I guess are there mechanics and

16 whether this is the forum to address those considerations,

17 which I think are real.  I mean --

18          MR. KOENIG:  Understood, Your Honor.

19          So we've been in contact with counsel.  We've been

20 trying to figure out a solution.

21          Here's the problem that we have.  The benefit of

22 the API key is that the Plan Administrator can reach out and

23 take the data directly and we have a script that has been

24 worked out that is run on that data and sort of sorts out the

25 eligible loss cryptocurrency, which is the data that we will

1  have and we will review, from the other cryptocurrency.

2          We will not be looking at Bitcoin, for example,

3  which is not an eligible loss cryptocurrency because it was

4  not traded on Terraform's blockchain or platform.

5          However, we obviously have that data in our

6  possession.  I suppose, hypothetically, if there was a hack

7  of some kind, like that data is available.

8          But the only alternative that we see, Your Honor,

9  is to allow the claimants to pull the statement themselves --

10          THE COURT:  Information themselves and that --

11          MR. KOENIG:  -- and send it to us.

12          THE COURT:  And that creates the problem.

13          MR. KOENIG:  That creates exactly the problem that

14  we're trying to avoid here.

15          We provided -- Kroll is obviously a respected

16  claims agent.  We provided the security policy.  We

17  corresponded with them and provided the details of their

18  security policy to counsel.  I won't repeat it but it's, you

19  know, what you would expect from a significant player in this

20  space.

21          What I will say is the procedures also provide

22  that we will destroy the API key when it is no longer needed.

23  I don't expect we're going to need it for longer than a

24  couple of months to go through that initial claims process.

25  So the point in time at which the data is at risk is limited.

1           But I just -- honestly, Your Honor, I don't see

2   another alternative because, otherwise, we end up in the same

3   problem that this is supposed to be a solution to, which is

4   somebody could pull the data, filter out transactions that

5   are detrimental to their claim and the Plan Administrator

6   simply would have no way of verifying whether they did that

7   or not.

8           THE COURT:  Well, I think though to your point, if

9   someone chose to do that, that would be their decision but

10  they would no longer be on your fast-track.

11          MR. KOENIG:  That's fair.  I just --

12          THE COURT:  They would -- and they would be

13  providing information that would be in the manual category

14  that you have.

15          MR. KOENIG:  Right.

16          THE COURT:  And if somebody makes that decision,

17  then it will be more cumbersome for them to prove up their

18  claim in the same way that if somebody said I don't want to

19  necessarily share my Social Security number or something else

20  --

21          MR. KOENIG:  Right.

22          THE COURT:  -- that it becomes more challenging.

23  I mean it kind of sounds like a softball but I understand.

24          MR. KOENIG:  Right.

25          THE COURT:  I mean the concern is real.  We've had

1  these hacks.

2          MR. KOENIG:  Yes, understood.

3          THE COURT:  And so I understand the point and your

4  thought is that if you want to have your claim dealt with

5  promptly, and probably allowed promptly, then, arguably, you

6  need to take that risk.

7          MR. KOENIG:  Right.  Your Honor, what I would

8  suggest is that in order to get a claim allowed in Bankruptcy

9  Court, you often times have to provide information that you

10  might prefer be kept private.

11          THE COURT:  So noted.

12          MR. KOENIG:  But that's the cost of doing business

13  sometimes.

14          THE COURT:  Yeah.  The thing is that -- and this

15  is just such a constant refrain.  This is different, you

16  know, because even if I have to provide some information,

17  hopefully it's sealed, but, you know, bank account

18  information -- I mean crypto is just different.  It's

19  intended to be anonymous.  It's intended to be untraceable,

20  et cetera.

21          So, in theory, while I'm -- I'm concerned if I

22  have to fill out a proof of claim form and put my Social

23  Security number and other stuff on.  It's not kind of

24  automatic.  If somebody gets, arguably, the API information,

25  it would be unfixable in some ways where, you know, you could

1  put a credit lock on your -- and, again, maybe that's a

2  grossly inapt analogy, but I understand the point and I think

3  my point was that, unlike actually the typical case where

4  often you -- if you want to fill out Form 10 and have an

5  allowed claim, you need to put this information in.

