UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

|  |  |
|---|---|
| IN RE: | . Chapter 11 |
|  | . |
|  | . Case No. 24-10070(BLS) |
| TERRAFORM LABS PTE., LTD, | . |
| et al, | . 824 Market Street |
|  | . Wilmington, Delaware 19801 |
| Debtors. | . |
| . . . . . . . . . . . . . . . | . Wednesday, April 9, 2025 |

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE BRENDAN L. SHANNON
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Plan
Administrator:                 Zachary I. Shapiro, Esq.
                               RICHARDS, LAYTON & FINGER, PA
                               One Rodney Square
                               920 North King Street
                               Wilmington, Delaware 19801


For the U.S. Trustee:          Jane Leamy, Esq.
                               Linda Richenderfer, Esq.
                               OFFICE OF THE U.S. TRUSTEE
                               844 King Street, Suite 2207
                               Wilmington, Delaware 19801


For White & Case, LLP:         Gregory F. Pesce, Esq.
                               WHITE & CASE, LLP
                               111 South Wacker Drive
                               Suite 5100
                               Chicago, Illinois 60606



(Appearances Continued)

Audio Operator:                Electronically Recorded
                               by Court Personnel

Transcription Company:         Reliable
                               1007 N. Orange Street
                               Wilmington, Delaware 19801
                               (302)654-8080
                               Email:  gmatthews@reliable-co.com


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES:   (Continued)

For White & Case, LLP:        Colin T. West, Esq.
                              Barrett Lingle, Esq.
                              WHITE & CASE, LLP
                              1221 Avenue of the Americas
                              New York, New York 10020


APPEARANCES VIA ZOOM:   (On the Record)

For the Plan
Administrator:                Christopher S. Koenig, Esq.
                              KIRKLAND & ELLIS, LLP
                              KIRKLAND & ELLIS
                               INTERNATIONAL, LLP
                              333 West Wolf Point Plaza
                              Chicago, Illinois 60654

<u>INDEX</u>

PAGE

Status Conference                                                    4

Application of White & Case LLP for Payment of Fees and    11
Expenses as Counsel to the Official Committee of
Unsecured Creditors [Docket No. 861]



<u>EXHIBIT</u>                                              <u>EVID.</u>

Pesce Declaration at ECF 982                               18

1        (Proceedings commence at 11:32 a.m.)

2        (Call to order of the Court)

3            THE COURT:  Please be seated.  Good morning.

4            PARTICIPANTS:  Good morning.  Good morning, Your

5    Honor.

6            MR. SHAPIRO:  Good morning.  For the record, Zach

7    Shapiro of Richards, Layton & Finger on behalf of the plan

8    administrator.

9            We have a --

10           THE COURT:  Good morning.  Good to see you.

11           MR. SHAPIRO:  We have a short agenda.

12           Just one item that we'd like to address before

13    turning it over to the movant is --

14           THE COURT:  Sure.

15           MR. SHAPIRO:  -- a brief status conference.  My

16    colleague at Kirkland & Ellis, Chris Koenig, should be on --

17    there he is -- he'll provide that to you, and then we'll cede

18    the podium to the movant.  Thank you.

19           THE COURT:  That sounds great.

20           MR. KOENIG:  Good morning, mister honor -- good

21    morning, Your Honor.  Good to see you.  Can you hear me okay?

22           THE COURT:  I sure can.

23           MR. KOENIG:  Thank you.

24           For the record, Chris Koenig of Kirkland & Ellis,

25    on behalf of Todd Snyder, the Plan Administrator.

1          Your Honor, as Mr. Shapiro said, before getting to

2     the one substantive item on today's agenda, we wanted to take

3     a moment and give the Court brief updates on two important

4     topics.

5          THE COURT:  Okay.

6          MR. KOENIG:  The first is the crypto loss claims

7     process.  After Your Honor entered the order approving the

8     claims procedures on March 12th, the plan administrator

9     finalized the opening of the claims portal, which went live

10    on March 31st.  The claim portal has now been open for a

11    little bit more than a week and, so far, the process has been

12    very successful.  Creditors from all over the world have been

13    able to log in and successfully submit claims.  In just over

14    1 week, we've received over 3,500 claims.

15         Your Honor may recall the difference between the

16    preferred evidence and the manual evidence under our claims

17    procedures.

18         THE COURT:  Right.

19         MR. KOENIG:  Preferred evidence is more the

20    reliable data.  And the great news, from our perspective, is

21    that nearly 3,200 of the 3,500 claims have submitted only

22    preferred evidence, which would lead to the more streamlined

23    claims process that we were hoping would be the case.

24         Relatedly, the claims -- the crypto loss claims

25    procedures order authorized the plan administrator to extend

1   out dates and deadlines in his discretion.  And yesterday,

2   the plan administrator filed a notice at Docket Number 986

3   that extended out the crypto loss claims bar date from April

4   30th to May 17th.  We wanted to ensure that claimants had

5   sufficient time to fill out this claim form on the claim

6   portal.

7           That's all on the crypto loss claims process.

8   Unless Your Honor has any questions there, I'll turn to the

9   other quick update I was hoping to provide.

10           THE COURT:  No.  That's certainly welcome knows.  I

11   know that, from our prior hearings, there was concern about

12   how smoothly this would go and the nature of the information

13   you would be receiving, and so I'm certainly gratified to

14   hear that it's been moving.

