**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| TERRAFORM LABS PTE LTD., *et al.*,[1] | ) | Case No. 24-10070 (BLS) |
|  | ) |  |
| Post-Effective Date Debtors. | ) | (Jointly Administered) |
|  | ) |  |
|  | ) | **Hearing Date: To be determined** |
|  | ) | **Objection Deadline: To be determined** |
|  | ) |  |

**PLAN ADMINISTRATOR'S MOTION TO CLARIFY OR MODIFY THE
PROTECTIVE ORDER AND TO STRIP CONFIDENTIALITY DESIGNATIONS**

The Plan Administrator of the jointly-administered estates of Terraform Labs Pte. Ltd. and Terraform Labs Limited (collectively, "Debtors") and the Wind Down Trust hereby files this motion to clarify or, in the alternative, to modify the protective order entered by this Court (Dkt. 263) (the "protective order") as to Jump Trading LLC and related entities and individuals, and to challenge certain of their confidentiality designations thereunder.  *See* Ex. 1 ("Proposed Order").

## INTRODUCTION

At issue in this motion are documents (the "Jump Reproduced Documents") that entities in the "Jump Trading Group" authorized the Debtors to reproduce to the Official Committee of Unsecured Creditors, which the Plan Administrator inherited upon his appointment by this Court.

The Chapter 11 Plan and Wind Down Trust Agreement entered in this Chapter 11 Case task the Plan Administrator with pursuing affirmative litigation to recover assets for Terraform's creditors, as well as with prosecuting individual claims contributed to the Wind Down Trust.  To

---

[1] The Post-Effective Date Debtors in these chapter 11 cases are Terraform Labs Pte. Ltd. and Terraform Labs Limited. The Post-Effective Date Debtors' principal offices are located at 10 Anson Road, #10-10 International Plaza, Singapore 079903.  The Plan Administrator of the Debtors is Todd R. Snyder.  The Plan Administrator's principal office is located at 1251 Avenue of the Americas, New York, New York 10020. Capitalized terms used but not defined shall have the meanings ascribed to them in the *Second Amended Chapter 11 Plan of Liquidation of Terraform Labs Pte. Ltd. and Terraform Labs Limited* [Dkt. 717] (the "Plan").

fulfill his mandate, the Plan Administrator reviewed certain Jump Reproduced Documents to investigate potential claims and, eventually, relied on a limited set of those documents to assert claims in the Northern District of Illinois against various Jump Trading entities, Jump's co-founder William DiSomma, and the head of Jump Crypto Kanav Kariya. N.D. Ill. Dkt. 1, *Snyder v. Jump Trading, LLC*, No. 1:25-cv-15414 (N.D. Ill. Dec. 18, 2025) (the "Jump Action" against, collectively, "Jump"); *see also* Plan Administrator's Third Status Update (filed Feb. 17, 2026), Dkt. 1177 at 8-9 (updating this Court about the Jump Action).

After Jump moved to dismiss the complaint, the Plan Administrator filed the operative Amended Complaint in the Jump Action on May 1, 2026. Ex. 2 (N.D. Ill. Dkt. 56).

Faced with the prospect of moving to dismiss or answering the Amended Complaint, Jump chose a different path. Jump initiated *this* dispute, contending that the Plan Administrator violated the protective order by using certain Jump Reproduced Documents to file the Amended Complaint and threatening a motion to strike the entire Amended Complaint.

The protective order entered by this Court states that "Confidential Information . . . disclosed by" a "Producing Party" "in connection with this Chapter 11 Case, shall be used solely in this Chapter 11 case." Dkt. 263-1 ¶ 2. Jump takes the position that the Plan Administrator violated the protective order by using Jump Reproduced Documents in the Jump Action. But Jump disclaims the ability to articulate what, exactly, the protective order allows or prohibits unless and until the Plan Administrator identifies for Jump all the Jump Reproduced Documents that were reviewed, and when. Ex. 3 at 5 (5/25/2026 Email from J. McNeily to C. McGushin); *id*. at 1-2 (5/28/2026 Email from C. Harris to J. Brown). Adding to the confusion, Jump agrees that the exact same complaint could have been filed in an adversary proceeding in this Court and does not identify a single confidential fact that the Plan Administrator disclosed. N.D. Ill. Dkt. 74 at 2. Of

the limited allegations in the Amended Complaint derived from Jump Reproduced Documents, nearly all are publicly available or independently in the Plan Administrator's possession—as the Plan Administrator has painstakingly detailed for Jump in an effort to moot this dispute.

Nonetheless, according to Jump, the Plan Administrator's supposed violation of the protective order means that the entire Amended Complaint must be stricken, the Plan Administrator must be thrown out of court for good, and Jump should never have to answer for its misconduct—in the Northern District of Illinois or anywhere else.  Ex. 4 at 1 (N.D. Ill. Dkt. 77). Why?  At a hearing before Judge Joan H. Lefkow in the Northern District of Illinois, Jump said the quiet part out loud: Jump is prejudiced because the Plan Administrator is "using documents and information that [he] shouldn't be able to use here to survive dismissal."  Ex. 5 at 21:23-22:22 (5/20/2026 N.D. Ill. Hr'g Tr.).  In other words, Jump accuses the Plan Administrator of violating the protective order because Jump needs the documents it produced in these bankruptcy proceedings to be off limits to increase its chances of getting the Plan Administrator's meritorious claims in the Jump Action dismissed at the pleading stage.

Fortunately, caselaw and common sense reject Jump's extreme position.  The protective order does not bar the Plan Administrator from using the Jump Reproduced Documents to carry out his mandate under the Chapter 11 Plan and the Wind Down Trust Agreement by suing Jump in the Northern District of Illinois.  The Jump Action is encompassed by the protective order's reference to "this Chapter 11 case," so there was no violation when the Plan Administrator used the Jump Reproduced Documents to hold Jump accountable for its misconduct.  The Jump Action exists solely because the Chapter 11 Plan and the Wind Down Trust Agreement entered in "this Chapter 11 case" authorize the Plan Administrator to prosecute it.  Without "this Chapter 11 case," the Plan Administrator would have no authority to bring the Jump Action, including the avoidance

3

claims asserted in the Jump Action under the Bankruptcy Code on behalf of the Debtors. The Jump Action is intertwined with "this Chapter 11 case." Interpreting the protective order to allow use of the Jump Reproduced Documents in one proceeding but not the other makes little sense.

Moreover, as courts around the country recognize, protective orders protect against the disclosure of sensitive business information and must be interpreted and applied in light of that specific purpose. Dkt. 263-1 ¶ 2. "Privacy of proprietary information, not immunity from suit," is "the legitimate purpose of [a] protective order." *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 696 (9th Cir. 1993). "For the protective order to comply with common sense, a reasonable reading must connect its prohibitions to its purpose—protection against disclosure of commercial secrets." *Id.* at 695. Here, there has been no disclosure of confidential information, as the Plan Administrator redacted information derived from Jump Reproduced Documents. In this context, there has been no violation.

In the alternative, the Plan Administrator respectfully requests that the Court modify the protective order to authorize the Plan Administrator to use the Jump Reproduced Documents in the Jump Action. Whether to modify a protective order is committed to the Court's discretion. The protective order explicitly contemplates modification, and, as Judge Lefkow recognized when initially presented with this dispute in the Northern District of Illinois, it is "unlikely" that the protective order was meant to "shield" Jump from accountability or to bar the Plan Administrator from using the Jump Reproduced Documents to investigate and assert claims against Jump pursuant to his authority under the Chapter 11 Plan and the Wind Down Trust Agreement. Ex. 4 at 2 (N.D. Ill. Dkt. 77). If the Plan Administrator is not already authorized to use the Jump Reproduced Documents in the Jump Action, the Court should modify the protective order— including because Jump suffers no prejudice other than being forced to litigate claims that it would

4

prefer to go away.

