**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| TERRAFORM LABS PTE LTD., et al., | Case No. 24-10070 (BLS) |
| Post-Effective Date Debtors.[1] | (Jointly Administered) |
| | **Docket Ref. No. 1223** |

**JUMP'S OBJECTION
TO PLAN ADMINISTRATOR'S MOTION TO
CLARIFY OR MODIFY THE PROTECTIVE ORDER
AND TO STRIP CONFIDENTIALITY DESIGNATIONS**

---

[1] The Post-Effective Date Debtors in these Chapter 11 cases are: Terraform Labs Pte. Ltd. and Terraform Labs Limited. The Post-Effective Date Debtors' principal offices are located at 10 Anson Road, #10-10 International Plaza, Singapore 079903. The Plan Administrator of the Debtors is Todd R. Snyder. The Plan Administrator's principal office is located at 1251 Avenue of the Americas, New York, New York 10020.

**TABLE OF CONTENTS**

**Page**

INTRODUCTION .................................................................................................................1

BACKGROUND ..................................................................................................................5

      A.    This Court Enters A Protective Order That Restricts The Plan Administrator's Use Of The Protected Materials To The Chapter 11 Case ............5

      B.    The Plan Administrator In *Snyder* Prepares And Files An Amended Complaint That Quotes, Paraphrases, And Otherwise Uses Jump's Protected Materials From This Chapter 11 Case ......................................................8

      C.    Judge Lefkow Conditionally Concludes That The Plan Administrator Violated The Protective Order ..........................................................................9

      D.    The Parties Meet And Confer, And The Plan Administrator Files The Present Motion ..................................................................................................11

ARGUMENT .....................................................................................................................13

I.     THE PLAN ADMINISTRATOR VIOLATED THE PROTECTIVE ORDER ...............13

      A.    The Protective Order's Plain Terms Prohibited The Plan Administrator From Using Protected Materials In The Amended Complaint He Filed In *Snyder* ........................................................................................................13

      B.    The Plan Administrator Has No Plausible Defense To His Violation...................16

            1.    The Plan Administrator's Interpretation Of The Protective Order Rewrites Its Plain Text............................................................................16

            2.    The Plan Administrator's Account Of The Protective Order's Purpose Is Incomplete And Insufficient To Excuse His Violation............20

            3.    The Plan Administrator's Cases Are Inapposite .......................................24

II.    THE PLAN ADMINISTRATOR HAS NOT SHOWN GOOD CAUSE TO MODIFY THE PROTECTIVE ORDER ....................................................................26

      A.    The Plan Administrator Presents No Valid Reason To Modify The Protective Order ........................................................................................27

      B.    The Plan Administrator Has Not Shown Good Cause To Modify A Protective Order On Which Jump Reasonably Relied.........................................30

III.    THE PLAN ADMINISTRATOR'S REQUEST TO REMOVE CERTAIN
        CONFIDENTIALITY DESIGNATIONS SHOULD BE REJECTED ............................33

CONCLUSION..................................................................................................................38

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*AT&T Corp. v. Sprint Corp.*,
   407 F.3d 560 (2d Cir. 2005).................................................................................. 27

*Avtel Servs., Inc. v. United States*,
   70 Fed. Cl. 173 (2006) ........................................................................................ 36

*Carnero G&P, L.L.C. v. SN EF Maverick, L.L.C. (In re Sanchez Energy Corp.)*,
   159 F.4th 309 (5th Cir. 2025) .............................................................................. 30

*Caudill Seed & Warehouse Co. v. Jarrow Formulas, Inc.*
   2013 WL 3872229 (W.D. Ky. July 24, 2013) ....................................................... 26

*Crocs, Inc. v. Joybees, Inc.*,
   2023 WL 8851997 (D. Colo. Dec. 8, 2023), *report and recommendation
   adopted*, 2024 WL 5055671 (D. Colo. Jan. 25, 2024)........................................... 26

*Culinary Foods, Inc. v. Raychem Corp.*,
   151 F.R.D. 297 (N.D. Ill.), *order clarified,* 153 F.R.D. 614 (N.D. Ill. 1993)............. 35, 36, 37

*Del Campo v. Am. Corrective Counseling Servs., Inc.*,
   2007 WL 1848660 (N.D. Cal. June 27, 2007) ............................................. 14, 21, 33

*Desmarais v. First Niagara Fin. Grp., Inc.*,
   2016 WL 768257 (D. Del. Feb. 26, 2016) ............................................................. 28

*DEV Indus., Inc. v. Rockwell Graphic Sys., Inc.*,
   1992 WL 100908 (N.D. Ill. May 4, 1992) ....................................................... 15, 17

*Eisai, Inc. v. Sanofi-Aventis U.S., LLC*,
   2014 WL 8108466 (D.N.J. Aug. 4, 2014) ............................................................. 31

*Feed.ing BV v. Principle Sols., LLC*,
   2015 WL 136402 (E.D. Wis. Jan. 8, 2015)............................................................ 26

*Ford Motor Co. v. Summit Motor Prods., Inc.*,
   930 F.2d 277 (3d Cir. 1991)................................................................................ 13

*Gann v. GM LLC*,
   2022 WL 3552484 (D. Ariz. Aug. 18, 2022).................................................... 34, 36

*Grand River Enters. Six Nations, Ltd. v. King*,
   2009 WL 222160 (S.D.N.Y. Jan. 30, 2009) .................................................... 34, 36

*Grimes v. Graue (In re Haws)*,
    158 B.R. 965 (Bankr. S.D. Tex. 1993) ................................................................. 30

*H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys. Inc.*,
    130 F.R.D. 281 (S.D.N.Y. 1989) ......................................................................... 32

*In re Adobe Sys., Inc. Sec. Litig.*,
    141 F.R.D. 155 (N.D. Cal. 1992).......................................................................... 34

*In re Alterra Healthcare Corp.*,
    353 B.R. 66 (Bankr. D. Del. 2006) ....................................................................... 37

*In re Avandia Mktg. Sales Pracs. & Prods. Liab. Litig.*,
    924 F.3d 662 (3d Cir. 2019)................................................................................. 36

*In re Biovail Corp. Sec. Litig.*,
    247 F.R.D. 69 (S.D.N.Y. 2007) ........................................................................... 15

*In re Dual-Deck Video Cassette Recorder Antitrust Litig.*,
    10 F.3d 693 (9th Cir. 1993) ................................................................................. 24

*In re eBay Seller Antitrust Litig.*,
    2010 WL 2106004 (N.D. Cal. May 25, 2010) ...................................................... 15

*In re Insilco Techs., Inc.*,
    394 B.R. 747 (D. Del. 2008) ................................................................................ 19

*In re Pattern Energy Grp. Inc. Sec. Litig.*,
    2021 WL 312752 (D. Del. Jan. 28, 2021).............................................................. 28

*In re Resorts Int'l, Inc.*,
    372 F.3d 154 (3d Cir. 2004)...................................................................... 19, 29, 30

*Jazz Pharms., Inc. v. Amneal Pharms. LLC*,
    2016 WL 11480203 (D.N.J. Jan. 22, 2016).......................................................... 14

*Kiobel v. Cravath, Swaine & Moore LLP*,
    895 F.3d 238 (2d Cir. 2018)................................................................................. 22

*LifeScan Scotland, Ltd. v. Shasta Techs., LLC*,
    2013 WL 4604746 (N.D. Cal. Aug. 28, 2013) ............................................... 15, 17

*Mesabi Metallics Co. v. Cleveland-Cliffs, Inc. (In re ESML Holdings Inc.)*,
    135 F.4th 80 (3d Cir. 2025) ................................................................................. 36

*Mine Safety Appliances Co. v. N. River Ins. Co.*,
    2016 WL 8221566 (W.D. Pa. Sept. 29, 2016)...................................................... 27

*MPI Tech A/S v. IBM Corp.*,
    2017 WL 11896263 (S.D.N.Y. Apr. 18, 2017).................................................. 15, 17, 25

*Navajo Nation v. United States*,
    46 Fed. Cl. 353 (2000) ........................................................................................ 24

*On Command Video Corp. v. LodgeNet Ent. Corp.*,
    976 F. Supp. 917 (N.D. Cal. 1997) ....................................................... 15, 17, 21, 25

*PG&E Co. v. United States*,
    79 Fed. Cl. 744 (2007) ................................................................................... 14, 21

*Phillips Petroleum Co. v. Rexene Prods. Co.*,
    158 F.R.D. 43 (D. Del. 1994) ............................................................................... 36

*Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*
    192 F. Supp.3d (S.D.N.Y. 2016)........................................................................... 25

*Salyers v. A.J. Blosenski, Inc.*,
    766 F. Supp. 3d 479 (E.D. Pa. 2025) ............................................................. 27, 31

*SEC v. Merrill Scott & Assocs. Ltd.*,
    600 F.3d 1262 (10th Cir. 2010) ........................................................................... 13

*SEC v. Terraform Labs Pte. Ltd.*,
    No. 1:23-cv-1346 (S.D.N.Y.).............................................................................. 1, 2

*Silicon Genesis Corp. v. EV Group E. Thallner GmbH*,
    2023 WL 6882749 (N.D. Cal. Oct. 18, 2023)........................................... 14, 21, 24

*Singer v. Nicor, Inc.*,
    2003 WL 22013905 (N.D. Ill. Apr. 23, 2003) ...................................................... 28

*Sisk v. Guidant Corp.*,
    2007 WL 1035090 (S.D. Ind. Mar. 30, 2007)....................................................... 28

*Stanley v. City of Sanford*,
    606 U.S. 46 (2025).............................................................................................. 18

*Static Media LLC v. Leader Accessories LLC*,
    38 F.4th 1042 (Fed. Cir. 2022) ........................................................................... 24

*Stoe v. Flaherty*,
    436 F.3d 209 (3d Cir. 2006), *as amended* (Mar. 17, 2006) .................................. 19

*Travelers Indem. Co. v. Bailey*,
    557 U.S. 137 (2009)............................................................................................ 13

*United States v. Armour & Co.*,
   402 U.S. 673 (1971) ............................................................................................ 20

*Whitehead v. Gateway Chevrolet*,
   2004 WL 316413 (N.D. Ill. Feb. 2, 2004) ............................................................ 14

*Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*,
   529 F. Supp. 866 (E.D. Pa. 1981) ................................................... 34, 36, 37, 38

## STATUTES

11 U.S.C. § 107 ...................................................................................................... 37