6            MR. KOENIG:  Right.

7            THE COURT:  And if you don't do that, your claim

8  is disallowed.

9            Here, the argument would be you can have a claim,

10 it just -- you may have some lifting ahead of you to satisfy

11 the Plan Administrator that, in fact, the screenshots that

12 you provided or the --

13           MR. KOENIG:  Right.

14           THE COURT:  -- other information is indeed

15 accurate and appropriate.

16           MR. KOENIG:  Right.

17           THE COURT:  Is that a fair way of describing how

18 your procedures would work?

19           MR. KOENIG:  I understand Your Honor's point and I

20 understand -- let me just make two quick points.

21           One is so the API key -- I just want to explain

22 the way that I think the technology works.  I'm just a

23 bankruptcy lawyer, not a cryptocurrency expert.

24           But my understanding from our client is that the

25 API key can be turned off in the same way that the credit

1  freeze can go into effect.  Now, that doesn't help if

2  somebody has already grabbed the statement.

3          THE COURT:  Right.

4          MR. KOENIG:  But it would prevent -- it's not like

5  everybody could then go and grab it.  You couldn't sort of

6  turn it off in that way.  Not a complete fix.  I certainly

7  acknowledge that.  But it is not as though that API key could

8  be distributed --

9          THE COURT:  It's just open --

10         MR. KOENIG:  Correct.  Correct.  And I think that

11 that limits the risk in some regard.

12         The other point is the whole reason we're doing

13 the preferred evidence -- I take your point.  People can take

14 the risk.  I am simply concerned that if we get 10,000

15 claims, all of which are just screenshots, we're going to be

16 left pulling our hair out and we're going to have a lot of

17 objections before Your Honor that say I just don't know how

18 to verify this data, they could've submitted this data, they

19 didn't, and the claimant is out of luck.

20         I mean perhaps -- if that's the way Your Honor

21 would like it to go, I'm totally happy to do it.  What I

22 would suggest is that we modify the procedures to be very

23 clear that the Plan Administrator is going to be concerned

24 about the manual evidence if you have the preferred evidence

25 available, just to be a flag for claimants.

1          I don't want people to lose their rights because

2    they think it's tomato/tomato, and it's actually a pretty big

3    difference.

4          THE COURT:  Okay.

5          MR. KOENIGH:  I think our only other -- I think

6    that I've -- I think that we've covered it.  I think that

7    we've covered it.

8          I just want to reiterate that what the Plan

9    Administrator is trying to do here is to have a process that

10   makes sense, is fair.  We have limited resources and we

11   really just don't want to spend all of those resources --

12         THE COURT:  Litigating.

13         MR. KOENIG:  Yeah.

14         THE COURT:  I understand.

15         MR. KOENIG:  We want to send distributions to

16   folks.  But if Your Honor has nothing else --

17         THE COURT:  No, I don't.

18         MR. KOENIG:  That's fine.  Thank you.

19         THE COURT:  Okay.  Here's what we're going to do.

20   I will require some modifications to the Crypto Loss Claim

21   Procedures Motion, but, overall, I am going to approve that

22   motion.

23         I'll make the specific comments with respect to

24   the changes I'm going to direct.

25         First, I'm going to strike the fee shifting.  I

1 understand the point, but my initial reaction to it was that

2 this is -- if you have unsophisticated parties, either they

3 will be intimidated by that, which might be the point, and

4 that's not necessarily appropriate, or they won't necessarily

5 appreciate what it means, whether it's a one-way rachet or

6 not.  I don't necessarily see it that way.

7        But I see the award of fees as being something

8 that is within the -- you know, the province of the Court and

9 the record would be developed to support that.  And, again, I

10 would not want a situation -- not that I'm assuming the Plan

11 Administrator of using it, but I would not want the risk that

12 this is specifically out there, highlighted, and, frankly,

13 used as a cudgel against parties.

14        And, again, I've dealt with many, many of the

15 crypto claimants and while they may be sophisticated in some

16 areas, Mr. Koenig, you're right, they're not generally very

17 sophisticated in bankruptcy.  So I will strike that

18 provision.