15           I assume that you'll go through a claims

16   administration process; and, to the extent you need

17   assistance with scheduling, et cetera, you will find the

18   Court to be a willing partner in that process.

19           MR. KOENIG:  Wonderful.  We appreciate that, Your

20   Honor.

21           The second topic that we wanted to raise this

22   morning is just to bring to Your Honor's attention litigation

23   that the plan administrator is bringing in the FTX Chapter 11

24   case, which is now pending in front of Judge Owens in this

25   district.

1          THE COURT:  I heard.

2          MR. KOENIG:  We filed a written update --

3     (Laughter)

4          MR. KOENIG:  We filed a written update on the topic

5     -- we filed a written update on this topic at Docket Number

6     983, but just wanted to briefly summarize it for Your Honor,

7     given the importance of this matter to the TFL estate.

8          THE COURT:  Thanks.

9          MR. KOENIG:  But the key --

10         THE COURT:  I mean, I'm kind of busting your chops

11    a little bit.  I did hear from Judge Owens, who has inherited

12    the FTX matter from Judge Dorsey, that she did advise that

13    one of my debtors was making trouble in her case.  So that

14    has "not my problem" written all over it.  But I did not have

15    a chance to review the submission you have at Docket Number

16    983, so I'd certainly appreciate any context you can provide.

17         MR. KOENIG:  Understood, Your Honor.  And that's

18    exactly why we wanted you to be aware of this, just in case

19    you heard it around the water cooler.

20         A key cornerstone of Terraform's Chapter 11 plan --

21         THE COURT:  The Government --

22         MR. KOENIG:  -- is the settlement --

23         THE COURT:  The Government --

24         MR. KOENIG:  -- between --

25         THE COURT:  -- does -- the Government does not give

1   us water coolers.

2           THE COURT:  I want to be clear --

3           MR. KOENIG:  I was just --

4           THE COURT:  -- just in case --

5           MR. KOENIG:  -- busting your chops --

6           THE COURT:  -- Elon Musk --

7           MR. KOENIG:  -- Your Honor.

8           THE COURT:  -- or anybody else is listening.

9       (Laughter)

10          MR. KOENIG:  Understood, Your Honor.  I was just

11  returning the busting of the chops.

12          A key cornerstone in Terraform's Chapter 11 plan is

13  the settlement between Do Kwon, the Terraform founder, and

14  the Securities and Exchange Commission.  Pursuant to that

15  settlement, Mr. Kwon agreed to turn over a significant amount

16  of property to the SEC, who agreed to distribute that

17  property through Terraform's Chapter 11 plan to holders of

18  allowed crypto loss claims.

19          One of the most significant pieces of property in

20  that settlement with the SEC were 500 million of a particular

21  kind of cryptocurrency token called PYTH token, P-Y-T-H.  And

22  the PYTH token was traded almost entirely on the FTX

23  exchange.  So, when FTX filed for bankruptcy, those tokens

24  were locked on the exchange.

25          The PYTH Data Association, who is the issuer of the

PYTH token -- and I'll refer to them as "PDA" -- had filed a

motion in the FTX bankruptcy case seeking relief from the

automatic stay for authority to re-mint these PYTH tokens and

send them to the holders of the old PYTH tokens.  That is,

given the difficulties of opening the FTX exchange to allow

holders to simply withdraw the old tokens, PYTH created new

tokens and sent them to the holders of the old tokens.  The

order in the FTX case required that PDA would use, quote,

"typical and customary identification procedures" as part of

the re-minting plan.

Now the problem here is that PDA did not use

typical or customary identification procedures with respect

to Mr. Kwon.  PDA required a live video verification of each

customers in order to claim the tokens.  Mr. Kwon was, at the

time, detained in a jail in Montenegro and could not meet the

video verification requirement.  Although Mr. Kwon's wife,

who had a power of attorney from Mr. Kwon, and Mr. Kwon's

outside counsel both repeatedly tried to work with PDA on

alternative -- on alternate identification procedures,

including a video verification of the identities of his wife

or outside counsel, PDA simply refused to engage and failed

Mr. Kwon out of the process.  Notably, Mr. Kwon was the

founding director of the PDA; they knew very well who he was.

Now Your Honor may find all of this a little bit

perplexing.  But the key point in all of this is that

1    customers who failed the identification process, not only

2    forfeited their right to the tokens, but PDA actually took

3    those tokens for itself.  This is a fact that was never

4    disclosed in the FTX bankruptcy proceeding to Judge Dorsey,

5    when he was running the matter.  At the time that those

6    tokens were seized by PDA, they had a value of approximately

7    $215 million.  So our perspective is that PDA was

8    economically incentivized to run a flawed customer

9    identification process, so it could seize those tokens for

10   itself and, thereby, enrich itself.

11          So the takeaway of all of this, Your Honor, is that

12   Mr. Kwon filed a motion in the FTX Bankruptcy Court to

13   enforce the automatic stay order with respect to this flawed

14   identification process, and the plan administrator has been

15   in close contact with Mr. Kwon's counsel and filed a robust

16   joinder, due to the importance of this issue to the Terraform

17   estate and to Terraform creditors.

18          Obviously, this is not a matter that is for Your

19   Honor to decide.  We simply say all of this to give context

20   to what the plan administrator is doing to maximize the value

21   of the estate's assets for the benefit of Terraform's

22   creditors, and just to make sure that Your Honor was aware of

23   this important litigation pending elsewhere in your

24   courthouse.