Finally, the Plan Administrator respectfully requests that the Court de-designate the Jump Reproduced Documents underlying the allegations redacted in the Amended Complaint.  Jump already admitted that it over-designated the Jump Reproduced Documents by bulk designating every document "Highly Confidential."  But when pressed to de-designate the few documents relied on in the Amended Complaint, Jump stood its ground and insisted with a straight face that everything that was not already public or independently in the Plan Administrator's possession remain confidential under the protective order.  But the four documents at issue come nowhere close to satisfying the protective order's standard for "Confidential Information," as explained below.  *See* Ex. 6 (the "four contested documents").  This is yet another extreme position adopted by Jump to erect roadblocks to the Plan Administrator's efforts, and the designations should be removed consistent with the terms of the protective order.

## JURISDICTION

1.      The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b).

2.      Pursuant to rule 9013-1(f) of the Local Rules of the United States Bankruptcy Court for the District of Delaware, the Plan Administrator consents to the entry of a final order by the Court in connection with this matter to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.  Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

RLF1 36018587v.1

**BACKGROUND**

**A. The Plan Administrator Obtains the Jump Reproduced Documents Pursuant to the Chapter 11 Plan.**

3.    During the Securities and Exchange Commission's civil action against Terraform and Do Kwon, the SEC reproduced to Terraform certain documents that Jump had produced to the SEC in connection with various investigations.

4.    On July 16, 2024, the Committee requested "Jump's consent to the Debtor providing the Committee with copies of Jump's productions" to the SEC that were in Debtors' possession.  Ex. 7 (7/16/2024 Ltr. from J. Evans to Counsel).

5.    On July 23, 2024, Jump's counsel authorized the Debtors to "reproduc[e]" the Jump documents in Debtors' possession to the Committee.  Ex. 8 (7/23/2024 Email from E. Bacon to Counsel).  Jump's counsel requested "that those materials be treated as 'Highly Confidential'" and that "Jump be treated as the Producing Party of those materials" under the protective order.  Thereafter, the Debtors provided the Jump Reproduced Documents to the Committee.

6.    On September 20, 2024, this Court entered its Findings of Fact, Conclusions of Law, and Order Confirming Second Amended Chapter 11 Plan of Liquidation of Terraform Labs Pte. Ltd. and Terraform Labs Limited.  Dkt. 734.  In the Confirmation Order, the Court authorized the creation of the Wind Down Trust, appointed the Wind Down Trustee and Plan Administrator, and ordered that: "The Debtors and the Wind Down Trustee, at the direction of the Plan Administrator, as set forth in the Wind Down Trust Agreement, and on behalf of the Wind Down Trust, are authorized to take all actions required to effectuate the Plan and the transactions contemplated therein." *Id*. at 6, 19-21, 29.

7.    Under the Second Amended Chapter 11 Plan of Liquidation, the Plan Administrator stepped into the shoes of the Chapter 11 Debtors.  Dkt. 717 (the "Chapter 11 Plan"); *see also* Dkt.

6

719-1 (the "Wind Down Trust Agreement").  Pursuant to the Chapter 11 Plan and the Wind Down Trust Agreement, the Plan Administrator inherited all the Debtors' documents, privileges, assets, rights, and obligations.  *See* Ch. 11 Plan § 5.5(e) (transferring estate assets to the Wind Down Trust); Wind Down Trust Agreement at 2 (defining "Estate Assets" as "all assets of the Estates"); *id.* § 4.10 ("The Plan Administrator shall be provided with originals or copies of or access to all documents and business records of the Debtors that are in the possession of the Debtors"); *id.* § 4.5 (giving the Plan Administrator all privileges from the Debtors and Committee and granting him the "exclusive authority to pursue causes of action").

### B. The Plan Administrator Uses the Jump Reproduced Documents to Bring Claims Against Jump Pursuant to the Chapter 11 Plan.

8.    As part of overseeing the estate assets, the Chapter 11 Plan tasks the Plan Administrator with prosecuting affirmative litigation to recover assets for creditors and individuals who contributed claims.  Specifically, the Chapter 11 Plan authorizes the Plan Administrator to "prosecute all Causes of Action and Contributed Third-Party Claims on behalf of the Debtor," and to "determine whether and when to compromise, settle, abandon, dismiss, or otherwise dispose of any Such Causes of Action and Contributed Third-Party claims, as [he] may determine is in the best interests of the Debtors and their Estates."  Ch. 11 Plan § 5.4(b)(ix); *see also id.* § 5.4(b)(xvii). The Wind Down Trust Agreement likewise directs the Plan Administrator to prosecute claims and explicitly contemplates proceedings in "other courts as may have jurisdiction over the relevant matter."  Wind Down Trust Agreement § 4.3.8.[2]  Moreover, the Plan Administrator is authorized

---

[2] For example, the Wind Down Trust Agreement authorizes the Plan Administrator to "investigate . . . potential Causes of Action and Contributed Third-Party Claims," Wind Down Trust Agreement § 4.8; "to review, reconcile, enforce, collect, compromise, settle, or elect not to pursue the Causes of Action," *id.* § 4.5; to "protect and enforce the rights to the Wind Down Trust Assets (including any Causes of Action and Contributed Third-Party Claims) . . . by any method deemed appropriate, including, without limitation, by judicial proceedings," *id.* § 4.3.7; and to "prepare, file, and prosecute any material and necessary filings or pleadings with the Bankruptcy Court and/or such other courts as may have jurisdiction over the relevant matter to carry out the duties of the Plan Administrator," *id.* § 4.3.8; and to

7

to "retain professionals" and "independent contractors" "pursuant to the Wind Down Trust Agreement to assist in performing its duties and the duties of the Wind Down Trustee under the Plan." Ch. 11 Plan § 5.4(b)(xiv). And the Plan Administrator is permitted, as part of "any investigation related to a Cause of Action," to "seek the examination of any person pursuant to Federal Rule of Bankruptcy Procedure 2004." *Id.* § 5.4(b)(xiii). The Plan Administrator's rights and obligations continue until this Court enters an order "closing the Chapter 11 Cases," which has not yet occurred. *Id*. §§ 5.4(a), 5.19.

9.     Consistent with his mandate, on December 18, 2025, the Plan Administrator commenced litigation in the Northern District of Illinois against various Jump entities, Jump's co-founder William DiSomma, and the head of Jump Crypto Kanav Kariya, asserting claims on behalf of Terraform and certain individual claimants who had contributed their claims to the Wind Down Trust. N.D. Ill. Dkt. 1. The Plan Administrator detailed Jump's misconduct, including how Jump schemed with Terraform to manipulate the market for certain Terraform tokens and ultimately made off with billions as the Terraform Ecosystem collapsed.

10.     The Plan Administrator's complaint in the Jump Action relied primarily on public sources. Jump's misconduct was at the center of the fraud prosecuted by the SEC in *SEC v. Terraform Labs Pte Ltd.*, No. 23-cv-1346 (S.D.N.Y), and therefore is a matter of public record. And the SEC initiated a cease-and-desist action and entered into a public settlement in which Jump subsidiary Tai Mo Shan admitted to market manipulation and elaborated on its own misconduct. *In re Tai Mo Shan Ltd.*, Securities Act Release No. 11349, Admin. Proc. File No. 3-22382 (Dec. 20, 2024). The Department of Justice separately indicted and obtained a guilty plea from

---

"investigate any Wind Down Trust Assets, and any other potential Causes of Action and Contributed Third-Party Claims," *id*. § 4.3.9. *See also id*. § 4.5 (Plan Administrator has "exclusive authority to pursue causes of action").