11 U.S.C. §§ 101-1532 ............................................................................................. 5

15 U.S.C. § 77e ...................................................................................................... 29

15 U.S.C. § 77q ...................................................................................................... 29

15 U.S.C. § 78u-4(b)(3)(B) .................................................................................... 28

28 U.S.C. § 1334(b) ............................................................................................... 19

## RULES

Rule 26 .................................................................................................................... 34

Rule 26(c) ................................................................................................... 33, 34, 36

## OTHER AUTHORITIES

*In re Tai Mo Shan Limited*,
   Securities Act Release No. 11349 (Dec. 20, 2024) ............................................... 29

Jump Trading, LLC, Jump Crypto Holdings LLC, Jump Financial, LLC, J Digital 6 Cayman Ltd., Jump Operations, LLC, Jump Capital LLC, JCDP-7 Digital Ltd., and Tai Mo Shan Limited (collectively, "Jump") respectfully oppose the Plan Administrator Todd R. Snyder's Motion to Clarify or Modify the Protective Order and to Strip Confidentiality Designations. Dkt. 1223 ("Motion").[2]

## INTRODUCTION

This dispute is before the Court because the Plan Administrator filed an Amended Complaint in *Snyder v. Jump Trading, LLC*, No. 25-cv-15414 (N.D. Ill.) (Lefkow, J.) ("*Snyder*"), that violated the plain terms of this Court's Protective Order in this Chapter 11 Case. The Protective Order provides that documents produced by Jump in this Chapter 11 Case "shall be used solely in this Chapter 11 Case" and "shall not be used … in any other proceeding or for any other purpose." When the Plan Administrator used such documents in his Amended Complaint in *Snyder*, Jump asked him to take remedial action. But rather than rectify his violation, the Plan Administrator doubled down, contending that the Protective Order does not mean what it very plainly says or, alternatively, that he need not follow it.

The district judge in *Snyder* rejected the Plan Administrator's reading of the Protective Order and conditionally concluded that he had violated it. So the Plan Administrator now turns to this Court, rehashing his failed argument that he complied with the Protective Order under a reading he reverse engineered to excuse his violation and, alternatively, seeks to alter a years-old order to suit his present purposes. And the Plan Administrator's unapologetic intransigence continues: he suggests here that *Jump* has overstepped by seeking to enforce the Protective Order

---

[2] "Dkt." citations refer to the docket in this Chapter 11 Case. "ECF No." citations refer to the docket in *Snyder v. Jump Trading, LLC*, No. 25-cv-15414 (N.D. Ill.). "SEC Case No." citations refer to the docket in *SEC v. Terraform Labs Pte. Ltd.*, No. 1:23-cv-1346 (S.D.N.Y.).

that this Court entered and upon which Jump relied in agreeing to the reproduction of hundreds of thousands of pages of documents in this Chapter 11 Case to the Committee of Unsecured Creditors ("Committee"). This Court should reject the Plan Administrator's untenable positions and deny his Motion.

Jump's documents had originally been produced in a separate SEC enforcement action against Terraform, an action itself governed by a separate protective order with its own use restrictions. *See SEC v. Terraform Labs Pte. Ltd.*, No. 1:23-cv-1346 (S.D.N.Y.) ("SEC Case"). Jump agreed to the reproduction of those materials in this Chapter 11 Case on the condition that those materials would be subject to this Court's Protective Order.

The Protective Order's use restriction is unambiguous. Paragraph 2 requires that Confidential Information be "used solely" in this Chapter 11 Case and prohibits its "use[] … in any other proceeding or for any other purpose" without the Producing Party's consent or the Court's approval. Dkt. 263-1 ("Protective Order") at ¶ 2. And Paragraph 12 provides that all Discovery Materials—regardless of confidentiality designation—shall be "use[d] … only in this Chapter 11 Case." *Id.* at ¶ 12. The Protective Order gave Jump the assurances it needed to consent to a broad reproduction of sensitive documents for the Debtor to use in the Chapter 11 Case. Indeed, Jump's consent was expressly "condition[ed]" on adherence to the Protective Order. Dkt. 1223-8 at 1.

The Plan Administrator intentionally and unapologetically defied those restrictions. On May 1, 2026, he filed his Amended Complaint against Jump, William DiSomma,[3] and Kanav Kariya in *Snyder*. In his contemporaneous motion to seal, the Plan Administrator admitted that

---

[3]  Although Mr. DiSomma was not a Producing Party in this Chapter 11 Case, his counsel has informed Jump that he joins in this Objection.

2

the Amended Complaint was "based in part on documents and information" that were "reproduc[ed]" on the "condition[]" that they be subject to this Court's "[P]rotective [O]rder." ECF No. 54 at 2.

The Plan Administrator's motivation for his violation is obvious.  He brought his claims as a standalone action in *Snyder*, rather than as an adversary proceeding in this Chapter 11 Case, because doing so afforded him the ability to assert claims that this Court would lack jurisdiction to entertain at this late stage of the Chapter 11 Case.  Those claims include (i) a claim seeking contribution for the $4.5 billion judgment entered against Terraform in the SEC Case and (ii) claims on behalf of individual "Crypto Loss Claimants" who contributed their own causes of action to the Wind Down Trust.  And when Jump and DiSomma moved to dismiss the Plan Administrator's original complaint in *Snyder* based on patent deficiencies in its allegations, he did not try to defend those allegations.  Rather, he went back to the drawing board and filed an Amended Complaint that quoted, paraphrased, and otherwise used restricted documents from this Chapter 11 Case in an effort to resuscitate his inadequate claims.

Regardless of what material the Plan Administrator puts into his *Snyder* pleading, his case against Jump is going nowhere, and Jump's forthcoming motion to dismiss will demonstrate that it should end at the pleading stage.  But the Plan Administrator cannot pick and choose which of this Court's orders he deigns to follow and which ones he flouts.  After getting caught in a clear violation of the Protective Order and failing to convince Judge Lefkow that the Protective Order does not mean what it says, the Plan Administrator makes three arguments to this Court seeking to absolve his conduct after the fact.  All are meritless.

*First*, the Plan Administrator argues that the Amended Complaint complies with the Protective Order, deploying an incredible interpretation of the term "this Chapter 11 Case" that

3

encompasses *Snyder* (and apparently any other claim worldwide if authorized by the Plan).  The Plan Administrator's argument does not interpret the Protective Order—rather, it rewrites its text and reimagines its purpose to manufacture a justification for his violation.  The Northern District of Illinois suit is not the same as "this Chapter 11 Case," and the Plan Administrator's desire to avoid jurisdictional and procedural constraints that would govern any claims he could bring in this Chapter 11 Case does not permit him to override a clear use restriction that applies to suits outside this Chapter 11 Case.

*Second*, implicitly recognizing that he in fact violated the Protective Order, the Plan Administrator asks the Court to modify it to excuse his violation retroactively, but he does not and cannot show good cause.  The Plan Administrator asserts that the relevance of Jump's documents to his claims supports modifying the Protective Order to permit their use in other litigation, but his request is a transparent (indeed, admitted) attempt to circumvent the automatic discovery stay under the Private Securities Litigation Reform Act ("PSLRA") by deploying documents obtained through this Chapter 11 Case in a standalone federal district court securities action where such discovery is barred.  And the Plan Administrator ignores that Jump, in agreeing to the reproduction of its documents in this Chapter 11 Case, reasonably relied on the Protective Order's restrictions on using the reproduced documents outside this Chapter 11 Case.  Dkt. 1223-8 at 1 (consenting to reproduction of documents "on the condition that" they be subject to "the [P]rotective [O]rder").  If the Plan Administrator is permitted to circumvent the Protective Order in this fashion, parties will rightfully hesitate before consenting to production in bankruptcy matters under similar terms, knowing that the protections they were promised may be disregarded whenever a receiving party believes the protected documents would be useful in separate litigation.

*Third*, the Plan Administrator asks the Court to strip confidentiality designations from four

internal Jump documents.  This effort is irrelevant to the issue before this Court, as Paragraph 12 of the Protective Order makes plain that all documents produced in discovery in this Chapter 11 Case, regardless of their level of confidentiality, can be "use[d] … only in this Chapter 11 Case." Protective Order ¶ 12.  In any event, those documents reflect Jump's competitive strategies and analytical methodologies in markets where it remains actively engaged, and so are entitled to continued protection despite their age or the demise of the Terraform ecosystem.

## BACKGROUND

**A.    This Court Enters A Protective Order That Restricts The Plan Administrator's Use Of The Protected Materials To The Chapter 11 Case**

1.    On January 21, 2024, Terraform Labs Pte. Ltd. ("Terraform") commenced this Chapter 11 Case. Dkt. 1.  On May 1, 2024, the Court approved the Protective Order, which governs the handling, review, and use of documents and information produced in this Chapter 11 Case, regardless of whether those materials are designated as confidential.  Dkt. 263-1 ("Protective Order").  As described below, the Protective Order restricts the use of all such materials (collectively, "Protected Materials").  The Protective Order defines the "Chapter 11 Case" as the "voluntary case" Terraform "commenced with [the Bankruptcy Court, No. 24-10070] … under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532."  Protective Order at 1.

2.    The Protective Order defines two overlapping categories of materials.  "Discovery Material" broadly encompasses, among other things, all documents and information provided by the Debtor to the Committee of Unsecured Creditors ("Committee") in connection with this Chapter 11 Case, including both current and future productions.  *Id.* at 2.  "Confidential Information" is a subset of Discovery Material: it refers to all Discovery Material "that is designated as 'Confidential' or 'Highly Confidential.'"  *Id.* at 2 & ¶¶ 4–6.

3.    The Protective Order imposes broad use restrictions on both types of Protected

Materials.  Paragraph 2 provides that "Confidential Information … disclosed by any person or entity (a 'Producing Party') to any other person or entity (a 'Receiving Party') in connection with this Chapter 11 Case, shall be *used solely in this Chapter 11 case*, unless otherwise agreed in writing by the Producing Party."  *Id.* ¶ 2 (emphasis added).  Paragraph 2 further mandates that "Confidential Information shall *not be used* or disclosed *in any other proceeding* or *for any other purpose*, … , absent agreement of the Producing Party or Order of the Court on reasonable notice and with an opportunity to be heard."  *Id.* (emphasis added).

4.     With respect to Discovery Material, Paragraph 12 states: "[T]he Parties shall *use the Discovery Material only in this Chapter 11 Case*, irrespective of any restrictions on such use in any preexisting confidentiality agreement with the Debtor."  *Id.* ¶ 12 (emphasis added).  In other words, Protected Materials cannot be used outside of the Chapter 11 Case, regardless of whether a document is designated as Confidential Information or is Discovery Material not so designated.