19        I will also require that the debtor tinker with

20 -- or the Plan Administrator tinker with the language

21 consistent with your final comment, which I was thinking it

22 really should explain the difference between the preferred

23 and the manual evidence and the consequences of that because

24 I do think that it's not necessarily intuitive -- even to a

25 sophisticated part what that means.  Evidence is evidence.

1            But many, many cases have -- this is not

2   administrative convenience, but we've had many cases that

3   have had even substantial administrative convenience classes

4   where it just says you need to provide X and Y and Z and

5   we'll allow your claim, you know, up to 3,000 or 10,000 or

6   $50,000.

7            In some ways, that's kind of what you're doing.

8   You're setting it up -- an easy way for somebody to provide

9   the trustee -- or yeah, the Plan Administrator with the

10  mechanics that they need in order to evaluate the claims and

11  to do so promptly without a heavy inquiry and lots of

12  litigation.

13           So I think that there should be revisions in that

14  respect.

15           I am satisfied with the timing.  I understand the

16  concerns with respect to the second depeg and choosing that

17  date.  I don't believe it does violence to the Plan or the

18  definitions in the Plan and, particularly, because I think

19  the modifications that have been proposed, which I would

20  adopt and direct be included, provide an escape valve from

21  that.

22           And, again, it's not clear to me that the

23  claimants that are objecting would be in a category that is

24  outside of the second depeg date, but we would leave that

25  where it is.

1         And in connection with that, I take comfort from

2    both the release valve, or the exit valve, that's being

3    proposed but also, frankly, from the input from the

4    Securities Exchange Commission.

5         They have been, as noted by Mr. Kelly, deeply

6    active in these proceedings.  I have every confidence that

7    they have looked particularly closely at the mechanics by

8    which claims could be pursued because, as a practical matter,

9    the SEC won its judgment and then is essentially confirming

10   the benefit of its judgment on creditors.  That's how I would

11   look at it.  And they are satisfied with the mechanics and

12   the timing, so I think that that, likewise, is appropriate.

13        With respect to concerns or issues on whether or

14   not consequential damages are precluded, I think the short

15   answer is I don't think that they're precluded but the

16   parties are, again, afforded the ability to make those claims

17   and I don't think that the definition precludes that.

18        I think that the definition does -- or the

19   procedures do make clear that those claims, if you want to

20   pursue them, are likely to be contested and that process will

21   play itself out.

22        But, otherwise, I'm satisfied that the procedures

23   that have been identified are appropriate and warranted and I

24   would start -- I would finish where Mr. Koenig started, which

25   is crypto cases generally are different and weird, and this

1   one is actually particularly unusual given the nature of it

2   and I appreciate the clarity that you've provided me between

3   this case and the exchange cases.

4          And even the exchange cases, while they're, in

5   some ways, simpler or conceptually easier to understand, they

6   are -- they come up with very, very alien features to a

7   Bankruptcy Code that was created in 1979.

8          So I think that the procedures that have been

9   identified are, obviously, kind of best spoke, but that's not

10  certainly prohibited and I believe it is necessary and I also

11  believe that it is largely anticipated by the Plan.

12         So I would direct that those modifications be made

13  to the Order.  I would ask that they be run past the

14  objectors and that it be submitted under certification.

15         If there are issues with any of that, I would ask

16  that you get me on the phone.  I don't want letters or

17  submissions.  I hope that I've been clear enough and if I

18  haven't, then we can clarify that.

19         But, again, it's a complicated matter but I

20  believe that it is appropriate in order to keep the matter

21  moving forward.

22         I've given you my thoughts on the different

23  elements of the objections and you have my ruling.

24         Mr. Koenig, do you have any questions?

25         MR. KOENIG:  Your Honor, I just want -- I have a

1  clarifying question.

2          So you asked us to clarify the difference between

3  preferred evidence and manual evidence.  The procedures would

4  require that if you have an API key, you submit it.

5          I think counsel for the Singapore claimants would

6  like the opportunity to do manual evidence.  I think you're

7  directing us to do that.