25          THE COURT:  No, I appreciate the report.  I will

1    pull Docket Number 983, which I think you've told me is a

2    report on it.  I did not have any visibility into it, again,

3    other than just hearing that there was activity in the case,

4    so it's certainly helpful and I appreciate the context.

5              Right now, I think consistent with your comments,

6    there's nothing that you're looking for from me in connection

7    with this matter, and I expect that Judge Owens will take me

8    off her Christmas card list.

9              MR. KOENIG:  Understood, Your Honor.  We hope that

10   that's not the case.  But we just wanted to make sure you

11   understood what we were doing elsewhere in the courthouse.

12   Thank you.

13             THE COURT:  Very good.  Thank you very much, Mr.

14   Koenig.  Anything else?

15             MR. KOENIG:  No.  Thank you.  Appreciate the time.

16             THE COURT:  Very good.

17             I think that moves us to our agenda?  Mr. Pesce,

18   good morning.  Good to see you again.

19             MR. PESCE:  Good morning, Your Honor.  It's good to

20   be here again.  Thank you.

21             So, for the record, Gregory Pesce of White & Case

22   in support of our substantial contribution application.

23             How we were going to proceed this morning was my

24   colleague Mr. West was here to handle any evidentiary issues,

25   including the submission of the declaration.  I was then

1    going to --

2              THE COURT:  Good morning, Mr. West.

3              MR. WEST:  Good morning.

4              THE COURT:  It's good to see you again.  I hope

5    you've been well.

6              MR. PESCE:  And then, once the evidentiary portion

7    is addressed, however Your Honor sees fit -- and I think the

8    U.S. Trustee might want to be heard in that regard -- I was

9    going to address the substance of the application and address

10   any objections that the trustee has.

11             THE COURT:  I think that sounds fine.

12             Can I hear from the United States Trustee just on

13   the mechanics of the hearing?  Ms. Leamy, good to see you.

14             MS. LEAMY:  Good morning, Your Honor.  Good to see

15   you, as well.

16             For this morning's hearing, I'll be handling the

17   argument portion and Ms. Richenderfer is going to address the

18   evidentiary issues.

19             THE COURT:  Okay.

20             MS. LEAMY:  Thank you.

21             THE COURT:  What are our evidentiary issues?  Are

22   you expecting to cross-examine Mr. Pesce regarding his -- we

23   have a declaration from Mr. Pesce.

24             Ms. Richenderfer, good morning.  Welcome.

25             MS. RICHENDERFER:  Good morning, Your Honor.  I was

1    glad to hear the update on FTX because I'm involved in both

2    cases, so I've been following both very carefully.

3            On the evidentiary issues, I guess this is where we

4    are because we want -- don't want to prolong this, we don't

5    want to waste the Court's time.  And we know that Your Honor

6    is more than capable of taking the declaration for what it is

7    worth.  We had had discussions with Mr. Pesce regarding they

8    wanted to file a late reply, and we were in agreement with

9    that, and then what we saw filed was this declaration.

10           Your Honor, I think that the declaration is -- has

11   a lot of hearsay in it.  I think a lot of it is irrelevant to

12   the issues that were raised in the motion that was filed by

13   White & Case, and I think a lot of is legal argument.  They

14   easily could have slapped the title "Reply" on it.

15           And so, if Your Honor is going to take this

16   declaration for the truth of the matter of everything that's

17   asserted in here, then we will need to do some cross-

18   examination.  If Your Honor -- as I said, I know you are more

19   than capable of looking at this and taking it for what it is

20   worth, then there is no need to cross-examine Mr. Pesce

21   because I don't like the scenario of putting counsel on the

22   stand.  But he put himself in this position, unfortunately.

23           THE COURT:  I understand.

24           Mr. Pesce, I'd like your thoughts, or Mr. West.

25           MR. WEST:  Good morning, Your Honor.

1          THE COURT:  Good morning.

2          MR. WEST:  Nice to see you again.

3          THE COURT:  Good to see you.

4          MR. WEST:  Colin West of White & Case.

5          So we did submit the declaration on Monday.  It was

6     submitted contemporaneously with the reply brief.  But at the

7     same time, we would have the ability to call Mr. Pesce live.

8     We thought it more efficient to submit his declaration -- or

9     his testimony by written declaration.  So we don't really see

10    an issue with the timing of the declaration.

11         To the extent there are substantive legal

12    objections to what's in the declaration, I think I heard

13    legal argument, hearsay, and relevance.  I --

14         THE COURT:  I think I'd like to chime in and I'd

15    like Ms. Richenderfer's thoughts because, kind of taking your

16    lead, obviously, I got the declaration and I read it.  I

17    understand the concern about that some of this is hearsay.  I

18    think I under -- I actually found the declaration was helpful

19    to give me some context because you may not recall, but I had

20    zero visibility into what was happening at the outset of this

21    case.  Mr. Pesce, I think you'll remember the hearing, and

22    all I did was adjourn a matter, and that's really the last

23    that I heard.

24         I'm happy to give you the opportunity to cross.  I

25    think the issue is more of a legal issue --

1          MS. RICHENDERFER:  Yes.

2          THE COURT:  -- here.  It's helpful for me to

3     understand what was happening, in terms of the retention of

4     counsel, what was done, et cetera.

5          MS. RICHENDERFER:  Uh-huh.

6          THE COURT:  But as I read your objection, your

7     objection is primarily a legal one about the interplay of 327

8     and 503, and so I don't believe that I need extensive direct

9     or cross from Mr. Pesce.