8

Terraform's co-founder Do Kwon, and, during those proceedings, the Government, the criminal defendant, and the presiding District Court Judge all publicly described Jump's central role in the fraud. *E.g.*, 11/26/2025 Sentencing Ltr. from D. Kwon to Court, Dkt. 54 at 11-14, *United States v. Kwon*, No. 23-cr-151 (S.D.N.Y.); 12/4/2025 Sentencing Ltr. from Government to Court, Dkt. 57 at 5–12; 12/11/2025 Sentencing Hr'g Tr., Dkt. 67 at 127:18-20, 135:12-19, 146:23-147:3.

11.     On March 23, 2026, Jump moved to dismiss the complaint in the Jump Action. N.D. Ill. Dkt. 45. In response, the Plan Administrator filed the operative Amended Complaint on May 1, 2026. N.D. Ill. Dkt. 56. The parties agreed to a briefing schedule pursuant to which Jump would move to dismiss the Amended Complaint no later than June 30, 2026. N.D. Ill. Dkt. 50.

12.     Relevant here, to discharge the Plan Administrator's duties under the Chapter 11 Plan and Wind Down Trust Agreement to investigate and pursue causes of action, counsel for the Plan Administrator reviewed documents in the Plan Administrator's possession, including certain Jump Reproduced Documents, during pre-suit investigation. Counsel likewise used certain of the Jump Reproduced Documents when drafting both the original and amended complaints in the Jump Action. Thus, although based largely on public sources, the Amended Complaint contains limited factual allegations and quotations derived from Jump Reproduced Documents.

13.     To comply with the protective order, the Plan Administrator isolated allegations derived from Jump Reproduced Documents before filing the Amended Complaint, redacted them, and filed a motion to seal in the Northern District of Illinois requesting that the court "conditional[ly] seal" the unredacted Amended Complaint "pending a ruling on [Jump's] anticipated motion to seal." N.D. Ill. Dkt. 54 at 3. The Plan Administrator explicitly acknowledged that the Amended Complaint is "based in part" on Jump Reproduced Documents

9

RLF1 36018587v.1

designated "Highly Confidential" under the protective order and cited the protective order as justification for his conditional sealing request. *Id.* at 2.

14.     On May 5, 2026, Jump requested that the Plan Administrator identify and provide the documents underlying the redacted information in the Amended Complaint. Ex. 9 at 1 (5/5/2026 Email from J. McNeily to C. McGushin). The Plan Administrator promptly sent the relied-upon documents to Jump. *Id*. (5/6/2026 Email from C. McGushin to J. McNeily).

**C. Jump Accuses the Plan Administrator of Violating the Protective Order by Using Jump Reproduced Documents Outside the "Chapter 11 Case."**

15.     On May 12, Jump sent the Plan Administrator a letter (i) demanding that the Plan Administrator "immediately withdraw the Amended Complaint," claiming it is "suffused with allegations derived from" the Jump Reproduced Documents, (ii) accusing the Plan Administrator of violating this Court's protective order by relying on the Jump Reproduced Documents, even suggesting the Plan Administrator and his counsel acted improperly merely by their "improper review of" the Jump Reproduced Documents, and (iii) threatening to file a motion to strike the entire Amended Complaint if the Plan Administrator did not withdraw it. Ex. 10 at 13-14 (5/12/2026 Email with Attachments from J. McNeily to Counsel) (N.D. Ill. Dkt. 73-1). Jump did not identify any allegations it believed should be stricken in place of withdrawing the entire Amended Complaint, nor did Jump identify any confidential information it contended was improperly disclosed.

16.     The next day, on May 13, the Plan Administrator responded. Ex. 10 at 44-45 (5/13/2026 Email and Ltr. from C. McGushin to J. McNeily) (N.D. Ill. Dkt. 73-2). The Plan Administrator declined to withdraw the entire Amended Complaint, pointed out that its allegations are overwhelmingly based on publicly available information and Terraform's own documents, and invited Jump to identify what confidential documents or information Jump believed were

improperly used in the Amended Complaint, noting that none of the redacted information was properly designated Confidential under the protective order in the first place. The Plan Administrator further disputed that he had violated the protective order and, to the extent Jump intended to argue otherwise, the Plan Administrator proposed to meet and confer so that the parties could focus the dispute over the protective order and, if necessary, seek resolution from this Court. Allowing this Court to address the issue would ensure that a single interpretation of the protective order governs the Plan Administrator's ongoing rights and obligations under the Chapter 11 Plan and the Wind Down Trust Agreement.

17.    Jump responded the next day but did not substantively engage with the Plan Administrator's proposal. Ex. 10 at 51 (5/14/2026 Email from J. McNeily to C. McGushin) (N.D. Ill. Dkt. 73-4). Jump ignored the invitation to identify allegations in the Amended Complaint that Jump believed should be stricken. And Jump sidestepped the proposal to meet and confer, rejecting the Plan Administrator's suggestion that the parties seek a decision from this Court as to the proper application of the protective order to the Jump Reproduced Documents.

18.    Less than two hours after rejecting the Plan Administrator's proposal to meet and confer, Jump filed its motion to stay all deadlines in the Jump Action pending a decision from Judge Lefkow on what Jump claimed would be its forthcoming motion to strike the Amended Complaint. N.D. Ill. Dkt. 71. In its moving papers, Jump raised the possibility for the first time that, as a fallback position, it would move to strike only "certain allegations of the Amended Complaint that quote, paraphrase, summarize, or otherwise rely on materials subject to the . . . protective order." *Id*. ¶ 5. But Jump still did not identify any of those allegations.

19.    On May 18, the Plan Administrator filed a response to Jump's motion to stay all deadlines. Ex. 10 (N.D. Ill. Dkt. 73). The Plan Administrator disputed that he violated the

11

protective order, pointing out that Jump's extreme position—that the Plan Administrator cannot even *review* documents produced in the bankruptcy proceedings—would impair the Plan Administrator's ability to efficiently and effectively discharge his mandate under the Chapter 11 Plan to investigate and prosecute affirmative litigation on behalf of the estate. The Plan Administrator separately made clear that Jump had misconstrued the parties' correspondence in its hasty motion to stay all deadlines, including by wrongly suggesting that Jump had already presented the Plan Administrator with its demand to strike only a subset of allegations in the Amended Complaint rather than the entire pleading. Given that the parties had not conferred, the Plan Administrator requested that, before entertaining Jump's motion to strike the Amended Complaint, Judge Lefkow deny Jump's motion to stay all deadlines and direct Jump to identify the supposedly offending passages in the Amended Complaint so that the parties could meaningfully meet and confer, and, if no resolution followed, present the issue of the proper interpretation of the protective order to this Court.

20.     On May 19, Jump conceded in its reply that the exact same complaint could have been filed against Jump in an adversary proceeding in this Court. N.D. Ill. Dkt. 74. According to Jump, the Plan Administrator's only misstep was filing the Amended Complaint in the Northern District of Illinois rather than "incorporat[ing] documents covered by the Protective Order into an adversary proceeding complaint filed in the Chapter 11 case." *Id.* at 2; *see also* Ex. 5 at 21:5-10, 22:16-18 (5/20/2026 N.D. Ill. Hr'g Tr.) (same).

21.     On May 20, Judge Lefkow held a hearing on Jump's motion to stay all deadlines. When Judge Lefkow inquired about the scope of Jump's objection and the specific allegations that should be stricken, Jump took the position that it was not obligated to identify offending passages and dodged the question entirely. *Id.* at 5:17-6:21. More remarkably, when addressing the

12

prejudice to Jump from the Plan Administrator's use of the Jump Reproduced Documents in the Amended Complaint, Jump's counsel conceded those documents "fill[ed] the holes" that Jump purportedly identified in its motion to dismiss the original complaint—and argued *that* was the prejudice to Jump. *Id*. at 19:13-20:2.  Judge Lefkow immediately understood what Jump was arguing, described it as "a trick bag," and questioned the prejudice Jump's counsel had identified given that the Plan Administrator would be entitled to discovery of the Jump Reproduced Documents in the ordinary course of litigation. *Id.* at 21:23-22:7.  In response, Jump's counsel doubled down on the purported prejudice, insisting that the Plan Administrator would only be able to obtain discovery if he "survived a motion to dismiss." *Id*. at 22:8.  According to counsel, the fact that the Plan Administrator is "using documents and information that [he] shouldn't be able to use here to survive dismissal" is "exactly the harm to [Jump]." *Id*. at 22:8-15; *see also id.* at 22:16-22 (accusing the Plan Administrator of "trying to take the advantage here" by using the Jump Reproduced Documents "as a benefit to get past the dismissal hurdle so that this case . . . can continue, and that's what's improper").  In other words, Jump's counsel argued that his client was prejudiced only because the Plan Administrator could survive a motion to dismiss if allowed to use certain Jump Reproduced Documents but (according to Jump) could not survive a motion to dismiss if he were precluded from using them.