5.     Paragraph 3, in turn, makes clear that the Protective Order "is binding on all the parties to this Chapter 11 Case, including their respective corporate parents, subsidiaries, and affiliates and their respective attorneys, principals, agents, experts, consultants, representatives, directors, officers, and employees."  *Id.* ¶ 3.

6.     Significantly, the Protective Order itself makes clear that it was "needed to govern this Chapter 11 Case" in order "to facilitate the exchange of Discovery Material, assist with the resolution of potential disputes over confidentiality, and protect against improper disclosure of Discovery Material."  *Id.* at 2.

7.     During this Chapter 11 Case, Jump agreed to the reproduction to the Committee of reams of documents originally produced in the SEC Case, which was itself governed by a separate protective order.  Specifically, on July 16, 2024, counsel for the Committee asked that Jump

consent to the Debtor reproducing to the Committee copies of Jump's productions from the SEC

Case and related SEC investigation ("Jump Reproduced Documents"). Dkt. 1223-7. Within a

week of the Committee's request, Jump consented to the Debtor "reproducing those materials on

the condition … that those materials be treated as 'Highly Confidential' and that Jump be treated

as the Producing Party of those materials under the" Protective Order. Dkt. 1223-8 at 1. The

Committee accepted those conditions, and the reproduction proceeded on that basis—meaning the

Jump Reproduced Documents were subject to the Protective Order's use restrictions from the

moment they were reproduced in this Chapter 11 Case.

8.      On September 20, 2024, this Court confirmed the Second Amended Chapter 11

Plan of Liquidation. Dkt. 734. The Plan became effective on October 1, 2024. Dkt. 765. The

Confirmation Order authorized the creation and implementation of the Wind Down Trust and the

appointment of the Wind Down Trustee, the Plan Administrator, and the Advisory Board to

accomplish the Wind Down Trust's purposes. Dkt. 734. On the effective date, the estate assets

were transferred to and vested in the Wind Down Trust in accordance with the Plan and the Wind

Down Trust Agreement. By virtue of his appointment, the Plan Administrator obtained access to

Protected Materials produced pursuant to this Court's Protective Order. As such, the Plan

Administrator is bound by the Protective Order. *See* Protective Order ¶ 3.

9.      The Plan further established a mechanism by which holders of Crypto Loss

Claims—non-debtor individuals who allegedly suffered losses arising from the purchase, sale, or

rescission of certain cryptocurrencies, referred to herein as Crypto Loss Claimants—could

contribute to the Wind Down Trust their own potential claims against third parties. Specifically,

Section 5.17 of the Plan defines these "Contributed Third-Party Claims" as direct causes of action

that any Contributing Claimant has against any Person other than a Debtor that had a direct

relationship with the Debtor[], their predecessors, or respective Affiliates and that harmed such

Contributing Claimant in the claimant's capacity as a creditor of the Debtor[].  Dkt. 734-1 at 39.

Critically, these are *not* claims belonging to the Debtor's estate; rather, they are creditors' own

causes of action against third parties that, standing alone, "may have insufficient value for creditors

to pursue individually; however, such Claims in the aggregate may have sufficient value to

pursue." *Id*.

10.     On January 31, 2025, the Plan Administrator moved for approval of the Crypto

Loss Claim procedures.  Dkt. 904.  On March 12, 2025, this Court entered the Crypto Loss Claims

Bar Date Order approving those procedures and a deadline for filing Crypto Loss Claims.  Dkt.

965.

> **B.      The Plan Administrator In *Snyder* Prepares And Files An Amended Complaint That Quotes, Paraphrases, And Otherwise Uses Jump's Protected Materials From This Chapter 11 Case**

11.     On December 18, 2025, the Plan Administrator filed the *Snyder* suit in the U.S.

District Court for the Northern District of Illinois against Jump, William DiSomma, and Kanav

Kariya.  ECF No. 1.  Notably, these are not just the Debtor's claims; rather, many are claims of

individual creditors that were assigned to the Plan Administrator and could not have been brought

by the Debtor.

12.     Jump and DiSomma moved to dismiss.[4]  ECF Nos. 45–46.  Rather than oppose the

motions, the Plan Administrator elected to amend.  The Plan Administrator negotiated an extended

schedule with Jump and DiSomma for the filing of an Amended Complaint.  ECF No. 50.  During

these discussions, the Plan Administrator did not refer to Jump's Protected Materials, nor did he

suggest that he intended to use such material.

---

[4] Defendant Kariya has not been served in the *Snyder* suit.

13. On May 1, 2026, the Plan Administrator filed the Amended Complaint. ECF No. 55 (Dkt. 1223-2). The Plan Administrator simultaneously filed a Motion to Seal, expressly acknowledging that "[t]he Amended Complaint is based in part on documents and information" subject to the Protective Order. ECF No. 54 at 2. The Plan Administrator redacted sixteen paragraphs directly quoting Protected Materials. ECF No. 55 ¶¶ 74, 75, 78, 83, 118, 123, 130, 131, 136, 138, 142, 162, 180, 181, 280, and 281. Some of the quotes in those paragraphs also appear in publicly available materials, but the Plan Administrator did not identify independent sources for them until he conducted a backdated analysis designed to paper over the extent of his violation. As Jump has explained to the Plan Administrator, numerous additional paragraphs contain unredacted allegations that appear to be derived from or inextricably intertwined with Jump's Protected Materials. *See id.* ¶¶ 80, 84, 94, 120, 122, 137, 163, 201, 202, 215, 248, 249, 250, 251, 252, 299, 307; Dkt. 1223-3 at 1 (May 28, 2026 email from C. Harris to J. Brown). In these paragraphs, the Plan Administrator does not just repeat what the Protected Materials say, but distorts their meaning and removes them from their context.

14. The Plan Administrator never sought Jump's consent to use these materials outside of the Chapter 11 Case, nor did he seek an order from this Court authorizing such use before he filed the Amended Complaint.

### C. Judge Lefkow Conditionally Concludes That The Plan Administrator Violated The Protective Order

15. On May 14, 2026, in anticipation of filing a motion to strike the Amended Complaint based on the Plan Administrator's violation of the Protective Order, Jump and DiSomma moved to stay deadlines in *Snyder*. ECF No. 71. On May 20, 2026, Judge Lefkow held a hearing on Jump and DiSomma's motion to stay. ECF No. 72. During the hearing, the Plan Administrator again confirmed that he used documents subject to the Protective Order in the

9

Amended Complaint, but insisted that he had not violated the order.  ECF No. 75 at 12:13–17 (Dkt. 1223-5).

16.     In response, Jump explained that the Plan Administrator had openly and without apology violated this Court's Protective Order.  *Id.* at 22:8–22.  The Plan Administrator's position was internally contradictory: he confirmed that he used in the Amended Complaint documents subject to the Protective Order, yet simultaneously insisted that he had not violated the Protective Order—even though the Protective Order expressly prohibits such use outside this Chapter 11 Case.

17.     Jump also explained that the Plan Administrator almost certainly committed this violation for strategic reasons.  *Id.*  Specifically, the Plan Administrator was trying to bolster claims that he had brought in "a standalone case" outside of the Chapter 11 Case "because it may have afforded [him the] ability to bring claims … that [he] couldn't have brought in [an] adversary proceeding."  *Id.* at 21:16–19.  And the Plan Administrator apparently believed he needed to "us[e] protected documents to try to fill the holes in the allegations" after seeing the arguments that Jump and DiSomma presented in moving to dismiss his original complaint.  *Id.* at 19:20–25.  In doing so, the Plan Administrator used the Protected Materials to make an "end-run around" the PSLRA's automatic discovery stay by deploying documents that would otherwise be unavailable at this early stage of the *Snyder* litigation.  *Id.* at 22:11–15.

18.     The Plan Administrator's actions violated both the Protective Order's letter and its purpose.  After all, the Protective Order encourages the exchange of discovery by offering safeguards such as use restrictions "to protect a producing party … from producing material and then having a receiving party turn around and use those documents against them in some other context in some other court."  *Id.* at 19:10–17.

10

19.     On May 21, Judge Lefkow granted Jump and DiSomma's motion to stay and placed the Amended Complaint under seal.  ECF No. 76 at 1 (Dkt. 1223-4); ECF No. 79 (extending stay until this Court resolves the Plan Administrator's present motion).  In ordering the stay, Judge Lefkow found that the Plan Administrator's use of Protected Materials in the Amended Complaint amounted to "a violation of the protective order as written."  ECF No. 76 at 2.  She therefore "conditionally conclude[d]" that the Plan Administrator "violated the protective order."  *Id.*  Because this Court has retained jurisdiction to resolve disputes regarding the Protective Order, Judge Lefkow ordered the Plan Administrator to "immediately" present the issue of whether he violated the Protective Order to this Court.  *Id.*

**D.     The Parties Meet And Confer, And The Plan Administrator Files The Present Motion**

20.     The parties met and conferred on Tuesday, May 26.  Continuing his intransigence, the Plan Administrator refused to acknowledge that he had violated the Protective Order, and so the parties agreed that the question of whether he had done so would be presented to this Court.

21.     During the meet-and-confer process, Jump and DiSomma repeatedly asked the Plan Administrator to identify the details of his review of Protected Materials, but he refused.  The Plan Administrator has, to date, failed to provide any information regarding the specific Protected Materials he reviewed, when he reviewed them, and for what purpose—except to confirm that he reviewed Protected Materials that were explicitly quoted in the Amended Complaint.  As Jump and DiSomma have repeatedly explained, without knowing all Protected Materials that the Plan Administrator (and his counsel) used in crafting and preparing the Amended Complaint and when they did so, it is impossible to determine the extent of his violation.