8          THE COURT:  To -- I want --

9          MR. KOENIG:  But to warn people.

10          THE COURT:   That's how I would say that --

11          MR. KOENIG:  Okay.

12          THE COURT:  -- is if you give -- and the other

13  point -- and I'm not making this direction because I don't

14  know what you could say, but, yes, if somebody doesn't want

15  to submit an API key, that is their prerogative in the same

16  way that a claimant that says I've -- I'm not comfortable

17  giving you my bank account --

18          MR. KOENIG:  Um-hum.

19          THE COURT:  -- or, you know, my check register,

20  the -- it might be difficult for them to prove up their claim

21  and you may -- that claim may be disallowed, but that's

22  evidence that you've chosen not to provide.

23          There are consequences here that are not typical.

24  Your point was right.  There's often information that needs

25  to be developed in connection with claims litigation that

1  people would rather keep quiet.

2          Crypto -- again, crypto cases are just different.

3  You know, you and I, we've all done this a thousand times and

4  somebody doesn't necessarily want to provide anything from

5  their Social Security numbers to bank account numbers and

6  check runs and everything else.  We have a measure of

7  confidence that we dealt with them before and we can protect

8  them and the consequences of a leak are bad, but manageable.

9          I confess that I don't know precisely what the

10  consequences or the risk of a leak or a hack of someone's API

11  key would be and I believe that they should be able to try to

12  prosecute their claim without providing that.  But, again,

13  they should know that they've got probably a heavier lift.

14          MR. KOENIG:  Right.

15          THE COURT:  Is that a fair way to put it?

16          MR. KOENIG:  I agree, Your Honor.  There are --

17  they can prosecute their claim however they wish but there

18  are likely to be consequences of that, including that the

19  Plan Administrator may simply object and say the evidence

20  you've provided is not verifiable by us and so we have to

21  object.

22          And I don't know where that goes in the future.

23  That's not for today.  But we'll explain that in the revised

24  procedures and run it by opposing counsel.

25          THE COURT:  You make one final -- you made a point

1  that I did want to touch on in my ruling and I missed it in

2  my notes and that is that I understand the concern I think

3  particular expressed by Ms. Diers on the shifting of the

4  burden.

5          I'm not really satisfied that that's actually

6  what's happening here.  I am obviously intimately familiar

7  with the mechanics of claim objections and the Allegheny

8  standard of, you know, claim, very low standard objection,

9  pretty low standard, and then we start teeing it up and it

10 goes back and forth until we get to a trial on the claim

11 itself.

12         I don't think that the procedures that you have do

13 violence to parties' expectations in that regard and so I

14 think that we can proceed and I do believe that it will

15 provide a usable mechanism by what I expect will be a pretty

16 broad range of participants to allow the estate to manage the

17 litigation.

18         And, you know, you've touched on it a couple times

19 and it is something that the Court is desperately -- or not

20 desperately, but very, very focused on in all cases and that

21 is, you know, we get post-confirmation and I want

22 distributions to occur.

23              MR. KOENIG:  Um-hum.

24              THE COURT:  And I have seen too many cases simply

25 burn all of the distributions on litigating.  And that's not

1  a fault of the counsel or anybody else.  It's just the

2  mechanics of the process.

3          So the point expressed by the Plan Administrator

4  is to come up with something that will allow for prompt

5  allowance of claims and distributions on those claims without

6  requiring, you know, an enormous amount of litigation and I

7  agree and I think that these are calculated to achieve that

8  result.  Okay?

9          MR. KOENIG:  Thank you, Your Honor.  We appreciate

10  the clarification.

11          THE COURT:  Very good.

12          Are there any questions?

13     (No verbal response)

14          THE COURT:  All right.  I appreciate everyone's

15  time this morning and, with that, we are -- or this -- now

16  it's this afternoon.  With that, we are adjourned.

17          Thank you, counsel.  Safe travels.

18          (Proceedings concluded at 12:08 p.m.)

19

20

21

22

23

24

25

1                        CERTIFICATION

2            I certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of my

5    knowledge and ability.

6

7    /s/ William Garling                    February 27, 2025

8    William J. Garling, CET-543

9    Certified Court Transcriptionist

10   For Reliable