10          If we get into a debate about the nature of the

11     services, you know, then we might have to rethink that.  But

12     I don't think that this is that much about what services were

13     done, it's -- your argument is that a professional

14     representing a committee has to be retained in order to be

15     compensated.  And their point is that they were engaged by

16     the committee, were performing services, and then the

17     committee made a decision, basically, and that the services

18     that they provided were, you know, valuable and necessary, et

19     cetera.

20          But I don't think that my -- my instinct would be,

21     if you're asking me, I don't think that much would come out

22     of either direct or cross from Mr. Pesce.  This is not one of

23     those situations where we've having an objection, for

24     example, to a fee app, straight-up fee app, and the argument

25     is, you know, look, we shouldn't pay this fee app, this --

1    whatever you did was a fool's errand --

2            MS. RICHENDERFER:  Uh-huh.

3            THE COURT:  -- or you didn't do anything and it was

4    duplicative of everyone else.  That's not really what this is

5    about.  That would be a situation where we would need Mr.

6    Pesce's testimony to say this is what we did, we were the

7    only ones doing it, it was really important, and this is why

8    it was valuable and you should pay us 330, 331.

9            That's not really the discussion we're having.  So

10   I'm certainly not foreclosing --

11           MS. RICHENDERFER:  Uh-huh.

12           THE COURT:  -- your right to cross-examine.  I have

13   the declaration and I'd be prepared to deal with it and have

14   it as part of our record, but I think I can take it for what

15   it is.

16           And again, I want to be clear that it is sort of a

17   hybrid between a reply and an affirmative declaration, but I

18   don't believe that the U.S. Trustee is going to be, you know,

19   on the back foot by not testing various propositions about

20   what was done or, you know, who spoke to who.  Does that make

21   sense to you?

22           MS. RICHENDERFER:  Your Honor, that's exactly our

23   thinking.

24           I think my only concern is it seems like the end of

25   the declaration tries to put forth the information that would

1    have been included if they did file an application to be

2    retained.  And we certainly, as the U.S. Trustee's Office,

3    would have had many followup questions to certain aspects of

4    that.  I don't know what the answers are, and I -- it's not

5    something I want to see played out in front of the Court

6    because, normally, when we do get a timely application, we

7    have a back-and-forth and then we reach a decision whether we

8    want to object or not.

9              THE COURT:  Whether you object or not --

10             MS. RICHENDERFER:  Right.

11             THE COURT:  -- and you get supplemental

12   disclosures, et cetera, none of which happened here.

13             MS. RICHENDERFER:  Exactly, Your Honor.

14             So that's why, when I look at the back of this and,

15   primarily due to White & Case's representation --

16             THE COURT:  Of Celsius.

17             MS. RICHENDERFER:  -- of Celsius, we would have had

18   extensive questions and back-and-forth on that.  We just

19   never got to that point.

20             Again, that's not something normally we play out in

21   front of the Court, and we usually consider that to be in the

22   guise of settlement discussions, if we can try to resolve it.

23   And so that is our only -- the concern that I walk in here

24   with today.

25             THE COURT:  Why don't we do this?  I think that we

1   should -- I don't know what other evidence we have, other

2   than the declaration.  I think we should probably proceed --

3          MS. RICHENDERFER:  Uh-huh.

4          THE COURT:  -- with argument and your rights are

5   reserved.  If this seems to go off the rails and we start to

6   get into a debate about eligibility or conflicts, et cetera,

7   then we can test that proposition or -- you know, I don't --

8   I certainly don't want to extend this.  But if there's a --

9   if it becomes relevant, you know, we would be able to have

10  that discussion and open the hearing.  So the Court is -- I'm

11  not foreclosing --

12         MS. RICHENDERFER:  Okay.

13         THE COURT:  -- the cross-examination.

14         I will admit the declaration --

15         MS. RICHENDERFER:  Okay.

16         THE COURT:  -- noting your relevance and hearsay

17  objections.

18     (Pesce Declaration at ECF 982 received in evidence)

19         THE COURT:  And I think we can reserve your rights.

20  If need be, we can move forward.  Obviously, Mr. West is here

21  today to -- if we need to put Mr. Pesce on the stand.  It's

22  not ideal, but we've done it before and it's -- you know,

23  it's something that I wasn't certain whether we were going to

24  proceed with live testimony.  And I think what we should do

25  is start the hearing and then get a sense of whether or not

1   the circumstances requiring the witness on the stand.

2          MS. RICHENDERFER:  Your Honor, the UST has no

3   objection to proceeding in that fashion --

4          THE COURT:  Okay.

5          MS. RICHENDERFER:  -- because we don't want to go

6   down roads we don't need to.  And like I said, we don't like

7   putting, in open court, counsel on the stand to have to

8   testify about things like this.

9          THE COURT:  Judge Balick, you'll recall, she never

10  let -- when lawyers testified, she wouldn't swear them in

11  because you're an officer of the Court and you are obliged to

12  speak candidly to the Court.

13         MS. RICHENDERFER:  Your Honor, I've been in those

14  situations before, where I have not objected to counsel not

15  being sworn in because there are bigger repercussions if they

16  don't tell the truth --

17         THE COURT:  Yeah.

18         MS. RICHENDERFER:  -- when they're on the stand

19  than just --

20         THE COURT:  All right.

21         MS. RICHENDERFER:  Okay.

22         THE COURT:  So why don't we do this?  We'll proceed

23  with the motion.  And again, to the extent that you feel it's

24  necessary then, I -- your rights are fully reserved --

25         MS. RICHENDERFER:  Okay.

1          THE COURT:  -- to adduce testimony.  Okay?

2          MS. RICHENDERFER:  Okay.  Thank you, Your Honor.

3          THE COURT:  Great.

4          Mr. Pesce.

5          MR. PESCE:  Thank you, Your Honor.

6          THE COURT:  Again, good morning.

7          MR. PESCE:  And thank you for keeping me from

8     making my maiden voyage as a witness on the bankruptcy court

9     stand today.