22.     The next day, May 21, Judge Lefkow issued an order (i) staying all deadlines until June 4, 2026, and (ii) directing the Plan Administrator to "immediately" present to this Court the issue whether the Plan Administrator violated the protective order and to seek "clarification of the order or amendment as needed." Ex. 4 at 2 (N.D. Ill. Dkt. 77).  Notably, although Judge Lefkow "conditionally conclude[d]" that the Plan Administrator violated the protective order, she found it "unlikely" that this Court intended for the protective order to operate as Jump claims by barring

13

the Plan Administrator from using the Jump Reproduced Documents to bring meritorious claims against Jump in the Northern District of Illinois.  *Id*. at 2.

23.    Consistent with Judge Lefkow's order, the Plan Administrator promptly contacted Jump to again propose a meet and confer.  Ex. 11 (5/22/2026 Ltr. with Attachments from C. McGushin to J. McNeily).  The Plan Administrator again requested that Jump identify the supposedly offending passages in the Amended Complaint.  And the Plan Administrator separately notified Jump, pursuant to paragraph 19 of the protective order, that he objected to Jump's confidentiality designations for the documents relied on for the information redacted from the Amended Complaint—because most of the relied-upon Jump Reproduced Documents are publicly available or independently possessed by the Plan Administrator, and because the remaining four documents come nowhere close to meeting the definition of "Confidential Information," let alone "Highly Confidential Information."  Ex. 6 (four contested documents).

24.    In the interest of transparency, and to facilitate the parties' meet-and-confer, the Plan Administrator provided Jump with a list of the public or independent sources for the documents underlying the Amended Complaint's redactions.  Ex. 11 at Exs. B and C.  The list underscores why Jump cannot articulate any legitimate prejudice from the Plan Administrator's use of the Jump Reproduced Documents.  The Plan Administrator redacted approximately 19 passages from the Amended Complaint.  Of those redactions, 15 were derived from Jump Reproduced Documents that are already public or independently possessed by the Plan Administrator.  Only a handful of redactions derived from four distinct Jump Reproduced Documents for which no public or independent source has been identified.  These redactions are limited to allegations about Jump's co-founder's efforts to gin up positive publicity for Terraform; his assessment of a colleague's close relationship with the co-founder of Terraform; and his high-

14

level reaction to Jump's investment in Terraform.  *Id*. at Ex. C; Ex. 6.  These documents do not implicate "Confidential Information" under the protective order.  *Infra* pp. 28-32.

25.    On May 26, the parties conferred in an effort to avoid motion practice.

26.    At the outset, Jump was unable to articulate the extent to which the protective order prohibited the Plan Administrator from "using" the Jump Reproduced Documents.  Was merely "reviewing" them a violation?  Jump wouldn't say.  Instead, Jump claimed that the Plan Administrator should identify all Jump Reproduced Documents that counsel reviewed, and when, before Jump could take a position on the protective order's scope.  No resolution was achieved.

27.    Next, the Plan Administrator inquired whether removing the redacted allegations that had no public or independent source from the Amended Complaint could resolve the parties' dispute.  Jump indicated that removing the passages would not moot the dispute.  Ex. 3 at 2-3 (5/27/2026 Email from J. Brown to J. McNeily).  Again, no resolution.

28.    Finally, the parties turned to Jump's confidentiality designations for the documents underlying the redacted information in the Amended Complaint.  Jump agreed that Jump Reproduced Documents that are publicly available or otherwise in the Plan Administrator's possession are not governed by the protective order.  And Jump also conceded that it had over-designated the Jump Reproduced Documents when it bulk designated them as "Highly Confidential."  But Jump insisted that unless the Jump Reproduced Documents underlying the redactions were publicly available or independently in the Plan Administrator's possession, they are Confidential under the protective order.  This remained the case (according to Jump) even though the only documents falling into that category contain non-sensitive, stale information dating to 2020 and 2021—as the Plan Administrator pointed out for the explicit purpose of

15

avoiding an unnecessary confidentiality dispute over four self-evidently not-confidential documents.

29.    The meet-and-confer proved productive in one respect: Jump finally identified the supposedly offending passages of the Amended Complaint.  But despite initially claiming that the Amended Complaint is "suffused" with allegations derived from improper sources and therefore must be stricken entirely, Ex. 10 at 13, Jump ultimately identified only a handful of paragraphs beyond the redacted allegations that "appear" to implicate the Jump Reproduced Documents, Ex. 3 at 1 (5/28/2026 Email from C. Harris to J. Brown).[3]  Of the 17 supposedly offending paragraphs identified by Jump, numerous are self-evidently based on documents with Terraform employees as authors or recipients, which the Plan Administrator possesses independently from the Jump Reproduced Documents; still more assert general allegations drawn from publicly available sources, including from the SEC trial and separate criminal proceedings; and others are carried over from the original complaint—to which Jump never objected.

30.    On the eve of the filing of this motion, Jump reiterated its position that the Plan Administrator violated the protective order by, "at a minimum," "quoting Protected Materials in his Amended Complaint in the Northern District of Illinois," and again requested that the Plan Administrator identify all Jump Reproduced Documents reviewed, and when.  Ex. 3 at 1 (5/28/2026 Email from C. Harris to J. Brown).  Yet again, Jump did not even attempt to identify any improperly disclosed confidential information.

31.    Underscoring how far out on a limb Jump now sits, several of Jump's objections are to a single document: a 3:49-minute video scrolling through Kariya and Kwon's messages that

---

[3] The supposedly offending paragraphs of the Amended Complaint are: ¶¶ 80, 84, 94, 120, 122, 137, 163, 201, 202, 215, 248, 249, 250, 251, 252, 299, 307.

RLF1 36018587v.1

was introduced as a trial exhibit in the public SEC trial.  During the meet-and-confer, Jump took the extreme position that this trial exhibit is non-public because, according to the trial transcript, only a portion of the video was played to the jury.  But the entire video was admitted into evidence—and the entire video was provided to the jury, as the trial transcript makes clear.  4/5/2024 SEC Trial Tr., Dkt. 266 at 1785:1-3, 1814:5-9, *SEC v. Terraform Labs Pte Ltd.*, No. 23-cv-1346 (S.D.N.Y).  Exhibits entered into evidence at trial and provided to the jury during deliberations are obviously public records.  Lest there be any doubt, the Court explicitly stated: "I don't see how FOIA could possibly prohibit giving to anyone in the world an exhibit that has in full been presented and received in evidence. . . . [T]his is a public court, and everything that occurs in this court is open to the press."  *Id.* at 1613:24-1614:7.