22.     Nevertheless, in an effort to make headway, and based on the limited information they had, Jump and DiSomma identified particular paragraphs of the Amended Complaint (beyond

11

those the Plan Administrator redacted based on his express quoting of Protected Material) that on their face appeared to be based on Protected Materials.[5]  Because the Plan Administrator used Protected Materials for more than just the Amended Complaint's redacted allegations, Jump and DiSomma explained that removing the redacted allegations would not resolve the parties' dispute. But Jump and DiSomma expressed willingness to review any documents that the Plan Administrator contends show that the information contained within those additional challenged allegations derived from public materials.  Dkt. 1223-3.  Although the Plan Administrator emailed Jump the next day purporting to summarize the parties' discussions, he did not identify specific public or independently obtainable documents from which he derived the information until Saturday, June 6.[6]

23.    With respect to confidentiality designations, Jump stated that the documents were designated in their entirety as Highly Confidential, consistent with the terms on which it had agreed to their reproduction and as is typical in document productions of this kind in bankruptcy court. The Plan Administrator asked Jump whether it maintained that a confidentiality designation was appropriate for a handful of Jump-produced, non-public documents.  Jump explained that the documents warranted a Confidential designation under the Protective Order because they reflected Jump's opinions, analyses, assessments, and strategies surrounding markets in which Jump remains actively involved, and thus were subject to the Protective Order's use restriction, which

---

[5] Among other allegations, Jump and DiSomma pointed to information drawn from a video of Signal messages between Kanav Kariya and Do Kwon.  *See, e.g.*, ECF No. 55 ¶¶ 84, 248–249, 252.  Jump and DiSomma recognized then (as they do now) that this video was entered into evidence at the Terraform trial.  4/5/2024 SEC Trial Tr., SEC Case No. 266 at 1785:1–3, 1814:5–9.  But to the best of Jump's knowledge, the video was not played to the jury in full during live testimony, 4/2/2024 SEC Trial Tr., SEC Case No. 260 at 1288:15–1289:2, and was not filed on the docket.  The Plan Administrator has yet to explain how he or his counsel obtained this video or learned its precise contents other than through the Jump Reproduced Documents.

[6] On June 6, 2026, the Plan Administrator sent Jump a list of sources that he contends support the allegations that appear to be based solely on Protected Materials.  At the time of this filing, Jump is reviewing the Plan Administrator's purported public sources.

is contained in Paragraphs 2 and 12 of the Protective Order.

24.     On Friday, May 29, the Plan Administrator filed the Motion, asking this Court to hold that he did not violate the Protective Order by conducting a pre-suit investigation and filing his Amended Complaint based on, using, and quoting the Protected Materials.  Alternatively, the Plan Administrator asks this Court to excuse any violation after the fact by modifying the Protective Order.  And he also asks this Court to remove the confidentiality designation for certain documents to which, as he concedes, he would not have had access but for Jump's agreement to the reproduction of Discovery Material pursuant to the Protective Order.

**ARGUMENT**

**I.      THE PLAN ADMINISTRATOR VIOLATED THE PROTECTIVE ORDER**

   **A.      The Protective Order's Plain Terms Prohibited The Plan Administrator From Using Protected Materials In The Amended Complaint He Filed In *Snyder***

25.     The Plan Administrator admits that his Amended Complaint in *Snyder* quotes and relies on Protected Materials and that he reviewed Protected Materials while preparing the Amended Complaint. Dkt. 1223 at 9.  As the Protective Order's plain text and case law interpreting similar use restrictions make clear, the Plan Administrator's conduct violated the Protective Order.

26.     "The starting point for interpretation of a protective order" is "its plain language." *SEC v. Merrill Scott & Assocs. Ltd.*, 600 F.3d 1262, 1271–72 (10th Cir. 2010); *accord Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 286 (3d Cir. 1991).  "[W]here the plain terms of a court order unambiguously apply … they are entitled to their effect." *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 150 (2009).  As relevant here, the Protective Order provides that Discovery Material "shall be used only in this Chapter 11 Case," Protective Order ¶ 12, and further provides for emphasis that Confidential Information—a subset of Discovery Material (as defined in the Protective Order) and Protected Materials (as defined *supra* at 5)—"shall be used solely in this

13

Chapter 11 case" and prohibits parties from "*us[ing]*" Confidential Information "in any other proceeding or for any other purpose," *id.* ¶ 2 (emphasis added).   This use restriction is straightforward, allowing for no ambiguity or doubt. *See Silicon Genesis Corp. v. EV Group E. Thallner GmbH*, 2023 WL 6882749, at *1 (N.D. Cal. Oct. 18, 2023) (protective order providing materials could be used "only for prosecuting, defending, or attempting to settle this litigation" prohibited use in separate action); *Del Campo v. Am. Corrective Counseling Servs., Inc.*, 2007 WL 1848660, at *1 (N.D. Cal. June 27, 2007) (same).  Courts have recognized that similarly worded protective orders proscribe at least three forms of "use" outside of a case in which protected materials are produced.

27.    *First*, a party improperly uses documents subject to a protective order by quoting from them or making specific reference to them in a separate action. *See PG&E Co. v. United States*, 79 Fed. Cl. 744, 747–48 (2007) (holding that "the presentation of … arguments in briefing based on the text of the protected documents is 'use'" that violated protective order restricting "'disclosure and/or use of all documents … to the attorneys for the plaintiffs *in this litigation only*'"); *Jazz Pharms., Inc. v. Amneal Pharms. LLC*, 2016 WL 11480203, at *1 (D.N.J. Jan. 22, 2016) (party violated protective order restricting use to "the purposes of this litigation" by using confidential information in inter partes review proceedings); *Del Campo*, 2007 WL 1848660, at *5 (party violated protective order by attaching and referring to confidential information in separate matter pending in different jurisdiction).  A party thus cannot "incorporate confidential information" from another case into a complaint the party files in a separate action. *Whitehead v. Gateway Chevrolet*, 2004 WL 316413, at *4–5 (N.D. Ill. Feb. 2, 2004) (enforcing protective order stating that "[n]either the confidential documents, nor the information contained therein shall be used or disseminated except as intended in this litigation … only").

14

28.     *Second*, a party violates the Protective Order's use restriction by making allegations or arguments that "are predicated on information" subject to the order. *DEV Indus., Inc. v. Rockwell Graphic Sys., Inc.*, 1992 WL 100908, at *2 (N.D. Ill. May 4, 1992); *see also LifeScan Scotland, Ltd. v. Shasta Techs., LLC*, 2013 WL 4604746, at *2, 5 (N.D. Cal. Aug. 28, 2013) (party violated protective order by sending cease-and-desist letters to distributors whose identities had been designated highly confidential).  Thus, regardless of whether a filing directly quotes, cites, or draws its essence from protected materials, a party cannot use protected materials from one action "for the purpose of initiating a separate … lawsuit." *On Command Video Corp. v. LodgeNet Ent. Corp.*, 976 F. Supp. 917, 920–21 (N.D. Cal. 1997).

29.     *Third*, a party cannot review protected materials to "'mine'" them for "source material for … other potential claims or actions." *In re eBay Seller Antitrust Litig.*, 2010 WL 2106004, at *1–2 (N.D. Cal. May 25, 2010) (agreeing that "under the plain language of the Protective Order" any "review" of documents "for some purpose other than the instant litigation" would "violate the Protective Order," though declining to impose sanctions absent clear evidence that such review occurred).  This limitation on review of protected materials ensures that a "use restriction" cannot "be avoided merely by counsel's reading the documents subject to the restriction, and then setting the documents aside and using his recollection of the documents' contents for the prohibited purpose." *MPI Tech A/S v. IBM Corp.*, 2017 WL 11896263, at *14 (S.D.N.Y. Apr. 18, 2017); *see also In re Biovail Corp. Sec. Litig.*, 247 F.R.D. 69, 70 (S.D.N.Y. 2007) (holding that use restriction was violated by putting "information flowing" from protected documents into a new action's allegations, even though complaint did not directly quote or attach those documents).

30.     Here, even based on the limited information he has provided to Jump, the Plan

15

Administrator plainly engaged in all three of these prohibited forms of use in the Amended Complaint.  Indeed, the Plan Administrator admits here that he (1) included "factual allegations and quotations derived from Jump Reproduced Documents" in the Amended Complaint, (2) "used … Jump Reproduced Documents when drafting both the original and amended complaints in" *Snyder*, and (3) "reviewed … Jump Reproduced Documents[] during pre-suit investigation."  Dkt. 1223 at 9.

31.     The Plan Administrator's violation of the use restriction is clear.  Indeed, his use of the Protected Materials is precisely why he filed his Motion to Seal alongside the Amended Complaint in *Snyder*.  In the Motion to Seal, the Plan Administrator stated that "[t]he Amended Complaint is based in part on" documents that are subject to this Court's "[P]rotective [O]rder." ECF No. 54 at 2.  The only real remaining question is the extent of his violation.  Only the Plan Administrator knows the precise ways that he (and his counsel) mined the Protected Materials during his pre-suit investigation and used them to prepare and draft their pleadings.  But the Plan Administrator has resisted Jump's requests for information that will allow a determination about the extent of his violation.  A ruling from this Court confirming that the Plan Administrator violated the Protective Order's use restriction will facilitate a determination of the scope of his violation and the appropriate consequences for that violation in the court where it occurred, the Northern District of Illinois.

**B.     The Plan Administrator Has No Plausible Defense To His Violation**

**1.     The Plan Administrator's Interpretation Of The Protective Order Rewrites Its Plain Text**

32.     Despite admitting that he "us[ed]" Protected Materials "to bring claims against Jump in the Northern District of Illinois," Dkt. 1223 at 19, the Plan Administrator insists that he did not violate the Protective Order because (1) "the protective order's reference to 'this Chapter

16

11 case'" includes *Snyder* and (2) "common sense and the protective order's ultimate purpose" permitted his use. *Id.* at 20–21. These *post hoc* arguments fail.

33. The Plan Administrator's first argument contorts beyond recognition the Protective Order's unambiguous text. As he admits, the *Snyder* suit in the Northern District of Illinois "is not literally 'a voluntary case under chapter 11 of title 11 of the United States Code' 'commenced with this Court' by the Debtor[]." *Id.* at 20. That concession is fatal.

34. Still, the Plan Administrator suggests that *Snyder* is not "a separate, 'other proceeding' independent from 'the Chapter 11 Case'" because the two actions are "structural[ly] interrelated[]." *Id.* Even if the Plan Administrator's premise (that the two actions are structurally interrelated) were true, his conclusion (that *Snyder* is "this Chapter 11 Case") does not follow from that premise. When a protective order does not authorize use in "'related litigation' or 'connected litigation,' … there is no reason to interpret the provision more broadly than the plain language of the protective order." *DEV Indus., Inc.*, 1992 WL 100908, at *2; *see also MPI Tech*, 2017 WL 11896263, at *8 (rejecting argument that use restriction should not apply to new action designated as "related" to original case); *LifeScan*, 2013 WL 4604746, at *4 (use restriction limited to "prosecuting, defending, or attempting to settle this litigation" did not permit sending cease-and-desist letters directed at nonparties); *On Command Video Corp.*, 976 F. Supp. at 921–22 (use restriction barring "all uses of confidential materials" except for "analysis of issues presented in this litigation" prohibited use to initiate separate state court lawsuit). Because nothing in the Protective Order's text exempts suits that are "structural[ly] interrelated[]" with the Chapter 11 Case or that "only … exist[] … because" of the Terraform bankruptcy, the Plan Administrator cannot stretch the defined term "Chapter 11 Case" to cover his *Snyder* suit in the Northern District of Illinois. Dkt. 1223 at 20.