10         So, for the record again, Gregory Pesce of White &

11    Case on behalf of our substantial contribution application.

12    That was filed on January the 31st at Docket 899.  For the

13    record, the declaration was Docket 982 on April the 7th --

14         THE COURT:  I have it.

15         MR. PESCE:  -- and we're responding -- we're going

16    to be responding to the trustee's filing, 899.

17         I think the -- we can keep the argument here

18    relatively short and straightforward.  So White & Case was

19    engaged by the Official Committee of Unsecured Creditors in

20    this case, despite the statements that were made at the

21    first-day hearing and then the second- or third-day hearings,

22    however you want to count them.  The narrative that was

23    presented to the Court that there were no creditors, yet the

24    company had to file for bankruptcy, proved to be demonstrably

25    false.  Rather than having a handful of taxing creditors,

1    which were listed on the first top creditor list, there ended

2    up being tens of billions of dollars of claims --

3              THE COURT:  Of claims.

4              MR. PESCE:  -- and Mr. Koenig and Mr. Snyder are

5    now working diligently to provide a recovery to those

6    creditors in their efforts.

7              White & Case was engaged, ultimately, by the

8    committee when it was appointed about a month into the case,

9    after much hard work by Ms. Richenderfer and Ms. Leamy to get

10   that committee appointed.  As we -- I don't need to belabor

11   sort of the stuff in the declaration.  But you know, in

12   short, following that hearing and some of the veiled

13   statements that were made by counsel to -- or then counsel to

14   the debtors, we were removed from the assignment.  That was a

15   regrettable turn of events.

16             You know, during -- while we were only there for

17   about a week, the work we did, I believe, did provide a

18   substantial contribution to the estate.  Despite the initial

19   posture of the case, where it was going to be a multi-year

20   case, they were basically going to run -- the estate's

21   position was they were going to run down the estate's

22   resources to zero on an appeal to the Supreme Court to deal

23   with various --

24             THE COURT:  Right.  From the --

25             MR. PESCE:  -- novel issues --

1          THE COURT:  -- SEC litigation and the --

2          MR. PESCE:  Right.

3          THE COURT:  -- judgment.

4          MR. PESCE:  Ultimately, cooler heads prevailed and

5    the strategy that we put forward at that hearing about trying

6    to engage and reach a subordinated resolution with the SEC

7    came to pass.  That cleared the way, ultimately, many months

8    later, for confirmation of a plan that had all of the support

9    that it did.

10         Regrettably, due to the circumstances around the

11   turnover and the tumult in the committee, we were,

12   unfortunately, not able to see that great result --

13         THE COURT:  A process story.

14         MR. PESCE:  -- at the end of the day.  And we were

15   sort of in an unusual position because, while we provided, at

16   the direction of the committee and Mr. West and my colleague

17   Mr. Colodny, I think, were the laboring oar of this, in terms

18   of losing sleep for, you know, that week or so, getting ready

19   for that hearing.  While we were not -- while we did all that

20   work, ultimately -- and it was at the direction of the

21   committee, to be clear -- we were not able to actually file a

22   retention application, which we very much were planning to

23   do, or comply with the traditional fee approval mechanisms.

24         You know, while the trustee says well, it's our, in

25   air quotes, "White & Case's retention application," at the

1  end of the day, we represent a client, and we needed their --

2        THE COURT:  Sure.

3        MR. PESCE:  -- buy-in, which was --

4        THE COURT:  The client has to sign it.

5        MR. PESCE:  -- which was not feasible.  That wasn't

6  feasible.

7        So what we had to do was find a different way that

8  we thought was consistent with the Bankruptcy Code and also

9  gave credence to the important issues that the United States

10  Trustee has, to make sure that people aren't getting hired

11  and departing before, you know, they have to actually get

12  retained and short-circuiting that process.

13        We believe that the provisions of Section 503 of

14  the Bankruptcy Code, when viewed in the context of what we

15  also submitted to ensure that this wasn't an end run, is an

16  appropriate mechanism in this case.

17        THE COURT:  How do I deal with the U.S. Trustee's

18  core argument about the interplay of 327 and 503 and 1102?

19  Pardon me.

20        And you know, I've dealt with this issue before --

21        MR. PESCE:  Uh-huh.

22        THE COURT:  -- and I'm sure you've seen it before;

23  whether you've been on the receiving end or not, I'm sure

24  you've been in cases where these sorts of things have

25  happened.  Often, it's even more dramatic.  And I believe

1   next door, in the Franchise Group matter, it came up where,

2   you know, the U.S. Trustee's issue -- this is kind of

3   unusual.  I have not had this fact pattern, where a committee

4   simply decides, you know, thanks, but we're going to go with

5   just the one counsel --

6                   MR. PESCE:  Right.

7                   THE COURT:  -- early on.  I have not seen this

8   before.