32.     It's not hard to understand why Jump is looking for any reason under the sun to contest the Plan Administrator's references to Kariya and Kwon's text messages in the Amended Complaint.  Kariya, while serving as the Head of Jump Crypto, repeatedly instructed Kwon to use messaging applications that would automatically delete all their communications.  Why?  According to Kariya, Jump's "compliance" department was on his case and "feels much mor [sic] comfortable here [on Signal] with the disappearing chats."[4]

33.     Jump methodically tried to ensure that there would never be any record of its misconduct.  Unfortunately for Jump, a record survives, and the Plan Administrator came to possess it through rightful means in these Chapter 11 proceedings.  Now that the Plan Administrator has used the record that survived Jump's destruction attempts to hold Jump

---

[4]  *See also* Alexander Osipovich (@aosipovich), X (Apr. 10, 2024, 1:02 PM ET), https://x.com/aosipovich/status/1778106293175107647 (publishing this excerpt of Kariya and Kwon's communications, further underscoring their public availability).

RLF1 36018587v.1

accountable in the Jump Action, Jump again tries to black out all the incriminating evidence and ensure it never sees the light of day.  This Court should not permit that outcome.

## RELIEF REQUESTED

34.     By this motion, the Plan Administrator seeks entry of an order substantially in the form attached hereto as Exhibit 1: (i) finding that the protective order does not prohibit the Plan Administrator from using the Jump Reproduced Documents in the Jump Action and thus there has been no violation of the protective order; (ii) removing the confidentiality designations from the four contested documents, Ex. 6; and (iii) granting such other relief as the Court deems appropriate under the circumstances.

## ARGUMENT

35.     The Plan Administrator's review and use of the Jump Reproduced Documents to assert claims against Jump in the Northern District of Illinois does not violate the protective order. Courts around the country have considered similar issues and concluded that protective orders must be interpreted to be consistent with both common sense and their ultimate purpose of safeguarding confidential information from disclosure.  Both interpretive principles point in the same direction here: the protective order does not disable the Plan Administrator from using the Jump Reproduced Documents to hold Jump accountable through litigation in the Northern District of Illinois.  In the alternative, if the Court disagrees and finds that the protective order *does* bar the Plan Administrator's use of the Jump Reproduced Documents in the Jump Action, the Plan Administrator respectfully requests that the Court modify the protective order to authorize such use.  The Plan Administrator has good cause for modification, and Jump has identified no legitimate prejudice that would result.

RLF1 36018587v.1

36.    Separately, the Plan Administrator respectfully requests that the Court de-designate four documents underlying the redacted allegations in the Amended Complaint that Jump wrongly maintains are confidential under the protective order.  Ex. 6.

## I.    THE PROTECTIVE ORDER DOES NOT BAR THE PLAN ADMINISTRATOR FROM USING JUMP REPRODUCED DOCUMENTS IN THE JUMP ACTION.

37.    The protective order states that "Confidential Information . . . disclosed by" a "Producing Party" "in connection with this Chapter 11 Case, shall be used solely in this Chapter 11 case," and "shall not be used or disclosed in any other proceeding or for any other purpose, including, but not limited to, any business or commercial purpose, absent agreement of the Producing Party or Order of the Court on reasonable notice and with an opportunity to be heard, or as otherwise provided herein."  Dkt. 263-1 ¶ 2; *id*. ¶ 12; *see also id*. at Ex. A.

38.    In the context of Jump's motion to stay all deadlines—and without merits briefing—Judge Lefkow "conditionally conclude[d]" that the Plan Administrator violated the protective order by using Jump Reproduced Documents in the Jump Action.  Ex. 4 at 2 (N.D. Ill. Dkt. 77).  But, recognizing that Jump's interpretation of the protective order led to an outcome that was "unlikely" to be consistent with the protective order's purpose, Judge Lefkow directed the parties to seek this Court's determination as to whether the Plan Administrator violated the protective order.  *Id*.  The Plan Administrator respectfully suggests that he did not.

39.    The Plan Administrator did not violate the protective order by reviewing Jump Reproduced Documents to investigate potential claims, or by using them to bring claims against Jump in the Northern District of Illinois.  The Jump Action is encompassed by the protective order's reference to "this Chapter 11 case," and thus there was no improper use of the Jump Reproduced Documents.  To be sure, the protective order refers to the "Chapter 11 Case" as "a voluntary case . . . under chapter 11 of title 11 of the United States Code" "commenced with this

Court" by the Debtors.  Dkt. 263-1 at 1.  But the structural interrelatedness of the Jump Action and the bankruptcy proceedings means that, even if the Jump Action is not literally "a voluntary case under chapter 11 of title 11 of the United States Code" "commenced with this Court" by the Debtors, neither is it a separate, "other proceeding" independent from the "Chapter 11 Case" for which "use" of the Jump Reproduced Documents is disallowed.

40.     The Chapter 11 Plan and Wind Down Trust Agreement establish the Plan Administrator's role and authorize him to pursue affirmative litigation for the benefit of creditors and to recover individual contributed claims.  *Supra* pp. 2-3 & n.2 (cataloguing provisions of Chapter 11 Plan and Wind Down Trust Agreement that vest exclusive authority in Plan Administrator to prosecute claims).  The only reason that the Jump Action exists is because the Chapter 11 Plan and Wind Down Trust Agreement entered in "this Chapter 11 case" authorized the Plan Administrator to prosecute it.  That is doubly true for the avoidance claims asserted in the Jump Action under the Bankruptcy Code, which can be prosecuted only in connection with "this Chapter 11 case," and only by the Plan Administrator as authorized under the Chapter 11 Plan and Wind Down Trust Agreement.  Similarly, the "Chapter 11 case" referenced in the protective order cannot be closed under section 5.19 of the Chapter 11 Plan until the Jump Action is resolved— otherwise the Plan Administrator would be divested of authority to prosecute it and unable to administer any recovery through the estate—further underscoring the interrelatedness of the proceedings.

41.     Moreover, the protective order must be interpreted to be consistent not only with its literal text but also with common sense and the protective order's ultimate purpose, which is to protect confidential information, not to shield wrongdoers like Jump from meritorious litigation. "For the protective order to comply with common sense, a reasonable reading must connect its

prohibitions to its purpose—protection against disclosure of commercial secrets." *Dual-Deck*, 10 F.3d at 695. "Privacy of proprietary information, not immunity from suit, was the legitimate purpose of the protective order." *Id.* at 696; *see also Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*, 192 F. Supp. 3d 400, 405 (S.D.N.Y. 2016) (observing with approval that, in *Dual-Deck*, the "appellate court expressly refused to apply the no-use-whatsoever language 'literally,' where such a reading would render the order 'absurd'"[5]); *Navajo Nation v. United States*, 46 Fed. Cl. 353, 359 (2000) (rejecting a "literal[]" interpretation of the protective order in favor of interpreting the order "in a common sense and reasonable manner that 'connect[s] its prohibitions to its purpose'" (second alteration in original)), *aff'd sub nom. Navajo Nation v. Peabody Coal Co.*, 7 F. App'x 951 (Fed. Cir. 2001); *Static Media LLC v. Leader Accessories LLC*, 38 F.4th 1042, 1048-49 (Fed. Cir. 2022) (similar).[6]

42.     Here, Jump's "literal" reading of the protective order defies common sense and is divorced from its purpose—especially considering that Jump cannot even identify any proprietary information that was improperly disclosed.  It is no wonder, then, that Judge Lefkow directed the parties to ask this Court for "clarification" of the protective order's language, implicitly finding the isolated text Jump cites did not control the outcome.  Ex. 4 at 2 (N.D. Ill. Dkt. 77).

43.     Courts around the country presented with similar facts favor flexible, sensible interpretations that serve the purposes of protective orders rather than the aims of wrongdoers.  For

---

[5] All internal quotation marks, emphasis, and citations omitted unless otherwise noted.

[6] *See also Birch Hill Real Est., LLC v. Breslin*, 2026 WL 765817, at *6 n.10 (D.N.J. Mar. 18, 2026) (protective orders are not meant to "confer sweeping immunity from suit"); *Philips Med. Sys. Nederland B.V. v. TEC Holdings, Inc.*, 2019 WL 11825448, at *2 (N.D. Ga. May 20, 2019) ("[P]rotective orders endeavor to protect confidential information, not to shield parties from future lawsuits.").