17

35.     Context further undercuts the Plan Administrator's reading.  Where the Protective Order addresses related proceedings outside of "this Chapter 11 Case," it does so expressly. Paragraphs 21 and 22 illustrate the point.  Paragraph 21 states that "[i]n the event that any Confidential Information is used in *any court proceeding relating to matters in* this Chapter 11 Case, that Confidential Information shall not lose its status as Confidential Information through such use."  Protective Order ¶ 21 (emphasis added).  In other words, Paragraph 21 does not authorize use of Confidential Information in related proceedings, which it describes as distinct from this Chapter 11 Case; rather, it addresses a consequence of such use if it occurs—whether with a party's consent, with this Court's approval, or in violation of the Protective Order—by providing that the confidentiality designation survives.  Paragraph 22 provides that the Protective Order "shall, absent written consent of all of the Parties or further order of the Bankruptcy Court, continue to be binding throughout the conclusion of this Chapter 11 Case and any related litigation." *Id.* ¶ 22.  Accordingly, while litigation related to the Chapter 11 Case continues in any court, the Protective Order remains enforceable.

36.     Contrast these express references to related litigation with the Protective Order's limited authorization of "use[] solely," Protective Order ¶ 2, or "only in this Chapter 11 Case." Protective Order ¶ 12.  The Protective Order's use-restriction paragraphs "use materially different" language from Paragraphs 21 and 22 to make clear that use of Protected Materials in related proceedings outside of the Chapter 11 Case is *not* permitted.  *Stanley v. City of Sanford*, 606 U.S. 46, 53 (2025) (citation omitted).  Not only do these provisions show that the Protective Order is explicit when it means to encompass related proceedings, but they would also be meaningless were the Plan Administrator's misinterpretation correct.  To accept the Plan Administrator's attempt to extend "this Chapter 11 Case" to sweep in actions filed elsewhere would impermissibly render

superfluous Paragraph 21 and 22's references to related proceedings.

37.     Other provisions confirm that the Plan Administrator's reading is wrong.  If the "Chapter 11 Case" encompasses the *Snyder* suit, then every provision of the Protective Order would "govern … proceedings" in the Northern District of Illinois.[7]  Protective Order ¶ 1; *see also* Protective Order ¶¶ 3–4, 12, 15.  Indeed, the Protective Order would govern all discovery in every lawsuit around the world that is intertwined with the Chapter 11 Case.  That would be nonsensical and clearly was not the Protective Order's intent.

38.     It also bears emphasis that the Protective Order was negotiated and entered into by the Debtor and the Committee, not by Jump, so the Debtor cannot credibly claim the plain meaning of those terms is unfair.  Jump relied on the Protective Order's plain terms when it consented to the reproduction of its documents in this Chapter 11 Case.  That was eminently reasonable, and the Plan Administrator's unnatural, result-oriented reading does not excuse his violation.

39.     In contrast to the Protective Order at issue, this Court last week signed a protective order between the Plan Administrator and Wintermute.  Dkt. 1243-1 ("Wintermute Order").  The Wintermute Order differs meaningfully from the Protective Order here in a way that further undermines the Plan Administrator's interpretation of the latter.  Unlike the Protective Order's

---

[7] The Plan Administrator's broad misreading of the term "Chapter 11 Case"—that *Snyder* is part of the "Chapter 11 case" just because the Plan authorizes the Plan Administrator to bring claims—also is at odds with settled law governing when jurisdiction exists because a case "aris[es] in or relate[s] to cases under title 11." 28 U.S.C. § 1334(b).  If the Plan Administrator's misreading of the term "Chapter 11 case" were correct, then a debtor could cause cases worldwide to be in a Chapter 11 case—and thereby manufacture federal jurisdiction—just by authorizing or otherwise preserving them in a plan.  But the Third Circuit has made clear that courts and parties cannot "write their own jurisdictional ticket" in a reorganization plan to make a claim "arise in … [a] case[] under Title 11." *In re Resorts Int'l, Inc.*, 372 F.3d 154, 161 (3d Cir. 2004); *see also In re Insilco Techs., Inc.*, 394 B.R. 747, 750 (D. Del. 2008) (affirming bankruptcy court's finding that jurisdiction cannot be created "simply by the preservation of a claim in a plan.").  Nor does a claim arise "in [a] case[] under Title 11" simply because an action "'would not exist, but for the bankruptcy filing.'" *Stoe v. Flaherty*, 436 F.3d 209, 217–18 (3d Cir. 2006), *as amended* (Mar. 17, 2006) (citation omitted).  Indeed, if the Plan Administrator's reading were correct, then the Third Circuit's holding in *Resorts* that post-confirmation jurisdiction requires a "close nexus" to the plan would be superfluous, as any suit by a Plan Administrator would meet that requirement.  372 F.3d at 166-67.

19

prohibition on use *and* disclosure of Protected Material, the Wintermute Order prohibits only "public[] disclos[ure]" of such material. *Id.* ¶ 16. The Wintermute Order also provides that certain parties (including the Plan Administrator, its agents, and outside counsel) may "access" covered material in "Related Proceedings," a term broadly defined as "any complaint, lawsuit, adversary proceeding, contested matter, cause of action, or other litigation initiated by the Plan Administrator, *in any court or tribunal*, that arises out of, *relates to*, or is in connection with the Chapter 11 Case, including but not limited to avoidance actions, preference claims, fraudulent transfer claims, breach of fiduciary duty claims, or any other claims or causes of action asserted by or on behalf of the Plan Administrator." *Id.* ¶¶ 11–12 (emphasis added). The Wintermute Order thus expressly authorizes what the Protective Order prohibits and confirms the Plan Administrator's violation thereof.

### 2. The Plan Administrator's Account Of The Protective Order's Purpose Is Incomplete And Insufficient To Excuse His Violation

40. The Plan Administrator's second argument—which invokes supposed "common sense" and "purpose" to suggest that his use of Protected Materials in the Amended Complaint did not violate the Protective Order—fares no better. Dkt. 1223 at 20–21. A court order entered with the parties' consent "must be construed as it is written," "not by reference to what might satisfy the purposes of one of the parties to it." *United States v. Armour & Co.*, 402 U.S. 673, 682 (1971) (interpreting consent decree). As Judge Lefkow recognized and Jump has explained, the Plan Administrator plainly violated the Protective Order's rule restricting the use of Protected Materials to this Chapter 11 Case. *See* ECF No. 76 at 2.

41. The Plan Administrator asserts that the Protective Order's purpose is merely "protection against disclosure of commercial secrets" and contends that he did not "disclose[]" Confidential Information by filing the Amended Complaint. Dkt. 1223 at 20–21. That selective

20

reading of the Protective Order is sensible only if much of its text is ignored.

42.     To start, the Plan Administrator's purpose argument tactically emphasizes the *disclosure* restriction, yet ignores the *use* restriction.  A protective order (like this one) with a use restriction "is not limited to the mere disclosure of protected information," but "[r]ather … prohibits use." *On Command Video Corp.*, 976 F. Supp. at 922.  And a complaint does not comply with a *use* restriction simply because it is filed under seal or "does not attach any discovery material marked 'Confidential.'" *Silicon Genesis Corp.*, 2023 WL 6882749, at *3; *see also PG&E Co.*, 79 Fed. Cl. at 748 (holding that "submission for in camera review, employment in briefing, and filing" of protected documents in a different case constituted prohibited "use," even where the same attorney represented the plaintiff in both matters); *Del Campo*, 2007 WL 1848660, at *5 (because "the Protective Order … is not limited to public filings," use of confidential documents in opposition brief served on opposing counsel in different litigation violated protective order even though documents were never publicly filed); *On Command Video Corp.*, 976 F. Supp. at 922–23 (finding civil contempt where party used protected materials to initiate separate lawsuit, emphasizing that "use" restriction is distinct from and broader than a "disclosure" restriction).

43.     That is particularly true here because the Protective Order's use limitation is not limited to confidential documents; instead, it explicitly applies to *all* Discovery Materials. Protective Order, ¶ 12 ("[T]he Parties shall use the Discovery Material only in this Chapter 11 Case, irrespective of any restrictions on such use in any preexisting confidentiality agreement with the Debtor.").  Since even non-confidential documents cannot be used outside of the Chapter 11 Case, confidentiality cannot have been the only concern behind the use restriction.

44.     In fact, contrary to his submission, the Plan Administrator's actions defy this Protective Order's purpose.  Protective orders "serve the vital function of securing the just, speedy,

and inexpensive determination of civil disputes by encouraging full disclosure of all evidence that might conceivably be relevant." *Kiobel v. Cravath, Swaine & Moore LLP*, 895 F.3d 238, 247 (2d Cir. 2018). Use restrictions advance that purpose by providing parties with certainty that information they might otherwise refuse to provide or resist providing will not be used against them in other matters. If the Plan Administrator is allowed to openly defy the Protective Order's use restriction in this case, the core purpose of such orders will be rendered a nullity and parties will rightfully hesitate before consenting to production.

45.    The Plan Administrator suggests that applying the Protective Order's use restriction according to its terms would be "absurd" because it would confer upon Jump and DiSomma "immunity from suit." Dkt. 1223 at 21 (citation omitted). That argument attacks a straw man and is flatly incorrect. The Plan Administrator can certainly try to press claims against Jump and DiSomma in whatever forum he wishes. He could have filed an adversary proceeding within this Chapter 11 Case and used the Protected Materials in accordance with the Protective Order. Or he could have opted to pursue a standalone action in *Snyder* (or any other court or matter outside the Chapter 11 Case) without using the Protected Materials and without the benefit of documents that would be subject to the PSLRA's automatic discovery stay. What he cannot do is pursue a standalone action while also using the Protected Materials.