9                   MR. PESCE:  Right.

10                  THE COURT:  In some ways -- so it's not,

11  necessarily speaking, directly to the concerns the United

12  States Trustee has, which are counsel shows up for the debtor

13  for the committee, whatever --

14                  MR. PESCE:  Uh-huh.

15                  THE COURT:  -- engages in the case, works in the

16  case, does all kinds of stuff, files an application, and that

17  application is denied for cause --

18                  MR. PESCE:  Uh-huh.

19                  THE COURT:  -- you're conflicted, you're not

20  eligible, whatever.  At that point, then the U.S. Trustee's

21  point is 503 is not a safety valve to pay you for work.  How

22  does I distinguish this case from that circumstance?

23                  MR. PESCE:  Sure.  I think this one is readily

24  distinguishable in this regard:  Unlike in Franchise Group,

25  where these other situations were a law firm shows up,

1    there's a substantive objection to their retention, and they

2    -- in a contested hearing, and they were found to not be

3    qualified to represent the estate or the committee, here,

4    there was an internal decision, effectively, by the committee

5    to change course after they had made that determination.  We

6    were not stepping aside because of an irreparable conflict or

7    failure to provide the relevant disclosures.

8            If we had been -- if we had been retained or even -

9    - I'll submit, even if we had sought retention under 1103 and

10   complied with, you know, 320 -- you know, with the 330, 331

11   process, and then didn't get it, clearly, that's not a safety

12   valve that we could rely on.  We played by the rules, we, in

13   that case, would have lost, and we can't resort.

14           Here, it's different because we weren't,

15   effectively, sort of given, you know, the keys to the car to

16   start driving it down the road in the first place.  And as a

17   result, the committee and -- because it was a committee for

18   the benefit of all unsecured creditors, which was the entire

19   the case -- there was no secured debt -- it was, by

20   definition, efforts we were doing for the benefit of someone

21   larger than ourselves, as a -- you know, a putative

22   administrative creditor, representing that committee.

23           I would not be here before you today if we had been

24   disqualified or if the retention had been --

25           THE COURT:  Sure.

1          MR. PESCE:  -- denied or fees hadn't been approved

2     or whatnot.  This is a very, very narrow issue where we're

3     not -- we don't even get to the 1103 and the fee approval

4     piece.  I'm trying to rectify what, otherwise, would be,

5     effectively, a windfall to the estate for a couple hundred

6     thousand dollars --

7          THE COURT:  Uh-huh.

8          MR. PESCE:  -- for the work that we provided that

9     then laid the groundwork for the future settlement that was

10    in the case.

11         THE COURT:  Okay.

12         MR. PESCE:  So, in terms of -- just to sort of make

13    a couple of other points here.  So, first off, look, we don't

14    -- since we stopped -- we would have filed a retention

15    application, we would have gone through the fee approval

16    process, the U.S. Trustee would have had standing to object

17    on those matters.  You know, we do make the point that they

18    don't have standing on the substantial contribution issue.

19    Be that as it may, in terms of the substance of the trustee's

20    argument:

21         First, we do think we made a substantial

22    contribution, setting aside the unique particularities of

23    this case.  Like I said, we developed the strategy for the

24    settlement that ultimately prevailed in case.  We weren't

25    doing it for ourselves.  This isn't like the lawyer for a

1    trade creditor trying to get a better outcome.  We literally

2    were providing -- representing an estate -- or an estate

3    fiduciary that was a fiduciary for tens of billions of

4    dollars of claims.  We think that more than satisfies the

5    issues about self-interest that aren't here and the ultimate

6    achievement.  We were, in fact --

7            THE COURT:  Can I ask you a question?

8            MR. PESCE:  Yes, sir.

9            THE COURT:  What if we -- would the same

10   proposition apply with debtor's counsel?  A debtor files a

11   case with -- and it's a Delaware case, so you've got a

12   capable outside firm, a capable Delaware firm.  The case gets

13   started and you were, you know, a few weeks in, and the

14   debtor simply decides you know something, we're just going to

15   stick with Richards or Young Conaway or whatever, for

16   whatever reason.  So the debtor, at that point, wouldn't sign

17   the retention application.

18           Does the firm have any recourse?  Would it be in

19   the same position that you're in, saying -- and again,

20   debtor's counsel -- I don't -- I have not looked about

21   whether debtor's counsel would be eligible under 503; I think

22   that might be limited to creditors.  But you understand the

23   proposition.

24           MR. PESCE:  Yeah.  I don't think this really would

25   apply in that circumstance because the position that White &

1  Case was in was we were, effectively, a putative

2  administrative creditor like a -- I guess like debtor's

3  counsel would be there, but we were working on behalf of a

4  creditors' committee, which was a fiduciary for creditors.  I

5  think the retention standards are, frankly, a little bit --

6  they're somewhat different in that circumstance.

7          THE COURT:  They are.

8          MR. PESCE:  For example, representing a pre-

9  petition creditor is not, per se, disqualifying --

10          THE COURT:  Of course.

11          MR. PESCE:  -- there's -- the Bankruptcy Code

12  actually sets forth rules for retaining counsel, which was

13  something, which I touch on in the declaration, might not

14  have been followed.  So the long and short of it is I think

15  it is different.  I think this is a very narrow issue for a

16  committee professional that was presented in this particular

17  case and with these circumstances.

18          THE COURT:  Okay.  I understand.

19          MR. PESCE:  So -- and to that end, even though we

20  were not retained and we had to -- and we're relying on this

21  different procedural mechanism here, we don't believe this is

22  an end run.  We went through the process of actually running

23  the full conflicts report, we put in a declaration, we talked

24  about what the services would have been, what the fee

25  structure would have been.