*But see* Ex. 5 at 19:13-17 (5/20/2026 N.D. Ill. Hr'g Tr.) (JUMP COUNSEL: "The purpose of that provision is to protect a producing party, like my clients, from producing material and then having a receiving party turn around and use those documents against them in some other context in some other case.").

21

example*, in *Crocs v. Joybees*, two litigants conducted discovery pursuant to a protective order providing that documents could be used "only for prosecuting, defending, or attempting to settle this litigation."  2023 WL 8851997, at *2 (D. Colo. Dec. 8, 2023), *report and recommendation adopted,* 2024 WL 5055671 (D. Colo. Jan. 25, 2024).  Thereafter, one party (Crocs) sued the other (Joybees) in a separate action and relied on documents produced in the first action and marked "Highly Confidential."  *Id.* at *5.  Like Jump, Joybees argued that Crocs violated the protective order and sought to dismiss the second action with prejudice.  *Id.*  The court disagreed and found no violation of the protective order after considering its text and purpose, as well as applicable precedent.  *Id*. at *6-10.  Protective orders must be interpreted "reasonably in light of [their] express terms and stated purposes," and the "weight of authority supports the conclusion" that protective orders exist to protect against disclosure of confidential information, not "to deprive [litigants] of the right to file a separate lawsuit merely because the supporting information bears a confidential designation."  *Id.* at *7-8 (collecting authorities).  The court found it particularly compelling that Joybees, like Jump, failed to identify any proprietary information that was improperly disclosed in the second action.  *See id*. at *9 (observing that a "party who has produced information in one action cannot shield itself from being sued in another action by designating its documents as confidential under a protective order where, as here, the [second] complaint does not publicly disclose highly confidential information").

44.    *Feed.ing BV v. Principle Solutions* is equally on point—and equally rejects Jump's approach.  2015 WL 136402 (E.D. Wis. Jan. 8, 2015).  The protective order at issue in that case provided that confidential information "shall not be used or disclosed for any purpose whatsoever other than . . . conducting the above-captioned lawsuit."  *Id*. at *2.  A party brought a second action that used materials produced in the first, and the defendants objected.  *Id*. at *2-3.  Considering

22

what the protective order was "designed" to do, the court easily concluded there was no violation: "[T]he protective order was designed to protect the privacy of information, not immunity from suit." *Id*. at *3. Here again, the court was further persuaded that no violation occurred because there had been no disclosure of proprietary information, and the protective order should not be interpreted to "shield" a defendant from a subsequent lawsuit based on documents produced in the first action. *Id.*; *accord Caudill Seed & Warehouse Co. v. Jarrow Formulas, Inc.*, 2013 WL 3872229, at *1 (W.D. Ky. July 24, 2013) (concluding that a filing that did not disclose confidential information did not "violate the purpose" of the protective order, which was only "to ensure that confidential and proprietary information would not be publicized to the [parties'] detriment").

45.     Simply put, even if the Court believes that the text of the protective order presents a close call, it should still decline to find a violation in light of the protective order's purpose and the fact that no improper disclosure occurred. *See, e.g., Static Media*, 38 F.4th at 1049 n.1 (observing that other cases "finding violations of protective orders typically involve public disclosures of information or disclosures to parties who are not signatories to the protective orders," and collecting authorities).

## II.    ALTERNATIVELY, THE COURT SHOULD MODIFY THE PROTECTIVE ORDER TO AUTHORIZE THE PLAN ADMINISTRATOR TO USE JUMP REPRODUCED DOCUMENTS IN THE JUMP ACTION.

46.     If the Court interprets the protective order to bar the Plan Administrator from using the Jump Reproduced Documents in the Jump Action, the Plan Administrator respectfully requests that the Court modify the order to authorize the Plan Administrator to use them. Judge Lefkow specifically invited the Plan Administrator to seek "amendment" of the protective order "as needed," Ex. 4 at 2 (N.D. Ill. Dkt. 77), and the protective order contemplates such modification, Dkt. 263-1 ¶ 2 (modification to allow use "on reasonable notice and with an opportunity to be

23

heard"). In these circumstances, the Plan Administrator has good cause to modify the protective order, and Jump has identified no legitimate prejudice.

47. Whether to modify a protective order to authorize the use of documents in another proceeding is committed to the discretion of the Court upon a showing of good cause. "Courts engage in a two-step analysis when considering modification of an existing protective order. First, the moving party must come forward with a reason to modify the order. Then, the court conducts a balancing test considering [] a number of factors, including reliance by the original parties to the order, to evaluate if good cause exists." *Sandoz Inc. v. Lannett Co.*, 2021 WL 4744893, at *1 (E.D. Pa. Oct. 12, 2021) (citing *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 790 (3d Cir. 1994)). Under the balancing test, courts consider, for example, "the relevance of the protected discovery" to the separate action and "its general discoverability therein." *Arconic Inc. v. Universal Alloy Corp.*, 2018 WL 4839225, at *3 (N.D. Ga. July 31, 2018), *aff'd*, 2019 WL 12528945 (N.D. Ga. Mar. 4, 2019). Courts additionally "weigh the countervailing reliance interest of the party opposing modification against the policy of avoiding duplicative discovery." *Id.*; *see also Philips Med. Sys. Nederland B.V. v. TEC Holdings, Inc.*, 2019 WL 11825448, at *1 (N.D. Ga. May 20, 2019) (describing and applying similar balancing test).

48. Applying these principles, the Court should modify the protective order to explicitly authorize the Plan Administrator to use the Jump Reproduced Documents in the Jump Action if he is not already allowed to do so.

49. *First*, the Plan Administrator has good cause to modify the protective order. The Jump Reproduced Documents are directly relevant to the Jump Action and further substantiate the Plan Administrator's allegations of Jump's misconduct. Jump conceded as much when its counsel took the position that the Plan Administrator's use of the Jump Reproduced Documents would

RLF1 36018587v.1

make it harder for Jump to obtain dismissal of the Jump Action at the pleading stage. *Supra* pp. 12-13 (collecting representations). "The relevance of [these documents] to the [Jump Action] provides a reason to modify the protective order." *Sandoz*, 2021 WL 4744893, at *1 (collecting authorities). Modifying the protective order would allow the Plan Administrator to more efficiently and effectively discharge his obligations under the Chapter 11 Plan and Wind Down Trust Agreement to prosecute affirmative litigation to recover assets for the estate and individuals who contributed their claims. "Courts have recognized the importance of modifying a protective order to meet a party's 'reasonable needs in other, related litigation.'" *Insituform Techs., Inc. v. Amerik Supplies, Inc.*, 2015 WL 13064917, at *3 (N.D. Ga. May 13, 2015) (quoting *Verizon Cal. Inc. v. Ronald A. Katz Tech. Licensing, L.P.*, 214 F.R.D. 583, 586 (C.D. Cal. 2003)).

50. *Second*, the Jump Reproduced Documents would otherwise be discoverable. Modifying the protective order to allow the Plan Administrator to use the Jump Reproduced Documents in the Jump Action would thus not subvert limitations on discovery that might otherwise apply. Jump has never suggested that the Jump Reproduced Documents could not be obtained through other means or are somehow categorically off-limits in the Jump Action. To the contrary, Jump's counsel conceded that the documents would be discoverable in the Jump Action if the Amended Complaint survives Jump's anticipated motion to dismiss. Ex. 5 at 21:23-22:22 (5/20/2026 N.D. Ill. Hr'g Tr.) (THE COURT: "[I]f there were no protective order, . . . they could file a complaint, get discovery, and get the same information, right?" JUMP COUNSEL: "If they survived a motion to dismiss.").