46.    The Plan Administrator also asserts that his purposive reading must be right because enforcing the Protective Order would doom his *Snyder* suit and "shield wrongdoers." Dkt. 1223 at 20–21. That refrain runs counter to his repeated assertions that the Amended Complaint is based overwhelmingly on public sources. Dkt. 1223 at 8–9. At the hearing before Judge Lefkow, the Plan Administrator represented that "the overwhelming bulk of the [A]mended [C]omplaint comes from publicly available information," and that "[a]ll of that information is

public, rightfully used in the [A]mended [C]omplaint." Dkt. 1223-5 at 10:1–2, 10:19–21.[8] While the Plan Administrator ultimately would not be able to state a claim based on public sources or Protected Materials, Jump and DiSomma are not seeking a shield from suit—just confirmation that the Plan Administrator must respect the Protective Order's use restrictions in a suit filed outside this Chapter 11 Case.

47.    This dispute is before this Court because the Plan Administrator wishes to have his cake and eat it too: he (i) filed a standalone action in the Northern District of Illinois rather than an adversary proceeding in this Chapter 11 Case in order to bring a broader set of claims than he could have raised in this Chapter 11 Case given its late stage, but (ii) simultaneously sought to leverage the Protected Materials available to use only in the Chapter 11 Case. There is nothing absurd about the Protective Order's restriction on the use of Protected Materials in separate litigation outside the Chapter 11 Case. Indeed, that is the express bargain Jump relied on when it consented to the reproduction in the Chapter 11 Case of the Protected Materials.[9]

48.    The claims on behalf of the Crypto Loss Claimants—non-debtors suing non-debtors—are particularly telling. The Protective Order makes clear that only parties and their authorized representatives are entitled to access Protected Materials. *See* Protective Order ¶¶ 10, 11, 18. The individual creditors who contributed their claims to the Wind Down Trust did not receive the document production and had no right to use the Protected Materials in any way. And yet the Plan Administrator brought claims on their behalf and used the Protected Materials to

---

[8] The Plan Administrator has also mischaracterized public materials in pressing his claims. *See infra* n.11 (noting the Plan Administrator's incorrect assertion that Tai Mo Shan Limited ("TMSL") admitted to market manipulation).

[9] Judge Lefkow deemed it "unlikely" that "the bankruptcy judge intended to shield producing parties" from the Plan Administrator's efforts to obtain "assets for the benefit of creditors." ECF No. 76 at 2. That is correct; as just noted, the Plan Administrator may try to press claims against Jump and DiSomma in whatever forum he wishes. But as Jump has explained, while the Protective Order's use restriction does not shield Jump from suit, it does require the Plan Administrator to play by its use restrictions (and other rules) if and when he sues outside of the Chapter 11 Case.

attempt to plead those individuals' claims.  The only way for third parties to obtain Protected

Materials outside of this Chapter 11 Case is through a subpoena, subject to the Protective Order's

notice and objection procedures.  *Id.* ¶ 18.  The Plan Administrator would like to have it both ways,

but the Protective Order plainly says he cannot.

### 3.  The Plan Administrator's Cases Are Inapposite

49.  The Plan Administrator's cited authorities do not advance his cause.  He primarily

relies on *In re Dual-Deck Video Cassette Recorder Antitrust Litigation*, 10 F.3d 693 (9th Cir.

1993).  But *Dual-Deck* focused on whether undisputed violations of a protective order warranted

civil contempt, which requires "clear and convincing evidence that under a good-faith, reasonable

interpretation of the protective order, [the violating party] did not substantially comply with [an]

order."  *Id.* at 695.

50.  *Dual-Deck* is inapposite.  The question here is not whether to hold the Plan

Administrator in civil contempt—that question, in the event it arises, is for Judge Lefkow to decide.

The question here is the antecedent one that Judge Lefkow instructed the Plan Administrator to

bring to this Court: whether the Plan Administrator's use of Protected Materials in *Snyder* violated

the Protective Order.[10]

51.  Regardless, even under *Dual-Deck*'s civil contempt standard, courts have found

civil contempt warranted when use restrictions prohibit parties from filing subsequent suits based

on information gleaned from protected materials in a prior case.  *See, e.g., Silicon Genesis Corp.*,

2023 WL 6882749, at *3 (imposing civil contempt sanctions where party "identifie[d] nothing in

---

[10] The Plan Administrator's other civil contempt cases do not move the needle for the same reason.  *See Navajo Nation v. United States*, 46 Fed. Cl. 353, 359–61 (2000) (holding that civil contempt was not warranted where subsequent suit relied on privileged information not governed by prior case's protective order); *Static Media LLC v. Leader Accessories LLC*, 38 F.4th 1042, 1048–49 (Fed. Cir. 2022) (disclosure of information to other signatories of protective order to develop joint defense strategy did not warrant civil contempt).

the Order's language suggesting [party] could use confidential emails produced in this action to sue [opponent] in another action"); *On Command Video Corp.*, 976 F. Supp. at 922 ("[U]se of protected information to file a separate … lawsuit—as opposed to this litigation—is tantamount to no compliance at all."); *MPI Tech*, 2017 WL 11896263, at *10–11, *14–15 (contempt warranted where counsel used his recollection of protected documents to draft complaint in new action, even though he did not directly quote or attach those documents). Because that is precisely what the Plan Administrator did here, *Dual-Deck* does not excuse his violation.

52.    *Dual-Deck* also involved distinct facts. The *Dual-Deck* protective order explicitly sought to "protect[] against" harms "from the unauthorized disclosure … of matters deemed confidential or proprietary or otherwise deemed inappropriate for public disclosure." 10 F.3d at 694 n.1. Here, the Protective Order sought not only to "protect against improper disclosure," but also more broadly "to facilitate the exchange of Discovery Material." Protective Order at 2. The Ninth Circuit's decision in *Dual-Deck* relied heavily on the fact that no commercial secrets had actually been disclosed, so the defendants could not show the violations caused "harm[]" or "actual loss," as required to establish that a contempt sanction was warranted. *Id.* at 696. Here, by contrast, Jump has identified concrete prejudice: the Plan Administrator's Amended Complaint cherry-picks—and frequently mischaracterizes—documents he was prohibited from using in the *Snyder* suit, and absent relief, Jump will be required to respond to this improper pleading.

53.    The Plan Administrator's remaining cases are also distinguishable. The court in *Royal Park Investments SA/NV v. Deutsche Bank National Trust Co.* had no occasion to decide the question at issue here, namely, whether a protective order "prohibits" a party "from filing a new lawsuit based on information learned through discovery in this one." 192 F. Supp. 3d 400, 405 (S.D.N.Y. 2016) (permitting lawyers to use "knowledge of what has been produced [in one case]

25

to advocate for the production of the same documents, if otherwise discoverable, in a parallel case against a different defendant"). In *Crocs, Inc. v. Joybees, Inc.*, the protective order expressly disclaimed protection of information that was not "entitled to confidential treatment *under the applicable legal principles*," 2023 WL 8851997, at *2, 7 (D. Colo. Dec. 8, 2023), *report and recommendation adopted*, 2024 WL 5055671 (D. Colo. Jan. 25, 2024), while the Protective Order here restricts the use of all Discovery Material, whether or not it includes Confidential Information. *See* Protective Order ¶¶ 2, 12. The Plan Administrator does not acknowledge, as he certainly should have, that the protective order in *Feed.ing BV v. Principle Solutions, LLC* was "subsequently modified … to allow the use of the materials in th[e] action" where the claimed violation occurred. 2015 WL 136402, at *3 (E.D. Wis. Jan. 8, 2015). And in *Caudill Seed & Warehouse Co. v. Jarrow Formulas, Inc.*, a court declined to strike a complaint where the plaintiff elected to reveal his own "proprietary and confidential information" in a subsequent suit, and the defendant "disingenuous[ly]" invoked a protective order. 2013 WL 3872229, at *1 (W.D. Ky. July 24, 2013).

54. In short, Judge Lefkow correctly found that the Plan Administrator violated this Court's Protective Order as written. And case law confirms that use restrictions like those in the Protective Order are routinely enforced as written. This Court should decline the Plan Administrator's invitation to disregard the Protective Order's use restriction, and should hold that he violated the Protective Order by using Protected Materials in the Amended Complaint.

## II. THE PLAN ADMINISTRATOR HAS NOT SHOWN GOOD CAUSE TO MODIFY THE PROTECTIVE ORDER

55. The Plan Administrator asks this Court to hold that even if he violated the Protective Order by using Protected Materials in the Amended Complaint, the Protective Order should be modified to authorize such use. This request to retroactively excuse the Plan

26

Administrator's violation is meritless and should be denied.

56.     Courts in this Circuit apply "a two-step analysis when considering proposed modifications to [confidentiality] orders." *Salyers v. A.J. Blosenski, Inc.*, 766 F. Supp. 3d 479, 483 (E.D. Pa. 2025). First, "[t]he party seeking to modify the order of confidentiality must come forward with a reason to modify the order." *Id.* Second, the court "balance[s] the interests, including the reliance by the original parties to the order, to determine whether good cause still exists for the order." *Id.* The Plan Administrator's argument fails at both steps.

## A.     The Plan Administrator Presents No Valid Reason To Modify The Protective Order

57.     The Plan Administrator argues that the relevance of the "Jump Reproduced Documents" to the *Snyder* suit and potential efficiency gains provide reasons to modify the Protective Order. Dkt. 1223 at 24–26. They do not.

58.     Courts regularly refuse to modify protective orders when doing so would "substantially subvert[]" a "limitation on discovery in … collateral litigation." *AT&T Corp. v. Sprint Corp.*, 407 F.3d 560, 562 (2d Cir. 2005) (citation omitted) (refusing to modify protective order where party sought to circumvent close of discovery in another action); *Mine Safety Appliances Co. v. N. River Ins. Co.*, 2016 WL 8221566, at *3 (W.D. Pa. Sept. 29, 2016) (similar). Here, the Plan Administrator's use of the "Jump Reproduced Documents" is a transparent "attempt to circumvent" the PSLRA discovery stay applicable during the pendency of any motion to dismiss his *Snyder* suit, which brings securities fraud claims. *AT&T Corp.*, 407 F.3d at 562. Maintaining the Protective Order's use restriction ensures that the Plan Administrator's securities claims in *Snyder* are litigated under the same rules as any other federal securities fraud suit. After all, if the non-debtor individuals, and not the Plan Administrator, had filed the same claims in the Northern District of Illinois, they would not have had access to the "Jump Reproduced Documents," and the

27

PSLRA stay would have prevented them from obtaining those documents in discovery while motions to dismiss are pending.