1          And to Ms. Richenderfer's point, I'm fully

2   sympathetic to that, I regularly engage with them -- with her

3   office on these types of issues.

4          THE COURT:  Of course.

5          MR. PESCE:  You know, to the extent any of the

6   disclosures that we have provided to date might require

7   further elaboration, we're happy to provide that and, you

8   know, we'd be happy to -- if this mechanism works, we can

9   work with her to try to resolve any questions that they might

10  have had in that regard about, you know, for example, the

11  Celsius creditor that she mentioned.

12         So, you know, look, at the end of the day, law

13  firms work for clients.  Clients are fully allowed to change

14  course.  I think, in this case, what we are looking at is a

15  very narrow issue, which is that the estate got a windfall,

16  effectively, from the work we provided that set up that

17  hearing, where Your Honor made some important rulings that

18  sort of set the stage for the rest of the case.

19         And even if a law firm is replaced by their client,

20  that doesn't mean, absent duplication --

21         THE COURT:  Sure.

22         MR. PESCE:  -- negligence, you pay the bill.

23         With the Bankruptcy Code, there's an additional

24  overlay, of course, with Your Honor and the approval process.

25  We've tried to, narrowly here, to the terms of 503, avoid the

1    issue that this sort of becomes an exception that swallows

2    the rule, and make it clear, you know, this isn't a situation

3    for any creditor that represents a trade creditor, looking

4    out for their interests.  This was an estate fiduciary that

5    did work at the direction of an estate body appointed by the

6    trustee, and we're just looking to get the fees for that

7    period paid.

8         We are happy to -- you know, if there's questions

9    about the specific entries, if we need to answer questions

10   about, you know, how we were staffing it for that limited

11   period of time, any of the disclosures that were made, if

12   there's other parties that might have been relevant in the

13   purview of the U.S. Trustee, we're happy to, you know, take

14   that up at a -- after the hearing, to try to clear that up,

15   if this procedure as we've set it out works for the Court in

16   this case.

17        THE COURT:  Very good.

18        MR. PESCE:  Thank you.  We appreciate your time

19   today.  And if there's responses that I have to make, I'll --

20        THE COURT:  Of course.

21        MR. PESCE:  -- return to address those.

22        THE COURT:  Ms. Leamy.

23        MS. LEAMY:  Jane Leamy for the U.S. Trustee.

24        Your Honor, at the outset, I just want to take a

25   few seconds to address the standing issue because it is

1   referenced in the declaration/reply.  We dispute White &

2   Case's contention that the U.S. Trustee does not have

3   standing to raise an objection to their application for fees.

4            First, the U.S. Trustee has standing under Section

5   307 to raise and appear -- raise and may appear and be heard

6   on any issue in any case or proceeding.

7            Second, Your Honor, *sua sponte*, has the ability to

8   review fees.

9            Third, we dispute, obviously, by the nature of our

10  objection, that this is even about an administrative claim.

11           And finally, Your Honor, the language of the plan,

12  it doesn't say that the plan administrator has sole

13  authority, it just says that, if no objection to an

14  administrative claim or request is filed on or before the

15  deadline, the claim will be allowed.

16           So, Your Honor, we think there's a gating issue

17  here, and that it's under 503(b)(3)(D), that a substantial

18  contribution claim is only permitted by the entities that are

19  listed there.  And it specifically excludes a committee -- an

20  official committee appointed under Section 1102, and that's

21  the entity for which White & Case rendered services and for

22  which it seeks allowance of its claim.  As a result, the U.S.

23  Trustee does believe that this application is an improper run

24  around the retention requirements of 1103 and the

25  professional compensation requirements of Section 330.

1          Mr. Pesce spends a lot of time explaining how this

2     is a unique case and it's unusual and that the firm should be

3     allowed to have its fees paid, but they do not dispute that

4     the requirements of Section 503(b)(3)(D) are not met.

5          He spent a little bit of time explaining -- I don't

6     think we really got a full explanation.  He acknowledges that

7     the committee didn't permit a retention application.  It's

8     not really clear --

9          THE COURT:  Yeah --

10         MS. LEAMY:  -- why.  And that would be the answer

11    to the problem here, is, if the committee said file a

12    retention application for the week and a half of work, you

13    know, everyone can have the opportunity to review and object,

14    if you're retained for that week and a half, you can then

15    file a final fee application.  I've seen that done in other

16    cases.  For whatever -- you know, there's different reasons

17    that a firm may withdraw.  So I don't think it's that unusual

18    in this instance.  There are a lot of cases where firms,

19    whether for debtor's counsel or for committee counsel, may

20    withdraw.

21         There's a lot of time spent on what the substantial

22    contribution was.  I don't think Your Honor really needs to

23    consider that because, as we indicated in our papers, there's

24    a gating issue as to whether they meet the requirements of

25    the statute to even apply for a substantial contribution

1   claim.  But the focus on the Dentons retention, I just wanted

2   to remind Your Honor that the U.S. Trustee filed a written

3   objection, the SEC filed a written objection.

4          THE COURT:  Oh, I remember.

5      (Laughter)

6          MS. LEAMY:  So there were other parties that

7   contributed.  So I don't think we can -- you know, the

8   committee had a role, but we can't --

9          THE COURT:  Is that the --

10          MR. PESCE:  -- ascribe it all to them.

11          THE COURT:  That was like the eighty-million-dollar

12   retainer?