51. In fact, the Plan Administrator has other paths to obtaining the Jump Reproduced Documents for use in the Jump Action, underscoring that Jump's objection to their use smacks of gamesmanship and delay. For example, the Plan Administrator can move to lift the Private

25

Securities Litigation Reform Act ("PSLRA") discovery stay in the Jump Action and seek reproduction of the documents even before a dismissal motion has been adjudicated. *See, e.g.*, *Singer v. Nicor, Inc.*, 2003 WL 22013905, at *2 (N.D. Ill. Apr. 23, 2003) (lifting PSLRA stay and recognizing that "documents have already been found and compiled" so defendant "would not be unduly burdened by producing them"). "The goal of the PSLRA's discovery stay is to prevent the unnecessary imposition of discovery costs in both money and time on defendants in securities fraud cases, given that such costs often coerce settlements by innocent parties." *Id.* at *1. That concern does not arise here. Lifting the PSLRA stay to require Jump to reproduce the Jump Reproduced Documents would impose zero burden on Jump given that the Plan Administrator already possesses the documents, and Jump would merely be required to consent to their use. Nor is Jump an "innocent party." There is a lengthy public record of Jump's fraudulent conduct, and a Jump subsidiary has already admitted to market manipulation in a settlement with the SEC. *Supra* p. 8. Simply put, the Plan Administrator is not attempting to circumvent limitations to discovery in the Jump Action that might otherwise preclude him from *ever* obtaining the Jump Reproduced Documents.

52.    Nonetheless, modification of the protective order by this Court would avoid incurring the unnecessary time and expense associated with pursuing these other viable paths and would further the "policy of avoiding duplicative discovery." *Arconic*, 2018 WL 4839225, at *3; *see also* 8A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2044.1 (3d ed. 2026) ("Where modification is designed to enable litigants to use information in other cases, modification can serve important efficiency and litigation fairness goals."). Because costs borne by the Plan Administrator reduce assets available to creditors, this Court should heavily

26

weigh the Plan Administrator's interest in avoiding duplicative discovery; avoided costs redound to the benefit of creditors, not the Plan Administrator.

53.      *Third*, Jump has no legitimate objection to modification.  Jump concedes outright that the same complaint—with the same allegations derived from Jump Reproduced Documents— could have been filed in an adversary proceeding in this Court.  N.D. Ill. Dkt. 74 at 2; Ex. 5 at 21:5-10 (5/20/2026 N.D. Ill. Hr'g Tr.) (JUMP COUNSEL: "We agree that plaintiff has a duty to discharge . . . his obligations under the Chapter 11 plan.  He could have done so by filing an adversary proceeding under the caption of the Chapter 11 case . . . ."); *id*. at 22:16-18 (JUMP COUNSEL: "[I]f they wanted to file an adversary proceeding and be in bankruptcy court with the limitations that would come with that, they could have done that.").  Whether Jump is correct that there might be "limitations" to an adversary proceeding implicates Jump's defenses, not whether the Jump Reproduced Documents could have been used to craft a complaint in the first instance. In any event, modification would simply allow the Plan Administrator to file a complaint with similar factual allegations in another venue.

54.      Relatedly, Jump can hardly claim any reliance interest in not being sued based on information in the Jump Reproduced Documents.  Everyone—Jump included—understood when Jump authorized the Debtors to reproduce the Jump Reproduced Documents to the Committee that Jump was being investigated for potential litigation claims against Jump arising from Terraform's collapse and subsequent bankruptcy.  "Certainly, from the start [Jump] must have contemplated its legal vulnerability" when the Committee requested the reproduction of its documents, and that in "pursuing [Jump as a] target," the Plan Administrator "would necessarily rely upon the information yielded by the discovery in this case." *Navajo Nation*, 46 Fed. Cl. at 360.

55.      When asked how the Plan Administrator's use of Jump Reproduced Documents prejudiced his client, counsel for Jump argued that the Amended Complaint is more difficult to dismiss at the pleading stage because of the Plan Administrator's use of the documents.  *Supra* pp. 12-13 (collecting representations).  That Jump would prefer to defeat meritorious litigation at the pleading stage is no grounds to refuse modification of the protective order.  *Cf. Royal Park*, 192 F. Supp. 3d at 403, 407 (observing that "inability to identify any concrete harm" "underscores" the likelihood of gamesmanship and modifying protective order to "put an end to litigation sideshows" "while continuing to protect genuinely confidential information").

56.      *Finally*, Jump has not identified any proprietary information that has been improperly disclosed in the Jump Action.  Nor could it: the Plan Administrator redacted information derived from Jump Reproduced Documents, and the confidentiality provisions of the protective order remain in place.  Where no disclosure will result from the modification, and where the core purpose of non-disclosure of proprietary and confidential business information is not implicated, courts reject objections to modification of protective orders.  *See Infineon Techs. AG V. Green Power Techs. Ltd.*, 247 F.R.D. 1, 3 (D.D.C. 2005) (finding "no issue of reliance in this case because the confidentiality provisions will remain in place"); *Sandoz*, 2021 WL 4744893, at *2 (similar).  This Court should do the same here.

57.      In sum, the Plan Administrator respectfully requests that, if the Court finds that the protective order bars the Plan Administrator from using Jump Reproduced Documents in the Jump Action, the Court modify the protective order to allow such use.

## III. THE CONTESTED DOCUMENTS SHOULD BE DE-DESIGNATED BECAUSE THEY ARE NOT "HIGHLY CONFIDENTIAL" OR "CONFIDENTIAL."

58.      When Jump reproduced the Jump Reproduced Documents, it did so subject to the condition that all documents be treated as "Highly Confidential" under the protective order.  Ex. 8

28

(7/23/2024 Email from E. Bacon to D. Kaltman).   But the "Highly Confidential" designation applies only where the producing party "in good faith reasonably believes that disclosure . . . would cause significant harm to an individual or to its commercial, financial, or business interests."  Dkt. 263-1 ¶ 6.  Jump has the burden to "justify the claim that the disputed material has been properly designated."  *Id*. ¶ 19 ("The burden shall be on the Producing Party … seeking to support the designation of the information as Confidential Information.").

59.     At the parties' meet-and-confer, Jump agreed that none of the documents underlying the information redacted in the Amended Complaint satisfy the demanding standard to qualify as "Highly Confidential."  And Jump allowed at the parties' meet-and-confer that Jump Reproduced Documents that are publicly available are not subject to the protective order, nor are documents that are independently in the Plan Administrator's possession.  *See also* Ex. 3 at 2-3 (5/27/2026 Email from J. Brown to J. McNeily).   As the Plan Administrator detailed in correspondence ahead of the parties' meet-and-confer, nearly all the documents relied on for the redacted information in the Amended Complaint are publicly available or otherwise in the Plan Administrator's possession.  Ex. 11 (5/22/2026 Ltr. with Attachments from C. McGushin to J. McNeily).  So Jump's concessions mean that the Plan Administrator can use those documents in his Northern District of Illinois complaint because they are not subject to the protective order's use restriction—even under Jump's interpretation of the protective order.  But Jump continues to insist that the four contested documents—four Jump Reproduced Documents that appear not to be publicly available or already in the possession of the Plan Administrator—are Confidential under the protective order.  Ex. 3 at 2 (5/28/2026 Email from C. Harris to J. Brown).  Jump is wrong.[7]

---

[7] As explained, *supra* p. 15, during the parties' meet-and-confer, the Plan Administrator offered to withdraw the limited allegations derived from the four contested documents in the interest of moving the case forward without

RLF1 36018587v.1

60.     The protective order limits "Confidential Information" to material that is "confidential, proprietary, or commercially sensitive information, within the meaning of Rule 26(c) of the Federal Rules, Rules 7026 or 9018 of the Bankruptcy Rules, or Section 107 of the Bankruptcy Code, that requires the protections provided in this Protective Order," or where "disclosure . . . would violate the terms or conditions of a confidentiality agreement, protective order, or similar agreement with a third-party."  Dkt. 263-1 ¶ 5.  The protective order lists illustrative examples of "non-public materials" that could be considered "Confidential Information":

> "(i) personally identifiable information; (ii) financial or business plans or projections; (iii) proposed strategic transactions and other business combinations, negotiations, inquiries or agreements including, but not limited to, joint ventures, mergers, purchases, buy-outs, consolidations, transfers of interests and partnerships; (iv) trade secrets and proprietary information; (v) studies or analyses by internal or outside experts or consultants; (vi) non-public financial, operational or accounting results or data; (vii) business, management and marketing plans, and strategies; (viii) acquisition offers and expressions of interest; and (ix) contracts or agreements with or among affiliates, partners or Parties."