59.     Anticipating the PSLRA issue, the Plan Administrator argues that he could move to lift the PSLRA stay in *Snyder*.  Dkt. 1223 at 26.  That is true, but irrelevant.  The Plan Administrator did not ask Judge Lefkow to lift the stay, and instead engaged in impermissible self-help by deploying Jump's Protected Materials in violation of the Protective Order's use restriction.

60.     Regardless, any motion to lift the stay would fail.  A court cannot lift a PSLRA stay unless a plaintiff demonstrates that "particularized discovery is necessary to preserve evidence or to prevent undue prejudice."  15 U.S.C. § 78u-4(b)(3)(B).  Neither showing is met simply because a defendant has "already produced" the same documents to another party in separate proceedings. *Sisk v. Guidant Corp.*, 2007 WL 1035090, at *1, 3–4 (S.D. Ind. Mar. 30, 2007).  The Plan Administrator's desire to use Protected Materials in hopes of "bolster[ing] the allegations in [his] complaint … plainly conflicts with the [PSLRA's] directive" and does not establish undue prejudice.  *In re Pattern Energy Grp. Inc. Sec. Litig.*, 2021 WL 312752, at *2–3 (D. Del. Jan. 28, 2021); *Desmarais v. First Niagara Fin. Grp., Inc.*, 2016 WL 768257, at *4 (D. Del. Feb. 26, 2016) (similar).

61.     The Plan Administrator's sole authority for suggesting that the stay could be lifted, *Singer v. Nicor, Inc.*, 2003 WL 22013905 (N.D. Ill. Apr. 23, 2003), underscores that he cannot meet the standard.  There, the court did not lift the stay because "documents have already been found and compiled," but rather because the private securities plaintiffs "may well be unfairly disadvantaged if they do not have access to the documents that the governmental and other agencies already have" and their private action lagged behind government enforcement actions. *Id.* at *2.  Here, the situation is reversed.  The government has already completed an enforcement

28

action based on the events underlying the Plan Administrator's claims against Terraform and its founder, Do Kwon—but did not name Jump as a co-defendant.[11]  Indeed, the Plan Administrator's largest claim is an attempt to shift liability to Jump for a $4.5 billion judgment entered in favor of the SEC against Terraform.

62.    The Plan Administrator also falsely maintains that Jump lacks a "legitimate objection to modification" because it has "concede[d] outright that the same complaint … could have been filed in an adversary proceeding in this Court."  Dkt. 1223 at 27.  This argument is remarkable, given that Jump explicitly said just the opposite: at the hearing before Judge Lefkow in *Snyder*, Jump stated that the Plan Administrator could have filed "an adversary proceeding under the caption of the Chapter 11 case, but he could not have filed this identical case that he has … filed in the Northern District of Illinois."  Dkt. 1223-5 at 21:5–10.  Jump further explained that filing in the Northern District of Illinois would come with significant "limitations," *i.e.*, the Plan Administrator's inability to pursue many of the claims and damages he seeks in the Amended Complaint.  *Id.* at 22:16–18.  Specifically, because the Plan has been confirmed, this Court's jurisdiction is confined to claims with a "close nexus" to the Plan, such as claims that "require a court to interpret or construe" a plan.  *In re Resorts Int'l, Inc.*, 372 F.3d 154, 167, 170 (3d Cir. 2004).  Thus, if the Plan Administrator filed suit against Jump in this Chapter 11 Case at this late juncture, he would have had to severely restrict his claims.

63.    To begin, this Court would have lacked jurisdiction over the Plan Administrator's claim (Count 2 of the Amended Complaint in *Snyder*) seeking contribution for the $4.5 billion

---

[11] The Plan Administrator repeatedly asserts that TMSL "admitted to market manipulation" in a settlement with the SEC.  Dkt. 1223 at 8, 26.  That is patently false.  TMSL agreed to pay $123 million with the SEC to settle allegations that it participated in an unregistered securities offering in violation of 15 U.S.C. § 77e and acted negligently in violation of 15 U.S.C. § 77q.  *In re Tai Mo Shan Limited*, Securities Act Release No. 11349 (Dec. 20, 2024) (cease and desist order).  TMSL consented to the entry of the SEC's order expressly without admitting or denying those allegations, let alone admitting to engaging in market manipulation.

judgment entered in the SEC Case against Terraform, as such a claim does not require a court "to construe or interpret the confirmed plan or to see that federal bankruptcy laws are complied with in the face of violations." *Id.* at 168 (quoting *Grimes v. Graue (In re Haws)*, 158 B.R. 965, 971 (Bankr. S.D. Tex. 1993)). That is precisely why the Plan Administrator chose to bring his case in the Northern District of Illinois, where this jurisdictional obstacle does not add to the (already insurmountable) obstacles he faces to stating a claim on any count, no matter the forum.

64. This Court also would have lacked jurisdiction over the Plan Administrator's claims on behalf of "Individual Victims" under the Exchange Act, Securities Act, Illinois law, and the common law (Counts 3–8 and 13 of the Amended Complaint), none of which involves the bankruptcy laws or construing the plan. *See Carnero G&P, L.L.C. v. SN EF Maverick, L.L.C. (In re Sanchez Energy Corp.)*, 159 F.4th 309, 318 (5th Cir. 2025) ("[f]ew disputes between non-debtors" satisfy close nexus requirement). As the Third Circuit has explained, the mere "potential to increase assets of [a] Litigation Trust and its beneficiaries" does not create a close nexus to a plan. *Resorts*, 372 F.3d at 170.

**B.      The Plan Administrator Has Not Shown Good Cause To Modify A Protective Order On Which Jump Reasonably Relied**

65. Even if the Plan Administrator had a valid reason to seek modification of the Protective Order, his arguments would fail the interest-balancing test required at the second step of the analysis. This is because Jump relied on the Protective Order in consenting to the production in this Chapter 11 Case of documents that it previously produced to the SEC—documents that the Plan Administrator now seeks to use outside the Chapter 11 Case in violation of the Protective Order. In consenting to the reproduction of those documents here, counsel for Jump "condition[ed]" consent on the documents being subject to the Protective Order's restrictions. Dkt. 1223-8 at 1. The record is thus clear that Jump "only agreed to" the reproduction of its documents

30

"under the security of [the] Protective Order[]" and that the "order induced [Jump]" to allow discovery." *Eisai, Inc. v. Sanofi-Aventis U.S., LLC*, 2014 WL 8108466, at *3 (D.N.J. Aug. 4, 2014); *see also Salyers*, 766 F. Supp. 3d at 485 (privacy interest and "proffered reliance" were "dispositive" reason not to modify protective order).  Jump anticipated that the Protected Materials could not be used in "any other proceeding" besides the Chapter 11 Case, Protective Order ¶ 2; *see also id.* ¶ 12, let alone in private securities litigation brought in part on behalf of non-debtors and subject to the PSLRA's automatic discovery stay.  On that understanding of the Protective Order's terms, Jump promptly agreed to the reproduction of a vast quantity of documents, including documents containing competitively sensitive information.

66.   Jump's reliance interest is particularly strong here because the Protective Order was entered in May 2024 between the Debtor and the Committee, months before the Plan Administrator was even appointed in October 2024, Dkt. 765, and nearly a year before the Court approved the Crypto Loss Claims procedures in March 2025 that allowed individual creditors to contribute their claims to the Wind Down Trust, Dkt. 965.  When Jump consented in July 2024 to the reproduction of its documents, it could not have contemplated that they would be transferred to a successor entity who would then deploy them to bring claims outside the Chapter 11 Case, including claims on behalf of non-debtor individuals who were never parties to this Chapter 11 Case, never signed the Protective Order, and would have had no independent right to obtain Jump's documents.  That the Plan Administrator now seeks to use these materials in precisely this manner—to prosecute contributed claims of third parties outside the Chapter 11 Case and a $4.5 billion contribution claim that is now outside this Court's jurisdiction—underscores why modification should be denied and why the Protective Order's use restriction should be enforced as written.

67.   The Plan Administrator contends that Jump had no "reliance interest in not being

sued." Dkt. 1223 at 27.  Again, this argument is a red herring and misunderstands the Protective Order.  Jump understands it can be sued—specifically, (i) in an adversary proceeding in this Chapter 11 Case with the plaintiff *using* Protected Materials or (ii) in a case outside this Chapter 11 Case with the plaintiff *not* using Protected Materials.

68.     The point of enforcing the Protective Order's use restriction is to encourage Jump and other entities that transact with businesses that end up in bankruptcy to exchange "voluminous information" in discovery designed to create value for the Debtor's estate and protect Jump's "reliance upon the fact that" this discovery "was to be used only for purposes of" the Chapter 11 Case. *H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys. Inc.*, 130 F.R.D. 281, 282–83 (S.D.N.Y. 1989).  The point is not to give Jump immunity from suit.  Jump demanded that the Plan Administrator withdraw the Amended Complaint for violating the Protective Order because he should play by the same rules as other litigants, and those rules include the Protective Order and the PSLRA's discovery stay prior to resolution of motions to dismiss.

69.     The Plan Administrator also argues that modification is warranted because he has not disclosed information subject to the Protective Order.  Dkt. 1223 at 28.  Jump disagrees with the premise that the Plan Administrator complied with the disclosure restriction.  But regardless, the Plan Administrator again conflates the Protective Order's *use* restriction with its *disclosure* restriction; compliance with the latter does not excuse a violation of the former.  The Protective Order should not be modified to retroactively excuse the Plan Administrator's violation of the use restriction—particularly given his stubborn insistence, based on a facially untenable argument, that he did not violate the Protective Order in the first place.  While Jump does not ask this Court to punish the Plan Administrator for his violation, nor should he be rewarded for his unapologetic violation.

70.     In short, the Plan Administrator's request for a modification of the Protective Order is a gambit to get around the PSLRA discovery stay, to evade the jurisdictional limitations on adversary proceedings at this stage of the Chapter 11 Case, and to disregard Jump's legitimate reliance on the Protective Order's use restriction.  The reason why the Plan Administrator chose to violate the Protective Order rather than ask this Court's permission is because there is no legitimate reason to change its terms.  That remains true today.

III.     **THE PLAN ADMINISTRATOR'S REQUEST TO REMOVE CERTAIN CONFIDENTIALITY DESIGNATIONS SHOULD BE REJECTED**

71.     Finally, the Plan Administrator seeks to de-designate four documents that Jump designated as Highly Confidential under the Protective Order.  This request should be denied.