13          UNIDENTIFIED:  Right.

14          MS. LEAMY:  Yes.  Right.  And just --

15          MS. RICHENDERFER:  Your Honor, it was 90 million.

16          THE COURT:  It was ninety.

17          MS. LEAMY:  And just as an aside, Your Honor --

18          MS. RICHENDERFER:  Yes, Your Honor.

19          MS. LEAMY:  -- the Dentons fee application is still

20   outstanding.  I think that's either one -- there's a couple

21   of fee apps that are still -- haven't been finally

22   determined.

23          THE COURT:  Okay.

24          MS. LEAMY:  There's been final fee orders for many

25   of the professionals in this case, but I think there are

1    still two outstanding, and that's one of them.

2             THE COURT:  Well, obviously, I make no comment on

3    anybody --

4             MS. LEAMY:  Understood.

5             THE COURT:  -- else's fee application --

6             MS. LEAMY:  Understood.

7             THE COURT:  -- at this point.

8             MS. LEAMY:  So I just wanted to address, you know,

9    that similar situations have been tried.  We reference a few

10   cases in the papers, the Villa Luisa case in Southern

11   District of New York, debtor's counsel -- you know, anyone

12   can say it's a substantial contribution claim, but you have

13   to meet the requirements.  And the Court said no, you have to

14   -- you know, a professional has to be -- for the debtor has

15   to be retained under 327 and has to file a fee application,

16   it's an improper end run.  A similar case in the Third

17   Circuit, F/S Airlease, a broker just sought an admin claim,

18   regular 502 admin claim.  The Court said no, a broker has to

19   be retained, it's a professional.

20            And then, Your Honor, there was another case that I

21   recently had with -- before Judge Owens, I think it was

22   during COVID, the Medley case, I don't have the case number

23   here.  But debtor's counsel in that case withdraw after about

24   a month or two.  And then, at the end of the case, the plan

25   administrator filed a 9019 motion to, essentially, pay their

1    fees for that period of time, and the U.S. Trustee objected

2    on similar grounds here, and Judge Owens sustained the

3    objection, basically, that it's an end run around being

4    retained.

5              So, Your Honor, you know, our position would just

6    be that, you know, while White & Case may have rendered fees

7    that's unpaid for, it's just simply not eligible for the

8    entity that it retained services for to be compensated in

9    this case.  Thank you.

10             THE COURT:  Okay.  I've heard enough.

11             I am going to deny the application.  I am certainly

12   sympathetic to the position that White & Case is in.  The

13   United States Trustee -- and I'm not faulting anybody.  The

14   case law talks about end runs and things like that, which is

15   kind of a loaded term, and I don't see any of that.

16             I have seen, as I said, a number of cases which

17   yield sort of painful and often surprising results months

18   into a case, and you determine that a professional is not

19   eligible and, therefore, cannot be compensated.  And I've had

20   counsel, many, many years ago, nearly faint at that podium

21   with that ruling.  But this is an unusual situation, but I

22   don't believe that it is -- still, notwithstanding the facts

23   that we have, that I accept, I don't believe that the Code

24   permits the payment to be made.

25             I am, again, certainly appreciative of the work

1    that White & Case had done at the outset of the case, and I

2    certainly am sympathetic to the position that they're in,

3    looking to get paid for services that were provided when a

4    client simply made a decision to go with different counsel at

5    the outset.  And in a non-bankruptcy situation, there would

6    be remedies.  You did the work; they got to pay the bill.

7         The fact is that, you know, representations in

8    bankruptcy as counsel, able and experienced counsel obviously

9    know, require the retention, require the approval, in order

10   to be paid.  I am familiar with the Mesa case [sic], and I

11   recall Judge Owens talking about that.  But again, I think

12   the circumstances here are such that I lack the authority to

13   approve and authorize the payment.  I think that there is a

14   body of case law that governs this that is well founded and

15   not in material dispute.

16        So, again, I certainly appreciate the argument by

17   White & Case to distinguish this circumstance from other

18   cases, again, and I don't necessarily quibble that it's not

19   the typical format that we see, but I don't think that the

20   distinction is sufficiently significant to require or permit

21   a further allowance of the claim.

22        I would make one further comment, which is I am

23   satisfied that the trustee, in fact, does have standing here

24   under Section 307, as well as within its core statutory

25   obligations, to deal with review of retentions and review of

1  fees for professionals.  So I don't think that the terms of

2  the plan, which have relatively unremarkable provisions that

3  the trustee -- the plan trustee can determine and allow and

4  pay admin claims in his or her discretion, doesn't remove the

5  United States Trustee from that process.

6          So, again, I am satisfied that the United States

7  Trustee's objection and legal citations are well founded and

8  I will deny the application.

9          Are there any questions?

10          MR. PESCE:  No, Your Honor.

11          THE COURT:  All right.

12          MR. PESCE:  Thank you for your time.  Appreciate

13  it.

14          THE COURT:  Very well.  Thank you very much.  We

15  are adjourned.  Thank you, Counsel.  Be well.

16      (Proceedings concluded at 10:17 a.m.)

17                              *****

18

19

20

21

22

23

24

25

1                        CERTIFICATION

2          I certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of my

5    knowledge and ability.

6

7

8

9

10   _____        April 11, 2025

11   Coleen Rand, AAERT Cert. No. 341

12   Certified Court Transcriptionist

13   For Reliable

14

15

16

17

18

19

20

21

22

23

24

25