*Id.*

61.     The four documents at issue reflect Jump's co-founder's efforts to gin up positive publicity for Terraform; his assessment of a colleague's close relationship with the co-founder of Terraform; and his high-level reaction to Jump's investment in Terraform.  They do not warrant protection under the protective order.

62.     To begin, the Court need not even reach whether the substance of these documents was once "Confidential Information" because all the content is clearly stale—the emails date to 2020 and 2021.  In general, "information loses its confidential nature once it becomes stale." *Avtel Servs., Inc. v. United States*, 70 Fed. Cl. 173, 191 (2006) (collecting cases).  Even sensitive

---

judicial intervention.  However, Jump did not agree that this would resolve the parties' dispute over the Plan Administrator's use of Jump Reproduced Documents.

information such as a "business planning report" or a "customer list" does not qualify for protection after the passage of time. *United States v. Int'l Bus. Machs. Corp.*, 67 F.R.D. 40, 49 (S.D.N.Y. 1975). Delaware courts have led the charge in recognizing that business information loses its confidentiality when it becomes stale, rendering "its competitive value" "non-existent." *Baker v. Sadiq*, 2016 WL 4988427, at *2 (Del. Ch. June 8, 2016) (two years); *Rivest v. Hauppauge Digital, Inc.*, 2022 WL 203202, at *11 (Del. Ch. Jan. 24, 2022) (two years); *Quantum Tech. Partners IV, L.P. v. Ploom, Inc.*, 2014 WL 2156622, at *18 (Del. Ch. May 14, 2014) (five years). Here, the documents plainly reflect stale information, regardless of whether that information was once Confidential Information." The documents concern a cryptocurrency enterprise that is now defunct and a founder who currently sits in prison. These documents cannot possibly reflect proprietary information remotely relevant to Jump's current operations.

63.    Even on the merits, the information contained in the four contested documents is not "Confidential Information." At the parties' meet-and-confer, Jump vaguely suggested that the documents reflected Jump's analysis of markets that Jump still operates in today. And in follow-up correspondence, Jump doubled down to assert that the four documents contain "Confidential Information" because "among other bases, those documents reflect Jump's opinions, analyses, assessments, and strategies surrounding markets, assets, and deal types in which Jump remains actively involved." Ex. 3 at 2 (5/28/2026 Email from C. Harris to J. Brown). Hardly. Even a brief skim of the four contested documents reveal that they contain only Jump's assessments of long-finished deals, long-defunct business partners, and long-ago public relations opportunities. If these documents are "Confidential Information" under the protective order, then effectively *all* internal company communications are. That cannot be right.

31

64.   Simply put, the four contested documents do not reflect "Confidential Information."  There can be no claim that disclosure of the information "would result in an unfair advantage to competitors."  *In re Alterra Healthcare Corp.*, 353 B.R. 66, 75-76 (Bankr. D. Del. 2006); *see also In re ESML Holdings Inc*, 135 F.4th 80, 97 (3d Cir. 2025).  "Simply calling something confidential does not make it so."  *Segerdahl Corp. v. Ferruzza*, 2017 WL 11953852, at *2 (N.D. Ill. May 31, 2017).  The Court should thus remove the designations for the four contested documents under the protective order, which would mean that the Plan Administrator can use them to support allegations in the Northern District of Illinois lawsuit regardless of the protective order's limitations.

## NOTICE

65.   The Plan Administrator will provide notice of this motion to counsel for (a) the United States Trustee for the District of Delaware; (b) the Internal Revenue Service; (c) the United States Attorney's Office for the District of Delaware; (d) the United States Securities and Exchange Commission; (e) Jump; and (f) any other party that has requested notice pursuant to rule 2002 of the Federal Rules of Bankruptcy Procedure.  The Plan Administrator respectfully submits that, in light of the nature of the relief requested, no other or further notice need be given.

66.   No prior request for the relief sought herein has been made by the Plan Administrator to this or any other Court.

[*Remainder of page left intentionally blank.*]

RLF1 36018587v.1

Dated: May 29, 2026
Wilmington, Delaware

/s/ Alexander R. Steiger

| | |
|---|---|
| **RICHARDS, LAYTON & FINGER, P.A.** | **KIRKLAND & ELLIS LLP** |
| Zachary I. Shapiro (No. 5103) | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| Alexander R. Steiger (No. 7139) | Christopher T. Greco, P.C. (admitted *pro hac vice*) |

RICHARDS, LAYTON & FINGER, P.A.
Zachary I. Shapiro (No. 5103)
Alexander R. Steiger (No. 7139)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:      (302) 651-7700
Email:           shapiro@rlf.com
                    steiger@rlf.com

*Co-Counsel for the Plan Administrator*

KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
Christopher T. Greco, P.C. (admitted *pro hac vice*)
Elizabeth Helen Jones (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:       (212) 446-4900
Email             christopher.greco@kirkland.com
                    elizabeth.jones@kirkland.com

-and-

Michael F. Williams, P.C. (admitted *pro hac vice*)
1301 Pennsylvania Ave., NW
Washington, DC 20004
Telephone:      (202) 389-5000
Facsimile:       (202) 389-5200
Email:           michael.williams@kirkland.com

-and-

Christopher S. Koenig (admitted *pro hac vice*)
Casey McGushin (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:       (312) 862-2200
Email             chris.koenig@kirkland.com
                    casey.mcgushin@kirkland.com

*Co-Counsel for the Plan Administrator*

RLF1 36018587v.1

**INDEX OF MOTION EXHIBITS**

| Ex. No. | Description |
|---|---|
| 1 | Proposed Order |
| 2 | 5/1/2026 Amended Complaint, *Snyder v. Jump Trading, LLC*, No. 1:25-cv-15414 (N.D. Ill.), Dkt. 56 |
| 3 | Email correspondence between counsel for the Plan Administrator and counsel for Jump, dated 5/22/2026 through 5/28/2026 |
| 4 | 5/21/2026 Order, *Snyder v. Jump Trading, LLC*, No. 1:25-cv-15414 (N.D. Ill.), Dkt. 77 |
| 5 | 5/20/2026 Hearing Transcript on Jump's Motion to Stay Deadlines |
| 6 | Contested Documents: <br><br> 6a – 9/10/2020 Email from W. DiSomma to M. Schrecengost, et al. <br><br> 6b – 9/10/2020 Slack Messages between W. DiSomma and D. Olsen <br><br> 6c – 1/26/2021 Email from W. DiSomma to M. Schrecengost <br><br> 6d – 2/1/2021 Email from W. DiSomma to P. Johnson |
| 7 | 7/16/2024 Letter from J. Evans to Counsel |
| 8 | 7/23/2024 Email from E. Bacon to Counsel |
| 9 | Email correspondence between counsel for the Plan Administrator and counsel for Jump, dated 5/5/2026 through 5/6/2026 |
| 10 | 5/18/2026 Plan Administrator's Response to Jump's Motion to Stay Deadlines (with exhibits), *Snyder v. Jump Trading, LLC*, No. 1:25-cv-15414 (N.D. Ill.), Dkt. 73 |
| 11 | 5/22/2026 Letter with Attachments from C. McGushin to J. McNeily |