72.     As an initial matter, the Plan Administrator's request is beside the point.  The Protective Order's use restriction applies to *all* Discovery Material, not merely to documents marked Confidential or Highly Confidential.  As noted, Paragraph 12 provides that "the Parties shall use the *Discovery Material* only in this Chapter 11 Case, irrespective of any restrictions on such use in any preexisting confidentiality agreement with the Debtor."  Protective Order ¶ 12 (emphasis added).  Accordingly, even if the Court were to remove any confidentiality designation from the four contested documents, they would remain Discovery Material subject to Paragraph 12's independent use restriction, which prohibits use of any Discovery Material outside this Chapter 11 Case regardless of its confidentiality designation.

73.     Moreover, "later de-designation of documents" does not "retroactively excuse[] the improper use of those documents while still designated as confidential."  *Del Campo*, 2007 WL 1848660, at *4.  Accordingly, the Plan Administrator's de-designation motion cannot achieve the result it seeks: the ability to *use* those materials in the Amended Complaint.

74.     Under Rule 26(c), a party seeking to maintain a confidentiality designation must

33

demonstrate "good cause"—that is, that the information is confidential and that disclosure would cause competitive harm. *See Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 529 F. Supp. 866, 889–91 (E.D. Pa. 1981). "[C]onfidential commercial information" under Rule 26(c) "is broad enough to include a wide variety of business information," and "[c]ompetitive disadvantage is a type of harm cognizable under Rule 26." *Id.* at 890. In *Zenith*, the court upheld confidentiality protections for internal pricing, marketing, and distribution data, crediting defendants' showing that their "marketing strategies, and the amount of money allocated for promotional needs, necessary discounts, and allowances, remain relatively constant from year to year" such that "study of these materials, regardless of the year chosen, would enable a skilled competitor to understand the pricing and marketing patterns of defendants and plan its own operations accordingly." *Id.* at 885. The same logic applies here: Jump's internal communications reflect strategic methodologies for evaluating and entering crypto-asset deals that remain constant across counterparties and time periods, making them competitively sensitive.

75.     Courts consistently recognize that internal communications reflecting a company's competitive strategy, deal evaluation methodology, and risk appetite constitute protectable confidential information. *See Gann v. GM LLC*, 2022 WL 3552484, at *4 (D. Ariz. Aug. 18, 2022) (protecting documents containing "unique … methodologies and practices" still in use); *Grand River Enters. Six Nations, Ltd. v. King*, 2009 WL 222160, at *3 (S.D.N.Y. Jan. 30, 2009) (protecting strategic business plans that revealed a company's "methods of analysis" and competitive strategy); *In re Adobe Sys., Inc. Sec. Litig.*, 141 F.R.D. 155, 162 (N.D. Cal. 1992) (sustaining confidential designation for documents containing "sensitive information regarding [a company's] business and marketing strategy which, if made public, will educate [its] competitors as to how [it] conducts its business").

34

76.     The Protective Order confirms and reflects this, as it enumerates illustrative categories of information that may be designated Confidential, including "studies or analyses by internal or outside experts or consultants" and "business, management and marketing plans, and strategies." *Id.*

77.     The four documents at issue are internal Jump communications from 2020 and 2021 in which senior Jump personnel discuss their analyses of crypto-asset deals, their assessments of market opportunities and counterparty relationships, and their approach to media and public relations surrounding Jump's trading positions. *See* Decl. of Simon Johansen ¶¶ 3–5. These are not routine transactional documents; they reflect internal strategic deliberations at the highest levels of the firm about how to evaluate, size, and structure crypto-asset investments, the very type of information a competitor would find most valuable. *Id.* The communications fall squarely within Paragraph 5's enumerated categories, including "studies or analyses by internal or outside experts or consultants" and "business, management and marketing plans, and strategies." Protective Order ¶ 5. Disclosure would educate Jump's competitors as to its methodology and decision-making processes in crypto markets in which Jump remains actively engaged, providing competitors with an unfair advantage. *See* Decl. of Simon Johansen ¶ 7.

78.     The Plan Administrator raises two arguments for removing the confidentiality designation. Each is meritless.

79.     *First*, the Plan Administrator argues that the documents cannot qualify as confidential because they are stale. That is wrong. The age of a document is not an independent bar to continued protection. *See Culinary Foods, Inc. v. Raychem Corp.*, 151 F.R.D. 297, 303 (N.D. Ill.), *order clarified,* 153 F.R.D. 614 (N.D. Ill. 1993). The dispositive question is whether their disclosure would cause present competitive harm, and the Plan Administrator makes no effort

35

to show that it would not.  *See Zenith*, 529 F. Supp. at 891; *Culinary Foods*, 151 F.R.D. at 303.

80.     Courts have sustained confidentiality protections for business information far older than the five-year-old documents at issue here.  In *Zenith*, for example, the court upheld protections for data ten to twenty years old, observing that "old business data may be extrapolated and interpreted to reveal a business' current strategy, strengths, and weaknesses," and that "in the hands of an able and shrewd competitor, old data could indeed be used for competitive purposes."  529 F. Supp. at 891; *see also Grand River*, 2009 WL 222160, at *3 (holding that the disclosure of older information is not necessarily harmless where it continues to reveal the producing party's competitive approach); *Phillips Petroleum Co. v. Rexene Prods. Co.*, 158 F.R.D. 43, 47 (D. Del. 1994) (rejecting argument that decade-old production data was "ancient" and unworthy of protection because it could "reveal a business' current strategy, strength and weaknesses"); *Gann*, 2022 WL 3552484, at *4 (crediting the producing party's showing that the documents related to twenty-year-old vehicle reflected methodologies and practices "still in use today").

81.     None of the Plan Administrator's cited authorities (at 30–31) holds that information is *per se* stale after any fixed period.  *See, e.g.*, *Avtel Servs., Inc. v. United States*, 70 Fed. Cl. 173, 191 (2006) (noting that staleness is "largely a fact and case-specific inquiry").  Each stands for the uncontroversial proposition that the passage of time is relevant to whether information retains competitive value.  Moreover, many of the Plan Administrator's cited authorities (at 32) address the standard for whether information is so confidential as to justify *sealing* a document filed in court—a standard that is "[a]nalytically distinct from" a court's "ability to protect discovery materials under Rule 26(c)."  *In re Avandia Mktg. Sales Pracs. & Prods. Liab. Litig.*, 924 F.3d 662, 672 (3d Cir. 2019); *see also Mesabi Metallics Co. v. Cleveland-Cliffs, Inc. (In re ESML Holdings Inc.)*, 135 F.4th 80, 88, 97–98 (3d Cir. 2025) (remanding for consideration of whether

36

11 U.S.C. § 107 warranted sealing filed documents); *In re Alterra Healthcare Corp.*, 353 B.R. 66, 75–76 (Bankr. D. Del. 2006) (resolving motion "to vacate several Orders sealing records of settlements").  Here, however, the critical question is whether the producing party has demonstrated that the information at issue continues to hold competitive significance despite its age.  Jump has made that showing.  *See* Decl. of Simon Johansen ¶ 7.

82.    *Second*, the Plan Administrator argues that the documents concern a "defunct" enterprise (Terraform) and therefore "cannot possibly reflect proprietary information remotely relevant to Jump's current operations."  Dkt. 1223 ¶ 62.  That argument misunderstands Jump's interest in protecting the information in the documents.  The documents reflect Jump's practices in crypto-asset markets in which Jump remains actively engaged.  *See* Decl. of Simon Johansen ¶ 6.  The question is not whether the specific counterparty is still in business; it is whether the documents reveal the producing party's competitive approach in ways that remain commercially valuable.  *See Zenith*, 529 F. Supp. at 891.  In *Culinary Foods*, for example, the court held that it was proper to protect pre-1987 product development plans even though the specific product was no longer manufactured in the United States because "several hundred different heating cable products" used "the same basic technology" and disclosure would "likely reveal information about the current operations" of the company.  151 F.R.D. at 303.  The same rationale applies here.

83.    The four documents are significant because of what they say about Jump, not Terraform.  A competitor reviewing these communications might learn, for example, how Jump's leadership sizes and evaluates early-stage crypto-asset deals, how much capital Jump is willing to deploy, and how Jump coordinates media strategy around its trading positions.  *See* Decl. of Simon Johansen ¶¶ 3–5.  That Terraform happened to be the counterparty in 2020 and 2021 does not limit the potential utility of those insights, and a competitor armed with this information would be better

37

positioned to anticipate Jump's approach to any similar opportunity in the crypto-asset markets going forward. *See Zenith*, 529 F. Supp. at 885. These documents are entitled to protection because they reflect internal deliberative processes, strategic judgments, and competitive approach of a firm that remains an active participant in crypto-asset markets. *See* Decl. of Simon Johansen ¶¶ 6–7. The designations should be maintained.

## CONCLUSION

For the foregoing reasons, the Court should deny the Plan Administrator's Motion to Clarify or Modify the Protective Order and to Strip Confidentiality Designations. Jump respectfully requests that the Court confirm that the Protective Order prohibits the Plan Administrator from using Jump Reproduced Documents in the *Snyder* action and that the Plan Administrator violated the Protective Order. The appropriate remedies for the Plan Administrator's violation—including any consequences for the Amended Complaint—are for the Northern District of Illinois to determine in the first instance, consistent with Judge Lefkow's order staying that action pending this Court's clarification.

Dated: June 8, 2026

Respectfully submitted,

*/s/ Kara Hammond Coyle*
**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Michael R. Nestor (No. 3526)
Kara Hammond Coyle (No. 4410)
Michael Neiburg (No. 5275)
1000 N King Street
Wilmington, DE 19801
Telephone: 302.571.6000
Fax: 302.576.3321
Email: mnestor@ycst.com
      kcoyle@ycst.com
      mneiburg@ycst.com

-and-

**LATHAM & WATKINS LLP**
Christopher Harris (*pro hac vice*)
Elizabeth A. Morris (*pro hac vice*)
1271 Avenue of the Americas
New York, NY 10020
Telephone: 212.906.1200
Fax: 212.751.4864
Email: christopher.harris@lw.com
      elizabeth.morris@lw.com

Gary Feinerman (*pro hac vice*)
Jack McNeily (*pro hac vice*)
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone: 312.876.7700
Fax: 312.993.9767
Email: gary.feinerman@lw.com
      jack.mcneily@lw.com

*Attorneys for Defendants Jump Trading, LLC, Jump Crypto Holdings LLC, Jump Financial, LLC, J Digital 6 Cayman Ltd., Jump Operations, LLC, Jump Capital LLC, JCDP-7 Digital Ltd., and Tai Mo Shan Limited*

39